**IMPORTANT: THIS PLAN OF REORGANIZATION IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THE SOLICITATION MATERIALS ACCOMPANYING THIS PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). THE DEBTORS WILL FILE THIS PLAN WITH THE BANKRUPTCY COURT FOLLOWING SOLICITATION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES AND WILL SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, INC., *et al.*,[1] | Case No. 18-_____ (___) |
| Debtors. | Joint Administration Requested |

**PROPOSED JOINT PREPACKAGED PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Jaime Luton Chapman (No. 4936)
Tara Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice* pending)
Nick S. Kaluk III (*pro hac vice* pending)
Daniel E. Stroik (*pro hac vice* pending)
919 Third Avenue
New York, New York 10022
Tel:     (212) 909-6000
Fax:     (212) 909-6836

-and-

Craig A. Bruens (*pro hac vice* pending)
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel:     (202) 383-8000
Fax:     (202) 383-8118

*Proposed Attorneys for Debtors and Debtors in Possession*

*Proposed Attorneys for Debtors and Debtors in Possession*

Dated:   November 18, 2018
             Wilmington, Delaware

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096).  The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

# TABLE OF CONTENTS

**ARTICLE I       DEFINITIONS, INTERPRETATION AND CONSENTS.** ........................................ 1

**ARTICLE II       ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS.** ..................... 15

2.1      Administrative Expense Claims. ............................................................................. 15

2.2      Professional Fee Claims. ........................................................................................ 15

2.3      Fees and Expenses of Unsecured Notes Indenture Trustee. ................................... 16

2.4      Priority Tax Claims. ............................................................................................... 16

2.5      DIP ABL Facility Claims. ...................................................................................... 16

2.6      DIP Term Loan Facility Claims. ............................................................................ 16

**ARTICLE III       CLASSIFICATION OF CLAIMS AND INTERESTS.** ................................... 17

3.1      Classification in General. ....................................................................................... 17

3.2      Consolidation of Debtor Class Descriptions for Convenience Only ....................... 17

3.3      Summary of Classification. .................................................................................... 17

3.4      Special Provision Governing Unimpaired Claims. ................................................. 18

3.5      Elimination of Vacant Classes. .............................................................................. 18

3.6      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ........... 18

3.7      Voting Classes; Presumed Acceptance by Non-Voting Classes. ............................ 18

**ARTICLE IV       TREATMENT OF CLAIMS AND INTERESTS.** .......................................... 18

4.1      Priority Non-Tax Claims (Class 1). ....................................................................... 18

4.2      Other Secured Claims (Class 2). ............................................................................ 19

4.3      Prepetition ABL Claims (Class 3). ......................................................................... 19

4.4      Prepetition Term Loan Claims (Class 4). ............................................................... 20

4.5      Unsecured Notes Claims (Class 5). ........................................................................ 20

4.6      General Unsecured Claims (Class 6). ..................................................................... 21

4.7      Intercompany Claims (Class 7). ............................................................................. 21

4.8      Intercompany Interests (Class 8). ........................................................................... 21

4.9      Parent Interests (Class 9). ...................................................................................... 22

**ARTICLE V       MEANS FOR IMPLEMENTATION.** ........................................................... 22

5.1      Compromise of Controversies. ............................................................................... 22

5.2      Sources of Cash for Plan Distribution. ................................................................... 22

5.3      Restructuring Expenses. ......................................................................................... 23

5.4      Continued Corporate Existence; Corporate Action. ............................................... 23

5.5      Exit Facilities. ....................................................................................................... 24

5.6      Authorization and Issuance of New Common Stock and the Warrants. .................. 24

| | | |
|---|---|---|
| 5.7 | Exemption from Registration. | 25 |
| 5.8 | Cancellation of Existing Securities and Agreements. | 26 |
| 5.9 | Officers and Boards of Directors. | 26 |
| 5.10 | Restructuring Transactions. | 27 |
| 5.11 | Cancellation of Liens. | 28 |
| 5.12 | Employee Matters. | 28 |
| 5.13 | Release of Avoidance Actions. | 29 |
| 5.14 | Closing of Chapter 11 Cases. | 29 |
| 5.15 | Notice of Effective Date. | 29 |
| **ARTICLE VI** | **DISTRIBUTIONS.** | **29** |
| 6.1 | Distributions Generally. | 29 |
| 6.2 | Distribution Record Date. | 29 |
| 6.3 | Date of Distributions. | 30 |
| 6.4 | Disbursing Agent. | 30 |
| 6.5 | Rights and Powers of Disbursing Agent. | 30 |
| 6.6 | Expenses of Disbursing Agent. | 31 |
| 6.7 | Postpetition Interest. | 31 |
| 6.8 | Delivery of Distributions. | 31 |
| 6.9 | Distributions after Effective Date. | 31 |
| 6.10 | Unclaimed Property. | 31 |
| 6.11 | Time Bar to Cash Payments. | 32 |
| 6.12 | Manner of Payment under Plan. | 32 |
| 6.13 | Satisfaction of Claims. | 32 |
| 6.14 | Fractional Stock and Warrant. | 32 |
| 6.15 | Minimum Cash Distributions. | 32 |
| 6.16 | Maximum Distributions and Rights of Reimbursement. | 32 |
| 6.17 | Setoffs. | 33 |
| 6.18 | No Distribution in Excess of Amount of Allowed Claim. | 33 |
| 6.19 | Withholding and Reporting Requirements. | 33 |
| 6.20 | Hart-Scott-Rodino Antitrust Improvements Act. | 34 |
| 6.21 | Claims Paid or Payable by Third Parties. | 34 |
| 6.22 | Allocation Between Principal and Accrued Interest. | 35 |
| **ARTICLE VII** | **PROCEDURES FOR DISPUTED CLAIMS.** | **35** |
| 7.1 | Disputed Claims Process. | 35 |
| 7.2 | Objections to Claims. | 35 |

ii

| | | |
|---|---|---|
| 7.3 | Estimation of Claims. | 36 |
| 7.4 | No Distributions Pending Allowance. | 36 |
| 7.5 | Distributions after Allowance. | 36 |
| 7.6 | Claim Resolution Procedures Cumulative. | 36 |
| 7.7 | Disallowance of Claims. | 36 |
| **ARTICLE VIII** | **EXECUTORY CONTRACTS AND UNEXPIRED LEASES.** | **37** |
| 8.1 | General Treatment. | 37 |
| 8.2 | Determination of Assumption Disputes and Deemed Consent. | 37 |
| 8.3 | Payment of Cure Amounts. | 38 |
| 8.4 | Survival of the Debtors' Indemnification Obligations and Guarantees. | 39 |
| 8.5 | Insurance Policies. | 39 |
| 8.6 | Intellectual Property Licenses and Agreements. | 39 |
| 8.7 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 40 |
| 8.8 | Reservation of Rights. | 40 |
| **ARTICLE IX** | **CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE** | **40** |
| 9.1 | Conditions Precedent to Confirmation of Plan. | 40 |
| 9.2 | Conditions Precedent to Effective Date. | 41 |
| 9.3 | Waiver of Conditions Precedent. | 42 |
| 9.4 | Effect of Failure of a Condition. | 42 |
| **ARTICLE X** | **EFFECT OF CONFIRMATION OF PLAN.** | **43** |
| 10.1 | Vesting of Assets. | 43 |
| 10.2 | Binding Effect. | 43 |
| 10.3 | Discharge of Claims and Termination of Interests. | 43 |
| 10.4 | Term of Injunctions or Stays. | 43 |
| 10.5 | Injunction. | 44 |
| 10.6 | Releases. | 44 |
| 10.7 | Exculpation. | 46 |
| 10.8 | Retention of Causes of Action/Reservation of Rights. | 47 |
| 10.9 | Solicitation of Plan. | 47 |
| 10.10 | Reimbursement or Contribution. | 48 |
| 10.11 | Recoupment. | 48 |
| 10.12 | Subordination Rights. | 48 |
| **ARTICLE XI** | **RETENTION OF JURISDICTION.** | **48** |
| 11.1 | Retention of Jurisdiction. | 48 |

| 11.2 | Courts of Competent Jurisdiction. | 50 |
|---|---|---|
| **ARTICLE XII** | **MISCELLANEOUS PROVISIONS.** | **50** |
| 12.1 | Payment of Statutory Fees. | 50 |
| 12.2 | Substantial Consummation of the Plan. | 50 |
| 12.3 | Expedited Determination of Taxes. | 51 |
| 12.4 | Exemption from Certain Transfer Taxes. | 51 |
| 12.5 | Amendments. | 51 |
| 12.6 | Effectuating Documents and Further Transactions. | 52 |
| 12.7 | Revocation or Withdrawal of Plan. | 52 |
| 12.8 | Severability of Plan Provisions. | 52 |
| 12.9 | Governing Law. | 53 |
| 12.10 | Time. | 53 |
| 12.11 | Dates of Actions to Implement the Plan. | 53 |
| 12.12 | Immediate Binding Effect. | 53 |
| 12.13 | Deemed Acts. | 53 |
| 12.14 | Successors and Assigns. | 53 |
| 12.15 | Entire Agreement. | 53 |
| 12.16 | Exhibits to Plan. | 54 |
| 12.17 | Reservation of Rights. | 54 |
| 12.18 | Plan Supplement. | 54 |
| 12.19 | Waiver or Estoppel. | 54 |
| 12.20 | Notices. | 54 |

Exhibit A        Restructuring Support Agreement

1004795077v10

David's Bridal, Inc., DB Investors, Inc., DB Holdco, Inc., and DB Midco, Inc. (each, a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint chapter 11 prepackaged plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code.

## ARTICLE I    DEFINITIONS, INTERPRETATION AND CONSENTS.

**A.    Definitions.** The following terms shall have the respective meanings specified below:

1.1    **Administrative Expense Claim** means any Claim for costs or expenses of administration of any of the Chapter 11 Cases incurred after the Petition Date and through the Effective Date under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code that have not already been paid by the Debtors, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including for the acquisition or lease of property or an interest in property or the performance of services, (d) the DIP ABL Facility Claims and the DIP Term Loan Facility Claims, (e) any compensation and reimbursement of expenses to the extent allowed under sections 330 or 503 of the Bankruptcy Code and (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

1.2    **Affiliates** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3    **Allowed** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection or dispute has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or the Reorganized Debtors, (c) as to which the liability of the Debtors or the Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; *provided*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.4    **Amended Organizational Documents** means the forms of certificates of incorporation, certificates of formation, limited liability company agreements, or other forms of organizational documents and bylaws for the Reorganized Debtors, subject to the RSA Definitive Document Requirements. To the extent the Amended Organizational Documents of Reorganized DB Parent reflect material changes to the existing forms of organizational documents and bylaws for DB Parent, draft forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.5    **Assumption Dispute** means an objection or dispute relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including to any Cure Amount or adequate assurance of future performance under an executory contract or unexpired lease to be assumed, which objection or dispute has been timely filed or interposed in accordance with the Plan and applicable law and has not been withdrawn or determined by a Final Order.

1.6    **Avoidance Action** means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547, 553 and 724(a) of the Bankruptcy

Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.7     **Backstop Parties** means the parties providing the Priority Exit Facility Backstop Commitment.

1.8     **Backstop Payment** means a Cash payment equal to 3.00% of the amount of the Priority Exit Facility Loans payable to the Backstop Parties as consideration for providing the Priority Exit Facility Backstop Commitment.

1.9     **Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. § 101, et seq., as now in effect or hereafter amended from time to time, as applicable to the Chapter 11 Cases.

1.10     **Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court having subject matter jurisdiction over the Chapter 11 Cases under section 157 of title 28 of the United States Code.

1.11     **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.12     **Benefit Plans** means (a) each "employee benefit plan," as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and (b) any other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of its current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests, or consideration based on the value of Interests, in the Debtors, which shall be assumed by the Debtors on the Effective Date.

1.13     **Business Day** means any day other than a Saturday, a Sunday, "legal holiday" as such term is defined in Bankruptcy Rule 9006(a) or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14     **Cash** means legal tender of the United States of America.

1.15     **Causes of Action** means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, claims, Avoidance Actions, counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, or assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date. Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtors or their Estates, Causes of Action shall include (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for

breaches of duties imposed by law or equity, (b) claims (including Avoidance Actions) pursuant to section 362, and chapter 5 of the Bankruptcy Code including sections 510, 542, 543, 544 through 550, or 553, and (c) claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

1.16 **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and styled *In re David's Bridal, Inc., et al.*, Ch. 11 Case No. [18-_____ (___)] (Jointly Administered).

1.17 **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.18 **Class** means any group of Claims or Interests classified herein pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.19 **Collateral** means any asset of the Estates that is subject to a Lien securing the payment or performance of a Claim, which Lien is valid, perfected and enforceable, and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

1.20 **Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order within the meaning of the Bankruptcy Rules 5003 and 9021.

1.21 **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court to consider approval of the Disclosure Statement and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.22 **Confirmation Order** means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be subject to the RSA Definitive Document Requirements.

1.23 **Creditor** has the meaning set forth in section 101(10) of the Bankruptcy Code.

1.24 **Crossover Holder** has the meaning ascribed to it in the Restructuring Support Agreement.

1.25 **Cure Amount** means the amount of Cash or other property the Debtors must distribute (as the parties may agree or the Bankruptcy Court may order), as necessary, to (a) cure a monetary default as required by section 365(b)(1) of the Bankruptcy Code by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (b) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.26 **DB Parent** means DB Investors, Inc.

1.27 **Debtor or Debtors** has the meaning set forth in the introductory paragraph of the Plan.

1.28 **Debtors in Possession** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.29 **Definitive Documents** means the documents (including any related orders, pleadings, agreements, supplements, instruments, schedules, or exhibits) that are described in or contemplated by the Restructuring Support Agreement or the Plan and that are otherwise reasonably necessary or advisable to

implement the Restructuring and the Plan, including, but not limited to: (i) the Plan; (ii) the Plan Supplement; (iii) the Disclosure Statement; (iv) any motion seeking the approval of the adequacy of the Disclosure Statement, the solicitation of the Plan, and/or confirming the Plan; (v) the Confirmation Order; (vi) the materials related to the solicitation of the Plan; (vii) the DIP Motion; (viii) the DIP Orders; (ix) the Exit Facility Documents; (x) Amended Organizational Documents; (xii) the New Stockholders' Agreement; and (xiii) the Warrant Agreement; *provided* that all Definitive Documents (including any amendment or modification thereof) shall be subject to the RSA Definitive Document Requirements.

1.30 **DIP ABL Agreement** means that certain Senior Secured, Super Priority Debtor-in-Possession Credit Agreement, dated as of November [20], 2018, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the DIP ABL Facility Lenders and the DIP ABL Facility Agent, and all exhibits, amendments, and supplements thereto, which shall be subject to the RSA Definitive Document Requirements.

1.31 **DIP ABL Facility Agent** means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the DIP ABL Agreement, and its successors and permitted assigns.

1.32 **DIP ABL Facility Claims** means all Claims arising under or related to the DIP ABL Facility Documents.

1.33 **DIP ABL Facility Documents** means the DIP ABL Agreement and all other Loan Documents (as defined in the DIP ABL Agreement), in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date and subject to the RSA Definitive Document Requirements.

1.34 **DIP ABL Facility Lenders** means the lenders party to the DIP ABL Agreement, including any Swingline Lender and any Issuing Lender (each as defined in the DIP ABL Agreement).

1.35 **DIP ABL Secured Parties** means the DIP ABL Facility Agent, the DIP ABL Facility Lenders and any other party to whom Obligations (as defined in the DIP ABL Agreement) may be owed.

1.36 **DIP Motion** means the motion by the Debtors seeking authority to enter into the DIP ABL Agreement and the DIP Term Loan Agreement and to use "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code.

1.37 **DIP Orders** means orders of the Bankruptcy Court authorizing the Debtors to enter into the DIP ABL Agreement and the DIP Term Loan Agreement and to continue to access cash collateral on an interim basis or final basis (as applicable), each of which shall be in form and substance acceptable to the DIP ABL Facility Agent, the DIP Term Loan Facility Agent, the Prepetition ABL Agent and the Prepetition Term Loan Agent and otherwise subject to the RSA Definitive Document Requirements.

1.38 **DIP Term Loan Agreement** means that certain Senior Secured Super Priority Term Loan Debtor-in-Possession Credit Agreement, dated as of November [20], 2018, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the DIP Term Loan Facility Lenders and the DIP Term Loan Facility Agent, and all exhibits, amendments, and supplements thereto, each of which shall be subject to the RSA Definitive Document Requirements.

1.39 **DIP Term Loan Facility Agent** means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the DIP Term Loan Agreement, and its successors and permitted assigns.

1004795077v10

1.40     **DIP Term Loan Facility Claims** means all Claims arising under or related to the DIP Term Loan Facility Documents.

1.41     **DIP Term Loan Facility Documents** means the DIP Term Loan Agreement and all other Loan Documents (as defined in the DIP Term Loan Agreement), in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date and subject to the RSA Definitive Document Requirements.

1.42     **DIP Term Loan Facility Lenders** means the lenders party to the DIP Term Loan Agreement.

1.43     **DIP Term Loan Secured Parties** means the DIP Term Loan Facility Agent, the DIP Term Loan Facility Lenders and any other party to whom Obligations (as defined in the DIP Term Loan Agreement) may be owed.

1.44     **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest (a) has been determined by a Final Order or specified in a provision of the Plan not to be Allowed, or (b) has been agreed to by the holder of such Claim or Interest and the applicable Debtor to be equal to $0 or to be expunged.

1.45     **Disbursing Agent** means any Entity (including the Debtor or Reorganized Debtor, as applicable, that acts in such a capacity) in its capacity as a disbursing agent under Article VI of the Plan.

1.46     **Disclosure Statement** means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, including all exhibits and schedules thereto filed by the Debtors with the Bankruptcy Court, as thereafter amended, supplemented, or modified in accordance with applicable law, which shall be subject to the RSA Definitive Document Requirements.

1.47     **Disputed** means, with respect to a Claim or Interest, that (a) such Claim or Interest is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code or (b) the Debtors or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors do not dispute, and Disputed as to the balance of such Claim.

1.48     **Distribution** means any initial or subsequent payment or transfer under the Plan.

1.49     **Distribution Record Date** means, except as otherwise provided in the Plan or designated by the Bankruptcy Court, the Effective Date.

1.50     **DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

1.51     **Effective Date** means the date following entry of the Confirmation Order on which all conditions to the effectiveness of the Plan set forth in Article IX of the Plan have been satisfied or waived in accordance with the terms of the Plan and the Plan becomes effective.

1.52     **Employee Arrangements** has the meaning set forth in section 5.12(a) of the Plan.

1.53     **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.54     **Estates** means the estates of the Debtors created under section 541 of the Bankruptcy Code.

1.55     **Exchange Act** means the Securities Exchange Act of 1934, as amended.

1.56     **Exculpated Parties** means each of the following solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each of the Restructuring Support Parties; and (d) with respect to each of (a) and (b), to the extent employed in such capacities on or after the Petition Date, each of their respective directors, officers, partners, managers, trustees, assigns, employees, agents, advisory board members, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

1.57     **Exit ABL Facility** means that certain senior secured asset-based revolving credit facility to be provided to the Reorganized Debtors on the Effective Date on the terms and conditions set forth in the Exit ABL Facility Credit Agreement with commitments in the original principal amount of one hundred and twenty five million  dollars ($125 million).

1.58     **Exit ABL Facility Agent** means Bank of America, N.A. or such other agent as is chosen by the lender parties to the Exit ABL Facility Credit Agreement, as the administrative and collateral agent under the Exit ABL Facility Credit Agreement, solely in its capacity as such.

1.59     **Exit ABL Facility Credit Agreement** means that certain senior secured revolving credit agreement, dated as of the Effective Date (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), and containing terms substantially consistent with the Restructuring Term Sheet, which shall be subject to the RSA Definitive Document Requirements.

1.60     **Exit Facility** means, collectively, the Exit ABL Facility, the Priority Exit Facility and the Takeback Term Loan.

1.61     **Exit Facility Documents** means, collectively, the Priority Exit Facility Credit Agreement, the Exit ABL Facility Credit Agreement and the Takeback Term Loan and each other agreement, security agreement, pledge agreement, collateral assignment, notice, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, amended and restated, supplemented or replaced from time to time and which shall be in form and substance substantially consistent with the Restructuring Term Sheet and subject to the RSA Definitive Document Requirements.

1.62     **Exit Facility Lenders** means each lender party to the Priority Exit Facility Credit Agreement or the Exit ABL Facility Credit Agreement and any other Person that shall become a lender under the Exit Facility from time to time in accordance with the Priority Exit Facility Credit Agreement and the Exit ABL Facility Credit Agreement, as applicable.

1.63     **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial,

reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.64    **Fully Diluted Shares** means a number of shares of New Common Stock equal to (a) the aggregate number of shares of New Common Stock that shall be outstanding as of the Effective Date, plus (b) the aggregate number of shares of New Common Stock or other instruments authorized for issuance under the Management Incentive Plan as of the Effective Date, plus (c) the aggregate number of shares of New Common Stock issuable upon exercise of the Warrants.

1.65    **General Unsecured Claim** means any Claim against the Debtors as of the Petition Date that is neither secured by a Lien on Collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court (other than an Unsecured Notes Claim or an Intercompany Claim).

1.66    **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.67    **Guarantee Claim** means a Claim on account of a guarantee, promise, pledge, indemnity or similar agreement to satisfy or that relates to a Primary Claim or liability of another Debtor.

1.68    **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.69    **Intercompany Claim** means any Claim against a Debtor held by another Debtor.

1.70    **Intercompany Interest** means an Interest in a Debtor held by another Debtor.

1.71    **Interest** means any equity interest in a Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares of stock, preferred stock, membership interests, other instruments evidencing an ownership interest, or equity security in any of the Debtors, whether or not transferable, and any option, warrant, right to purchase or acquire any such interests at any time, or any other interest that is exercisable, convertible or exchangeable into equity of a Debtor, contractual or otherwise, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.72    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.73    **Management Incentive Plan** means the management incentive plan that will provide for stock-based compensation awards, on terms to be determined by the board of directors of the Reorganized Debtors, of up to 10.0% of the Fully Diluted Shares.

1.74    **MIP Equity** means the Fully Diluted Shares that may be issued pursuant to the Management Incentive Plan, to the extent provided for thereunder.

1.75    **New Board** means the initial board of directors of Reorganized DB Parent to be selected in accordance with Section 5.9 of the Plan.

1.76    **New Common Stock** means the shares of common stock, par value $.001 per share, of Reorganized DB Parent authorized pursuant to its certificate of incorporation, as included in the Plan Supplement.

1.77    **New Stockholders' Agreement** means that certain shareholders' agreement, in substantially the form to be filed as part of the Plan Supplement, effective as of the Effective Date, to which all parties receiving New Common Stock (and all persons to whom such parties may sell or transfer their New Common Stock in the future and all persons who purchase or acquire the New Common Stock in future transactions) shall be required to become or shall be deemed parties, which shall be subject to the RSA Definitive Document Requirements.

1.78    **Other Secured Claim** means a Claim, other than an ABL Facility Claim or Prepetition Term Loan Claim, that is (a) secured by a Lien on Collateral, which lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, to the extent of the value of such Collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors (with the consent of the DIP ABL Facility Agent, the Required DIP Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.79    **Parent Interests** means any Interest in DB Parent.

1.80    **Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

1.81    **Petition Date** means, with respect to each Debtor, the date on which such Debtor commenced its Chapter 11 Case.

1.82    **Plan** means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

1.83    **Plan Supplement** means the forms of certain documents, schedules, and exhibits effectuating the transactions contemplated in the Plan, which are to be filed with the Clerk of the Bankruptcy Court not later than ten (10) calendar days prior to the deadline to object to the Plan, including, but not limited to, (a) the Exit ABL Facility Credit Agreement, (b) the Priority Exit Facility Credit Agreement, (c) the Takeback Term Loan Credit Agreement, (d) the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), (e) the New Stockholders' Agreement, (f) a term sheet containing the key terms of the Management Incentive Plan, (g) the Warrant Agreement, (h) a list of retained Causes of Action and (i) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, which, in each case, shall be subject to the RSA Definitive Document Requirements; *provided* that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement.

1.84    **Prepetition ABL Agent** means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the Prepetition ABL Agreement, and its successors and permitted assigns.

1.85    **Prepetition ABL Agreement** means that certain Credit Agreement, dated as of October 11, 2012, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the Prepetition ABL Lenders and the Prepetition ABL Agent, and all exhibits, amendments, and supplements thereto.

1.86    **Prepetition ABL Claims** means all Claims arising under or related to the Prepetition ABL Documents.

1.87    **Prepetition ABL Documents** means the Prepetition ABL Agreement and all other Loan Documents (as defined in the Prepetition ABL Agreement) , in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date.

1.88    **Prepetition ABL Lenders** means the lenders party to the Prepetition ABL Agreement, including any Swingline Lender and any Issuing Lender (each as defined in the Prepetition ABL Agreement).

1.89    **Prepetition ABL Secured Parties** means the Prepetition ABL Agent, the Prepetition ABL Lenders and any other party to whom Obligations (as defined in the Prepetition ABL Agreement) may be owed.

1.90    **Prepetition Term Lenders** means the lenders party to the Prepetition Term Loan Agreement from time to time.

1.91    **Prepetition Term Loan Agent** means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Agreement, and its successors and permitted assigns.

1.92    **Prepetition Term Loan Agreement** means that certain Credit Agreement, dated as of October 11, 2012, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the Prepetition Term Lenders and the Prepetition Term Loan Agent, and all exhibits, amendments, and supplements thereto.

1.93    **Prepetition Term Loan Claims** means all Claims arising under or related to the Prepetition Term Loan Documents.

1.94    **Prepetition Term Loan Documents** means the Prepetition Term Loan Agreement and all other Loan Documents (as defined in the Prepetition Term Loan Agreement) , in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date.

1.95    **Prepetition Term Loan Secured Parties** means the Prepetition Term Loan Agent, the Prepetition Term Lenders and any other party to whom Obligations (as defined in the Prepetition Term Loan Agreement) may be owed.

1.96    **Primary Claim** means a Claim against a Debtor with respect to which a Guarantee Claim has been asserted against that or another Debtor.

1.97    **Priority Exit Facility** means that certain senior secured term loan facility to be provided to the Reorganized Debtors on the Effective Date on the terms and conditions set forth in the Priority Exit Facility Credit Agreement.

9

1.98    **Priority Exit Facility Agent** means the Person selected by the Required Supporting Term Lenders in consultation with the Crossover Holder to serve as administrative and collateral agent under the Priority Exit Facility Credit Agreement, solely in its capacity as such.

1.99    **Priority Exit Facility Backstop Commitment** means the Backstop Parties' commitment to backstop the syndication of the Priority Exit Facility in accordance with the Restructuring Term Sheet.

1.100   **Priority Exit Facility Credit Agreement** means that certain senior secured credit agreement, dated as of the Effective Date (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), and containing terms substantially consistent with the Restructuring Term Sheet and otherwise subject to the RSA Definitive Document Requirements.

1.101   **Priority Exit Facility Documents** means the Priority Exit Facility Credit Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, notice, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, amended and restated, supplemented or replaced from time to time and which shall be in form and substance substantially consistent with the Restructuring Term Sheet and subject to the RSA Definitive Document Requirements.

1.102   **Priority Exit Facility Loans** means the loans made by the lenders under the Priority Exit Facility Credit Agreement and in accordance with the terms thereof.

1.103   **Priority Non-Tax Claim** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.104   **Priority Tax Claim** means any secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.105   **Professional Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained under sections 327, 328, 330 or 1103 of the Bankruptcy Code in these Chapter 11 Cases by an order of the Bankruptcy Court, in each case to the extent such fees and expenses have not been paid or are not disallowed pursuant to an order of the Bankruptcy Court.

1.106   **Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.107   **Reinstate, Reinstated, or Reinstatement** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest in accordance with section 1124 of the Bankruptcy Code, or (b) if applicable under section 1124 of the Bankruptcy Code: (i) curing all prepetition and postpetition defaults other than defaults relating to the insolvency or financial condition of the applicable Debtor or its status as a debtor under the Bankruptcy Code; (ii) reinstating the maturity date of the Claim; (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a contractual provision or such applicable law

allowing the Claim's acceleration; and (iv) not otherwise altering the legal, equitable or contractual rights to which the Claim entitles the holder thereof.

1.108 **Related Parties** means with respect to any Released Party, such entities' predecessors, successors and assigns (whether by operation of law or otherwise) subsidiaries, current and former affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders (and any fund managers, fiduciaries or other agents of shareholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such entities' respective heirs, executors, estates, servants and nominees; *provided* that any Person or Entity who has asserted or subsequently asserts a Claim against a Released Party shall not be a Related Party with respect to any release provided by such Released Party hereunder.

1.109 **Released Parties** means each of, and solely in its capacity as such, (a) the Debtors or the Reorganized Debtors, (b) the DIP ABL Facility Agent, (c) the DIP ABL Secured Parties, (d) the DIP Term Loan Facility Agent, (e) the DIP Term Loan Secured Parties, (f) the Supporting Term Lenders, (g) the Crossover Holder, (h) the Supporting Noteholders, (i) the Supporting Sponsors, (j) the Unsecured Notes Indenture Trustee, (k) the Exit ABL Facility Agent, (l) the Priority Exit Facility Agent, (m) the Exit Facility Lenders, (n) the Takeback Term Loan Agent, (o) the Prepetition ABL Secured Parties, (p) the Prepetition Term Loan Secured Parties and (q) the Related Parties for each of the foregoing; *provided that*, Released Parties shall exclude any of the foregoing parties that do not (or are not deemed to) provide the releases under the Plan.

1.110 **Releasing Parties** means each of, and solely in its capacity as such, (a) the Debtors or the Reorganized Debtors, (b) the DIP ABL Facility Agent, (c) the DIP ABL Secured Parties, (d) the DIP Term Loan Facility Agent, (e) the DIP Term Loan Secured Parties, (f) the Supporting Term Lenders, (g) the Crossover Holder, (h) the Supporting Noteholders, (i) the Supporting Sponsors, (j) the Unsecured Notes Indenture Trustee, (k) the Exit ABL Facility Agent, (l) the Priority Exit Facility Agent, (m) the Exit Facility Lenders, (n) the Takeback Term Loan Agent, (o) the Prepetition ABL Secured Parties, (p) the Prepetition Term Loan Secured Parties and (q) all Holders of Claims or Interests (i) who vote to accept the Plan, (ii) who are Unimpaired under the Plan and do not timely object to the releases provided herein, (iii) whose vote to accept or reject the Plan is solicited but do not vote either to accept or to reject the Plan and do not opt out of granting the releases herein, or (iv) who vote to reject the Plan but do not opt out of granting the releases herein.

1.111 **Reorganized Debtors** means each of the Debtors, as reorganized on the Effective Date in accordance with the Plan, including any newly-formed Entity that is a transferee or successor thereto by merger, consolidation, transfer or otherwise pursuant to the Restructuring Transactions.

1.112 **Reorganized DB Parent** means the Entity that will be, as of the Effective Date, the ultimate parent company of the other Reorganized Debtors and that, in accordance with the Plan (including the Restructuring Transactions), will be the issuer of the New Common Stock and the Warrants.

1.113 **Required DIP Term Lenders** has the meaning ascribed to "Required Lenders" under the DIP Term Loan Agreement.

1.114 **Required Supporting Term Lenders** has the meaning ascribed to it in the Restructuring Support Agreement.

1004795077v10

1.115    **Restructuring** has the meaning ascribed to it in the Restructuring Support Agreement.

1.116    **Restructuring Expenses** means all reasonable and documented fees and expenses of the Supporting Party Professionals incurred in their respective representation of the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders or the Supporting Sponsors, as applicable, relating to the Restructuring.

1.117    **Restructuring Support Agreement** means that certain Restructuring Support Agreement, dated as of November 18, 2018, by and among the Debtors and the parties thereto, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, a copy of which, without individual holdings shown on the signature pages, is attached to the Plan as **Exhibit A**.

1.118    **Restructuring Support Parties** means, collectively, the Supporting Term Lenders, the Supporting Noteholders, the Crossover Holder and the Supporting Sponsors, in each case, that are or from time to time become parties to the Restructuring Support Agreement.

1.119    **Restructuring Term Sheet** means that certain term sheet attached to the Restructuring Support Agreement as Exhibit A.

1.120    **Restructuring Transactions** has the meaning set forth in Article V of the Plan.

1.121    **RSA Definitive Document Requirements** means that the Definitive Documents shall be subject to the respective consent rights of the Debtors and the applicable Restructuring Support Parties as set forth in the Restructuring Support Agreement.

1.122    **Security** has the meaning set forth in in section 101(49) of the Bankruptcy Code.

1.123    **Solicitation Parties** means each of the following in its capacity as a solicitation agent: (a) the Debtors; (b) the Unsecured Notes Indenture Trustee; and (c) the professionals of each of the foregoing.

1.124    **Supplemental Securities** means 15.0% of the New Common Stock to be issued and distributed on the Effective Date to the initial lenders under the Priority Exit Facility.

1.125    **Supporting Noteholder** has the meaning ascribed to it in the Restructuring Support Agreement.

1.126    **Supporting Party Professionals** means (i) Jones Day as counsel to the Supporting Term Lenders; (ii) Pachulski Stang Ziehl & Jones as co-counsel to the Supporting Term Lenders; (iii) Greenhill & Co., LLC as financial advisor and investment banker to the Supporting Term Lenders; (iv) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Crossover Holder; (v) Cozen O'Connor P.C. as co-counsel to the Crossover Holder; (vi) Moelis & Company LLC as financial advisor and investment banker to the Crossover Holder; (vii) Fried, Frank, Harris, Shriver & Jacobson LLP as counsel to a Supporting Noteholder, (viii) Morris Nichols Arsht & Tunnell LLP as Delaware counsel to a Supporting Noteholder, (ix) FTI Consulting as counsel to a Supporting Noteholder, and (x) Cole Schotz P.C. as counsel to a Supporting Sponsor.

1.127    **Supporting Sponsor** has the meaning ascribed to it in the Restructuring Support Agreement.

1.128    **Supporting Term Lender** has the meaning ascribed to it in the Restructuring Support Agreement.

1.129    **Takeback Term Loan** means the debt to be issued by the Reorganized Debtors under the Plan to the Prepetition Term Lenders on the terms and conditions set forth in the Takeback Term Loan Credit Agreement, in the original principal amount equal to three hundred million Dollars ($300,000,000), less the commitment amount of the Priority Exit Facility.

1.130    **Takeback Term Loan Agent** means the Person selected by the Required Supporting Term Lenders in consultation with the Crossover Holder to serve as the administrative and collateral agent under the Takeback Term Loan Credit Agreement, solely in its capacity as such.

1.131    **Takeback Term Loan Credit Agreement** means that certain second-priority secured credit agreement, dated as of the Effective Date (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), and containing terms substantially consistent with the Restructuring Term Sheet and otherwise subject to the RSA Definitive Document Requirements.

1.132    **Term Loan Stock Allocation** means 76.25% of the New Common Stock (subject to dilution by the MIP Equity and any Warrant Equity).

1.133    **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.134    **Unsecured Noteholder** means a holder of Unsecured Notes and its successors and permitted assigns.

1.135    **Unsecured Notes** means the outstanding 7.75% notes due 2020, issued pursuant to the Unsecured Notes Indenture in the aggregate principal amount of $270,000,000 Dollars.

1.136    **Unsecured Notes Claim** means, collectively, all Claims arising under the Unsecured Notes and the Unsecured Notes Indenture, including any Guarantee Claims arising on account of the Unsecured Notes and the Unsecured Notes Indenture, other than Restructuring Expenses.

1.137    **Unsecured Notes Indenture** means that certain Indenture, dated as of October 11, 2012, by and among David's Bridal, Inc., as issuer, the guarantors named therein, and the Unsecured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

1.138    **Unsecured Notes Indenture Trustee** means Wilmington Trust, National Association, in its capacity as trustee under the Unsecured Notes Indenture and its successors and assigns.

1.139    **Unsecured Notes Stock Allocation** means 8.75% of the New Common Stock (subject to dilution by the MIP Equity and any Warrant Equity).

1.140    **U.S. Trustee** means the United States Trustee for the District of Delaware.

1.141    **Voting Agent** means Donlin, Recano & Company, Inc., the Debtors' voting agent.

1.142    **Voting Deadline** means the date by which all Persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.

1.143    **Warrants** means the five (5) year warrants issued in accordance with the Plan, entitling holders thereof, upon exercise thereof, to receive 20% of the New Common Stock, subject to dilution by the MIP Equity and subject to the terms of the Amended Organizational Documents and the New Stockholders' Agreement, on terms and conditions otherwise consistent with the Restructuring Term Sheet and subject to the RSA Definitive Document Requirements.

1.144    **Warrant Agreement** means the Definitive Document governing the Warrants, which shall be subject to the RSA Definitive Document Requirements and filed as part of the Plan Supplement (as further amended, modified or supplemented in accordance with its terms).

1.145    **Warrant Equity** means the New Common Stock issued upon the exercise of the Warrants.

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.    Reference to Monetary Figures.

All references in the Plan to monetary figures shall refer to Cash, unless otherwise expressly provided.

### D.    Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control. In the event of an inconsistency between the Plan and any Definitive Documents or other documents, schedules or exhibits contained in the Plan Supplement, subject to the RSA Definitive Document Requirements, such Definitive Document or other document, schedule or exhibit shall control. In the event of an inconsistency between the Plan or any Definitive Documents or other documents, schedules or exhibits contained in the Plan Supplement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control.

## ARTICLE II   ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS.

2.1     **Administrative Expense Claims.**

Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided* that any Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions; *provided further*, that the Debtors or Reorganized Debtors, as applicable, shall obtain the consent of the Priority Exit Facility Agent (as directed by the requisite lenders under the applicable underlying documentation), which consent shall not be unreasonably withheld, before resolving, settling or otherwise agreeing to the payment of any Administrative Expense Claim representing liabilities incurred outside of the ordinary course of business before such Claim becomes an Allowed Administrative Expense Claim.

2.2     **Professional Fee Claims.**

All Entities seeking an award by the Bankruptcy Court of Professional Fee Claims shall file and serve on counsel for the Reorganized Debtors, the U.S. Trustee, counsel for the Supporting Term Lenders, counsel for the Crossover Holder, counsel for the Supporting Noteholders, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Professional Fee Claims must be filed and served on counsel for the Reorganized Debtors, counsel for the Supporting Term Lenders, counsel for the Crossover Holder, counsel for the Supporting Noteholders, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (a) upon the later of (i) the Effective Date, and (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, in each case, as soon as reasonably practicable, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors or the Reorganized Debtors, as applicable.  On or about the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtors or their Estates as of the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's request for payment of Professional Fee Claims.  The Debtors or the Reorganized Debtors shall either escrow or separately reserve for and segregate such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by order of the Bankruptcy Court or agreement of the parties.

The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3     **Fees and Expenses of Unsecured Notes Indenture Trustee.**

On the Effective Date, the Reorganized Debtors shall pay (without duplication of amounts to be paid, if any, pursuant to Section 4.5 of the Plan) in full in Cash all reasonable and documented prepetition and postpetition fees, expenses, and reimbursements of the Unsecured Notes Indenture Trustee (including the reasonable and documented fees and expenses of one counsel) to the extent provided for under the Unsecured Notes Indenture. Any such fees, expenses, or reimbursements invoiced after the Effective Date shall be paid promptly, but no later than ten (10) Business Days after the Reorganized Debtors receive an invoice. The Unsecured Notes Indenture Trustee shall provide the Debtors, the Supporting Term Lenders, the Crossover Holder and the Supporting Noteholders with an estimate of the Unsecured Notes Indenture Trustee fees and expenses no later than five (5) Business Days prior to the Effective Date.

2.4     **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

2.5     **DIP ABL Facility Claims.**

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to a less favorable treatment of such Claim or has been indefeasibly paid in full in Cash at the default rate before the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL Facility Claim, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall (i) receive Cash in the full amount of its Allowed DIP ABL Facility Claim and (ii) all issued and undrawn Letters of Credit (as defined in the DIP ABL Agreement) shall be replaced or cash collateralized in the amounts specified under the DIP ABL Agreement, from the proceeds of the Exit ABL Facility and the existing commitments under the DIP ABL Agreement shall be terminated, provided that, at the option of such holder, to the extent such holder has issued commitments under the Exit ABL Facility, such holder's Allowed DIP ABL Facility Claim may be converted on a cashless basis to loans deemed outstanding under the Exit ABL Facility as of the Effective Date.

2.6     **DIP Term Loan Facility Claims.**

Except to the extent that a holder of an Allowed DIP Term Loan Facility Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Loan Facility Claim, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed DIP Term Loan Facility Claim shall receive Cash in the full amount of its Allowed DIP Term Loan Facility Claim and such claim shall be deemed

satisfied and discharged in full, provided that, at the option of such holder, to the extent such holder has issued commitments under the Priority Exit Facility, such holder's Allowed DIP Term Loan Facility Claim may be converted on a cashless basis to loans deemed outstanding under the Priority Exit Facility as of the Effective Date.

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1     **Classification in General.**

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code.  A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled.

### 3.2     **Consolidation of Debtor Class Descriptions for Convenience Only.**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### 3.3     **Summary of Classification.**

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Prepetition ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Prepetition Term Loan Claims | Impaired | Yes |
| 5 | Unsecured Notes Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Interests | Impaired | No (Deemed to reject) |

3.4    **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5    **Elimination of Vacant Classes.**

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one (1) holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan (subject to the Restructuring Support Agreement and, for the avoidance of doubt, the RSA Definitive Document Requirements) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.

3.7    **Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

## ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS.

4.1    **Priority Non-Tax Claims (Class 1).**

(a)    <u>Classification</u>: Class 1 consists of Priority Non-Tax Claims.

(b)    <u>Treatment</u>: Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, at the option of the Debtors (subject to the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, (i) each such holder shall receive payment in Cash in an amount equal to the Allowed amount of such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder

shall receive such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)     Voting:  Class 1 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.2     **Other Secured Claims (Class 2).**

(a)     Classification:  Class 2 consists of Other Secured Claims.  To the extent that Other Secured Claims are secured by different Collateral or different interests in the same Collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Distributions under the Plan.

(b)     Treatment:  Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Required Supporting Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive on account of such Allowed Claim (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) Reinstatement of such holder's Allowed Other Secured Claim, or (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired.  In the event that an Other Secured Claim against any of the Debtors is treated under clause (i) of this Section 4.2(b) of the Plan, the Liens securing such Other Secured Claim shall be deemed released immediately upon payment.

(c)     Voting:  Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.3     **Prepetition ABL Claims (Class 3).**

(a)     Classification:  Class 3 consists of Prepetition ABL Claims.

(b)     Allowance:  The Prepetition ABL Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against each of the Debtors in the aggregate face amount of the then outstanding amount under the Prepetition ABL Agreement, plus any unreimbursed amounts thereunder, and any accrued and unpaid interest payable at the default rate specified under the Prepetition ABL Agreement on such unreimbursed amounts through the Effective Date, plus any fees, charges, expenses, reimbursement obligations, indemnification obligations, Unpaid Drawings (as defined in the Prepetition ABL Agreement), increased costs, and other amounts due but unpaid under the Prepetition ABL Agreement. Neither the holders of the Prepetition ABL Claims nor the Prepetition ABL Agent shall be required to file proofs of Claim on account of any Prepetition ABL Claim.

(c)     Treatment:  Except to the extent that a holder of an Allowed Prepetition ABL Claim agrees to a less favorable treatment of such Claim or has been indefeasibly paid in full in Cash at the default rate or "rolled up" or converted into DIP ABL Claims pursuant to the applicable DIP Order before the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in

exchange for, each Allowed Prepetition ABL Claim, on the Effective Date, each holder of an Allowed Prepetition ABL Claim shall (i) receive Cash in the full amount of its Allowed Prepetition ABL Claim and (ii) all issued and undrawn Letters of Credit (as defined in the Prepetition ABL Agreement) shall be replaced or cash collateralized in the amounts specified under the Prepetition ABL Agreement, from the proceeds of the Exit ABL Facility and the existing commitments under the Prepetition ABL Agreement shall be terminated.

(d)     Voting:  Class 3 is Unimpaired, and the holders of Prepetition ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Prepetition ABL Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.4     **Prepetition Term Loan Claims (Class 4).**

(a)     Classification:  Class 4 consists of Prepetition Term Loan Claims.

(b)     Allowance:  The Prepetition Term Loans Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against David's Bridal, Inc. and DB Midco, Inc. in the aggregate principal amount of $481,239,196.00, plus (i) accrued but unpaid interest owed as of the Petition Date and any fees, charges, and other amounts due but unpaid under the Prepetition Term Loan Credit Agreement or any related documents as of the Petition Date and (ii) any other Prepetition Term Loan Claims accrued under any order of the Bankruptcy Court but unpaid as of the Effective Date.  Neither the holders of the Prepetition Term Loan Claims nor the Prepetition Term Loan Agent shall be required to file proofs of Claim on account of any Prepetition Term Loan Claim.

(c)     Treatment:  Except to the extent that a holder of an Allowed Prepetition Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Term Loan Claim, on the Effective Date, each holder of an Allowed Prepetition Term Loan Claim shall receive its Pro Rata Share of (i) the Takeback Term Loan, (ii) the Term Loan Stock Allocation and (iii) the right to participate in the Priority Exit Facility (and receive the Supplemental Securities in accordance therewith).  The holders of Allowed Prepetition Term Loan Claims shall be deemed to have waived, and shall not receive any recovery on account of, any deficiency claim.

(d)     Voting:  Class 4 is Impaired, and the holders of Secured Notes Claims are entitled to vote to accept or reject the Plan.

4.5     **Unsecured Notes Claims (Class 5).**

(a)     Classification:  Class 5 consists of Unsecured Notes Claims.

(b)     Allowance:  The Unsecured Notes Claims are Allowed against David's Bridal, Inc. in the aggregate principal amount of $270,000,000 plus accrued but unpaid interest owed as of the Petition Date and any fees, charges, and other amounts due but unpaid under the Unsecured Notes, the Unsecured Notes Indenture, or any related documents as of the Petition Date.  Neither the holders of the Unsecured Notes Claims nor the Unsecured Notes Indenture Trustee shall be required to file proofs of Claim on account of any Unsecured Notes Claim.

(c)     Treatment:  Except to the extent that a holder of an Allowed Unsecured Notes Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Unsecured Notes Claim, on the Effective Date, each

holder of an Allowed Unsecured Notes Claim shall receive its Pro Rata share of (i) the Unsecured Notes Stock Allocation and (ii) the Warrants.

(d) <u>Voting</u>: Class 5 is Impaired, and the holders of Unsecured Notes Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.6 **General Unsecured Claims (Class 6).**

(a) <u>Classification</u>: Class 6 consists of General Unsecured Claims.

(b) <u>Treatment</u>: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim or has been paid before the Effective Date, on and after the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, (i) the Reorganized Debtors shall continue to pay or treat each Allowed General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced, or (ii) such holder will receive such other treatment so as to render such holder's Allowed General Unsecured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, in each case subject to all defenses or disputes the Debtors and the Reorganized Debtors may have with respect to such Claims, including as provided in Section 6.17 of the Plan; *provided* that, notwithstanding the foregoing, the Allowed amount of General Unsecured Claims shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable; *provided*, *further*, that the Supporting Sponsors holding General Unsecured Claims shall be deemed to have waived such Claims and shall not receive any distributions on account of such Claims.

(c) <u>Voting</u>: Class 6 is Unimpaired, and the holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.7 **Intercompany Claims (Class 7).**

(a) <u>Classification</u>: Class 7 consists of Intercompany Claims.

(b) <u>Treatment</u>: On the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be paid, adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Debtors (with the consent of the Required Supporting Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, subject to the Restructuring Transactions.

(c) <u>Voting</u>: Class 7 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.8 **Intercompany Interests (Class 8).**

(a) <u>Classification</u>: Class 8 consists of Intercompany Interests.

(b)    Treatment:  On the Effective Date, or as soon as practicable thereafter, all Intercompany Interests shall be Reinstated, (i) subject to the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder and (ii) the Restructuring Transactions.

(c)    Voting:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

(d)    To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the holders of the New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

### 4.9    **Parent Interests (Class 9).**

(a)    Classification:  Class 9 consists of Parent Interests.

(b)    Treatment:  Holders of Parent Interests shall not receive or retain any property under the Plan on account of such Parent Interests.  On the Effective Date, or as soon as practicable thereafter, all Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    Voting:  Class 9 is Impaired, and the holders of Parent Interests are conclusively deemed to have rejected the Plan.  Therefore, holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders of Parent Interests will not be solicited.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

### 5.1    **Compromise of Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest, and fair and equitable.  Each provision of Plan constitutes a part of this settlement that is non-severable from the remaining terms of the Plan.

### 5.2    **Sources of Cash for Plan Distribution.**

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and Cash balances, the Priority Exit Facility Loans and the Exit ABL Facility.

1004795077v10

5.3     **Restructuring Expenses.**

To the extent not otherwise paid and notwithstanding any contrary limitations or conditions to such payment in an order of the Bankruptcy Court other than the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay outstanding and invoiced Restructuring Expenses as follows: (A) on the Effective Date, Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least two (2) Business Days in advance of the Effective Date and (B) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided that* such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.

5.4     **Continued Corporate Existence; Corporate Action.**

(a)     Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and will be effective without any further action or approval (other than any requisite filings required under applicable state or federal law).

(b)     On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (i) the adoption and/or filing of the Amended Organizational Documents and the New Stockholders' Agreement; (ii) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (iii) the authorization, issuance, and distribution of New Common Stock (including the Supplemental Securities) and Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; (iv) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (v) the entry into the Exit Facilities and the execution, delivery, and filing of the Exit Facility Documents, as applicable; (vi) implementation of the Restructuring Transactions; (vii) payment of the Backstop Payment; and (viii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtors, and any corporate action required by the Debtors or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, Reorganized DB Parent, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of Reorganized DB Parent and the other Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and

approvals contemplated by this Section 5.4(b) shall be effective notwithstanding any requirements under non-bankruptcy law.

5.5     **Exit Facilities.**

(a)     On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit Facility Documents, the Reorganized Debtors will enter into the Exit Facilities without the need for any further corporate action and without further action by the holders of Claims or Interests. The proceeds of the Exit Facilities shall be used to (i) refinance the Prepetition ABL Agreement (to the extent outstanding), DIP ABL Facility and DIP Term Loan Facility in full in accordance with 3.7 of the Plan, (ii) fund other Distributions, costs, and expenses contemplated by the Plan, (iii) pay the Backstop Payment and (iv) fund general working capital and for general corporate purposes of the Reorganized Debtors, in each case subject to the terms of the Exit Facility Documents.

(b)     To the extent that holders of Prepetition Term Loan Claims do not fully fund the Priority Exit Facility in accordance with Section 4.4 hereof, the Backstop Parties have agreed to backstop the Priority Exit Facility to the extent of the Priority Exit Facility Backstop Commitment, consistent with the Restructuring Term Sheet and subject to the terms thereof, to ensure that the entire Priority Exit Facility is funded. In consideration of the Priority Exit Facility Backstop Commitment, on the Effective Date, each Backstop Party shall receive its applicable allocation of the Backstop Payment.

(c)     The Confirmation Order shall constitute approval of the Exit Facilities (including the transactions contemplated thereby and all payments contemplated thereunder (including the Backstop Payment), and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents and make such payment and any other payment in connection therewith as may be required or appropriate.

(d)     On the Effective Date, the Exit Facility Documents shall be executed and delivered substantially on the terms and conditions set forth in the Restructuring Term Sheet. All Liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law, (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer, and (iii) not otherwise subject to avoidance, recharacterization, or subordination under any applicable law. Each of the Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under any applicable law, and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(e)     The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

5.6     **Authorization and Issuance of New Common Stock and the Warrants.**

(a)     All existing interests in DB Parent shall be cancelled as of the Effective Date and, subject to the Restructuring Transactions, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue to (i) holders of

Prepetition Term Loan Claims, (ii) holders of Unsecured Notes Claims and (iii) lenders under the Priority Exit Facility, as applicable, the New Common Stock (including the Supplemental Securities) and the Warrants in accordance with the terms of the Plan, the Amended Organizational Documents, and the Warrant Agreement, without the need for any further corporate, limited liability company, or shareholder action. All of the New Common Stock and the Warrants issuable under the Plan (including the Supplemental Securities), when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable, and the holders of New Common Stock and Warrants shall be deemed to have accepted the terms of the New Stockholders' Agreement (solely in their capacity as shareholders and holders of warrants of Reorganized DB Parent) and to be parties thereto without further action or signature. The New Stockholders' Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock and Warrants shall be bound thereby.

(b)     Upon the Effective Date, unless otherwise consented to by the Required Supporting Term Lenders and the Crossover Holder, (i) the New Common Stock shall not be registered under the Securities Act of 1933, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act. Except as provided in the Plan or the Confirmation Order, the New Common Stock to be distributed under the Plan to holders of Allowed Class 5 Claims shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Stock will only be issued in accordance with DTC book-entry procedures if it is permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deem such method of distribution advisable. To receive distributions of New Common Stock, holders of applicable Allowed Claims shall be required to designate a direct or indirect participant in DTC with whom such holder has an account into which such New Common Stock may be deposited.

5.7     **Exemption from Registration.**

(a)     The offer, issuance, and distribution of the New Common Stock and the Warrants hereunder to holders of Prepetition Term Loan Claims and Unsecured Notes Claims shall be exempt, pursuant to section 1145 of the Bankruptcy Code, if applicable, or other available exemptions without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)     The New Common Stock and the Warrants shall be issued without registration under the Securities Act or any similar federal, state or local law in reliance on available exemptions or section 1145(a) of the Bankruptcy Code and, if applicable, shall be freely tradable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) any applicable regulatory approval.

(c)     Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock and/or the Warrants through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock and Warrants under applicable securities laws.

(d)     Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any

transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock and Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock and/or Warrants and/or shares of New Common Stock (including any other securities issuable upon exercise of Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

5.8    **Cancellation of Existing Securities and Agreements.**

(a)    Except for the purpose of evidencing a right to a Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any Prepetition ABL Claims, Prepetition Term Loan Claims, Unsecured Notes Claims, or any Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, the Prepetition ABL Agreement, the Prepetition Term Loan Agreement, and the Unsecured Notes Indenture shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Prepetition ABL Claims, Allowed Prepetition Term Loan Claims, and Allowed Unsecured Notes Claims to receive Distributions under the Plan, (ii) allow the Debtors, the Reorganized Debtors, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Unsecured Notes Indenture Trustee, and the Disbursing Agent to make post-Effective Date Distributions or take such other action pursuant to the Plan on account of the Allowed Prepetition ABL Claims, Allowed Prepetition Term Loan Claims, and Allowed Unsecured Notes Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (iii) permit the Prepetition ABL Agent, the Prepetition Term Loan Agent, and the Unsecured Notes Indenture Trustee to appear in the Chapter 11 Cases, *provided* that nothing in this Section 5.8 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(c)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.8 shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.9    **Officers and Boards of Directors.**

(a)    On the Effective Date, the New Board shall consist of seven (7) directors in total to be designated by the Supporting Term Lenders and the Crossover Holder in a manner to be determined consistent with the Restructuring Term Sheet. To the extent then known and determined, the identities of the members of each board of directors or managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such Amended Organizational Documents.

5.10    **Restructuring Transactions.**

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors shall, subject to the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder, take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (collectively, the "**Restructuring Transactions**"), including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution, the Amended Organizational Documents, (iv) the issuance of Securities (including the New Common Stock, Warrants and Supplemental Securities), all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (v) all other actions that the applicable Entities determine to be necessary or appropriate, including (A) making filings or recordings that may be required by applicable law, subject, in each case, to the Amended Organizational Documents, and (B) such other transactions that may be required or necessary to effectuate any of the Restructuring Transactions in the most tax-efficient manner, including mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations; (vi) the execution, delivery, and filing, if applicable, of the Exit Facility Documents, the Amended Organizational Documents, the New Stockholders' Agreement and the Warrant Agreement; and (vii) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, *provided*, that any of the foregoing actions and documents shall, in each case, be subject to the RSA Definitive Document Requirements (as applicable). The Restructuring Transactions may include a taxable transfer of all or a portion of the Debtors' assets or Entities to one or more newly-formed Entities (or an affiliate or subsidiary of such Entity or Entities) formed and controlled by certain holders of Claims against the Debtors and, in such case, the New Common Stock (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of such Entity or Entities.

(b)     Each officer, member of the board, or manager of the Debtors is (and each officer, member of the board, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Securities issued pursuant to the Plan and any Restructuring Transaction (including the New Common Stock, Warrants and Supplemental Securities) in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the shareholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)     On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the New Stockholders' Agreement, the Warrant Agreement, and the Exit Facility Documents, as applicable, and the Bankruptcy Code.  The Amended Organizational Documents shall, among other things:  (i) authorize the issuance of the New Common Stock (including the Supplemental Securities) and the Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; and (ii) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the Amended Organizational Documents, the New Stockholders Agreement and the Warrant Agreement.

(d)     All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, to the extent applicable, or any corporate, limited liability company, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, members, or directors or managers of the Debtors or the Reorganized Debtors, and with like effect as though such action had been taken unanimously by the shareholders, members, directors, managers, or officers, as applicable, of the Debtors or the Reorganized Debtors.

## 5.11    **Cancellation of Liens.**

Except as otherwise specifically provided herein, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge or other security interest under the Exit Facility Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including pursuant to Section 5.8(b) hereof, upon the indefeasible payment in full in Cash of an Other Secured Claim or ABL Facility Claim, any Lien securing an Other Secured Claim or ABL Facility Claim that is indefeasibly paid in full, in Cash, shall be deemed released and discharged, and the holder of such Other Secured Claim or ABL Facility Claim shall be authorized and directed to release any Collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release or discharge of such Lien, including the execution, delivery and filing or recording of such releases or discharges as may be requested by the Reorganized Debtors, and the Reorganized Debtors and their designees shall be authorized to file UCC-3 termination statements and other release or discharge documentation (to the extent applicable) with respect thereto.

## 5.12    **Employee Matters.**

(a)     Subject to Section 5.12(c) of this Plan, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which any Debtor is a party (collectively, the "**Employee Arrangements**"); *provided that* notwithstanding anything contrary in the Employee Arrangements, the consummation of the Plan shall not be treated as a change in control or change of control or other similar transaction under the Employee Arrangements.

(b)     Within sixty (60) days following the Effective Date, the New Board shall establish the Management Incentive Plan for members of the Reorganized Debtors' management.  The participants and the amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board.

(c)    Any Parent Interests granted prior to the Effective Date to a current or former employee, officer, director or contractor under an Employee Arrangement or otherwise shall be deemed cancelled on the Effective Date.   For the avoidance of doubt, if a Benefit Plan or an Employee Arrangement is assumed and the Benefit Plan or Employment Arrangement provides in part for an award or potential award of Interests in the Debtors, such Benefit Plan or Employment Arrangement shall be assumed in all respects other than the provisions of such agreement relating to Interest awards.

5.13    **Release of Avoidance Actions.**

On the Effective Date, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors.

5.14    **Closing of Chapter 11 Cases.**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases, *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.  Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

5.15    **Notice of Effective Date.**

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE VI  DISTRIBUTIONS.

6.1    **Distributions Generally.**

One or more Disbursing Agents shall make all Distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2    **Distribution Record Date.**

As of the close of business on the Effective Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Effective Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation

to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Unsecured Notes, the holders of which shall receive a Distribution in accordance with 3.7 of the Plan and, as applicable, the customary procedures of DTC on or as soon as practicable after the Effective Date.

6.3 **Date of Distributions.**

Except as otherwise provided in the Plan, any Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of 3.7 of the Plan, or as soon as practicable thereafter; *provided* that the Reorganized Debtors may implement periodic Distribution dates to the extent they determine them to be appropriate.

6.4 **Disbursing Agent.**

All Distributions under the Plan shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided herein), on or after the Effective Date or as otherwise provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and expenses incurred by such Disbursing Agent directly related to Distributions hereunder shall be reimbursed by the Reorganized Debtors. The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or the Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

6.5 **Rights and Powers of Disbursing Agent.**

(a) From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b) The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6     **Expenses of Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.7     **Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court (including the DIP Orders) or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Petition Date; *provided* that, if interest is payable pursuant to this Section 6.7, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment. Notwithstanding the foregoing, postpetition interest on Prepetition ABL Claims and Prepetition Term Loan Claims shall accrue and be paid in accordance with the terms set forth in the agreements governing such Claims, including, without limitation, the DIP Orders, the Prepetition ABL Documents and the Prepetition Term Loan Documents (as applicable).

6.8     **Delivery of Distributions.**

All Distributions to any holder of an Allowed Claim as and when required by the Plan shall be made by the Disbursing Agent. In the event that any Distribution to any holder is returned as undeliverable, no further Distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently due, missed Distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable Distributions and, if located, assist such holders in complying with Section 6.19 of the Plan.

6.9     **Distributions after Effective Date.**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.10     **Unclaimed Property.**

Undeliverable Distributions or unclaimed Distributions shall remain in the possession of the Reorganized Debtors until such time as a Distribution becomes deliverable or the holder accepts Distribution, or such Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of the attempted Distribution. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

6.11    **Time Bar to Cash Payments.**

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12    **Manner of Payment under Plan.**

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.13    **Satisfaction of Claims.**

Except as otherwise specifically provided in the Plan, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14    **Fractional Stock and Warrant.**

If any Distributions of New Common Stock or the Warrant pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or the Warrant, then the number of shares of New Common Stock or the Warrant to be issued in respect of such Distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down). The total number of shares of New Common Stock or the Warrant to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14. No consideration shall be provided in lieu of fractional shares that are rounded down. To the extent applicable, DTC is considered a single holder for rounding and distribution purposes. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a Distribution that is less than one (1) share of New Common Stock.

6.15    **Minimum Cash Distributions.**

The Disbursing Agent shall not be required to make any Distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided* that if any Distribution is not made pursuant to this Section 6.15, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

6.16    **Maximum Distributions and Rights of Reimbursement.**

(a)    An (i) Allowed Primary Claim that receives Distributions in the Allowed amount of such Claim or (ii) Allowed Guarantee Claim that receives any payment or transfer that, when combined with Distributions provided on account of the corresponding Primary Claim equals the Allowed amount of the Primary Claim, shall, in each case, be deemed to have had such Allowed Primary Claim or Allowed Guarantee Claim, as applicable, satisfied in full as against the applicable Debtor.

1004795077v10

(b)     In no event shall (i) an Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim, or (ii) an Allowed Guarantee Claim receive Distributions under the Plan that, when combined with Distributions or other consideration provided on the corresponding Primary Claim are in excess of the Allowed amount of the Primary Claim (or such amount as may be agreed to by the Debtors and the holder of the Allowed Guarantee Claim, with the consent of the Required Supporting Term Lenders and the Crossover Holder).

(c)     Nothing contained herein shall in any way affect, impair or modify the rights of a holder of a Primary Claim or a Guarantee Claim against an Entity that is not a Debtor.

6.17    **Setoffs.**

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

6.18    **No Distribution in Excess of Amount of Allowed Claim.**

No holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim, except to the extent postpetition interest is permitted by Section 6.7 of the Plan.

6.19    **Withholding and Reporting Requirements.**

(a)     <u>Withholding Rights</u>.  In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not

the obligation, to not make a Distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations. Any party issuing any instrument or making any Distribution pursuant to the Plan, shall, to the extent reasonably practicable, notify any recipient of a Distribution pursuant to the Plan and all related agreements if it is going to withhold taxes pursuant to this Section 6.19 and reasonably cooperate with the recipient to minimize or avoid such withholding.

(b)     Forms.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.

### 6.20    Hart-Scott-Rodino Antitrust Improvements Act.

Any New Common Stock or the Warrant to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

### 6.21    Claims Paid or Payable by Third Parties.

(a)     **Claims Paid by Third Parties**

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen days of receipt thereof, repay or return the Distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.  The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Reorganized Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen day grace period specified above until the amount is repaid.

(b)     **Claims Payable by Insurance Carriers**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 days'

notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(c)    **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein, nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.22    **Allocation Between Principal and Accrued Interest.**

The aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued but unpaid through the Effective Date.

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1    **Disputed Claims Process.**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, holders of Claims do not need to file proofs of Claim with the Bankruptcy Court, and the Debtors (with the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business; *provided*, that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. If a holder of a Claim elects to file a proof of Claim with the Bankruptcy Court, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Claims, which shall be resolved on a case-by-case basis through settlements, Claim objections (or, if necessary, through adversary proceedings), adjudication in a forum other than the Bankruptcy Court, or by withdrawal of the Claims by the holders of such Claims. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

7.2    **Objections to Claims.**

Except insofar as a Claim is Allowed under the Plan, only the Reorganized Debtors shall be entitled to object to Claims after the Effective Date. Any objections to proofs of Claim shall be served and filed (a) on or before one-hundred and eighty (180) days following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors. The expiration of such period shall

not limit or affect the Reorganized Debtors' rights to dispute Claims asserted other than through a proof of Claim.

7.3     **Estimation of Claims.**

        The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

7.4     **No Distributions Pending Allowance.**

        If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.5     **Distributions after Allowance.**

        To the extent that a Disputed Claim ultimately becomes, in whole or in part, an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in 3.7 of the Plan. Such Distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.6     **Claim Resolution Procedures Cumulative.**

        All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.7     **Disallowance of Claims.**

        All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

# ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1    **General Treatment.**

(a)    As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties, and which have not expired or terminated by their own terms on or prior to the Effective Date, including Employment Arrangements (subject to Section 5.12 of the Plan) shall be deemed assumed by the Debtors except for any executory contract or unexpired lease that (i) previously has been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is the subject of a separate motion or notice filed by the Debtors on or before the Confirmation Date seeking to assume, assume and assign, or reject pursuant to this Plan, the Confirmation Order or section 365 of the Bankruptcy Code, or (iii) is the subject of a pending Assumption Dispute.

(b)    Subject to satisfaction of the conditions set forth in Section 8.1(a), resolution of any Assumption Dispute in accordance with Section 8.2 of the Plan, and the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the assumptions or assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors have provided adequate assurance of future performance under each assumed executory contract and unexpired lease. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law, *provided* that the assumption of executory contracts and unexpired leases hereunder may include the assignment of certain of such contracts to Affiliates.

(c)    Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed executory contract or unexpired lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.2    **Determination of Assumption Disputes and Deemed Consent.**

(a)    Following the Petition Date, the Debtors shall serve a notice on parties to executory contracts and unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to assume or assume and assign the executory contract or unexpired lease in connection with the Plan and indicating that the Cure Amount shall be asserted against the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business.

(b)    Upon assumption, Cure Amounts shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, subject to all defenses and disputes the Debtors or the Reorganized Debtors may have with respect to the underlying executory contracts or unexpired leases, which the Debtors or the Reorganized Debtors may assert in the ordinary course. If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, *provided*, *however*, that before the Effective Date, the Debtors (with the consent of the Required Supporting Term Lenders and the Crossover Holder) may settle any dispute regarding Cure Amounts or the nature thereof without any

further notice to any party or any action, order, or approval of the Bankruptcy Court.  To the extent the Assumption Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor counterparty to such contract or lease (or such lesser amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor counterparty and the applicable Debtor or the Reorganized Debtor).  To the extent the Assumption Dispute is resolved or determined unfavorably to the Debtor or the Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject (with the consent of the Required Supporting Term Lenders and the Crossover Holder) the applicable executory contract or unexpired lease after such determination.

(c)     Any non-Debtor counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption, assumption and assignment or sublease of such executory contract or unexpired lease shall be deemed to have assented to assumption, assumption and assignment or sublease of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, restrain, or condition the transfer, assignment or sublease of such executory contract or unexpired lease (including provisions related to rights of first refusal, rights of first offer, tag rights, drag rights, or change of control fees or other like limitations), (ii) terminate or modify, or permit the termination or modification of, an executory contract or unexpired lease  as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control as contemplated by the Plan, (iii) increase, accelerate, or otherwise alter any obligations or liabilities of the Debtors or the Reorganized Debtors under such executory contract or unexpired lease, or (iv) create or impose a Lien upon any property or asset of the Debtors or the Reorganized Debtors, as applicable.  Each such provision shall be deemed to not apply to the assumption, assumption and assignment or sublease of such executory contract or unexpired lease pursuant to the Plan, and non-Debtor counterparties thereto that fail to object to the proposed assumption, assumption and assignment or sublease in accordance with the terms set forth in this Section 8.2(c) shall forever be barred and enjoined from objecting to the proposed assumption, assumption and assignment, or sublease, or to the validity of such assumption, assumption and assignment (including the provision of adequate assurance of future performance), or sublease, or taking actions prohibited by the foregoing on account of transactions contemplated by the Plan.

8.3     **Payment of Cure Amounts.**

Subject to resolution of any Assumption Dispute, all Cure Amounts relating to an executory contract or unexpired lease that is to be assumed by the Debtors or the Reorganized Debtors shall be satisfied by the Debtors or the Reorganized Debtors, as applicable, following assumption or assumption and assignment of the underlying executory contract or unexpired lease.  Such Cure Amounts shall, in the discretion of the Debtors or the Reorganized Debtors, as applicable, be paid on the later of (i) the Effective Date and (ii) without acceleration in the ordinary course of business and according to the terms of the executory contract or unexpired lease.  Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall, subject to satisfaction of the Cure Amount, result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned executory contract or unexpired lease at any time before the effective date of the assumption or assumption and assignment.

8.4     **Survival of the Debtors' Indemnification Obligations and Guarantees.**

(a)     Any obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, shall not be discharged or impaired by confirmation of the Plan; *provided*, *however*, that the Reorganized Debtors shall not indemnify directors of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes intentional fraud, gross negligence, or willful misconduct.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on such obligations shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. None of the Reorganized Debtors shall amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

(b)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)     On the Effective Date, all guarantees, indemnities, or other credit support provided by a Debtor in support of the primary obligations of another Debtor described in Section 8.4(a) shall be Unimpaired by the Plan and Reinstated to their position immediately prior to the Petition Date.

8.5     **Insurance Policies.**

All insurance policies (including all directors' and officers' insurance policies and tail coverage liability insurance) pursuant to which any Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

8.6     **Intellectual Property Licenses and Agreements.**

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors (with the consent of the Required Supporting Term Lenders and the Crossover Holder) in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.7     __Modifications, Amendments, Supplements, Restatements, or Other Agreements.__

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

8.8     __Reservation of Rights.__

(a)     Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates have any liability thereunder.

(b)     Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)     If there is an Assumption Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE

9.1     __Conditions Precedent to Confirmation of Plan.__

The following are conditions precedent to confirmation of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order;

(b)     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and shall have satisfied the RSA Definitive Document Requirements; and

(c)     the Restructuring Support Agreement shall not have been terminated and no termination notice shall have been given that with the passage of time would cause or permit a termination of the Restructuring Support Agreement.

9.2     **Conditions Precedent to Effective Date.**

The following are conditions precedent to the Effective Date of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order and no stay thereof shall be in effect;

(b)     the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect and no termination notice shall have been given that with the passage of time would cause or permit a termination of the Restructuring Support Agreement;

(c)     the Debtors shall not be in default under the DIP ABL Facility, the DIP Term Loan Facility or any of the DIP Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the applicable DIP ABL Facility Parties or DIP Term Loan Facility Parties or cured by the Debtors in a manner consistent with the DIP ABL Facility, the DIP Term Loan Facility or the applicable DIP Orders);

(d)     (i) the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility Documents shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility Documents shall be deemed to occur concurrently with the occurrence of the Effective Date; and (ii) the Debtors shall have paid the Backstop Payment in full in Cash to the appropriate Backstop Parties;

(e)     (i) the Definitive Documents shall (x) have satisfied the RSA Definitive Document Requirements, (y) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith (other than any conditions precedent related to the occurrence of the Effective Date), and (z) be in full force and effect and binding upon the relevant parties; (ii) in addition to the RSA Definitive Document Requirements applicable to the Exit Facility Documents, (x) the Exit Facility Documents governing the Exit ABL Facility also shall be in form and substance reasonably satisfactory to the Exit ABL Facility Agent, (y) the Exit Facility Documents governing the Priority Exit Facility shall be in form and substance reasonably satisfactory to the Priority Exit Facility Agent (solely with respect to the provisions thereof that affect the rights and duties of the Priority Exit Facility Agent), and (z) the Exit Facility Documents governing the Takeback Term Loan shall be in form and substance reasonably satisfactory to the Takeback Term Loan Agent (solely with respect to the provisions thereof that affect the rights and duties of the Takeback Term Loan Agent);

(f)     all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Stockholders' Agreement and the Warrant Agreement shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Stockholders' Agreement and the Warrant Agreement shall be deemed to occur concurrently with the occurrence of the Effective Date;

(g)     all conditions precedent to the issuance of the New Common Stock and the Warrants, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(h)     to the extent required under applicable non-bankruptcy law, the Amended Organizational Documents shall have been filed with the appropriate governmental authorities;

(i)        all actions, documents (including the Definitive Documents), and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto;

(j)        all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(k)        all unpaid Restructuring Expenses and all amounts payable by the Debtors pursuant to the DIP Orders and Section 5(b) of the Restructuring Support Agreement shall have been paid in Cash, to the extent invoiced at least two (2) Business Days prior to the Effective Date.

9.3        **Waiver of Conditions Precedent.**

(a)        Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan (except for Section 9.2(a)) may be waived in writing by the Debtors with the prior written consent of the Required Supporting Term Lenders, the Crossover Holder, the Exit ABL Facility Agent (solely with respect to conditions related to the effectiveness of the Exit ABL Facility), the Priority Exit Facility Agent (solely with respect to conditions related to the effectiveness of the Priority Exit Facility) and the Takeback Term Loan Agent (solely with respect to conditions related to the effectiveness of the Takeback Term Loan) without leave of or order of the Bankruptcy Court, *provided*, *however*, that the condition in Section 9.2(e) of the Plan may be waived with respect to a particular Definitive Document only to the extent that every party that maintains a consent right over the subject Definitive Document as set forth in the Restructuring Support Agreement agrees to waive such condition with respect to the subject Definitive Document.

(b)        The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4        **Effect of Failure of a Condition.**

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims against or any Interests in the Debtors or claims by the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Supporting Term Lenders, any of the Supporting Noteholders, any of the Supporting Sponsors, or any other Entity.

**ARTICLE X   EFFECT OF CONFIRMATION OF PLAN.**

10.1    <u>**Vesting of Assets.**</u>

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Restructuring Transactions), on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility Documents.  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

10.2    <u>**Binding Effect.**</u>

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

10.3    <u>**Discharge of Claims and Termination of Interests.**</u>

Upon the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.4    <u>**Term of Injunctions or Stays.**</u>

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5    **Injunction.**

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Interest extinguished, discharged or released pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in any or all of the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of or in connection with or with respect to any such Claims or Interests or against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)    **By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.**

(d)    **The injunctions in this Section 10.5 shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

10.6    **Releases.**

(a)    Releases by Debtors.

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, effective as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is confirmed by this Plan, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates, and any person seeking to exercise the**

rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, asserted or unasserted, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the DIP ABL Facility Documents, the DIP Term Loan Documents, the DIP Orders, the Disclosure Statement, the Restructuring Support Agreement, any Restructuring Transactions and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, without limitation, all Avoidance Actions; *provided that* nothing in this Section 10.6(a) shall be construed to release the Released Parties from gross negligence, willful misconduct or intentional fraud as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released thereby; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released pursuant to such release.

(b)     Releases by Holders of Claims or Interests.

Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, effective as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is confirmed by this Plan, the Releasing Parties are deemed to have fully, conclusively, absolutely and irrevocably released and discharged the Released Parties from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, asserted or unasserted, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that any such Releasing Party would have been legally entitled to assert (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole

45

or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Prepetition ABL Documents, the Prepetition Term Loan Documents, DIP ABL Facility Documents, the DIP Term Loan Documents, the DIP Orders, the Disclosure Statement, the Restructuring Support Agreement, any Restructuring Transactions and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, without limitation, all Avoidance Actions; *provided that* nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released thereby; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released pursuant to such release.

10.7    **Exculpation.**

Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation, formulation, preparation, and pursuit of the Disclosure Statement, the Restructuring Support Agreement, the transactions relating to the Debtors' restructuring, the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan (including the Plan Supplement), the Definitive Documents, the Restructuring Transactions, or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Distribution of any Securities issued or to be issued pursuant to the Plan, whether or not such Distribution occurs following the Effective Date, the occurrence of the Effective Date, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan, except for actions determined by Final Order to constitute gross negligence, willful misconduct, or intentional fraud. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. Nothing herein shall be deemed to be a release or waiver of the Reorganized Debtors' obligations under the Exit Facility Documents.

10.8    **Retention of Causes of Action/Reservation of Rights.**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Section 10.6(a) of the Plan, the DIP Orders, or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Section 10.6(a) of the Plan, the DIP Orders, or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 10.8 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Section 10.8 that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties or arising under chapter 5 of the Bankruptcy Code (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures pursuant to section 502(d) of the Bankruptcy Code or otherwise).

10.9    **Solicitation of Plan.**

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any Securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any Securities under the Plan.

Notwithstanding anything herein to the contrary, as of the Effective Date, pursuant to section 1125(e) of the Bankruptcy Code, the Solicitation Parties and each of their respective affiliates, agents, representatives, members, principals, equityholders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors and attorneys shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security offered or sold under the Plan of a Reorganized Debtor, and shall not be liable to any Person on account of such solicitation or participation.

### 10.10 **Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### 10.11 **Recoupment.**

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 10.12 **Subordination Rights.**

Any Distributions to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided* that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

## ARTICLE XI  RETENTION OF JURISDICTION.

### 11.1 **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising under, or arising in, or relating to these Chapter 11 Cases or the Plan to the fullest extent legally permissible by 28 U.S.C. § 1334 to hear, and by 28 U.S.C. § 157 to determine, all proceedings in respect thereof, including, without limitation, for the following purposes:

(a)     to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, any proceeding with respect to a Cause of Action;

(c)     to ensure that Distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(d)     to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Interest, including any Administrative Expense Claims;

(e)     to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     to hear and determine all Professional Fee Claims and any disputes related to Restructuring Expenses;

(i)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)     to enforce all orders previously entered by the Bankruptcy Court;

(o) to resolve disputes concerning Disputed Claims or the administration thereof;

(p) to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code, including in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing;

(q) to enter a final decree closing the Chapter 11 Cases;

(r) to recover all assets of the Debtors and property of the Estates, wherever located;

(s) to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t) to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code; *provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the Exit Facility Documents, the Amended Organizational Documents, the New Stockholders' Agreement and the Warrant Agreement, and the Exit Facility Documents, the Amended Organizational Documents, the New Stockholders' Agreement and the Warrant Agreement shall be governed by the respective jurisdictional provisions therein.

## 11.2 Courts of Competent Jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

## 12.1 Payment of Statutory Fees.

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

## 12.2 Substantial Consummation of the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.3 **Expedited Determination of Taxes.**

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods of the Debtors through the Effective Date.

12.4 **Exemption from Certain Transfer Taxes.**

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities or instruments, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of Collateral under the Exit Facility Documents, and (e) the issuance, renewal, modification, or securing of indebtedness in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

12.5 **Amendments.**

(a) Plan Modifications. Subject to the terms of the Restructuring Support Agreement, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify or supplement the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct.

(b) Other Amendments. Subject to the Restructuring Support Agreement, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Interests hereunder, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests and that any such technical adjustment or modification is consistent with the Restructuring Support Agreement.

12.6    **Effectuating Documents and Further Transactions.**

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

12.7    **Revocation or Withdrawal of Plan.**

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting an amount of any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission of any sort by any Debtor, any Supporting Term Lender, the Crossover Holder, any Supporting Noteholder, any Supporting Sponsor, or any other Entity. This provision shall have no impact on the rights of the Supporting Term Lenders, the Crossover Holder, Supporting Noteholders, Supporting Sponsors or the Debtors, as set forth in the Restructuring Support Agreement, in respect of any such revocation or withdrawal.

12.8    **Severability of Plan Provisions.**

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and the request of the Debtors, shall have the power (subject to the Restructuring Support Agreement) to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

1004795077v10

12.9 **Governing Law.**

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an exhibit or schedule hereto, or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; *provided* that corporate or entity governance matters relating to a Debtor or a Reorganized Debtor shall be governed by the laws of the state of incorporation or organization of the Debtors or the Reorganized Debtors.

12.10 **Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.11 **Dates of Actions to Implement the Plan.**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.12 **Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.13 **Deemed Acts.**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.14 **Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.15 **Entire Agreement.**

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.16 **Exhibits to Plan.**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.17 **Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

12.18 **Plan Supplement.**

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Voting Agent's website at www.donlinrecano.com/davidsbridal. or the Bankruptcy Court's website at https://www.pacer.gov/.

12.19 **Waiver or Estoppel.**

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

12.20 **Notices.**

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> David's Bridal, Inc.
> 1001 Washington Street
> Conshohocken, PA 19428
> Attn:  Lori Cochran Kinkade, Esq.
> Email:  lkinkade@dbi.com
>
>     -and-
>
> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022
> Attn:  M. Natasha Labovitz, Esq.
> Email:  nlabovitz@debevoise.com
>
>     -and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn:  Edmon L. Morton, Esq.
Email:  emorton@ycst.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

1004795077v10

IN WITNESS WHEREOF, each Debtor has executed this Plan this <u>18th</u> day of November, 2018.

Respectfully submitted,

**DAVID'S BRIDAL, INC.**
**DB INVESTORS, INC.**
**DB HOLDCO, INC.**
**DB MIDCO, INC.**

By: _____
Name: Joan Hilson
Title: Executive Vice President and
Chief Financial and Operating Officer

**Exhibit A**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of November 18, 2018, is entered into by and among the following parties:

(i)     DB Investors, Inc. ("**DB Topco**");

(ii)    DB Holdco, Inc. ("**DB Holdco**");

(iii)   DB Midco, Inc. ("**DB Midco**");

(iv)    David's Bridal, Inc. ("**DBI**" and, together with DB Topco, DB Holdco and DB Midco, the "**Company**");

(v)     the undersigned holders (to the extent identified as a "Supporting Term Lender" on the signature pages hereto, each in such capacity, a "**Supporting Term Lender**") of outstanding term loans (the "**Term Loans**") under that certain credit agreement, dated as of October 11, 2012 (as amended, supplemented or otherwise modified from time to time, the "**TL Credit Agreement**" and, collectively with any security agreement, intercreditor agreement and any other collateral and ancillary documents, the "**TL Credit Documents**"), among DBI, the lenders from time to time party thereto (the "**Term Lenders**") and Bank of America, N.A., as administrative agent and collateral agent;

(vi)    the undersigned beneficial holders (to the extent identified as a "Supporting Noteholder" on the signature pages hereto, each in such capacity, a "**Supporting Noteholder**") of outstanding 7.75% notes due 2020 (the "**Notes**"; the beneficial holders of Notes are the "**Noteholders**") under that certain indenture, dated as of October 11, 2012 (as amended, supplemented or otherwise modified from time to time, the "**Indenture**" and together with any ancillary documentation governing the indebtedness under the Indenture, the "**Notes Documents**"), among DBI, the subsidiary guarantors named therein and Wilmington Trust, National Association, as trustee;

(vii)   certain funds and accounts managed by Oaktree Capital Management, L.P. within its Strategic Credit, High Yield and Loan Strategies, in their respective capacities as Supporting Term Lenders and Supporting Noteholders (collectively, the "**Crossover Holder**" and, together with the other Supporting Term Lenders, and the other Supporting Noteholders, the "**Supporting Creditors**"); and

(viii) the undersigned funds or accounts managed, advised or sub-advised by Clayton, Dubilier & Rice LLC and Leonard Green & Partners, L.P. (each in such capacity, a "**Supporting Sponsor**") that hold common stock in DB Topco (the "**Topco Common Stock**").

Each of DB Topco, DB Holdco, DB Midco, DBI, the Supporting Term Lenders, the Supporting Noteholders, the Crossover Holder and the Supporting Sponsors shall be referred to as a "**Party**" and, collectively, as the "**Parties**."

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Term Sheet (as defined below). The terms of this Agreement and the Term Sheet shall whenever possible be read in a complementary manner.

## RECITALS

**WHEREAS**, prior to the date hereof, the Parties have discussed consummating a restructuring of the Company's outstanding indebtedness (the "**Restructuring**") pursuant to a joint "pre-packaged" chapter 11 plan of reorganization on the terms set forth in this Agreement and in the restructuring term sheet attached hereto as <u>Exhibit A</u> (the "**Term Sheet**");

**WHEREAS**, the Parties have engaged in arm's-length, good faith discussions with the objective of reaching an agreement regarding the Restructuring;

**WHEREAS**, as of the date hereof, the Supporting Term Lenders collectively hold approximately 85% of the outstanding Term Loans;

**WHEREAS**, as of the date hereof, the Supporting Noteholders collectively hold approximately 97% of the outstanding Notes;

**WHEREAS**, as of the date hereof, the Supporting Sponsors collectively hold approximately 95% of the Topco Common Stock; and

**WHEREAS**, subject to the execution of the Definitive Documentation (as defined below), the following sets forth the agreement among the Parties concerning their support, subject to the terms and conditions hereof, to implement the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

Section 1.     <u>Proposed Restructuring; Definitive Documentation</u>.

(a)     The principal terms of the Restructuring are set forth in the Term Sheet and will be further set forth in a pre-packaged chapter 11 plan of reorganization that will

2

contain terms in all cases consistent with the Term Sheet (the "**Plan**"). The Company shall effectuate the Restructuring by commencing voluntary "pre-packaged" cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date on which the Chapter 11 Cases are commenced is the "**Petition Date**".

(b)     The Restructuring will be implemented pursuant to definitive documentation (collectively, the "**Definitive Documentation**"), which shall include:

(i)     this Agreement;

(ii)    the Plan (and all exhibits thereto) and any supplement to the Plan (the "**Plan Supplement**"), which shall include (A) a stockholders' agreement, or other similar agreement, setting forth the rights and obligations of the holders of the New Common Stock (as defined in the Term Sheet) and (B) a warrant agreement or similar agreement, setting forth the rights and obligations of the holders of the Warrants (as defined in the Term Sheet); provided that, notwithstanding the foregoing, with respect to any Definitive Document expressly identified in this Agreement (whether identified by individual document or categorically) that subsequently is an exhibit to the Plan or contained in the Plan Supplement (such Definitive Document, a "**Specific Document**"), the consent right or lack of consent right (as applicable) of any Party with respect to such Specific Document set forth herein shall control;

(iii)   the confirmation order with respect to the Plan (the "**Confirmation Order**") and any motion or other pleadings related to the Plan (and all exhibits thereto) or confirmation of the Plan;

(iv)    a disclosure statement (and all exhibits thereto) with respect to the Plan (the "**Disclosure Statement**") and the solicitation materials with respect to the Plan (the "**Solicitation Materials**");

(v)     the motion seeking approval of, and the order of the Bankruptcy Court approving, the Disclosure Statement and the Solicitation Materials (such order, including to the extent combined with the Confirmation Order, the "**Solicitation Order**");

(vi)    (A) the interim order authorizing use of cash collateral and approving the DIP ABL Facility and DIP Term Facility (each defined below) on terms consistent with the Term Sheet (the "**Interim DIP Order**"), and (B) the final order authorizing use of cash collateral and approving the DIP ABL Facility and DIP Term Facility on terms consistent with the Term Sheet (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP Orders**");

3

(vii)    the debtor-in-possession credit agreement for the priming super priority secured asset-based revolving loans (the "**DIP ABL Agreement**" and, the credit facility thereunder, the "**DIP ABL Facility**" and, the lenders thereunder, the "**DIP ABL Lenders**") to be entered into in accordance with the Term Sheet and the DIP Orders, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**DIP ABL Documents**")

(viii)    the debtor-in-possession credit agreement for the priming super priority secured term loans (the "**DIP Term Loan Agreement**" and, the credit facility thereunder, the "**DIP Term Facility**" and the lenders thereunder, including the Supporting Term Lenders (including the Crossover Holder) in their capacity as lenders under the DIP Term Loan Agreement, the "**DIP Term Lenders**") to be entered into in accordance with the Term Sheet and the DIP Orders, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**DIP Term Loan Documents**"); and

(ix)    the credit agreements for the Exit ABL Facility, the Priority Exit Facility and the Takeback Term Loan, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**Exit Credit Documents**" and the credit facilities thereunder, the "**Exit Facilities**").

(c)    Except as set forth herein, the Definitive Documentation (and any modifications, restatements, supplements or amendments to any of them) will, after the Execution Date, remain subject to negotiation in good faith and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits (including the Term Sheet) and Schedules (defined below)) and be in form and substance reasonably satisfactory in all respects to each of: (i) the Company; (ii) the Supporting Term Lenders who hold, in the aggregate, more than 50% in principal amount outstanding of all Term Loans held by Supporting Term Lenders (the "**Required Supporting Term Lenders**"); (iii) the Crossover Holder, (iv) the Supporting Noteholders who hold, in the aggregate, more than 33% in principal amount outstanding of all Notes held by Supporting Noteholders (the "**Required Supporting Noteholders**"), solely to the extent required under the Supporting Noteholder Consent Right (as defined below); and (v) the Supporting Sponsors, solely to the extent required under the Sponsor Consent Right (as defined below) (collectively, the parties described in clauses (i) through (v), the

4

"**Required RSA Parties**"); <u>provided</u>, that notwithstanding the foregoing, the DIP Orders, the DIP ABL Documents, the DIP Term Loan Credit Documents and the Exit Credit Documents shall be in form and substance satisfactory to the Required Supporting Term Lenders and the Crossover Holder.

(d)     For the purposes hereof, (1) the "**Supporting Noteholder Consent Right**" means the Required Supporting Noteholders' right to consent or approve any of the Definitive Documentation (or such amendments, modifications or supplements) and shall apply solely to the extent any Definitive Documentation, (i) materially and adversely affects, directly or indirectly, the economic rights, waivers, or otherwise modifies or affects the releases and injunctions proposed to be granted to, or received by, the Supporting Noteholders as identified in the Term Sheet and this Agreement and implemented pursuant to the Plan and/or the procedures relating thereto (including through the treatment (or change to the treatment) under the Plan of any claim or interest), other than such different treatment that may be consented to by any Noteholder, or (ii) materially and adversely affects, directly or indirectly, the obligations that the Supporting Noteholders may have pursuant to this Agreement or the Plan, in each case, which consent shall not be unreasonably withheld, conditioned or delayed; and (2) the "**Sponsor Consent Right**" means each Supporting Sponsor's right to consent or approve any of the Definitive Documentation (or such amendments, modifications or supplements) and shall apply solely to the extent any Definitive Documentation (i) materially and adversely affects the economic rights, waivers, or otherwise modifies or affects the releases and injunctions proposed to be granted to, or received by, such Supporting Sponsor as identified in the Term Sheet and this Agreement and implemented pursuant to the Plan, and/or the procedures relating thereto (including through the treatment (or change to the treatment) under the Plan of any claim or interest), other than such different treatment that may be consented to by such Supporting Sponsor, or (ii) materially and adversely affects the obligations that such Supporting Sponsor may have pursuant to this Agreement or the Plan, in each case, which consent shall not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, the Supporting Noteholders and Supporting Sponsors shall not have any consent rights with respect to, and the Supporting Noteholder Consent Right and the Sponsor Consent Right shall not apply to, (1) the DIP Orders, (2) the DIP ABL Documents, (3) the DIP Term Loan Documents and (4) the Exit Credit Documents (except to the extent the applicable Exit Credit Document is inconsistent with the terms set forth in the Term Sheet with respect to the Exit Facility related to such Exit Credit Document).

(e)     Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "**Exhibits and Schedules**") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, the Exhibits and Schedules shall govern.   In the event of any inconsistency between the terms of this Agreement (including the Exhibits and Schedules) and the Plan, the terms of the Plan shall govern.

Section 2.     Representations and Warranties.

(a)     Each of the Parties, severally and not jointly, hereby represents and warrants solely with respect to itself that the following statements are true, correct and complete:

(i)     (A) such Party is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (B) such Party has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and (C) the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries, (B) violate its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (C) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, in connection with the filing of the Chapter 11 Cases;

(iii)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(iv)     the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, other than those which have been obtained, taken or made; and

(v)     such Party is not currently engaged in any discussions, negotiations or other arrangements with respect to any Alternative Transaction (as defined in Section 24 below).

(b)     Each Supporting Creditor, severally and not jointly, hereby represents and warrants solely with respect to itself that the following statements are true, correct and complete:

(i)     such Supporting Creditor (A) either (1) is the sole legal and beneficial owner of the Term Loans or Notes, as applicable, set forth below its

6

name on the signature page hereof, free and clear of all claims, liens and encumbrances (other than ordinary course claims, liens and encumbrances in connection with prime brokerage or custodian arrangements), or (2) has all necessary investment and voting discretion with respect to such Term Loans or Notes in respect of matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Term Loans or Notes to the terms of this Agreement, and (B) has full power and authority to act on behalf of, vote and consent to matters concerning such Term Loans or Notes in respect of matters relating to the Restructuring contemplated by this Agreement and to dispose of, exchange, assign, sell and otherwise transfer (each, a "**Transfer**") such Term Loans or Notes (all Term Loans and Notes under clauses (A) and (B) and any additional Term Loans or Notes that a Supporting Creditor owns or has such control over from time to time or acquires after the Execution Date (as defined below), collectively, are its "**Participating Term Loans**" and "**Participating Notes**", as applicable; a Supporting Creditor's Participating Term Loans and Participating Notes, collectively, are its "**Participating Debt**");

(ii)     such Supporting Creditor has made no prior Transfer of, and has not entered into any other binding agreement to Transfer, in whole or in part, any portion of its right, title, or interests in such Participating Debt that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Supporting Creditor herein or would render such Supporting Creditor otherwise unable to comply with its obligations under this Agreement;

(iii)     such Supporting Creditor is an "accredited investor" (as defined in Rule 501(a)(1), (2), (3), (7) or (8) under the Securities Act of 1933, as amended); and

(iv)     such Supporting Creditor acknowledges the Company's representation and warranty that the issuance and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code.

(c)     Each Supporting Sponsor, severally and not jointly, hereby represents and warrants solely with respect to itself that the following statements are true, correct and complete:

(i)     such Supporting Sponsor (A) either (1) is the sole legal and beneficial owner of the Topco Common Stock set forth below its name on the signature page hereof, free and clear of all claims, liens and encumbrances (other than ordinary course claims, liens and encumbrances in connection with prime brokerage or custodian arrangements), or (2) has sole investment and voting

7

discretion with respect to such Topco Common Stock in respect of matters relating to the Restructuring and has the power and authority to bind the beneficial owner(s) of such Topco Common Stock to the terms of this Agreement, and (B) has full power and authority to act on behalf of, vote and consent to matters concerning such Topco Common Stock in respect of matters relating to the Restructuring and to Transfer such Topco Common Stock (all Topco Common Stock under clauses (A) and (B) and any additional Topco Common Stock that a Supporting Sponsor owns or has such control over from time to time or acquires after the Execution Date, collectively, are its "**Participating Topco Common Stock**");

(ii)     such Supporting Sponsor has made no prior Transfer of, and has not entered into any other binding agreement to Transfer, in whole or in part, any portion of its right, title, or interests in such Participating Topco Common Stock that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Supporting Sponsor herein or would render such Supporting Sponsor otherwise unable to comply with its obligations under this Agreement.

Section 3.     <u>Agreements of the Supporting Creditors</u>.

(a)     *Support of Restructuring by All Supporting Creditors.*    Subject to the terms and conditions hereof, for so long as this Agreement has not been terminated upon the occurrence of a Support Termination Event (defined below), and except as expressly released by the Required RSA Parties in writing from any of the following obligations, each Supporting Creditor agrees, in its capacity as a holder or beneficial holder of any Term Loans, Notes or any other type of claim against or indebtedness issued by the Company, severally and not jointly, to use commercially reasonable efforts to:

(i)     (A) support and to take all reasonable actions necessary to implement and consummate the Restructuring in a timely manner as contemplated by this Agreement, the Term Sheet and the Definitive Documentation, (B) vote or cause to be voted its Participating Debt in favor of the Plan, when solicited to do so and by the applicable deadline for doing so; and (C) not "opt out" of any releases under the Plan (except such Supporting Term Lender or Supporting Noteholder shall not be prohibited from "opting out" of granting such a release to any Party that has materially breached or terminated this Agreement);

(ii)     not (A) object to, or vote any of its Participating Debt or other claims to, reject or impede, the Restructuring, support directly or indirectly any such objection, rejection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Restructuring or any Definitive Documentation prepared in connection with the pursuit or consummation of the Restructuring; and (B) otherwise take any actions, directly or indirectly, inconsistent with this Agreement or the Definitive Documentation;

8

(iii)    support and, in the case of each Supporting Term Lender and the Crossover Holder, to take all reasonable actions necessary to implement and consummate, the DIP Term Facility, and, so long as the Exit ABL Facility is in form and substance acceptable to the Required Supporting Term Lenders and the Crossover Holder, the Priority Exit Facility and Takeback Term Loan;

(iv)    not, directly or indirectly, seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter or participate in any discussions or any agreement with any non-Party regarding, any Alternative Transaction;

(v)    negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documentation to which it is (or will be) a party;

(vi)    not direct any administrative agent, collateral agent or indenture trustee (as applicable) to take any action inconsistent with such Supporting Creditor's obligations under this Agreement, and, if any applicable administrative agent, collateral agent or indenture trustee (as applicable) takes any action inconsistent with such Supporting Creditor's obligations under this Agreement, such Supporting Creditor shall use its commercially reasonable efforts to direct such administrative agent, collateral agent or indenture trustee (as applicable) to cease and refrain from taking any such action;

(vii)    not withdraw, amend or revoke (or cause to be withdrawn, amended or revoked) its vote with respect to the Plan; _provided_, _however_, that (i) upon the occurrence of a Term Lender Termination Event votes tendered by the Supporting Term Lenders; or (ii) upon the occurrence of a Noteholder Termination Event, all votes tendered by the Supporting Noteholders, in each case, shall be immediately revoked and deemed void _ab initio_ without any further notice to or action, order or approval of the Bankruptcy Court; and

(viii)    to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Restructuring, negotiate with the Parties in good faith appropriate additional or alternative provisions to address any such impediment; _provided_ that the economic outcome for the Supporting Creditors, the anticipated timing of the effective date of the Plan (the "**Effective Date**") and other materials terms of this Agreement must be substantially preserved in such alternate provisions;

(b)    _Transfers_.

(i)    Each Supporting Creditor agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not Transfer any of its Participating Debt, or any option thereon or any right or interest (voting or otherwise) therein; _provided_ that a Supporting Creditor may Transfer any or all of

9

its Participating Debt to (A) any other Supporting Creditor (including through a broker-dealer intermediary), in which case, such Participating Debt shall automatically be deemed to be subject to the terms of this Agreement and any vote in favor of the Plan by such Supporting Creditor shall be binding upon the transferee, or (B) any third party that executes and delivers a Joinder (as defined below) to the Company and counsel for the Supporting Term Lenders and Supporting Noteholders at least two business days prior to the relevant Transfer, in which case such transferee shall be deemed to be a Supporting Term Lender or Supporting Noteholder, as applicable, for purposes of this Agreement, and any vote in favor of the Plan by such Supporting Creditor shall be binding upon the transferee.

(ii)     Any third party that receives or acquires any portion of a Supporting Creditor's Participating Debt pursuant to a Transfer shall agree to be bound by all of the terms of this Agreement (a "**Joining Creditor**") by executing and delivering to counsel for the Company a joinder in the form of Exhibit B hereto (the "**Joinder**").  The Joining Creditor shall thereafter be deemed to be a Supporting Term Lender or Supporting Noteholder, as applicable, and a Party for all purposes under this Agreement.  Each Joining Creditor shall indicate, on the appropriate schedule annexed to its Joinder, the number and amount of Participating Debt held by such Joining Creditor.  With respect to the Participating Debt held by a Joining Creditor upon consummation of the Transfer of such Participating Debt, such Joining Creditor hereby makes the applicable representations and warranties set forth in Section 2 of this Agreement to the other Parties.  Each Supporting Creditor agrees that any Transfer of any claim, option or interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Supporting Creditor shall have the right to enforce the voiding of such Transfer.

(iii)     Except as set forth in Section 3(b)(i), this Agreement shall in no way be construed to preclude any Supporting Creditor from consummating any Transfer of any Term Loans, Notes or other securities of the Company.  To the extent any Supporting Creditor acquires additional Term Loans or Notes, such Term Loans and Notes shall automatically and immediately be deemed subject to this Agreement and such Supporting Creditor shall be deemed to make the applicable representations and warranties set forth in Section 2 of this Agreement to the other Parties with respect to such newly acquired Term Loans and Notes as of the date of such acquisition.  Each Supporting Creditor agrees to provide to counsel for the Company a written notice of the acquisition of any additional Term Loans or Notes, including any Participating Debt pursuant to Section 3(b)(i)(A), within three business days of the consummation of such acquisition.

(c)     *Marketmaking*.  Notwithstanding anything in this Agreement to the contrary, (i) a Supporting Creditor may Transfer any Participating Debt to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the

10

requirement that such entity be or become a Supporting Creditor; <u>provided</u> that the transferee of such Participating Debt from the Qualified Marketmaker shall comply in all respects with the terms of this Agreement (including executing and delivering a Joinder), and (ii) to the extent that a Supporting Creditor, acting in its capacity as a Qualified Marketmaker, acquires any Term Loans or Notes from a holder of such claims that is not a Supporting Creditor, such Qualified Marketmaker may Transfer such claim without the requirement that the transferee be or become a Supporting Creditor in accordance with <u>Section 3(c)</u>. A "**Qualified Marketmaker**" is an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company, or enter with customers into long and short positions in claims against the Company, in its capacity as a dealer or market maker in such claims, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(d)     *Forbearance*.  By executing this Agreement, each Supporting Creditor (including, for the avoidance of doubt, any entity that may execute this Agreement pursuant to a Joinder) agrees, as long as this Agreement has not terminated in accordance with its terms, to forbear from the exercise of any rights or remedies it may have under the TL Credit Documents or the Notes Documents, applicable United States, local or foreign law or otherwise, in each case with respect to any Default or Event of Default (each as defined under the TL Credit Agreement or the Indenture, as applicable) by the Company that is caused solely by the Company's (i) failure to make an interest payment due with respect to the Notes, and (ii) entry into this Agreement or the other documents related to this Agreement and the transactions contemplated by this Agreement and the implementation thereof (collectively, the "**Specified Defaults**") and on no other basis. The forbearance in this <u>Section 3(d)</u> (i) shall automatically terminate, without the need for any further notice, if this Agreement is terminated in accordance with its terms, (ii) shall not constitute a waiver with respect to any Defaults or Events of Default (each as defined under the TL Credit Agreement or the Indenture, as applicable) and (iii) shall not bar any Supporting Creditor from filing a proof of claim in the Chapter 11 Cases or taking action to establish the amount of such claim.  If the Restructuring is not consummated, the Parties fully reserve any and all of their rights, remedies, claims and defenses.  For the avoidance of doubt, the forbearance set forth in this Section 3(d) shall not constitute a waiver with respect to any default or event of default under the TL Credit Documents. Except as expressly provided in this Agreement and any applicable intercreditor agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Supporting Term Lender or Supporting Noteholder to protect and preserve any right, remedy, condition or approval requirement under this Agreement or the Definitive Documentation.  Upon the termination of this Agreement in accordance with <u>Section 6</u> below, the agreement of the Supporting Creditors to forbear from exercising rights and remedies in accordance with this <u>Section 3(d)</u> shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Company hereby waives.

(e)      Notwithstanding anything to the contrary herein, nothing in this Agreement shall limit, condition or restrict the Supporting Term Lenders (including the Crossover Holder), in their capacities as DIP Term Lenders, from (i) exercising any rights and remedies under the DIP Term Loan Agreement and DIP Term Loan Documents (and any related credit documents, including the DIP Orders), (ii) waiving or forbearing with respect to any "Default" or "Event of Default" under and as defined in the DIP Term Loan Agreement and DIP Term Loan Documents (and any related credit documents, including the DIP Orders), (iii) amending, modifying or supplementing the DIP Term Loan Agreement and DIP Term Loan Documents (and any related credit documents) or (iv) refusing to make additional advances under the DIP Term Loan Agreement and DIP Term Loan Documents (and any related credit documents, including the DIP Orders), in each case in clauses (i)-(iv) above, in accordance with the terms of the DIP Term Loan Agreement and DIP Term Loan Documents (and any related credit documents, including the DIP Orders).

Section 4.      Agreements of the Supporting Sponsors.

(a)      *Support of Restructuring.*  Subject to the terms and conditions hereof, for so long as this Agreement has not been terminated upon the occurrence of a Support Termination Event, and except as expressly released by the Required RSA Parties in writing from any of the following obligations, each Supporting Sponsor, severally, and not jointly, agrees to use commercially reasonable efforts to:

(i)      (A) support and to take all reasonable actions necessary to implement and consummate the Restructuring in a timely manner as contemplated by this Agreement, the Term Sheet and the Definitive Documentation, (B) participate in the Restructuring and (C) vote or cause to be voted its Participating Topco Common Stock in favor of the Plan, if solicited to do so and by the applicable deadline for doing so;

(ii)      upon consummation of the Restructuring, waive any and all of its unsecured claims of any kind or nature against the Company, except any Term Loans or Notes held by the Supporting Sponsors;

(iii)      not (A) object to, or vote any of its Participating Topco Common Stock or other claims to, reject or impede, the Restructuring, support directly or indirectly any such objection, rejection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Restructuring or the Definitive Documentation prepared in connection with the pursuit or consummation of the Restructuring; and (B) otherwise take any actions, directly or indirectly, inconsistent with this Agreement or the Definitive Documentation;

(iv)     not, directly or indirectly, to seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter or participate in any discussions or any agreement with any non-Party regarding, any Alternative Transaction;

(v)     to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Restructuring, negotiate with the Parties in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Supporting Sponsors, the anticipated timing of the Effective Date and other materials terms of this Agreement must be substantially preserved in such alternate provisions; and

(vi)     not, unless otherwise permitted pursuant an order entered by the Bankruptcy Court, (i) pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Company; or (ii) acquire any outstanding indebtedness of the Company, in each case, to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event will impair or adversely affect any of the Company's tax attributes (including under section 108 or 382 of the Internal Revenue Code of 1986 (as amended)); and

(vii)     except to the extent expressly provided hereunder or under the Definitive Documentation, (i) not enter into any transactions or agreements with the Company or receive any management or transaction fees or expense reimbursements from the Company; or (ii) without otherwise modifying any rights conferred by the Plan, until after the Term Loans are paid in full in cash or as otherwise agreed to by the Required Supporting Term Lenders and the Crossover Holder, in each case, in their sole discretion, not assert any claims of any kind or any priority against the Company, rights to indemnification and contribution under the Company's constituent documents or applicable state law.

(b)     *Transfers*.  Each Supporting Sponsor agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not Transfer any of its Topco Common Stock, or any option thereon or any right or interest (voting or otherwise) therein.

Section 5.     Agreements of the Company.

(a)     *Support of Restructuring*.  Subject to the terms and conditions hereof, for so long as this Agreement has not been terminated upon the occurrence of a Support Termination Event, and except as expressly released by the Required RSA Parties in writing from any of the following obligations, the Company agrees to:

(i)    (A) prepare or cause the preparation of the Definitive Documentation, and (B) provide draft copies of the Definitive Documentation (to the extent reasonably required to be drafted before to the Petition Date) and "first day" pleadings to the Creditor Advisors (as defined below) before the Petition Date;

(ii)    (A) support and take all reasonable actions necessary to implement and consummate the Restructuring in a timely manner as contemplated by this Agreement, the Term Sheet and the Definitive Documentation, (B) not take any actions, directly or indirectly, inconsistent with this Agreement or the Definitive Documentation and (C) negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documentation to which it is (or will be) a party;

(iii)    to the extent that any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Restructuring, negotiate with the Parties in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the other Parties, the anticipated timing of the Effective Date and other material terms as contemplated herein must be substantially preserved in such alternate provisions, as determined by the Required Supporting Term Lenders and the Crossover Holder, in each case, in their sole discretion;

(iv)    maintain its good standing under the laws of the state or other jurisdiction in which it is incorporated or organized;

(v)    promptly notify counsel to the Supporting Term Lenders, the Crossover Holder and Supporting Noteholders in writing of the commencement or filing of any material governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened);

(vi)    if the Company knows of a material breach by any Party of such Party's obligations, representations, warranties or covenants set forth in this Agreement, furnish prompt written notice (and in any event within three business days of such actual knowledge) to counsel to the Supporting Term Lenders, the Crossover Holder and the Supporting Noteholders and promptly take all remedial action necessary to cure such breach by any such Party;

(vii)    timely file a formal objection, in form and substance reasonably acceptable to the Required RSA Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases,

14

(D) modifying or terminating the Company's exclusive right to file or solicit acceptances of a plan of reorganization; or (E) challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, any portion of the Term Loans or Notes, or asserting any other cause of action against or with respect or relating to such claims or any pre-petition liens securing such claims;

(viii)  not sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business; and

(ix)  not seek, solicit or support any Alternative Transaction, other than as expressly permitted under <u>Section 24</u> hereof.

(b)  In each case subject to the DIP Orders and the agreements executed by the Company prior to the Execution Date, (i) the Company shall timely pay the reasonable and documented fees and expenses of (A) Jones Day; Pachulski Stang Ziehl & Jones LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Cozen O'Conner, P.C.,Fried, Frank, Harris, Shriver & Jacobson LLP and Morris, Nichols, Arsht & Tunnell LLP, in each case as counsel to certain Supporting Creditors, and (B) Greenhill & Co., LLC; Moelis & Company LLC; and FTI Consulting, Inc., in each case as financial advisor to certain Supporting Creditors (the advisors in <u>clauses (A) and (B)</u>, the "**Creditor Advisors**"), arising prior to the Petition Date to the extent invoiced at least two business days prior to the Petition Date, (ii) the Company shall pay the reasonable and documented fees and expenses of the Creditor Advisors arising after the Petition Date in accordance with the terms of the Plan and the DIP Orders and (iii) the Company shall not terminate, and shall remain in compliance with and not breach, the reimbursement obligations owed to the Creditor Advisors and the Supporting Creditors.

(c)  From the Execution Date until the Effective Date, DB Topco, DB Holdco, DB Midco or DBI (i) will not make or declare any dividends, distributions or other payments on account of its equity (other than as set forth in the Term Sheet), (ii) will not make any payments to the Supporting Sponsors or any of their respective affiliates (other than reimbursements to the Supporting Sponsors for actual expenses incurred on behalf of the Company prior to the Effective Date up to an aggregate amount for each of the Supporting Sponsors of $10,000) and (iii) will ensure that DBI does not make any transfers (whether by dividend, distribution or otherwise) to any direct or indirect parent entity or shareholder of DBI and that no subsidiaries of DBI make any transfers (whether by dividend, distribution or otherwise) to any direct or indirect parent entity or shareholder of DBI, in each case other than the expense reimbursement described above.

(d)  From and after the Execution Date, the Company will operate the business of the Company in the ordinary course and keep the Supporting Creditors reasonably informed about the operations of the Company, and the Company shall (i) provide to the Creditor Advisors, and shall direct its employees, officers, advisors and other representatives to provide the Creditor Advisors, (A) reasonable access (without any

material disruption to the conduct of the Company's businesses) during normal business hours to the Company's books and records; (B) reasonable access during normal business hours to the management and advisors of the Company; and (C) timely and reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs.

Section 6.       Termination of Obligations.

(a)       Supporting Creditor Termination Events.  (A) The Required Supporting Term Lenders may, upon notice to the other Parties, terminate the obligations of the Supporting Term Lenders under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Required Supporting Term Lenders on a prospective or retroactive basis (each, a "**Term Lender Termination Event**"); (B) the Crossover Holder may, upon notice to the other Parties, terminate the obligations of the Crossover Holder under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Crossover Holder on a prospective or retroactive basis (each, a "**Crossover Holder Termination Event**"); and (C) the Required Supporting Noteholders may, upon notice to the other Parties, terminate the obligations of the Supporting Noteholders under this Agreement upon the occurrence of certain events specified below, unless waived in writing by the Required Supporting Noteholders on a prospective or retroactive basis (each, a "**Noteholder Termination Event**" and, together with the Term Lender Termination Events and the Crossover Holder Termination Events, the "**Creditor Termination Events**"):

(i)       the occurrence of a material breach of this Agreement by the Company or other Party that has not been cured (if susceptible to cure) before the earlier of (A) five business days after written notice to the Company of such material breach by the Required Supporting Term Lenders, Crossover Holder or Required Supporting Noteholders (as applicable) asserting such termination and (B) one calendar day prior to any proposed Effective Date;

(ii)       the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(iii)       the dismissal of one or more of the Chapter 11 Cases;

(iv)       the appointment of a trustee, receiver or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(v)       (A)(1) any Definitive Documentation does not comply with Section 1 of this Agreement or (2) any other document or agreement necessary to consummate the Restructuring is not satisfactory or reasonably satisfactory (as applicable) to the Required Support Term Lenders and the Crossover Holder and

16

(B) any Definitive Documentation is inconsistent with the Supporting Noteholder Consent Right, provided that the Creditor Termination Event set forth in the immediately preceding clause (v)(A) shall only be assertable by the Required Support Term Lenders and the Crossover Holder; provided, further, that the Creditor Termination Event set forth in the immediately preceding clause (v)(B) shall only be assertable by the Required Supporting Noteholders;

(vi)     the Company or the Supporting Sponsors (A) amends or modifies, or files a pleading seeking authority to amend or modify, any Definitive Documentation in a manner that is materially inconsistent with this Agreement; (B) suspends or revokes the Restructuring; or (C) publicly announces its intention to take any such action listed in clauses (A) and (B) of this subsection; provided that the Required Supporting Noteholders shall be entitled to exercise the Creditor Termination Event set forth in this clause (vi) only to the extent the actions described in this clause (vi) are inconsistent with the Supporting Noteholder Consent Right;

(vii)     the Company (A) files or announces that it will file any plan of reorganization that is inconsistent with the Restructuring or (B) withdraws or announces its intention not to support the Restructuring;

(viii)     the Company files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Supporting Term Lenders and the Crossover Holder;

(ix)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the Company shall have five business days after the issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (A) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (B) is reasonably acceptable to the Required Supporting Term Lenders and the Crossover Holder;

(x)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required Supporting Term Lenders and the Crossover Holder;

(xi)     the occurrence of any default or event of default arising before the Petition Date under the TL Credit Documents other than the Specified Defaults; provided that the Creditor Termination Event set forth in this clause (xi) shall only be assertable by the Required Support Term Lenders and Crossover Holder;

(xii)     the occurrence of any Event of Default under the DIP Orders, the DIP Term Loan Agreement or the DIP ABL Agreement, as applicable, that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Term Lenders or the ABL DIP Lenders, as applicable, in accordance with the terms of the DIP Term Loan Agreement or the DIP ABL Agreement, as applicable;

(xiii)     a breach by the Company or the Supporting Sponsor of any representation, warranty or covenant of such entity set forth in Section 2 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring that (to the extent curable) has not been cured before the earlier of five business days after the receipt by the Company of written notice and description of such breach from any other Party;

(xiv)     either (A) the Company or any other Party files a motion, application, or adversary proceeding (or the Company or other Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (1) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loans or asserting any other cause of action against the Supporting Term Lenders or with respect or relating to such Term Loans or the prepetition liens securing the Term Loans, or (2) challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, any portion of the Notes or asserting any other cause of action against the Supporting Noteholders or with respect or relating to such Notes; provided that the Creditor Termination Event set forth in the immediately preceding clause (xiii)(A)(1) shall only be assertable by the Required Support Term Lenders and Crossover Holder; provided, further, that the Creditor Termination Event set forth in the immediately preceding clause (xiii)(A)(2) shall only be assertable by the Required Supporting Noteholders and the Crossover Holder; or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order with respect to any of the foregoing adverse to the Term Lenders, the Crossover Holder or the Noteholders or that is inconsistent with this Agreement or the Term Sheet in any material respect;

(xv)     the Company or the Supporting Sponsors terminate any of their obligations under and in accordance with Sections 6(b) or (c), as applicable, of this Agreement;

(xvi)     the Required Supporting Term Lenders, the Crossover Holder or the Required Supporting Noteholders terminate any of their respective obligations under and in accordance with this Section 6(a), as applicable;

(xvii)     if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating the Company's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

18

(xviii)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company or that would materially and adversely affect any of the Company's ability to operate their businesses in the ordinary course;

(xix)    the commencement of an involuntary case against the Company or any of the Company's foreign subsidiaries and affiliates or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company or the Company's foreign subsidiaries and affiliates, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(xx)    the Company or any of the Company's foreign subsidiaries or affiliates (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing;

(xxi)    if (A) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the consent of the Required Supporting Term Lenders and Crossover Holder, or (B) a motion for reconsideration, reargument or rehearing with respect to any such order has been filed and the Company has failed to timely object to such motion;

(xxii)    if (A) the Solicitation Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the consent of the Required Supporting Term Lender and the Crossover Holder, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company has failed to timely object to such motion;

(xxiii)    the occurrence of the Maturity Date (as defined in the DIP Term Loan Agreement or DIP ABL Agreement) without the Plan having been

19

substantially consummated, which shall only be a Noteholder Termination Event to the extent not consented to or waived in writing by the Supporting Term Lenders and Crossover Holder;

(xxiv)     the Company exercises its fiduciary out, in accordance with Section 24 hereof;

(xxv)      if the Company fails to implement the Restructuring in accordance with the milestones set forth in this Section 6(a)(xxv) (each, a "Milestone"); provided that the Company may extend a Milestone only with the express written consent of the Required Supporting Term Lenders and the Crossover Holder:

(A)     the Company shall commence the solicitation of votes to accept or reject the Plan on or before November 19, 2018 and, in connection with such solicitation, establish a date no later than December 20, 2018 as the deadline to submit votes to accept or reject the Plan;

(B)     on the Petition Date, the Company shall file the Plan, the Disclosure Statement and motions seeking approval of the DIP Term Facility and DIP ABL Facility and requesting a combined hearing for approval of the Disclosure Statement and confirmation of the Plan;

(C)     at or prior to 11:59 p.m. prevailing Eastern Time on November 22, 2018, the Bankruptcy Court shall have entered the Interim DIP Order;

(D)     at or prior to 5:00 p.m. prevailing Eastern Time on December 10, 2018, the Debtors shall have delivered a 12-month post-emergence liquidity forecast (containing weekly detail for the first 3 months of such forecast) to the Supporting Term Lenders and the Crossover Holder;

(E)     at or prior to 11:59 p.m. prevailing Eastern Time on December 21, 2018, the Bankruptcy Court shall have entered the Final DIP Order;

(F)     at or prior to 11:59 p.m. prevailing Eastern Time on January 7, 2019, the Bankruptcy Court shall have entered the Solicitation Order and the Confirmation Order; and

(G)     at or prior to 11:59 p.m. prevailing Eastern Time on January 14, 2019, the Effective Date shall have occurred.

(b)     Company Termination Events.  The Company may, upon notice to the Parties, terminate its obligations under this Agreement upon the occurrence of any of the

20

following events (each, a "**Company Termination Event**"), unless waived, in writing, by the Company on a prospective or retroactive basis:

(i)     a breach by a Party of any representation, warranty, or covenant of such Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring that (to the extent curable) has not been cured before the earlier of five business days after notice to all Parties of such breach and a description thereof; provided, however, notwithstanding the foregoing, it shall not be a Company Termination Event if the non-breaching Parties hold more than half in number and two-thirds in amount of each of the Term Loans and the Notes;

(ii)     the occurrence of a breach of this Agreement by any Party that has the effect of materially impairing the Company's ability to effectuate the Restructuring and has not been cured (if susceptible to cure) within five business days after notice to all Parties of such breach and a description thereof;

(iii)    the Company exercises its fiduciary out, in accordance with Section 24 hereof; or

(iv)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the Company has made commercially reasonable, good faith efforts to cure, vacate or have overruled such ruling or order prior to terminating this Agreement.

(c)     Sponsor Termination Events. The Supporting Sponsors may, upon notice to the other Parties, terminate their obligations under this Agreement upon the occurrence of any of the following events (each, a "**Sponsor Termination Event**," and together with the Creditor Termination Events and the Company Termination Events, the "**Support Termination Events**"), unless waived, in writing, by the Supporting Sponsors on a prospective or retroactive basis:

(i)     a breach by the Company or a Party (other than the Supporting Sponsor) of any representation, warranty or covenant of such entity set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring that (to the extent curable) remains uncured for a period of five business days after notice to all Parties of such breach and a description thereof;

(ii)    the Company (A) amends or modifies, or files a pleading seeking authority to amend or modify, any Definitive Documentation in a manner that is subject to the Sponsor Consent Right; (B) suspends or revokes the Restructuring; or

21

(C) publicly announces its intention to take any such action listed in <u>clauses (A)</u> and <u>(B)</u> of this subsection;

(iii)　　the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(iv)　　the dismissal of one or more of the Chapter 11 Cases;

(v)　　the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(vi)　　(A) any Definitive Documentation does not comply with <u>Section 1</u> of this Agreement or (B) any other document or agreement necessary to consummate the Restructuring is not satisfactory or reasonably satisfactory (as applicable) to the Supporting Sponsors, subject to the Sponsor Consent Right;

(vii)　　the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; <u>provided, however</u>, that the Company shall have five business days after the issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (A) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (B) is reasonably acceptable to the Supporting Sponsors;

(viii)　　if the Company withdraws or materially adversely alters the treatment to the Supporting Sponsor under the Plan or files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case subject to the Sponsor Consent Right;

(ix)　　if (A) the Solicitation Order or the Confirmation Order is reversed, stayed, dismissed, vacated or reconsidered, or modified or amended with respect to a matter within the scope of the Sponsor Consent Right without the consent of the Supporting Sponsors, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company has failed to timely object to such motion;

(x)　　the Required Supporting Term Lenders, the Crossover Holder, the Required Supporting Noteholders or the Company terminate any of their obligations under and in accordance with <u>Sections 6(a)</u> or <u>(b)</u>, as applicable, of this Agreement; or

(xi)　　if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating the Company's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code.

22

(d)     This Agreement may also be terminated by the mutual written consent of each of the Parties, notice of which shall be provided by the Company within two business days to the persons and entities listed on Schedule 1 annexed hereto, in accordance with Section 13;

(e)     Effect of Termination.  Subject to clauses (i) and (ii) of this Section 6(e), upon the occurrence of a Support Termination Event, unless waived by the applicable Parties, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Definitive Documentation, and there shall be no liability or obligation hereunder on the part of any Party hereto; provided that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations under this Agreement before the date of such Support Termination Event or (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 16 hereunder.  The automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof, and the Company hereby waives the automatic stay for such purposes.

(i)     Termination by Supporting Noteholders.    Notwithstanding anything in this Agreement, in the event any Supporting Noteholder terminates this Agreement under the terms hereof, (i) the Required Supporting Term Lenders and Crossover Holder shall have the option (which shall be delivered in writing to the Company, including via email) to (A) determine that the Supporting Term Lenders and Crossover Holder will continue remaining Parties to this Agreement in pursuit and in support of the Restructuring in which case all other Parties (other than the terminating Supporting Noteholder) shall remain bound by their obligations under this Agreement or (B) terminate this Agreement in accordance with this Section 6; (ii) this Agreement shall be deemed terminated with respect to the Supporting Noteholder and the Supporting Noteholder shall no longer be a Party to this Agreement and shall be relieved of any obligations hereunder; (iii) such other Parties shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Documentation or other document or matter or the Restructuring without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; and (iv) the Supporting Creditors (other than any Supporting Creditor that has breached this Agreement and such breach caused the occurrence of a Noteholder Termination Event pursuant to which such Supporting Noteholder has terminated this Agreement) shall no longer be obligated to not "opt out" of any releases proposed to be granted to any Supporting Noteholder under the Plan; (v) such other Parties shall not be obligated to grant or support the grant of any releases to such Supporting Noteholder under the Plan; and (vi) all of the applicable rights and remedies of the remaining Parties under this Agreement, the TL Credit Documents, the Notes Documents and applicable law shall be reserved in all respects.

23

(ii)     <u>Termination by Supporting Sponsor</u>.  Notwithstanding anything in this Agreement, in the event the Supporting Sponsor terminates this Agreement as a result of the occurrence of a Termination Event, (i) the Required Supporting Term Lenders and the Crossover Holder shall have the option (which shall be delivered in writing to the Company, including via email) to (A) determine that the Supporting Term Lenders and Crossover Holder will continue remaining Parties to this Agreement in pursuit and in support of the Restructuring in which case all other Parties (other than the terminating Supporting Sponsor) shall remain bound by their obligations under this Agreement or (B) terminate this Agreement in accordance with this <u>Section 6</u>; (ii) this Agreement shall be deemed terminated with respect to the Supporting Sponsor and the Supporting Sponsor shall no longer be a Party to this Agreement and shall be relieved of any obligations hereunder; (iii) such other Parties shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Documentation or other document or matter or the Restructuring without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; (iv) the Supporting Creditors (other than any Supporting Creditor that has breached this Agreement and such breach caused the occurrence of a Sponsor Termination Event pursuant to which such Supporting Sponsor has terminated this Agreement) shall no longer be obligated to not "opt out" of any releases proposed to be granted to any Supporting Sponsor under the Plan; (v) such other Parties shall not be obligated to grant or support the grant of any releases to such Supporting Sponsor under the Plan; and (vi) all of the applicable rights and remedies of the remaining Parties under this Agreement, the TL Credit Documents, the Notes Documents and applicable law shall be reserved in all respects.

Section 7.     <u>Good Faith Cooperation; Further Assurances; Definitive Documentation</u>.

(a)     The Parties shall, and shall cause each of their affiliates to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Furthermore, each of the Parties shall, and shall cause each of its affiliates to, take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement, in each case, to the extent in accordance with the terms hereof or, if not in accordance with the terms hereof, in such Party's reasonable discretion.  Each of the Parties, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Definitive Documentation, each of which shall, except as otherwise provided for herein, contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Term Sheet (as amended, supplemented or otherwise modified as provided herein), the other documents attached hereto or thereto and such other terms as are reasonably acceptable to each of the Parties (to the extent such Parties are expressly provided with consent rights over such documents pursuant to this Agreement), and (b) subject to the satisfaction of the terms and conditions set forth herein and therein, to execute, deliver and perform the Definitive

24

Documentation (in each case to the extent such Party is contemplated to be a party thereto).

(b)     The Company shall provide draft copies of all "first day" and other motions, applications, and other documents that the Company intends to file with the Bankruptcy Court in any of the Chapter 11 Cases to counsel for each Party at least two business days prior to the date when the Company intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  All such "first day" and other motions, applications and other documents that the Company intends to file with the Bankruptcy Court in any of the Chapter 11 Cases (other than the Definitive Documentation) shall be in form and substance reasonably satisfactory to the Required RSA Parties, subject to the Sponsor Consent Right and the Supporting Noteholder Consent Right.  The Company will use reasonable efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to counsel to each Party at least two business days prior to filing such pleading, and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

Section 8.     <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach, including an order of a court of competent jurisdiction requiring any Party to comply with any of its obligations hereunder; <u>provided</u> that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

Section 9.     <u>Amendments and Waivers</u>.  This Agreement, including the Exhibits and Schedules hereto, may be amended only upon written approval of the Parties to the extent set forth in <u>Section 1(d)</u> above.  Any waiver of any condition, term or provision to this Agreement must be in writing signed by the Parties entitled to waive such condition, term or provision.  In determining whether any consent or approval has been given or obtained by the applicable number of Supporting Creditors or Supporting Sponsors, any then-existing Supporting Creditors or Supporting Sponsors, as applicable, that is in material breach of its covenants, obligations or representations under this Agreement (and the respective Term Loans, Notes or Topco Common Stock, as applicable, held by such Party) shall be excluded from such determination, and the Term Loans, Notes or Topco Common Stock, as applicable, held by such Party shall be treated as if they were not outstanding.

Section 10.     <u>Representation by Counsel</u>.  Each Party acknowledges that it has had the opportunity to be represented by counsel of its choice in connection with this Agreement, the Restructuring and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived by each Party.

25

Section 11.    Governing Law, etc.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing, each of the Parties hereto hereby agrees that, if the Chapter 11 Cases have been commenced and are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.    EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

Section 12.    Execution Date.  This Agreement shall become effective, and each Party hereto shall be bound to the terms of this Agreement, as of the date (a) the reasonable and documented fees and expenses of the Creditor Advisors invoiced and outstanding for at least two business days as of the date hereof have been paid in full in cash, and (b)(i) the Company, (ii) Term Lenders representing more than one-half in the aggregate number of Term Lenders and two-thirds of the aggregate principal amount outstanding under the TL Credit Agreement, (iii) the Crossover Holder and (iv) Noteholders representing more than one-half of the aggregate principal amount of outstanding Notes have each executed and delivered a signature page to this Agreement; and (ii) the Supporting Term Lenders and Required Supporting Noteholders have communicated to the Company that the form, substance and manner of dissemination of the Announcement (as defined below) and the Communications Plan (as defined below) is reasonably satisfactory to the Supporting Term Lenders and Required Supporting Noteholders, as applicable (the "**Execution Date**").  The thresholds set forth in clauses (b)(ii) and (b)(iv) of the immediately preceding sentence shall be determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

Section 13.    Notices.    All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, at the addresses and facsimile numbers set forth on Schedule 1 hereto.

Section 14.    Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including its Participating Debt and any other interests in or claims against the Company or other Parties.  Without limiting the foregoing sentence in any way, after a Support Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests, subject to Section 6, in the case of any claim for breach of this Agreement.  Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Restructuring and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

Section 15.    Rule of Interpretation.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a plan of reorganization under the Bankruptcy Code. Unless otherwise specified, references in this Agreement to any Section or clause refer to such Section or clause as contained in this Agreement.  The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including," "includes" and "include" shall each be deemed to be followed by the words "without limitation."  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

Section 16.    Survival.

(a)    Notwithstanding (i) any Transfer of Participating Debt in accordance with Section 3 or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 8, 10, 11 and 13-23 shall survive such Transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

(b)    Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Company and in contemplation of possible chapter 11 filings by the Company and

that the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

Section 17.    Successors and Assigns; Severability; Several Obligations.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.    The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 18.    Third-Party Beneficiary.  This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof or have any rights hereunder.

Section 19.    Counterparts; Additional Supporting Creditors.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Executed copies of this Agreement and any Joinders hereto may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

Section 20.    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Definitive Documentation; provided that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any other Party shall continue in full force and effect as provided therein.

Section 21.    Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

Section 22.    Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

Section 23.    Publicity.

(a)    The Company shall not (i) use or disclose to any person the name of any other Party, including in any press release, without such Party's prior written consent or (ii) disclose to any person, other than legal, accounting, financial and other advisors to

28

the Company who have a need to know such information in connection with the Restructuring, the amount or percentage of any Term Loans, Notes or Topco Common Stock held by any Party; provided that the Company shall be permitted to disclose at any time the aggregate amount of, and aggregate percentage of, the Term Loans, Notes and Topco Common Stock held by the Parties. The Parties hereby consent to the disclosure by the Company in the Definitive Documentation, or in any motion or other pleading seeking approval of any aspect of the Restructuring, or as otherwise required by law or regulation or by the Company's existing financing agreements, of the execution, terms and contents of this Agreement and the aggregate amount of, and aggregate percentage of, the Term Loans, Notes and Topco Common Stock held by the Parties.

(b)     Subject to the terms of any confidentiality agreement between the Company and any other Party, such other Party shall not (i) use the name of the Company in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the transactions contemplated hereby and any amendments thereof without first (x) submitting such press releases, public filings, public announcements or other communications to counsel for the Company, the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors for review and comment and (y) receiving the prior written consent of the Company, the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors.

(c)     In the event that the Company seeks to disseminate a press release, public filing, public announcement or other communications (collectively, an "**Announcement**") regarding the commencement of the Chapter 11 Cases, the Restructuring or any terms thereof, it shall provide a draft of such Announcement to counsel for the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors for review and comment at least 24 hours before the public disclosure of such Announcement and shall act in good faith in considering and incorporating the reasonable comments of the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors to any such Announcement. The Company shall consult with the Supporting Term Lenders, the Crossover Holder, the Required Supporting Noteholders and the Supporting Sponsors with respect to any communications plan with respect to the Restructuring or the Company's business on a go-forward basis, including a communications plan with respect to customers (any such plan, a "**Communications Plan**"), and shall act in good faith in considering and incorporating the reasonable comments of the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors to any such plan; provided, that any such Announcement and Communications Plan must be reasonably acceptable to the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors.

1004765451v14

Section 24.    Exclusivity; Fiduciary Duties.

(a)    From the date of the execution of this Agreement until the earlier of Effective Date or termination of this Agreement pursuant to Section 6, the Company will not and will use its reasonable efforts to cause its representatives and shareholders not to, and the Supporting Sponsor shall not, directly or indirectly, (i) solicit, initiate, encourage or attempt to obtain or arrange for the submission of (A) any proposal or offer from any person relating to the Restructuring or any purchase, sale, issuance, acquisition, repurchase, exchange or other disposition of any securities or indebtedness of the Company or (B) any refinancing, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, or other comprehensive restructuring involving the Company, in each case, other than the Restructuring and internal transactions undertaken for tax planning and reorganization purposes (each, an "**Alternative Transaction**"), or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, enter into any agreement, arrangement or understanding related to, or facilitate in any other manner any effort or attempt by any person to do or seek any such Alternative Transaction; unless the Company's boards of directors determine, based on the advice of outside legal counsel and outside financial advisors, in good faith, and consistent with their respective fiduciary duties, that (a) such Alternative Transaction would maximize the value of the Company's estates and recoveries to all their stakeholders and (b) proceeding with the Restructuring (as opposed to such Alternative Transaction) would be inconsistent with their respective fiduciary duties.  Prior to the earlier of (x) making a public announcement regarding their intention to accept an Alternative Transaction or (y) entering into a definitive agreement with respect to an Alternative Transaction, the Company shall have terminated this Agreement pursuant to Section 6(b) above.  The Company shall give counsel to the Supporting Creditors and the Crossover Holder not less than three business days' prior written notice before exercising such termination right in accordance with this Agreement.  At all times prior to the date on which the Company delivers a termination notice pursuant to Section 6(b) above, the Company shall provide to counsel to the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Transaction within three business days of the Company's receipt of such offer or proposal.

(b)    Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company, the Supporting Creditors or the Supporting Sponsors, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

30

Section 25.    <u>Tax</u>.  To the extent practicable, subject to the consent of the Required Supporting Term Lenders and the Crossover Holder (such consent not to be unreasonably withheld, conditioned or delayed), the Restructuring will be structured so as to preserve or otherwise maximize favorable tax attributes (including tax basis) of the Company and to otherwise obtain the most beneficial structure for the Company or the reorganized debtors and the holders of New Common Stock post-Effective Date, and the Debtors will cooperate on a reasonable basis with the Supporting Term Lenders and the Crossover Holder in connection with making such determination, including by providing the Supporting Term Lenders and the Crossover Holder with reasonable information relevant to making such determination.

Section 26.    <u>Limitations</u>.  The Company understands that each Supporting Creditor is engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of such Supporting Creditor that principally manages and/or supervises the Supporting Creditor's investment in the Company (as further set forth in the signature page hereto) (the "**Designated Group**"), and shall not apply to any other affiliate, trading desk or business group of such Supporting Creditor so long as they are not acting at the direction or for the benefit of any Designated Group.

*[Remainder of page intentionally left blank]*

1004765451v14

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

DB INVESTORS, INC.

By: _____
Name: Joan Hilson
Title:    Executive Vice President and Chief
Financial and Operating Officer


DB HOLDCO, INC.

By: _____
Name: Joan Hilson
Title:    Executive Vice President and Chief
Financial and Operating Officer


DB MIDCO, INC.

By: _____
Name: Joan Hilson
Title:    Executive Vice President and Chief
Financial and Operating Officer


DAVID'S BRIDAL, INC.

By: _____
Name: Joan Hilson
Title:    Executive Vice President and Chief
Financial and Operating Officer

Dated: November 18, 2018

## SUPPORTING TERM LENDER

Name of Institution: AlbaCore Capital LLP as investment manager for and on behalf of AlbaCore Capital Limited as AIFM for AlbaCore Partners II Investment Holdings D Designated Activity Company

By:

Name: Matthew Courey

Title: Member

Address: 55 St James's Street, London, SW1A 1LA
United Kingdom

Telephone: +44(0)207 881 6000

Facsimile: +44(0)207 681 1266

## PRINCIPAL AMOUNT OF TERM LOANS

$ ███████

Dated: November 18, 2018

## SUPPORTING TERM LENDER

Name of Institution:  AlbaCore Capital LLP as investment manager for and on behalf of AlbaCore Capital Limited as AIFM for AlbaCore Partners I Investment Holdings B Designated Activity Company

By:
Name:        Matthew Courey
Title:         Member

Address:     55 St James's Street, London, SW1A 1LA
                 United Kingdom
Telephone:  +44(0)207 881 6000
Facsimile:   +44(0)207 681 1266

## PRINCIPAL AMOUNT OF TERM LOANS

$ ▮▮▮▮▮▮▮

Dated: November 18, 2018

## SUPPORTING TERM LENDER

Name of Institution: Courage Credit Opportunities
Onshore Fund III, L.P.

By: its Investment Manager, Courage
Capital Management, LLC

Signature: _John E. Klinge_

Name: John E. Klinge

Title: Senior Managing Director

Address: 2815 Townsgate Road, Suite 122
Westlake Village, CA 91361-5890

Telephone: 310-622-9270

Facsimile:

## PRINCIPAL AMOUNT OF TERM LOANS

$ ██████████

Dated: November 18, 2018

## SUPPORTING TERM LENDER

Name of Institution: Courage Credit Opportunities
Offshore Master Fund III,
L.P.

By: its Investment Manager, Courage
Capital Management, LLC

Signature: _____

Name: John E. Klinge

Title: Senior Managing Director

Address: 2815 Townsgate Road, Suite 122
Westlake Village, CA 91361-5890

Telephone: 310-622-9270

Facsimile: _____

## PRINCIPAL AMOUNT OF TERM LOANS

$ ███████

Dated: November 18, 2018
_____

## SUPPORTING TERM LENDER

Name of Institution: Courage Credit Opportunities
Fund IV, LP
_____

By: its Investment Manager, Courage
Capital Management, LLC

Signature: _____
Name: John E. Klinge
Title: Senior Managing Director

Address: 2815 Townsgate Road, Suite 122
Westlake Village, CA 91361-5890
Telephone: 310-622-9270
Facsimile: _____

## PRINCIPAL AMOUNT OF TERM LOANS

$ ██████ _____

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Name of Institution: **AGF Floating Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

By:

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115

Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ █████████████████████

Dated: November 15, 2018

## SUPPORTING TERM LENDER

**Brighthouse Funds Trust I -**
**Brighthouse/Eaton Vance Floating Rate Portfolio**
By: Eaton Vance Management as Investment Sub-Advisor

Name of Institution: _____

By: _____

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ████████████████████████

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Eaton Vance CLO 2014-1R, Ltd.
By: Eaton Vance Management
As Investment Advisor

Name of Institution: _____

By: _____
Name: Michael B. Botthof
Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ████████████████

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Name of Institution: **Eaton Vance Floating-Rate Income Plus Fund**
By: Eaton Vance Management as Investment Advisor

By:
Name: ~~Michael B. Botthof~~
Title: ~~Vice President~~

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dated: November 15, 2018

## SUPPORTING TERM LENDER

**Eaton Vance Senior Floating-Rate Trust**
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _~Michael B. Botthof~_ (signature)
Name: ~Michael B. Botthof~
Title: ~Vice President~

Address: Two International Place, 9th Floor
Boston , MA 02110
_____

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ___ ████████████████ ___

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Eaton Vance Floating-Rate Income Trust
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _____
Name: Michael B. Botthof
Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ████████████████████

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Eaton Vance International (Cayman Islands)
Floating-Rate Income Portfolio
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _____
Name: Michael B. Botthof
Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ████████████████

*Signature Page to Restructuring Support Agreement*

Dated: November 15, 2018

## SUPPORTING TERM LENDER

**Eaton Vance Senior Income Trust**
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115

Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ _____ ██████████████ _____

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Name of Institution: **Eaton Vance Short Duration Diversified Income Fund**
By: Eaton Vance Management
as Investment Advisor

By:

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ▮▮▮▮▮▮▮▮▮▮

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Eaton Vance Institutional Senior Loan Fund
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _____
Name: ~~Michael B. Botthof~~
Title: ~~Vice President~~

Address:  Two International Place, 9th Floor
          Boston , MA 02110

Telephone:  617-672-8115
Facsimile:  617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ _____ ███████████████ _____

Dated: November 15, 2018

## SUPPORTING TERM LENDER

**Eaton Vance Limited Duration Income Fund**
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _____

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115

Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ___ ███████████████████ ___

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Name of Institution: Eaton Vance Floating Rate Portfolio
By: Boston Management and Research
as Investment Advisor

By:

Name:

Title: Michael B. Botthof
Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ▮▮▮▮▮▮▮▮▮▮▮▮▮

Dated: November 15, 2018

## SUPPORTING TERM LENDER

**Senior Debt Portfolio**
By: Boston Management and Research
as Investment Advisor

Name of Institution: _____

By: _____

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115

Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ███████████████████

*Signature Page to Restructuring Support Agreement*

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Eaton Vance VT Floating-Rate Income Fund
By: Eaton Vance Management
as Investment Advisor

Name of Institution: _____

By: _____
Name: Michael B. Botthof
Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115
Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ _____████████████████_____

Dated: November 15, 2018

## SUPPORTING TERM LENDER

Name of Institution: ___Pacific Select Fund-
Floating Rate Loan Portfolio
By: Eaton Vance Management
as Investment Sub-Advisor___

By: _____

Name: Michael B. Botthof

Title: Vice President

Address: Two International Place, 9th Floor
Boston , MA 02110

Telephone: 617-672-8115

Facsimile: 617-672-1180

## PRINCIPAL AMOUNT OF TERM LOANS

$ ___█████████████___

*Signature Page to Restructuring Support Agreement*

Dated: November 14, 2018

**SUPPORTING TERM LENDER**

Name of Institution:   DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH
(solely with respect to the Distressed Products Group)
By: DB USA Core Corporation

By: *Andrew Mac Donald*
Name: Andrew MacDonald
Title: Assistant Vice President

By: *Deirdre Cesario*
Name: Deirdre Cesario
Title: Vice President

Address:   c/o Deutsche Bank Securities Inc.
60 Wall Street, 3rd Floor
New York, NY 10005
Attn: Elliott Horner
Telephone:   212-250-9304
Facsimile:   N/A

**PRINCIPAL AMOUNT OF TERM LOANS**

$ ▮▮▮▮▮▮▮▮▮

Dated: November 18, 2018

**SUPPORTING TERM LENDER**

Name of Institution:   HG Vora Special Opportunities Master Fund, Ltd.


By:          HG Vora Capital Management, LLC
             *as investment adviser*


Name:        Philip M. Garthe
Title:       Chief Operating Officer

Address:     330 Madison Avenue, 20th floor
             New York, NY 10017
Telephone:   212-707-4300
Facsimile:


**PRINCIPAL AMOUNT OF TERM LOANS**

$ ███████

Dated: November 18, 2018

## SUPPORTING TERM LENDER

Name of Institution: <u>Rimrock Capital Management, LLC</u>

By:
Name: <u>Chris Chester</u>
Title: <u>MD</u>
Address: <u>100 Innovation Drive</u>
<u>Irvine, CA 92617</u>
Telephone: <u>(949) 381-7816</u>
Facsimile: _____

## PRINCIPAL AMOUNT OF TERM LOANS

$ █████████ _____

Dated: November 16, 2018

## SUPPORTING TERM LENDER

**Name of Institution:** Neuberger Berman Alternative Funds –
Neuberger Berman Absolute Return Multi-Manager Fund
By: Sound Point Capital Management, LP as Sub-Adviser

_____
Name: Kevin Gerlitz
Title: Chief Financial Officer – Authorized Signer
Address: 375 Park Avenue, 33rd Floor
New York, NY 10152
Telephone: (212) 468-5701

## PRINCIPAL AMOUNT OF TERM LOANS

$ ███████████ _____

Dated: November 16, 2018

## SUPPORTING TERM LENDER

**Name of Institution**: Sound Point Credit
Opportunities Master Fund, L.P.
By: Sound Point Capital Management, LP as
Investment Manager

_(signature)_

Name: Kevin Gerlitz
Title: Chief Financial Officer – Authorized Signer
Address: 375 Park Avenue, 33rd Floor
New York, NY 10152
Telephone: (212) 468-5701

## PRINCIPAL AMOUNT OF TERM LOANS

$ ██████████

Dated: November 16, 2018

## SUPPORTING TERM LENDER

**Name of Institution**: Sound Point Beacon
Master Fund, L.P.
By: Sound Point Capital Management, LP as
Investment Manager

Name: Kevin Gerlitz
Title: Chief Financial Officer – Authorized Signer
Address: 375 Park Avenue, 33rd Floor
New York, NY 10152
Telephone: (212) 468-5701

## PRINCIPAL AMOUNT OF TERM LOANS

$ ▬▬▬▬▬▬▬

Dated: November 16, 2018

## SUPPORTING TERM LENDER

**Name of Institution**: Sound Point
Montauk Fund, L.P.
By: Sound Point Capital Management, LP as
Investment Manager

By: _____
Name: Kevin Gerlitz
Title: Chief Financial Officer – Authorized Signer
Address: 375 Park Avenue, 33rd Floor
New York, NY 10152
Telephone: (212) 468-5701

## PRINCIPAL AMOUNT OF TERM LOANS

$ █████████

Dated: November 16, 2018

**SUPPORTING TERM LENDER**

**Name of Institution**: Principal Funds, Inc. –
Global Multi-Strategy Fund
By: Sound Point Capital Management, LP as
Sub-Advisor

Name: Kevin Gerlitz
Title: Chief Financial Officer – Authorized Signer
Address: 375 Park Avenue, 33rd Floor
New York, NY 10152
Telephone: (212) 468-5701

**PRINCIPAL AMOUNT OF TERM LOANS**

$ ███████████

DocuSign Envelope ID: D7208884-BCC9-4426-88B6-0637FC285C50

Dated: November 14, 2018

## SUPPORTING TERM LENDER

Name of Institution:   Whitebox Multi-Strategy Partners, L.P.

By:          Whitebox Advisors LLC, as its investment manager

By:
Name:      Mark Strefling
Title:       Chief Executive Officer and General Counsel

Address:   3033 Excelsior Boulevard, Suite 300,

Minneapolis, MN 55416
Telephone:  612-253-6001

## PRINCIPAL AMOUNT OF TERM LOANS

$ ███████

Dated: November 14, 2018

## SUPPORTING TERM LENDER

Name of Institution:   Whitebox Asymmetric Partners, L.P.

By:        Whitebox  Advisors  LLC,  as  its  investment
           manager

By:
Name:      Mark Strefling
Title:     Chief Executive Officer and General Counsel

Address:   3033 Excelsior Boulevard, Suite 300,

           Minneapolis, MN 55416
Telephone: 612-253-6001


## PRINCIPAL AMOUNT OF TERM LOANS

$ ███████

Dated: November 18, 2018

**CROSSOVER HOLDER**

Name of Institution: Certain funds and accounts managed by Oaktree Capital Management, L.P. within its Strategic Credit, High Yield and Loan Strategies

By: Oaktree Capital Management, L.P., investment manager

By:
Name:
Title:
~~Philip McDermott~~ ~~Martin Boskovich~~
~~Vice President~~ ~~Managing Director~~

Address: 333 S. Grand Avenue, 28th Floor
Los Angeles, CA 90071
Telephone: 213-830-6300
Facsimile: 213-830-6293

**PRINCIPAL AMOUNT OF TERM LOANS**

$

**PRINCIPAL AMOUNT OF NOTES**

$

Dated: November 16, 2018

## SUPPORTING NOTEHOLDER

| | |
|---|---|
| Name of Institution: | Gateway Securities Holdings, LLC |
| By: | Solace Capital Partners, L.P., its Manager |
| By: | Solace Capital Partners, LLC, its General Partner |

| | |
|---|---|
| By: | _[signature]_ |
| Name: | Brett Wyard |
| Title: | Managing Partner |

| | |
|---|---|
| Address: | 11111 Santa Monica Blvd, Suite 1275 |
| | Los Angeles, CA 90025 |
| Telephone: | (310) 919-5404 |
| Facsimile: | (310) 919-5402 |

## PRINCIPAL AMOUNT OF NOTES

Dated: November 18, 2018

## SUPPORTING NOTEHOLDER

Name of Institution:  Arawak VIII, L.P.

By:  _Theresa A. Gore_

Name:  Theresa A. Gore

Title:  Vice President, Treasurer and Assistant Secretary of Clayton, Dubilier & Rice Fund VIII (Credit Investor), Ltd., the general partner of Arawak VIII, L.P.

Address:  c/o Clayton, Dubilier & Rice, LLC

375 Park Avenue

New York, NY 10152

Telephone:  212-407-5227

Facsimile:  212-407-5250

## PRINCIPAL AMOUNT OF NOTES

$ _____

Dated: November 18, 2018

**SUPPORTING SPONSOR**

Name of Institution:  Clayton,  Dubilier  &  Rice
Fund VIII, L.P.

By:

Name:   Theresa A. Gore

Title:   Vice    President,    Treasurer    and
Assistant   Secretary   of   CD&R
Associates   VIII,   Ltd.,   the   general
partner of Clayton, Dubilier & Rice
Fund VIII, L.P.

Address:   c/o Clayton, Dubilier & Rice, LLC

375 Park Avenue

New York, NY 10152

Telephone:  212-407-5227

Facsimile:  212-407-5250

**SHARES OF TOPCO COMMON STOCK**

Dated: November 18, 2018

**SUPPORTING SPONSOR**

Name of Institution:  CD&R Advisor Fund VIII Co-Investor, L.P.

By:

Name:  Theresa A. Gore

Title:  Vice President, Treasurer and Assistant Secretary of CD&R Associates VIII, Ltd., the general partner of CD&R Advisor Fund VIII Co-Investor, L.P.

Address:  c/o Clayton, Dubilier & Rice, LLC

375 Park Avenue

New York, NY 10152

Telephone:  212-407-5227

Facsimile:  212-407-5250

**SHARES OF TOPCO COMMON STOCK**

Dated: November 18, 2018

**SUPPORTING SPONSOR**

Name of Institution: CD&R Friends & Family Fund VIII, L.P.

By:

Name: Theresa A. Gore

Title: Vice President, Treasurer and Assistant Secretary of CD&R Associates VIII, Ltd., the general partner of CD&R Friends & Family Fund VIII, L.P.

Address: c/o Clayton, Dubilier & Rice, LLC

375 Park Avenue

New York, NY 10152

Telephone: 212-407-5227

Facsimile: 212-407-5250

**SHARES OF TOPCO COMMON STOCK**

Dated: November 18, 2018

## SUPPORTING SPONSOR

Name of Institution:   DBI Coinvest, LLC

By:                  By:  LGP Associates I, LLC, its sole member
                     By: Peridot Coinvest Manager LLC, its sole member
Name:                _Andrew Goldberg_
Title:               _General Counsel_

Address:             c/o Leonard Green & Partners, L.P., 11111 Santa Monica Blvd
                     suite 2000, Los Angeles, CA  90025
Telephone:           (310) 954-0444
Facsimile:           (310) 954-0404

## SHARES OF TOPCO COMMON STOCK

Dated: November 18, 2018

## SUPPORTING SPONSOR

Name of Institution: Green Equity Investors IV, L.P.
By: GEI Capital IV, LLC, its general partner

By: _____

Name: Andrew Goldberg

Title: General Counsel

Address: c/o Leonard Green & Partners, L.P., 11111 Santa Monica Blvd
suite 2000, Los Angeles, CA  90025

Telephone: (310) 954-0444

Facsimile: (310) 954-0404

## SHARES OF TOPCO COMMON STOCK

_____

NOTICE ADDRESSES

**If to the Company:**

David's Bridal, Inc.
1001 Washington Street
Conshohocken, PA 19428
Attn:   Lori Cochran Kinkade, Esq.
Email:  lkinkade@dbi.com

with a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attn:   M. Natasha Labovitz, Esq.
Email: nlabovitz@debevoise.com

**If to the Supporting Term Lenders, to the contacts lists on the Supporting Term Lender signature pages hereto, with a copy to:**

Jones Day
250 Vesey St
New York, NY 10281
Attn:   Scott J. Greenberg, Esq.
Email:  sgreenberg@jonesday.com

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019
Attn:   Alan W. Kornberg, Esq.
Email:  akornberg@paulweiss.com

**If to the Crossover Holder, to the contacts lists on the Supporting Noteholder signature pages hereto, with a copy to:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019
Attn:   Alan W. Kornberg, Esq.
Email:  akornberg@paulweiss.com

**If to the Supporting Noteholders, to the contacts lists on the Supporting Noteholder signature pages hereto, with a copy to:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Alan W. Kornberg, Esq.
Email: akornberg@paulweiss.com

Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Attn:   Norman L. Pernick, Esq., and Kate
        Stickles, Esq.
Email:  npernick@coleschotz.com;
        kstickles@coleschotz.com
                -and-
        dbass@coleschotz.com

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attn:   Brad E. Scheler, Esq.
Email: Brad.eric.scheler@friedfrank.com

**If to the Supporting Sponsors, to the contacts lists on the Supporting Sponsor signature pages hereto, with a copy to:**

Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Attn:   Norman L. Pernick, Esq., and Kate
        Stickles, Esq.
Email:  npernick@coleschotz.com;
        kstickles@coleschotz.com
                -and-
        dbass@coleschotz.com

Leonard Green & Partners, L.P.
11111 Santa Monica Boulevard, Suite 2000
Los Angeles, CA 90025
Attn:   Andrew Goldberg, Esq.
Email:  agoldberg@leonardgreen.com

<u>EXHIBIT A</u>

RESTRUCTURING TERM SHEET


[Attached]

November 18, 2018

**RESTRUCTURING TERM SHEET**

---

This non-binding indicative term sheet (the "Term Sheet") sets forth the principal terms of a comprehensive restructuring (the "Restructuring") of the existing debt and other obligations of the David's Bridal, Inc. and certain of its affiliates and subsidiaries (collectively, the "Company"). The Restructuring will be consummated through the commencement of voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Delaware to implement a prepackaged chapter 11 plan, in accordance with the terms of a restructuring support agreement to be executed by the Company and certain creditors supporting the Restructuring (the "RSA"). Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the RSA.

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTS.

| Material Terms of Credit Facilities Implemented as Part of Restructuring | |
|---|---|
| **Term** | **Description** |
| **DIP ABL Facility** | |
| Size | • $125 million commitment (with the existing borrowing base)<br>• LC sublimit increased to $80 million |
| Security | • First priority security interest in all ABL priority collateral<br>• Third priority security interest in all existing term priority collateral<br>• Third priority interest in any unencumbered collateral |
| Rate | • L + 300 bps; 1% Libor floor |
| Maturity | • Earlier of 6 months post-petition, conversion / dismissal of cases, effective date of the Restructuring ("Effective Date"), acceleration of loan, and effective date of plan |
| Fee | • 100 bps |
| Use of Proceeds | • Refinance existing ABL |

| **DIP Term Loan Facility** | |
|---|---|
| Size | <ul><li>$60 million DIP term loan, available upon entry of the Interim DIP Order</li><li>Offered on a pro rata basis</li></ul> |
| Borrower | <ul><li>DBI</li></ul> |
| Lenders | <ul><li>Term Lenders party to the RSA and Term Lenders who from time to time become DIP Lenders</li></ul> |
| Guarantors | <ul><li>All existing loan parties other than the Borrower, and any other debtors in the Chapter 11 Cases</li></ul> |
| Admin. Agent | <ul><li>Selected by DIP Term Lenders</li></ul> |
| Security | <ul><li>Second priority security interest in all ABL priority collateral (junior to the DIP ABL Facility)</li><li>First priority security interest in all existing term priority collateral</li><li>First priority interest in any unencumbered assets</li></ul> |
| Rate | <ul><li>L + 750 bps; 1% Libor floor</li></ul> |
| Maturity | <ul><li>Same as DIP ABL Facility</li></ul> |
| Backstop Payment | <ul><li>200 bps, paid in cash to backstop parties upon closing of interim DIP funding</li></ul> |
| Commitment Payment | <ul><li>100 bps, paid in cash to initial DIP Lenders upon closing of interim DIP funding</li></ul> |
| Adequate Protection | The administrative agent under the TL Credit Agreement shall receive (for the benefit of the Term Lenders) replacement liens on the Company's unencumbered and encumbered assets as follows:<ul><li>Replacement liens on the existing term priority collateral and unencumbered assets that are junior to the liens on such assets securing the DIP Term Facility, but senior to the liens on such assets securing the ABL DIP Facility, and (b) replacement liens on the ABL priority collateral that are junior to the liens on such assets securing the DIP Term Facility</li><li>Term Lenders shall receive section 507(b) administrative claims</li><li>Monthly adequate protection payments to the Term Lenders paid in cash equal to the amount of accrued interest under the TL Credit Agreement calculated using the contract rate plus the default premium accrued and not paid in cash</li><li>Payment of fees and expenses of the Consenting Term Lenders (defined below) respective professionals</li></ul> |
| Use of Proceeds | <ul><li>Incremental liquidity / general corporate purposes, strictly subject to the DIP budget agreed to among the Company and the DIP Term Lenders</li><li>Proceeds used to pay down drawn portion of existing ABL to allow LC capacity</li></ul> |
| Call Protection | <ul><li>None</li></ul> |
| Mandatory Prepayment | <ul><li>Payable at par upon emergence</li><li>100% of net proceeds of asset sales, debt incurrences and casualty events</li></ul> |
| Covenants | <ul><li>Usual and customary for DIP facilities of this type, including, but not limited to:<ul><li>Maximum 10% budget variance for receipts and disbursements (no test until third week (which test shall be on a cumulative 3-week basis) and then tested weekly on (a) a cumulative basis from Petition Date and (b) a cumulative 4-week rolling basis). Test against original DIP Budget unless DIP Term Lenders consent to new budget.</li><li>Usual and other customary covenants</li></ul></li></ul> |
| Rating | <ul><li>The Company must use commercially reasonable efforts to have the DIP Term Facility rated by two agencies prior to entry of Final DIP Order</li></ul> |

| | |
|---|---|
| Reporting | • Usual and customary for DIP facilities of this type, including, but not limited to:<br>  • Weekly update call with Company management<br>  • Weekly 13-week cash flow forecast<br>  • Weekly DIP budget variance report with written discussion of variances (including but not limited to temporary vs. permanent)<br>  • Monthly financial statements |
| Milestones | • Compliance with milestones reasonably acceptable to the DIP Term Lenders, including, but not limited to:<br>  • File Disclosure Statement, Plan and motion for combined hearing on Disclosure Statement and Plan (which shall provide for payment of Priority Exit Facility backstop commitment payment) on November 19, 2018<br>  • Entry of Interim DIP Order no later than November 22, 2018<br>  • Debtors will deliver to Consenting Term Lenders a 12-month post-emergence liquidity forecast (with first 3 months weekly) no later than December 10, 2018<br>  • Prepetition solicitation on Plan completed no later than 30 days after Petition Date<br>  • Entry of Final DIP Order no later than December 21, 2018<br>  • Joint approval of Disclosure Statement and confirmation of Plan (including payment of Priority Exit Facility backstop commitment payment) no later than January 7, 2019<br>  • Effective date of Plan no later than January 14, 2019 |
| Conditions Precedent | • Usual and customary for DIP facilities of this type, including, but not limited to:<br>  • Receipt of an acceptable DIP budget<br>  • Receipt of latest 13-week cash flow forecast<br>  • Receipt of Company's detailed internal and external communications plan in connection with the chapter 11 cases and the restructuring in form and substance acceptable to the DIP Term Lenders<br>  • Entry of the applicable DIP Order<br>  • Filing of Plan and Disclosure Statement |
| Other | • Agency payment plus professional fees and expenses of the administrative agent under the DIP Term Facility and DIP Term Lenders |
| **Exit ABL Facility** | |
| Size | • $125 million commitment (with potential modifications to borrowing base and without the existing 10% reserve)<br>• No cash collateralization of LCs |
| Lenders | • All DIP ABL Lenders shall be entitled to provide commitments of their respective pro rata share |
| Security | • First priority security interest in all ABL priority collateral (excluding IP)<br>• Third priority security interest in term loan priority collateral (including IP) |
| Rate | • L + 275 bps; 1% Libor floor |
| Maturity | • 4 years |
| Use of Proceeds | • Refinance DIP ABL Facility |
| **Priority Exit Facility** | |
| Size | • $40 - 60 million.<br>• Size of Priority Exit Facility will be determined on or prior to December 21, 2018. |
| Lenders | • All Term Lenders shall be entitled to provide commitments of their respective pro rata share of the aggregate commitment amount of the Priority Exit Facility |
| Backstop Payment | • 3% of principal amount paid in cash to the backstop parties on the closing of the financing |
| Commitment Payment | • 200 bps payable to all lenders participating in the Priority Exit Facility on the closing of the financing |

| | |
|---|---|
| Security | • First priority security interest in term loan priority collateral (including IP) and unencumbered assets<br>• Second priority security interest in ABL priority collateral |
| Rate | • L + 750 bps; 1% Libor floor |
| Maturity | • 4.5 years after the Effective Date |
| Equity Incentive | • Lenders under the Priority Exit Facility shall receive their respective pro rata share of 15% of New Common Stock (defined below) (subject to dilution by the MIP Equity (defined below) and the New Common Stock issuable upon the exercise of the Warrants (defined below)) |
| Mandatory Redemption | • 100% of (i) non-permitted debt incurrences and (ii) asset sales and casualty / condemnation proceeds, with priority over Takeback Term Loan until Priority Exit Facility is repaid in full<br>• No reinvestment rights unless leverage test of 3.50 to 1.00 for four consecutive quarters satisfied (the "<u>Leverage Test</u>"); specific basket to be negotiated<br>• Any cash collateral provided from proceeds under the Priority Exit Facility supporting LCs that is released upon termination of any such LCs shall repay Priority Exit Facility within 3 business days without any call premium |
| ECF | • 85% of excess cash flow paid annually following each fiscal year end upon delivery of audited results, with priority over Takeback Term Loan ECF until repaid in full, subject to step down to 50% upon satisfaction of the Leverage Test |
| Mandatory Amortization | • 2.0% p.a. payable quarterly<br>• Remaining balance due at maturity |
| Call | • 101 for 2 years, par thereafter |
| Rating | • The Company shall use commercially reasonable efforts to have the Priority Exit Facility rated by two agencies (a) prior to funding and (b) to the extent any such ratings are not obtained prior to funding, no later than 30 days post-funding |
| Use of Proceeds | • Claims under the DIP Term Facility shall be repaid in full in cash by the proceeds of the Priority Exit Facility |
| Other | • Generally consistent with Takeback Term Loan |
| **Takeback Term Loan** | |
| Borrower | • DBI as reorganized by the Restructuring ("<u>Reorganized DBI</u>" and, together with its subsidiaries, the "<u>Reorganized Company</u>") |
| Guarantors | • Same as those for the Company's $481mm Term Loan dated October 11, 2012 ("<u>Existing Term Loan</u>") |
| Size | • $300 million, less the commitment amount of the Priority Exit Facility (net $240 – 260 million). The exact size of the Takeback Term Loan Facility will depend on the size of the Priority Exit Facility, as described above. |
| Parties | • All Term Lenders |
| Security | • Second priority security interest in term loan priority collateral and unencumbered assets<br>• Third priority security interest in all ABL priority collateral |
| Rate | • L + 800 bps; 1% Libor floor |
| Maturity | • 5 years from the Effective Date |
| Amendment Payment | • None |

| | |
|---|---|
| Mandatory Amortization | • 2.0% p.a. payable quarterly<br>• Remaining balance due at maturity |
| ECF | • 85% of excess cash flow paid annually following each fiscal year end upon delivery of audited results, following repayment in full of Priority Exit Facility, subject to step down to 50% upon satisfaction of Leverage Test |
| Mandatory Redemption | • 100% of (i) non-permitted debt incurrences and (ii) asset sales and casualty / condemnation proceeds, following repayment in full of Priority Exit Facility<br>• No reinvestment rights unless Leverage Test satisfied; specific basket to be negotiated |
| Use of Proceeds | • Debt received in exchange for Term Loans |
| Call Protection | • 101 for 2 years, par thereafter |
| Negative Covenants | • Affirmative and negative covenants to be acceptable to (i) the ad hoc group of Term Lenders represented by Jones Day and Greenhill and (ii) Oaktree (collectively, the "Consenting Term Lenders") |
| Financial Covenants | • None |
| Disclosure and Reporting | Reporting obligations usual and customary for financings of this type, or as otherwise required by the Required Supporting Term Loan Group Lenders, including, without limitation, increased reporting requirements from those contained in the TL Credit Agreement, including, without limitation:<br>• Monthly financial reporting with management discussion and analysis (containing segment and product level data and other KPIs to be agreed) and variance report with comparisons to budget and prior year actual results (monthly until Leverage Test satisfied; quarterly when satisfied)<br>• Quarterly conference calls with management<br>• Semiannual lender meetings until Leverage Test is satisfied<br>• Annual budget based on form acceptable to the Required Supporting Term Loan Group Lenders<br>• Annual inspection rights available to Required Lenders<br>• Collateral reports delivered to ABL agent |
| Rating | • The Company shall use commercially reasonable efforts to have the Takeback Term Loan rated by two agencies (a) prior to funding and (b) to the extent any such ratings are not obtained prior to funding, no later than 30 days post-funding |

| Treatment of Claims and Interests Under the Restructuring | |
|---|---|
| **Claim** | **Proposed Treatment** |
| Exiting ABL Facility | $125 million commitment to be refinanced in full by the DIP ABL Facility, which in turn is to be refinanced in full by the Exit ABL Facility |
| Existing Term Loan | • Takeback Term Loan of $300 million less the commitment amount of the Priority Exit Facility (net $240-260 million, as described above)<br><br>• 76.25% of the common stock of DB Topco, as reorganized, issued on the Effective Date (the "New Common Stock") (subject to dilution on account of the MIP Equity and the New Common Stock issued upon exercise of the Warrants)<br><br>• Right to participate in the Priority Exit Facility<br><br>• Waiver of deficiency claims |

| | |
|---|---|
| Notes | - 8.75% of the New Common Stock<br>- Warrants<br><br>The term "Warrants" as used herein shall mean the warrants issued under the Company's chapter 11 plan to holders of Notes that shall be exercisable within 5 years of the Effective Date for 20% of the New Common Stock (on a fully diluted basis) at a valuation equivalent to a 100% recovery to Term Lenders (including accrued interest) when taking into account the value of distributions pursuant to the Restructuring. The Warrants shall incorporate Black-Scholes protections acceptable to the Consenting Term Lenders |
| General Unsecured Claims | General unsecured claims shall be unimpaired |
| Existing Equity | All existing equity interests (including common stock, preferred stock and any options, warrants, profit interest units, or rights to acquire any equity interests) shall be cancelled and holders of such interests shall receive no recovery |
| **Other Terms** | |
| Real Estate | For the avoidance of doubt, no lease rejections will be pursued, subject to the consent of the Consenting Term Lenders (which consent will not be unreasonably withheld) |
| Management Incentive Plan | Among other things, the Plan shall provide for the establishment of a management equity incentive plan under which New Common Stock representing up to 10% of the New Common Stock authorized on the Effective Date on a fully-diluted basis (the "MIP Equity") may be reserved for grants (or restricted stock units, options or other instruments) made from time to time to the directors, officers, and other management of Reorganized DBI, subject to the terms and conditions established from time to time in the discretion of the New Board (as defined below) |
| New Board | Reorganized DBI's initial board of directors (the "New Board") shall consist of 7 directors in total to be designated by the Consenting Term Lenders in a manner to be determined |
| Shareholders Agreement/Amended Governance Documents | Holders of New Common Stock shall be (or be deemed) parties to the New Shareholders' Agreement, the material terms of which shall be satisfactory in form and substance to the Consenting Term Lenders. To the extent necessary, the Company's current corporate organizational documents shall be amended, and such amended governance documents shall be in form and substance satisfactory to the Consenting Term Lenders |
| Releases and Exculpation | The Plan and order confirming the Plan shall provide customary releases (including third party releases) and exculpation provisions, in each case, to the fullest extent permitted by law, for the benefit of the Company, the Reorganized Company, the DIP ABL Lenders, the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders, the Supporting Sponsors, and such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such |

| | |
|---|---|
| Waiver of Claims by Supporting Sponsors | Upon consummation of the Restructuring, each Supporting Sponsor shall waive any and all of its unsecured claims of any kind or nature against the Company, except any Term Loans or Notes held by the Supporting Sponsors |

## EXHIBIT B

## FORM OF JOINDER


       The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "**Agreement**"), dated as of November 18, 2018, by and among DB Investors, Inc. and its direct and indirect subsidiaries that are party thereto (collectively, the "**Company**"), certain holders of claims against the Company signatory thereto, and certain holders of interests in DB Investors, Inc. signatory thereto, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "**Joining Creditor**" under the terms of the Agreement.  The Transferee hereby makes the representations and warranties of the Supporting Creditors set forth in Sections 2(a) and 2(b) of the Agreement to the other Parties thereto.  This joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the of any other jurisdiction.


Date Executed: _____


## **TRANSFEREE**

Name of Institution:  _____


By:         _____
Name:      _____
Its:         _____
Telephone:  _____
Facsimile:   _____


Term Loan Holdings:     _____

Notes Holdings:         _____