## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, INC., *et al.*,[1] | Case No. 18-12635 (LSS) |
| Debtors. | Joint Administration Requested |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") seek entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), pursuant to sections 105, 107, 361, 362, 363 and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6003, 6004, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1, 4001-2 and 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Code for the District of Delaware (the "**Local Rules**"), that, among other things (a) authorizes David's Bridal, Inc. (the "**Borrower**") to obtain, and authorizes each of the other Debtors (collectively the "**Guarantors**") to guarantee, jointly and severally, the Borrower's obligations in respect of (i) the DIP ABL Facility (as defined herein) as set forth in the DIP ABL Credit Agreement (as defined herein) and (ii) the DIP Term

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

Loan Facility (as defined herein) as set forth in the DIP Term Loan Credit Agreement (as defined herein), (b) authorizes the Debtors to use "cash collateral" pursuant to section 363(c) of the Bankruptcy Code, Bankruptcy Rule 4001(b) and the Local Rules, including Local Rule 4001-2, (c) grants liens and providing superpriority claims with respect to such postpetition financing, (d) approves the form of adequate protection to be provided to certain prepetition lenders as set forth herein, (e) modifies the automatic stay on a limited basis as set forth herein, (f) schedules a final hearing (the "**Final Hearing**") to consider entry of the Final Order and (g) grants related relief. In support of this motion, the Debtors submit the *Declaration of Joan Hilson, Executive Vice President and Chief Financial and Operating Officer of the Debtors, in Support of First Day Pleadings* (the "**First Day Declaration**") and the *Declaration of Stephen Goldstein in Support for Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* (the "**Evercore Declaration**").  In further support of this motion, the Debtors respectfully state as follows:

<u>**Jurisdiction and Venue**</u>

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Debtors consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for relief requested herein are sections 105(a), 107, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and 6004, and 9018 and Local Rules 2002-1, 4001-2, 9018-1.

## Background

4.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  Each Debtor is authorized to continue to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes.  As of the date hereof, no trustee, examiner or statutory committee has been appointed in these chapter 11 cases.

5.      On November 18, 2018, the Debtors entered into a restructuring support agreement (the "**Restructuring Support Agreement**") with (a) holders of approximately 85% of the approximately $481 million in outstanding principal amount of Prepetition Term Loans, (b) holders of approximately 97% of the $270 million in outstanding principal amount of Unsecured Notes and (c) the Debtors' principal equity holders, outlining the material terms for a joint prepackaged chapter 11 plan of reorganization (the "**Prepackaged Plan**").  The Prepackaged Plan provides for the restructuring of the Prepetition Term Loans and Unsecured Notes while leaving General Unsecured Claims unimpaired.

6.      Concurrently with this motion, the Debtors have filed the Prepackaged Plan and a related disclosure statement (the "**Disclosure Statement**").  The Debtors also have filed a motion to schedule a combined hearing for the Court to consider approval of the Disclosure Statement and confirmation of the Prepackaged Plan.  Prior to the Petition Date, the Debtors commenced

01:23878438.1

the solicitation of votes of impaired creditors on the Prepackaged Plan.  The solicitation period

for the Prepackaged Plan will remain open until December 18, 2018.

7. The events leading to the Petition Date and the facts and circumstances supporting

the requested relief are more fully set forth in the First Day Declaration, which is filed

contemporaneously herewith and incorporated herein by reference.

**Relief Requested**

8. By this motion, the Debtors seek entry of the Interim Order and the Final Order,

pursuant to sections 361, 363 and 364 of the Bankruptcy Code and Local Rules 2002-1(b) and

4001-2, authorizing the Debtors to enter into the DIP Documents (as defined below).  More

specifically, the Debtors seek authority to:

a. obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority revolving credit facility in the aggregate principal amount of up to $125,000,000 (the "**DIP ABL Facility**", and all amounts extended under the DIP ABL Facility, the "**DIP ABL Loans**"), including (i) a $80,000,000 sublimit for the issuance of letters of credit and (ii) a $20,000,000 sublimit for swingline loans, pursuant to the terms and conditions of that certain Senior Secured, Super-Priority ABL Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP ABL Credit Agreement**"), by and among the Borrower, the Guarantors party thereto, Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "**DIP ABL Agent**"), for and on behalf of itself and the other lenders party thereto (collectively, including the DIP ABL Agent, the "**DIP ABL Lenders**"), substantially in the form of **Exhibit B**, attached hereto.

b. execute and deliver the DIP ABL Credit Agreement and any other agreements and documents related thereto (collectively with the DIP ABL Credit Agreement, the "**DIP ABL Documents**"), including, without limitation, the fee letter related thereto (the "**ABL Fee Letter**")[2] and to perform such other acts as may be necessary or desirable in connection with the DIP ABL Documents;

c. grant the DIP ABL Facility and all obligations owing thereunder and under the DIP ABL Documents or otherwise to the DIP ABL Agent and

---

[2] A copy of the ABL Fee Letter is attached hereto as **Exhibit D**.

DIP ABL Lenders (collectively, and including all "Obligations" as described in the DIP ABL Agreement, the "**DIP ABL Obligations**") allowed superpriority administrative expense claim status in each of the these chapter 11 cases and any Successor Cases (as defined in the Interim Order);

d.      obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $60,000,000 (the "**DIP Term Loan Facility**", and all amounts extended under the DIP Term Loan Facility, the "**DIP Term Loans**", and the DIP Term Loan Facility together with the DIP ABL Facility, the "**DIP Facilities**"), consisting of a new money multiple draw term loan facility, pursuant to the terms and conditions of that certain Senior Secured, Super-Priority Term Loan Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Term Loan Credit Agreement**," and together with the DIP ABL Credit Agreement, the "**DIP Agreements**"), by and among the Borrower and Cantor Fitzgerald Securities as administrative agent and collateral agent (the "**DIP Term Loan Agent**", and, together with the DIP ABL Agent, the "**DIP Agents**") for and on behalf of itself and the other lenders party thereto (collectively, including the DIP Term Loan Agent, the "**DIP Term Loan Lenders**", and, together with the DIP ABL Lenders, the "**DIP Lenders**"), substantially in the form of **Exhibit C** attached hereto;

e.      execute and deliver the DIP Term Loan Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Term Loan Credit Agreement, the "**DIP Term Loan Documents**", and together with the DIP ABL Documents, the "**DIP Documents**"), by and among the Borrower, the Guarantors, the DIP Term Loan Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Term Loan Documents;

f.      grant the DIP Term Loan Facility and all obligations owing thereunder and under the DIP Term Loan Documents to the DIP Term Loan Agent and DIP Term Loan Lenders (collectively, and including all "Obligations" as described in the DIP Term Loan Credit Agreement, the "**DIP Term Loan Obligations**", and together with the DIP ABL Obligations, the "**DIP Obligations**") allowed superpriority administrative expense claim status in each of the these chapter 11 cases and any Successor Cases;

g.      grant to the DIP Agents, for the benefit of themselves and the DIP Lenders and the other Secured Parties (as defined in the DIP Agreements) under the applicable DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), which liens shall be subject to the priorities set forth herein;

h.  pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

i.  use the Prepetition Collateral, including the Cash Collateral of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value of their respective interests in the Prepetition Collateral, including the Cash Collateral;

j.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

k.  scheduling a final hearing (the "**Final Hearing**") to consider the relief requested herein and approving the form of notice with respect to the Final Hearing.

## **Prepetition Debt**

9.  As of the Petition Date, the Debtors have funded debt facilities in place with a face amount (including issued and unfunded letters of credit) of approximately $819 million, of which approximately $549 million is secured and $270 million is unsecured.

10.  Prior to the Petition Date, the Borrower and the Guarantors were provided financing pursuant to:  (a) a senior secured asset-based revolving credit facility (the "**Prepetition ABL Facility**", and the obligations incurred thereunder, the "**Prepetition ABL Obligations**")) under the credit agreement, dated as of October 11, 2012 (the "**Prepetition ABL Agreement**"), by and among David's Bridal, Inc., the other Debtors party thereto, the banks and other financial institutions party thereto (the "**Prepetition ABL Lenders**") and Bank of America, N.A., as administrative agent and collateral agent for the lenders thereunder (in such capacity, the

01:23878438.1

"**Prepetition ABL Agent**"), (b) a senior secured term loan facility (the "**Prepetition Term Loan Facility**" and, the obligations incurred thereunder, the "**Prepetition Term Loan Obligations**", and together with the Prepetition ABL Obligations, the "**Prepetition Secured Obligations**", and the Prepetition Term Loan Facility, together with the Prepetition ABL Facility, the "**Prepetition Secured Credit Facilities**") under the credit agreement, dated as of October 11, 2012 (the "**Prepetition Term Loan Agreement**"), by and among David's Bridal, Inc., the other Debtors party thereto, the banks and other financial institutions party thereto (the "**Prepetition Term Loan Lenders**", and together with the Prepetition ABL Lenders, the "**Prepetition Lenders**") and Bank of America, N.A., as administrative agent and collateral agent for the lenders thereunder (in such capacity, the "**Prepetition Term Loan Agent**" and together with the Prepetition ABL Agent, the "**Prepetition Agents**", and the Prepetition Agents, together with the Prepetition Term Loan Lenders and the Prepetition ABL Lenders, the "**Prepetition Secured Parties**"), and (c) unsecured notes (the "**Prepetition Notes**", and the purchasers thereof, the "**Prepetition Noteholders**") issued under that certain Indenture, dated as of October 11, 2012 (the "**Indenture**"), among the Borrower as issuer thereunder, the other Debtors party thereto as guarantors and Wilmington Trust, National Association, as trustee.

11.    The chart below summarizes the Debtors' prepetition indebtedness, including approximate outstanding amounts as of November 19, 2018.

| Debt Obligation | Original Amount | Approximate Amount Outstanding | Maturity Date | Security Status |
|---|---|---|---|---|
| Prepetition ABL Facility | $125 million total commitments | $25.7 million of revolving loans[3] and $42.5 of issued but undrawn outstanding letters of credit | July 26, 2021 | Senior Secured |

---

[3]    The revolving loans outstanding on the Petition Date will be rolled into the DIP ABL Facility upon entry to the Interim Order; proceeds of the DIP Term Loan Facility will subsequently be used to repay those obligations.

| Debt Obligation | Original Amount | Approximate Amount Outstanding | Maturity Date | Security Status |
|---|---|---|---|---|
| Prepetition Term Loan Facility | $520 million | $481.2 million | October 11, 2019 | Senior Secured |
| Prepetition Notes | $270 million | $270 million | October 15, 2020 | Unsecured |

### A.    Prepetition Secured Obligations

12.    The Debtors have an aggregate of approximately $549.4 million in principal amount of Prepetition Secured Obligations outstanding, consisting of the Prepetition ABL Facility and the Prepetition Term Loan Facility.

### (i)    Prepetition Term Loan Facility

13.    The Prepetition Term Loan Facility had an initial aggregate principal amount of $520 million.  Due to subsequent amortization payments, as of November 19, 2018, the aggregate principal amount of the Prepetition Term Loan Facility was $481.2 million.  The Prepetition Term Loan Facility is scheduled to mature on October 11, 2019.  Interest on the Prepetition Term Loan Facility is equal to, at the option of the Borrower,  (i) if the "Consolidated Total Leverage Ratio" (as such term is defined in the Prepetition Term Loan Agreement, the "**Consolidated Total Leverage Ratio**") is greater than 7.25:1.00, (x) the alternate base rate plus 3.00% or (y) the LIBOR rate plus 4.00%, (ii) if the Consolidated Total Leverage Ratio is equal to or less than 7.25:1.00 and greater than 5.25:1.00, (x) the alternate base rate plus 2.75% or (y) the LIBOR rate plus 3.75% and, (iii) if the Consolidated Total Leverage Ratio is equal to or less than 5.25:1.00, (x) the alternate base rate plus 2.50% or (y) the LIBOR rate plus 3.50%.  The Prepetition Term Loan Facility is not currently subject to any prepayment premium.

14.    The Prepetition Term Loan Facility is secured by (i) a duly perfected first priority security interest in all "Term Loan Priority Collateral" (as defined in the Prepetition ICA (as defined below), the "**Prepetition Term Loan Priority Collateral**") and (ii) a duly perfected

second priority security interest in all "ABL Priority Collateral" (as defined in the Prepetition ICA (as defined below), the "**Prepetition ABL Priority Collateral**", and together with the Prepetition Term Loan Priority Collateral, the "**Prepetition Collateral**").

### (ii)    Prepetition ABL Facility

15.    The aggregate revolving commitments under the Prepetition ABL Facility total $125 million, with a $60 million letter of credit sublimit.  As of November 19, 2018, $25.7 million has been drawn and remains outstanding under the Prepetition ABL Facility, and $42.5 million of unfunded letters of credit were issued under the Prepetition ABL Facility.  The Prepetition ABL Facility is scheduled to mature on July 26, 2021.  Interest on the Prepetition ABL Facility is equal to, at the option of the Borrower, (i) if the "Average Daily Excess Availability" (as such term is defined in the Prepetition ABL Agreement, the "**Average Daily Excess Availability**") is greater than $60 million , (x) the alternate base rate plus 0.25% or (y) the LIBOR rate plus 1.25%, (ii) if the Average Daily Excess Availability is greater than $30 million but less than or equal to $60 million, (x) the alternate base rate plus 0.50% or (y) the LIBOR rate plus 1.50% and, (iii) if the Average Daily Excess Availability is less than or equal to $30 million, (x) the alternate base rate plus 0.75% or (y) the LIBOR rate plus 1.75%.

16.    The Prepetition ABL Facility is secured by (i) a duly perfected first priority security interest (the "**Prepetition ABL Senior Lien**") in all Prepetition ABL Priority Collateral and (ii) a duly perfected second priority security interest (the "**Prepetition ABL Junior Lien**", and together with the Prepetition ABL Senior Lien, the "**Prepetition ABL Liens**") in all Prepetition Term Loan Priority Collateral.

### (iii)    Prepetition ICA

17.    The Prepetition ABL Facility and the Prepetition Term Loan Facility are also subject to an intercreditor agreement, dated as of October 11, 2012 (the "**Prepetition ICA**"),

between the Prepetition ABL Agent and the Prepetition Term Loan Agent and acknowledged by the Debtors.  The Prepetition ICA governs relative contractual rights of lenders under the Prepetition ABL Facility and the Prepetition Term Loan Facility.

**B.      Prepetition Notes**

18.      The Borrower issued the Prepetition Notes in an aggregate principal amount of $270 million pursuant to the Prepetition Indenture.  The Prepetition Notes mature on October 11, 2020.  Interest on the Prepetition Notes accrues at 7.75%, payable in cash on April 15 and October 15 of each year.  The Prepetition Notes are not currently subject to any prepayment premium.

### The Debtors' Efforts to Obtain Postpetition Financing

19.      As set forth in the Evercore Declaration, during the negotiation of the comprehensive restructuring package embodied in the Restructuring Support Agreement (as defined in the First Day Declaration) (the "**Restructuring Support Agreement**"), Evercore Group L.L.C. ("**Evercore**")—an investment banker with expertise in mergers and acquisitions, recapitalization, and financial restructuring—contacted a number of third-parties to determine whether postpetition financing could be obtained on terms more favorable than the terms offered by the DIP Lenders.  These third parties included traditional and non-traditional lenders with experience providing DIP financing.  Most of the parties contacted by Evercore were unwilling to either provide junior financing or to embark on a costly priming fight over the objections of such existing lienholders, while other select parties were not responsive.  Given the Debtors' desire to avoid the cost and uncertainty of a postpetition DIP facility that would attempt to non-consensually prime the Prepetition Secured Parties, the Debtors concluded that acceptable third-party financing was not reasonably obtainable.

### The DIP Facilities are Necessary to Preserve Value of Debtors' Estates

20.    As set forth in detail in the First Day Declaration, the filing of the Prepackaged Plan—and the signing of the Restructuring Support Agreement—was the result of exhaustive arms-length negotiations between the debtors and their debt and equity stakeholders.  Those negotiations eventually bore fruit in the form of a prepackaged bankruptcy process, which enjoys overwhelming creditor support and promises to pay trade creditors in full.  As no third party financing was reasonably available, the Debtors looked to their existing lenders–namely the Prepetition Term Loan Lenders and the Prepetition ABL Lenders–to provide funding on a postpetition basis.  Given the Prepetition Term Loan Lenders' and the Prepetition ABL Lenders' involvement in the Restructuring Support Agreement, the negotiation of the terms of the DIP Facilities was an integral part of obtaining the creditor support necessary to sign the Restructuring Support Agreement and secure the necessary support for the Prepackaged Plan.

21.    Moreover, absent the liquidity infusion that the DIP Facilities will provide, the Debtors will not be able to run their business as a going concern, let alone reach a successful restructuring.  Even if the Debtors had the ability to access cash collateral, liquidity at the company is at critical levels; cash on hand and expected inflows will not be sufficient to fund the entirety of these chapter 11 cases.  Without a new source of liquidity, the Debtors will not be able to continue operations, reassure vendors that business will continue, pay thousands of employees or continue to deliver the goods and services on which their customers rely.  As discussed above, no outside funding is reasonably obtainable.  Consequently, the DIP Facilities represent the only option for the Debtors to meet operational obligations as well as their best chance to preserve value: the carefully negotiated deal embodied in the Restructuring Support Agreement.

01:23878438.1

### Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2

**A.    DIP ABL Facility and DIP Term Loan Facility**

22.    Pursuant to Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, the Debtors submit this chart listing certain material terms of the relief set forth in the proposed DIP ABL Facility, DIP Term Loan Facility and DIP Order, together with the location of such terms in the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement, as applicable, or the Interim Order:[4]

| | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| **Borrower**<br><br>*DIP ABL Credit Agreement preamble; DIP Term Loan Credit Agreement preamble; Interim Order preamble* | David's Bridal, Inc. | Same as DIP ABL Facility. |
| **Guarantors**<br><br>*DIP ABL Credit Agreement preamble; DIP Term Loan Credit Agreement preamble; Interim Order preamble* | All the Debtors in these chapter 11 cases other than the Borrower (together with the Borrower, the "**Loan Parties**"). | Same as DIP ABL Facility. |
| **DIP Lenders**<br><br>*DIP ABL Credit Agreement Schedule A; DIP Term Loan Credit Agreement Schedule A; Interim Order at ¶¶ i and iv (referencing Exhibit B to this Motion)* | Bank of America and each other lender party to the Prepetition ABL Agreement. | Certain Prepetition Term Loan Lenders party to the Prepetition Term Loan Agreement and the RSA upon execution and Prepetition Term Loan Lenders who from time to time become DIP Term Loan Lenders. |
| **DIP Agents**<br><br>*DIP ABL Credit* | Bank of America, N.A. | Cantor Fitzgerald Securities |

---

[4]    The summaries and descriptions of the terms and conditions of the DIP ABL Credit Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  This motion is qualified in its entirety by reference to the provisions of the DIP ABL Credit Agreement and the Interim Order. In the event that there is a conflict between this motion and the DIP ABL Credit Agreement, the DIP ABL Credit Agreement shall control in all respects, or in the case of a conflict between this motion and/or the DIP ABL Credit Agreement and the Interim Order, the Interim Order shall control in all respects.

| *Agreement preamble; DIP Term Loan Credit Agreement preamble; Interim Order at ¶¶ i and iv* | | |
|---|---|---|
| **DIP Facility / Borrowing Limits** <br><br> *DIP ABL Credit Agreement recitals, definition of "Commitment" and §2; DIP Term Loan Credit Agreement recitals and §2; Interim Order at ¶¶ i and iv* | Aggregate $125,000,000 secured revolving debtor-in-possession financing with an $80,000,000 sublimit for the issuance of letters of credit and a $20,000,000 sublimit for swingline loans. | Aggregate $60,000,000 secured delayed draw debtor-in-possession term loan financing. |
| **DIP Repayment** <br><br> *DIP ABL Credit Agreement § 2.5; DIP Term Loan Credit Agreement § 2.5* | Payable in full, in cash, on the Maturity Date. | Same as DIP ABL Facility.  Subject to certain conditions, voluntary prepayments are permitted at any time without penalty and mandatory prepayments are required upon the occurrence of certain events. |
| **Use of Proceeds and Cash Collateral** <br><br> *DIP ABL Credit Agreement § 5.16; DIP Term Loan Credit Agreement § 5.16* <br><br> *Interim Order at ¶ 9, 11, 24* | Used, in accordance with the Budget and the DIP Orders, for (a) working capital and letters of credit, (b) other general corporate purposes of the Borrower, (c) payment of costs of administration of these chapter 11 cases, (d) payment of the Prepetition ABL Obligations and (e) payment of such other prepetition expenses as permitted under the DIP ABL Credit Agreement and approved by the Court. | Used, in accordance with the Budget and the DIP Orders, for (a) working capital and general corporate purposes of the Borrower, (b) payment of costs of administration of these chapter 11 cases, (c) payment of prepetition expenses and (d) payment of obligations under the Prepetition Term Loan Agreement as permitted under the DIP Term Loan Credit Agreement and approved by the Court. |
| **Entities with Interest in Cash Collateral** <br><br> *Interim Order at ¶ H* | The Prepetition Secured Parties. | Same as DIP ABL Facility. |
| **Maturity** <br><br> *DIP ABL Credit Agreement definition of "Termination Date" and §2.5; DIP Term Loan Credit Agreement definition of "Termination Date" and §2.5* | On the earliest of (a) the date that is 180 days from the Petition Date, (b) the date of termination of all of the Commitments (as defined in the DIP ABL Credit Agreement) pursuant to the terms of the DBL ABL Credit Agreement, (c) the date on which the DIP ABL Obligations become due and payable pursuant to the terms of the DIP Term Loan Credit Agreement, whether by acceleration or otherwise, (D) the effective date of a plan of reorganization for the Debtors, (c) the date the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect, (h) conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code of any Debtor shall file a motion or other pleading | On the earlier of (a) the date that is 180 days after the Petition Date, (b) the date on which all DIP Term Loan Obligations become due and payable pursuant to the terms of the DIP Term Loan Credit Agreement, whether by acceleration or otherwise, (c) the effective date of a plan of reorganization for the Debtors, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code and (e) the date on which the Interim Order expires or is terminated, unless the Final Order has been entered, (f) the date of conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (g) dismissal of any of the Chapter 11 Cases, unless otherwise consented to, and (h) the Final Order is |

| | | |
|---|---|---|
| | seeking the conversion of these chapter 11 cases to chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the DIP ABL Agent and the Required Lenders (as defined in the DIP ABL Credit Agreement) and (i) the dismissal of any of these chapter 11 cases, unless otherwise consented to in writing by DIP ABL Agent and the Required Lenders (as defined in the DIP ABL Credit Agreement) | vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect. |
| **Interest Rate**<br><br>*DIP ABL Credit Agreement definition of "Applicable Margin" and §4.1; DIP Term Loan Credit Agreement definition of "Applicable Margin" and §4.1* | At the option of the Borrower:<br><br>• Alternate Base Rate (as defined in the DIP ABL Credit Agreement) + 2.00% for ABR Loans (as defined in the DIP ABL Credit Agreement).<br><br>• Adjusted LIBOR Rate (as defined in the DIP ABL Credit Agreement) + 3.00% for Eurodollar Loans (as defined in the DIP ABL Credit Agreement). | At the option of the Borrower:<br><br>Alternate Base Rate (as defined in the DIP Term Loan Credit Agreement) + 6.50% for ABR Loans (as defined in the DIP Term Loan Credit Agreement).<br><br>Adjusted LIBOR Rate (as defined in the DIP Term Loan Credit Agreement) + 7.50% for Eurodollar Loans (as defined in the DIP Term Loan Credit Agreement), with a LIBOR floor of 1%. |
| **Events of Default**<br><br>*DIP ABL Credit Agreement § 9; DIP Term Loan Credit Agreement § 9* | Usual and customary events of defaults for facilities of this type and purpose, including, among others, material breach of the Interim or Final Order approving the DIP, failure to comply with Milestones, nonpayment of obligations, defaults under covenants, breaches of representations and warranties, attachment defaults, judgment defaults, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of pre-petition loan documents, invalidity of intercreditor agreement, failure to fund loans under either DIP Facility, and the occurrence of any number of adverse actions or consequences in any of the chapter 11 cases. | Same as DIP ABL Facility. |
| **Milestones**<br><br>*Interim Order Exhibit 1* | Petition Date: November 19, 2018<br><br>• Prior to the Petition Date: Entry into the Restructuring Support Agreement<br><br>• Petition date    File (a) Prepackaged Plan, (b) a motion to approve solicitation procedures for the Prepackaged Plan, (c) a motion for a combined hearing approving the former and confirming the latter and (d) a motion seeking approval of the DIP Facilities<br><br>• November 22, 2018: Entry of Interim Order<br><br>• November 23, 2018:  the Debtors' notice agent shall have caused the | Same as DIP ABL Facility. |

<table>
<tr><td></td><td>notices of the Prepackaged Plan and Disclosure Statement to be distributed<br><br>• November 30, 2018: File a motion requesting the entry of an order not later than January 7, 2019, extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days<br><br>• December 10, 2018: Debtors will deliver a 12-month post-emergence liquidity forecast (with first 3 months with weekly detail) no later than December 10, 2018<br><br>• December 20, 2018: Deadline to vote on the Prepackaged Plan<br><br>• December 21, 2018: Entry of Final Order<br><br>• January 7, 2019: Entry of (a) Confirmation Order approving the Disclosure Statement and Confirming the Pre-Packaged Plan and (b) if such Confirmation Order is not obtained, an order extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days<br><br>• January 14, 2019: Outside date for consummation of the Pre-Packaged Plan<br><br>The DIP Agents may in their sole discretion extend any milestone for a period of not more than 10 days (or for a longer period with the consent of the applicable Required Lenders (as defined in the DIP Agreements)).</td><td></td></tr>
<tr><td>**Budget**<br><br>*DIP ABL Credit Agreement § 7.4 and Annex A; DIP Term Loan Credit Agreement § 7.14 and Annex A; Interim Order at ¶ 21*</td><td>So long as the DIP ABL Facility has not been terminated, the Debtors shall operate generally in accordance with the latest budget approved by the DIP Agents (the "**Budget**").<br><br>The Debtors shall not, commencing with the third full calendar week after the Petition Date, (a) permit actual aggregate operational disbursements and non-operating disbursements to be above 110% of disbursements set forth in the Budget for the corresponding rolling four-week period or the cumulative period since the Petition Date, (b) permit aggregate cash receipts, to be less than 90% of the cash receipts set forth in the Budget for the corresponding rolling four-week period</td><td>Same as DIP ABL Facility.</td></tr>
</table>

<table>
<tr><td></td><td>or the cumulative period since the Petition Date, or (c) permit aggregate consolidated inventory levels at the end of any week, to be less than 90% of inventory levels set forth in the Budget for the corresponding week.  The Budget is tested weekly on a rolling four-week basis, starting with the third full calendar week after the Petition Date.  The Debtors shall, commencing with the first full calendar week after the Petition Date, deliver to the DIP ABL Agent and the DIP Term Loan Agent and the DIP Loan Lenders by 5:00 p.m., Eastern time, on Wednesday of each week, a reconciliation for the prior week, the prior four-week cumulative period and the cumulative period from the Petition Date of actual expenses and disbursements, sales receipts and inventory to the amounts set forth in the Budget for such periods.</td><td></td></tr>
<tr><td>**DIP Liens**<br><br>*Interim Order at ¶ 5, 6*</td><td>The DIP ABL Facility will be secured by liens (the "**DIP ABL Liens**") on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, (the "**DIP Collateral**"); *provided* that the DIP Collateral shall not include (a) leased real property, (b) to the extent that the applicable parties have not provided, and have not deemed to have provided, consent, partner any equity interests in joint ventures, (c) any leasehold interest (or any rights or interests thereunder) the grant of a lien on which, notwithstanding the Bankruptcy Code, shall constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of the obligor under any lease governing such leasehold interest or a breach or termination pursuant to the terms of, or a default under, such lease, (d) avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code), or (e) the Debtors' rights under section 506(c) or 550 of the Bankruptcy Code; provided, further, that DIP Collateral shall include proceeds of all of the foregoing, subject to the entry of the Final Order in the case of clauses (d), and (e) and provided further that the Debtors' owned real property shall not secure the DIP ABL Obligations or the Prepetition ABL Obligations.<br><br>The DIP ABL Liens shall be valid, automatically perfected, non-avoidable, senior liens subject only to (a) the Carve Out, (b)</td><td>The DIP Term Loan Facility will be secured by liens (the "**DIP Term Loan Liens**" and, together with the DIP ABL Liens, the "**DIP Liens**") on the DIP Collateral.<br><br>The DIP Term Loan Liens shall be valid, automatically perfected, non-avoidable, senior liens subject only to (a) the Carve Out, (b) certain existing liens which are senior under applicable law and (c) with respect to DIP Collateral which would constitute "ABL Priority Collateral" under the Prepetition ICA ("**DIP ABL Priority Collateral**"), (i) the ABL DIP Liens, (ii) the Prepetition ABL Liens; and (iii) the Prepetition ABL Adequate Protection Liens (as defined below).</td></tr>
</table>

| | | |
|---|---|---|
| | certain existing liens which are senior under applicable law and (c) with respect to DIP Collateral which would constitute "Term Loan Priority Collateral" under the Prepetition ICA (**"DIP Term Loan Priority Collateral"**), (i) the Term Loan DIP Liens, (ii) the Prepetition Term Loan Liens; and (iii) the Prepetition Term Loan Adequate Protection Liens (as defined below). | |
| **Superpriority Administrative Claims**<br><br>*Interim Order at ¶7* | The DIP Obligations shall constitute allowed superpriority administrative (the "**DIP Superpriority Claims**") claims with priority over any and all administrative expenses and unsecured claims, including, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code. | Same as DIP ABL Facility. |
| **Adequate Protection Payments**<br><br>*Interim Order at ¶ 16, 17* | As adequate protection in accordance with sections 361 and 363 of the Bankruptcy Code, the Debtors will pay to the Prepetition ABL Parties (as defined in the Interim Order), until the repayment in full of the Prepetition ABL Obligations, (i) interest at the non-default rate, (ii) principal due under the Prepetition ABL Agreement, if any, (iii) reasonable and documented and fees and expenses (including, without limitation, professional fees) incurred by the Prepetition ABL Loan Parties and (iv) upon the commencement of a Challenge (as defined in the Interim Order), $500,000 to fund the Prepetition ABL Indemnity Reserve (as defined in the Interim Order). | As adequate protection in accordance with sections 361 and 363 of the Bankruptcy Code, the Debtors will pay to the Prepetition Term Loan Parties (as defined in the Interim Order), until the repayment in full of the Prepetition Term Loan Obligations, (i) cash interest at the non-default rate and in kind interest equal to the default premium under the Prepetition Term Loan Agreement, (ii) reasonable and documented fees and expenses (including, without limitation, professional fees) incurred by the Prepetition Term Loan Parties and (iv) upon the commencement of a Challenge (as defined in the Interim Order), $500,000 to fund the Prepetition Term Loan Indemnity Reserve (as defined in the Interim Order). |
| **Adequate Protection Liens and Claims for Prepetition ABL Secured Parties**<br><br>*DIP ABL Credit Agreement definitions of "Adequate Protection Liens", "Adequate Protection Superpriority Claims" and § 8.13(m); DIP Term Loan Credit Agreement definitions of "Adequate Protection Liens", "Adequate Protection Superpriority* | <u>Liens</u>: Replacement liens (the "**ABL Adequate Protection Liens**") on the DIP Collateral to the extent of diminution of value of their interest in the Prepetition Collateral, which shall be subject to (a) certain existing liens which are senior under applicable law, (b) the Carve Out, (c) with respect to the DIP ABL Priority Collateral, the DIP ABL Liens, and (d) with respect to the DIP Term Loan Priority Collateral, (i) the DIP Liens, (ii) the Prepetition Term Loan Liens and (iii) the Term Loan Adequate Protection Liens.<br><br><u>Claims</u>: Allowed superpriority administrative claims (the "**ABL Adequate Protection Claims**") against each of the Debtors' estates | <u>Liens</u>: Replacement liens (the "**Term Loan Adequate Protection Liens**") on the DIP Collateral to the extent of diminution of value of their interest in the Prepetition Collateral, which shall be subject to (a) certain existing liens which are senior under applicable law, (b) the Carve Out, (c) with respect to the DIP Term Loan Priority Collateral, the DIP Term Loan Liens, and (d) with respect to the DIP ABL Priority Collateral, (i) the DIP Liens, (ii) the Prepetition ABL Liens and (iii) the Prepetition ABL Adequate Protection Liens.<br><br><u>Claims</u>: Allowed superpriority administrative claims (the "**Term Loan Adequate Protection Claims**") against each of the Debtors' estates |

| | | |
|---|---|---|
| *Claims" and § 8.13(m); Interim Order at ¶ 13, 14* | with priority over any and all administrative expenses and priority or unsecured claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; *provided*, however, that the Adequate Protection Superpriority Claims shall be *pari passu* with each other, without otherwise impair the lien priorities as set forth in the Interim Order, and subject to the Carve Out, and junior to the DIP Superpriority Claims. | with priority over any and all administrative expenses and priority or unsecured claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; *provided*, however, that the Adequate Protection Superpriority Claims shall be *pari passu* with each other, without otherwise impair the lien priorities as set forth in the Interim Order, and subject to the Carve Out, and junior to the DIP Superpriority Claims. |
| **Fees and Expenses**<br><br>*Interim Order at ¶ 36; DIP ABL Credit Agreement § 4.5; DIP Term Loan Credit Agreement § 4.5* | <u>Commitment Fee</u>:  0.375% per annum, payable on the average daily unused portions of the DIP ABL Facility.<br><br><u>Closing Fee</u>:  1.00%.<br><br><u>Fronting Fee</u>:  0.125% per annum, payable to the applicable L/C Issuer (as defined in the DIP ABL Credit Agreement) for its own account, payable monthly in arrears, commencing on the first monthly payment date to occur after the Closing Date (as defined in the DIP ABL Credit Agreement).<br><br><u>Administrative fees</u>:  The DIP ABL Agent is entitled to reimbursement of all reasonable and documented out-of-pocket expenses, including reasonable fees and expenses of its counsel, in connection with the DIP ABL Facility, and such other fees and expenses as are contained in the DIP ABL Documents. | <u>Commitment Fee</u>:  1.00% of the aggregate Initial Term Loan Commitment (as defined in the DIP Term Loan Credit Agreement), payable to the Lenders (as defined in the DIP Term Loan Credit Agreement) in accordance with each such Lender's Term Credit Percentage (as defined in the DIP Term Loan Credit Agreement) on the closing of interim DIP financing.<br><br><u>Backstop Fee</u>: 2.00% of the aggregate Initial Term Loan Commitment, payable in cash to the backstop lenders on the closing of interim DIP financing.<br><br><u>Administrative fees</u>:  The DIP Term Loan Agent is entitled to reimbursement of all reasonable and documented out-of-pocket expenses, including reasonable fees and expenses of its counsel, in connection with the DIP Term Loan Facility. |
| **Carve Out**<br><br>*Interim Order at ¶ 40* | (a)    Allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;<br><br>(b)    All accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors or the Committee (the "**Case Professionals**") prior to the delivery of the Carve Out Trigger Notice and allowed at any time by the Court and earned success or transaction fees of Case Professionals reflected in the Budget and allowed at any time by the Court, solely to the extent the same are reflected as estimated professional fees and disbursements in, and maintained as a reserve under, the most recent borrowing base report delivered to the DIP Agents by the Debtors prior to the delivery of a | Same as DIP ABL Facility. |

| | | |
|---|---|---|
| | Carve Out Trigger Notice;<br><br>(c) All accrued and unpaid fees, disbursements and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $2,000,000 less the amount of any prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above; and<br><br>(d) All reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000. | |
| **Governing Law**<br><br>*DIP ABL Credit Agreement § 11.12*; *DIP Term Loan Credit Agreement § 11.12* | The DIP ABL Documents will be governed by the law of New York, except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing. | Same as DIP ABL Facility. |

### **Provisions to Be Highlighted Pursuant to Local Rule 4001-2**

23.    The Debtors believe the following provisions of the DIP ABL Credit Agreement

and the DIP Term Loan Credit Agreement must be highlighted pursuant to Local Rule 4001-2:

   a.    <u>Cross Collateralization (Local Rule 4001-2(a)(i)(A))</u>.  Not applicable.

   b.    <u>Binding the Estate to Validity, Perfection, or Amount of Secured Debt (Local Rule 4001-2(a)(i)(B))</u>.  The Debtors stipulate as to liability with respect to obligations arising under the Prepetition Term Loan Facility and the Prepetition ABL Facility; the perfection and priority of security interests in the Prepetition Collateral; and validity of the liens securing the Prepetition Secured Obligations.    Parties in interest will have an investigation period of the earliest of (i) the date set for a hearing on confirmation of a plan of reorganization, (ii) 75 days from the entry of the Interim Order, and (iii) if a creditors' committee is formed, for the creditors' committee, 60 days from the date of its formation, to investigate these stipulations. *See* Interim Order, ¶ i-ix, 41.

   c.    <u>Waiver of Rights Under Section 506(c) (Local Rule 4001-2(a)(i)(C))</u>.  Effective as of entry of the Final Order, the Debtors waive the ability to charge costs or expenses of administration of these chapter 11 cases against or recover from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or equity without the prior written consent of the

DIP ABL Agent, the DIP Term Loan Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable. *See* Interim Order, ¶ 45.

d.    <u>Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>. The DIP Collateral shall not include, and the DIP Agents shall not be granted a lien on, Avoidance Actions (in the Interim Order); <u>provided</u>, <u>however</u>, that, subject to the entry of the Final Order, the DIP Collateral shall include the proceeds of such Avoidance Actions and, consequently, the DIP Liens, the Prepetition Term Loan Adequate Protection Liens, and the Prepetition ABL Adequate protection liens shall each encumber proceeds of such Avoidance Actions upon the Entry of the Final Order. *See* Interim Order, ¶ 5.

e.    <u>Provisions that Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(E))</u>. Upon entry of an Interim Order, all outstanding Prepetition ABL Obligations shall be "rolled-up" into the DIP ABL Facility (and all outstanding letters of credit under the Prepetition ABL Facility will be converted into outstanding letters of credit under the DIP ABL Facility). *See* Interim Order, ¶ 10.

f.    <u>Provisions that Provide Disparate Treatment of Professionals Retained by a Creditors' Committee (Local Rule 4001-2(a)(i)(F))</u>. Not applicable.

g.    <u>Provisions that Prime Secured Liens Without the Consent of the Lienholder (Local Rule 4001-2(a)(i)(G))</u>. The DIP Facilities do not provide for non-consensual priming liens. The Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties consented to the priming of, respectively the liens securing the Prepetition ABL Facility and the liens securing the Prepetition Term Loan Facility.

h.    <u>Provisions that Seek to Affect the Court's Power to Consider the Equities of the Case (Local Rule 4001-2(a)(i)(H))</u>. Subject to entry of the Final Order, the "equities of the case" exception of section 552 of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to the proceeds, offspring or profits of any of the Prepetition Collateral. *See* Interim Order, ¶ 47.

## Basis for Relief

## I.    The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.

### A.    Entry into the DIP Facilities Is an Exercise of the Debtors' Sound Business Judgment.

24.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue

using the Cash Collateral. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

25.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

26.    Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (finding financing terms, many of which favored the DIP lenders, reasonable when "taken

in context, and considering the relative circumstances of the parties"); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  **Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization**.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

27.    The Debtors' determination to move forward with the DIP Facilities is an exercise of their sound business judgment, which follows an arm's-length process and a careful evaluation of the available alternatives.  Specifically, and in the face of insufficient cash-on-hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and chapter 11 activities.  The Debtors also determined that negotiating a financing package with their existing secured creditors in tandem with negotiation of the Restructuring Support Agreement would enhance their chances of finalizing the Restructuring Support Agreement and securing sufficient creditor support to

01:23878438.1

22

launch their prepackaged plan process. The Debtors negotiated the DIP Agreements and other DIP Documents with the DIP Lenders in good faith, at arm's-length and with the assistance of their respective advisors, and the Debtors believe that they have obtained financing on the best terms reasonably available. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

> **B.**     **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**.

28.     The Debtors propose to obtain financing under the DIP Facilities by providing the security interests and liens set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lenders with perfected first priority claims, priming liens, and security interests in the DIP Collateral and Prepetition Collateral.

29.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re L.A. Dodgers LLC*, 457 B.R. at 312 (Bankr. D. Del. 2011); In re

Ames Dep't Stores, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); see also In re St. Mary Hosp., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); Crouse Grp., 71 B.R. at 549.

30.     As described above and as set forth in the First Day Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' existing assets are encumbered under their existing capital structure.  In light of the foregoing and following discussions with potential lenders regarding potential postpetition financing, the Debtors, in consultation with their advisors have concluded that any workable financing and successful start to these chapter 11 cases was possible only if such financing had the support of, or was provided by, the Debtors' existing lenders.  Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due and cover the projected costs of these chapter 11 cases.  Absent the DIP Facilities, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Documents, are fair, reasonable, and adequate, as set forth in more detail below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

31.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is

subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

32. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interests in collateral are adequately protected. Here, the Prepetition Lenders have consented to the DIP Facilities. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

C.    **No Comparable Alternative to the DIP Facilities Is Reasonably Available**.

33. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, as here, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (requiring a debtor to show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)).

34.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure. The Prepetition Secured Parties assert that substantially all of the Debtors' existing assets are encumbered under their existing capital structure.  Thus, the Debtors have determined that the DIP Facilities provide the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

      **D.**      **The "Roll-Up" Repayment Feature of the DIP Facilities Is Appropriate**.

35.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule provides a

presumption of reasonableness to the decisions of a debtor's management . *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

36.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor–in–possession financing arrangements.    Courts in this jurisdiction have approved similar DIP features, including on the first day of the case.  *See, e.g.*, *In re Brookstone Co., Inc.*, No. 18-11780 (BLS) (Bankr. D. Del. Aug. 3, 2018 (authorizing full roll-up of all outstanding prepetition revolving obligations pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP that included roll-up of approximately $160 million pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all outstanding prepetition revolving obligations pursuant to interim order); *In re Real Indus., Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing full roll-up of prepetition revolving obligations pursuant to interim order); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP that included roll-up of approximately $250 million prepetition debt pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order).

37.     As set forth above, the DIP Agreements and the DIP Orders provide that upon entry of the Interim Order (and subject to the "challenge" rights of third parties), all outstanding Prepetition ABL Obligations will be rolled into the ABL DIP Facility.

38.     The roll-up of the Prepetition ABL Facility is a sound exercise of the Debtors' business judgment, is a material component of the structure of the DIP Facilities, and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.  Without continued access to an asset-based lending facility and the ability to issue letters of credit under the DIP ABL Facility and up to $60 million in incremental liquidity under the DIP Term Loan Facility, the Debtors would lack sufficient liquidity to operate their business. Maintaining the going-concern value of the Debtors' assets until consummation of the proposed transactions set forth in the Restructuring Support Agreement is of immense benefit to the Debtors' estates and stakeholders.

39.     The Debtors agreed to repay roll-up all outstanding Prepetition ABL Obligations into the DIP ABL Facility because, among other things, it (i) will not prejudice the Debtors' stakeholders and (ii) provides significant benefits to the Debtors' estates.  The roll-up of the Prepetition ABL Obligations will not prejudice the Debtors or their estates because the Prepetition ABL Lenders are oversecured.  Repayment or roll-up of a prepetition ABL facility that is oversecured does not harm the Debtors' stakeholders–including the general unsecured creditors–because the only variable is timing, not certainty, of repayment.  Courts in this district place particular importance on whether a prepetition secured creditor is oversecured in determining whether to approve a roll-up.  *See, e.g., In re Real Indus., Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017), Hr'g Tr. 39:9-19 ("So, let's talk about the roll-up.  I had the same issue on Friday and I did something that, as you might imagine, a Court would be reluctant

to do, and I approved the roll-up on the first day, and I did it in those circumstances in which there didn't seem to be any dispute over whether that lender that was the beneficiary of the roll-up was over-secured."); *In re Velocity Holding Co., Inc.*, No. 17-12442 (KJC) (Bankr. D. Del. Nov. 17, 2017), Hr'g Tr. 38:1-2 (remarking that whether a secured creditor is oversecured "directly affects whether they should have a roll-up"); *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882 (LSS) (Bankr. D. Del. April 8, 2016), Hr'g Tr. 65:7-17 ("[A]s noted in the colloquia of counsel, Wells Fargo has the first [lien] on all the current assets and they are, it has been represented to me, over-secured.  So in that event I don't see the harm in letting this [roll-up of prepetition obligations] go out on first day.").  Furthermore, the roll-up of the Prepetition ABL Obligations into the DIP Term Loan Facility is subject to review and challenge—and potentially to being unwound—by a creditors' committee, if appointed, or another party-in-interest with requisite standing if a committee is not appointed.  Moreover, were the Prepetition ABL Obligations to remain outstanding, interest would accrue on those obligations at the default rate.

40.     Ultimately, the DIP Facilities provide the Debtors with the best path for a smooth transition into chapter 11.  The Prepetition Lenders are unlikely to continue to lend postpetition without some assurance regarding their prepetition claims.  Absent the Prepetition Secured Parties' support, the first month of the chapter 11 cases would likely devolve into a costly priming fight or result in a total lack of liquidity.  With the Prepetition Secured Parties' support, in contrast, the Debtors are on a solid path to swift emergence from chapter 11, which leaves their trade creditors unimpaired and minimizes disruption to their business.

41.     Given these circumstances, repayment of all outstanding Prepetition ABL Obligations with proceeds of the DIP Facilities, as set forth in the DIP Agreements and the DIP Orders, is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

II.    **The Debtors Should Be Authorized to Use the Cash Collateral**.

42.    Section 363 of the Bankruptcy Code generally governs the use of estate property. section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

43.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis").

44.    Under the terms of the Interim Order, the Debtors have agreed to provide the Prepetition Secured Parties with a variety of adequate protection measures to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay, including (i) the payment of cash interest, (ii) the repayment of reasonable fees and expenses of the Prepetition Secured Parties, (iii) replacement security interests and liens, (iv) superpriority administrative claims under section 507(c) of the Bankruptcy Code, subject to the payment in full in cash of amounts due under the Carve Out and the DIP Facilities, and (v) funding certain indemnity reserve accounts in the event of a challenge to their liens.

01:23878438.1

45.     The Debtors submit that the adequate protection measures proposed are to protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.  Thus, the Debtors' provision of the adequate protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agents and the DIP Lenders Under the DIP Documents**.

46.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders pursuant to the DIP Documents. Specifically, the Debtors have agreed to pay (a) a nonrefundable closing fee equal to 1.00% of the DIP ABL Facility, (b) a commitment fee of 0.375% per annum on the actual daily unused portions of the DIP ABL Facility, (c) a fronting fee of 0.125% per annum on aggregate amount available to be drawn under letters of credit issued under the DIP ABL Facility, (d) administrative and other fees and expenses as contained in the DIP ABL Documents, including without limitation, the ABL Fee Letter, (d) administrative fees to the DIP Term Loan Agent totaling $30,000, (e) a commitment fee to the DIP Term Loan Lenders of 1.00% of the aggregate Initial Term Loan Commitments, and (f) a backstop fee to the Backstop Lenders (as defined in the DIP Term Loan Credit Agreement) of 2.00% of the aggregate Initial Term Loan Commitments.  The Debtors, in consultation with their advisors, believe that these fees are an integral component of the overall terms of the DIP Facilities, were required by the DIP Agents

and the DIP Lenders as consideration for the extension of postpetition financing, are reasonable and customary for similar transactions and represent the best financing terms reasonably available to the Debtors.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

47.     The Debtors also respectfully request that the Court authorize the ABL Fee Letter to be filed under seal.  By its terms, the ABL Fee Letter requires the Debtors to keep the description of fees contained therein confidential.  Specifically, the descriptions of fees set forth in the ABL Fee Letter constitute proprietary information not typically disclosed to the public or to competing financial institutions.  In light of the highly competitive nature of the investment banking and finance lending industries, it is of critical importance to the DIP ABL Agent and the DIP ABL Lenders that the details of the fee structure set forth in the ABL Fee Letter be kept confidential so that competitors may not use the information contained therein to gain a strategic advantage over the lenders in the marketplace.

48.     To ensure that the key constituencies in these cases receive adequate disclosure, the Debtors intend to provide the ABL Fee Letter to the Court, the U.S. Trustee, and counsel to any Committee appointed in these chapter 11 cases; *provided*, *however*, that the foregoing parties shall maintain the ABL Fee Letter as strictly confidential.  Courts in this jurisdiction have previously determined that certain documents entered into in connection with postpetition and/or exit financing, such as fee or expense letters, qualify as "confidential commercial information" within the meaning of section 107(b) of the Bankruptcy Code and have authorized the filing of such documents under seal.  *See, e.g.*, *In re Mattress Firm, Inc.*, Case No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct.

9, 2018); *In re Se. Grocers, LLC*, Case No. 18-10700 (MFW) (Bankr. D. Del. Apr. 9, 2018); *In re Energy Future Holdings, Corp.*, Case No. 14-10979 (CSS) (Bank. D. Del. June 23, 2017).

## IV.    **The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e)**.

49.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).  As explained herein and in the First Day Declaration, the DIP Documents are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Agents and DIP Lenders. The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

01:23878438.1

V.     **The Automatic Stay Should Be Modified on a Limited Basis**.

50.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agents may request to assure the perfection and priority of the DIP Liens, (b) the Debtors to take all appropriate action to grant the replacement liens (as set forth herein), and to take all appropriate action to ensure that such replacement liens are perfected and maintain the priority set forth in the Interim Order, (c) the Debtors to incur all liabilities and obligations to the DIP Agents as contemplated under the DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the Interim Order and the DIP Documents, and (e) the implementation of the terms of the Interim Order.

51.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 Cases.  *See, e.g., In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default).

VI.    **Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm**.

52.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities.  The Debtors require the initial funding under the DIP Facilities, including the full $60 million available under the DIP Term Loan Facility, prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses and implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for Final Hearing

54.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Necessity of Immediate Relief and Waiver of Stay

55.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  Absent access to the DIP Facilities, the Debtors will have no alternative but to immediately cease operating and convert these cases to cases under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtors

respectfully submit that, because of the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

### Waiver of Bankruptcy Rules 6004(h)

56.     The Debtors further seek a waiver of any stay of the effectiveness of the Interim Order.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.    Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

57.     The Debtors have provided notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the lenders and agent under the Debtors' prepetition ABL facility; (d) counsel to the ad hoc term loan lender group; (e) counsel to Oaktree Capital Management, L.P.; (f) counsel to the agent under the Debtors' prepetition term loan facility; (g) counsel to the lenders and agent under the Debtors' postpetition DIP ABL facility; (h) counsel to the lenders and agent under the Debtors' postpetition DIP term loan facility; (i) the indenture trustee for the Debtors' outstanding bond issuance; (j) each of the counsel to the parties to the Restructuring Support Agreement; (k) all parties known to have asserted a lien or security interest in the Debtors' property; (l) the Internal Revenue Service; (l) the Office of the United States Attorney for the District of Delaware; (m) the Securities Exchange Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule

01:23878438.1

2002.  The Debtors will serve copies of this motion and any order entered in respect of this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and the Final Order granting the relief requested herein and (b) grant such other and further relief as is just and proper.

Dated:    November 19, 2018          */s/ Jaime Luton Chapman*
          Wilmington, Delaware      **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
                                    Robert S. Brady (No. 2847)
                                    Edmon L. Morton (No. 3856)
                                    Jaime Luton Chapman (No. 4936)
                                    Tara C. Pakrouh (No. 6192)
                                    Rodney Square
                                    1000 North King Street
                                    Wilmington, Delaware 19801
                                    Tel:    (302) 571-6600
                                    Fax:    (302) 571-1253
                                    Email: rbrady@ycst
                                            emorton@ycst.com
                                            jchapman@ycst.com
                                            tpakrouh@ycst.com


                                    -and-

                                    **DEBEVOISE & PLIMPTON LLP**
                                    M. Natasha Labovitz (*pro hac vice* pending)
                                    Nick S. Kaluk III (*pro hac vice* pending)
                                    Daniel E. Stroik (*pro hac vice* pending)
                                    919 Third Avenue
                                    New York, New York 10022
                                    Tel:    (212) 909-6000
                                    Fax:    (212) 909-6836
                                    Email: nlabovitz@debevoise.com
                                            nskaluk@debevoise.com
                                            destroik@debevoise.com

                                    -and-

                                    **DEBEVOISE & PLIMPTON LLP**
                                    Craig A. Bruens (*pro hac vice* pending)
                                    801 Pennsylvania Avenue N.W.
                                    Washington, D.C. 20004
                                    Tel:    (202) 383-8000
                                    Fax:    (208) 383-8118
                                    Email: cabruens@debevoise.com

                                    *Proposed Co-Counsel for the Debtors and Debtors in Possession*

# EXHIBIT A

## Proposed Interim Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DAVID'S BRIDAL INC.., *et al.*,[1] | ) | Case No. 18-12635 (LSS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Re: Docket No. ___ |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated November 19, 2018 (the "DIP Motion") of David's Bridal, Inc. (as successor by merger to DBP Holding Corp.) (the "Borrower") and its debtor affiliates, each as a debtor and debtor in possession (collectively, the "Debtors"), and DB Midco, Inc. ("Holdings"), each other obligor, if any, of the DIP Term Loan Facility (as defined below) and each existing and future direct and indirect domestic subsidiary of the Borrower (together with Holdings, the "Guarantors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096).  The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Bankruptcy Rules for District of Delaware (the "<u>Local Rules</u>"), *inter alia*:

(i)        authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority revolving credit facility in the aggregate principal amount of up to $125,000,000 (the "<u>DIP ABL Credit Facility</u>," and all amounts extended under the DIP ABL Credit Facility, the "<u>DIP ABL Loans</u>"), including (a) a $80,000,000 sublimit for the issuance of letters of credit and (b) a $20,000,000 sublimit for swingline loans, pursuant to the terms and conditions of that certain *Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP ABL Agreement</u>"), by and among the Borrower, the Guarantors, Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "<u>DIP ABL Agent</u>"), for and on behalf of itself and the other lenders party thereto (collectively, including the DIP ABL Agent, the "<u>DIP ABL Lenders</u>"), substantially in the form of **Exhibit B**, attached to the DIP Motion[2];

(ii)        authorizing the Debtors to execute and deliver the DIP ABL Agreement and any other agreements and documents related thereto (collectively with the DIP ABL Agreement, the "<u>DIP ABL Documents</u>") and to perform such other acts as may be necessary or desirable in connection with the DIP ABL Documents;

(iii)        granting the DIP ABL Credit Facility and all obligations owing thereunder and under the DIP ABL Documents or otherwise to the DIP ABL Agent and DIP ABL Lenders (collectively, and including all "Obligations" as described in the DIP ABL Agreement, the "<u>DIP</u>

---

[2] Upon entry of the Interim Order, all Prepetition ABL Obligations (as defined below), including all accrued and unpaid interest thereon and fees and expenses, shall be fully-rolled into the DIP ABL Credit Facility and shall constitute DIP ABL Obligations hereunder.

ABL Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein);

(iv)    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $60,000,000 (the "DIP Term Loan Facility," and all amounts extended under the DIP Term Loan Facility, the "DIP Term Loans," and the DIP Term Loan Facility together with the DIP ABL Credit Facility, the "DIP Facilities"), consisting of a new money term loan facility, pursuant to the terms and conditions of that certain *Senior Secured, Super-Priority Term Loan Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Loan Agreement," and together with the DIP ABL Agreement, the "DIP Agreements"), by and among the Borrower, the Guarantors, and Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, the "DIP Term Loan Agent," and, together with the DIP ABL Agent, the "DIP Agents") for and on behalf of itself and the other lenders party thereto (collectively, including the DIP Term Loan Agent, the "DIP Term Loan Lenders," and, together with the DIP ABL Lenders, the "DIP Lenders"), substantially in the form of **Exhibit C** attached to the DIP Motion;

(v)    authorizing the Debtors to execute and deliver the DIP Term Loan Agreement and any other agreements and documents related thereto (collectively with the DIP Term Loan Agreement, the "DIP Term Loan Documents," and together with the DIP ABL Documents, the "DIP Documents"), by and among the Borrower, the Guarantors, the DIP Term Loan Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Term Loan Documents;

(vi)        granting the DIP Term Loan Facility and all obligations owing thereunder and under the DIP Term Loan Documents to the DIP Term Loan Agent and DIP Term Loan Lenders (collectively, and including all "Obligations" as described in the DIP Term Loan Agreement, the "DIP Term Loan Obligations," and together with the DIP ABL Obligations, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases;

(vii)       granting to the DIP Agents, for the benefit of themselves and the DIP Lenders and the other Secured Parties (as defined in the DIP Agreements) under the applicable DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein;

(viii)      authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(ix)        authorizing the Debtors to use, on the terms described herein, the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the

Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value of their respective interests in the Prepetition Collateral, including the Cash Collateral;

(x)      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(xi)      scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the *Declaration of Joan Hilson, Executive Vice President and Chief Financial and Operating Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Pleadings*, the *Declaration of Stephen Goldstein in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, the DIP Documents, and the evidence submitted and argument made at the interim hearing held on November [20], 2018 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their

estates and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Agreements is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date**.  On November 19, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed an official committee of

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.    **Notice**.    Timely, adequate, and sufficient notice under the circumstances of the DIP Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the DIP Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.    **Debtors' Stipulations**.    After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 43 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)    *Prepetition ABL Facility*.    Pursuant to that certain ABL Credit Agreement dated as of October 11, 2012 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower, (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party thereto (including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and collectively with the Prepetition ABL Agent, the "Prepetition ABL Parties"), the Prepetition ABL Lenders provided revolving

credit and other financial accommodations to, and issued letters of credit for the account of, the Borrower pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility").

(ii)    *Prepetition ABL Obligations*.    The Prepetition ABL Facility provided the Borrower with, among other things, $125,000,000 in aggregate Revolving Credit Commitments (as defined in the Prepetition ABL Agreement), including letters of credit and swingline loan commitments.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than $25,700,000 in loans and not less than $42,500,000 in issued and outstanding letters of credit (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrower's or the Prepetition ABL Guarantors' obligations pursuant to the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

(iii)    *Prepetition ABL Liens and Prepetition ABL Priority Collateral*. As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Borrower and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, a security interest in and continuing lien on

(the "Prepetition ABL Liens") substantially all of their assets and property, including, without limitation, (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to below) (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds and products of any of the foregoing, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Priority Collateral (as defined in the Intercreditor Agreement) and proceeds and products of any of the foregoing, in each case whether then owned or existing or thereafter acquired (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the Prepetition ABL Permitted Prior Liens and the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral.

(iv)    *Prepetition Term Loan Facility*.    Pursuant to that certain Credit Agreement dated as of October 11, 2012 (as amended, restated or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower, (b) Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "Prepetition Term Loan Agent," and together with the Prepetition ABL Agent, the "Prepetition Agents"), (c) the guarantors thereunder (the "Prepetition Term Loan Guarantors" and, together with the Prepetition ABL Guarantors, the "Prepetition Guarantors"), and (d) the lenders party thereto (the "Prepetition Term Loan Lenders," and collectively with the

Prepetition Term Loan Agent, the "Prepetition Term Loan Parties," and together with the Prepetition ABL Parties, the "Prepetition Secured Parties"), the Prepetition Term Loan Lenders provided term loans to the Borrower (the "Prepetition Term Loan Facility," and together with the Prepetition ABL Facility, the "Prepetition Secured Facilities").

(v)    *Prepetition Term Loan Obligations*.  The Prepetition Term Loan Facility provided the Borrower with commitments to provide term loans in the aggregate principal amount of up to approximately $520,000,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was $481,239,196.00 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

(vi)    *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Borrower and Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, a security interest in and continuing lien on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL

Liens, the "<u>Prepetition Liens</u>") substantially all of their assets and property, including, without limitation, (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the Prepetition Term Loan Permitted Prior Liens and the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral.

(vii)    *Priority of Prepetition Liens; Intercreditor Agreement.*    The Prepetition Agents and others entered into that certain Intercreditor Agreement dated as of October 11, 2012 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "<u>Intercreditor Agreement</u>") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors.  Each of the Borrower and Prepetition Guarantors acknowledged and agreed to the Intercreditor Agreement.

(viii)    *Validity, Perfection and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral, and (2) liens senior by operation of law or permitted by the Prepetition ABL Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition ABL Liens as of the Petition Date, the "<u>Prepetition ABL Permitted Prior Liens</u>"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations

of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix) *Validity, Perfection and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.* The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL

Priority Collateral, and (2) liens senior by operation of law or permitted by the Prepetition Term Loan Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Term Loan Liens as of the Petition Date, the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens"); (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)     *Default by the Debtors.*  The Debtors acknowledge and stipulate that the Debtors have, since October 15, 2018, been and are in default of their obligations under the Prepetition ABL Documents and that from the Petition Date interest was accruing on the Prepetition ABL Obligations at the default rate since October 15, 2018.

(xi)     *Senior Notes.*  Pursuant to that certain Indenture dated as of October 11, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Senior Notes Indenture") among the Borrower and Wilmington Trust, National Association, as trustee (in such capacity, the "Indenture Trustee"), the Borrower issued $270,000,000 in senior unsecured notes (the "Senior Notes").  As of the Petition Date, the aggregate principal amount of Senior Notes outstanding was $270,000,000.

G.     **Permitted Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including the Debtors, the DIP Agents, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the Prepetition Liens and DIP Liens.

H.     **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

I.     **Intercreditor Agreement**.  Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreement (as the same may be amended, modified or acknowledged)

and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein. Repayment or the "roll-up" of the Prepetition ABL Obligations pursuant to this Interim Order shall not be deemed to constitute a "discharge" of Prepetition ABL Obligations as that term is used in the Intercreditor Agreement.

J.  **Findings Regarding Postpetition Financing**

(i)  *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facilities on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Agents.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)  *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facilities and as further described below, will enable the Debtors to obtain the DIP Facilities and to continue to operate their businesses to the benefit of their estates

and creditors. The Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code for any diminution in value ("Diminution in Value") of each of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iii)   *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facilities in order to, among other things, enable the orderly continuation of their operations, to administer and preserve the value of their estates and to prosecute the transactions contemplated under the Restructuring Support Agreement (as defined in the DIP Motion). The ability of the Debtors to maintain business relationships with their vendors, suppliers and customers, to pay their employees and otherwise finance their operations requires the availability of working capital from the DIP Facilities and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facilities and authorized use of Cash Collateral.

(iv)   *No Credit Available on More Favorable Terms*. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative

expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agents, for the benefit of themselves and the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) the DIP Collateral (as specified herein) with the priorities set forth in paragraph 6 hereof, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)      *Use of proceeds of the DIP Facilities*.  As a condition to entry into the DIP Agreements, the extension of credit under the DIP Facilities and the authorization to use Cash Collateral, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facilities shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents, and subject to such variances as permitted in the DIP Agreements, and as set forth in paragraph 21 hereof, the "Budget"),[4] solely for: (a) working capital and letters of credit, (b) other general corporate purposes of the Debtors; (c) permitted payment of costs of administration of the Cases; (d) payment of such other prepetition obligations as consented to by the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders (as defined in the DIP Term Credit Agreement)), each in its sole discretion, and as approved by the Court; (e) payment of interest, fees and expenses (including without limitation, legal and other professionals' fees and expenses of the DIP Agents

---

[4] A copy of the initial Budget is attached hereto as **Exhibit** _ (the "Initial Budget"), which constitutes the "Approved Budget" under each of the DIP Agreements.

and DIP Lenders) owed under the DIP Documents as set forth in paragraph 36 hereof; (f) payment of certain adequate protection amounts to the Prepetition Secured Parties, as set forth in paragraphs 16-17 hereof; (g) the roll-up of the Prepetition ABL Obligations into DIP ABL Obligations, subject to the rights preserved in paragraph 43 of this Interim Order; (h) payment of outstanding DIP ABL Obligations; and (i) payment of the Carve Out.   The roll-up of the Prepetition ABL Obligations into DIP ABL Obligations in accordance with this Interim Order is necessary as the Prepetition ABL Parties have not otherwise consented to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP ABL Agent and the DIP ABL Lenders will not otherwise consent to providing the DIP ABL Credit Facility and extending credit to the Debtors thereunder.   In addition, the roll-up of the Prepetition ABL Obligations is subject to the reservation of rights in paragraph 43 below, will not prejudice the rights of any party in interest.

(vi)     *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Agreements, the extension of credit under the DIP Facilities and authorization to use Cash Collateral, the Debtors, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order.

(vii)    *Roll-up Loans.*   Upon entry of this Interim Order and the occurrence of the Closing Date (as defined in the DIP Agreements), without any further action by the Debtors or any other party, all of the Prepetition ABL Obligations shall be converted into DIP ABL Obligations (the "DIP Roll-Up Obligations").  The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition ABL Lenders to fund amounts under the DIP ABL Credit Facility and not as

payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations.  Notwithstanding any other provision of this Interim Order, the DIP Agreements or the Intercreditor Agreement, all rights of the Prepetition ABL Lenders shall be fully preserved. The Prepetition ABL Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP ABL Liens, and the DIP Agents and the DIP Lenders would not be willing to provide the respective DIP Facilities or extend credit to the Debtors thereunder without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations. Moreover, the "roll-up" of all outstanding Prepetition ABL Obligations into DIP ABL Obligations upon entry of the Interim Order will result in interest savings to the Debtors and their estates and, because they are subject to the reservation of rights in paragraph 43 below, will not prejudice the right of any party in interest.

K.    **Adequate Protection**.  The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral as set forth in this Interim Order.

L.    **Sections 506(c) and 552(b).**  In light of (i) the DIP Agents' and DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve Out; (ii) the Prepetition ABL Parties' agreement that their liens shall be subject to the Carve Out and subordinate to the DIP ABL Liens and, in the case of the Prepetition Term Priority Collateral, subordinate to the DIP Term Loan Liens; and (iii) the Prepetition Term Loan Parties' agreement that their liens shall be subject to the Carve Out and subordinate to the DIP Term Loan Liens and, in the case of the Prepetition ABL Priority Collateral, subordinate to the DIP ABL Liens, (a)

subject to entry of a Final Order, the Prepetition Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Agents, DIP Lenders, and Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.     **Good Faith of the DIP Agents and DIP Lenders**.

(i)     *Willingness to Provide Financing*.    The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facilities and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facilities are essential to the Debtors' estates, that the DIP Agents and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agents' and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the DIP Facilities and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The terms and conditions of the DIP Facilities and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, DIP Agents, DIP Lenders, and Prepetition Secured Parties, with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be

extended under the DIP Facilities shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agents, DIP Lenders, and Prepetition Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

N.   **Immediate Entry**.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

O.   **Interim Hearing**.   Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee, (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis, (iii) counsel to the Prepetition ABL Agent, (iv) counsel to the Prepetition Term Loan Agent; and (v) all other parties entitled to notice under the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.   <u>Interim Financing Approved</u>.   The DIP Motion is granted, the Interim Financing (as defined herein) is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled.

**<u>DIP Facilities Authorization</u>**

2.    <u>Authorization of the DIP Facilities</u>.  The DIP Facilities, including the DIP Roll-Up Obligations, are hereby approved.   The Debtors are expressly and immediately authorized and  empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facilities and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents, including, without limitation, each Guarantor providing its joint and several guarantee of all of the DIP Obligations.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, closing fees, arrangement fees, letter of credit fees (including issuance, fronting, and other related charges), unused facility fees, continuing commitment fees, backstop fees, servicing fees, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees and collateral agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery,

the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3.     <u>Authorization to Borrow</u>.  In order to prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Declaration (as defined below), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request extensions of credit (in the form of loans and letters of credit) up to an aggregate outstanding principal amount of not greater than $125,000,000 at any one time outstanding under the DIP ABL Credit Facility, and $60,000,000 at any one time outstanding under the DIP Term Loan Credit Facility (together, the "<u>Interim Financing</u>").

4.     <u>DIP Obligations</u>.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry of this Interim Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or any of the DIP Lenders, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owing under the DIP Documents. Without limiting the foregoing, the DIP ABL Obligations shall also include cash management

and bank product exposure and derivative and swap exposure and obligations to the extent provided under the DIP Documents.  Upon entry of this Interim Order and the occurrence of the Closing Date (as defined in the DIP Agreements), all letters of credit issued for the account of the Debtors under the Prepetition ABL Agreement shall continue in place and all obligations under or in connection with such letters of credit shall be subject to the DIP ABL Agreement and shall constitute DIP ABL Obligations.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the DIP Termination Date (as defined herein), except as provided in paragraph 31 herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below), and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5. <u>DIP Liens</u>.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agents, for the benefit of themselves and the DIP Lenders, are hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and

01:23878455.1

properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "<u>DIP Collateral</u>"), including without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, (i) all of the issued and outstanding capital stock or equivalents of each of its subsidiaries, including issued and outstanding capital stock or equivalents of each of David's Bridal Canada Inc. and David's Bridal UK Limited and all proceeds thereof (collectively, such capital stock or equivalents, the "<u>Foreign Stock</u>"), and (ii) to the extent the applicable parties have provided consent or have been deemed to consent to a lien on the applicable JV Interest (as defined below), the Debtors' applicable capital stock or equivalents in (1) Executive Management Limited, a limited company incorporated in Hong Kong, (2) Fillberg, Ltd., a limited company incorporated in Hong Kong, (3) Wingreat Limited, a limited company incorporated in Hong Kong and (4) Maxtel Limited, a limited company incorporated in Hong Kong, and all proceeds, products and offspring thereof (collectively, such capital stock or equivalents the "<u>JV Interests</u>")), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the

Debtors, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, (b) all owned real property and all proceeds of leased real property, (c) all proceeds of actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code), (e) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code, and (f) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date.  DIP Collateral that is of a type that would be ABL Priority Collateral (as defined in the Intercreditor Agreement), the other collateral described as DIP ABL Priority Collateral below, and the proceeds, products and offspring thereof shall, in each case, shall constitute "DIP ABL Priority Collateral," and DIP Collateral that is of a type that would be Term Priority Collateral (as defined in the Intercreditor Agreement), the other collateral described as DIP Term Priority Collateral below, and the proceeds, products and offspring thereof shall, in each case, constitute "DIP Term Priority Collateral."  For the avoidance of doubt, (i) after entry of the Final Order, DIP ABL Priority Collateral shall include proceeds of the Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code, solely to the extent such rights are enforceable against DIP ABL Priority Collateral; (ii) the Debtors' owned real property shall not secure the DIP ABL Obligations or the Prepetition ABL Obligations; and (iii) DIP Term Priority Collateral shall include (1) the Foreign Stock, (2) any JV Interest for which the applicable consent has been provided (or has been deemed to have been provided), (3) all owned real property, (4) the proceeds, products and offspring of (A) the Debtors' real property leases and (B) any JV Interest

for which the applicable consent has not been provided (and has not been deemed to have been provided), and (5) after entry of the Final Order, proceeds of the Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code, solely to the extent such rights are enforceable against DIP Term Priority Collateral.  In addition, proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared DIP Collateral, and the DIP ABL Liens and the DIP Term Liens (each as defined below) on such proceeds shall rank equally in priority and share such proceeds *pro rata* (based on the outstanding principal amount of the respective DIP Facilities at the time of the distribution of such proceeds to the DIP Agents for the benefit of the DIP Lenders).  The DIP Term Obligations, at the option of the Required Lenders (as defined in the DIP Term Loan Credit Agreement), to be exercised in their sole and absolute discretion, but subject in all respects to the DIP Documents and the priorities and provisions set forth in this Interim Order, shall be repaid (a) *first*, from DIP Term Priority Collateral that was not subject to any valid, perfected, non-avoidable and enforceable lien in existence on or as of the Petition Date and (b) *second*, from all other DIP Collateral.  Notwithstanding the foregoing, DIP Collateral shall not include (a) real property leases, (b) to the extent the applicable parties have not provided consent and have not been deemed to consent to a lien on the applicable JV Interest, such applicable JV Interest, (c) any leasehold interest (or any rights or interests thereunder) the grant of a lien on which, notwithstanding the Bankruptcy Code, shall constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of the obligor under any lease governing such leasehold interest or a breach or termination pursuant to the terms of, or a default under, any such lease, (d) avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy

Code), or (e) the Debtors' rights under section 506(c) or 550 of the Bankruptcy Code; provided, however, that DIP Collateral shall include proceeds of all of the foregoing, subject to the entry of the Final Order in the case of clauses (d) and (e).

6.      DIP Lien Priority.  The DIP Liens securing the DIP ABL Obligations (the "DIP ABL Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens shall be subject to the Carve Out and shall otherwise be junior only to: (i) as to the DIP ABL Priority Collateral, Prepetition ABL Permitted Prior Liens; and (ii) as to the DIP Term Priority Collateral, (A) Prepetition ABL Permitted Prior Liens; (B) the DIP Term Loan Liens (as defined herein); (C) the Prepetition Term Loan Liens; and (D) the Prepetition Term Adequate Protection Liens.  The DIP Liens securing the DIP Term Loan Obligations (the "DIP Term Loan Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Term Loan Liens shall be subject to the Carve Out and shall otherwise be junior only to: (i) as to the DIP Term Priority Collateral, Prepetition Term Loan Permitted Prior Liens; and (ii) as to the DIP ABL Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens; (B) the DIP ABL Liens; (C) the Prepetition ABL Liens; and (D) the Prepetition ABL Adequate Protection Liens.  Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP

Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.     Superpriority Claims.  Upon entry of this Interim Order, the DIP Agents and DIP Lenders are hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations: (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law; *provided, however*, that the DIP Superpriority Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities as set forth herein, and shall be subject to the Carve Out and senior to the Adequate Protection Superpriority Claim.

8.     No Obligation to Extend Credit.  The DIP Agents and DIP Lenders shall have no obligation to make any loan or advance, or to issue, amend, renew or extend any letters of credit or bankers' acceptance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance, amendment, renewal or extension of such letter of credit or bankers' acceptance under the DIP Documents have been satisfied in full

or waived by the DIP ABL Agent or the DIP Term Loan Agent (with the consent of the Required

Lenders), as applicable, each in its sole discretion, and in accordance with the terms of the DIP

ABL Agreement and the DIP Term Loan Agreement.

         9.     Use of Proceeds of DIP Facilities.  From and after the Petition Date, the

Debtors shall use advances of credit under the DIP Facilities, in accordance with the Budget,

only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in

compliance with the terms and conditions in this Interim Order and the DIP Documents.

         10.     Roll-Up of Loans.  Upon entry of this Interim Order and the occurrence of

the Closing Date, without any further action by the Debtors or any other party, all Prepetition

ABL Obligations (including, without limitation, all outstanding letters of credit) shall be

converted and "rolled-up" into DIP Roll-Up Obligations, and such DIP Roll-Up Obligations

shall constitute DIP ABL Obligations.

**Authorization to Use Cash Collateral**

         11.     Authorization to Use Cash Collateral.  Subject to the terms and conditions

of this Interim Order, the DIP Facilities and the DIP Documents and in accordance with the

Budget, the Debtors are authorized to use Cash Collateral until the DIP Termination Date (as

defined herein); provided, however, that during the Remedies Notice Period (as defined herein)

the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses critical

to the administration of the Debtors' estates strictly in accordance with the Budget, and as

otherwise agreed by the DIP Agents (with respect to the DIP Term Loan Agent, with the consent

of the Required Lenders) in their sole discretion.  Nothing in this Interim Order shall authorize

the disposition of any assets of the Debtors or their estates outside the ordinary course of

business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order and the DIP Documents.

        12.    <u>Adequate Protection Liens</u>.

        (a)    *Prepetition ABL Adequate Protection Liens*.  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Prepetition ABL Adequate Protection Liens</u>").

        (b)    *Prepetition Term Adequate Protection Liens*.  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Prepetition Term Adequate Protection Liens</u>," and together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").

        13.    <u>Priority of Adequate Protection Liens</u>.

        (a)    The Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior only to: (i) with respect to the DIP ABL Priority Collateral, (1) Prepetition ABL Permitted Prior Liens; (2) the DIP ABL Liens; and (3) the Prepetition ABL Liens; and (ii) with respect to the DIP Term Priority Collateral, (1) Prepetition

ABL Permitted Prior Liens; (2) the DIP Term Loan Liens; (3) the Prepetition Term Loan Liens; (4) the Prepetition Term Adequate Protection Liens; (5) the DIP ABL Liens; and (6) the Prepetition ABL Liens.  The Prepetition ABL Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Debtors' assets.

(b)    The Prepetition Term Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior only to: (i) with respect to the DIP ABL Priority Collateral (1) Prepetition Term Loan Permitted Prior Liens; (2) the DIP ABL Liens; (3) the Prepetition ABL Liens; (4) the Prepetition ABL Adequate Protection Liens; and (5) the DIP Term Loan Liens; and (ii) with respect to the DIP Term Priority Collateral (1) Prepetition Term Loan Permitted Prior Liens and (2) the DIP Term Loan Liens.  The Prepetition Term Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Debtors' assets.

(c)    Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

14.    Adequate Protection Superpriority Claims.

(a)    *Prepetition ABL Superpriority Claim*.    As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral against any

Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition ABL Superpriority Claim").

(b)    *Prepetition Term Loan Superpriority Claim*.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Term Loan Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

15.    Priority of the Adequate Protection Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; provided, however, that the Adequate Protection Superpriority Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities as set forth herein, and subject to the Carve Out, and junior to the DIP Superpriority Claims.

16.    <u>Adequate Protection Payments and Protections for Prepetition ABL Parties</u>.  As further adequate protection (the "<u>Prepetition ABL Adequate Protection Payments</u>"), the Debtors are authorized and directed to provide adequate protection to the Prepetition ABL Parties in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) interest at the non-default rate (*provided* that, for the avoidance of doubt, interest shall cease to accrue under the Prepetition ABL Documents upon the roll-up of the Prepetition ABL Obligations as provided in this Interim Order), (ii) principal due under the Prepetition ABL Documents to the extent outstanding, subject to the rights preserved in paragraph 43 below, (iii) immediately upon entry of this Interim Order, payment of reasonable and documented fees and expenses (including the reasonable and documented fees, expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date, including reasonable and documented fees and expenses of (1) Morgan, Lewis & Bockius LLP, (2) Richards, Layton & Finger, PA and (3) Berkeley Research Group, LLC (collectively, the "<u>ABL Advisors</u>"), and (iv) in accordance with the procedures set forth in paragraph 36 hereof, the reasonable and documented fees and expenses (including the reasonable and documented fees, expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising subsequent to the Petition Date, including reasonable and documented fees and expenses of the ABL Advisors; <u>provided</u>, <u>however</u>, during the continuance of an Event of Default, any such payments to the Prepetition ABL Parties shall be made solely from DIP ABL Priority Collateral.  Upon commencement of a Challenge (as defined herein), the Debtors are further authorized and directed to pay to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $250,000 into a non-

interest bearing account maintained at Bank of America, N.A. (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations").  (A) The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders in connection with or responding to (1) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 43 hereof, or (2) any Challenge against the Prepetition ABL Agent or Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens granted to the Prepetition ABL Agent, as applicable, whether in these Cases or independently in another forum, court, or venue; (B) the Prepetition ABL Indemnity Obligations shall be secured by a first lien on the Prepetition ABL Indemnity Reserve and the funds therein and by a lien on the Prepetition Collateral (subject in all respects to the Intercreditor Agreement); (C) subject to paragraph 36 below, the Prepetition ABL Agent and Prepetition ABL Lenders may apply amounts in the Prepetition ABL Indemnity Reserve against the Prepetition ABL Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, the Committee, or any other parties in interest and without further order of this Court; and (D) until the Challenge Deadline (as defined below), the Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Lenders) shall retain and maintain the Prepetition ABL Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition ABL Indemnity Reserve; provided, that (i) any such indemnification claims shall be

subject to (a) the terms of the Prepetition ABL Documents and (b) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with paragraph 43 hereof, and (ii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s). The Prepetition ABL Indemnity Reserve shall be subject to the DIP Liens and the Adequate Protection Liens, subject to the priority set forth herein. The Prepetition ABL Indemnity Reserve shall be released and the funds applied in accordance with paragraph 24 of this Interim Order upon the indefeasible payment in full in cash of the Prepetition ABL Indemnity Obligations or the withdrawal or dismissal of the applicable Challenge.

17. <u>Adequate Protection Payments and Protections for Prepetition Term Loan Parties</u>. As further adequate protection (the "<u>Prepetition Term Adequate Protection Payments</u>," and together with the Prepetition ABL Adequate Protection Payments, the "<u>Adequate Protection Payments</u>"), the Debtors are authorized and directed to provide adequate protection to the Prepetition Term Loan Parties in the form of (A) payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) accrued interest at the non-default rate due under the Prepetition Term Loan Documents (paid monthly); (ii) immediately upon entry of this Interim Order, the reasonable and documented fees and expenses (including the reasonable and documented fees, expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Parties arising prior to the Petition Date (including any fees, disbursements and expenses relating to preparing a bid to acquire the Debtors' assets), including reasonable and documented fees and expenses of (1) Jones Day, (2) Greenhill & Co. LLC, (3) Pachulski Stang Ziehl & Jones LLP, (4) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (5) Moelis & Company, (6) Cozen

O'Connor, P.C., and (7) Cahill Gordon & Reindel LLP (collectively, the "Term Loan Advisors"); and (iii) in accordance with the procedures set forth in paragraph 36 hereof, the reasonable and documented fees and expenses (including the reasonable and documented fees, expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Parties arising subsequent to the Petition Date (including any fees, disbursements and expenses relating to preparing a bid to acquire the Debtors' assets), including reasonable and documented fees and expenses of the Term Loan Advisors; provided, however, that during the continuance of an Event of Default, any such payments to the Prepetition Term Loan Parties shall be made solely from the DIP Term Priority Collateral and (B) payment in kind of accrued interest at the default premium under the Prepetition Term Loan Documents.  Upon the commencement of a Challenge, the Debtors are further authorized and directed to pay to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Lenders, of $250,000 into a non-interest bearing account maintained at a financial institution reasonably acceptable to the Prepetition Term Loan Agent, the Required Lenders (as defined in the Prepetition Term Loan Agreement) and the Debtors (the "Prepetition Term Loan Indemnity Reserve," and, together with the Prepetition ABL Indemnity Reserve, the "Prepetition Indemnity Reserves") to secure contingent indemnification, reimbursement or similar continuing obligations arising under or related to the Prepetition Term Loan Documents (the "Prepetition Term Indemnity Obligations").  The Prepetition Term Loan Indemnity Reserve shall (A) secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in connection with or responding to (1) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge

as contemplated in paragraph 43 hereof, or (2) any Challenge against the Prepetition Term Loan Agent or Prepetition Term Loan Lenders related to the Prepetition Term Loan Documents, the Prepetition Term Loan Obligations, or the Prepetition Term Loan Liens granted to the Prepetition Term Loan Agent, as applicable, whether in these Cases or independently in another forum, court, or venue; (B) the Prepetition Term Indemnity Obligations shall be secured by a first lien on the Prepetition Term Loan Indemnity Reserve and the funds therein and by a lien on the Prepetition Collateral (subject in all respects to the Intercreditor Agreement); (C) subject to paragraph 36 below, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders may apply amounts in the Prepetition Term Loan Indemnity Reserve against the Prepetition Term Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, the Committee, or any other parties in interest and without further order of this Court; and (D) until the Challenge Deadline (as defined below), the Prepetition Term Loan Agent (for itself and on behalf of the Prepetition Term Loan Lenders) shall retain and maintain the Prepetition Term Loan Liens granted to the Prepetition Term Loan Agent as security for the amount of any Prepetition Term Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Term Loan Indemnity Reserve; provided, that (i) any such indemnification claims shall (a) be subject to the terms of the Prepetition Term Loan Documents and (b) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with paragraph 43 hereof, and (ii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).  The Prepetition Term Loan Indemnity Reserve shall be subject to the DIP Liens and the Adequate Protection Liens, subject to the priority set forth herein.  The Prepetition Term Loan Indemnity Reserve shall be released and the funds applied in accordance with paragraph 24

of this Interim Order upon the indefeasible payment in full in cash of the Prepetition Term Loan Obligations or the withdrawal or dismissal of the applicable Challenge.   Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, the funding of the Prepetition Indemnity Reserves shall be excluded for the purposes of determining compliance with the Budget or associated variance requirements.

18.   <u>Adequate Protection Reservation</u>.   Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.   The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.   Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or additional adequate protection.

**Provisions Common to DIP Financing
and use of Cash Collateral**

19.   <u>Amendment of the DIP Documents</u>.   The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court if the amendment, modification, or supplement is (a) non-material and (b) in accordance with the DIP Documents.   In the case of a material amendment, modification, or supplement to the DIP Documents, the Debtors shall provide notice (which shall be provided through electronic mail) to counsel to a Committee (if appointed), the U.S. Trustee and the DIP Agent not party to such amendment, modification, or supplement (collectively, the "<u>Notice Parties</u>") at least three (3) business days prior to the effective date thereof.   Any material modification, amendment or

supplement that becomes effective in accordance with this paragraph shall be filed with the Court.

20.    _Budget Maintenance_.  The use of borrowings and letters of credit under the DIP Facilities shall be limited in accordance with the Budget, as described in paragraph 21 below, depicting on a weekly basis cash revenue, receipts, expenses, disbursements and inventory receipts and levels on a line item basis for the first 13 weeks from the Closing Date, with a break-out for stores being closed (if any) or proposed to be closed (if any), which shall be in form and substance satisfactory to, and approved by, (a) the DIP ABL Agent and (b) the Required Lenders or the DIP Term Loan Agent (with the consent of the Required Lenders) and the Crossover Holder (as defined in the DIP Term Loan Agreement), if any, each in their sole discretion prior to the Closing Date.  The Budget shall be updated by the Debtors (with the consent and/or at the reasonable request of (a) the DIP ABL Agent or (b) the Required Lenders (as defined in the DIP Term Loan Agreement) or the DIP Term Loan Agent (with the consent of the Required Lenders) and the Crossover Holder, if any) from time to time (provided that such updated Budget shall be in form and substance satisfactory to, and approved by, (a) the DIP ABL Agent and (b) the Required Lenders (as defined in the DIP Term Loan Agreement) or the DIP Term Loan Agent (with the consent of the Required Lenders) and the Crossover Holder, if any, each in their sole discretion), but in any event not less than once every four (4) weeks and actuals and variances shall be updated on a weekly basis (with delivery to the DIP Agents before 5:00 p.m., Eastern time, on Wednesday of each week) and the Debtors shall be required to comply with the Budget as provided in paragraph 21 below.

21.    _Budget Compliance_.  Commencing with the third full calendar week following the Petition Date and for each calendar week thereafter, the Debtors shall not permit

(a) Actual Inventory Levels (as defined in the DIP Documents) as at the end of any week to be less than 90% of the Budgeted Inventory Levels (as defined in the DIP Documents) set forth in the Budget as at the end of such week, (b) the Actual Cash Receipts (as defined in the DIP Documents) (without giving effect to borrowings and repayments under DIP Agreements), measured on a cumulative basis, for any Cumulative Four Week Period (as defined in the DIP Documents) or the Cumulative Period (as defined in the DIP Documents), in each case, to be less than 90% of the Budgeted Cash Receipts (as defined in the DIP Documents) (without giving effect to borrowings and repayments under the DIP Agreements), measured on a cumulative basis, for any Cumulative Four Week Period or the Cumulative Period, or (c) the Actual Disbursement Amount (as defined in the DIP Documents), measured on a cumulative basis, for any Cumulative Four Week Period or the Cumulative Period, in each case, to exceed 110% of the Budgeted Disbursement Amount (as defined in the DIP Documents), measured on a cumulative basis, for any such Cumulative Four Week Period or the Cumulative Period.  The Debtors shall, commencing with the conclusion of the first full calendar week after the Petition Date, deliver to the DIP Agents by 5:00 p.m., Eastern time, on Wednesday of each week, a reconciliation for the prior week, the prior four-week cumulative period, as applicable, and the cumulative period from the Closing Date of actual expenses and disbursements, sales receipts and inventory to the amounts for such periods set forth in (a) the Initial Budget and (b) any subsequent Budget consented to by (i) the DIP ABL Agent and (ii) the Required Lenders (as defined in the DIP Term Loan Agreement) or the DIP Term Loan Agent (with the consent of the Required Lenders) and the Crossover Holder, if any, in accordance with Paragraph 20 of this Interim Order ("Budget Variance Report").  The Budget Variance Report shall include a written discussion of variances by line item including, but not limited to, identification of permanent vs.

temporary or timing related variances.    Budget compliance shall be tested weekly on a rolling four-week basis (commencing with the fourth full calendar week after the Petition Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended); provided, however, if (i) the DIP ABL Agent and (ii) the Required Lenders (as defined in the DIP Term Loan Agreement) or the DIP Term Loan Agent (with the consent of the Required Lenders) and the Crossover Holder, if any, do not agree to a revised Budget in accordance with Paragraph 20 of this Interim Order, Budget compliance shall not be tested on a rolling four-week basis, but instead shall be tested on a cumulative basis against the Initial Budget (or last Budget to which the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) consented in accordance with Paragraph 20 of this Interim Order).  Without limiting any of the Debtors' other reporting obligations under this Interim Order or the DIP Documents:  (a) the Debtors' management shall participate in a weekly call with the financial advisors to the DIP ABL Agent and the DIP Term Loan Lenders to discuss the budget, variances and other business developments; and (b) the Debtors shall provide the financial advisors to the DIP ABL Agent and the DIP Term Loan Lenders with weekly borrowing base calculations and monthly unaudited financial statements.

22.    Modification of Automatic Stay.    The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or the Prepetition Agents each may reasonably request which is

necessary to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facilities and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Agents, the DIP Lenders and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

23. <u>Perfection of DIP Liens and Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Adequate Protection Liens, or to entitle the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agents (with respect to the DIP Term Loan Agent, as may be directed by the Required Lenders) and Prepetition Agents is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; <u>provided</u>, <u>however</u>, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens. The Debtors are authorized and directed to execute and

deliver promptly upon demand to the DIP Agents and the Prepetition Agents all such financing statements, mortgages, notices and other documents as the DIP Agents or the Prepetition Agents may reasonably request.  Each of the DIP Agents and the Prepetition Agents, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.  To the extent that the Prepetition ABL Agent or the Prepetition Term Loan Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other Prepetition Documents or is listed as loss payee or additional insured under any of the Debtors' insurance policies, each DIP Agent (as applicable) shall also be deemed to be the secured party under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Agents shall serve as agents for the DIP Agents for purposes of perfecting the DIP Agents' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

24.    <u>Application of Proceeds of Collateral</u>.  As a condition to the entry of the DIP Documents, the extension of credit under the DIP Facilities and the authorization to use Cash Collateral, the Debtors, the DIP ABL Agent, the DIP Term Loan Agent, the DIP ABL Lenders, and the DIP Term Loan Lenders have agreed that as of and commencing on the date of the Interim Hearing, net proceeds of DIP Collateral, including, without limitation, whether sold in the ordinary course, liquidated, or otherwise, shall be applied as follows: (a) with respect to DIP ABL Priority Collateral (i) *first*, to costs and expenses, including fees and expenses of

counsel, of the DIP ABL Agent; (ii) *second*, to permanently reduce the Prepetition ABL Obligations; (iii) *third*, to reduce the DIP ABL Obligations, and (iv) after indefeasible repayment in full in cash of the Prepetition ABL Obligations and the DIP ABL Obligations (including, in each case, provision for contingent obligations) and the termination of the DIP ABL Credit Facility (w) *fourth*, to costs and expenses, including fees and expenses of counsel, of the DIP Term Loan Agent, the DIP Term Lenders and the Prepetition Term Loan Parties (including, without limitation, the fees and expenses of the Term Loan Advisors as advisors to the foregoing parties), (x) *fifth*, to permanently reduce the DIP Term Loan Obligations, (y) *sixth*, to permanently reduce the Prepetition Term Loan Superpriority Claim and (z) *seventh*, to reduce the Prepetition Term Loan Obligations; and (b) with respect to DIP Term Priority Collateral, (i) *first*, to costs and expenses, including fees and expenses of counsel, of the DIP Term Loan Agent, the DIP Term Lenders and the Prepetition Term Loan Parties (including, without limitation, the fees and expenses of the Term Loan Advisors as advisors to the foregoing parties); (ii) *second,* to reduce the DIP Term Loan Obligations; and (iii) *third*, to reduce the Prepetition Term Loan Superpriority Claim; (iv) *fourth*, to reduce the Prepetition Term Loan Obligations, and (v) after indefeasible repayment in full in cash of the Prepetition Term Loan Obligations and the DIP Term Loan Obligations (including, in each case, provision for contingent obligations), (x) *fifth*, to costs and expenses, including fees and expenses of counsel, of the DIP ABL Agent, (y) *sixth*, to permanently reduce the Prepetition ABL Obligations, and (z) *seventh*, to reduce the DIP ABL Obligations.  The reduction of the Prepetition Secured Obligations is subject to the preservation of rights provided in paragraph 43 herein.

25.    <u>Protections of Rights of DIP Agents, DIP Lenders and Prepetition Secured Parties</u>.[5]

(a)    Unless the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) and the Prepetition Agents (with respect to the Prepetition Term Loan Agent, with the consent of the Required Lenders (as defined in the Prepetition Term Loan Agreement)) shall have provided their prior written consent, or all DIP Obligations and all Prepetition Secured Obligations have been indefeasibly paid in full in cash, there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the DIP Agents', DIP Lenders', or the Prepetition Secured Parties' rights under this Interim Order, the DIP Documents or the Prepetition Documents with respect any DIP Obligations or Prepetition Secured Obligations.

---

[5] TBD: Treatment of customer returns/deposits.

(b)      No Debtor shall object to any DIP Lenders or any Prepetition Secured Parties credit bidding up to the full amount of the applicable outstanding DIP Obligations, Prepetition ABL Obligations (as applicable), and Prepetition Term Loan Obligations (as applicable), in each case including any accrued interest and expenses, in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through Section 363 or Section 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise.

26.      Credit Bidding.  In connection with any sale process authorized by the Court, (i) the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) and DIP Lenders and (ii) subject to the rights preserved in paragraph 43, Prepetition ABL Agent, Prepetition Term Loan Agent and Prepetition Secured Parties, or any assignee or designee of any of the foregoing, shall be authorized to credit bid, consistent with the applicable DIP Documents and/or Prepetition Documents, some or all of their claims for their respective priority collateral (each a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code, subject in each case to the rights and duties of the parties under the Intercreditor Agreement and to the provision of consideration sufficient to indefeasibly pay in full in cash any senior liens on the collateral that is subject to the credit bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion.  Each of the Prepetition Agents, the Prepetition Secured Parties and the DIP Agents shall be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by Credit Bid.

27.      Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code

sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full of all DIP Obligations and Prepetition Secured Obligations, and the termination of the DIP Agents' and DIP Lenders' obligation to extend credit under the DIP Facilities, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agents to be applied in accordance with this Interim Order and the DIP Documents.

28.    <u>Cash Collection</u>.

(a)    From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP ABL Priority Collateral or Prepetition ABL Priority Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the DIP ABL Agent from time to time) (collectively, the "<u>Cash Collection Accounts</u>"), which accounts shall be subject to the sole dominion and control of the DIP ABL Agent.  All proceeds and other amounts in the Cash Collection Accounts shall be remitted to the DIP ABL Agent for application in accordance with the DIP ABL Documents and this Interim Order.  Unless otherwise agreed to in writing by the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) and Prepetition Agents, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "<u>Cash Management Order</u>").  The Debtors and the financial institutions where the Debtors' Cash

Collection Accounts are maintained (including those accounts identified in any Cash Management Order) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP ABL Agent consistent with the DIP ABL Credit Agreement.

(b)      Notwithstanding anything in this Interim Order or any of the DIP Documents to the contrary, (i) (A) upon any draw under the DIP Term Loan Facility, the Debtors shall first apply the proceeds of the DIP Term Loan Facility to any outstanding Prepetition ABL Obligations and/or DIP ABL Obligations (other than letters of credit) as provided in the DIP Documents and thereafter deposit any remaining proceeds into a segregated deposit account furnished by a depositary bank acceptable to the DIP Term Loan Agent and subject to the control of the DIP Term Loan Agent (such account, the "DIP Term Account"), subject to the priorities in the immediately succeeding clause (B); and (B) the DIP Term Loan Agent shall have a first priority security interest in and lien on the DIP Term Account  and the DIP ABL Agent shall have a security interest in and lien on the DIP Term Account junior only to the first priority security interest in and lien on the DIP Term Account of the DIP Term Loan Agent; and (ii) the Debtor' use of the proceeds in the DIP Term Account shall be subject to this Interim Order and the DIP Term Loan Documents; provided that, for the avoidance of doubt, except for amounts necessary to pay outstanding Prepetition ABL Obligations and/or DIP ABL Obligations as of the Closing Date under the DIP Documents (other than letters of credit), the Debtors shall not apply any of the DIP Term Loans or the proceeds thereof to make any payment in reduction of the revolving credit loans under the obligations owing under the DIP ABL Agreement and/or the Prepetition ABL Agreement or otherwise deposit any proceeds of the DIP Term Loans in any deposit account subject to a sweep by the DIP ABL Agent or any DIP ABL Lender.

29.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations, all Prepetition Secured Obligations, and the termination of the DIP Agents' and the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Facilities or the Prepetition Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any Cash Management Order that has first been agreed to by the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) or as otherwise required by the DIP Documents or this Interim Order.

30.    <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP ABL Priority Collateral or Prepetition ABL Priority Collateral other than in the ordinary course of business without the prior written consent of the DIP ABL Agent and Prepetition ABL Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP ABL Agent, DIP ABL Lenders, or Prepetition ABL Parties, or from any order of this Court), except as otherwise permitted by the DIP ABL Documents or otherwise ordered by the Court, and subject to the Intercreditor Agreement.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Term Priority Collateral or Prepetition Term Priority Collateral other than in the ordinary course of business without the prior written consent of the DIP Term Loan Agent (with the consent of the Required Lenders) and Prepetition Term Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Term Loan Agent, DIP Term Loan Lenders, or Prepetition Term Loan Parties, or from any order of this Court), except as otherwise permitted by the DIP Term Loan Documents or otherwise ordered by the Court, and subject to the Intercreditor Agreement.

31.    DIP Termination Date.    On the applicable DIP Termination Date (as defined herein), (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facilities will terminate, other than as required in paragraph 40 with respect to the Carve Out, all treasury and cash management, hedging obligations and bank product obligations shall be cash collateralized, and all letters of credit and bankers' acceptances outstanding shall be cash collateralized in an amount equal to 105% of the face amount thereof, and such cash collateral shall not be subject to or subordinate to the Carve Out; (b) all authority to use Cash Collateral shall cease, provided, however, that during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral to pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Budget as determined by each DIP Agent (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) in its sole discretion; and (c) otherwise exercise rights and remedies under the DIP Documents in accordance with this Interim Order (including, without limitation, paragraph 34).  For the purposes of this Interim Order, the "DIP Termination Date" shall mean the "Revolving Credit Termination Date" as defined in the DIP ABL Agreement and the "Term Loan Termination Date" as defined in the DIP Term Loan Agreement, as applicable.

32.    Events of Default.    The occurrence of any of the following events, unless waived by the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) in writing and in accordance with the terms of the DIP Agreements, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or

obligations under this Interim Order, or (b) the occurrence of an "Event of Default" under either of the DIP Agreements.

33.   <u>Milestones</u>.  The failure of the Debtors to comply with any of the Case milestones set forth on **Exhibit 1** attached hereto (the "<u>Milestones</u>") shall constitute an Event of Default under (a) each of the DIP Agreements and (b) this Interim Order.

34.   <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under any of the DIP Documents, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (a) each DIP Agent (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) may declare (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") (i) all DIP Obligations owing under the respective DIP Documents to be immediately due and payable (including the cash collateralization of all outstanding letters of credit in accordance with the DIP Documents), (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the respective DIP Facilities, (iii) termination of the respective DIP Facilities and the respective DIP Documents as to any future liability or obligation of the applicable DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice to the Borrower; and (b) either the DIP ABL Agent (in the case of Cash Collateral of proceeds of the DIP ABL Priority Collateral) or the DIP Term Loan Agent (in the case of Cash Collateral of proceeds of the DIP Term Priority Collateral and proceeds in the DIP Term Account, and with the consent of the Required Lenders) may declare a termination,

reduction or restriction on the ability of the Debtors to use Cash Collateral (the date which is the earliest to occur of any such date a Termination Declaration is delivered and the DIP Termination Date shall be referred to herein as the "Termination Date").  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the DIP ABL Agent (if delivered by the DIP Term Loan Agent), counsel to the DIP Term Loan Agent (if delivered by the DIP ABL Agent), counsel to the Crossover Holder, counsel to a Committee (if appointed), counsel to the Indenture Trustee, and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"): (a) the applicable DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the respective DIP Documents and this Interim Order to satisfy the relevant DIP Obligations, DIP Superpriority Claim and DIP Liens, subject to the Carve Out; (b) the applicable Prepetition Secured Parties shall be entitled to exercise their rights and remedies in accordance with the applicable Prepetition Documents and this Interim Order to satisfy the relevant Prepetition Secured Obligations, Adequate Prepetition Superpriority Claims and Prepetition Adequate Protection Liens, subject to the Carve Out.  During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court (with respect to the Debtors, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing), and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agents, the DIP Lenders, or the

Prepetition Secured Parties.  Unless the Court orders otherwise, the automatic stay, as to all of the DIP Agents, DIP Lenders, and Prepetition Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agents, DIP Lenders, and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, in the DIP Documents, the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and paragraph 30 of this Interim Order.

35.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Agents, the DIP Lenders, and the Prepetition Secured Parties have acted at arms' length in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reargued, reconsidered, reversed, modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code to the maximum extent set forth therein.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

36.    <u>DIP and Other Expenses; Procedures for Payment of DIP Agents', DIP Lenders' and Prepetition Secured Parties' Professional Fees and Expenses</u>.  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees

and expenses of the DIP Agents and DIP Lenders in connection with the DIP Facilities, as

provided in the DIP Documents, or incurred in connection with any proposed exit or acquisition

financing, chapter 11 plan or transactions contemplated thereunder or sale transaction (including

the preparation and negotiation of the documentation relating to any such exit or acquisition

financing, plan or sale transaction), whether or not the transactions contemplated hereby are

consummated, including reasonable and documented attorneys' fees, monitoring and appraisal

fees, financial advisory fees, fees and expenses of other consultants, and indemnification and

reimbursement of reasonable and documented fees and expenses, including the fees and

expenses of the ABL Advisors and the Term Loan Advisors.  Payment of all professional fees

and expenses of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties addressed

in this Interim Order (including the ABL Advisors and the Term Loan Advisors) shall not be

subject to allowance by the Court.  Professionals for the DIP Agents, DIP Lenders and the

Prepetition Secured Parties (including the ABL Advisors and the Term Loan Advisors) shall not

be required to comply with the U.S. Trustee fee guidelines, however any time that such

professionals seek payment of fees and expenses from the Debtors, each professional shall

provide copies of its invoices (which shall not be required to contain time entries, but shall

include a general, brief description of the nature of the matters for which services were

performed, and which may be redacted or modified to the extent necessary to delete any

information subject to the attorney-client privilege, any information constituting attorney work

product, or any other confidential information, and the provision of such invoices shall not

constitute any waiver of the attorney client privilege or of any benefits of the attorney work

product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed)

contemporaneously with the delivery of such fee and expense statements to the Debtors.  Any

objections raised by the Debtors, the U.S. Trustee or a Committee (if appointed) with respect to the Debtors' payment of the amounts in such invoices must be filed with the Bankruptcy Court and served within ten (10) days of such party's receipt of such invoice, and any such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs and expenses, including fees and expenses of counsel, of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties incurred on or prior to such date without the need for any professional engaged by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to first deliver a copy of its invoice as provided for herein.  No attorney or advisor to the DIP Agents, DIP Lenders or the Prepetition Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agents or DIP Lenders in connection with or with respect to the DIP Facilities, are hereby approved in full.

    37.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Agents and the DIP Lenders in accordance with the terms and conditions of the DIP Agreements. Upon the earlier of (A) payment in full in cash of the DIP ABL Obligations or (B) conclusion of the Remedies Notice Period, the Debtors shall pay $250,000 from proceeds of the DIP Collateral into an indemnity account (the "<u>DIP ABL Indemnity Account</u>") subject to first priority liens of the DIP ABL Agent, for the benefit of the DIP ABL Lenders.  The DIP ABL Indemnity Account shall be released and the funds applied in accordance with paragraph 24 of this Interim Order upon the indefeasible payment in full in cash of the DIP ABL Obligations and the receipt by the

DIP ABL Agent and each of the DIP ABL Lenders of releases from the Debtors and their estates, with respect to any claims arising out of or related to the DIP ABL Documents, acceptable to the DIP ABL Agent and the DIP ABL Lenders, each in their sole discretion.  Upon the earlier of (A) payment in full in cash of the DIP Term Loan Obligations or (B) conclusion of the Remedies Notice Period, the Debtors shall pay $250,000 from proceeds of the DIP Collateral into an indemnity account (the "DIP Term Loan Indemnity Account") subject to first priority liens of the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders.  The DIP Term Loan Indemnity Account shall be released and the funds applied in accordance with paragraph 24 of this Interim Order upon the indefeasible payment in full in cash of the DIP Term Loan Obligations and the receipt by the DIP Term Loan Agent and each of the DIP Term Loan Lenders of releases from the Debtors and their estates, with respect to any claims arising out of or related to the DIP Term Loan Documents, acceptable to the DIP Term Loan Agent (with the consent of the Required Lenders) and the DIP Term Loan Lenders, each in their sole discretion.

38.    Proofs of Claim.    Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agents, the DIP Lenders, and Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the DIP Documents or the Prepetition Documents.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Agents, the DIP Lenders and the Prepetition Secured Parties with regard to all claims arising under the DIP Documents or the Prepetition Documents. Notwithstanding the foregoing, each of (a) the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties and (b) the Prepetition Term Loan Agent on behalf of itself and the

Prepetition Term Loan Parties is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim allowed herein (with any such aggregate or master proof of claim filed in the Cases deemed to be filed in all Cases of the Debtors and asserted against all of the Debtors). Any proof of claim filed by the Prepetition ABL Agent or Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties, respectively. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

39.     Rights of Access and Information.  Without limiting the rights of access and information afforded the DIP Agents and DIP Lenders under the DIP Documents, the Debtors and their agents and advisors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agents, DIP Lenders, and the Prepetition Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents and Prepetition Documents, as applicable, including, without limitation, (a) upon reasonable advance notice, permit the DIP Agents and Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and Prepetition Collateral; and (b) reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the

Debtors authorize their independent certified public accountants, financial advisors, investment bankers and consultants, including Evercore Group L.L.C. and AlixPartners to cooperate, consult with, and provide to the DIP Agents and the Crossover Holder, if any, (and so long as an Event of Default has occurred and is continuing, each DIP Lender) and the Prepetition Agents all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Borrower or Guarantors.

40.   Carve Out.

(a)   Subject to the terms and conditions contained in this paragraph 40, the DIP Liens, DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims are all subordinate to the following (collectively, the "Carve Out"):

(i)   Allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

(ii)   All accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors or the Committee (the "Case Professionals") prior to the delivery of the Carve Out Trigger Notice (as defined below) and allowed at any time by this Court and earned success or transaction fees of Case Professionals reflected in the Budget and allowed at any time by this Court, in each case, solely to the extent the same are reflected as estimated professional fees and disbursements in, and maintained as a reserve under, the most recent borrowing base report delivered to the DIP Agents by the Debtors prior to the delivery of a Carve Out Trigger Notice;

(iii)   All accrued and unpaid fees, disbursements and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger

Notice, to the extent allowed at any time, in an aggregate amount not to exceed $2,000,000 (the "Wind-Down Carve Out Amount") less the amount of any prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (ii) above; and

(iv)    All reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000.

(b)    The Debtors shall reflect in each borrowing base certificate (and the DIP ABL Agent shall at all times be entitled to implement and maintain) a reserve against the borrowing base in the amount equal to the Debtors' projections of then estimated Carve Out on the most recent such certificate, and the Budget shall be required to include the Debtors' projections of such estimated Carve Out. So long as no Carve Out Trigger Notice has been issued by the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders), the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code or under this Interim Order but solely to the extent the same are incurred in accordance with (and not in excess of those amounts set forth in) the Budget and are reflected as estimates in, and maintained as a reserve under, the most recent borrowing base report delivered to the DIP Agents by the Debtors prior to the delivery of the Carve Out Trigger Notice, as the same may be due and payable and otherwise allowed and payable by order of the Court, and the same shall not reduce the Wind-Down Carve Out Amount. The Carve Out shall not be deemed increased if actual fees are higher in fact than the estimates provided on a borrowing base report. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered (i) by the DIP ABL Agent to the Debtors and their counsel, the DIP Term Loan Agent, the U.S. Trustee and lead counsel to

any Committee, which notice may be delivered at any time by the DIP ABL Agent (1) in connection with the repayment in full in cash of the DIP ABL Obligations and the Prepetition ABL Obligations and the termination of all commitments thereunder and all letters of credit under the Prepetition ABL Facility and the DIP ABL Facility having been cancelled, backed, or cash collateralized in accordance with the terms thereof, and all bank product obligations shall be cash collateralized in a manner and amount acceptable to the DIP ABL Agent or the Prepetition ABL Agent (as applicable) or (2) following the occurrence and continuance of any Event of Default and, in any case, shall specify that it is a "Carve Out Trigger Notice," or (ii) by the DIP Term Loan Agent to the Debtors and their counsel, the DIP ABL Agent, the U.S. Trustee and lead counsel to any Committee, which notice may be delivered at any time by the DIP Term Loan Agent (1) in connection with the repayment in full in cash of the DIP Term Loan Obligations and the Prepetition Term Loan Obligations or (2) following the occurrence and continuance of any Event of Default and, in any event, shall specify that it is a "Carve Out Trigger Notice."

(c)    Upon delivery of a Carve Out Trigger Notice, an amount equal to the Carve Out (as of the date of the Carve Out Trigger Notice), shall, to the extent reflected in the most recent borrowing base certificate delivered to the DIP ABL Agent by the Debtors and maintained as part of a reserve against the borrowing base, be funded with the proceeds of the DIP ABL Facility (which shall then constitute DIP ABL Obligations and be included in the repayment amount) and/or Cash Collateral.  Following delivery of a Carve Out Trigger Notice, upon the funding of the Carve Out as of the date of the Carve Out Trigger Notice as described above, none of the DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders, and the Prepetition Secured Parties shall have any further liability whatsoever for the Carve Out

(including any amounts described in subsections (a)(i)-(iv) above) or any subordination in respect thereof.  None of the DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders, and the Prepetition Secured Parties shall be responsible for funding any "success," "restructuring," "transaction" or similar fee payable to the Debtor's investment banker or financial advisor, and in no event shall any such amounts be paid out of the Carve Out.  For the avoidance of doubt, the Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations and/or the Prepetition Secured Obligations.

(d)     Nothing herein, including the inclusion of line items in the Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Agents, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders to object to the allowance and payment of such fees and expenses.  The DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders or the Prepetition Secured Parties in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors has sufficient funds to pay such compensation or reimbursement.

41.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve Out</u>.  The DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve Out may not be used in connection with: (a) preventing, hindering, or delaying any of the DIP Agents', the DIP Lenders', or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) or as permitted by the DIP Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders); (d) incurring Indebtedness (as defined in the DIP ABL Agreement or the DIP Term Loan Agreement) without the prior consent of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders), except to the extent permitted under the DIP Agreements; (e) seeking to amend or modify any of the rights granted to the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Prepetition Liens, Prepetition Secured Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, or any of their

respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition Secured Obligations; provided, however, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens within sixty (60) calendar days following the selection of counsel to a Committee.  Notwithstanding anything to the contrary, any fees, expenses or costs incurred by the Committee or its professionals in excess of the Investigation Budget Amount or in excess of the amount budgeted for Committee Professionals set forth in the DIP Budget shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

42.    Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Case Professional or shall affect the right of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, but solely

to the extent the same are incurred in accordance with (and not in excess of those amounts set forth in) the Budget and are reflected as estimates in, and maintained as a reserve under, the most recent borrowing base report delivered to the DIP Agents by the Debtors.

43.     Effect of Stipulations on Third Parties.

(a)     *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including, without limitation, a Committee (if appointed), unless, and solely to the extent that, a party in interest that has sought and obtained standing and the requisite authority to commence a Challenge (as defined below) (other than the Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 43 of this Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by the earlier of (A) the date of the hearing scheduled to consider confirmation of any plan of reorganization and (B) no later than (1) for a Committee, (if appointed), sixty (60) days from the date of formation of a Committee (if appointed), or (2) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the earlier to occur of (A) and (B), the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with

respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)    *Binding Effect.*  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties

shall be entitled to payment of the reasonable related costs and expenses, including, but not limited to reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 43, the Court may fashion any appropriate remedy.

44.    No Third Party Rights.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

45.    Section 506(c) Claims.    Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Agents, DIP Lenders, or the Prepetition Secured Parties, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agents, DIP Lenders, or Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

46.    No Marshaling/Applications of Proceeds.    Subject to entry of a Final Order, the DIP Agents, DIP Lenders, and Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

47.    Section 552(b).    Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(h) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall

not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

48.    <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agents, exercisable on behalf of the DIP ABL Lenders and DIP Term Loan Lenders, respectively, contained in this Interim Order, the DIP ABL Documents, the DIP Term Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP ABL Documents and DIP Term Loan Documents, upon written notice to the landlord of any leased premises that an Event of Default or the Termination Date has occurred and is continuing, the DIP ABL Agent or DIP Term Loan Agent, as applicable, may, subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord and the DIP ABL Agent or DIP Term Loan Agent, as applicable, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, <u>provided</u> that the DIP ABL Agent and/or DIP Term Loan Agent, as applicable, shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP ABL Agent and/or DIP Term Loan Agent, as applicable, calculated on a daily per diem basis.  Nothing herein shall require the DIP ABL Agent or DIP Term Loan Agent to assume any lease as a condition to the rights afforded in this paragraph.  For the avoidance of doubt, subject to (and without waiver of) the rights of the DIP Agents and/or DIP Lenders under applicable nonbankruptcy law, the DIP Agents and/or DIP Lenders can only enter upon a leased premises after an Event of Default in accordance with (i) a separate agreement with the landlord

at the applicable leased premises, or (ii) upon entry of an order of this Court obtained by motion of the DIP Agents and/or DIP Lenders on such notice to the landlord as shall be required by this Court.

49.    <u>Limits on Lender Liability</u>.  Subject to entry of a Final Order, nothing in this Interim Order, any of the DIP Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases.  The DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall not be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

50.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP ABL Agent (on behalf of the DIP ABL Lenders), the DIP Term Loan Agent (on behalf of the DIP Term Loan Lenders), the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders), and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy

maintained by the Debtors that in any way relates to the DIP Collateral (which shall not include directors and officers policies).

51.    <u>Joint and Several Liability</u>.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Borrower and Guarantors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facilities and the DIP Documents.

52.    <u>No Superior Rights of Reclamation</u>.    Based on the findings and rulings herein regarding the integrated nature of the DIP Facilities and the Prepetition Documents and the relation back of the DIP Liens, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

53.    <u>Rights Preserved</u>.    Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agents', DIP Lenders' and Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agents, DIP Lenders and/or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) subject to the Intercreditor Agreement, any other rights, claims or privileges (whether legal, equitable or

otherwise) of any of the DIP Agents, DIP Lenders or Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed) or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.

54.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agents, DIP Lenders, or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, DIP Lenders, Prepetition Secured Parties, a Committee (if appointed) or any party in interest.

55.    <u>Binding Effect of Interim Order</u>.  Subject to paragraph 43, immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

56.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations and the Prepetition Secured Obligations have been indefeasibly paid in full in cash, and all letters of credit under the DIP Facilities shall have been cancelled, backed, or cash collateralized in accordance with the terms thereof (such payment being without prejudice to any terms or

provisions contained in the DIP Facilities which survive such discharge by their terms), and all commitments to extend credit under the DIP Facilities have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders) or the Prepetition Agents, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders), or the Prepetition Agents, for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Prepetition Collateral in a manner inconsistent with this Interim Order or the Final Order, as applicable; (c) without the prior written consent of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (d) without the prior written consent of the Prepetition Agents, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders), or the

01:23878455.1

Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agents or the Prepetition Agents.

57.     Continuing Effect of Intercreditor Agreement.  The Debtors, DIP Agents, DIP Lenders and Prepetition Secured Parties each shall be bound by, and in all respects of the DIP Facilities shall be governed by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

58.     Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

59.     Discharge.  The DIP ABL Obligations, the DIP Term Loan Obligations, and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP ABL Agent, DIP Term Loan Agent, DIP ABL Lenders, DIP Term Loan Lenders, and each of the Prepetition Agents, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP ABL Obligations (in the case of the sale of DIP ABL Priority Collateral) and DIP Term Loan Obligations (in the case of the sale of DIP Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of

such plan of reorganization or sale) (a "Prohibited Plan or Sale") without the written consent of each of the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders), DIP Lenders, and the Prepetition Agents, as applicable. For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP ABL Documents and DIP Term Loan Documents.

60. Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agents, DIP Lenders and Prepetition Secured Parties granted pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP ABL Credit Facility, all the DIP ABL Obligations, pursuant to the DIP ABL Documents and this Interim Order, have been indefeasibly paid in full in cash and all letters of credit under the DIP ABL Credit Facility shall have been cancelled or cash collateralized in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP ABL Credit Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP ABL Credit Facility are terminated; (ii) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to

74

the Prepetition ABL Documents and this Interim Order, have been indefeasibly paid in full in cash; (iii) in respect of the DIP Term Loan Credit Facility, all the DIP Term Loan Obligations, pursuant to the DIP Term Loan Documents and this Interim Order, have been indefeasibly paid in full in cash; and (iv) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been indefeasibly paid in full in cash.   The terms and provisions concerning the indemnification of the DIP Agents and DIP Lenders shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of or termination of the DIP ABL Obligations or the Prepetition ABL Obligations.

61.    <u>ABL Fee Letter</u>. The ABL Fee Letter is authorized to be filed under seal and shall be provided solely to: (i) the U.S. Trustee; (ii) counsel to any Committee; (iii) this Court; and (iv) any other party as may be ordered by this Court after notice and a hearing, or agreed by the Debtors and the DIP ABL Agent.  Any party who receives the ABL Fee Letter in accordance with this Interim Order shall not disclose or otherwise disseminate the ABL Fee Letter, or the information contained therein, to any other person or entity and shall keep the ABL Fee Letter and the information contained therein strictly confidential.

62.    <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final, approval of the DIP Facilities is scheduled for **_____, 2018, at _____ __.m. (EST)** before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, 6th Floor, Courtroom #2, at the United States Bankruptcy Court for District of Delaware.  On or before

November _____, 2018, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on _____, **2018, at 4:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) proposed counsel to the Debtors, (a)  Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022, Attn: Natasha Labovitz, Esq. (nlabovitz@debevoise.com) and Daniel E. Stroik, Esq. (destroik@debevoise.com) and (b) Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com); (ii) counsel to the DIP ABL Agent and the Prepetition ABL Agent, (a) Morgan Lewis & Bockius LLP, (1) One Federal Street, Boston, Massachusetts 02110, Attn: Julia Frost-Davies, Esq. and Christopher L. Carter, Esq., and (2) 101 Park Avenue, New York, NY 10178-0060, Attn: Glenn E. Siegel, Esq., and (b) Richards, Layton & Finger, PA, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, Esq.; (iii) counsel to the DIP Term Loan Agent, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, Attn:  Kathleen M. LaManna and Nathan Z. Plotkin; (iv) counsel to certain DIP Term Loan Lenders and certain Prepetition Term Loan Lenders, (a) Jones Day, (1) 250 Vesey Street, New York, NY 10281, Attn: Scott J. Greenberg, Esq. and Michael J. Cohen, Esq., and (2) 77 W. Wacker Drive, Suite 3500 Chicago, IL 60601, Attn: Steven A. Domanowski,

Esq.; and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market St. Suite 1700, Wilmington, DE 19801, Attn: Laura Davis Jones, Esq.; (v) counsel to the Crossover Holder, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Alan W. Kornberg and John T. Weber; and (b) Cozen O'Connor P.C., 1201 North Market Street, Suite 1001, Wilmington, DE, 19801, Attn: Mark E. Felger; and (vi) counsel to the Committee (if appointed).

63.     _Nunc Pro Tunc_ Effect of this Interim Order.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable _nunc pro tunc_ to the Petition Date immediately upon execution thereof.

64.     Retention of Jurisdiction.   The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the DIP Facilities, and/or this Interim Order.

Dated: _____
          Wilmington, Delaware


                                        _____
                                        LAURIE SELBER SILVERSTEIN
                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Milestones**

## MILESTONES

Each of the following DIP Milestones and Plan Milestones are herein referred to, individually, as a "**Required Milestone**" and collectively, as the "**Required Milestones**".[1]

(a)    The Debtors[2] must achieve each of the following milestones (the "**DIP Milestones**"), in each case on terms and conditions, and subject to documentation in form and substance, acceptable to the DIP Agents (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders (as defined in the DIP Term Loan Agreement)) in all respects:

(i)    On November 19, 2018 (the "**Petition Date**"), the Debtors shall file a motion seeking approval of the facilities evidenced by the DIP Facilities.

(ii)    On or before November 22, 2018, the Interim Order shall have been entered by the Court.

(iii)    On or before November 30, 2018, the Debtors shall have filed a motion requesting the entry of an order to be entered not later than January 7, 2019, extending the Debtors' lease assumption/rejection period such that the Debtors' lease assumption/rejection period shall be 210 days from the Petition Date.

(iv)    On or before December 21, 2018, the Final Order authorizing and approving the DIP Facilities on a final basis shall have been entered by the Bankruptcy Court.

(b)    The Debtors must achieve each of the following milestones (the "**Plan Milestones**"), in each case on terms and conditions, and subject to documentation in form and substance, acceptable to the applicable DIP Agent (with respect to the DIP Term Loan Agent, with the consent of the Required Lenders (as defined in the DIP Term Loan Agreement)) in all respects:

(i)    The Debtors' failure to achieve the following Plan Milestones shall be an Event of Default under the DIP ABL Agreement:

(1)    On or before November 19, 2018, the Debtors shall have commenced the solicitation of votes to accept or reject the ABL Acceptable Plan (as defined below).

---

[1] With respect to the DIP ABL Agreement, the DIP ABL Agent may in its sole and absolute discretion extend any of the Required Milestones for a period of not more than 10 days or for such longer period with the consent of the Required Lenders (as defined in the DIP ABL Agreement) (in their sole and absolute discretion).  With respect to the DIP Term Loan Agreement, the DIP Term Loan Agent may in its sole and absolute discretion extend any of the Required Milestones for a period of not more than 10 days or for such longer period with the consent of the Required Lenders (as defined in the DIP Term Loan Agreement) (in their sole and absolute discretion).

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, to which this Milestones exhibit is attached as **Exhibit 1**.

(2)    Prior to the Petition Date, the Debtors shall have entered into a Restructuring Support Agreement with (A) the holders of not less than 85% of the Prepetition Term Loan Obligations, (B) not less than 97% of the Senior Notes (as defined in the DIP ABL Agreement), and (C) the Sponsor (as defined in the DIP ABL Agreement) (such Restructuring Support Agreement, the "**RSA**"), which RSA shall contain support for a Chapter 11 plan of reorganization that shall constitute an ABL Acceptable Plan (defined below).

(3)    On the Petition Date, the Debtors shall have filed (A) a Chapter 11 plan of reorganization and a disclosure statement relating to such plan of reorganization, which plan shall be supported by committed financing, the parties to the RSA and at least one impaired accepting class and shall be acceptable to the DIP ABL Agent, which plan shall provide, among other things, for payment in full in cash of the DIP ABL Obligations and the Prepetition ABL Obligations, and the DIP ABL Agent shall be satisfied that such plan is reasonably anticipated to become effective on or prior to January 14, 2019 (any such Chapter 11 plan, an "**ABL Acceptable Plan**"), (B) a motion to approve the Disclosure Statement (as defined in the DIP ABL Agreement) and the solicitation procedures for the ABL Acceptable Plan (which shall set a deadline of not later than December 20, 2018 for voting on the ABL Acceptable Plan), and (C) a motion for a combined hearing to approve such solicitation procedures, the Disclosure Statement (as defined in the DIP ABL Agreement) and confirming the ABL Acceptable Plan.

(4)    On or before November 23, 2018, the Debtors' noticing agent shall have caused the notices of the ABL Acceptable Plan and Disclosure Statement (as defined in the DIP ABL Agreement) to have been distributed in accordance with applicable sections of the Bankruptcy Code and related rules.

(5)    On or before January 7, 2019, the Debtors shall have obtained (A) an order from the Bankruptcy Court approving the disclosure statement and confirming the ABL Acceptable Plan and (B) if such order is not obtained, an order of the Bankruptcy Court extending the Debtors' lease assumption/rejection period such that the Debtors' lease assumption/rejection period shall be 210 days from the Petition Date.

(6)    On or before January 14, 2019, the effective date of the ABL Acceptable Plan shall have occurred in accordance with its terms, and the Debtors shall have emerged from Chapter 11.

(ii)    The Debtors' failure to achieve the following Plan Milestones shall be an Event of Default under the DIP Term Loan Agreement:

2

(1)     On or before November 19, 2018, the Debtors shall have commenced the solicitation of votes to accept or reject the TL Acceptable Plan (as defined below).

(2)     Prior to the Petition Date, the Debtors shall have entered into the RSA.

(3)     On the Petition Date, the Debtors shall have filed (A) a Chapter 11 plan of reorganization with terms consistent with the RSA (any such Chapter 11 plan, a "**TL Acceptable Plan**") and a disclosure statement with terms consistent with the RSA (any such disclosure statement, a "**TL Acceptable Disclosure Statement**"), and the DIP Term Loan Agent (with the consent of the Required Lenders (as defined in the DIP Term Loan Agreement)) shall be satisfied that such plan is reasonably anticipated to become effective on or prior to January 14, 2019, (B) a motion to approve such TL Acceptable Disclosure Statement and the solicitation procedures for the TL Acceptable Plan (which shall set a deadline of not later than December 20, 2018 for voting on the TL Acceptable Plan), and (C) a motion for a combined hearing to approve such solicitation procedures, the TL Acceptable Disclosure Statement and confirming the TL Acceptable Plan.

(4)     On or before November 23, 2018, the Debtors' noticing agent shall have caused the notices of the TL Acceptable Plan and TL Acceptable Disclosure Statement to have been distributed in accordance with applicable sections of the Bankruptcy Code and related rules.

(5)     At or prior to 5:00 p.m. prevailing Eastern Time on December 10, 2018, the Debtors shall have delivered a 12-month post-emergence liquidity forecast (containing weekly detail for the first 3 months of such forecast) to the Supporting Term Lenders and the Crossover Holder (as such terms are defined in the RSA).

(6)     On or before January 7, 2019, the Debtors shall have obtained (A) an order from the Bankruptcy Court approving the TL Acceptable Disclosure Statement and confirming the TL Acceptable Plan and (B) if such order is not obtained, an order of the Bankruptcy Court extending the Debtors' lease assumption/rejection period such that the Debtors' lease assumption/rejection period shall be 210 days from the Petition Date.

(7)     On or before January 14, 2019, the effective date of the TL Acceptable Plan shall have occurred in accordance with its terms, and the Debtors shall have emerged from Chapter 11.

## **EXHIBIT 2**

**Initial Budget**

**David's Bridal, Inc. - US Operations**
*DIP Budget*
*($ in 000s)*

| | November | December | | | | | | January | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wk 46 | Wk 47 | Wk 48 | Wk 49 | Wk 50 | Wk 51 | Wk 52 | Wk 1 | Wk 2 | Wk 3 | |
| *Week Ending (Saturday)* | **Nov-17** | **Nov-24** | **Dec-01** | **Dec-08** | **Dec-15** | **Dec-22** | **Dec-29** | **Jan-05** | **Jan-12** | **Jan-19** | **Total wk 47 - wk 3** |
| **I. Cash Flows** | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | |
| Retail Receipts | 9,557 | 10,255 | 9,865 | 8,135 | 6,974 | 6,868 | 8,032 | 10,916 | 14,769 | 17,569 | 93,383 |
| Partner Payments | - | - | 1,704 | - | - | - | - | 1,239 | - | - | 2,944 |
| Intercompany Inventory Receivables | - | 129 | 129 | 124 | 124 | 124 | 124 | 146 | 146 | 146 | 1,192 |
| Other Receipts | - | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 19 |
| Total Cash Receipts | 9,557 | 10,385 | 11,699 | 8,262 | 7,101 | 6,994 | 8,159 | 12,304 | 14,917 | 17,717 | 97,537 |
| **Operating Disbursements** | | | | | | | | | | | |
| Merchandise (Fillberg) | 1,751 | 5,169 | 4,569 | 2,344 | 4,234 | 2,384 | 2,702 | 7,048 | 7,048 | 7,048 | 42,546 |
| Merchandise (Market Vendors) | 526 | 267 | 279 | 354 | 408 | 99 | 235 | 114 | 355 | 1,301 | 3,411 |
| Payroll | 621 | 6,759 | 455 | 6,856 | 455 | 6,856 | 455 | 5,446 | 289 | 6,165 | 33,737 |
| Benefits | 103 | 830 | 296 | 522 | 296 | 542 | 583 | 400 | 400 | 400 | 4,270 |
| Rent | - | - | 6,480 | - | - | - | 6,480 | - | - | - | 12,960 |
| Marketing and Media | - | 877 | 820 | 820 | 1,070 | 995 | 820 | 1,790 | 1,318 | 1,318 | 9,829 |
| Customs and Freight | - | 120 | 293 | 446 | 436 | 550 | 796 | 319 | 663 | 878 | 4,501 |
| Utilities | 170 | 254 | 254 | 804 | 254 | 203 | (347) | 81 | 244 | 244 | 1,990 |
| Capital Expenditures | - | 441 | 37 | 37 | 37 | 37 | 37 | 185 | 185 | 185 | 1,181 |
| Royalties | - | 419 | - | - | - | - | 419 | - | - | - | 838 |
| Other Vendor Payables | 536 | 339 | 574 | 458 | 450 | 200 | 456 | 1,100 | 1,100 | 1,100 | 5,777 |
| State Taxes | 2,131 | 282 | 55 | 247 | 1,977 | 247 | - | 424 | 3,390 | 424 | 7,047 |
| Other Intercompany Payments | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Disbursements | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | 5,837 | 15,757 | 14,113 | 12,889 | 9,617 | 12,114 | 12,636 | 16,906 | 14,992 | 19,062 | 128,087 |
| **Operating Cash Flow** | **3,720** | **(5,372)** | **(2,414)** | **(4,627)** | **(2,516)** | **(5,120)** | **(4,477)** | **(4,603)** | **(75)** | **(1,345)** | **(30,549)** |
| **Non-Operating Disbursements** | | | | | | | | | | | |
| Professional Fees [1, 4] | 6,207 | 1,766 | 500 | - | - | - | - | - | - | 11,896 | 14,163 |
| Refinancing Fees | - | 3,350 | - | - | - | - | - | - | - | - | 3,350 |
| Interest | - | 374 | 8,418 | - | - | - | 3,350 | - | - | - | 12,142 |
| Other non-operating disbursements | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | 6,207 | 5,490 | 8,918 | - | - | - | 3,350 | - | - | 11,896 | 29,654 |
| **NET CASH FLOW** | **(2,487)** | **(10,862)** | **(11,332)** | **(4,627)** | **(2,516)** | **(5,120)** | **(7,828)** | **(4,603)** | **(75)** | **(13,241)** | **(60,203)** |
| | | | | | | | | | | | - |

**David's Bridal, Inc. - US Operations**
*DIP Budget*
*($ in 000s)*

| | | November | December | | | | | | January | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Wk 46 | Wk 47 | Wk 48 | Wk 49 | Wk 50 | Wk 51 | Wk 52 | Wk 1 | Wk 2 | Wk 3 | |
| *Week Ending (Saturday)* | | Nov-17 | Nov-24 | Dec-01 | Dec-08 | Dec-15 | Dec-22 | Dec-29 | Jan-05 | Jan-12 | Jan-19 | **Total wk 47 - wk 3** |
| **II. Liquidity** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Cash at Bank** | | | | | | | | | | | | |
| Opening Balance | | 8,360 | 5,873 | 29,311 | 17,979 | 13,352 | 10,836 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Net Cash Flow | | (2,487) | (10,862) | (11,332) | (4,627) | (2,516) | (5,120) | (7,828) | (4,603) | (75) | (13,241) | |
| DIP Facility Draws | | - | 60,000 | - | - | - | - | - | - | - | - | |
| ABL Draw/(Paydown) | | - | (25,700) | - | - | - | 4,284 | 7,828 | 4,603 | 75 | 13,241 | |
| LC Cash Collateralization | | - | - | - | - | - | - | - | - | - | - | |
| Closing Unrestricted Cash (Bank) | | 5,873 | 29,311 | 17,979 | 13,352 | 10,836 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| | | | | | | | | | | | | |
| **Funded ABL Debt** | | | | | | | | | | | | |
| Opening Balance | | 25,700 | 25,700 | - | - | - | - | 4,284 | 12,112 | 16,715 | 16,790 | |
| Draw/(Paydown) | | - | (25,700) | - | - | - | 4,284 | 7,828 | 4,603 | 75 | 13,241 | |
| Funded ABL Closing Balance | | 25,700 | - | - | - | - | 4,284 | 12,112 | 16,715 | 16,790 | 30,030 | |
| | | | | | | | | | | | | |
| **ABL Backed LCs** | | | | | | | | | | | | |
| Opening Balance | | 42,496 | 42,496 | 42,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | |
| New Issuances/(Maturities) | | - | - | 5,000 | - | - | - | - | - | - | - | |
| Closing Balance | | 42,496 | 42,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | 47,496 | |
| | | | | | | | | | | | | |
| **ABL Excess Availability** | | | | | | | | | | | | |
| Projected Availability (Pre-Block) [2] | | | 83,334 | 84,758 | 83,721 | 83,095 | 83,050 | 85,064 | 89,127 | 123,811 | 127,691 | |
| Excess Availability Block [5] | | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (12,587) | (12,975) | |
| Professional Fee Carveout [4] | | | (9,380) | (10,146) | (10,912) | (11,678) | (12,444) | (13,210) | (14,236) | (15,002) | (12,091) | |
| Less: Closing ABL Balance | | | (42,496) | (47,496) | (47,496) | (47,496) | (51,780) | (59,608) | (64,211) | (64,286) | (77,527) | |
| Net Excess Availability | | | 21,458 | 17,116 | 15,313 | 13,920 | 8,826 | 2,246 | 680 | 31,936 | 25,098 | |
| | | | | | | | | | | | | |
| **TOTAL LIQUIDITY** | | **5,873** | **50,768** | **35,095** | **28,664** | **24,756** | **18,826** | **12,246** | **10,680** | **41,936** | **35,098** | |
| **III. Memo Detail** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total Cash** | | | | | | | | | | | | |
| Closing Unrestricted Cash (Bank) | | 5,873 | 29,311 | 17,979 | 13,352 | 10,836 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Cash Collateralization (Restricted Cash) | | - | - | - | - | - | - | - | - | - | - | |
| International Cash [3] | | 3,611 | 3,611 | 3,611 | 3,611 | 3,611 | 3,611 | 3,611 | 3,611 | 3,611 | 3,611 | |
| Total Cash (Including Restricted) | | 9,484 | 32,922 | 21,590 | 16,963 | 14,447 | 13,611 | 13,611 | 13,611 | 13,611 | 13,611 | |
| | | | | | | | | | | | | |
| **Total Eligible Inventory** | | 103,762 | 103,762 | 102,805 | 103,641 | 103,869 | 103,134 | 103,027 | 100,914 | 103,983 | 108,843 | |

**IV. Footnotes**

1. Residual professional fees (including transaction fees) assumed to be escrowed in final week of bankruptcy. Escrow to be funded from release of ABL Professional Fee Carveout and cash at bank.

2. Projected Availability (Pre-Block) includes availability reductions for landlord liens and freight forward reserves, consistent with current borrowing base formula.

3. International Cash based on current estimate of Canada and UK cash at filing. International subsidiaries not expected to build cash through restructuring process.

4. Professional Fee Carveout reserve included in ABL availability calculation. Carveout amount calculated consistent with DIP Motion.

5. Excess Availability Block calculated as the greater of (i) 10% of the borrowing base and (ii) $10M

# **EXHIBIT B**

**DIP ABL Credit Agreement**

$125,000,000

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

DAVID'S BRIDAL, INC.,
as the Parent Borrower

THE SUBSIDIARY BORROWERS PARTY HERETO,
as Borrowers, Debtors, and Debtors-In-Possession Under Chapter 11 of the Bankruptcy Code,

THE GUARANTORS PARTY HERETO,
as Guarantors, Debtors, and Debtors-In-Possession Under Chapter 11 of the Bankruptcy Code,

THE LENDERS
FROM TIME TO TIME PARTIES HERETO,

and

BANK OF AMERICA, N.A.,
as an Issuing Lender, Swingline Lender, Administrative Agent and Collateral Agent,

---

BANK OF AMERICA, N.A.
as Sole Lead Arranger and Sole Bookrunner

dated as of November [__], 2018

---

Table of Contents

Page

SECTION 1 Definitions ...................................................................................................................... 2

    1.1    Defined Terms ................................................................................................................ 2

    1.2    Other Definitional Provisions ...................................................................................... 42

    1.3    Divisions ....................................................................................................................... 43

SECTION 2 Amount and Terms of Commitments ......................................................................... 43

    2.1    Commitments ................................................................................................................ 43

    2.2    Procedure for Revolving Credit Borrowing ............................................................... 44

    2.3    Termination or Reduction of Commitments ............................................................... 45

    2.4    Swingline Commitments ............................................................................................... 45

    2.5    Repayment of Loans ..................................................................................................... 47

SECTION 3    48

    3.1    L/C Commitment ........................................................................................................... 48

    3.2    Procedure for Issuance of Letters of Credit ............................................................... 49

    3.3    Fees, Commissions and Other Charges ...................................................................... 50

    3.4    L/C Participations ........................................................................................................ 50

    3.5    Reimbursement Obligation of the Borrowers ............................................................. 51

    3.6    Obligations Absolute ..................................................................................................... 51

    3.7    L/C Disbursements ........................................................................................................ 52

    3.8    L/C Request ................................................................................................................... 52

    3.9    Cash Collateralization .................................................................................................. 52

    3.10    Additional Issuing Lenders ........................................................................................ 52

    3.11    Resignation or Removal of the Issuing Lender .......................................................... 52

SECTION 4 General Provisions Applicable to Loans and Letters of Credit ............................... 53

    4.1    Interest Rates and Payment Dates ............................................................................... 53

    4.2    Conversion and Continuation Options ........................................................................ 53

    4.3    Minimum Amounts; Maximum Sets ............................................................................. 54

    4.4    Optional and Mandatory Prepayments; Full Roll of Prior Lender Obligations ........... 54

    4.5    Commitment Fees; Administrative Agent's Fee; Other Fees ...................................... 55

    4.6    Computation of Interest and Fees ................................................................................ 55

    4.7    Inability to Determine Interest Rate ............................................................................. 56

    4.8    Pro Rata Treatment and Payments .............................................................................. 57

    4.9    Illegality ......................................................................................................................... 58

    4.10    Requirements of Law .................................................................................................. 58

    4.11    Taxes ............................................................................................................................ 60

DB1/ 100792318.9

# Table of Contents
(continued)

Page

| | | | |
|---|---|---|---:|
| | 4.12 | Indemnity | 64 |
| | 4.13 | Certain Rules Relating to the Payment of Additional Amounts | 64 |
| | 4.14 | Controls on Prepayment if Aggregate Outstanding Credit Exceeds Aggregate Revolving Credit Loan Commitments | 66 |
| | 4.15 | Defaulting Lenders | 66 |
| | 4.16 | Cash Management | 68 |
| | 4.17 | Super Priority Nature of Obligations and Collateral Agent's Liens; Payment of Obligations. | 69 |
| SECTION 5 | Representations and Warranties | | 70 |
| | 5.1 | Financial Condition | 70 |
| | 5.2 | No Change | 70 |
| | 5.3 | Corporate Existence; Compliance with Law | 70 |
| | 5.4 | Corporate Power; Authorization; Enforceable Obligations | 70 |
| | 5.5 | No Legal Bar | 71 |
| | 5.6 | No Material Litigation | 71 |
| | 5.7 | No Default | 71 |
| | 5.8 | Ownership of Property; Liens | 71 |
| | 5.9 | Intellectual Property | 71 |
| | 5.10 | Taxes | 71 |
| | 5.11 | Federal Regulations | 72 |
| | 5.12 | ERISA | 72 |
| | 5.13 | Collateral | 72 |
| | 5.14 | Investment Company Act; Other Regulations | 73 |
| | 5.15 | Subsidiaries | 73 |
| | 5.16 | Purpose of Loans | 73 |
| | 5.17 | Environmental Matters | 73 |
| | 5.18 | No Material Misstatements | 74 |
| | 5.19 | Labor Matters | 74 |
| | 5.20 | Insurance | 74 |
| | 5.21 | Eligible Accounts | 74 |
| | 5.22 | Eligible Inventory | 75 |
| | 5.23 | OFAC; Anti-Terrorism | 75 |
| | 5.24 | EEA Financial Institution | 75 |
| | 5.25 | Approved Budget | 75 |
| | 5.26 | Reorganization Matters | 75 |

# Table of Contents
(continued)

| | | | |
|---|---|---|---|
| | 5.27 | Beneficial Ownership Certification | 76 |
| SECTION 6 | | Conditions Precedent | 76 |
| | 6.1 | Conditions Precedent to Effectiveness of this Agreement. | 76 |
| | 6.2 | Conditions to All Extensions of Credit | 78 |
| SECTION 7 | | Affirmative Covenants | 80 |
| | 7.1 | Financial Statements | 80 |
| | 7.2 | Certificates; Other Information | 80 |
| | 7.3 | Collateral Updates | 81 |
| | 7.4 | Approved Budget. | 82 |
| | 7.5 | Required Milestones | 83 |
| | 7.6 | Loan Parties' Advisors | 83 |
| | 7.7 | Administrative Agent's Advisors | 84 |
| | 7.8 | Transaction | 84 |
| | 7.9 | Debtor-In-Possession Obligations | 84 |
| | 7.10 | Request for Loans under DIP Term Loan Facility | 84 |
| | 7.11 | Payment of Taxes | 84 |
| | 7.12 | Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law | 84 |
| | 7.13 | Maintenance of Property; Insurance | 84 |
| | 7.14 | Inspection of Property; Books and Records; Discussions | 85 |
| | 7.15 | Notices | 86 |
| | 7.16 | Environmental Laws | 87 |
| | 7.17 | Subsidiaries | 88 |
| | 7.18 | Use of Proceeds | 89 |
| | 7.19 | Accounting Changes | 89 |
| | 7.20 | KYC Information | 89 |
| | 7.21 | Anti-Corruption Laws; Sanctions | 89 |
| SECTION 8 | | Negative Covenants | 89 |
| | 8.1 | Limitation on Fundamental Changes | 89 |
| | 8.2 | Limitation on Restricted Payments | 90 |
| | 8.3 | Limitations on Certain Acquisitions | 90 |
| | 8.4 | Limitation on Dispositions | 90 |
| | 8.5 | Limitation on Modifications of Indebtedness and Other Documents | 91 |
| | 8.6 | Sanctions; Anti-Corruption Laws | 91 |
| | 8.7 | Limitation on Negative Pledge Clauses | 91 |

Table of Contents
(continued)

| | | Page |
|---|---|---|
| 8.8 | Limitation on Lines of Business | 93 |
| 8.9 | Limitations on Currency, Commodity and Other Hedging Transactions | 93 |
| 8.10 | Limitations on Transactions with Affiliates | 93 |
| 8.11 | Limitations on Investments | 93 |
| 8.12 | Limitations on Indebtedness | 93 |
| 8.13 | Limitations on Liens | 95 |
| 8.14 | Orders | 96 |
| 8.15 | Prepayments of Other Indebtedness | 96 |
| 8.16 | Repayment of Indebtedness | 97 |
| 8.17 | Reclamation Claims | 97 |
| 8.18 | Insolvency Proceeding Claims | 97 |
| 8.19 | Bankruptcy Actions | 97 |
| 8.20 | Holdings, DB Parent, and Investor Covenants | 97 |
| SECTION 9 | Events of Default | 97 |
| 9.1 | Events of Default | 97 |
| 9.2 | Remedies Upon an Event of Default | 103 |
| 9.3 | License; Access; Cooperation | 104 |
| 9.4 | Lift of Stay; Stay of Proceedings | 104 |
| SECTION 10 | The Agents and the Other Representatives | 104 |
| 10.1 | Appointment | 104 |
| 10.2 | The Administrative Agent and Affiliates | 105 |
| 10.3 | Action by an Agent | 105 |
| 10.4 | Exculpatory Provisions | 105 |
| 10.5 | Acknowledgement and Representations by Lenders | 106 |
| 10.6 | Indemnity; Reimbursement by Lenders | 107 |
| 10.7 | Right to Request and Act on Instructions; Reliance | 107 |
| 10.8 | Collateral Matters | 108 |
| 10.9 | Successor Agent | 109 |
| 10.10 | Swingline Lender | 109 |
| 10.11 | Withholding Tax | 109 |
| 10.12 | Other Representatives | 110 |
| 10.13 | Appointment of Borrower Representatives | 110 |
| 10.14 | Administrative Agent May File Proofs of Claim | 110 |
| 10.15 | Application of Proceeds | 110 |
| 10.16 | ERISA Representations | 112 |

Table of Contents
(continued)

SECTION 11 Miscellaneous ................................................................................................ 113

    11.1    Amendments and Waivers ............................................................................ 113

    11.2    Notices ......................................................................................................... 116

    11.3    No Waiver; Cumulative Remedies............................................................... 117

    11.4    Survival of Representations and Warranties ................................................ 118

    11.5    Payment of Expenses and Taxes; Indemnification....................................... 118

    11.6    Successors and Assigns; Participations and Assignments............................ 120

    11.7    Adjustments; Set-off; Calculations; Computations ..................................... 124

    11.8    Judgment ...................................................................................................... 125

    11.9    Counterparts ................................................................................................. 125

    11.10   Severability .................................................................................................. 125

    11.11   Integration ................................................................................................... 125

    11.12   Governing Law ............................................................................................ 125

    11.13   Submission to Jurisdiction; Waivers ........................................................... 126

    11.14   Acknowledgements...................................................................................... 126

    11.15   Waiver of Jury Trial .................................................................................... 127

    11.16   Confidentiality ............................................................................................. 127

    11.17   Keepwell ...................................................................................................... 127

    11.18   USA PATRIOT Act Notice ......................................................................... 128

    11.19   Electronic Execution of Assignments and Certain Other Documents........... 128

    11.20   Reinstatement............................................................................................... 128

    11.21   Joint and Several Liability; Postponement of Subrogation .......................... 128

    11.22   Designated Cash Management Agreements and Designated Hedging Agreements ................. 129

    11.23   Acknowledgement and Consent to Bail-In of EEA Financial Institutions................................ 129

## Table of Contents
(continued)

SCHEDULES

| | | |
|---|---|---|
| A | -- | Commitments and Addresses |
| 1.1(a) | -- | Assumed Indebtedness |
| 1.1(b) | -- | Credit Card Issuers |
| 1.1(c) | -- | Credit Card Processors |
| 1.1(d) | -- | Excluded Subsidiaries |
| 1.1(e) | -- | Existing Letters of Credit |
| 1.1(f) | -- | Existing Investments |
| 4.16 | -- | DDAs and Concentration Accounts |
| 5.4 | -- | Consents Required |
| 5.6 | -- | Litigation |
| 5.9 | -- | Intellectual Property Claims |
| 5.15 | -- | Subsidiaries |
| 5.17 | -- | Environmental Matters |
| 5.20 | -- | Insurance |
| 7.5 | -- | Required Milestones |
| 7.14 | -- | Website Address for Electronic Financial Reporting |
| 8.7 | -- | Restrictions on Negative Pledge Clauses |
| 8.12(c) | -- | Closing Date Existing Indebtedness |
| 8.13(b) | -- | Existing Liens |


EXHIBITS

| | | |
|---|---|---|
| A-1 | -- | Form of Revolving Credit Note |
| A-2 | -- | Form of Swingline Note |
| B | -- | Form of Guarantee and Collateral Agreement |
| C | -- | Form of Information Certificate |
| D | -- | Form of U.S. Tax Compliance Certificate |
| E | -- | Form of Assignment and Acceptance |
| F | -- | Form of Swingline Loan Participation Certificate |
| G | -- | Form of Secretary's Certificate |
| H | -- | Form of L/C Request |
| I | -- | Form of Borrowing Base Certificate |
| J | -- | Form of Collateral Access Agreement |
| K | -- | Form of Subsidiary Borrower Joinder |
| L | -- | Form of ABL/Term Loan Intercreditor Agreement |
| M | -- | [Reserved] |
| N | -- | Form of Compliance Certificate |


ANNEXES

| | | |
|---|---|---|
| Annex A | -- | Approved Budget |

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of November [__], 2018, among DAVID'S BRIDAL, INC. (as successor by merger to DBD, Inc. and DBP Holding Corp.), a Florida corporation (the "Parent Borrower") and the Subsidiary Borrowers from time to time party hereto (together with the Parent Borrower, collectively, the "Borrowers" and each individually, a "Borrower"), the guarantors from time to time party hereto, the several banks and other financial institutions from time to time party hereto (as further defined in Subsection 1.1, the "Lenders"), and BANK OF AMERICA, N.A., as swingline lender (in such capacity, the "Swingline Lender"), as an issuing lender (in such capacity, an "Issuing Lender"), as administrative agent (in such capacity and as further defined in Subsection 1.1, the "Administrative Agent") for the Lenders hereunder and as collateral agent (in such capacity and as further defined in Subsection 1.1, the "Collateral Agent") for the Secured Parties and the Issuing Lenders.

The parties hereto hereby agree as follows:

W I T N E S S E T H:

WHEREAS, on [_____, 2018] (the "Petition Date"), the Borrowers, Holdings, DB Parent and Investor (collectively, the "Debtors", and each individually, a "Debtor") commenced Chapter 11 Case Nos. [__]-[_____] through [__]-[_____], as administratively consolidated at Chapter 11 Case No. [____] (collectively, the "Chapter 11 Cases" and each individually, a "Chapter 11 Case") in the United States Bankruptcy Court for the [_____] District of [_____] (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of October 11, 2012, among the Borrowers, Holdings, Bank of America, N.A., as Prior Agent, the lenders party thereto (the "Prior Lenders"), and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the Petition Date, the "Pre-Petition Credit Agreement");

WHEREAS, as of the close of business on [_____, 2018], the Prior Lenders under the Pre-Petition Credit Agreement were owed approximately: (i) $[_____] in outstanding principal balance of Revolving Credit Loans (as defined in the Pre-Petition Credit Agreement) and (ii) $[_____] in maximum aggregate amounts available to be drawn under outstanding Letters of Credit (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Prior Lender Obligations under the Pre-Petition Credit Agreement.

WHEREAS, the Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and Guarantors as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected (except with respect to leases; provided, however, that such security interests were perfected as to proceeds of leases), and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests;

WHEREAS, the Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a senior secured super-priority revolving credit facility of up to $125,000,000 in the aggregate to fund the working capital requirements of the Borrowers during the pendency of the Chapter 11 Cases (the "Revolving Credit Facility");

WHEREAS, the Borrowers and the Guarantors have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal property;

WHEREAS, the Borrowers' and Guarantors' business is a mutual and collective enterprise and the Borrowers, and the Guarantors believe that the loans and other financial accommodations to the Borrowers under

1

this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Agents and the Lenders, all to the mutual advantage of the Borrowers and the Guarantors.

WHEREAS, each Borrower and each Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in the Agreement;

WHEREAS, the Administrative Agent's and the Lenders' willingness to extend financial accommodations to the Borrowers, and to administer each Borrower's and Guarantors' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the Guarantors and at each Borrower's and the Guarantors' request and in furtherance of each Borrower's and Guarantors' mutual and collective enterprise; and

WHEREAS, all capitalized terms used in this Agreement, including in these Recitals, shall have the meanings ascribed to them in Section 1.1, and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Section 1.2 shall govern. All Schedules, Exhibits, Annexes, and other attachments hereto, or expressly identified in this Agreement, are incorporated by reference, and taken together with this Agreement, shall constitute a single agreement. These Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

# SECTION 1

## Definitions

1.1     <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"ABL Priority Collateral":  as defined in the ABL/Term Loan Intercreditor Agreement whether or not the same remains in full force and effect.

"ABL/Term Loan Intercreditor Agreement":  the Intercreditor Agreement, dated as of October 11, 2012, between the Collateral Agent and the Prior Term Loan Agent (in its capacity as collateral agent under the Term Loan Documents), and acknowledged by certain of the Loan Parties in the form attached hereto as Exhibit L, as modified and confirmed pursuant to that certain Acknowledgment and Agreement, dated as of the Closing Date, as the same may be further amended, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof.

"ABR":  when used in reference to any Loan or Borrowing, is used when such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ABR Loans":  Loans to which the rate of interest applicable is based upon the Alternate Base Rate.

"Accelerated":  as defined in Subsection 9.1(e).

"Acceleration":  as defined in Subsection 9.1(e).

"Account Debtor":  each Person who is obligated on an Account, Chattel Paper or General Intangible.

"Accounts": "accounts" as defined in the UCC and, with respect to any Person, all such Accounts of such Person, whether now existing or existing in the future, including (a) all accounts receivable of such Person

(whether or not specifically listed on schedules furnished to the Administrative Agent), including all accounts created by or arising from all of such Person's sales of goods or rendition of services made under any of its trade names, or through any of its divisions, (b) all unpaid rights of such Person (including rescission, replevin, reclamation and stopping in transit) relating to the foregoing or arising therefrom, (c) all rights to any goods represented by any of the foregoing, including returned or repossessed goods, (d) all reserves and credit balances held by such Person with respect to any such accounts receivable of any Account Debtors, (e) all letters of credit, guarantees or collateral for any of the foregoing and (f) all insurance policies or rights relating to any of the foregoing.

"Actual Cash Receipts": with respect to any period, as the context requires, (x) the amount of cash received during such period by the Loan Parties (excluding any borrowings under this Agreement or the DIP Term Loan Credit Agreement) that correspond to each line item (on a line item by line item basis) under the heading "Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Total Cash Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"Actual Disbursement Amount": with respect to any period, as the context requires, (x) the amount of cash expenditures made by the Loan Parties during such period by the Loan Parties that correspond to each line item (on a line item by line item basis) under the headings "Operating Disbursements" and "Non-Operating Disbursements" in the Approved Budget and/or (y) the sum, for such period, of all such disbursements for all such line items which comprise "Total Operating Disbursements" and "Total Non-Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"Actual Inventory Levels": the actual aggregate consolidated inventory levels of the Loan Parties as of the relevant date of determination which correspond to the budgeted aggregate consolidated inventory levels described in the line item contained in the Approved Budget under the heading "Eligible Inventory" [1] as determined in a manner consistent with the Approved Budget.

"Actual Liquidity": [_____][2]

"Adequate Protection Liens": has the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"Adequate Protection Superpriority Claims": has the meaning assigned to the term "Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable).

"Adjusted LIBOR Rate":  with respect to any Borrowing of Eurodollar Loans for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next $1/16^{th}$ of one percent (1%)) determined by the Administrative Agent to be equal to the LIBOR Rate for such Borrowing of Eurodollar Loans for such Interest Period multiplied by the Statutory Reserve Rate.  The Adjusted LIBOR Rate will be adjusted automatically as to all LIBOR borrowings then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"Administrative Agent":  as defined in the Preamble hereto and shall include any successor to the Administrative Agent appointed pursuant to Subsection 10.9.

"Affected Eurodollar Rate":  as defined in Subsection 4.7.

"Affected Loans":  as defined in Subsection 4.9.

"Affiliate":  as to any specified Person, any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this

---

[1] To confirm against final Budget.
[2] The definition/provisions with respect to Actual Liquidity to be conformed to the final Term Loan Agreement.

definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent Advance": as defined in Subsection 2.1(c).

"Agent Advance Period": as defined in Subsection 2.1(c).

"Agents": the collective reference to the Administrative Agent and the Collateral Agent and "Agent" shall mean any of them.

"Agent Fee Letter": the Fee Letter dated as of [_____, 2018] among the Borrowers and Bank of America, N.A.

"Agent's Advisors": any financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Agents (it being understood that the Administrative Agent will use good faith efforts to notify the Parent Borrower of any new retentions after the Closing Date).

"Aggregate Lender Exposure": the sum of (a) the aggregate principal amount of all Revolving Credit Loans then outstanding, (b) the aggregate amount of all L/C Obligations at such time and (c) the aggregate amount of all Swingline Exposure at such time.

"Aggregate Outstanding Credit": as to any Revolving Credit Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Credit Loans made by such Revolving Credit Lender then outstanding, (b) the aggregate amount equal to such Revolving Credit Lender's Commitment Percentage of the L/C Obligations then outstanding and (c) the aggregate amount equal to such Revolving Credit Lender's Commitment Percentage, if any, of the Swingline Loans then outstanding.

"Agreement": this Senior Secured, Super Priority, Debtor-In-Possession Credit Agreement, as amended, supplemented, waived or otherwise modified from time to time.

"Alternate Base Rate": for any day, a fluctuating rate per annum equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Rate in effect on such day plus 0.50% and (c) the Adjusted LIBOR Rate for an Interest Period of one month beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Rate or the Adjusted LIBOR Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) or (c) above, as the case may be, of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate, the Federal Funds Rate or the Adjusted LIBOR Rate shall be effective on the effective date of such change in the Base Rate, the Federal Funds Rate or the Adjusted LIBOR Rate, respectively.

"Applicable Commitment Fee Rate": 0.375% per annum.

"Applicable Courts": as defined in Subsection 11.13(a).

"Applicable Margin": a rate per annum equal to the rate set forth below for the applicable type of Loan:

| Applicable Margin | |
|---|---|
| Alternate Base Rate | Adjusted LIBOR |

DB1/ 100473273.8
1004794810v9

2.00%          3.00%

; provided that Tradename Advance Loans, the amount of which shall be adjusted automatically from time to time as of the date of delivery of each Borrowing Base Certificate, shall bear interest at Adjusted LIBOR Rate or Alternate Base Rate, as applicable, plus the Applicable Margin set forth above plus 125 basis points.

"Approved Budget": the budget prepared by the Borrower Representative in the form of Annex A and initially furnished to the Administrative Agent on the Closing Date and which is approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion, as the same may be updated, modified or supplemented from time to time as provided in Section 7.4.

"Approved Budget Variance Report": a weekly report provided by the Borrower Representative to the Administrative Agent and (i) showing, in each case, by line item, the Actual Cash Receipts, the Actual Disbursements, Actual Inventory Levels, Excess Availability and [Actual Liquidity] for the last day of the Prior Week, the Cumulative Four Week Period, if applicable, and the Cumulative Period, noting therein (x) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Disbursements, the Budgeted Inventory Levels and the Budgeted Liquidity for such period set forth in the Approved Budget as in effect for such period and (y) if such Approved Budget as then in effect is not the Initial Approved Budget, all such variances, on a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Disbursements, the Budgeted Inventory Levels and the Budgeted Liquidity for such period as set forth in the Initial Approved Budget, and (ii) shall include explanations for all material variances, which report shall be certified by a Responsible Officer of the Borrower Representative. The Approved Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to the Administrative Agent in its sole discretion.

"Assignee": as defined in Subsection 11.6(b)(i).

"Assignment and Acceptance": an Assignment and Acceptance, substantially in the form of Exhibit E hereto.

"Assumed Indebtedness": Indebtedness for borrowed money of the Parent Borrower and its Restricted Subsidiaries outstanding on the Closing Date and disclosed on Schedule 1.1(a).

"Auto-Renewal L/C": as defined in Subsection 3.1(c).

"Automatic Stay": the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability": the lesser of (x) the total Commitments as in effect at such time and (y) the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered).

"Availability Reserves": reserves, if any, (1) established by the Administrative Agent from time to time hereunder in its Permitted Discretion against the Borrowing Base, including such reserves being appropriate to reflect (A) any impairment to the value, or the collectability in the ordinary course of business, of Eligible Accounts or Eligible Credit Card Receivables (including on account of bad debts and dilution) or the value (based on cost and quantity) of Eligible Inventory, Eligible In-Transit Inventory or Eligible Letter of Credit Inventory, (B) any impediments to the Agents' ability to realize upon the Collateral, (C) any claims and liabilities that the Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, or (D) criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, the Collateral or the validity, the enforceability or priority of the Lien on the Collateral (including claims that the Administrative Agent determines will need to be satisfied in connection with the realization upon such Collateral), of this Agreement or the other Loan Documents, the Pre-Petition Loan Documents or any material remedies of the Secured Parties hereunder or thereunder, (2) in the amount of the Carve-Out and the Priority Carve-Out (which may be maintained at any time in an amount equal to the greater of the projected amounts set forth in the Approved Budget at such time and the amounts reported in the latest Borrowing Base Certificate at such time), (3)

constituting the Lease Reserves, and (4) constituting Cash Management Reserves and Designated Hedging Reserves established in accordance with <u>Subsection 2.1(b)</u>.

"<u>Bail-In Action</u>":  the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>":  with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bank Products Affiliate</u>":  as defined in the ABL/Term Loan Intercreditor Agreement.

"<u>Bank Products Agreement</u>":  any agreement pursuant to which a bank or other financial institution agrees to provide to any Loan Party or any of their Subsidiaries:  (a) treasury services, (b) credit card, merchant card, purchasing card or stored value card services (including the processing of payments and other administrative services with respect thereto), (c) cash management services (including controlled disbursements, automated clearinghouse transactions, return items, netting, overdrafts, depository, lockbox, stop payment, electronic funds transfer, information reporting, wire transfer and interstate depository network services) and (d) other banking products or services as may be requested by any Loan Party or any of their Subsidiaries (other than letters of credit and other than loans and advances except indebtedness arising from services described in clauses (a) through (c) of this definition).

"<u>Bankruptcy Code</u>": Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"<u>Bankruptcy Rules</u>": the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"<u>Base Rate</u>":  for any day a fluctuating rate per annum (and in no event less than zero) equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate"; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) the LIBOR Rate for a one month interest period as determined on such day, plus 1.00%.  The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in Bank of America's prime rate, the Federal Funds Rate or the LIBOR Rate, respectively, shall take effect at the opening of business on the day specified in the public announcement of such change.  [If the Base Rate is being used as an alternate rate of interest pursuant to Section 4.6 hereof, then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.]

"<u>Beneficial Ownership Certification</u>": a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>": 31 C.F.R. § 1010.230.

"<u>Benefited Lender</u>":  as defined in <u>Subsection 11.7(a)</u>.

"<u>Blocked Account</u>":  as defined in <u>Subsection 4.16(b)</u>.

"<u>Blocked Account Agreement</u>":  as defined in <u>Subsection 4.16(b)</u>.

"<u>Board</u>":  the Board of Governors of the Federal Reserve System.

"<u>Board of Directors</u>":  for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the board of directors or other governing body of such entity, or, in either case, any committee

thereof duly authorized to act on behalf of such board of directors or other governing body.  Unless otherwise provided, "Board of Directors": the Board of Directors of the Borrower Representative.

"Borrower Materials": as defined in Subsection 11.2(e).

"Borrower Representative": the Parent Borrower or such other Borrower as may be designated as the "Borrower Representative" by the Borrowers from time to time, in each case in its capacity as Borrower Representative pursuant to the provisions of Subsection 10.13.

"Borrowers":  as defined in the Preamble hereto.

"Borrowing":  the borrowing of one Type of Loan of a single Tranche by the Borrowers (on a joint and several basis), from all the Lenders having Commitments of the respective Tranche on a given date (or resulting from a conversion or conversions on such date) having, in the case of Eurodollar Loans, the same Interest Period.

"Borrowing Base":  as of any date of determination, shall equal the sum of

(a)        90.0% of Eligible Credit Card Receivables, plus

(b)        90.0% of Eligible Accounts, plus

(c)        (i) during the months of December through April, 92.5% of the Net Orderly Liquidation Value of Eligible Inventory, and (ii) at all other times, 90.0% of the Net Orderly Liquidation Value of Eligible Inventory, plus

(d)        90.0% of the Net Orderly Liquidation Value of Eligible In-Transit Inventory, plus

(e)        90.0% of the Net Orderly Liquidation Value of Eligible Letter of Credit Inventory, plus

(f)        the lesser of (i) 50% of the Tradename Appraisal Amount and (ii) 25.0% of Availability (calculated after giving effect to the Tradename Appraisal Amount), minus

(g)        the amount of all Availability Reserves, minus

(h)        an amount equal to the greater of (i) 10% of the sum of the foregoing clauses (a) through (f) and (ii) $10 million.

Notwithstanding anything herein to the contrary, the Administrative Agent may, in its Permitted Discretion, exclude Eligible In-Transit Inventory (in whole or in part) from the Borrowing Base (or take additional Availability Reserves) if the Borrowers have commenced or are reasonably anticipated to commence a full-chain liquidation (as determined by the Administrative Agent in its Permitted Discretion).

"Borrowing Base Certificate":  as defined in Subsection 7.2(d).

"Borrowing Date":  any Business Day specified in a notice delivered pursuant to Subsection 2.2, 2.4, or 3.2 as a date on which the Borrower Representative requests the Lenders to make Loans hereunder or an Issuing Lender to issue Letters of Credit hereunder.

"Budgeted Cash Receipts":  with respect to any period, as the context requires, (x) the amount that corresponds to each line item (on a line item by line item basis) under the heading "Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Total Cash Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined in a manner consistent with the Approved Budget.

"Budgeted Disbursement Amount":  with respect to any period, as the context requires, (x) the amount that corresponds to each line item (on a line item by line item basis) under the headings "Operating Disbursements" and "Non-Operating Disbursements" in the Approved Budget and/or (y) the sum, for such period, of all such disbursements for all such line items (which comprise "Total Operating Disbursements" and "Total Non-Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined in a manner consistent with the Approved Budget.

"Budgeted Inventory Levels":  the budgeted inventory levels contained in the Approved Budget under the heading "Eligible inventory" as of the relevant date of determination.

"Budgeted Liquidity":  [_____][3]

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York (or with respect only to Letters of Credit issued by an Issuing Lender not located in the City of New York, the location of such Issuing Lender) are authorized or required by law to close, except that, when used in connection with a Eurodollar Loan, "Business Day" shall mean any Business Day on which dealings in Dollars between banks may be carried on in London, England and New York, New York.

"Capital Stock":  as to any Person, any and all shares or units of, rights to purchase, warrants or options for, or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"Captive Insurance Subsidiary":  any Subsidiary of the Parent Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"Carve-Out": as defined in the Interim Order (or Final Order, when applicable).

"Cash Equivalents":   any of the following: (1) money and (2) (a) securities issued or fully guaranteed or insured by the United States of America or a member state of the European Union or any agency or instrumentality of any thereof, (b) time deposits, certificates of deposit or bankers' acceptances of (i) any bank or other institutional lender under this Agreement or the DIP Term Loan Facility or any affiliate thereof or (ii) any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and the commercial paper of the holding company of which is rated at least A-2 or the equivalent thereof by Standard & Poor's Ratings Group (a division of S&P Global, Inc.) or any successor rating agency ("S&P") or at least P-2 or the equivalent thereof by Moody's Investors Service, Inc. or any successor rating agency ("Moody's") (or if at such time neither is issuing ratings, then a comparable rating of another nationally recognized rating agency), (c) repurchase obligations with a  term of not more than seven days for underlying securities of the types described in clauses (2)(a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (2)(b) above, (d) money market instruments, commercial paper or other short-term obligations rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of another nationally recognized rating agency), (e) investments in money market funds subject to the risk limiting conditions of Rule 2a-7 or any successor rule of the SEC under the Investment Company Act of 1940, as amended, (f) investments similar to any of the foregoing denominated in foreign currencies approved by the Board of Directors, and (g) solely with respect to any Captive Insurance Subsidiary, any investment that person is permitted to make in accordance with applicable law.

"Cash Management Arrangements":  any agreement or arrangement relating to any service provided pursuant to a Bank Products Agreement.

"Cash Management Party": any Bank Products Affiliate party to a Bank Products Agreement.

---

[3] The definition/provisions with respect to Actual Liquidity to be conformed to the final Term Loan Agreement.

"Cash Management Order": the order of the Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be acceptable to the Administrative Agent in all material respects.

"Cash Management Reserves": reserves in an amount equal to the then reasonably anticipated monetary obligations of the Loan Parties and their Subsidiaries under any Designated Cash Management Agreements owing to any Cash Management Party. Such anticipated monetary obligations shall be the amount calculated by the relevant Cash Management Party and provided to the Administrative Agent, the relevant Loan Party and the Parent Borrower together with the supporting calculations therefor (a) on or prior to the date on which the applicable Bank Products Agreement is designated as a Designated Cash Management Agreement and (b) thereafter promptly (but in any case not later than three Business Days) following (x) the last calendar day of each calendar month and (y) such other date on which a request was made by the Administrative Agent, the relevant Loan Party or the Parent Borrower, as applicable.

"CDD Rule" the Customer Due Diligence Requirements for Financial Institutions issued by the U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN") under the Bank Secrecy Act (such rule published May 11, 2016 and effective May 11, 2018, as amended from time to time).

"CD&R Fund VIII": Clayton, Dubilier & Rice Fund VIII, L.P., a Cayman Islands exempted limited partnership, and any successor in interest thereto.

"CD&R Investors": collectively, (i) CD&R Fund VIII, (ii) CD&R Friends & Family Fund VIII, L.P., a Cayman Islands exempted limited partnership, and any successor in interest thereto, (iii) CD&R Advisor Fund VIII Co-Investor, L.P., a Cayman Islands exempted limited partnership, and any successor in interest thereto, and (iv) any Affiliate of any CD&R Investor identified in clauses (i) through (iii) of this definition.]

"Change in Law": as defined in Subsection 4.11(a).

"Change of Control": (a) Continuing Directors shall cease to constitute a majority of the members of the Board of Directors of DB Parent; (b) Continuing Directors shall cease to constitute a majority of the members of the Board of Directors of Investor; (c) Continuing Directors shall cease to constitute a majority of the members of the Board of Directors of Holdings; (d) Holdings shall cease to own, directly or indirectly, 100.0% of the Capital Stock of the Parent Borrower; or (e) a "Change of Control" as defined in the DIP Term Loan Credit Agreement.

"Chapter 11 Cases": as defined in the Recitals.

"Chattel Paper": chattel paper (as such term is defined in Article 9 of the UCC).

"Closing Date": the date on which all the conditions precedent set forth in Subsection 6.1 shall be satisfied or waived.

"Closing Fee Letter": the Fee Letter dated as of November [__], 2018 between the Borrowers and Bank of America, N.A.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": (i) all assets of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document and (ii) the "DIP Collateral" referred to in the Orders, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Access Agreement": an agreement, in substantially the form of Exhibit J hereto (or in form and substance reasonably satisfactory to the Administrative Agent).

"Collateral Agent": as defined in the Preamble hereto, and shall include any successor to the Collateral Agent appointed pursuant to Subsection 10.9.

"Commitment": as to any Lender, the commitment, if any, of such Lender to make Extensions of Credit to the Borrowers in the amount set forth opposite its name on Schedule A hereto or as may subsequently be set forth in the Register from time to time. The original amount of the aggregate Commitments of the Lenders is $125,000,000.

"Commitment Percentage": of any Lender at any time shall be that percentage which is equal to a fraction (expressed as a percentage) the numerator of which is the Commitment of such Lender at such time and the denominator of which is the aggregate Commitments at such time; provided that for purposes of Subsections 4.15(d) and 4.15(e), "Commitment Percentage" shall mean the percentage of the total Commitments (disregarding the Commitment of any Defaulting Lender to the extent its Swingline Exposure or L/C Obligations is reallocated to the Non-Defaulting Lenders) represented by such Lender's Commitment; provided, further, that if any such determination is to be made after the Commitments (and the related Commitments of the Lenders) has (or have) terminated, the determination of such percentages shall be made immediately before giving effect to such termination.

"Commitment Period": the period from and including the Closing Date to but not including the Termination Date, or such earlier date as the Commitments shall terminate as provided herein.

"Committed Lenders": [Bank of America, N.A., Morgan Stanley Senior Funding, Inc., Barclays Bank PLC, Goldman Sachs Bank USA, Credit Suisse AG and Deutsche Bank AG New York Branch.]

"Committee" an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

"Commodity Exchange Act" the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity": an entity, whether or not incorporated, which is under common control with the Parent Borrower within the meaning of Section 4001 of ERISA or is part of a group which includes the Parent Borrower and which is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Sections 414(m) and (o) of the Code.

"Compliance Certificate": as defined in Subsection 7.2(a).

"Concentration Account": any concentration account (other than any such concentration account if such concentration account is an Excluded Account) maintained by any Qualified Loan Party into which the funds in any DDA are transferred on a periodic basis as provided for in Subsection 4.16(b). All funds in any Concentration Account shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in such Concentration Account, subject to the Security Documents, the ABL/Term Loan Intercreditor Agreement or any other applicable intercreditor agreement.

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument delivered to the Administrative Agent (a copy of which shall be provided by the Administrative Agent to the Borrower Representative on request); provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations under this Agreement, including its obligation to fund a Loan if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to any provision of this Agreement, including Subsection

4.10, 4.11, 4.12 or 11.5, than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender if such designating Lender had not designated such Conduit Lender hereunder, (b) be deemed to have any Commitment or (c) be designated if such designation would otherwise increase the costs of any Facility to any Borrower.

"Continuing Directors":  the directors of the Holdings, DB Parent and Investor, as applicable, on the Closing Date and each other director if, in each case, such other director's nomination for election to the Board of Directors of the Holdings, DB Parent and Investor, as applicable, is recommended by at least a majority of the then Continuing Directors or the election of such other director is approved by one or more Permitted Holders.

"Contractual Obligation":  as to any Person, any provision of any material security issued by such Person or of any material agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Core Concentration Account":  as defined in Subsection 4.16(c).

"Court": as defined in the Recitals.

"Credit Card Agreements":  all agreements now or hereafter entered into by any Qualified Loan Party for the benefit of a Qualified Loan Party, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card Issuer":  any of the credit card issuers listed on Schedule 1.1(b), and any other credit card issuer reasonably acceptable to the Administrative Agent.

"Credit Card Notification":  collectively, the notices to Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements, which Credit Card Notifications shall require the ACH or wire transfer no less frequently than each Business Day (and whether or not there are then any outstanding Obligations) of all payments due from Credit Card Processors to (i) a DDA, (ii) a Concentration Account, or (iii) any other deposit account in the United States, in each case with respect to which a control agreement is in place between the applicable Qualified Loan Party, the applicable depositary institution and the Administrative Agent or the Collateral Agent (or over which any such Agent has "control" whether or not pursuant to a control agreement).

"Credit Card Processor":  any of the credit card processors or clearinghouses listed on Schedule 1.1(c), and any other credit card processor or clearinghouse reasonably acceptable to the Administrative Agent.

"Credit Card Receivables":  each Payment Intangible together with all (a) present and future rights of the Qualified Loan Parties to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) present and future rights of the Qualified Loan Parties to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise, in each case above calculated net of prevailing interchange charges.

"Cumulative Four Week Period": the four-week period up to and through the Saturday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Cumulative Period": the period from the Petition Date through the most recent week ended.

"Customary Permitted Liens":

(a)    Liens for taxes, assessments and similar charges that are not yet delinquent or which are being contested in good faith by appropriate proceedings and adequate reserves with respect thereto are maintained on the books of the Parent Borrower or its Restricted Subsidiaries, as the case may be, in conformity with GAAP;

(b)    Liens with respect to outstanding motor vehicle fines, liens of landlords or of mortgagees of landlords arising by statute and liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other liens imposed by law created in the ordinary course of business for amounts not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(c)    Subject to the Orders, deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security benefits or other insurance related obligations (including pledges or deposits securing liability to insurance carriers under insurance or self-insurance arrangements);

(d)    encumbrances arising by reason of zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar encumbrances on the use of real property not materially detracting from the value of such real property or not materially interfering with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(e)    encumbrances arising under leases or subleases of real property that do not, in the aggregate over all such encumbrances, materially detract from the value of such real property or interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(f)    financing statements filed Pre-Petition with respect to a lessor's rights in and to personal property leased to such Person in the ordinary course of such Person's business;

(g)    Liens, pledges or deposits securing the performance of (x) bids, contracts (other than for borrowed money), obligations for utilities, leases and statutory or regulatory obligations, or (y) performance, bid, surety, appeal, judgment, replevin and similar bonds, other surety arrangements, and other similar obligations, all in, or relating to liabilities or obligations incurred in, the ordinary course of business;

(h)    Liens arising after the Petition Date by reason of any judgment, decree or order of any court or other Governmental Authority not constituting an Event of Default hereunder; provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; and

(i)    Liens on goods in favor of customs and revenue authorities arising as a matter of law to secure customs duties in connection with the importation of such goods.

"Customs Broker Agreement":  an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among a Qualified Loan Party, a customs broker, freight forwarder or other carrier, and the Collateral Agent, in which the customs broker, freight forwarder or other carrier acknowledges that it has control over and holds the documents evidencing ownership of, or other shipping documents relating to, the subject Inventory or other property for the benefit of the Collateral Agent, and agrees, upon notice from the Collateral Agent (which notice shall be delivered only upon the occurrence and during the continuance of an Event of Default), to hold and dispose of the subject Inventory and other property solely as directed by the Collateral Agent.

"DB Parent":  DB Holdco, Inc., a Delaware corporation, and any successor in interest thereto.

"DBI":  David's Bridal, Inc., a Florida corporation, and any successor in interest thereto.

"DDA":  any checking or other demand deposit bank account maintained by any Qualified Loan Party (other than any such checking or other demand deposit account if such checking or other demand deposit

account is an Excluded Account) into which the proceeds of ABL Priority Collateral are deposited or are expected to be deposited. All funds in any DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in such DDA, subject to the Security Documents or the ABL/Term Loan Intercreditor Agreement.

"<u>Debtors</u>": as defined in the Recitals.

"<u>Default</u>": any of the events specified in <u>Subsection 9.1</u>, whether or not any requirement for the giving of notice (other than, in the case of <u>Subsection 9.1(e)</u>, a Default Notice), the lapse of time, or both, or any other condition specified in <u>Subsection 9.1</u>, has been satisfied.

"<u>Default Notice</u>": as defined in <u>Subsection 9.1(e)</u>.

"<u>Defaulting Lender</u>": any Lender or Agent whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

"<u>Default Rate</u>" an interest rate equal to (a) the Alternate Base Rate plus (b) the Applicable Margin applicable to ABR Loans plus (c) 2.0% per annum; <u>provided</u> that with respect to a Eurodollar Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable laws.

"<u>Deposit Account</u>": a deposit account (as such term is defined in Article 9 of the UCC).

"<u>Designated Cash Management Agreements</u>": (i) any Designated Cash Management Agreement under the Pre-Petition Credit Agreement which constituted a "Designated Cash Management Agreement" under the Pre-Petition Credit Agreement, (ii) any Cash Management Arrangement entered into by and between any Loan Party and Bank of America, N.A., and (iii) any other Cash Management Arrangement in respect of which the notice delivered to the Administrative Agent by the applicable bank or financial institution and the Borrower Representative confirms that Cash Management Arrangement shall be deemed a "Designated Cash Management Agreement" hereunder for all purposes, including the application of Availability Reserves and Section <u>10.15</u>, so long as the establishment of Cash Management Reserves with respect to such Cash Management Arrangement would not result in the Aggregate Lender Exposure exceeding the lesser of (<u>A</u>) the total Commitments as then in effect and (<u>B</u>) the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered).

"<u>Designated Hedging Agreements</u>": (i) any Designated Hedging Agreements under the Pre-Petition Credit Agreement which constituted a "Designated Hedging Agreement" under the Pre-Petition Credit Agreement, (ii) any Interest Rate Protection Agreements, Hedging Agreements or other Permitted Hedging Arrangements entered into by and between any Loan Party and Bank of America, N.A., and (iii) any other Interest Rate Protection Agreements, Hedging Agreements or other Permitted Hedging Arrangements in respect of which the notice delivered to the Administrative Agent by the applicable bank or financial institution and the Borrower Representative confirms that such Interest Rate Protection Agreements, Hedging Agreements or other Permitted Hedging Arrangements shall be deemed a "Designated Hedging Agreements" hereunder for all purposes, including the application of Availability Reserves and Section <u>10.15</u>, so long as the establishment of Designated Hedging Reserves with respect to such Interest Rate Protection Agreements, Hedging Agreements or other Permitted Hedging Arrangements would not result in the Aggregate Lender Exposure exceeding the lesser of (<u>A</u>) the total Commitments as then in effect and (<u>B</u>) the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered).

"<u>Designated Hedging Reserves</u>": reserves in an amount equal to the then aggregate outstanding mark-to-market ("<u>MTM</u>") exposure of all Loan Parties to the relevant Hedging Parties under all Designated Hedging Agreements as provided by the applicable Hedging Party from time to time in accordance with the succeeding requirements. Such exposure shall be the sum of the positive aggregate MTM values to each Hedging Party of all Designated Hedging Agreements with such Hedging Party outstanding at the time of the relevant calculation. The aggregate MTM value to a Hedging Party of all Designated Hedging Agreements with such Hedging Party shall be calculated by such Hedging Party (<u>i</u>) on a net basis by taking into account the netting provision contained in the

ISDA Master Agreement (or other similar agreement with netting provisions substantially similar to an ISDA Master Agreement) with such Hedging Party and (ii) if applicable, by taking into account any master netting agreement or arrangement in place among such Hedging Party, any Subsidiary or Affiliate thereof that is also party to a Designated Hedging Agreement and the relevant Loan Party, in which case the positive aggregate MTM value of all relevant Designated Hedging Agreements to such Hedging Party and such Subsidiaries or Affiliates who are parties to such master netting agreements shall be calculated in respect of all of the relevant Designated Hedging Agreements on a net basis across all such Designated Hedging Agreements; provided that the Borrower Representative (i) certifies to the Administrative Agent that such master netting agreement shall apply to all such Designated Hedging Agreements in all cases including upon the occurrence of an event of default by the relevant Loan Party in respect of any such Designated Hedging Agreement and (ii) upon request, provides to the Administrative Agent a copy of the master netting agreement.  The Hedging Party, in calculating the positive aggregate MTM value to such Hedging Party, shall take into account the value of collateral posted to such Hedging Party in respect of such Designated Hedging Agreements, such that the value of such collateral shall reduce the MTM value of such Designated Hedging Agreements that is out-of-the-money to the relevant Loan Party by an amount equal to (x) the amount of cash collateral or (y) the value of non-cash collateral with such value as determined by the relevant Hedging Party or the relevant valuation agent in accordance with the relevant credit support annex or other collateral agreement (for the avoidance of doubt, taking into account any haircut provision applicable to such non-cash collateral); provided that the Borrower Representative shall provide any supporting documentation for such value as may be reasonably requested by the Administrative Agent.  For the avoidance of doubt, if the MTM value of all Designated Hedging Agreements with a Hedging Party is a negative amount to such Hedging Party (i.e., if all such Designated Hedging Agreements with such Hedging Party are in-the-money to the relevant Loan Party on a net basis), such MTM value shall be treated as zero in calculating the amount of the Designated Hedging Reserves.  The MTM value of a Designated Hedging Agreement for this purpose shall be calculated and provided to the Administrative Agent, the relevant Loan Party and the Borrower Representative together with the supporting calculations therefor (i) on or prior to the date on which the applicable Interest Rate Protection Agreement, Hedging Agreement or other Permitted Hedging Arrangement is designated as a Designated Hedging Agreement and (ii) thereafter promptly (but in any case not later than three Business Days) following (x) the last calendar day of each calendar month and (y) such other date on which a request was made by the Administrative Agent, the relevant Loan Party or the Borrower Representative, as applicable, for such MTM value.  Upon receipt of such MTM value of a Designated Hedging Agreement from the relevant Hedging Party, the Borrower Representative may, within three Business Days of such receipt, notify the Administrative Agent that the Borrower Representative does not agree with such MTM value provided by such Hedging Party and seek a Dealer Polling (as defined below) with respect to the relevant Designated Hedging Agreement as set forth below.  In the event the Borrower Representative does not provide such notice to the Administrative Agent, the Administrative Agent shall use such MTM value in calculating the relevant portion of the Designated Hedging Reserves.  Prior to any Hedging Party providing the MTM value of an Interest Rate Protection Agreement, Hedging Agreement or other Permitted Hedging Arrangement, the applicable Interest Rate Protection Agreement, Hedging Agreement or other Permitted Hedging Arrangement will not be designated as a Designated Hedging Agreement for the purposes of this Agreement, until such time as an MTM value is provided by such Hedging Party or an alternative value is provided by the Borrower Representative pursuant to a Dealer Polling.  The Borrower Representative may commence a Dealer Polling (i) at any time if a Hedging Party fails to provide an MTM value or (ii) within three Business Days of the receipt by the Administrative Agent of an MTM value provided by a Hedging Party.  In the case of the immediately preceding subclause (ii), until Dealer Polling results in an alternative MTM value, the MTM value provided by the Hedging Party shall be used for purposes of calculating the Designated Hedging Reserves.  If a Hedging Party provides an MTM value in respect of the relevant Designated Hedging Agreement subsequent to the determination of an MTM value in accordance with a Dealer Polling, such MTM value so provided by the Hedging Party shall be used in calculating the relevant portion of the Designated Hedging Reserves; provided that the Borrower Representative may disagree with such new MTM value and commence a new Dealer Polling in accordance with these provisions.  A "Dealer Polling" for purposes hereof is a procedure by which the Borrower Representative seeks mid-market quotations (which may be firm or indicative) from at least two (and not more than three) recognized dealers in Hedging Agreements of the same or similar type of the MTM value of a Designated Hedging Agreement.  In seeking such quotations, the Borrower Representative shall (x) instruct each such dealer to calculate its mid-market valuation in a manner consistent with the manner in which such dealer would calculate such valuation for products of its own that are of the same or substantially similar type as the relevant Designated Hedging Agreement and (y) provide each such dealer with the transaction details and other information necessary for such dealer to provide such mid-market quotation.  The Borrower Representative shall provide a copy of all

written communications with each such dealer and all information provided pursuant to clause (y) of the preceding sentence to the dealers participating in the Dealer Polling to the Administrative Agent and the relevant Hedging Party. Upon notification and delivery by the Borrower Representative to the Administrative Agent of (<u>A</u>) the details and results of any such mid-market quotations from such other dealers attributable to the Designated Hedging Agreement for which such additional dealer mid-market quotations have been obtained, and (<u>B</u>) a certificate showing the amount determined by calculating either (<u>i</u>) the arithmetic average of the valuation provided by the relevant Hedging Party and the valuations provided by each of such other dealers in the event the Borrower Representative did not agree with the valuation provided by such Hedging Party or (<u>ii</u>) the arithmetic average of the valuations provided by each of such other dealers in the event the relevant Hedging Party has not provided its valuation (in either case, including reasonable details of such calculation), the Administrative Agent shall adjust the Designated Hedging Reserves attributable to the Designated Hedging Agreement for which such additional dealer mid-market quotations have been obtained to equal the amount provided by the Borrower Representative in preceding clause (B). In the event that (<u>x</u>) the Borrower Representative commenced the Dealer Polling but no third party dealer has provided any quotation within seven Business Days from the date on which the Borrower Representative notified the Administrative Agent of the commencement of the Dealer Polling, or (<u>y</u>) the Borrower Representative has failed to commence the Dealer Polling in a situation described above, then the MTM value of the relevant Designated Hedging Agreement for purposes of the determination of the relevant portion of the Designated Hedging Reserves shall be determined by the Administrative Agent based on the previous MTM value provided by the relevant Hedging Party.

"<u>Designated Jurisdiction</u>": any country or territory to the extent that such country or territory itself is the subject of any applicable Sanctions.

"<u>DIP Term Loan Agent</u>": Bank of America, N.A., in its capacity as administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

"<u>DIP Term Loan Borrowing Account</u>": the account of the Borrowers into which the proceeds of the DIP Term Loan Facility are deposited and held until released to the Borrowers, which shall be subject to the control of the DIP Term Loan Agent.

"<u>DIP Term Loan Credit Agreement</u>": that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit Agreement dated as of the date hereof, by and among Holdings, the Parent Borrower, the DIP Term Loan Agent, as administrative agent and the banks and other financial institutions party thereto, as in effect on the Closing Date and as the same may be amended with the prior written consent of the Administrative Agent (provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous notice thereof is given to the Administrative Agent).

"<u>DIP Term Loan Facility</u>": the term loan facility provided by the DIP Term Loan Lenders under the DIP Term Loan Credit Agreement.

"<u>DIP Term Loan Lenders</u>": the agents and the lenders under the DIP Term Loan Credit Agreement.

"<u>Disposition</u>": the sale, assignment, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction and any sale of Capital Stock) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Disqualified Capital Stock</u>": with respect to any Person, any Capital Stock (other than management stock) that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event (other than following the occurrence of a Change of Control or other similar event described under such terms as a "change of control" or an asset sale or other disposition), (<u>a</u>) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (<u>b</u>) is convertible or exchangeable for Indebtedness or Disqualified Capital Stock or (<u>c</u>) is redeemable at the option of the holder thereof (other than following the occurrence of a Change of Control or other similar event described under such terms as a "change of control" or an asset sale or other disposition), in whole or in part, in each case on or prior

to the Termination Date, provided that Capital Stock issued to any employee benefit plan, or by any such plan to any employees of the Parent Borrower or any Subsidiary, shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased or otherwise acquired or retired in order to satisfy applicable statutory or regulatory obligations.

"Dollars" and "$":  dollars in lawful currency of the United States of America.

"Domestic Subsidiary":  any Subsidiary of the Parent Borrower which is not a Foreign Subsidiary.

 "EEA Financial Institution":  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country":  any of the member states of the European Union, Iceland Liechtenstein, and Norway.

"EEA Resolution Authority":  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Accounts":  those Accounts created by each of the Qualified Loan Parties in the ordinary course of its business, that arise out of its sale, lease or rental of goods or rendition of services, that comply in all material respects with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash and sales tax.  Eligible Accounts shall not include the following:

(a)        Accounts which either are 60 days or more past due or are unpaid more than 120 days after the original invoice date;

(b)        Accounts owed by an Account Debtor (or its Affiliates) where 50.0% or more of the total amount of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible hereunder;

(c)        Accounts with respect to which the Account Debtor is (i) an Affiliate of a Qualified Loan Party or (ii) an employee or agent of a Qualified Loan Party; provided that Accounts of a portfolio company of any of the CD&R Investors or their respective Affiliates or an employee or agent thereof shall not be excluded by virtue of this clause (c);

(d)        Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold (to the extent it remains unpaid), or any other terms by reason of which the payment by an Account Debtor may be conditional (other than, for the avoidance of doubt, a rental or lease basis);

(e)        Accounts that are not payable in Dollars;

(f)        Accounts with respect to which the Account Debtor is a Person other than a Governmental Authority unless: (i) the Account Debtor either (A) maintains its Chief Executive Office in the United States, (B) is organized under the laws of the United States, or any state or subdivision thereof or (C) is a natural person with a billing address in the United States; or (ii) (A) the Account is supported by an irrevocable letter of credit satisfactory to the Administrative Agent, in its Permitted Discretion (as to form, substance, and issuer or domestic confirming bank), that has been delivered to the Administrative Agent and is directly drawable by the Administrative Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, satisfactory to the Administrative Agent, in its Permitted Discretion;

16

(g)        Accounts with respect to which the Account Debtor is the government of any foreign country or sovereign state other than the United States, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (i) the Account is supported by an irrevocable letter of credit satisfactory to the Administrative Agent, in its Permitted Discretion (as to form, substance, and issuer or domestic confirming bank), that has been delivered to the Administrative Agent and is directly drawable by the Administrative Agent, or (ii) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, satisfactory to the Administrative Agent, in its Permitted Discretion;

(h)        Accounts with respect to which the Account Debtor is the federal government of the United States or any department, agency or instrumentality of the United States (exclusive, however, of Accounts with respect to which a Qualified Loan Party has complied, to the reasonable satisfaction of the Administrative Agent, with the Assignment of Claims Act, 31 USC § 3727);

(i)        Accounts with respect to which the Account Debtor is a creditor of the Parent Borrower or any other Qualified Loan Party, has or has asserted a right of setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent (including with respect to rebates) of such claim, right of setoff, or dispute;

(j)        Accounts with respect to an Account Debtor (other than Account Debtors under the Macy's.com Agreement or the Men's Wearhouse Agreement) whose total obligations owing to the Parent Borrower or any Subsidiary of the Parent Borrower exceed 20.0% of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentages; provided, however that the amount of Eligible Accounts that are excluded because they exceed the foregoing percentages shall be determined by the Administrative Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit;

(k)        Accounts with respect to which the Account Debtor is subject to an insolvency proceeding, has gone out of business, or as to which any Borrower has received notice of an imminent insolvency proceeding unless (x) such Account is supported by a letter of credit satisfactory to the Collateral Agent, in its Permitted Discretion (as to form, substance, and issuer or domestic confirming bank), that has been delivered to the Administrative Agent and is directly drawable by the Administrative Agent or (y) such Account Debtor has received debtor-in-possession financing sufficient as determined by the Collateral Agent in its Permitted Discretion to finance its ongoing business activities;

(l)        Accounts that are not subject to a valid and perfected first priority Lien in favor of the Collateral Agent pursuant to the relevant Security Document (as and to the extent provided therein);

(m)        Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor;

(n)        Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by a Borrower of the subject contract for goods or services (other than customary maintenance contracts);

(o)        Any Account that has not been invoiced, has not been billed and has not been recognized as received by the applicable Account Debtor;

(p)        Any Account with respect to which a partial payment of such Account has been made by the respective Account Debtor; provided that to the extent such Account consists of multiple separate line-items, only the line items that have been partially paid shall be excluded;

(q)        Accounts to the extent representing service charges or late fees;

(r)        Accounts that are evidenced by Chattel Paper or a promissory note issued by an Account Debtor;

(s)       Credit Card Receivables; and

(t)       Accounts that the Administrative Agent has determined, in its Permitted Discretion, to exclude from Eligible Accounts, which shall be excluded from the Borrowing Base effective immediately upon notice thereof to the Borrower Representative.

Any Accounts of the Qualified Loan Parties that are not Eligible Accounts shall nevertheless be part of the Collateral as and to the extent provided in the Security Documents.

"Eligible Credit Card Receivables":  all Credit Card Receivables of the Qualified Loan Parties which satisfy the criteria set forth below:

(a)       such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by such Qualified Loan Party in the ordinary course of the business of such Qualified Loan Party;

(b)       such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which give rise to such Credit Card Receivables;

(c)       such Credit Card Receivables are not unpaid more than five Business Days after the date of the sale of Inventory giving rise to such Credit Card Receivables;

(d)       the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivable has not failed to remit any monthly payment in respect of such Credit Card Receivable;

(e)       the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not asserted a counterclaim, defense or dispute against such Credit Card Receivables (other than customary set-offs to fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Person from time to time), but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the amount owing by such Person to such Credit Card Issuer or Credit Card Processor pursuant to such fees and chargebacks shall be deemed Eligible Credit Card Receivables;

(f)       the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not set off against amounts otherwise payable by such Credit Card Issuer or Credit Card Processor to such Person for the purpose of establishing a reserve or collateral for obligations of such Person to such Credit Card Issuer or Credit Card Processor (other than customary set-offs and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor from time to time) but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the set-off amounts shall be deemed Eligible Credit Card Receivables;

(g)       such Credit Card Receivables (x) are owned by a Qualified Loan Party and such Qualified Loan Party has a good title to such Credit Card Receivables, (y) are subject to a valid and perfected first priority Lien in favor of the Collateral Agent pursuant to the relevant Security Document (as and to the extent provided therein), and (z) are not subject to any other Lien (other than Liens permitted hereunder pursuant to clauses (a), (c) (with respect to clauses (a), (b) and (h) of the definition of "Customary Permitted Liens"), (e) (with respect to clauses (a) and (q) of Section 8.13), (h) of Section 8.13) (the foregoing clauses (y) and (z) (other than in respect of clause (a) of Section 8.13) not being intended to limit the ability of the Administrative Agent to change, establish or eliminate any Availability Reserves in its Permitted Discretion on account of any such permitted Liens);

(h)       the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables is not subject to an insolvency proceeding, has gone out of business, or as to which any Borrower has received notice of an imminent insolvency proceeding;

18

(i)        no event of default has occurred under the Credit Card Agreement of such Qualified Loan Party with the Credit Card Issuer or Credit Card Processor who has issued the credit card or debit card or handles payments under the credit card or debit card used in the sale which gave rise to such Credit Card Receivables which event of default gives such Credit Card Issuer or Credit Card Processor the right to cease or suspend payments to such Qualified Loan Party;

(j)        the customer using the credit card or debit card giving rise to such Credit Card Receivable shall not have returned the merchandise purchased giving rise to such Credit Card Receivable;

(k)        to the extent required by Subsection 4.16(b), the Credit Card Receivables are subject to Credit Card Notifications;

(l)        the Credit Card Processor is organized and has its principal offices or assets within the United States or is otherwise acceptable to the Administrative Agent in its Permitted Discretion;

(m)        such Credit Card Receivables are not evidenced by chattel paper or an instrument of any kind, and have not been reduced to judgment;

(n)        the portion of such Credit Card Receivables that does not include a billing for interest, fees or late charges;

(o)        in the case of a Credit Card Receivable due from a Credit Card Processor, the Administrative Agent has not notified the Borrower Representative that the Administrative Agent has determined in its Permitted Discretion that such Credit Card Receivable is unlikely to be collected; and

(p)        such Credit Card Receivables due from major credit card processors that the Administrative Agent has not determined, in its Permitted Discretion, to exclude from Eligible Credit Card Receivables, which shall be excluded from the Borrowing Base effective immediately upon notice to the Borrower Representative.

Any Credit Card Receivables which are not Eligible Credit Card Receivables shall nevertheless be part of the Collateral as and to the extent provided in the Security Documents.

"Eligible In-Transit Inventory": as of any date of determination, without duplication of other Eligible Inventory or Eligible Letter of Credit Inventory, Inventory of the Qualified Loan Parties which meets the following criteria:

(a)        such Inventory has been shipped from any foreign location to a United States location for receipt by a Qualified Loan Party within 30 days of the date of determination and has not yet been received by a Qualified Loan Party;

(b)        the purchase order for such Inventory is in the name of a Qualified Loan Party and title has passed to such Qualified Loan Party;

(c)        either (i) such Inventory is subject to a negotiable document of title, in form reasonably satisfactory to the Administrative Agent, which shall, except as otherwise agreed by the Administrative Agent in its Permitted Discretion, have been endorsed to the Administrative Agent or an agent acting on its behalf or (ii) such Inventory is evidenced by a non-negotiable document of title in form reasonably acceptable to the Administrative Agent, or other shipping document reasonably acceptable to the Administrative Agent, which names a Qualified Loan Party as consignee;

(d)        (i) each relevant freight carrier, freight forwarder, customs broker, shipping company or other Person in possession of such Inventory and/or the documents relating to such Inventory, in each case, as reasonably requested by Administrative Agent, shall have entered into a Customs Broker Agreement and (ii) as reasonably requested by the Administrative Agent, the documents relating to such Inventory shall be in the possession of the Administrative Agent or an agent (or sub-agent) acting on its behalf;

(e)        such Inventory is insured in accordance with the provisions of this Agreement and the other Loan Documents, including marine cargo insurance;

(f)        such Inventory is subject, to the reasonable satisfaction of the Administrative Agent, to a valid and perfected first priority Lien in favor of the Collateral Agent pursuant to the relevant Security Document (as and to the extent provided therein);

(g)        such Inventory is not excluded from the definition of "Eligible Inventory" (except solely pursuant to clauses (c), (e), (i), (m) and (p) thereof); and

(h)        such Inventory that the Administrative Agent has determined, in its Permitted Discretion, not to exclude from Eligible In-Transit Inventory.

provided that the Administrative Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" (or take Availability Reserves in respect thereof) (i) in the event the Administrative Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Administrative Agent to arise which may otherwise adversely impact the value of such Inventory or the ability of the Administrative Agent to realize upon such Inventory or (ii) in the event that the Borrowers have commenced or is likely to commence a full-chain liquidation; provided, further, however, that the exclusion of Inventory based on the discretionary power afforded to the Administrative Agent shall become effectively immediately upon notice to the Borrower Representative. Eligible In-Transit Inventory shall not include Inventory accounted for as "in transit" by the applicable Qualified Loan Party by virtue of such Inventory's being in transit between the Loan Parties' locations or in storage trailers at Loan Parties' locations; rather, such Inventory shall be treated as "Eligible Inventory" if it satisfies the conditions therefor.

"Eligible Inventory": all Inventory of the Qualified Loan Parties, except for any Inventory:

(a)        that is damaged or unfit for sale;

(b)        that is not of a type held for sale by any of the Qualified Loan Parties in the ordinary course of business as is being conducted by each such party;

(c)        that is not subject to a valid and perfected first priority Lien in favor of the Collateral Agent, as applicable, pursuant to a Security Document (as and to the extent provided therein);

(d)        that is not owned by any of the Qualified Loan Parties;

(e)        other than In-Transit Inventory, that is not located on premises owned or leased by any of the Qualified Loan Parties, or that is stored with a bailee, warehouseman, processor or similar Person, unless (i) the Administrative Agent has given its prior consent thereto, (ii) a Collateral Access Agreement has been delivered to the Administrative Agent, or (iii) Availability Reserves for rent with respect to such premises or storage reasonably satisfactory to the Administrative Agent in its Permitted Discretion, but in no event to exceed the aggregate of two months' rent with respect to each such location, have been established with respect thereto;

(f)        that is placed on consignment;

(g)        that consists of display items, samples or packing or shipping materials, packaging, manufacturing supplies or replacement or spare parts not considered for sale in the ordinary course of business;

(h)        that consists of goods which have been returned by the buyer, other than goods that are undamaged or that are resaleable in the normal course of business;

(i)        that does not comply in all material respects with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents;

(j)        that consists of Materials of Environmental Concern that can be transported or sold only with licenses that are not readily available;

(k)        that is covered by negotiable document of title, unless such document has been delivered to the Administrative Agent;

(l)        that is bill and hold Inventory;

(m)        that is located outside the United States of America (it being understood that, for purposes of this clause (m), "United States of America" includes Puerto Rico and all other territories and possessions of the United States);

(n)        that is excess, obsolete, unsalable, seconds, damaged or unfit for sale;

(o)        that is In-Transit Inventory; and

(p)        that the Administrative Agent has determined, in its Permitted Discretion, to exclude from Eligible Inventory.

provided that the Administrative Agent's right, in its Permitted Discretion, to exclude particular Inventory from the Borrowing Base, shall become effective immediately upon notice thereof to the Borrower Representative.   Any Inventory of the Qualified Loan Parties that is not Eligible Inventory shall nevertheless be part of the Collateral as and to the extent provided in the Security Documents.

"Eligible Letter of Credit Inventory":   Letter of Credit Inventory owned or to be owned by a Qualified Loan Party and which is (a) when applicable, fully insured and subject a valid and perfected first priority Lien in favor of the Collateral Agent pursuant to the relevant Security Document (as and to the extent provided therein), (b) subject to a Letter of Credit with an expiry date that is not more than 30 days from the date of the most recently delivered Borrowing Base Certificate and (c) Inventory that, when received, would otherwise satisfy all of the requirements of Eligible Inventory hereunder.   For the avoidance of doubt, Eligible Letter of Credit Inventory is without duplication of Eligible In-Transit Inventory.

"Environmental Costs":   any and all costs or expenses (including attorney's and consultant's fees, investigation and laboratory fees, response costs, court costs and litigation expenses, fines, penalties, damages, settlement payments, judgments and awards), of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or in any way relating to, any actual or alleged violation of, noncompliance with or liability under any Environmental Laws.   Environmental Costs include any and all of the foregoing, without regard to whether they arise out of or are related to any past, pending or threatened proceeding of any kind.

"Environmental Laws":   any and all U.S. or foreign, federal, state, provincial, territorial, local or municipal laws, rules, orders, enforceable guidelines and orders-in-council, regulations, statutes, ordinances, codes, decrees, and such requirements of any Governmental Authority properly promulgated and having the force and effect of law or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health (as it relates to exposure to Materials of Environmental Concern) or the environment, as have been, or now or at any relevant time hereafter are, in effect.

"Environmental Permits":   any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any Environmental Law.

"ERISA":   the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Reorganization":   with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Adjusted LIBOR Rate.

"Event of Default":  any of the events specified in Subsection 9.1, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Excess Availability":  as of any date of determination, the amount by which (a) Availability exceeds (b) the Aggregate Lender Exposure at such time.

"Exchange Act":  the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Accounts":  (a) bank accounts the balance of which consists exclusively of and used exclusively for (i) withheld income taxes and federal, state or local employment taxes in such amounts as are required in the reasonable judgment of the Parent Borrower to be paid to the Internal Revenue Service or state or local government agencies within the following two months with respect to employees of any of the Loan Parties and (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. Sec. 2510.3-102 on behalf of or for the benefit of employees of one or more Loan Parties, (b) bank accounts constituting (and the balance of which consists solely of funds set aside to be used in connection with) taxes bank accounts and payroll bank accounts and (c) the DIP Term Loan Borrowing Account.

"Excluded Subsidiary": each of the Subsidiaries of the Parent Borrower set forth on Schedule 1.1(d); provided that, notwithstanding the foregoing, any Subsidiary that Guarantees the payment of the Pre-Petition Term Loan Credit Agreement, the DIP Term Loan Credit Agreement or the Pre-Petition Senior Notes shall not be an Excluded Subsidiary.

"Excluded Swap Obligation" with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes":  (a) any Taxes measured by or imposed upon the net income of any Agent or Lender or its applicable lending office, or any branch or affiliate thereof, and all franchise Taxes, branch Taxes, Taxes on doing business or Taxes measured by or imposed upon the overall capital or net worth of any such Agent or Lender or its applicable lending office, or any branch or affiliate thereof, in each case imposed:  (i) by the jurisdiction under the laws of which such Agent or Lender, applicable lending office, branch or affiliate is organized or is located, or in which its principal executive office is located, or any nation within which such jurisdiction is located or any political subdivision thereof; or (ii) by reason of any connection between the jurisdiction imposing such Tax and such Agent or Lender, applicable lending office, branch or affiliate other than a connection arising solely from such Agent or Lender having executed, delivered or performed its obligations under, or received payment under or enforced, this Agreement or any Notes, and (b) any Tax imposed by FATCA.  For purposes of this definition, the term "Lender" includes any Issuing Lender.

"Existing Letters of Credit":  Letters of Credit issued prior to, and outstanding on, the Closing Date and disclosed on Schedule 1.1(e).

"<u>Extension of Credit</u>":  as to any Lender, the making of a Loan, and with respect to an Issuing Lender, the issuance of a Letter of Credit.

"<u>Facility</u>":  each of the Commitments and the Extensions of Credit made hereunder.

"<u>Fair Market Value</u>":  with respect to any asset or property, the fair market value of such asset or property as determined in good faith by the Board of Directors, whose determination shall be conclusive.

"<u>FATCA</u>":  Sections 1471 through 1474 of the Code as in effect on the Closing Date (and any amended or successor provisions that are substantially comparable), and any regulations or other administrative authority promulgated thereunder and any agreements entered into pursuant to Section 1471(b)(1) of the Code as in effect on the Closing Date (or any amended or successor provisions that are substantially comparable).

"<u>Federal Funds Rate</u>":  for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"<u>Fee Letters</u>":  collectively, the Agent Fee Letter and the Closing Fee Letter.

"<u>Final Order</u>":  collectively, the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Administrative Agent, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"<u>Financial Advisor</u>":  a financial advisor reasonably acceptable to the Administrative Agent. For the avoidance of doubt, [_____] shall be a reasonably acceptable Financial Advisor.

"<u>Financing Lease</u>":  any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee.  The Stated Maturity of any Indebtedness under a Financing Lease shall be the scheduled date under the terms thereof of the last payment of rent or any other amount due under such Financing Lease.

"<u>Fiscal Quarter</u>":  successive 13-week periods (each such 13 week period to begin on a Sunday and end on a Saturday) of the Parent Borrower of any Fiscal Year; <u>provided</u> that for any 53-week Fiscal Year, the last Fiscal Quarter of such Fiscal Year shall consist of the successive 14-week period from and including the first day after the third Fiscal Quarter of such Fiscal Year through and including the last day of such Fiscal Year.

"<u>Fiscal Year</u>":  the annual accounting period of the Parent Borrower ending on the Saturday closest to December 31 of any calendar year calculated in accordance with the fiscal calendar of the Parent Borrower.

"<u>Fixed GAAP Date</u>":  the Closing Date, <u>provided</u> that at any time after the Closing Date, the Borrower Representative may by written notice to the Administrative Agent elect to change the Fixed GAAP Date

to be the date specified in such notice, and upon such notice, the Fixed GAAP Date shall be such date for all periods beginning on and after the date specified in such notice.

"Fixed GAAP Terms": (a) all defined terms in this Agreement to the extent used in or relating to any of the foregoing definitions, and all ratios and computations based on any of the foregoing definitions, and (b) any other term or provision of this Agreement or the Loan Documents that, at the Borrower Representative's election, may be specified by the Borrower Representative by written notice to the Administrative Agent from time to time.

"Foreign Pension Plan":  a registered pension plan which is subject to applicable pension legislation other than ERISA or the Code, which a Restricted Subsidiary sponsors or maintains, or to which it makes or is obligated to make contributions.

"Foreign Plan":  each Foreign Pension Plan, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement whether oral or written, funded or unfunded, sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the United States of America, by the Parent Borrower or any of its Restricted Subsidiaries, other than any such plan, fund, program, agreement or arrangement sponsored by a Governmental Authority.

"Foreign Subsidiary":  any Subsidiary of the Parent Borrower which is organized and existing under the laws of any jurisdiction outside of the United States of America or that is a Foreign Subsidiary Holdco. Any subsidiary of the Parent Borrower which is organized and existing under the laws of Puerto Rico or any other territory of the United States of America shall be a Foreign Subsidiary.

"Foreign Subsidiary Holdco":  any Restricted Subsidiary of the Parent Borrower, so long as such Restricted Subsidiary has no material assets other than securities or Indebtedness of one or more Foreign Subsidiaries (or Subsidiaries thereof), and intellectual property relating to such Foreign Subsidiaries (or Subsidiaries thereof) and other assets (including cash, Cash Equivalents and Temporary Cash Investments) relating to an ownership interest in any such securities, Indebtedness, intellectual property or Subsidiaries.  Any Subsidiary which is a Foreign Subsidiary Holdco that fails to meet the foregoing requirements as of the last day of the period for which consolidated financial statements of the Parent Borrower are available shall continue to be deemed a "Foreign Subsidiary Holdco" hereunder until the date that is 60 days following the date on which such annual or quarterly financial statements were required to be delivered pursuant to Subsection 7.1 with respect to such period.

"Full Payment":  with respect to any Obligations (other than contingent indemnification obligations for which a claim has not been asserted), (a) the full and complete cash payment thereof, including any interest, fees and other charges accruing during the Chapter 11 Cases (whether or not allowed in the proceeding); and (b) if such Obligations are L/C Obligations, such Obligations are cash collateralized (or a standby letter of credit acceptable to the Administrative Agent in its reasonable discretion is delivered in the amount of required cash collateral). No Loans shall be deemed to have been paid in full until all Commitments related to such Loans have expired or been terminated.

"GAAP":  generally accepted accounting principles in the United States of America as in effect on the Fixed GAAP Date (for purposes of the Fixed GAAP Terms) and as in effect from time to time (for all other purposes of this Agreement), including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession, and subject to the following sentence.  If at any time the SEC permits or requires U.S. domiciled companies subject to the reporting requirements of the Exchange Act to use IFRS in lieu of GAAP for financial reporting purposes, the Parent Borrower may elect by written notice to the Administrative Agent to so use IFRS in lieu of GAAP and, upon any such notice, references herein to GAAP shall thereafter be construed to mean (a) for periods beginning on and after the date specified in such notice, IFRS as in effect on the date specified in such notice (for purposes of the Fixed GAAP Terms) and as in effect from time to time (for all other purposes of this Agreement) and (b) for prior periods, GAAP as defined in the first sentence of

this definition.  All ratios and computations based on GAAP contained in this Agreement shall be computed in conformity with GAAP.

"General Intangibles":  general intangibles (as such term is defined in Article 9 of the UCC), including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, patents, trade names, trade secrets, trademarks, servicemarks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, insurance premium rebates, tax refunds, and tax refund claims, and any and all supporting obligations in respect thereof, and any other personal property other than Accounts, Deposit Accounts, goods, Investment Property, and Negotiable Collateral.

"Governmental Authority":  the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantee":  any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantee and Collateral Agreement":  the ABL Guarantee and Collateral Agreement delivered to the Collateral Agent as of the date hereof, substantially in the form of Exhibit B hereto, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any such obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower Representative in good faith.

"Guarantors":  the collective reference to Holdings, DB Parent, Investor and each Subsidiary Guarantor; individually, a "Guarantor".

"Hedging Affiliate":  as defined in the ABL/Term Loan Intercreditor Agreement.

"Hedging Agreement":  as defined in the ABL/Term Loan Intercreditor Agreement.

"Hedging Arrangement":  as defined in Subsection 8.9.

"Hedging Party":  any Hedging Affiliate party to an Interest Rate Protection Agreement, Hedging Agreement or other Permitted Hedging Arrangement.

"Holdings":  DB Midco, Inc., a Delaware corporation.

"IFRS":  International Financial Reporting Standards and applicable accounting requirements set by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants, or any successor to either such board, or the SEC, as the case may be), as in effect from time to time.

"Indebtedness":  of any Person at any date, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property (other than trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), which purchase price is due more than one year after the date of placing such property in final service or taking final delivery and title thereto, (b) any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument, (c) all obligations of such Person under Financing Leases, (d) all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments issued or created for the account of such Person, (e) for purposes of Subsection 9.1(e) only, all obligations of such Person in respect of interest rate protection agreements, interest rate futures, interest rate options, interest rate caps and any other interest rate hedge arrangements, (f) all indebtedness or obligations of the types referred to in the preceding clauses (a) through (e) to the extent secured by any Lien on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof and (g) Guarantee Obligations of such Person in respect of any Indebtedness of the type described in the preceding clauses (a) through (f).

"Indemnified Liabilities":  as defined in Subsection 11.5.

"Indemnitee":  as defined in Subsection 11.5.

"Individual Lender Exposure":  of any Revolving Credit Lender, at any time, the sum of (a) the aggregate principal amount of all Revolving Credit Loans made by such Lender then outstanding, (b) the sum of such Lender's Commitment Percentage in each then outstanding Letter of Credit multiplied by the sum of the Stated Amount of the respective Letters of Credit and any Unpaid Drawings relating thereto and (c) such Lender's Commitment Percentage of the Swingline Loans then outstanding.

"Information Certificate":  an Information Certificate substantially in the form of Exhibit C attached hereto.

"Initial Approved Budget":  as defined in Subsection 7.4(a).

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property":  as defined in Subsection 5.9.

"Intercreditor Acknowledgment":  that certain Acknowledgment and Agreement, dated as of the date hereof, by and among the Administrative Agent, the Prior Agent, the DIP Term Loan Agent, and the Prior Term Loan Agent, and acknowledged by the Loan Parties.

"Interest Payment Date":  (a) as to any ABR Loan, the first calendar day after the end of each calendar month to occur while such Loan is outstanding, and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, and (c) as to any Eurodollar Loan having an Interest Period longer than three months, (i) each day which is three months, or a

whole multiple thereof, after the first calendar day of such Interest Period and (ii) the last day of such Interest Period.

"Interest Period": with respect to any Eurodollar Loan:

(a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two or three months thereafter, as selected by the Borrower Representative in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and

(b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months (or if agreed to by each affected Lender, nine months, 12 months or a shorter period) thereafter, as selected by the Borrower Representative by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) any Interest Period that would otherwise extend beyond the Termination Date shall (for all purposes other than Subsection 4.12) end on the Termination Date;

(iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(iv) the Borrower Representative shall select Interest Periods so as not to require a scheduled payment of any Eurodollar Loan during an Interest Period for such Loan.

"Interest Rate Protection Agreement": with respect to any Person, any interest rate protection agreement, future agreement, option agreement, swap agreement, cap agreement, collar agreement, hedge agreement or other similar agreement or arrangement (including derivative agreements or arrangements), as to which such Person is a party or a beneficiary.

"Interim Order":, collectively, the order of the Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers and Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"In-Transit Inventory": Inventory located outside of the United States or in transit within or outside of the United States to a Qualified Loan Party from vendors and suppliers that has not yet been received into a distribution center or store of such Person.

"Inventory": inventory (as such term is defined in Article 9 of the UCC).

"Investment": in any Person by any other Person, any direct or indirect advance, loan or other extension of credit (other than to customers, dealers, licensees, franchisees, suppliers, consultants, directors, officers or employees of any Person in the ordinary course of business) or capital contribution (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) to, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such Person.

Guarantees shall not be deemed to be Investments.  The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced (at the Borrower Representative's option) by any dividend, distribution, interest payment, return of capital, repayment or other amount or value received in respect of such Investment.

"Investment Company Act":  the Investment Company Act of 1940, as amended from time to time.

"Investment Grade Rating":  a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or any equivalent rating by any other nationally recognized rating agency.

"Investment Grade Securities":  (i) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents); (ii) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Parent Borrower and its Subsidiaries; (iii) investments in any fund that invests exclusively in investments of the type described in clauses (i) and (ii), which fund may also hold immaterial amounts of cash pending investment or distribution; and (iv) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"Investment Property":  investment property (as such term is defined in Article 9 of the UCC) and any and all supporting obligations in respect thereof.

"Investor":  DB Investors, Inc., a Delaware corporation, and any successor in interest thereto.

"ISP":  the International Standby Practices (1998), International Chamber of Commerce Publication No. 590.

"Issuing Lender":  as the context may require, (a) Bank of America, N.A. in its capacity as issuer of Letters of Credit issued by it; (b) any other Lender that may become an Issuing Lender pursuant to Subsections 3.10 and 3.11 in its capacity as issuer of Letters of Credit issued by such Lender; or (c) collectively, all of the foregoing.

"Joint Venture Agreements":  collectively, (a) the Joint Venture and Shareholders Agreement, dated May, 2001, by and among DBI, Elemax Limited (a Hong Kong company), Soundstone Limited (a British Virgin Islands company), Wingreat Limited (a Hong Kong company) and Mordechai (Moty) Kafry, (b) the Joint Venture and Shareholders Agreement, dated August, 1995, by and among David's Bridal Corporation (a Pennsylvania company), Addwood Limited (a Hong Kong company), Fillberg Limited (a Hong Kong company) and Mordechai (Moty) Kafry, (c) the Joint Venture and Shareholders Agreement, dated July 1, 1998, by and among DBI, Pretty Fashions Inc. (a Taiwanese company), Elemax Limited (a Hong Kong company), Multihulls Trading Limited (a Hong Kong company) and Maxtel Limited (a Hong Kong company) and (d) the Joint Venture and Shareholders Agreement, dated January 1, 2010, by and among DBI, The Bridge Holding Limited (a Hong Kong company), Soundstone Limited (a British Virgin Island company), Executive Management Limited (a Hong Kong company) and Mordechai (Moty) Kafry, in each case as amended, supplemented, waived or otherwise modified from time to time.

"Joint Ventures":  (a) Executive Management Limited, a limited company incorporated in Hong Kong, (b) Fillberg, Ltd., a limited company incorporated in Hong Kong, (c) Wingreat Limited, a limited company incorporated in Hong Kong and (d) Maxtel Limited, a limited company incorporated in Hong Kong.

"Judgment Conversion Date":  as defined in Subsection 11.8(a).

"Judgment Currency":  as defined in Subsection 11.8(a).

"L/C Disbursement":  as defined in Subsection 3.5(a).

"L/C Exposure":  at any time the aggregate principal amount at such time of the L/C Obligations. The L/C Exposure of any Revolving Credit Lender at any time shall equal its Commitment Percentage of the aggregate L/C Exposure at such time.

"L/C Fee Payment Date":  with respect to any Letter of Credit, the first calendar day after the end of each calendar month to occur after the Closing Date, to and including the first such day to occur on or after the date of expiry thereof; provided that if any L/C Fee Payment Date would otherwise occur on a day that is not a Business Day, such L/C Fee Payment Date shall be the immediately preceding Business Day.

"L/C Fees":  the fees and commissions specified in Subsection 3.3.

"L/C Obligations":  at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit which have not then been reimbursed pursuant to Subsection 3.5(a).

"L/C Request":  a letter of credit request in the form of Exhibit H attached hereto or, in such form as the applicable Issuing Lender may specify from time to time, requesting the Issuing Lender to issue a Letter of Credit.

"Lead Arranger":  Bank of America, N.A., in its capacity as Lead Arranger and Bookrunner under this Agreement.

"Lease Rejection Date":  the last day of the 120-day lease rejection/assumption period, as such period may be extended or shortened by the Court.

"Lease Reserve":  a reserve, in an amount established by the Administrative Agent in its reasonable credit judgment, in respect of (i) Inventory held at any leased Store locations intended to be closed with respect to which the lease therefor is or is intended to be terminated by the applicable Loan Party, or (ii) Inventory at leased Store locations with respect to which the lease has not been assumed commencing on the Lease Reserve Commencement Date, or with respect to any specific location, the date that is fourteen (14) weeks prior to the expiration of such period of time as shall have been consented to for rejection/assumption of such lease by the landlord for such location and approved by the Court, in each case in an amount determined by the Administrative Agent in its sole discretion.

"Lease Reserve Commencement Date":  the date that is fourteen (14) weeks prior to the Lease Rejection Date.

"Lender Default":  (a) the refusal (which may be given verbally or in writing and has not been retracted) or failure of any Lender (including any Agent in its capacity as Lender) to make available its portion of any incurrence of Loans or reimbursement obligations required to be made hereunder, which refusal or failure is not cured within two Business Days after the date of such refusal or failure, (b) the failure of any Lender (including any Agent in its capacity as Lender) to pay over to the Administrative Agent, any Issuing Lender or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, (c) a Lender (including any Agent in its capacity as Lender) has notified the Parent Borrower or the Administrative Agent that it does not intend to comply with its funding obligations hereunder, (d) a Lender (including any Agent in its capacity as Lender) has failed, within 10 Business Days after request by the Administrative Agent, to confirm that it will comply with its funding obligations hereunder or (e) an Agent or a Lender has admitted in writing that it is insolvent or such Agent or Lender becomes subject to a Lender-Related Distress Event.

"Lender-Related Distress Event":  with respect to any Agent or Lender (each, a "Distressed Person"), a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such

Distressed Person to be, insolvent or bankrupt or become the subject of a Bail-In Action; <u>provided</u> that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Agent or Lender or any person that directly or indirectly controls such Agent or Lender by a Governmental Authority or an instrumentality thereof.

"<u>Lenders</u>":  the several banks and other financial institutions from time to time parties to this Agreement together with, in each case, any affiliate of any such bank or financial institution through which such bank or financial institution elects, by notice to the Administrative Agent and the Borrower Representative, to make any Revolving Credit Loans, Swingline Loans or Letters of Credit available to any Borrower, <u>provided</u> that for all purposes of voting or consenting with respect to (<u>a</u>) any amendment, supplementation or modification of any Loan Document, (<u>b</u>) any waiver of any of the requirements of any Loan Document or any Default or Event of Default and its consequences or (<u>c</u>) any other matter as to which a Lender may vote or consent pursuant to <u>Subsection 11.1</u> hereof, the bank or financial institution making such election shall be deemed the "Lender" rather than such affiliate, which shall not be entitled to so vote or consent.

"<u>Letter of Credit Inventory</u>":  Inventory the purchase of which is financed with Letters of Credit hereunder, (<u>a</u>) which Inventory does not constitute Eligible Inventory or Eligible In-Transit Inventory and for which no document of title has been issued and (<u>b</u>) which Inventory, when purchased, would otherwise constitute Eligible Inventory or Eligible In-Transit Inventory.

"<u>Letters of Credit</u>" or "<u>L/Cs</u>":  as defined in <u>Subsection 3.1(a)</u>.

"<u>LIBOR Rate</u>":  the per annum rate of interest (rounded upwards, if necessary, to the next 1/16th of one percent (1%) and in no event less than zero) determined by the Administrative Agent at or about 11:00 a.m. (London time) two Business Days prior to an interest period for a term equivalent to such period, equal the London Interbank Offered Rate, or comparable or successor rate approved by the Administrative Agent for the applicable currency, as published on the applicable Reuters screen page (or other commercially available source designated by the Administrative Agent from time to time); <u>provided</u>, that any comparable or successor rate shall be applied by the Administrative Agent, if administratively feasible, in a manner consistent with market practice.

"<u>LIBOR Screen Rate</u>" the LIBOR quote on the applicable screen page the Administrative Agent designates to determine LIBOR (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"<u>LIBOR Successor Rate</u>" as defined in <u>Section 4.7</u>.

"<u>LIBOR Successor Rate Conforming Changes</u>" as defined in <u>Section 4.7</u>.

"<u>Lien</u>":  any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"<u>Loan</u>":  a Revolving Credit Loan or a Swingline Loan, as the context shall require; collectively, the "<u>Loans</u>".

"<u>Loan Documents</u>":  this Agreement, any Notes, the L/C Requests, the ABL/Term Loan Intercreditor Agreement, the Intercreditor Acknowledgement, the Guarantee and Collateral Agreement, the Fee Letters, and any other Security Documents, each as amended, supplemented, waived or otherwise modified from time to time.

"<u>Loan Parties</u>":  Holdings, DB Parent, Investor, the Borrowers and the Subsidiary Guarantors; individually, a "<u>Loan Party</u>".

"<u>Macy's.com Agreement</u>":  the Marketing Agreement dated as of December 1, 2006 between Macys.com, Inc. and DBI.

"Mandatory Revolving Credit Loan Borrowing": as defined in Subsection 2.4(c).

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) of the Parent Borrower and its Restricted Subsidiaries taken as a whole (excluding (i) any matters publicly disclosed or disclosed to the Administrative Agent in writing prior to the filing of the Chapter 11 Cases, (ii) any matters disclosed in the schedules hereto, (iii) any matters disclosed in any first day pleadings or declarations, and (iv) the effect of filing the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the Chapter 11 Orders) or (b) the validity or enforceability as to any Loan Party party thereto of this Agreement or any of the other Loan Documents or the rights or remedies of the Agents and the Lenders under the Loan Documents, in each case taken as a whole.

"Materials of Environmental Concern":  any pollutants, contaminants, hazardous or toxic substances or materials or wastes defined, listed, or regulated as such in or under, or which may give rise to liability under, any applicable Environmental Law, including gasoline, petroleum (including crude oil or any fraction thereof), petroleum products or by-products, asbestos and polychlorinated biphenyls.

"Men's Wearhouse Agreement":  the Marketing Agreement dated as of January 31, 2007 between DBI and The Men's Wearhouse, Inc.

"Moody's":  as defined in the definition of "Cash Equivalents" in this Subsection 1.1.

"Most Recent Four Quarter Period":  the four Fiscal Quarter period of the Parent Borrower ending on the last day of the most recently completed Fiscal Year or Fiscal Quarter for which financial statements of the Parent Borrower have been (or have been required to be) delivered under Subsection 7.1(a).

"MTM":  as defined in the definition of "Designated Hedging Reserves" in this Subsection 1.1.

"Multiemployer Plan":  a Plan which is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Negotiable Collateral":  letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper), and any and all supporting obligations in respect thereof.

"Net Orderly Liquidation Value":  the orderly liquidation value (net of costs and expenses estimated to be incurred in connection with such liquidation) of the Qualified Loan Parties' Inventory, that is estimated to be recoverable in an orderly liquidation of such Inventory expressed as a percentage of the net book value thereof, such percentage to be as determined from time to time by reference to the most recent Inventory appraisal completed by a qualified third-party appraisal company (approved by the Administrative Agent in its Permitted Discretion) delivered to the Administrative Agent.

"Net Proceeds":  with respect to any new public or private issuance or sale of any securities, any capital contribution (whether of property or assets, including cash) or any incurrence of Indebtedness, an amount equal to the gross proceeds in cash and Cash Equivalents (or with respect to capital contributions of non-cash property or assets, the Fair Market Value) of such issuance, sale or contribution net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions, and brokerage, consultant and other fees actually incurred in connection with such issuance, sale or contribution and net of taxes paid or payable as a result, or in respect, thereof.

"Non-Consenting Lender":  as defined in Subsection 11.1(f).

"Non-Defaulting Lender":  any Lender other than a Defaulting Lender.

"Non-Excluded Taxes":  all Taxes other than Excluded Taxes.

"<u>Non-Loan Party</u>":  each Subsidiary of the Parent Borrower that is not a Loan Party.

"<u>Non-Wholly Owned Subsidiary</u>":  each Subsidiary of the Parent Borrower that is not a Wholly Owned Subsidiary.

"<u>Notes</u>":  the collective reference to the Revolving Credit Notes and the Swingline Note.

"<u>Obligation Currency</u>":  as defined in <u>Subsection 11.8(a)</u>.

"<u>Obligations</u>":  obligations of the Parent Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of ($\underline{i}$) the principal of and premium, if any, and interest (including interest accruing during (or would accrue but for) the pendency of any bankruptcy, insolvency, receivership, Bail-In Action or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, ($\underline{ii}$) each payment required to be made in respect of any Letter of Credit, when and as due, including payments in respect of Reimbursement Obligations and interest thereon, ($\underline{iii}$) all obligations under Cash Management Arrangements, Designated Cash Management Agreements, Bank Products Agreements, Hedging Agreements, Hedging Arrangements and Designated Hedging Agreements, and ($\underline{iv}$) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership, Bail-In Action or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Parent Borrower and the other Loan Parties under this Agreement and the other Loan Documents.

"<u>OFAC</u>": the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Order</u>": as the context may require, the Interim Order or the Final Order.

"<u>Organizational Documents</u>":  with respect to any Person, (<u>a</u>) the articles of incorporation, certificate of incorporation or certificate of formation (or the equivalent organizational documents) of such Person and (<u>b</u>) the bylaws or operating agreement (or the equivalent governing documents) of such Person.

"<u>Other Representatives</u>": Bank of America, N.A., as Lead Arranger.

"<u>Parent Borrower</u>":  as defined in the Preamble hereto.

"<u>Parent Entity</u>":  any of Investor, DB Parent, Holdings, any Other Parent, and any other Person that is a Subsidiary of Investor, DB Parent, Holdings or any Other Parent and of which the Parent Borrower is a Subsidiary.  As used herein, "<u>Other Parent</u>": a Person of which the Parent Borrower becomes a Subsidiary after the Closing Date, <u>provided</u> that either (<u>x</u>) immediately after the Parent Borrower first becomes a Subsidiary of such Person, more than 50.0% of the Voting Stock of such Person shall be held by one or more Persons that held more than 50.0% of the Voting Stock of a Parent Entity of the Parent Borrower immediately prior to the Parent Borrower first becoming such Subsidiary or (<u>y</u>) such Person shall be deemed not to be an Other Parent for the purpose of determining whether a Change of Control shall have occurred by reason of the Parent Borrower first becoming a Subsidiary of such Person.

"<u>Participant</u>":  as defined in <u>Subsection 11.6(c)(i)</u>.

"<u>Participant Register</u>":  as defined in <u>Subsection 11.6(b)(v)</u>.

"<u>Patriot Act</u>":  as defined in <u>Subsection 11.18</u>.

"<u>Payment Intangible</u>" has the meaning given to such term in Article 9 of the UCC.

"<u>PBGC</u>":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

"<u>Permitted Discretion</u>":  the commercially reasonable judgment of the Administrative Agent exercised in good faith in accordance with customary business practices for comparable asset-based lending transactions, as to any factor which the Administrative Agent reasonably determines:  (<u>a</u>) will or could be expected to adversely affect in any material respect the value of any Collateral, the enforceability or priority of the applicable Agent's Liens thereon or the amount which any Agent, the Lenders or any Issuing Lender would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of any Collateral,  (<u>b</u>) is evidence that any collateral report or financial information delivered to the Administrative Agent by any Person on behalf of the applicable Borrower is incomplete, inaccurate or misleading in any material respect, (<u>c</u>) creates or could reasonably be expected to create an Event of Default, or (<u>d</u>) may increase the likelihood that the Secured Parties would not receive timely payment in full in cash for all of the Obligations.  In exercising such judgment, the Administrative Agent may consider, without duplication, such factors already included in or tested by the definition of Eligible Inventory, Eligible In-Transit Inventory, Eligible Letter of Credit Inventory, Eligible Accounts or Eligible Credit Card Receivables, as well as any of the following: (<u>i</u>) changes after the Closing Date in any material respect in demand for, pricing of, or product mix of Inventory; (<u>ii</u>) changes after the Closing Date in any material respect in any concentration of risk with respect to Accounts; and (<u>iii</u>) any other factors arising after the Closing Date that change in any material respect the credit risk of lending to the Borrowers on the security of the Collateral.

"<u>Permitted Hedging Arrangement</u>":  as defined in <u>Subsection 8.9</u>.

"<u>Permitted Indebtedness</u>":  as defined in <u>Subsection 8.12</u>.

"<u>Permitted Investments</u>":

(a)     Investments in accounts, payment intangibles and chattel paper (each as defined in the UCC), notes receivable, extensions of trade credit and similar items arising or acquired in the ordinary course of business consistent with the past practice of the Parent Borrower and its Restricted Subsidiaries;

(b)     Investments in cash, Cash Equivalents, Temporary Cash Investments and Investment Grade Securities;

(c)     Investments existing or made pursuant to legally binding written commitments in existence on the Closing Date and set forth on <u>Schedule 1.1(f)</u> and Investments in any Joint Venture made pursuant any Joint Venture Agreement as in effect on the Closing Date, in each case, solely to the extent reflected in the Approved Budget;

(d)     (i) Investments by any Loan Party in any other Loan Party (other than Holdings, DB Parent, or Investor); provided, however, that if any such Investment is in the form of intercompany Indebtedness, such Indebtedness shall not be secured by any Lien and (ii) Investments in Holdings, DB Parent, or Investor in amounts and for purposes for which dividends are permitted under Subsection 8.2;

(e)     Investments received in settlement amounts due to the Parent Borrower or any Restricted Subsidiary of the Parent Borrower effected in the ordinary course of business;

(f)     Investments by any Non-Loan Party in any other Non-Loan Party;

(g)     Solely to the extent reflected in the Approved Budget, Investments by Loan Parties in any Non-Loan Parties; provided, however, that the aggregate outstanding amount at any time of all intercompany Investments made pursuant to this clause (g) during the Chapter 11 Cases shall not exceed $50,000;

(h)     Investments by any Non-Loan Party in any Loan Party (other than Holdings, DB Parent, or Investor); provided, however, that if any such Investment is in the form of intercompany Indebtedness, such Indebtedness shall not be secured by any Lien;

(i)     loans and advances (and guarantees of loans and advances by third parties) made to officers, directors or employees of any Parent Entity or Holdings, the Parent Borrower or any of its Restricted

Subsidiaries, and Guarantee Obligations of the Parent Borrower or any of its Restricted Subsidiaries in respect of obligations of officers, directors or employees of any Parent Entity, Holdings, the Parent Borrower or any of its Restricted Subsidiaries, in each case (i) in the ordinary course of business (other than in connection with the Management Subscription Agreement), (ii) existing on the Closing Date and described on Schedule 1.1(f), (iii) made after the Closing Date for relocation expenses in the ordinary course of business, (iv) made for other purposes in an aggregate principal amount not to exceed $50,000 at any time or (v) relating to indemnification or reimbursement of any officers, directors or employees in respect of liabilities relating to their serving in any such capacity; provided, however, that (i) with respect to any employee of any Parent Entity, no such loans or advances shall be permitted unless the activities of such employee relate primarily to the Parent Borrower and its Restricted Subsidiaries and (ii) any such amounts permitted under this clause (i) shall be reflected in the Approved Budget;

(j)        Investments in the nature of pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "Customary Permitted Liens" or made in connection with Liens permitted under Subsection 8.13; or

(k)        Investments representing evidences of Indebtedness, securities or other property received from another Person by the Parent Borrower or any of its Restricted Subsidiaries in connection with any bankruptcy proceeding, Bail–In Action or other reorganization of such other Person or as a result of foreclosure, perfection or enforcement of any Lien or exchange for evidences of Indebtedness, securities or other property of such other Person held by the Parent Borrower or any of its Restricted Subsidiaries; provided that any such securities or other property received by the Parent Borrower or any other Loan Party is pledged to the Collateral Agent for the benefit of the Secured Parties pursuant to the Security Documents as and to the extent required thereby.

"Permitted Liens":  as defined in Subsection 8.13.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date": as defined in the Recitals.

"Plan":  at a particular time, any employee benefit plan which is covered by ERISA and in respect of which the Parent Borrower or a Commonly Controlled Entity is an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization": a plan of reorganization in form and substance satisfactory to the Administrative Agent in all respects and consented to by the Administrative Agent, confirmed by an order (in form and substance satisfactory to the Administrative Agent) of the Court under the Chapter 11 Cases (i), containing a provision for termination of the Commitments and repayment in full in cash of all of the Obligations and the Prior Lender Obligations on or before the effective date of such plan, (ii) containing a release in favor of the Agents and the Lenders and their respective affiliates, (iii) containing provisions with respect to the settlement or discharge of all claims and other debts and liabilities, and such Plan of Reorganization shall be in full force and effect and shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of the Administrative Agent and (iv) such other terms as the Administrative Agent may require.

"Platform": Intralinks, SyndTrak Online or any other similar electronic distribution system.

"Post-Petition":  the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"Pre-Petition":  the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Credit Agreement": as defined in the Recitals.

"Pre-Petition Indemnity Account": an amount equal to $[250,000][4] for the purpose of securing contingent indemnification obligations and other contingent claims arising under the Pre-Petition Credit Agreement, the other Pre-Petition Loan Documents or otherwise in respect of Prior Lender Obligations in the event the Prior Agent and the Prior Lenders have not received releases and discharges of claims and liabilities with respect to such obligations, in form and substance reasonably satisfactory to the Prior Agent and the Prior Lenders, at the time of payment in full in cash of all Prior Lender Obligations other than contingent obligations relating thereto, which will be funded as provided in the Order.

"Pre-Petition Loan Documents": the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Senior Notes":  7.75% Senior Notes due 2020 of the Parent Borrower issued pursuant to the Pre-Petition Senior Notes Indenture, as may be amended, supplemented, waived or otherwise modified from time to time.

"Pre-Petition Senior Notes Debt Documents":  the Pre-Petition Senior Notes Indenture and all other instruments, agreements and other documents evidencing or governing the Pre-Petition Senior Notes or providing for any guarantee, obligation, security or other right in respect thereof.

"Pre-Petition Senior Notes Indenture": the Indenture dated as of October 11, 2012, under which the Pre-Petition Senior Notes are issued, as the same may be amended, supplemented, waived or otherwise modified from time to time.

 "Pre-Petition Term Loan Credit Agreement": the Credit Agreement dated as of October 11, 2012, by and among the Parent Borrower, the lenders party thereto and Bank of America, N.A., as Administrative Agent and Collateral Agent, as amended or otherwise modified prior to the Closing Date in accordance with the terms of the Pre-Petition Credit Agreement and the ABL/Term Loan Intercreditor Agreement.

"Preferred Stock":  as applied to the Capital Stock of any corporation or company, Capital Stock of any class or classes (however designated) that by its terms is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation or company, over Capital Stock of any other class of such corporation or company.

 "Prior Agent": Bank of America, N.A., in its capacities as administrative agent and collateral agent under any of the Pre-Petition Loan Documents.

"Priority Carve-Out": an amount equal to the sum of: [the ABL Professional Fee Carve Out Cap (as defined in the applicable Order), plus the Post-Carve Out Trigger Notice Cap (as defined in the applicable Order), plus the amounts set forth in clauses [_____] of paragraph [_____] of the Interim Order (or the Final Order, when applicable).]

"Prior L/C Obligations": Prior Lender Obligations in respect of principal of "L/C Obligations" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prior Lender Obligations": all "Obligations" as defined in the Pre-Petition Credit Agreement.

"Prior Lenders": as defined in the Recitals.

"Prior Revolving Credit Loans": Prior Lender Obligations in respect of principal of "Revolving Credit Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees and other sums payable in respect thereof under the Pre-Petition Loan Documents.

---

[4] To be confirmed.

"Prior Term Loan Agent": Bank of America, N.A., as agent under the Pre-Petition Term Loan Credit Agreement.

"Prior Term Loan Lenders": the lenders under the Pre-Petition Term Loan Credit Agreement.

"Prior Week": as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified ECP Guarantor": in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Loan Party": each Borrower and each Subsidiary Guarantor.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Parent Borrower or any of its Restricted Subsidiaries.

"Register": as defined in Subsection 11.6(b)(c)(iv).

"Regulation D": Regulation D of the Board as in effect from time to time.

"Regulation S-X": Regulation S-X promulgated by the SEC, as in effect on the Closing Date.

"Regulation T": Regulation T of the Board as in effect from time to time.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Regulation X": Regulation X of the Board as in effect from time to time.

"Reimbursement Obligations": the obligation of the applicable Borrower to reimburse the applicable Issuing Lender pursuant to Subsection 3.5(a) for amounts drawn under the applicable Letters of Credit.

"Related Parties": with respect to any Person, such Person's affiliates and the partners, officers, directors, trustees, employees, employees, shareholders, members, attorneys and other advisors, agents and controlling persons of such person and of such person's affiliates and "Related Party" shall mean any of them.

"Remedies Notice Period": as defined in the Interim Order (or Final Order, when applicable).

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the 30-day notice period is waived under Section 21, 22, 23, 24, 25, 27 or 28 of PBGC Regulation Section 4043 or any successor regulation thereto.

"Required Lenders": Lenders the sum of whose outstanding Commitments (or after the termination thereof, outstanding Individual Lender Exposures) represent a majority of aggregate Commitments (or after the termination thereof, the sum of the Individual Lender Exposures) at such time; provided that the Commitments (or Individual Lender Exposures) held or deemed held by Defaulting Lenders shall be excluded for purposes of making a determination of Required Lenders.

"<u>Required Milestones</u>": "Milestones" as defined in the Interim Order (or the Final Order, when applicable).

"<u>Requirement of Law</u>":  as to any Person, the Organizational Documents of such Person, and any law, statute, ordinance, code, decree, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its material property or to which such Person or any of its material property is subject, including laws, ordinances and regulations pertaining to zoning, occupancy and subdivision of real properties; <u>provided</u> that the foregoing shall not apply to any non-binding recommendation of any Governmental Authority.

"<u>Responsible Officer</u>":  as to any Person, any of the following officers of such Person:  (<u>a</u>) the chief executive officer or the president of such Person and, with respect to financial matters, the chief financial officer, the treasurer, the controller or the Vice President–Finance of such Person, (<u>b</u>) any vice president of such Person or, with respect to financial matters, any assistant treasurer or assistant controller of such Person, in each case who has been designated in writing to the Administrative Agent or the Collateral Agent as a Responsible Officer by such chief executive officer or president of such Person or, with respect to financial matters, by such chief financial officer of such Person, (<u>c</u>) with respect to <u>Subsection 7.7</u> and without limiting the foregoing, the general counsel of such Person and (<u>d</u>) with respect to ERISA matters, the senior vice president–human resources (or substantial equivalent) of such Person.

"<u>Restricted Payment</u>":  any dividend or any other payment whether direct or indirect (other than dividends payable solely in common stock of the Parent Borrower or options, warrants or other rights to purchase common stock of the Parent Borrower) on, or any payment on account of, or any setting apart of assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any shares of any class of Capital Stock of the Parent Borrower (other than any acquisition of Capital Stock deemed to occur upon the exercise of options if such Capital Stock represents a portion of the exercise price thereof) or any warrants or options to purchase any such Capital Stock, whether now or hereafter outstanding, or any other distribution (other than (<u>x</u>) distributions payable solely in common stock of the Parent Borrower or (<u>y</u>) options, warrants or other rights to purchase common stock of the Parent Borrower) in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Parent Borrower.

"<u>Restricted Subsidiary</u>":  any Subsidiary of the Parent Borrower.

"<u>Restructuring Advisor</u>": a financial advisor reasonably acceptable to the Administrative Agent. For the avoidance of doubt, AlixPartners LLP shall be a reasonably acceptable Restructuring Advisor.

"<u>Restructuring Support Agreement</u>": that certain Restructuring Support Agreement, dated as of [_____, 2018] by and among the Loan Parties, the Prior Term Loan Lenders and the other creditors party thereto as "Restructuring Support Parties".

"<u>Restructuring Support Parties</u>": as defined in that certain Restructuring Support Agreement.

 "<u>Revolving Credit Facility</u>":  as defined in the Recitals.

"<u>Revolving Credit Lender</u>":  any Lender having a Commitment hereunder and/or a Revolving Credit Loan outstanding hereunder.

"<u>Revolving Credit Loan</u>":  a Loan made pursuant to <u>Subsection 2.1(a)</u>.

"<u>Revolving Credit Note</u>":  as defined in <u>Subsection 2.1(d)</u>.

"<u>Revolving Exposure</u>":  at any time the aggregate principal amount at such time of all outstanding Revolving Credit Loans.  The Revolving Exposure of any Revolving Credit Lender at any time shall equal its Commitment Percentage of the aggregate Revolving Exposure at such time.

"S&P": as defined in the definition of the term "Cash Equivalents" in this Subsection 1.1.

"Sale and Leaseback Transaction": any arrangement with any Person providing for the leasing by the Parent Borrower or any of its Restricted Subsidiaries of real or personal property which has been or is to be sold or transferred by the Parent Borrower or any such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Parent Borrower or such Restricted Subsidiary.

"Sanction(s)": any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"SEC": the United States Securities and Exchange Commission.

"Secured Parties": the "Secured Parties" as defined in the Guarantee and Collateral Agreement.

"Securities Act": the Securities Act of 1933, as amended from time to time.

"Security Documents": the collective reference to the Orders, the Guarantee and Collateral Agreement, each Blocked Account Agreement and all other similar security documents hereafter delivered to the Collateral Agent granting or perfecting a Lien on any asset or assets of any Person to secure the obligations and liabilities of the Loan Parties hereunder and/or under any of the other Loan Documents or to secure any guarantee of any such obligations and liabilities, including any security documents executed and delivered or caused to be delivered to the Collateral Agent pursuant to Section 10.8 in each case, as amended, supplemented, waived or otherwise modified from time to time.

"Set": the collective reference to Eurodollar Loans of a single Tranche, the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Eurodollar Loans shall originally have been made on the same day).

"Settlement Service": as defined in Subsection 11.6.

"Scheduled Unavailability Date" as defined in Section 4.7(b)(ii).

"Single Employer Plan": any Plan which is covered by Title IV or Section 302 of ERISA or Section 412 of the Code, but which is not a Multiemployer Plan.

"Specified Liquidation Agent": Great American Group, or, with respect to Intellectual Property, from Hilco Streambank, or any other liquidation agent approved by Administrative Agent.

"Stated Amount": at any time, as to any Letter of Credit, the maximum amount available to be drawn thereunder (regardless of whether any conditions for drawing could then be met).

"Stated Maturity": with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"Statutory Reserve Rate": a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Administrative Agent is subject with respect to the Adjusted LIBOR Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBOR Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or

credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Store</u>":  any retail store operated, or to be operated, by any Loan Party.

"<u>Store Liquidation</u>": a liquidation of the entire chain of stores of the Loan Parties and all of the assets relating thereto under Section 363 of the Bankruptcy Code. The Store Liquidation shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Administrative Agent.

"<u>Subsidiary</u>":  as to any Person, a corporation, partnership, limited liability company or other entity (<u>a</u>) of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned by such Person, or (<u>b</u>) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person and, in the case of this clause (b), which is treated as a consolidated subsidiary for accounting purposes.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Parent Borrower.  The term "Subsidiary" shall not include any Joint Ventures even if such entity would be consolidated with the Parent Borrower under GAAP; <u>provided</u> that, for the avoidance of doubt, nothing in this sentence shall limit or otherwise affect the treatment of Joint Ventures (including with respect to consolidation) for financial reporting purposes under and in accordance with GAAP.

"<u>Subsidiary Borrower Joinder</u>":  a joinder in substantially the form of <u>Exhibit K</u> hereto, to be executed by each Subsidiary Borrower designated as such after the Closing Date.

"<u>Subsidiary Borrowers</u>":  each Domestic Subsidiary that is a Wholly Owned Subsidiary and a Restricted Subsidiary that becomes a Borrower after five days' written notice to the Administrative Agent pursuant to a Subsidiary Borrower Joinder, together with their respective successors and assigns.  Upon receipt thereof the Administrative Agent shall promptly transmit each such notice to each of the Lenders; <u>provided</u> that any failure to do so by the Administrative Agent shall not in any way affect the status of any such Domestic Subsidiary as a Subsidiary Borrower hereunder.

"<u>Subsidiary Guarantor</u>":  each Domestic Subsidiary (other than any Borrower, Excluded Subsidiary and DBI) of the Parent Borrower which executes and delivers a Subsidiary Guaranty pursuant to <u>Subsection 10.8</u> or otherwise, in each case, unless and until such time as the respective Subsidiary Guarantor (<u>a</u>) ceases to constitute a Domestic Subsidiary of the Parent Borrower in accordance with the terms and provisions hereof or (<u>b</u>) is released from all of its obligations under the Subsidiary Guaranty in accordance with terms and provisions thereof.

"<u>Subsidiary Guaranty</u>":  the guaranty of the Obligations of the Borrowers under the Loan Documents provided pursuant to the Guarantee and Collateral Agreement.

"<u>Successor Case</u>": with respect to the Chapter 11 Cases, any subsequent proceedings under Chapter 7 of the Bankruptcy Code.

"<u>Supermajority Lenders</u>":  Lenders the sum of whose outstanding Commitments (or after the termination thereof, outstanding Individual Lender Exposures) representing more than 66 ⅔% of the sum of the aggregate amount of the total Commitments less the Commitments of all Defaulting Lenders (or after the termination thereof, the sum of the Individual Lender Exposures of Non-Defaulting Lenders) at such time.

"Swap Obligation": with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swingline Commitment":  the Swingline Lender's obligation to make Swingline Loans pursuant to Subsection 2.4.

"Swingline Exposure":  at any time the aggregate principal amount at such time of all outstanding Swingline Loans.  The Swingline Exposure of any Revolving Credit Lender at any time shall equal its Commitment Percentage of the aggregate Swingline Exposure at such time.

"Swingline Lender":  as defined in the Preamble hereto.

"Swingline Loan Participation Certificate":  a certificate in substantially the form of Exhibit F hereto.

"Swingline Loans":  as defined in Subsection 2.4(a).

"Swingline Note":  as defined in Subsection 2.4(b).

"Taxes":  any and all present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.

"Temporary Cash Investments":  any of the following: (i) any investment in (x) direct obligations of the United States of America, a member state of the European Union or any country in whose currency funds are being held pending their application in the making of an investment or capital expenditure by the Parent Borrower or a Restricted Subsidiary in that country or with such funds, or any agency or instrumentality of any thereof or obligations guaranteed by the United States of America or a member state of the European Union or any country in whose currency funds are being held pending their application in the making of an investment or capital expenditure by the Parent Borrower or a Restricted Subsidiary in that country or with such funds, or any agency or instrumentality of any of the foregoing, or obligations guaranteed by any of the foregoing or (y) direct obligations of any foreign country recognized by the United States of America rated at least "A" by S&P or "A-1" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (ii) overnight bank deposits, and investments in time deposit accounts, certificates of deposit, bankers' acceptances and money market deposits (or, with respect to foreign banks, similar instruments) maturing not more than one year after the date of acquisition thereof issued by (x) any bank or other institutional lender under this Agreement or the DIP Term Loan Facility or any affiliate thereof or (y) a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital and surplus aggregating in excess of $250,000,000 (or the foreign currency equivalent thereof) and whose long term debt is rated at least "A" by S&P or "A-1" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization) at the time such Investment is made, (iii) repurchase obligations with a term of not more than 30 days for underlying securities or instruments of the types described in clause (i) or (ii) above entered into with a bank meeting the qualifications described in clause (ii) above, (iv) Investments in commercial paper, maturing not more than 270 days after the date of acquisition, issued by a Person (other than that of the Parent Borrower or any of its Subsidiaries), with a rating at the time as of which any Investment therein is made of "P-2" (or higher) according to Moody's or "A-2" (or higher) according to S&P (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (v) Investments in securities maturing not more than one year after the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (vi) Indebtedness or Preferred Stock (other than of the Parent Borrower or any of its Subsidiaries) having a rating of "A" or higher by S&P or "A2" or

higher by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (vii) investment funds investing 95.0% of their assets in securities of the type described in clauses (i) through (vi) above (which funds may also hold reasonable amounts of cash pending investment and/or distribution), (viii) any money market deposit accounts issued or offered by a domestic commercial bank or a commercial bank organized and located in a country recognized by the United States of America, in each case, having capital and surplus in excess of $250,000,000 (or the foreign currency equivalent thereof), or investments in money market funds subject to the risk limiting conditions of Rule 2a-7 (or any successor rule) of the SEC under the Investment Company Act of 1940, as amended, and (ix) similar investments approved by the Board of Directors in the ordinary course of business.

"Termination Date": the earlier of (a) the date that is 180 days after the Petition Date, (b) the date of termination of all of the Commitments pursuant to Section 2.3, (c) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (d) the effective date of a Plan of Reorganization for the Debtors, (e) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (f) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (g) the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect, (h) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Administrative Agent and the Required Lenders, and (i) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Administrative Agent and the Required Lenders.

"Tradename Advance Loans":  as of any date of determination, the amount of Revolving Credit Loans equal to the amount, if any, by which the total amount of Revolving Credit Loans then outstanding exceeds the aggregate amount of the Borrowing Base calculated exclusive of clause (f) of the definition of "Borrowing Base", as such Borrowing Base is shown on the Borrowing Base Certificate last delivered as of such date of determination.  The amount of Tradename Advance Loans shall be adjusted automatically from time to time as of the date of delivery of each Borrowing Base Certificate.

"Tradename Appraisal Amount":  the most recent appraised forced liquidation value of the Intellectual Property of the Parent Borrower and its Restricted Subsidiaries pursuant to Subsection 11.1.

"Tranche":  each Tranche of Loans available hereunder, with there being two tranches on the Closing Date; namely, Revolving Credit Loans and Swingline Loans.

"Transaction":  any or all of the Plan of Reorganization or the Store Liquidation; provided that any such Transaction shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms reasonably satisfactory to the Administrative Agent and as set forth in the Restructuring Support Agreement.

"Transferee":  any Participant or Assignee.

"Type":  the type of Loan determined based on the currency in which the same is denominated, and the interest option applicable thereto, with there being multiple Types of Loans hereunder, namely ABR Loans and Eurodollar Loans.

"UCC":  the Uniform Commercial Code as in effect in the State of New York from time to time.

"Uniform Customs":  the Uniform Customs and Practice for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600, as the same may be amended from time to time.

"<u>United States Person</u>":  any United States person within the meaning of Section 7701(a)(30) of the Code.

"<u>Unpaid Drawing</u>":  drawings on Letters of Credit that have not been reimbursed by the applicable Borrower.

"<u>Unutilized Commitment</u>":  with respect to any Lender at any time, an amount equal to the remainder of (<u>x</u>) such Lender's Commitment as in effect at such time less (<u>y</u>) such Lender's Individual Lender Exposure at such time (excluding any Swingline Exposure of such Lender).

"<u>U.S. Tax Compliance Certificate</u>":  as defined in <u>Subsection 4.11(b)(ii)(2)</u>.

"<u>U.S. Trustee</u>":  the United States Trustee applicable in the Chapter 11 Cases.

"<u>Wholly Owned Subsidiary</u>":  as to any Person, any Subsidiary of such Person of which such Person owns, directly or indirectly through one or more Wholly Owned Subsidiaries, all of the Capital Stock of such Subsidiary other than directors qualifying shares or shares held by nominees.

"<u>Write-Down and Conversion Powers</u>":  with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2     <u>Other Definitional Provisions</u>.  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any Notes, any other Loan Document or any certificate or other document made or delivered pursuant hereto.

(a)     As used herein and in any Notes and any other Loan Document, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Parent Borrower and its Restricted Subsidiaries not defined in <u>Subsection 1.1</u> and accounting terms partly defined in <u>Subsection 1.1</u>, to the extent not defined, shall have the respective meanings given to them under GAAP.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

(c)     Any references in this Agreement to "cash and/or Cash Equivalents", "cash, Cash Equivalents and/or Temporary Cash Investments" or any similar combination of the foregoing shall be construed as not double counting cash or any other applicable amount which would otherwise be duplicated therein.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)     All references herein to consolidated financial statements of the Parent Borrower shall include each variable interest entity (including the Joint Ventures) that the Parent Borrower is otherwise required to consolidate in accordance with GAAP.

(f)     The Borrowing Base shall be calculated without duplication, including without duplication of any reserves, items that are otherwise addressed or excluded through eligibility criteria or items that are factored into the calculation of collection rates or collection percentages.

(g)     All references herein to the determination of any amount or ratio for the Parent Borrower and its Restricted Subsidiaries on a consolidated basis or any similar reference shall, in each case, not be deemed to

include each variable interest entity (including the Joint Ventures) that the Parent Borrower is otherwise required to consolidate in accordance with GAAP.

       1.3    <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

# SECTION 2

## Amount and Terms of Commitments

       2.1    <u>Commitments</u>.  (a) Subject to and upon the terms and conditions set forth herein, each Lender severally agrees to make, at any time and from time to time on or after the Closing Date and prior to the Termination Date, a Revolving Credit Loan or Revolving Credit Loans to the Borrowers (on a joint and several basis as between the Borrowers), which Revolving Credit Loans:

       (i)      shall be denominated in Dollars;

       (ii)     shall, at the option of the Borrowers, be incurred and maintained as, and/or converted into, ABR Loans or Eurodollar Loans, <u>provided</u> that except as otherwise specifically provided in <u>Subsections 4.9</u> and <u>4.10</u>, all Revolving Credit Loans comprising the same Borrowing shall at all times be of the same Type;

       (iii)    may be repaid and reborrowed in accordance with the provisions hereof;

       (iv)    shall not be made (and shall not be required to be made) by any Lender to the extent the incurrence thereof (after giving effect to the use of the proceeds thereof on the date of the incurrence thereof to repay any amounts theretofore outstanding pursuant to this Agreement) would cause the Individual Lender Exposure of such Lender to exceed the amount of its Commitment at such time; and

       (v)     shall not be made (and shall not be required to be made) by any Lender to the extent the incurrence thereof (after giving effect to the use of the proceeds thereof on the date of the incurrence thereof to repay any amounts theretofore outstanding pursuant to this Agreement) would cause (i) the Aggregate Lender Exposure to exceed the lesser of (<u>A</u>) the total Commitments as then in effect and (<u>B</u>) the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered) and (ii) after giving effect to the requested Revolving Credit Loan, the sum of the Aggregate Lender Exposure and the aggregate amount of all Prior Revolving Credit Loans to exceed the lesser of (<u>A</u>) the total Commitments as then in effect and (<u>B</u>) the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered).

       (b)    (I) Notwithstanding anything to the contrary in <u>Subsection 2.1(a)</u> or elsewhere in this Agreement, the Administrative Agent shall have the right to establish Availability Reserves (other than any Designated Hedging Reserves or Cash Management Reserves, which are provided for pursuant to clause (II) below) in such amounts, and with respect to such matters, as the Administrative Agent in its Permitted Discretion shall deem necessary or appropriate, against the Borrowing Base including reserves with respect to (<u>i</u>) sums that the Borrowers are or will be required to pay (such as taxes (including payroll and sales taxes), assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and have not yet paid and (<u>ii</u>) amounts owing by the Borrowers or, without duplication, their respective Restricted Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the ABL Priority Collateral, which Lien or trust, in the Permitted Discretion of the Administrative Agent, is capable of ranking senior in priority to or pari passu with one or more of the Liens in the ABL Priority Collateral granted in the Security

Documents or the Pre-Petition Loan Documents (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the ABL Priority Collateral; provided that with respect to any Availability Reserve (other than any Designated Hedging Reserves or Cash Management Reserves, which are provided for pursuant to clause (II) below), the Administrative Agent agrees to use good faith efforts to notify the applicable Borrower of the establishment of such Availability Reserve. (II) In addition, upon the designation of any Interest Rate Protection Agreement, Hedging Agreement or Permitted Hedging Arrangement as a "Designated Hedging Agreement" or any Cash Management Arrangement as a "Designated Cash Management Agreement", subject to Subsection 11.22, a Designated Hedging Reserve or Cash Management Reserve in an amount contemplated by the respective definition thereof relating to such Designated Hedging Agreement or Designated Cash Management Agreement shall be automatically and immediately established, without any action of the Administrative Agent. Any adjustment in any Designated Hedging Reserve or Cash Management Reserve contemplated by the respective definitions thereof shall be immediately effective upon the notification to the Administrative Agent of the details and results of (x) in the case of any Designated Hedging Reserve, the applicable mid-market quotations as provided in the penultimate sentence of the definition of "Designated Hedging Reserves" and (y) in the case of any Cash Management Reserve, the new applicable anticipated monetary obligations as provided in the final sentence of the definition of "Cash Management Reserves".

(c)     In the event the Borrowers are unable to comply with (i) the borrowing base limitations set forth in Subsection 2.1(a) or (ii) the conditions precedent to the making of Revolving Credit Loans or the issuance of Letters of Credit set forth in Section 6, the Lenders authorize the Administrative Agent, for the account of the Lenders, to make Revolving Credit Loans to the Borrowers, which may only be made as ABR Loans (each, an "Agent Advance") for a period commencing on the date the Administrative Agent first receives a notice of Borrowing requesting an Agent Advance until the earliest of (i) the 30th Business Day after such date, (ii) the date the respective Borrower is again able to comply with the Borrowing Base limitations and the conditions precedent to the making of Revolving Credit Loans and issuance of Letters of Credit, or obtains an amendment or waiver with respect thereto and (iii) the date the Required Lenders instruct the Administrative Agent to cease making Agent Advances (in each case, the "Agent Advance Period"). The Administrative Agent shall not make any Agent Advance to the extent that at such time the amount of such Agent Advance (A) when added to the aggregate outstanding amount of all other Agent Advances made to the Borrowers at such time, would exceed 10.0% of the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered) or (B) when added to the Aggregate Lender Exposure as then in effect (immediately prior to the incurrence of such Agent Advance) and the aggregate amount of all Prior Revolving Credit Loans, would exceed the total Commitments at such time. It is understood and agreed that, subject to the requirements set forth above, Agent Advances may be made by the Administrative Agent in its discretion to the extent the Administrative Agent deems such Agent Advances necessary or desirable (x) to preserve and protect the applicable ABL Priority Collateral, or any portion thereof, (y) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other obligations of the Loan Parties hereunder and under the other Loan Documents or (z) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement, including payments of reimbursable expenses and other sums payable under the Loan Documents, and that the Borrowers shall have no right to require that any Agent Advances be made.

(d)     Each Borrower agrees that, upon the request to the Administrative Agent by any Revolving Credit Lender made on or prior to the Closing Date or in connection with any assignment pursuant to Subsection 11.6(b), in order to evidence such Lender's Revolving Credit Loans, such Borrower will execute and deliver to such Lender a promissory note substantially in the form of Exhibit A-1 hereto (each, as amended, supplemented, replaced or otherwise modified from time to time, a "Revolving Credit Note"), with appropriate insertions as to payee, date and principal amount, payable to such Lender and in a principal amount equal to the aggregate unpaid principal amount of all Revolving Credit Loans made by such Revolving Credit Lender to such Borrower. Each Revolving Credit Note shall (i) be dated the Closing Date, (ii) be stated to mature on the Termination Date and (iii) provide for the payment of interest in accordance with Subsection 4.1.

2.2     Procedure for Revolving Credit Borrowing. Each of the Borrowers may borrow under the Commitments during the Commitment Period on any Business Day, provided that the Borrower Representative shall give the Administrative Agent irrevocable (in the case of any notice except notice with respect to the initial

Extension of Credit hereunder, which shall be irrevocable after the funding) notice (which notice must be received by the Administrative Agent prior to (1) in the case of either Eurodollar Loans or ABR Loans to be borrowed on the Closing Date, 9:00 A.M., New York City time, on the Closing Date, and (2) in all other cases, (a) 2:00 P.M., New York City time, at least three Business Days prior to the requested Borrowing Date, if all or any part of the requested Revolving Credit Loans are to be initially Eurodollar Loans or (b) 10:00 A.M., New York City time, on the requested Borrowing Date, for ABR Loans) specifying (i) the identity of a Borrower, (ii) the amount to be borrowed, (iii) the requested Borrowing Date, (iv) whether the borrowing is to be of Eurodollar Loans, ABR Loans or a combination thereof and (v) if the borrowing is to be entirely or partly of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Periods therefor.  Each borrowing shall be in an amount equal to (x) in the case of ABR Loans, except any ABR Loan to be used solely to pay a like amount of outstanding Reimbursement Obligations or Swingline Loans, in multiples of $500,000 (or, if the Commitments then available (as calculated in accordance with Subsection 2.1(a)) are less than $500,000, such lesser amount) or a whole multiple of $100,000 in excess thereof, and (y) in the case of Eurodollar Loans, $500,000, or a whole multiple of $500,000 in excess thereof.   Upon receipt of any such notice from the Borrower Representative the Administrative Agent shall promptly notify each applicable Revolving Credit Lender thereof.   Subject to the satisfaction of the conditions precedent specified in Subsection 6.2 (or in the case of the initial Extension of Credit on the Closing Date, Subsection 6.1), each applicable Revolving Credit Lender will make the amount of its pro rata share of each borrowing of Revolving Credit Loans available to the Administrative Agent for the account of the Borrower identified in such notice at the office of the Administrative Agent specified in Subsection 11.2 prior to 12:00 P.M. (or 9:00 A.M., in the case of the initial borrowing hereunder), New York City time, or at such other office of the Administrative Agent or at such other time as to which the Administrative Agent shall notify such Borrower reasonably in advance of the Borrowing Date with respect thereto, on the Borrowing Date requested by such Borrower and in funds immediately available to the Administrative Agent.

2.3    Termination or Reduction of Commitments.  The Borrower Representative (on behalf of itself and each other applicable Borrower) shall have the right, upon not less than three Business Days' notice to the Administrative Agent (who will promptly notify the Lenders), to terminate the Commitments, or, from time to time, to reduce the amount of the Commitments; provided that no such termination or reduction shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans and Swingline Loans made on the effective date thereof, the aggregate principal amount of the Revolving Credit Loans and Swingline Loans then outstanding, when added to the sum of the then outstanding L/C Obligations and the aggregate amount of all Prior Revolving Credit Loans, would exceed the Commitments then in effect and provided, further, that any such notice of termination delivered by the Borrower Representative may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower Representative (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any such reduction shall be in an amount equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and shall reduce permanently the applicable Commitments then in effect.

2.4    Swingline Commitments.  (a) Subject to the terms and conditions hereof, the Swingline Lender agrees to make swingline loans (individually, a "Swingline Loan"; collectively, the "Swingline Loans") to any of the Borrowers from time to time during the Commitment Period in an aggregate principal amount at any one time outstanding not to exceed $20,000,000; provided that at no time may the sum of the then outstanding Swingline Loans, Revolving Credit Loans, L/C Obligations and the Prior Revolving Credit Loans exceed the lesser of (1) the Commitments then in effect and (2) the Borrowing Base then in effect (based on the most recent Borrowing Base Certificate).   Swingline Loans shall be made in minimum amounts of $100,000.   Amounts borrowed by any Borrower under this Subsection 2.4 may be repaid and, through but excluding the Termination Date, reborrowed. All Swingline Loans made to any Borrower shall be made in Dollars as ABR Loans, and shall not be entitled to be converted into Eurodollar Loans.  The Borrower Representative (on behalf of itself or any other Borrower as the case may be), shall give the Swingline Lender irrevocable notice (which notice must be received by the Swingline Lender prior to 1:00 P.M., New York City time, on the requested Borrowing Date) specifying (1) the identity of a Borrower, (2) the amount of the requested Swingline Loan and (3) that the Borrowing is to be of ABR Loans.  The proceeds of the Swingline Loans will be made available by the Swingline Lender to the Borrower identified in such notice at an office of the Swingline Lender by crediting the account of such Borrower at such office with such proceeds in Dollars.

(b)     Each of the Borrowers agrees that, upon the request to the Administrative Agent by the Swingline Lender made on or prior to the Closing Date or in connection with any assignment pursuant to Subsection 11.6(b), in order to evidence the Swingline Loans such Borrower will execute and deliver to the Swingline Lender a promissory note substantially in the form of Exhibit A-2 hereto, with appropriate insertions (as the same may be amended, supplemented, replaced or otherwise modified from time to time, the "Swingline Note"), payable to the Swingline Lender and representing the obligation of such Borrower to pay the amount of the Swingline Commitment or, if less, the unpaid principal amount of the Swingline Loans made to such Borrower, with interest thereon as prescribed in Subsection 4.1.  The Swingline Note shall (i) be dated the Closing Date, (ii) be stated to mature on the Termination Date and (iii) provide for the payment of interest in accordance with Subsection 4.1.

(c)     The Swingline Lender, at any time in its sole and absolute discretion may, and, at any time as there shall be a Swingline Loan outstanding for more than five Business Days, the Swingline Lender shall, on behalf of the Borrower to which the Swingline Loan has been made (which hereby irrevocably directs and authorizes such Swingline Lender to act on its behalf), request each Lender, including the Swingline Lender, to make a Revolving Credit Loan as an ABR Loan in an amount equal to such Lender's Commitment Percentage of the principal amount of all Swingline Loans made in Dollars (each, a "Mandatory Revolving Credit Loan Borrowing") in an amount equal to such Lender's Commitment Percentage of the principal amount of all of the Swingline Loans (collectively, the "Refunded Swingline Loans") outstanding on the date such notice is given; provided that the provisions of this Subsection 2.4 shall not affect the obligations of any Borrower to prepay Swingline Loans in accordance with the provisions of Subsection 4.4(c).  Unless the Commitments shall have expired or terminated (in which event the procedures of clause (d) of this Subsection 2.4 shall apply), each Lender hereby agrees to make the proceeds of its Revolving Credit Loan (including any Eurodollar Loan) available to the Administrative Agent for the account of the Swingline Lender at the office of the Administrative Agent prior to 11:00 A.M., New York City time, in funds immediately available on the Business Day next succeeding the date such notice is given notwithstanding (i) that the amount of the Mandatory Revolving Credit Loan Borrowing may not comply with the minimum amount for Revolving Credit Loans otherwise required hereunder, (ii) whether any conditions specified in Section 6 are then satisfied, (iii) whether a Default or an Event of Default then exists, (iv) the date of such Mandatory Revolving Credit Loan Borrowing and (v) the amount of the Commitment of such, or any other, Lender at such time.  The proceeds of such Revolving Credit Loans (including any Eurodollar Loan) shall be immediately applied to repay the Refunded Swingline Loans.

(d)     If the Commitments shall expire or terminate at any time while Swingline Loans are outstanding, each Lender shall, at the option of the Swingline Lender, exercised reasonably, either (i) notwithstanding the expiration or termination of the Commitments, make a Loan as an ABR Loan (which Revolving Credit Loan shall be deemed a "Revolving Credit Loan" for all purposes of this Agreement and the other Loan Documents) or (ii) purchase an undivided participating interest in such Swingline Loans, in either case in an amount equal to such Lender's Commitment Percentage determined on the date of, and immediately prior to, expiration or termination of the Commitments of the aggregate principal amount of such Swingline Loans; provided that in the event that any Mandatory Revolving Credit Loan Borrowing cannot for any reason be made on the date otherwise required above (including as a result of the commencement of a proceeding under any domestic or foreign bankruptcy, reorganization, dissolution, insolvency, receivership, administration or liquidation or Bail-In Action or similar law with respect to any Borrower), then each Lender hereby agrees that it shall forthwith purchase (as of the date the Mandatory Revolving Credit Loan Borrowing would otherwise have occurred, but adjusted for any payments received from such Borrower on or after such date and prior to such purchase) from the Swingline Lender such participations in such outstanding Swingline Loans as shall be necessary to cause such Lenders to share in such Swingline Loans ratably based upon their respective Commitment Percentages, provided, further, that (x) all interest payable on the Swingline Loans shall be for the account of the Swingline Lender until the date as of which the respective participation is required to be purchased and, to the extent attributable to the purchased participation, shall be payable to the participant from and after such date and (y) at the time any purchase of participations pursuant to this sentence is actually made, the purchasing Lender shall be required to pay the Swingline Lender interest on the principal amount of the participation purchased for each day from and including the day upon which the Mandatory Revolving Credit Loan Borrowing would otherwise have occurred to but excluding the date of payment for such participation, at the rate otherwise applicable to Revolving Credit Loans made as ABR Loans.  Each Lender will make the proceeds of any Revolving Credit Loan made pursuant to the immediately preceding sentence available to the Administrative Agent for the account of the Swingline Lender

at the office of the Administrative Agent prior to 11:00 A.M., New York City time, in Dollars in funds immediately available on the Business Day next succeeding the date on which the Commitments expire or terminate.  The proceeds of such Revolving Credit Loans shall be immediately applied to repay the Swingline Loans outstanding on the date of termination or expiration of the Commitments.  In the event that the Lenders purchase undivided participating interests pursuant to the first sentence of this clause (d), each Lender shall immediately transfer to the Swingline Lender, in Dollars in immediately available funds, the amount of its participation and upon receipt thereof the Swingline Lender will deliver to such Lender a Swingline Loan Participation Certificate dated the date of receipt of such funds and in such amount.

(e)     Whenever, at any time after the Swingline Lender has received from any Lender such Lender's participating interest in a Swingline Loan, the Swingline Lender receives any payment on account thereof (whether directly from a Borrower or otherwise, including proceeds of Collateral applied thereto by the Swingline Lender), or any payment of interest on account thereof, the Swingline Lender will, if such payment is received prior to 11:00 A.M., New York City time, on a Business Day, distribute to such Lender its pro rata share thereof prior to the end of such Business Day and otherwise, the Swingline Lender will distribute such payment on the next succeeding Business Day (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded); provided, however, that in the event that such payment received by the Swingline Lender is required to be returned, such Lender will return to the Swingline Lender any portion thereof previously distributed by the Swingline Lender to it.

(f)     Each Lender's obligation to make the Revolving Credit Loans and to purchase participating interests with respect to Swingline Loans in accordance with Subsections 2.4(c) and 2.4(d) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right that such Lender or any of the Borrowers may have against the Swingline Lender, any of the Borrowers or any other Person for any reason whatsoever; (ii) the occurrence or continuance of a Default or an Event of Default; (iii) any adverse change in condition (financial or otherwise) of any of the Borrowers; (iv) any breach of this Agreement or any other Loan Document by any of the Borrowers, any other Loan Party or any other Lender; (v) any inability of any of the Borrowers to satisfy the conditions precedent to borrowing set forth in this Agreement on the date upon which such Revolving Credit Loan is to be made or participating interest is to be purchased or (vi) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.5     Repayment of Loans.  (a) Each Borrower hereby unconditionally promises to pay to the Administrative Agent in Dollars for the account of:  (i) each Lender the then unpaid principal amount of each Revolving Credit Loan of such Lender made to such Borrower, on the Termination Date (or such earlier date on which the Revolving Credit Loans become due and payable pursuant to Section 9); and (ii) the Swingline Lender, the then unpaid principal amount of the Swingline Loans made to such Borrower, on the Termination Date (or such earlier date on which the Swingline Loans become due and payable pursuant to Section 9).  Each Borrower hereby further agrees to pay interest (which payments shall be in Dollars) on the unpaid principal amount of such Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Subsection 4.1.

(b)     Each Lender (including the Swingline Lender) shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of each of the Borrowers to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain the Register pursuant to Subsection 11.6(b), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder, the Type thereof, the Borrowers to which such Loan is made, each Interest Period, if any, applicable thereto and whether such Loans are Revolving Credit Loans or Swingline Loans, (ii) the amount of any principal or interest due and payable or to become due and payable from each of the Borrowers to each applicable Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from each of the Borrowers and each applicable Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Subsection 2.5(c) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of each of the Borrowers therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of any Borrower to repay (with applicable interest) the Loans made to such Borrower by such Lender in accordance with the terms of this Agreement.

## SECTION 3

### Letters of Credit

3.1     L/C Commitment.  (a) Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Revolving Credit Lenders set forth in Subsection 3.4(a), agrees to continue under this Agreement for the account of the Parent Borrower the Existing Letters of Credit issued by it and to issue letters of credit (the letters of credit issued on and after the Closing Date pursuant to this Section 3, together with the Existing Letters of Credit, collectively, the "Letters of Credit") for the account of the applicable Borrower or (if required by the applicable Issuing Lender, so long as a Borrower is a co-applicant and jointly and severally liable thereunder) any Restricted Subsidiary on any Business Day during the Commitment Period but in no event later than the fifth day prior to the Termination Date in such form as may be approved from time to time by the Issuing Lender; provided that no Letter of Credit shall be issued if, after giving effect to such issuance, (i) the aggregate Extensions of Credit to the Borrowers would exceed the applicable limitations set forth in Subsection 2.1, (ii) the L/C Obligations in respect of Letters of Credit would exceed $80,000,000 or (iii) the Aggregate Outstanding Credit of all the Revolving Credit Lenders and the aggregate amount of all Prior Revolving Credit Loans would exceed the Commitments of all the Revolving Credit Lenders then in effect.  All Prior L/C Obligations shall constitute "L/C Obligations" for all purposes of this Agreement.

(b)     Each Letter of Credit shall be denominated in Dollars and shall be either (i) a standby letter of credit issued to support obligations of the Parent Borrower or any of its Restricted Subsidiaries, contingent or otherwise, which finance or otherwise arise in connection with the working capital and business needs of the Parent Borrower or its Restricted Subsidiaries, and for general corporate purposes, of the Parent Borrower or any of its Restricted Subsidiaries, or (ii) a commercial letter of credit in respect of the purchase of goods or services by the Parent Borrower, or any of its Restricted Subsidiaries, and unless otherwise agreed by the applicable Issuing Lender and, in the case of clause (B) below, the Administrative Agent, expire no later than the earlier of (A) one year after its date of issuance and (B) the fifth Business Day prior to the Termination Date; provided that, unless otherwise agreed, no Issuing Lender shall be obligated to issue a Letter of Credit that expires beyond the non-extended Termination Date.

(c)     Notwithstanding anything to the contrary in Subsection 3.1(b), if the Borrower Representative so requests in any L/C Request, the applicable Issuing Lender may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic renewal provisions (each, an "Auto-Renewal L/C"); provided that any such Auto-Renewal L/C must permit the applicable Issuing Lender to prevent any such renewal at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day in each such 12-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the applicable Issuing Lender, the applicable Borrower shall not be required to make a specific request to such Issuing Lender for any such renewal.  Once an Auto-Renewal L/C has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable Issuing Lender to permit the renewal of such Letter of Credit at any time to an extended expiry date not later than the earlier of (i) one year from the date of such renewal and (ii) the fifth Business Day prior to the Termination Date; provided that such Issuing Lender shall not permit any such renewal if (x) such Issuing Lender has determined that it would have no obligation at such time to issue such Letter of Credit in its renewed form under the terms hereof (by reason of the provisions of Subsection 3.2(c) or otherwise), or (y) it has received notice on or before the day that is two Business Days before the date which has been agreed upon pursuant to the proviso of the first sentence of this clause (c), (1) from the Administrative Agent that any Lender directly affected thereby has elected not to permit such renewal or (2) from the Administrative Agent, any Lender or Borrower that one or

more of the applicable conditions specified in <u>Section 6</u> are not then satisfied, or that the issuance of such Letter of Credit would violate <u>Subsection 3.1</u>.

(d)    Each Letter of Credit issued by an Issuing Lender shall be deemed to constitute a utilization of the Commitments, and shall be participated in (as more fully described in the following <u>Subsection 3.4</u>) by the Lenders in accordance with their respective Commitment Percentages.  All Letters of Credit issued hereunder shall be denominated in Dollars and shall be issued for the account of the applicable Borrower or (if required by the applicable Issuing Lender, so long as a Borrower is a co-applicant and jointly and severally liable thereunder) any Subsidiary.

(e)    Unless otherwise agreed by the applicable Issuing Lender and the Parent Borrower, each Letter of Credit shall be governed by, and shall be construed in accordance with, the laws of the State of New York, and to the extent not prohibited by such laws, the ISP shall apply to each standby Letter of Credit and the Uniform Customs shall apply to each commercial Letter of Credit.  The ISP shall not in any event apply to this Agreement.  All Letters of Credit shall be issued on a sight basis only.

3.2    <u>Procedure for Issuance of Letters of Credit</u>.  (a) The Borrower Representative may, from time to time during the Commitment Period but in no event later than the 30th day prior to the Termination Date, request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender and the Administrative Agent at its address for notices specified herein, an L/C Request therefor in the form of <u>Exhibit H</u> hereto (completed to the reasonable satisfaction of such Issuing Lender), and such other certificates, documents and other papers and information as such Issuing Lender may reasonably request.  Upon receipt of any L/C Request, such Issuing Lender will process such L/C Request and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall an Issuing Lender be required, unless otherwise agreed to by such Issuing Lender, to issue any Letter of Credit earlier than five Business Days after its receipt of the L/C Request therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed by such Issuing Lender and the Borrower Representative.  The applicable Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower Representative promptly following the issuance thereof.  No Issuing Lender shall amend, cancel or waive presentation of any Letter of Credit, or replace any lost, mutilated or destroyed Letter of Credit, without the prior written consent of the Borrower Representative.  Upon the issuance of any Letter of Credit or amendment, renewal, extension or modification to a Letter of Credit, the applicable Issuing Lender shall promptly notify the Administrative Agent, who shall promptly notify each Lender, thereof, which notice shall be accompanied by a copy of such Letter of Credit or amendment, renewal, extension or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to <u>Subsection 3.4</u>.  If the applicable Issuing Lender is not the same person as the Administrative Agent, on the first Business Day of each calendar month, such Issuing Lender shall provide to the Administrative Agent a report listing all outstanding Letters of Credit and the amounts and beneficiaries thereof and the Administrative Agent shall promptly provide such report to each Lender.

(b)    The making of each request for a Letter of Credit by the Borrower Representative shall be deemed to be a representation and warranty by the Borrower Representative that such Letter of Credit may be issued in accordance with, and will not violate the requirements of, <u>Subsection 3.1</u>.  Unless the respective Issuing Lender has received notice from the Required Lenders before it issues a Letter of Credit that one or more of the applicable conditions specified in <u>Section 6</u> are not then satisfied, or that the issuance of such Letter of Credit would violate <u>Subsection 3.1</u>, then such Issuing Lender may issue the requested Letter of Credit for the account of the applicable Borrower or Subsidiary in accordance with such Issuing Lender's usual and customary practices.

(c)    No Issuing Lender shall be under any obligation to issue any Letter of Credit if

(i)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Lender from issuing such Letter of Credit, or any Requirement of Law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any banking regulatory authority with jurisdiction over such Issuing Lender shall prohibit the issuance of letters of credit generally, or

(ii)    the issuance of such Letter of Credit would violate one or more existing (as of the date hereof) policies of such Issuing Lender consistently applied by such Issuing Lender to borrowers generally.

3.3    <u>Fees, Commissions and Other Charges</u>.    (a) Each Borrower agrees to pay to the Administrative Agent a letter of credit commission with respect to each Letter of Credit issued by such Issuing Lender on its behalf, computed for the period from and including the date of issuance of such Letter of Credit through to the expiration date of such Letter of Credit, computed at a rate per annum equal to the Applicable Margin then in effect for Eurodollar Loans calculated based upon the actual number of days elapsed over a 360-day year, of the aggregate amount available to be drawn under such Letter of Credit, payable monthly in arrears on each L/C Fee Payment Date with respect to such Letter of Credit and on the Termination Date or such earlier date as the Commitments shall terminate as provided herein.  Such commission shall be payable to the Administrative Agent for the account of the applicable Revolving Credit Lenders to be shared ratably among them in accordance with their respective Commitment Percentages.  Each Borrower shall pay to the relevant Issuing Lender with respect to each Letter of Credit a fee equal to 1/8 of 1.0% per annum of the aggregate amount available to be drawn under such Letter of Credit or such other amounts as may be agreed by such Borrower and such Issuing Lender, payable monthly in arrears on each L/C Fee Payment Date with respect to such Letter of Credit and on the Termination Date or such other date as the Commitments shall terminate calculated based upon the actual number of days elapsed over a 360-day year.  Such commissions and fees shall be nonrefundable.  Such fees and commissions shall be payable in Dollars.

(b)    In addition to the foregoing commissions and fees, each Borrower agrees to pay amounts necessary to reimburse the applicable Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, effecting payment under, amending or otherwise administering any Letter of Credit issued by such Issuing Lender within 10 days after demand therefor.

(c)    The Administrative Agent shall, promptly following any receipt thereof, distribute to the applicable Issuing Lender and the applicable Lenders all commissions and fees received by the Administrative Agent for their respective accounts pursuant to this <u>Subsection 3.3</u>.

3.4    <u>L/C Participations</u>.    (a) By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Lender or the Lenders, each Issuing Lender hereby irrevocably grants to each Lender, and each Lender hereby acquires from such Issuing Lender, a participation in such Letter of Credit equal to such Lender's Commitment Percentage of the aggregate amount available to be drawn under such Letter of Credit.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, or expiration, termination or cash collateralization of any Letter of Credit and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  All calculations of the Lenders' Commitment Percentages shall be made from time to time by the Administrative Agent, which calculations shall be conclusive absent manifest error.

(b)    If the Borrowers fail to reimburse the applicable Issuing Lender on the due date as provided in <u>Subsection 3.5</u>, such Issuing Lender shall notify the Administrative Agent and the Administrative Agent shall notify each Lender of the applicable L/C Disbursement, the payment then due from the Borrowers in respect thereof and such Lender's Commitment Percentage thereof.  Each Lender shall pay by wire transfer of immediately available funds to the Administrative Agent not later than 2:00 P.M., New York City time, on such date (or, if such Lender shall have received such notice later than 12:00 P.M., New York City time, on any day, not later than 11:00 A.M., New York City time, on the next succeeding Business Day), an amount equal to such Lender's Commitment Percentage of the unreimbursed L/C Disbursement in the same manner as provided in <u>Subsection 2.2</u> with respect to Loans made by such Lender, and the Administrative Agent will promptly pay to the applicable Issuing Lender the amounts so received by it from the Lenders.  The Administrative Agent will promptly pay to the applicable Issuing Lender any amounts received by it from the Borrowers pursuant to the above clause (a) prior to the time that any Lender makes any payment pursuant to the preceding sentence and any such amounts received by the Administrative Agent from the Borrowers thereafter will be promptly remitted by

the Administrative Agent to the Lender that shall have made such payments and to such Issuing Lender, as appropriate.

(c)    If any Lender shall not have made its Commitment Percentage of such L/C Disbursement available to the Administrative Agent as provided above, each of such Lender and each Borrower severally agrees to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with the foregoing to but excluding the date such amount is paid, to the Administrative Agent for the account of the applicable Issuing Lender at (i) in the case of Borrower, the rate per annum set forth in <u>Subsection 3.5(b)</u> and (ii) in the case of such Lender, at a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

3.5    <u>Reimbursement Obligation of the Borrowers</u>.  (a) Each Issuing Lender shall promptly notify the Borrower Representative of any presentation of a draft under any Letter of Credit.  Each Borrower hereby agrees to reimburse each Issuing Lender, upon receipt by the Borrower Representative of notice from the applicable Issuing Lender of the date and amount of a draft presented under any Letter of Credit issued on its behalf and paid by such Issuing Lender (an "<u>L/C Disbursement</u>"), for the amount of such draft so paid and any taxes, fees, charges or other costs or expenses reasonably incurred by such Issuing Lender in connection with such payment.  Each such payment shall be made to the applicable Issuing Lender, at its address for notices specified herein, in Dollars in immediately available funds, no later than 3:00 P.M., New York City time, on the date which is one Business Day (or, if the Facility is fully drawn on such date and the applicable Borrower does not have sufficient cash on hand to make such payment, two Business Days) after the date on which the Borrower Representative receives such notice, if received prior to 11:00 A.M., New York City Time, on a Business Day and otherwise, no later than 3:00 P.M., New York City time, on the next succeeding Business Day; <u>provided</u> that the Borrowers may, subject to the conditions to borrowing set forth herein, request in accordance with <u>Subsection 2.2</u> that such payment be financed with ABR Loans or Swingline Loans in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting ABR Loans or Swingline Loans.

(b)    Interest shall be payable on any and all amounts remaining unpaid by the Borrowers under this <u>Subsection 3.5(b)</u> from the date the draft presented under the affected Letter of Credit is paid to the date on which the applicable Borrower is required to pay such amounts pursuant to clause (a) above at the rate which would then be payable on any outstanding ABR Loans that are Revolving Credit Loans and thereafter until payment in full at the rate which would be payable on any outstanding ABR Loans that are Revolving Credit Loans which were then overdue.

3.6    <u>Obligations Absolute</u>.  The Reimbursement Obligations of Borrowers as provided in <u>Subsection 3.5</u> shall be absolute, unconditional and irrevocable, and shall be paid and performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein; (ii) any draft or other document presented under a Letter of Credit being proved to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iii) payment by any Issuing Lender under a Letter of Credit against presentation of a draft or other document that fails to comply with the terms of such Letter of Credit; (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>Section 3</u>, constitute a legal or equitable discharge of, or provide a right of setoff against, the obligations of Borrower hereunder; (v) the fact that a Default shall have occurred and be continuing; or (vi) any material adverse change in the business, property, results of operations, prospects or condition, financial or otherwise, of the Parent Borrower and its Restricted Subsidiaries.  None of the Agents, the Lenders, the Issuing Lenders or any of their affiliates shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Lenders; <u>provided</u> that the foregoing shall not be construed to excuse any Issuing Lender from liability to the Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable Requirements of Law) suffered by the Borrowers that are caused by such Issuing Lender's failure to exercise care when determining whether drafts and other documents

DB1/ 100473273.8
1004794810v9

presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the applicable Issuing Lender (as finally determined by a court of competent jurisdiction), such Issuing Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

3.7     L/C Disbursements. The applicable Issuing Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Such Issuing Lender shall promptly give written notice to the Administrative Agent and the Borrower Representative of such demand for payment and whether such Issuing Lender has made or will make an L/C Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve Borrower of its Reimbursement Obligation to such Issuing Lender and the Lenders with respect to any such L/C Disbursement (other than with respect to the timing of such Reimbursement Obligation set forth in Subsection 3.5).

3.8     L/C Request. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any L/C Request or other application or agreement submitted by any Borrower or any Subsidiary, to, or entered into by any Borrower or any Subsidiary with, any Issuing Lender relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

3.9     Cash Collateralization. If (i) an Event of Default occurs and is continuing or (ii) the Termination Date occurs, then the Borrowers shall then deposit on terms and in accounts satisfactory to the Administrative Agent, in the name of the Collateral Agent and for the benefit of the Revolving Credit Lenders, an amount in cash equal to 105% of the maximum drawable amount of any such Letter of Credit determined as of such date. Funds so deposited shall be applied by the Administrative Agent to reimburse the applicable Issuing Lender for L/C Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be applied to satisfy other Obligations of the Borrowers under this Agreement.

3.10     Additional Issuing Lenders. The Borrower Representative may, at any time and from time to time with the consent of the Administrative Agent (which consent shall not be unreasonably withheld) and such Lender, designate one or more additional Lenders to act as an issuing lender under the terms of this Agreement. Any Lender designated as an issuing lender pursuant to this Subsection 3.10 shall be deemed to be an "Issuing Lender" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender, and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Lender or Issuing Lenders and such Lender. The Administrative Agent shall notify the Lenders of any such additional Issuing Lender. If at any time there is more than one Issuing Lender hereunder, the Borrower Representative may, in its discretion, select which Issuing Lender is to issue any particular Letter of Credit.

3.11     Resignation or Removal of the Issuing Lender. Any Issuing Lender may resign as Issuing Lender hereunder at any time upon at least 30 days' prior notice to the Lenders, the Administrative Agent and the Borrower Representative. Any Issuing Lender may be replaced at any time by written agreement among the Borrower Representative, each Agent, the replaced Issuing Lender and the successor Issuing Lender. The Administrative Agent shall notify the Lenders of any such resignation or replacement of an Issuing Lender. At the time any such resignation of an Issuing Lender shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the retiring Issuing Lender pursuant to Subsection 3.3. From and after the effective date of any such resignation or replacement, (i) the successor Issuing Lender shall have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) references herein to the term "Issuing Lender" shall be deemed to refer to such successor or to any previous Issuing Lender, or to such successor and all previous Issuing Lenders, as the context shall require. After the resignation or replacement of an Issuing Lender, the retiring or replaced Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit.

## SECTION 4

<u>General Provisions Applicable to Loans and Letters of Credit</u>

4.1     <u>Interest Rates and Payment Dates</u>.  (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted LIBOR Rate determined for such day <u>plus</u> the Applicable Margin in effect for such day.

(b)     Each ABR Loan denominated in Dollars shall bear interest for each day that it is outstanding at a rate per annum equal to the Alternate Base Rate in effect for such day <u>plus</u> the Applicable Margin in effect for such day.

(c)     During the continuance of any Event of Default arising from the failure to repay principal when due, and during the continuance of any other Event of Default to which the Administrative Agent may (and shall at the direction of Required Lenders) have elected to apply Default Rate interest, and without further notice, motion or application to, hearing before, or order from the Court, the Obligations shall bear interest at the Default Rate.

(d)     Interest shall be payable in arrears on each Interest Payment Date, <u>provided</u> that interest accruing pursuant to clause (c) of this <u>Subsection 4.1</u> shall be payable from time to time on demand.

(e)     It is the intention of the parties hereto to comply strictly with applicable usury laws; accordingly, it is stipulated and agreed that the aggregate of all amounts which constitute interest under applicable usury laws, whether contracted for, charged, taken, reserved, or received, in connection with the indebtedness evidenced by this Agreement or any Notes, or any other document relating or referring hereto or thereto, now or hereafter existing, shall never exceed under any circumstance whatsoever the maximum amount of interest allowed by applicable usury laws.

4.2     <u>Conversion and Continuation Options</u>.     (a) Subject to its obligations pursuant to <u>Subsection 4.12(c)</u>, the applicable Borrowers may elect from time to time to convert outstanding Revolving Credit Loans from Eurodollar Loans to ABR Loans by the Borrower Representative giving the Administrative Agent irrevocable notice of such election prior to 2:00 P.M., New York City time two Business Days prior to such election. The Borrowers may elect from time to time to convert outstanding Revolving Credit Loans from ABR Loans to Eurodollar Loans by the Borrower Representative giving the Administrative Agent irrevocable notice of such election prior to 2:00 P.M., New York City time at least three Business Days prior to such election.  Any such notice of conversion to Eurodollar Loans shall specify the length of the initial Interest Period or Interest Periods therefor. Upon receipt of any such notice the Administrative Agent shall promptly notify each affected Lender thereof.  All or any part of outstanding Eurodollar Loans or ABR Loans may be converted as provided herein, <u>provided</u> that (<u>i</u>) (unless the Required Lenders otherwise consent) no Loan may be converted into a Eurodollar Loan when any Default or Event of Default has occurred and is continuing and (<u>ii</u>) no Loan may be converted into a Eurodollar Loan after the date that is one month prior to the applicable Termination Date.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower Representative giving notice to the Administrative Agent of the length of the next Interest Period to be applicable to such Loan, determined in accordance with the applicable provisions of the term "Interest Period" set forth in <u>Subsection 1.1</u>, <u>provided</u> that no Eurodollar Loan may be continued as such (<u>i</u>) (unless the Required Lenders otherwise consent) when any Default or Event of Default has occurred and is continuing or (<u>ii</u>) after the date that is one month prior to the applicable Termination Date, and <u>provided</u>, <u>further</u>, that if the Borrower Representative shall fail to give any required notice as described above in this clause (b) or if such continuation is not permitted pursuant to the preceding proviso such Eurodollar Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice of continuation pursuant to this <u>Subsection 4.2(b)</u>, the Administrative Agent shall promptly notify each affected Lender thereof.

4.3    <u>Minimum Amounts; Maximum Sets</u>.  All borrowings, conversions and continuations of Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Set shall be equal to $500,000 or a whole multiple of $500,000 in excess thereof and so that there shall not be more than 12 Sets at any one time outstanding.

4.4    <u>Optional and Mandatory Prepayments; Full Roll of Prior Lender Obligations.</u>.  (a) Each of the Borrowers may at any time and from time to time prepay the Loans made to it and the Reimbursement Obligations in respect of Letters of Credit issued for its account, in whole or in part, subject to <u>Subsection 4.12</u>, without premium or penalty, upon notice by the Borrower Representative to the Administrative Agent prior to 2:00 P.M., New York City time at least three Business Days prior to the date of prepayment (in the case of Eurodollar Loans) or prior to 2:00 P.M., New York City time on the date of prepayment (in the case of (x) ABR Loans, (y) Swingline Loans and (z) Reimbursement Obligations outstanding in Dollars).  Such notice shall be irrevocable except as provided in <u>Subsection 4.4(g)</u>.  Such notice shall specify, in the case of any prepayment of Loans, the identity of the prepaying Borrower, the date and amount of prepayment and whether the prepayment is (i) of Revolving Credit Loans or Swingline Loans, or a combination thereof, and (ii) of Eurodollar Loans or ABR Loans, or a combination thereof, and, in each case if a combination thereof, the principal amount allocable to each and, in the case of any prepayment of Reimbursement Obligations, the date and amount of prepayment, the identity of the applicable Letter of Credit or Letters of Credit and the amount allocable to each of such Reimbursement Obligations.  Upon the receipt of any such notice the Administrative Agent shall promptly notify each affected Lender thereof.  If any such notice is given, the amount specified in such notice shall (subject to <u>Subsection 4.4(g)</u>) be due and payable on the date specified therein, together with (if a Eurodollar Loan is prepaid other than at the end of the Interest Period applicable thereto) any amounts payable pursuant to <u>Subsection 4.12</u>, the Revolving Credit Loans and the Reimbursement Obligations pursuant to this Section and shall be applied in accordance with <u>Section 10.15</u>; <u>provided</u>, however, that any such prepayment shall be applied, <u>first</u>, to the Prior Revolving Credit Loans (in the order and manner provided in the Pre-Petition Credit Agreement) and then to the Revolving Credit Loans and the Reimbursement Obligations.

(b)    On any day (other than during an Agent Advance Period) on which the sum of the Aggregate Lender Exposure or the unpaid balance of Extensions of Credit to, or for the account of, the Borrowers and the aggregate amount of all Prior Revolving Credit Loans exceeds the lesser of (i) the Borrowing Base (based on the Borrowing Base Certificate last delivered) or (ii) the total Commitments at such time, the Borrowers shall prepay on such day the Prior Revolving Credit Loans (in the order and manner provided in the Pre-Petition Credit Agreement) and the principal of outstanding Revolving Credit Loans in an amount equal to such excess for application in accordance with <u>Section 10.15</u>.  If, after giving effect to the prepayment of all outstanding Revolving Credit Loans, the aggregate amount of the L/C Obligations exceeds the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered), the Borrowers shall pay to the Administrative Agent on such day an amount of cash and/or Cash Equivalents in an amount equal to 105% of the maximum drawable amount of any such Letter of Credit determined as of such date, such cash and/or Cash Equivalents to be held as security for all obligations of the Borrowers to the Issuing Lenders and the Revolving Credit Lenders hereunder in a cash collateral account to be established by, and under the sole dominion and control of, the Administrative Agent.

(c)    The Borrowers shall prepay all Swingline Loans then outstanding simultaneously with each borrowing by them of Revolving Credit Loans.

(d)    Prepayments pursuant to <u>Subsection 4.4(b)</u> shall be applied in accordance with <u>Section 10.15</u>.

(e)    For avoidance of doubt, the Commitments shall not be correspondingly reduced by the amount of any prepayments of Revolving Credit Loans, payments of Reimbursement Obligations and cash collateralizations of L/C Obligations, in each case, made under <u>Subsection 4.4(b)</u>.

(f)    Notwithstanding the foregoing provisions of this <u>Subsection 4.4</u>, if at any time any prepayment of the Loans pursuant to <u>Subsection 4.4(a)</u> or <u>4.4(b)</u> would result, after giving effect to the procedures set forth in this Agreement, in any Borrower incurring breakage costs under <u>Subsection 4.12</u> as a result of

Eurodollar Loans being prepaid other than on the last day of an Interest Period with respect thereto, then, the relevant Borrower may, so long as no Default or Event of Default shall have occurred and be continuing, in its sole discretion, initially (i) deposit a portion (up to 100.0%) of the amounts that otherwise would have been paid in respect of such Eurodollar Loans with the Administrative Agent (which deposit must be equal in amount to the amount of such Eurodollar Loans not immediately prepaid), to be held as security for the obligations of such Borrowers to make such prepayment pursuant to a cash collateral agreement to be entered into on terms reasonably satisfactory to the Administrative Agent with such cash collateral to be directly applied upon the first occurrence thereafter of the last day of an Interest Period with respect to such Eurodollar Loans (or such earlier date or dates as shall be requested by such Borrower) or (ii) make a prepayment of the Revolving Credit Loans in accordance with Subsection 4.4(a) with an amount equal to a portion (up to 100.0%) of the amounts that otherwise would have been paid in respect of such Eurodollar Loans (which prepayment, together with any deposits pursuant to clause (i) above, must be equal in amount to the amount of such Eurodollar Loans not immediately prepaid); provided that, notwithstanding anything in this Agreement to the contrary, none of the Borrowers may request any Extension of Credit under the Commitments that would reduce Excess Availability to an amount that is less than the amount of such prepayment until the related portion of such Eurodollar Loans have been prepaid upon the first occurrence thereafter of the last day of an Interest Period with respect to such Eurodollar Loans; provided that, in the case of either clause (i) or (ii) above, such unpaid Eurodollar Loans shall continue to bear interest in accordance with Subsection 4.1 until such unpaid Eurodollar Loans or the related portion of such Eurodollar Loans, as the case may be, have or has been prepaid.

(g)     If a notice of prepayment in connection with a repayment of all outstanding Loans is given in connection with a conditional notice of termination of Commitments as contemplated by Subsection 2.3, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Subsection 2.3.

(h)     Notwithstanding anything to the contrary herein, during the period between the Closing Date and payment in full of all Prior Lender Obligations (including all accrued and unpaid interest thereon and fees but excluding all contingent indemnification obligations and other contingent obligations relating to the Prior Lender Obligations), such amounts may be applied to the Prior Lender Obligations.

(i)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, on the Closing Date the total outstanding amount of the Prior Lender Obligations shall constitute Obligations hereunder, with (i) the outstanding principal amount of all Prior Revolving Credit Loans as of the Closing Date, and all interest and fees thereon accrued as of the Closing Date, being refinanced as Revolving Credit Loans hereunder and Prior L/C Obligations constituting L/C Obligations hereunder.

4.5     Commitment Fees; Administrative Agent's Fee; Other Fees.  (a) Each Borrower agrees to pay to the Administrative Agent, for the account of each Lender, a commitment fee for the period from and including the first day of the Commitment Period to the Termination Date, computed at the Applicable Commitment Fee Rate on the average daily amount of the Unutilized Commitment of such Revolving Credit Lender during the period for which payment is made, payable monthly in arrears on the first calendar day after the end of each calendar month and on the Termination Date or such earlier date as the Commitments shall terminate as provided herein, commencing on the first such date to occur after the date hereof.

(b)     Each Borrower agrees to pay to the Administrative Agent the fees set forth in the [_____] of the Agent Fee Letter.

4.6     Computation of Interest and Fees.  (a) Interest (other than interest based on the Base Rate) and all fees shall be calculated on the basis of a 360-day year for the actual days elapsed; and interest based on the Base Rate shall be calculated on the basis of a 365-day year (or 366-day year, as the case may be) for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower Representative and the affected Lenders of each determination of an Adjusted LIBOR Rate.  Any change in the interest rate on a Loan resulting from a change in the Alternate Base Rate shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower Representative and the affected Lenders of the effective date and the amount of each such change in interest rate.

(b)      Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on each of the Borrowers and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower Representative or any Lender, deliver to the Borrower Representative or such Lender a statement showing in reasonable detail the calculations used by the Administrative Agent in determining any interest rate pursuant to <u>Subsection 4.1</u>, excluding any LIBOR Rate which is based upon the Reuters Monitor Money Rates Service page and any ABR Loan which is based upon the Alternate Base Rate.

4.7      <u>Inability to Determine Interest Rate</u>.  If prior to the first day of any Interest Period, the Administrative Agent shall have determined (which determination shall be conclusive and binding upon each of the Borrowers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate with respect to any Eurodollar Loan for such Interest Period (the "<u>Affected Eurodollar Rate</u>"), the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower Representative and the Lenders as soon as practicable thereafter.  If such notice is given (<u>a</u>) any Eurodollar Loans the rate of interest applicable to which is based on the Affected Eurodollar Rate requested to be made on the first day of such Interest Period shall be made as ABR Loans and (<u>b</u>) any Loans that were to have been converted on the first day of such Interest Period to or continued as Eurodollar Loans the rate of interest applicable to which is based upon the Affected Eurodollar Rate shall be converted to or continued as ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans the rate of interest applicable to which is based upon the Affected Eurodollar Rate shall be made or continued as such, nor shall any of the Borrowers have the right to convert ABR Loans to Eurodollar Loans the rate of interest applicable to which is based upon the Affected Eurodollar Rate.

(b)      Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower Representative or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower Representative) that the Borrower Representative or Required Lenders (as applicable) have determined, that:

(i)      adequate and reasonable means do not exist for ascertaining LIBOR for any requested Interest Period, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)      the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "<u>Scheduled Unavailability Date</u>"), or

(iii)      syndicated loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Borrowers may amend this Agreement to replace LIBOR with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "<u>LIBOR Successor Rate</u>"), together with any proposed LIBOR Successor Rate Conforming Changes (as defined below) and any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower Representative unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not accept such amendment. Such LIBOR Successor Rate shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for the Administrative Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower Representative and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended, (to the extent of the affected Eurodollar Loans or Interest Periods), and (y) the Eurodollar component shall no longer be utilized in determining the Base Rate.  Upon receipt of such notice, the Borrower Representative may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of ABR Loans (subject to the foregoing clause (y)) in the amount specified therein.

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

For purposes hereof, "<u>LIBOR Successor Rate Conforming Changes</u>" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the discretion of the Administrative Agent in consultation with the Borrower Representative, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement).

4.8    <u>Pro Rata Treatment and Payments</u>.  (a) Except as expressly otherwise provided herein, each borrowing of Revolving Credit Loans (other than Swingline Loans) by any of the applicable Borrowers from the Lenders hereunder shall be made, each payment by any of the Borrowers on account of any commitment fee in respect of the Commitments hereunder shall be allocated by the Administrative Agent and any reduction of the Commitments of the Lenders, as applicable, shall be allocated by the Administrative Agent in each case pro rata according to the Commitment Percentage of the Lenders.  Except as expressly otherwise provided herein, each payment (including each prepayment (but excluding payments made pursuant to <u>Subsection</u> <u>4.5(b)</u>, <u>4.9</u>, <u>4.10</u>, <u>4.11</u>, <u>4.12</u>, <u>4.13(d)</u>, or <u>4.15(c)</u>) by any of the applicable Borrowers on account of principal of and interest on any Revolving Credit Loans shall be allocated by the Administrative Agent pro rata according to the respective outstanding principal amounts of such Revolving Credit Loans then held by the relevant Revolving Credit Lenders, and each payment on account of principal of and interest on any loans made pursuant to any Tranche established after the date of this Agreement shall be allocated pro rata (or as may otherwise be provided for in the applicable amendment to this Agreement relating to such Tranche) among the Lenders with participations in such Tranche.  All payments (including prepayments) to be made by any of the Borrowers hereunder, whether on account of principal, interest, fees, Reimbursement Obligations or otherwise, shall be made without set-off or counterclaim and shall be made on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 P.M., New York City time) on the due date thereof to the Administrative Agent for the account of the Lenders holding the relevant Loans, the Lenders, the Administrative Agent, or the Other Representatives, as the case may be, at the Administrative Agent's office specified in <u>Subsection</u> <u>11.2</u>, in Dollars, and in immediately available funds.  Payments received by the Administrative Agent after such time shall be deemed to have been received on the next Business Day.  The Administrative Agent shall distribute such payments to such Lenders or Other Representatives, as the case may be, if any such payment is received prior to 2:00 P.M., New York City time, on a Business Day, in like funds as received prior to the end of such Business Day and otherwise the Administrative Agent shall distribute such payment to such Lenders or Other Representatives, as the case may be, on the next succeeding Business Day.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day (and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension) unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.

(b)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the applicable Borrowers in respect of such borrowing a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Rate for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Subsection 4.8(b) shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, (x) the Administrative Agent shall notify the Borrower Representative of the failure of such Lender to make such amount available to the Administrative Agent and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans hereunder on demand from such Borrower and (y) then such Borrower may, without waiving or limiting any rights or remedies it may have against such Lender hereunder or under applicable law or otherwise, borrow a like amount on an unsecured basis from any commercial bank for a period ending on the date upon which such Lender does in fact make such borrowing available, provided that at the time such borrowing is made and at all times while such amount is outstanding such Borrower would be permitted to borrow such amount pursuant to Subsection 2.1.

4.9     Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof in each case occurring after the Closing Date shall make it unlawful for any Lender to make or maintain any Eurodollar Loans as contemplated by this Agreement ("Affected Loans"), (a) such Lender shall promptly give written notice of such circumstances to the Borrower Representative and the Administrative Agent (which notice shall be withdrawn whenever such circumstances no longer exist), (b) the commitment of such Lender hereunder to make Affected Loans, continue Affected Loans as such and convert an ABR Loan to an Affected Loan shall forthwith be cancelled and, until such time as it shall no longer be unlawful for such Lender to make or maintain such Affected Loans, such Lender shall then have a commitment only to make an ABR Loan (or a Swingline Loan) when an Affected Loan is requested and (c) such Lender's Loans then outstanding as Affected Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Affected Loans or within such earlier period as required by law.  If any such conversion or prepayment of an Affected Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the applicable Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Subsection 4.12.

4.10     Requirements of Law.  (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof applicable to any Lender or any Issuing Lender, or compliance by any Lender or any Issuing Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case made subsequent to the Closing Date (or, if later, the date on which such Lender becomes a Lender or such Issuing Lender becomes an Issuing Lender):

(i)     shall subject such Lender or such Issuing Lender to any Tax of any kind whatsoever with respect to any Letter of Credit, any L/C Request or any Eurodollar Loans made or maintained by it or its obligation to make or maintain Eurodollar Loans, or change the basis of taxation of payments to such Lender in respect thereof, in each case, except for Non-Excluded Taxes, Taxes imposed by FATCA and Taxes measured by or imposed upon net income, or franchise Taxes, or Taxes measured by or imposed upon overall capital or net worth, or branch Taxes (in the case of such capital, net worth or branch Taxes, imposed in lieu of such net income Tax), of such Lender, such Issuing Lender or its applicable lending office, branch, or any affiliate thereof;

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the LIBOR Rate hereunder; or

DB1/ 100473273.8
1004794810v9

(iii)    shall impose on such Lender or such Issuing Lender any other condition (excluding any Tax of any kind whatsoever);

and the result of any of the foregoing is to increase the cost to such Lender or such Issuing Lender, by an amount which such Lender or such Issuing Lender deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans, or issuing or participating in Letters of Credit or to reduce any amount receivable hereunder in respect thereof, then, in any such case, upon notice to the Borrower Representative from such Lender, through the Administrative Agent in accordance herewith, the applicable Borrower shall promptly pay such Lender or such Issuing Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable with respect to such Eurodollar Loans, or Letters of Credit, provided that, in any such case, such Borrower may elect to convert the Eurodollar Loans made by such Lender hereunder to ABR Loans by giving the Administrative Agent at least one Business Day's notice of such election, in which case such Borrower shall promptly pay to such Lender, upon demand, without duplication, amounts theretofore required to be paid to such Lender pursuant to this Subsection 4.10(a) and such amounts, if any, as may be required pursuant to Subsection 4.12. If any Lender becomes entitled to claim any additional amounts pursuant to this Subsection 4.10(a), it shall provide prompt notice thereof to the Borrower Representative, through the Administrative Agent, certifying (x) that one of the events described in this clause (a) has occurred and describing in reasonable detail the nature of such event, (y) as to the increased cost or reduced amount resulting from such event and (z) as to the additional amount demanded by such Lender and a reasonably detailed explanation of the calculation thereof. Such a certificate as to any additional amounts payable pursuant to this Subsection 4.10(a) submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Subsection 4.10(a), the Borrowers shall not be required to compensate a Lender pursuant to this Subsection 4.10(a) for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower Representative of such Lender's intention to claim compensation therefor (except that, if the adoption of or change in any Requirement of Law or in the interpretation or application thereof giving rise to such increased costs or reductions is retroactive, then provided such Lender shall, within six months of such adoption, change, interpretation or application, have notified the Borrower Representative of such Lender's intention to claim compensation therefor, the six-month period first referred to in this sentence shall be extended to include the period of retroactive effect thereof). This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)    If any Lender or any Issuing Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity or in the interpretation or application thereof or compliance by such Lender or such Issuing Lender or any corporation controlling such Lender or such Issuing Lender with any request or directive regarding capital adequacy or liquidity (whether or not having the force of law) from any Governmental Authority, in each case, made subsequent to the Closing Date, does or shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of such Lender's or such Issuing Lender's obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such change or compliance (taking into consideration such Lender's or such Issuing Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender or such Issuing Lender to be material, then from time to time, within 10 Business Days after submission by such Lender to the Borrower Representative (through the Administrative Agent) of a written request therefor certifying (x) that one of the events described in this clause (b) has occurred and describing in reasonable detail the nature of such event, (y) as to the reduction of the rate of return on capital resulting from such event and (z) as to the additional amount or amounts demanded by such Lender or such Issuing Lender or corporation and a reasonably detailed explanation of the calculation thereof, the applicable Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or corporation for such reduction. Such a certificate as to any additional amounts payable pursuant to this Subsection 4.10(b) submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Subsection 4.10(b), the Borrowers shall not be required to compensate a Lender pursuant to this Subsection 4.10(b) for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower Representative of such Lender's intention to claim compensation therefor (except that, if the adoption of or change in any Requirement of Law or in the interpretation or application thereof giving rise to such increased costs or reductions is retroactive, then provided such Lender shall, within six months of such adoption, change, interpretation or application, have notified the Borrower Representative of such Lender's intention to claim compensation therefor,

DB1/ 100473273.8
1004794810v9

the six-month period first referred to in this sentence shall be extended to include the period of retroactive effect thereof).  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(c)    Notwithstanding anything herein to the contrary, the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case shall be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date for all purposes herein.

4.11    Taxes.  (a) Except as provided below in this Subsection 4.11 or as required by law (which, for purposes of this Subsection 4.11, shall include FATCA), all payments made by each of the Borrowers or the Agents under this Agreement and any Notes shall be made free and clear of, and without deduction or withholding for or on account of any Taxes; provided that if any Non-Excluded Taxes are required to be withheld by any Borrower or the Administrative Agent from any amounts payable by such Borrower or the Administrative Agent to any Agent or any Lender hereunder or under any Notes, the amounts so payable by such Borrower shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that each of the Borrowers and the Administrative Agent shall be entitled to deduct and withhold, and the Borrowers shall not be required to indemnify for, any Non-Excluded Taxes, and any such amounts payable by any Borrower to or for the account of any Agent or Lender shall not be increased (x) if such Agent or Lender fails to comply with the requirements of clause (b), (c) or (d) of this Subsection 4.11 or with the requirements of Subsection 4.13, or (y) with respect to any Non-Excluded Taxes imposed in connection with the payment of any fees paid under this Agreement unless such Non-Excluded Taxes are imposed as a result of a Change in Law, or (z) with respect to any Non-Excluded Taxes imposed by the United States or any state or political subdivision thereof, unless such Non-Excluded Taxes are imposed as a result of a change in treaty, law or regulation that occurred after such Agent became an Agent hereunder or such Lender became a Lender hereunder (or, if such Agent or Lender is a non-U.S. intermediary or flow-through entity for U.S. federal income tax purposes, after the relevant beneficiary or member of such Agent or Lender became such a beneficiary or member, if later) (any such change, at such time, a "Change in Law").  Whenever any Non-Excluded Taxes are payable by any Borrower, as promptly as possible thereafter the Borrower Representative shall send to the Administrative Agent for its own account or for the account of the respective Lender or Agent, as the case may be, a certified copy of an original official receipt received by such Borrower showing payment thereof.  If any Borrower fails to pay any Non-Excluded Taxes when due to the appropriate Governmental Authority in accordance with applicable law or the Borrower Representative fails to remit to the Administrative Agent the required receipts or other required documentary evidence, such Borrower shall indemnify the Administrative Agent, the Lenders and the Agents for any incremental Taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.  The agreements in this Subsection 4.11 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)    Each Agent and each Lender that is not a United States Person shall:

(i)    (1) on or before the date of any payment by any of the Borrowers under this Agreement or any Notes to, or for the account of, such Agent or Lender, deliver to the Borrower Representative and the Administrative Agent (A) two accurate and complete original signed Internal Revenue Service Forms W-8BEN or W-8BEN-E, as applicable (certifying that it is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country) or Forms W-8ECI, or successor applicable form, as the case may be, in each case certifying that it is entitled to receive all payments under this Agreement and any Notes without deduction or withholding of any United States federal income taxes, and (B) such other forms, documentation or certifications, as the case may be, certifying that it is entitled to an exemption from United States backup withholding tax with respect to payments under this Agreement and any Notes;

(2)      deliver to the Borrower Representative and the Administrative Agent two further original signed forms or certifications provided in <u>Subsection 4.11(b)(i)(1)</u> on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form or certificate previously delivered by it to the Borrower Representative;

(3)      obtain such extensions of time for filing and completing such forms or certifications as may reasonably be requested by the Borrower Representative or the Administrative Agent; and

(4)      deliver, to the extent legally entitled to do so, upon reasonable request by the Borrower Representative, to the Borrower Representative and the Administrative Agent such other forms as may be reasonably required in order to establish the legal entitlement of such Lender to an exemption from, or reduction of, withholding with respect to payments under this Agreement and any Notes, <u>provided</u> that in determining the reasonableness of a request under this clause (4) such Lender shall be entitled to consider the cost (to the extent unreimbursed by any Loan Party) which would be imposed on such Lender of complying with such request; or

(ii)      in the case of any such Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and is claiming the so-called "portfolio interest exemption",

(1)      represent to the Borrowers and the Administrative Agent that it is not (<u>A</u>) a bank within the meaning of Section 881(c)(3)(A) of the Code, (<u>B</u>) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (<u>C</u>) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code;

(2)      deliver to the Borrower Representative on or before the date of any payment by any of the Borrowers with a copy to the Administrative Agent, (<u>A</u>) two certificates substantially in the form of <u>Exhibit D</u> hereto (any such certificate a "<u>U.S. Tax Compliance Certificate</u>") and (<u>B</u>) two accurate and complete original signed Internal Revenue Service Forms W-8BEN or W-8BEN-E, as applicable, or successor applicable form, certifying to such Lender's legal entitlement at the date of such form to an exemption from U.S. withholding tax under the provisions of Section 871(h) or Section 881(c) of the Code with respect to payments to be made under this Agreement and any Notes and (<u>C</u>) such other forms, documentation or certifications, as the case may be certifying that it is entitled to an exemption from United States backup withholding tax with respect to payments under this Agreement and any Notes (and shall also deliver to the Borrower Representative and the Administrative Agent two further original signed forms or certificates on or before the date it expires or becomes obsolete and after the occurrence of any event requiring a change in the most recently provided form or certificate and, if necessary, obtain any extensions of time reasonably requested by the Borrower Representative or the Administrative Agent for filing and completing such forms or certificates); and

(3)      deliver, to the extent legally entitled to do so, upon reasonable request by the Borrower Representative, to the Borrower Representative and the Administrative Agent such other forms as may be reasonably required in order to establish the legal entitlement of such Lender to an exemption from, or reduction of, withholding with respect to payments under this Agreement and any Notes, <u>provided</u> that in determining the reasonableness of a request under this clause (3) such Lender shall be entitled to consider the cost (to the extent unreimbursed by the Borrower Representative) which would be imposed on such Lender of complying with such request; or

(iii)      in the case of any such Agent or Lender that is a non-U.S. intermediary or flow-through entity for U.S. federal income tax purposes,

(1)      on or before the date of any payment by any of the Borrowers under this Agreement or any Notes to, or for the account of, such Agent or Lender, deliver to the Borrower Representative and the Administrative Agent two accurate and complete original signed Internal

61

Revenue Service Forms W-8IMY and, if any beneficiary or member of such Lender is claiming the so-called "portfolio interest exemption", (I) represent to the Borrowers and the Administrative Agent that such Lender is not (A) a bank within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and (II) also deliver to the Borrower Representative and the Administrative Agent two U.S. Tax Compliance Certificates certifying to such Lender's legal entitlement at the date of such certificate to an exemption from U.S. withholding tax under the provisions of Section 881(c) of the Code with respect to payments to be made under this Agreement and any Notes; and

(A) with respect to each beneficiary or member of such Agent or Lender that is not claiming the so-called "portfolio interest exemption", also deliver to the Borrower Representative and the Administrative Agent (I) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (certifying that such beneficiary or member is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country), Form W-8ECI or Form W-9, or successor applicable form, as the case may be, in each case so that each such beneficiary or member is entitled to receive all payments under this Agreement and any Notes without deduction or withholding of any United States federal income taxes and (II) such other forms, documentation or certifications, as the case may be, certifying that each such beneficiary or member is entitled to an exemption from United States backup withholding tax with respect to all payments under this Agreement and any Notes; and

(B) with respect to each beneficiary or member of such Lender that is claiming the so-called "portfolio interest exemption", (I) represent to the Borrowers and the Administrative Agent that such beneficiary or member is not (1) a bank within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and (II) also deliver to the Borrower Representative and the Administrative Agent two U.S. Tax Compliance Certificates with respect to each beneficiary or member (which may be provided by such Lender on behalf of such beneficiary or member) and two accurate and complete copies of such beneficiary or member's original signed Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, or successor applicable form, certifying to such beneficiary's or member's legal entitlement at the date of such certificate to an exemption from U.S. withholding tax under the provisions of Section 871(h) or Section 881(c) of the Code with respect to payments to be made under this Agreement and any Notes, and (III) also deliver to the Borrower Representative and the Administrative Agent such other forms, documentation or certifications, as the case may be, certifying that it is entitled to an exemption from United States backup withholding tax with respect to payments under this Agreement and any Notes;

(2) deliver to the Borrower Representative and the Administrative Agent two further signed copies or originals (as applicable) of any forms, certificates or certifications referred to above on or before the date any such form, certificate or certification expires or becomes obsolete, or any beneficiary or member changes, and after the occurrence of any event requiring a change in the most recently provided form, certificate or certification and obtain such extensions of time reasonably requested by the Borrower Representative or the Administrative Agent for filing and completing such forms, certificates or certifications; and

(3) deliver, to the extent legally entitled to do so, upon reasonable request by the Borrower Representative, to the Borrower Representative and the Administrative Agent such other forms as may be reasonably required in order to establish the legal entitlement of such Agent or Lender (or beneficiary or member) to an exemption from, or reduction of, withholding with respect to payments under this Agreement and any Notes, provided that in determining the reasonableness of a request under this clause (3) such Agent or Lender shall be entitled to consider

the cost (to the extent unreimbursed by any of the Borrowers) which would be imposed on such Agent or Lender (or beneficiary or member) of complying with such request;

unless in any such case (other than with respect to United States backup withholding tax) there has been a Change in Law which renders all such forms inapplicable or which would prevent such Agent or such Lender (or such beneficiary or member) from duly completing and delivering any such form with respect to it and such Agent or such Lender so advises the Borrower Representative and the Administrative Agent.

(c)     Each Lender and each Agent, in each case that is a United States Person, shall on or before the date of any payment by any Borrower under this Agreement or any Notes to such Lender or Agent, deliver to the Borrower Representative and the Administrative Agent two accurate and complete original signed Internal Revenue Service Forms W-9, or successor form, certifying that such Lender or Agent is a United States Person and that such Lender or Agent is entitled to complete exemption from United States backup withholding tax.

(d)     Notwithstanding the foregoing, if the Administrative Agent is not a United States Person, on or before the date of any payment by any of the Borrowers under this Agreement or any Notes to the Administrative Agent, the Administrative Agent shall:

(i)     deliver to the Borrower Representative (A) two accurate and complete original signed Internal Revenue Service Forms W-8ECI, or successor applicable form, with respect to any amounts payable to the Administrative Agent for its own account, (B) two accurate and complete original signed Internal Revenue Service Forms W-8IMY, or successor applicable form, with respect to any amounts payable to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business in the United States and that it is using such form as evidence of its agreement with the Borrowers to be treated as a U.S. person with respect to such payments (and the Borrowers and the Administrative Agent agree to so treat the Administrative Agent as a U.S. person with respect to such payments as contemplated by U.S. Treasury Regulation § 1.1441-1(b)(2)(iv)) or (C) such other forms or certifications as may be sufficient under applicable law to establish that the Administrative Agent is entitled to receive any payment by any of the Borrowers under this Agreement or any Notes (whether for its own account or for the account of others) without deduction or withholding of any United States federal income taxes;

(ii)     deliver to the Borrower Representative two further original signed forms or certifications provided in Subsection 4.11(d)(i) on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form or certificate previously delivered by it to the Borrower Representative; and

(iii)     obtain such extensions of time for filing and completing such forms or certifications as may reasonably be requested by the Borrower Representative or the Administrative Agent;

unless in any such case (other than with respect to United States backup withholding tax) there has been a Change in Law which renders all such forms inapplicable or which would prevent the Administrative Agent from duly completing and delivering any such form with respect to it and the Administrative Agent so advises the Borrower Representative.

(e)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA, such Lender shall deliver to the Administrative Agent and the Borrower Representative, at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Agent or the Borrower Representative, such documentation prescribed by applicable law and such additional documentation reasonably requested by the Administrative Agent or the Borrower Representative as may be

necessary for the Administrative Agent and the Borrowers to comply with their respective obligations (including any applicable reporting requirements) under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. For the avoidance of doubt, the Borrowers and the Administrative Agent shall be permitted to withhold any Taxes imposed by FATCA.

(f)    For purposes of determining withholding Taxes imposed under FATCA, from and after the effective date of this Agreement, the Borrowers and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) this Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

(g)    For purposes of this <u>Section 4.11</u> and for purposes of <u>Section 4.13</u>, the term "Lender" includes any Issuing Lender.

4.12    <u>Indemnity</u>.    The Borrowers agree, jointly and severally, to indemnify each Lender in respect of Extensions of Credit made, or requested to be made, to the Borrowers and to hold each such Lender harmless from any loss or expense which such Lender may sustain or incur (other than through such Lender's bad faith, gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable decision) as a consequence of (<u>a</u>) default by such Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans, after the Borrower Representative has given a notice requesting the same in accordance with the provisions of this Agreement, (<u>b</u>) default by such Borrower in making any prepayment or conversion of Eurodollar Loans after the Borrower Representative has given a notice thereof in accordance with the provisions of this Agreement or (<u>c</u>) the making of a payment or prepayment of Eurodollar Loans or the conversion of Eurodollar Loans on a day which is not the last day of an Interest Period with respect thereto.    Such indemnification may include an amount equal to the excess, if any, of (<u>i</u>) the amount of interest which would have accrued on the amount so prepaid, or converted, or not so borrowed, converted or continued, for the period from the date of such prepayment or conversion or of such failure to borrow, convert or continue to the last day of the applicable Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Eurodollar Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (<u>ii</u>) the amount of interest (as reasonably determined by such Lender) which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.    If any Lender becomes entitled to claim any amounts under the indemnity contained in this <u>Subsection 4.12</u>, it shall provide prompt notice thereof to the Borrower Representative, through the Administrative Agent, certifying (<u>x</u>) that one of the events described in clause (a), (b) or (c) has occurred and describing in reasonable detail the nature of such event, (<u>y</u>) as to the loss or expense sustained or incurred by such Lender as a consequence thereof and (<u>z</u>) as to the amount for which such Lender seeks indemnification hereunder and a reasonably detailed explanation of the calculation thereof.    Such a certificate as to any indemnification pursuant to this <u>Subsection 4.12</u> submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error.    The Parent Borrower shall pay (or cause the relevant Borrower to pay) such Lender the amount shown as due on any such certificate within five Business Days after receipt thereof.    This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

4.13    <u>Certain Rules Relating to the Payment of Additional Amounts</u>.    (a) Upon the request, and at the expense of the Borrower Representative, each Lender and Agent to which any Borrower is required to pay any additional amount pursuant to <u>Subsection 4.10</u> or <u>4.11</u>, and any Participant in respect of whose participation such payment is required, shall reasonably afford the Borrower Representative the opportunity to contest, and reasonably cooperate with the Borrower Representative in contesting, the imposition of any Non-Excluded Tax giving rise to such payment; <u>provided</u> that (<u>i</u>) such Lender or Agent shall not be required to afford the Borrower Representative the opportunity to so contest unless the Borrower Representative shall have confirmed in writing to such Lender or Agent such Borrower's obligation to pay such amounts pursuant to this Agreement and (<u>ii</u>) the Borrowers shall reimburse such Lender or Agent for its reasonable attorneys' and accountants' fees and disbursements incurred in so cooperating with the Borrower Representative in contesting the imposition of such Non-Excluded Tax; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing no Lender or Agent shall be required to afford the Borrower Representative the opportunity to contest, or cooperate with the Borrower Representative in contesting, the

imposition of any Non-Excluded Taxes, if such Lender or Agent in its sole discretion in good faith determines that to do so would have an adverse effect on it.

   (b) If a Lender changes its applicable lending office (other than (i) pursuant to clause (c) below or (ii) after an Event of Default has occurred and is continuing) and the effect of such change, as of the date of such change, would be to cause any of the Borrowers to become obligated to pay any additional amount under Subsection 4.10 or 4.11, such Borrower shall not be obligated to pay such additional amount.

   (c) If a condition or an event occurs which would, or would upon the passage of time or giving of notice, result in the payment of any additional amount to any Lender or Agent by any of the Borrowers pursuant to Subsection 4.10 or 4.11 or result in Affected Loans or commitments to make Affected Loans being automatically converted to ABR Loans or commitments to make ABR Loans, as the case may be, pursuant to Subsection 4.9, such Lender or Agent shall promptly notify the Borrower Representative and the Administrative Agent and shall take such steps as may reasonably be available to it to mitigate the effects of such condition or event (which shall include efforts to rebook the Loans held by such Lender at another lending office, or through another branch or an affiliate, of such Lender); provided that such Lender or Agent shall not be required to take any step that, in its reasonable judgment, would be materially disadvantageous to its business or operations or would require it to incur additional costs (unless the Borrowers agree to reimburse such Lender or Agent for the reasonable incremental out-of-pocket costs thereof).

   (d) If any of the Borrowers shall become obligated to pay additional amounts pursuant to Subsection 4.10 or 4.11 and any affected Lender shall not have promptly taken steps necessary to avoid the need for payments under Subsection 4.10 or 4.11 or if Affected Loans or commitments to make Affected Loans are automatically converted to ABR Loans or commitments to make ABR Loans, as the case may be, under Subsection 4.9 and any affected Lender shall not have promptly taken steps necessary to avoid the need for such conversion under Subsection 4.9, the Borrower Representative shall have the right, for so long as such obligation remains, (i) with the assistance of the Administrative Agent to seek one or more substitute Lenders reasonably satisfactory to the Administrative Agent and the Borrower Representative to purchase the affected Loan, in whole or in part, at an aggregate price no less than such Loan's principal amount plus accrued interest, and assume the affected obligations under this Agreement, or (ii) so long as no Event of Default then exists or will exist immediately after giving effect to the respective prepayment, upon notice to the Administrative Agent to prepay the affected Loan, in whole or in part, subject to Subsection 4.12, without premium or penalty and terminate the Commitments in respect of the Revolving Credit Facility of such Lender.  In the case of the substitution of a Lender, then, the Parent Borrower, any other applicable Borrower, the Administrative Agent, the affected Lender, and any substitute Lender shall execute and deliver an appropriately completed Assignment and Acceptance pursuant to Subsection 11.6(b) to effect the assignment of rights to, and the assumption of obligations by, the substitute Lender; provided that any fees required to be paid by Subsection 11.6(b) in connection with such assignment shall be paid by the Parent Borrower or the substitute Lender.  In the case of a prepayment of an affected Loan, the amount specified in the notice shall be due and payable on the date specified therein, together with any accrued interest to such date on the amount prepaid.  In the case of each of the substitution of a Lender and of the prepayment of an affected Loan, the applicable Borrower shall first pay the affected Lender any additional amounts owing under Subsections 4.10 and 4.11 (as well as any commitment fees and other amounts then due and owing to such Lender, including any amounts under this Subsection 4.13) prior to such substitution or prepayment. In the case of the substitution of a Lender pursuant to this Subsection 4.13(d) or Subsection 4.15(c)(i), if the Lender being replaced does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the assignee Lender executes and delivers such Assignment and Acceptance and/or such other documentation and (b) the date as of which all obligations of the Borrowers owing to such replaced Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender and/or the Parent Borrower to such Lender being replaced, then the Lender being replaced shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the applicable Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Lender.

   (e) If any Agent or any Lender receives a refund directly attributable to Taxes for which any of the Borrowers has made additional payments pursuant to Subsection 4.10(a) or 4.11(a), such Agent or such

Lender, as the case may be, shall promptly pay such refund (together with any interest with respect thereto received from the relevant taxing authority, but net of any reasonable cost incurred in connection therewith) to such Borrower, and in no event will a Lender or Agent be required to pay any amount to a Borrower pursuant to this Section 4.13(e), the payment of which would place the Lender or Agent in a less favorable net after-Tax position than the Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid; provided, however, that such Borrower agrees promptly to return such refund (together with any interest with respect thereto due to the relevant taxing authority) (free of all Non-Excluded Taxes) to such Agent or the applicable Lender, as the case may be, upon receipt of a notice that such refund is required to be repaid to the relevant taxing authority.

(f)        The obligations of any Agent, Lender or Participant under this Subsection 4.13 shall survive the termination of this Agreement and the payment of the Loans and all amounts payable hereunder.

4.14    Controls on Prepayment if Aggregate Outstanding Credit Exceeds Aggregate Revolving Credit Loan Commitments.  (a) In addition to the provisions set forth in Subsection 4.4(b), the Parent Borrower will implement and maintain internal controls to monitor the borrowings and repayments of Loans by the Borrowers and the issuance of and drawings under Letters of Credit, with the objective of preventing any request for an Extension of Credit that would result in (i) the Aggregate Outstanding Credit with respect to all of the Revolving Credit Lenders (including the Swingline Lender) being in excess of the aggregate Commitments then in effect or (ii) any other circumstance under which an Extension of Credit would not be permitted pursuant to Subsection 2.1(a).

(b)        The Administrative Agent will calculate the Aggregate Outstanding Credit with respect to all of (A) the Revolving Credit Lenders and (B) the Lenders (in each case, including the Swingline Lender) from time to time, and in any event not less frequently than once during each calendar week.  In making such calculations, the Administrative Agent will rely on the information most recently received by it from the Swingline Lender in respect of outstanding Swingline Loans and from the Issuing Lenders in respect of outstanding L/C Obligations.

4.15    Defaulting Lenders.  Notwithstanding anything contained in this Agreement to the contrary, if any Revolving Credit Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Revolving Credit Lender is a Defaulting Lender:

(a)        no commitment fee shall accrue for the account of a Defaulting Lender so long as such Lender shall be a Defaulting Lender (except to the extent it is payable to the Issuing Lender pursuant to clause (d)(v) below);

(b)        in determining the Required Lenders or Supermajority Lenders, any Lender that at the time is a Defaulting Lender (and the Revolving Credit Loans and/or Commitment of such Defaulting Lender) shall be excluded and disregarded;

(c)        the Borrower Representative shall have the right, at its sole expense and effort (i) to seek one or more Persons reasonably satisfactory to the Administrative Agent and the Borrower Representative to each become a substitute Revolving Credit Lender and assume all or part of the Commitment of any Defaulting Lender and the Borrower Representative, the Administrative Agent and any such substitute Revolving Credit Lender shall execute and deliver, and such Defaulting Lender shall thereupon be deemed to have executed and delivered, an appropriately completed Assignment and Acceptance to effect such substitution or (ii) so long as no Event of Default then exists or will exist immediately after giving effect to the respective prepayment, upon notice to the Administrative Agent, to prepay the Loans and, at the Borrower Representative's option, terminate the Commitments of such Defaulting Lender, in whole or in part, without premium or penalty;

(d)        if any Swingline Exposure exists or any L/C Obligations exist at the time a Revolving Credit Lender becomes a Defaulting Lender then:

(i)        all or any part of such Swingline Exposure and L/C Obligations shall be re-allocated among the Non-Defaulting Lenders in accordance with their respective Commitment Percentages but only to the extent the sum of all Non-Defaulting Lenders' Revolving Exposures plus such Defaulting Lender's Swingline Exposure and L/C Obligations does not exceed the total of all Non-Defaulting Lenders' Commitments;

(ii)       if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrowers shall within one Business Day following notice by the Administrative Agent (x) first, prepay such Defaulting Lender's Swingline Exposure and (y) second, cash collateralize such Defaulting Lender's L/C Obligations (after giving effect to any partial reallocation pursuant to clause (i) above) on terms reasonably satisfactory to the Administrative Agent for so long as such L/C Obligations are outstanding;

(iii)      if any portion of such Defaulting Lender's L/C Obligations is cash collateralized pursuant to clause (ii) above, the Borrowers shall not be required to pay the L/C Fee for participation with respect to such portion of such Defaulting Lender's L/C Exposure so long as it is cash collateralized;

(iv)      if any portion of such Defaulting Lender's L/C Obligations is reallocated to the Non-Defaulting Lenders pursuant to clause (i) above, then the letter of credit commission with respect to such portion shall be allocated among the Non-Defaulting Lenders in accordance with their Commitment Percentages; or

(v)       if any portion of such Defaulting Lender's L/C Obligations is neither cash collateralized nor reallocated pursuant to this Subsection 4.15(d), then, without prejudice to any rights or remedies of the Issuing Lender or any Revolving Credit Lender hereunder, the commitment fee that otherwise would have been payable to such Defaulting Lender (with respect to the portion of such Defaulting Lender's Commitment that was utilized by such L/C Obligations) and the letter of credit commission payable with respect to such Defaulting Lender's L/C Obligations shall be payable to the Issuing Lender until such L/C Obligations are cash collateralized and/or reallocated;

(e)       so long as any Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, unless they are respectively satisfied that the related exposure will be 100% covered by the Commitments of the Non-Defaulting Lenders and/or cash collateralized on terms reasonably satisfactory to the Administrative Agent, and participations in any such newly issued or increased Letter of Credit or newly made Swingline Loan shall be allocated among Non-Defaulting Lenders in accordance with their respective Commitment Percentages (and Defaulting Lenders shall not participate therein); and

(f)       any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Subsection 11.7) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, pro rata, to the payment of any amounts owing by such Defaulting Lender to the Issuing Lender or Swingline Lender hereunder, (iii) third, to the funding of any Loan or the funding or cash collateralization of any participation in any Swingline Loan or Letter of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iv) fourth, if so determined by the Administrative Agent and the Parent Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (v) fifth, pro rata, to the payment of any amounts owing to the Borrowers or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by a Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (vi) sixth, to such Defaulting Lender or as otherwise directed by a

court of competent jurisdiction; provided that if such payment is (x) a prepayment of the principal amount of any Loans or Reimbursement Obligations in respect of L/C Disbursements in respect of which a Defaulting Lender has funded its participation obligations and (y) made at a time when the conditions set forth in Subsection 6.2 are satisfied, such payment shall be applied solely to prepay the Loans of, and Reimbursement Obligations owed to, all Non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans, or Reimbursement Obligations owed to, any Defaulting Lender.

(g)    In the event that the Administrative Agent, the Borrower Representative, each applicable Issuing Lender or the Swingline Lender, as the case may be, each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure and L/C Obligations of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Commitment Percentage.  The rights and remedies against a Defaulting Lender under this Subsection 4.15 are in addition to other rights and remedies that the Borrowers, the Administrative Agent, the Issuing Lenders, the Swingline Lender and the Non-Defaulting Lenders may have against such Defaulting Lender.  The arrangements permitted or required by this Subsection 4.15 shall be permitted under this Agreement, notwithstanding any limitation on Liens or the pro rata sharing provisions or otherwise.

4.16    Cash Management.  (a) Annexed hereto as Schedule 4.16, as the same may be modified from time to time by notice to the Administrative Agent, is a schedule of all DDAs and Concentration Accounts that are maintained by the Qualified Loan Parties, which schedule includes, with respect to each depository (i) the name and address of such depository; (ii) the account number(s) (and account name(s) of such bank account(s)) maintained with such depository; and (iii) a contact person at such depository.

(b)    Except as otherwise agreed by the Administrative Agent, each Qualified Loan Party shall (i) deliver to the Administrative Agent (A) notifications executed on behalf of each such Qualified Loan Party to each depository institution with which any DDA (other than Excluded Accounts) is maintained, in form reasonably satisfactory to the Administrative Agent of the Administrative Agent's interest in such DDA and (B) Credit Card Notifications executed on behalf of each such Qualified Loan Party and delivered to each Credit Card Issuer and Credit Card Processor, in form reasonably satisfactory to the Administrative Agent, (ii) instruct each depository institution for a DDA (other than Excluded Accounts) that the amount available at the close of each Business Day in such DDA should be swept to one of the Qualified Loan Parties' Concentration Accounts no less frequently than on a daily basis, such instructions to be irrevocable unless otherwise agreed to by the Administrative Agent, (iii) enter into a blocked account agreement (each, a "Blocked Account Agreement"), in form reasonably satisfactory to the Administrative Agent, with the Administrative Agent or the Collateral Agent and any bank with which such Qualified Loan Party maintains a Concentration Account into which the DDAs (other than Excluded Accounts) are swept (each such account, a "Blocked Account" and collectively, the "Blocked Accounts"), covering each such Concentration Account maintained with such bank and (iv) (A) instruct all Account Debtors of such Qualified Loan Party that remit payments of Accounts of such Account Debtor regularly by check pursuant to arrangements with such Qualified Loan Party to remit all such payments to the applicable "P.O. Boxes" or "Lockbox Addresses" with respect to the applicable DDA or Concentration Account, which remittances shall be collected by the applicable bank and deposited in the applicable DDA or Concentration Account or (B) cause the checks of any such Account Debtors to be deposited in the applicable DDA or Concentration Account within two Business Days after such check is received by such Qualified Loan Party.  All amounts received by the Parent Borrower or any of its Domestic Subsidiaries that is a Loan Party in respect of any Account, in addition to all other cash received from any other source, shall upon receipt of such amount or cash (other than any such amount to be deposited in Excluded Accounts) be deposited into a DDA (other than an Excluded Account) or Concentration Account.  Each Qualified Loan Party agrees that it will not cause proceeds of such DDAs (other than Excluded Accounts) to be otherwise redirected.

(c)    Each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than once per Business Day (unless the Commitments have been terminated and the monetary obligations then due and owing hereunder and under the other Loan Documents have been paid in full and all Letters of Credit have either been terminated or expired (unless cash collateralized or otherwise provided for in a manner reasonably

satisfactory to the Administrative Agent)), of all available cash balances and cash receipts, including the then contents or then entire available ledger balance of each Blocked Account net of such minimum balance (not to exceed $500,000 in the aggregate), if any, required by the bank at which such Blocked Account is maintained to an account maintained by the Administrative Agent at Bank of America, N.A. (or another bank of recognized standing reasonably selected by the Administrative Agent with the reasonable consent of the Parent Borrower) (the "Core Concentration Account").  Each Qualified Loan Party agrees that it will not cause proceeds of any Blocked Account to be otherwise redirected.

(d)      All collected amounts received in the Core Concentration Account shall be distributed and applied on a daily basis in accordance with Section 10.15.

(e)      If any cash, Cash Equivalents or Temporary Cash Investments owned by any Qualified Loan Party (other than cash, Cash Equivalents or Temporary Cash Investments deposited or to be deposited in an Excluded Account in accordance with this Subsection 4.16), are deposited to any bank account, or held or invested in any manner, otherwise than in a Blocked Account subject to a Blocked Account Agreement (or a DDA which is swept daily to such Blocked Account), the Administrative Agent shall be entitled to require the applicable Qualified Loan Party to close such bank account and have all funds therein transferred to a Blocked Account, and to cause all future deposits that were previously made or required to be made to such bank account to be made to a Blocked Account.

(f)      The Core Concentration Account shall at all times be under the sole dominion and control of the Administrative Agent.   The Borrower Representative, on behalf of each Qualified Loan Party, hereby acknowledges and agrees that, except to the extent otherwise provided in the Guarantee and Collateral Agreement or the ABL/Term Loan Intercreditor Agreement, as applicable, (x) such Qualified Loan Party has no right of withdrawal from the Core Concentration Account, (y) the funds on deposit in the Core Concentration Account shall at all times continue to be collateral security for all of the Obligations of the Qualified Loan Parties hereunder and under the other Loan Documents, and (z) the funds on deposit in the Core Concentration Account shall be applied as provided in this Agreement and the ABL/Term Loan Intercreditor Agreement (and any other applicable intercreditor agreement).   In the event that, notwithstanding the provisions of this Subsection 4.16, any Qualified Loan Party receives or otherwise has dominion and control of any proceeds or collections required to be transferred to the Core Concentration Account pursuant to Subsection 4.16(c), such proceeds and collections shall be held in trust by such Qualified Loan Party for the Administrative Agent, shall not be commingled with any of such Qualified Loan Party's other funds or deposited in any bank account of such Qualified Loan Party (other than any bank account by which such Qualified Loan Party received or acquired dominion or control over such proceeds and collections or with any funds in such bank account) and shall promptly be deposited into the Core Concentration Account or dealt with in such other fashion as such Qualified Loan Party may be instructed by the Administrative Agent.

(g)      The Qualified Loan Parties may not direct, and shall have no control over, the manner of disposition of funds in the Blocked Accounts.

(h)      Any amounts held or received in the Core Concentration Account (including all interest and other earnings with respect hereto, if any) at any time when all of the monetary obligations due and owing hereunder and under the other Loan Documents have been satisfied, shall (subject to the provisions of the applicable intercreditor agreement), be remitted to the disbursement bank account of the applicable Qualified Loan Party (any such account, a Disbursement Account"); provided any such Disbursement Account shall be exempt from requirements of Subsection 4.16(b).

4.17     Super Priority Nature of Obligations and Collateral Agent's Liens; Payment of Obligations.

(a)      The priority of the Collateral Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Interim Order and the Final Order.

(b)      Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Agents and Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Court.

                                    69

# SECTION 5

## Representations and Warranties

To induce the Administrative Agent and each Lender to make the Extensions of Credit requested to be made by it on the Closing Date and on each Borrowing Date thereafter, the Parent Borrower with respect to itself and its Restricted Subsidiaries, hereby represents and warrants, on the Closing Date, and on every Borrowing Date thereafter to the Administrative Agent and each Lender that:

5.1     <u>Financial Condition</u>.  (a) The annual financial statements and other unaudited financial statements, including balance sheets and related statements of income, cash flow, and shareholder's equity, that have been and are hereafter delivered to the Administrative Agent and the Lenders present fairly, in all material respects, the consolidated financial condition as at such dates, and the consolidated statements of operations and consolidated cash flows for the respective periods then ended, of the Parent Borrower and its Restricted Subsidiaries and each variable interest entity (including the Joint Ventures) that the Parent Borrower is required to consolidate in accordance with GAAP.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby (except as approved by a Responsible Officer, and disclosed in any such schedules and notes).

(b)     As of the Closing Date, except as set forth in the financial statements referred to in <u>Subsection 5.1(a)</u> and the Chapter 11 Cases, there are no liabilities of any Loan Party of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which would reasonably be expected to result in a Material Adverse Effect.

5.2     <u>No Change</u>.  Since the Closing Date, other than those customarily resulting from the commencement of the Chapter 11 Cases and changes contemplated in the Borrowers' business plan delivered to the Administrative Agent, there has been no development or event relating to or affecting any Loan Party which has had or would be reasonably expected to have a Material Adverse Effect.

5.3     <u>Corporate Existence; Compliance with Law</u>.  Each of the Loan Parties (<u>a</u>) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, except (other than with respect to the Borrowers), to the extent that the failure to be in good standing would not reasonably be expected to have a Material Adverse Effect, (<u>b</u>) has the legal right to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, except to the extent that the failure to have such legal right would not be reasonably expected to have a Material Adverse Effect, (<u>c</u>) is duly qualified as a foreign corporation or limited liability company and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, other than in such jurisdictions where the failure to be so qualified and in good standing would not be reasonably expected to have a Material Adverse Effect and (<u>d</u>) is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

5.4     <u>Corporate Power; Authorization; Enforceable Obligations</u>.  Subject to the entry of the Interim Order or Final Order, as applicable, each Loan Party has the corporate or other organizational power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of each of the Borrowers, to obtain Extensions of Credit hereunder, and each such Loan Party has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of each of the Borrowers, to authorize the Extensions of Credit to it, if any, on the terms and conditions of this Agreement, any Notes and the L/C Requests.  Except for the entry of, or pursuant to the terms of, the Interim Order or Final Order, as applicable, no consent or authorization of, filing with, notice to or other similar act by or in respect of, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of any Loan Party in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents to which it is a party or, in the case of each of the Borrowers, with

the Extensions of Credit to it, if any, hereunder, except for (a) consents, authorizations, notices and filings described in <u>Schedule 5.4</u>, all of which have been obtained or made prior to the Closing Date, (b) filings to perfect the Liens created by the Security Documents, and (c) consents, authorizations, notices and filings which the failure to obtain or make would not reasonably be expected to have a Material Adverse Effect.  This Agreement has been duly executed and delivered by the Parent Borrower and each of the Borrowers, and each other Loan Document to which any Loan Party is a party will be duly executed and delivered on behalf of such Loan Party.  Upon entry by the Court of the Interim Order or Final Order, as applicable, this Agreement constitutes a legal, valid and binding obligation of each of the Borrowers and each other Loan Document to which any Loan Party is a party when executed and delivered will constitute a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, in each case except as enforceability may be limited by applicable domestic or foreign bankruptcy, insolvency, reorganization, moratorium, Bail-In Action or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

5.5     <u>No Legal Bar</u>.  Subject to the entry of the Interim Order or Final Order, as applicable, the execution, delivery and performance of the Loan Documents by any of the Loan Parties, the Extensions of Credit hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or Contractual Obligation of such Loan Party in any respect that would reasonably be expected to have a Material Adverse Effect, (b) will not result in, or require the creation or imposition of any Lien (other than Liens securing the Obligations or otherwise permitted hereby) on any of its properties or revenues pursuant to any such Requirement of Law or Contractual Obligation and (c) will not violate any provision of the Organizational Documents of such Loan Party or any of the Restricted Subsidiaries, except (other than with respect to the Borrowers) as would not reasonably be expected to have a Material Adverse Effect.

5.6     <u>No Material Litigation</u>.  No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower Representative, threatened by or against the Parent Borrower or any of its Restricted Subsidiaries or against any of their respective properties or revenues, (a) except as described on <u>Schedule 5.6</u> and Chapter 11 Cases, which is so pending or threatened at any time on or prior to the Closing Date and relates to any of the Loan Documents or any of the transactions contemplated hereby or thereby or (b) which would be reasonably expected to have a Material Adverse Effect.

5.7     <u>No Default</u>.  Since the Closing Date, no Default or Event of Default has occurred and is continuing.

5.8     <u>Ownership of Property; Liens</u>.  Each of the Parent Borrower and its Restricted Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all its material real property located in the United States of America, and good title to, or a valid leasehold interest in, all its other material property located in the United States of America, except those for which the failure to have such good title or such leasehold interest would not be reasonably expected to have a Material Adverse Effect, and none of such real or other property is subject to any Lien, except for Permitted Liens..

5.9     <u>Intellectual Property</u>.  The Parent Borrower and each of its Restricted Subsidiaries owns, or has the legal right to use, all United States and foreign patents, patent applications, trademarks, trademark applications, trade names, copyrights and rights in know-how and processes necessary for each of them to conduct its business as currently conducted (the "<u>Intellectual Property</u>") except for those the failure to own or have such legal right to use would not be reasonably expected to have a Material Adverse Effect.  Except as provided on <u>Schedule 5.9</u>, no claim has been asserted and is pending by any Person against the Parent Borrower or any of its Restricted Subsidiaries challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower Representative know of any such claim, and, to the knowledge of the Borrower Representative, the use of such Intellectual Property by the Parent Borrower and its Restricted Subsidiaries does not infringe on the rights of any Person, except for such claims and infringements which in the aggregate, would not be reasonably expected to have a Material Adverse Effect.

5.10    <u>Taxes</u>.  To the knowledge of the Borrower Representative, (1) the Parent Borrower and each of its Restricted Subsidiaries has filed or caused to be filed all material tax returns which are required to be filed by it and has paid (a) all Taxes shown to be due and payable on such returns and (b) all Taxes shown to be due

and payable on any assessments of which it has received notice made against it or any of its property and all other Taxes imposed on it or any of its property by any Governmental Authority and (2) no Tax Liens have been filed (except for Liens for Taxes not yet due and payable), and no claim is being asserted in writing, with respect to any such Taxes (in each case other than in respect of any such (i) Taxes with respect to which the failure to pay, in the aggregate, would not have a Material Adverse Effect or (ii) Taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings diligently conducted and with respect to which reserves in conformity with GAAP have been provided on the books of the Parent Borrower or its Restricted Subsidiaries, as the case may be).

      5.11   <u>Federal Regulations</u>.  No part of the proceeds of any Extensions of Credit will be used for any purpose which violates the provisions of the Regulations of the Board, including Regulation T, Regulation U or Regulation X of the Board.  If requested by any Lender or the Administrative Agent, the Borrower Representative will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, referred to in said Regulation U.  None of the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying "margin stock" (as defined in Regulation U).

      5.12   <u>ERISA</u>.  (a) During the five year period prior to each date as of which this representation is made, or deemed made, with respect to any Plan, none of the following events or conditions, either individually or in the aggregate, has resulted or is reasonably likely to result in a Material Adverse Effect:  (i) a Reportable Event; (ii) a failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA); (iii) any noncompliance with the applicable provisions of ERISA or the Code; (iv) a termination of a Single Employer Plan (other than a standard termination pursuant to Section 4041(b) of ERISA); (v) a Lien on the property of the Parent Borrower or its Restricted Subsidiaries in favor of the PBGC or a Plan; (vi) a complete or partial withdrawal from any Multiemployer Plan by the Parent Borrower or any Commonly Controlled Entity; (vii) the ERISA Reorganization or Insolvency of any Multiemployer Plan; or (viii) any transactions that resulted or could reasonably be expected to result in any liability to the Parent Borrower or any Commonly Controlled Entity under Section 4069 of ERISA or Section 4212(c) of ERISA.

      (b)   With respect to any Foreign Plan, none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:  (i) substantial non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders; (ii) failure to be maintained, where required, in good standing with applicable regulatory authorities; (iii) any obligation of the Parent Borrower or its Restricted Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any Foreign Plan; (iv) any Lien on the property of the Parent Borrower or its Restricted Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding a Foreign Plan; (v) for each Foreign Plan which is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities); (vi) any facts that, to the best knowledge of the Parent Borrower or any of its Restricted Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of the Parent Borrower or any of its Restricted Subsidiaries, would reasonably be expected to result in a material liability to the Parent Borrower or any of its Restricted Subsidiaries concerning the assets of any Foreign Plan (other than individual claims for the payment of benefits); and (vii) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law.

      (c)   The Parent Borrower and its Restricted Subsidiaries represent and warrant as of the Closing Date that the Borrowers are not and will not be using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Plans with respect to the Borrowers entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement.

      5.13   <u>Collateral</u>.  Upon execution and delivery thereof by the parties thereto and upon the entry of the by the Court of the Interim Order or Final Order, as applicable, the Security Documents will be effective to create (to the extent described therein) in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in or liens on the Collateral described therein and the proceeds thereof, except as to enforcement, as may be limited by Bail-In Action, general equitable principles (whether considered in a

DB1/ 100473273.8
1004794810v9

proceeding in equity or at law) and an implied covenant of good faith and fair dealing. When (<u>a</u>) the actions specified in Schedule 3 to the Guarantee and Collateral Agreement have been duly taken upon the entry by the Court of the Interim Order or Final Order, as applicable, (<u>b</u>) all applicable Instruments, Chattel Paper and Documents (each as described therein) constituting Collateral a security interest in which is perfected by possession have been delivered to, and/or are in the continued possession of, the Collateral Agent, (<u>c</u>) all Deposit Accounts and Pledged Stock (each as defined in the Guarantee and Collateral Agreement) a security interest in which is required to be or is perfected by "control" (as described in the Uniform Commercial Code as in effect in each applicable jurisdiction (in the case of Deposit Accounts) and the State of New York (in the case of Pledged Stock) from time to time) are under the "control" of the Collateral Agent or the Administrative Agent, as agent for the Collateral Agent and as directed by the Collateral Agent, and (<u>d</u>) the Interim Order or the Final Order, as applicable have been entered, the security interests and liens granted pursuant thereto shall constitute a perfected security interest in (to the extent intended to be created thereby and required to be perfected under the Loan Documents), all right, title and interest of each pledgor party thereto in the Collateral described therein with respect to such pledgor. Notwithstanding any other provision of this Agreement, capitalized terms that are used in this <u>Subsection 5.13</u> and not defined in this Agreement are so used as defined in the applicable Security Document.

      5.14    <u>Investment Company Act; Other Regulations</u>. None of the Borrowers is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act. None of the Borrowers are subject to regulation under any federal or state statute or regulation (other than Regulation X of the Board) which limits its ability to incur Indebtedness as contemplated hereby.

      5.15    <u>Subsidiaries</u>. <u>Schedule 5.15</u> sets forth all the Subsidiaries of the Parent Borrower at the Closing Date, the jurisdiction of their organization and the direct or indirect ownership interest of the Parent Borrower therein.

      5.16    <u>Purpose of Loans</u>. Subject to the terms and conditions herein, the use of cash collateral and the proceeds of Loans made hereunder and of Letters of Credit issued hereunder shall be used by Borrowers, solely on or after the Closing Date, to fund the Chapter 11 Cases in accordance with the Orders and the Approved Budget and for the financing of Parent Borrower's and its Restricted Subsidiaries' ordinary working capital, letters of credit and other general corporate needs including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve-Out, and for certain other Pre-Petition and pre-filing expenses that are approved by the Court (including adequate protection payments, if any) and permitted by the Approved Budget and to pay the Prior Lender Obligations, including as provided in <u>Section 4.4</u>. Loan Parties shall not be permitted to use the proceeds of the Loans, Letters of Credit or any cash collateral in contravention of the provisions of the Loan Documents, the applicable Order or the applicable insolvency laws, including any restrictions or limitations on the use of proceeds contained therein. Nothing in this Agreement, including this <u>Section 5.16</u>, shall prohibit the Post-Petition payment of Prior Lender Obligations, including principal, interest, fees, penalties or recoverable costs, due and payable in connection with the Pre-Petition Credit Agreement with the proceeds of the Collateral (as defined herein) or Collateral (as defined in the Pre-Petition Credit Agreement).

      5.17    <u>Environmental Matters</u>. Other than as disclosed on <u>Schedule 5.17</u> or exceptions to any of the following that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

      (a)    The Parent Borrower and its Restricted Subsidiaries: (<u>i</u>) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (<u>ii</u>) hold all Environmental Permits (each of which is in full force and effect) required for any of their current operations or for any property owned, leased, or otherwise operated by any of them and reasonably expect to timely obtain without material expense all such Environmental Permits required for planned operations; (<u>iii</u>) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits; and (<u>iv</u>) believe they will be able to maintain compliance with Environmental Laws and Environmental Permits, including any reasonably foreseeable future requirements thereof.

      (b)    Materials of Environmental Concern have not been transported, disposed of, emitted, discharged, or otherwise released or threatened to be released, to, at or from any real property presently or formerly owned, leased or operated by the Parent Borrower or any of its Restricted Subsidiaries or at any other location,

which would reasonably be expected to (<u>i</u>) give rise to liability or other Environmental Costs of the Parent Borrower or any of its Restricted Subsidiaries under any applicable Environmental Law, or (<u>ii</u>) interfere with the planned or continued operations of the Parent Borrower and its Restricted Subsidiaries, or (<u>iii</u>) impair the fair saleable value of any real property owned by the Parent Borrower or any of its Restricted Subsidiaries that is part of the Collateral.

(c)    There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under any Environmental Law to which the Parent Borrower or any of its Restricted Subsidiaries is, or to the knowledge of the Parent Borrower or any of its Restricted Subsidiaries is reasonably likely to be, named as a party that is pending or, to the knowledge of the Parent Borrower or any of its Restricted Subsidiaries, threatened.

(d)    Neither the Parent Borrower nor any of its Restricted Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party, under the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or received any other written request for information from any Governmental Authority with respect to any Materials of Environmental Concern.

(e)    Neither the Parent Borrower nor any of its Restricted Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, nor is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum, relating to compliance with or liability under any Environmental Law.

5.18    <u>No Material Misstatements</u>.    The written information, reports, financial statements, exhibits and schedules furnished by or on behalf of the Borrower Representative to the Administrative Agent, the Other Representatives and the Lenders on or prior to the Closing Date in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, did not contain as of the Closing Date any material misstatement of fact and did not omit to state as of the Closing Date any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in their presentation of the Parent Borrower and its Restricted Subsidiaries taken as a whole.    It is understood that (<u>a</u>) no representation or warranty is made concerning the forecasts, estimates, pro forma information, projections and statements as to anticipated future performance or conditions, and the assumptions on which they were based or concerning any information of a general economic nature or general information about Parent Borrower's and its Subsidiaries' industry, contained in any such information, reports, financial statements, exhibits or schedules, except that, in the case of such forecasts, estimates, pro forma information, projections and statements, as of the date such forecasts, estimates, pro forma information, projections and statements were generated, (<u>i</u>) such forecasts, estimates, pro forma information, projections and statements were based on the good faith assumptions of the management of the Borrower Representative and (<u>ii</u>) such assumptions were believed by such management to be reasonable and (<u>b</u>) such forecasts, estimates, pro forma information and statements, and the assumptions on which they were based, may or may not prove to be correct.

5.19    <u>Labor Matters</u>.    There are no strikes pending or, to the knowledge of the Borrower Representative, reasonably expected to be commenced against the Parent Borrower or any of its Restricted Subsidiaries which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.    The hours worked and payments made to employees of the Parent Borrower and each of its Restricted Subsidiaries have not been in violation of any applicable laws, rules or regulations, except where such violations would not reasonably be expected to have a Material Adverse Effect.

5.20    <u>Insurance</u>.    <u>Schedule 5.20</u> sets forth a complete and correct listing as of the Closing Date of all insurance that is (<u>a</u>) maintained by the Loan Parties and (<u>b</u>) material to the business and operations of the Parent Borrower and its Restricted Subsidiaries taken as a whole, with the amounts insured (and any deductibles) set forth therein.

5.21    <u>Eligible Accounts</u>.    As of the date of any Borrowing Base Certificate, the Accounts included in the calculation of Eligible Accounts and Eligible Credit Card Receivables on such Borrowing Base

Certificate satisfy in all material respects the requirements of an "Eligible Account" or "Eligible Credit Card Receivable", as applicable, hereunder.

5.22    Eligible Inventory.  As of the date of any Borrowing Base Certificate, the Inventory included in the calculation of Eligible Inventory, Eligible In-Transit Inventory and Eligible Letter of Credit Inventory on such Borrowing Base Certificate satisfy in all material respects the requirements of an "Eligible Inventory", "Eligible In-Transit Inventory" or "Eligible Letter of Credit Inventory", as applicable, hereunder.

5.23    OFAC; Anti-Terrorism.  (a) The Parent Borrower and its Restricted Subsidiaries are in compliance with the Patriot Act and (b) none of the Parent Borrower and its Restricted Subsidiaries, nor, to the knowledge of the Parent Borrower and its Restricted Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by one or more individuals or entities that are (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals or HMT's Consolidated List of Financial Sanctions Targets, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.  The Parent Borrower and its Restricted Subsidiaries have conducted their businesses in compliance in all material respects with all applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Sanctions. The Parent Borrower, its Restricted Subsidiaries, and to the Parent Borrower's knowledge, their respective directors, officers, employees, agents, affiliates and representatives, have conducted their businesses in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other applicable anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

5.24    EEA Financial Institution.  No Loan Party is an EEA Financial Institution.

5.25    Approved Budget.  The Borrower Representative has heretofore furnished to the Administrative Agent the Approved Budget and such Approved Budget was prepared in good faith upon assumptions the Borrower Representative believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrower Representative, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget (taking into account the variances permitted under Section 7.4(b)). The Borrower shall thereafter deliver to the Administrative Agent updates to the Approved Budget in accordance with Section 7.4.

5.26    Reorganization Matters.  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, and (ii) the hearing for the entry of the Interim Order. The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable. After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Law. The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable. any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Priority Carve-Out and the priorities set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to the Priority Carve-Out and Liens securing the Indebtedness permitted pursuant to Section 8.12 to the extent set forth in the Interim Order and the Final Order.

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final

Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Administrative Agent's consent.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from, the Court.

5.27    Beneficial Ownership Certification.  As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

# SECTION 6

## Conditions Precedent

6.1    Conditions Precedent to Effectiveness of this Agreement.  In addition to the conditions set forth in Section 6.2, this Agreement, including the agreement of each Lender to make the initial Extension of Credit requested to be made by it, shall become effective on the date on which the following conditions precedent shall have been satisfied or waived, all in form and substance satisfactory to the Administrative Agent:

(a)     Loan Documents.  The Administrative Agent shall have received the following Loan Documents, executed and delivered as required below:

(i)      this Agreement, executed and delivered by a duly authorized officer of each Borrower;

(ii)     the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of each Loan Party signatory thereto;

(iii)    a Note executed by the Borrowers and delivered to each Lender that requests issuance of a Note;

(iv)    a Florida Affidavit As To Out-Of-State Execution And Delivery executed by the Parent Borrower; and

(v)     the Intercreditor Acknowledgment, acknowledged by a duly authorized officer of each Loan Party.

(b)     Debt Financings.  The Administrative Agent shall have received evidence, in form and substance satisfactory to the Administrative Agent that, prior to or concurrently with the effectiveness of this Agreement, (i) the DIP Term Loan Facility shall be in full force and effect, and (ii) the Borrowers have received in the DIP Term Loan Borrowing Account proceeds under the DIP Term Loan Facility of not less than \$60,000,000 (which amount shall be reduced by certain fees and expenses as reflected in the Approved Budget) in an aggregate principal amount not to exceed \$[___],000,000 consisting of a new money term loan tranche in an aggregate principal amount of \$[___],000,000 and applied to repay in full the Obligations such that the outstanding loans thereunder are reduced to zero and, to the extent of any excess amounts, such amount shall be otherwise available to the Borrowers to fund the Chapter 11 Cases.

(c)     Fees and Expenses.  The Lead Arranger, the Agents and the Lenders, respectively, shall have received all fees payable to them to the extent due (which may be offset against the proceeds of the Facilities).

(d)     Secretary's Certificate.  The Administrative Agent shall have received a certificate from each Loan Party, dated the Closing Date, substantially in the form of Exhibit G hereto, with appropriate

insertions and attachments of resolutions or other actions, evidence of incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the Secretary or any Assistant Secretary or other authorized representative of such Loan Party.

(e)    <u>Patriot Act</u>.  The Administrative Agent and the Committed Lenders shall have received at least five days prior to the Closing Date all documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the CDD Rule, that has been requested in writing at least 10 days prior to the Closing Date.

(f)    <u>Borrowing Notice or L/C Request</u>.  With respect to the initial Extensions of Credit, the Administrative Agent shall have received a notice of such Borrowing as required by <u>Subsection 2.2</u> or <u>2.4</u>, as applicable (or such notice shall have been deemed given in accordance with <u>Subsection 2.2</u> or <u>2.4</u>, as applicable).  With respect to the issuance of any Letter of Credit, the applicable Issuing Lender shall have received a L/C Request, completed to its satisfaction, and such other certificates, documents and other papers and information as such Issuing Lender may reasonably request.

(g)    <u>KYC Information</u>.  At least three (3) days prior to the Closing Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver, to each Lender that so requests, a Beneficial Ownership Certification in relation to such Borrower.

(h)    <u>Borrowing Base Certificate</u>.  The Administrative Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on November 16, 2018, and executed by a Responsible Officer of the Borrower Representative.

(i)    <u>Officer's Certificate</u>.  The Administrative Agent shall have received a certificate, from Responsible Officer of the Borrower Representative, certifying that: (i) after giving effect to the initial Loans and transactions hereunder, the representations and warranties in Article V are true and correct in all material respects (except for representations and warranties that expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date) and (ii) no Default or Event of Default has accrued and is continuing;

(j)    <u>Loan Documents</u>.  The Administrative Agent shall have received each other Loan Document required by the Administrative Agent to be delivered on or prior to the Closing Date, and each such Loan Document shall have been duly executed and delivered to Administrative Agent by each of the signatories thereto, including, without limitation, the Intercreditor Acknowledgment.

(k)    <u>Insurance</u>.  Administrative Agent shall be satisfied with the amount, types and terms and conditions of all insurance maintained by the Loan Parties.

(l)    [<u>Reports</u>.  The Administrative Agent shall have received all inventory and asset appraisals, commercial finance audits, and field audits, each in form and substance reasonably satisfactory to the Administrative Agent, and such other reports, audits, and other information or certifications as Administrative Agent may reasonably request.][5]

(m)    <u>Material Adverse Effect</u>.  <u>Since</u> the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(n)    <u>Litigation</u>.  Except for actions, suits, proceedings, investigations, claims or disputes stayed by Section 362 of the Bankruptcy Code, there shall be no actions, suits, proceedings, investigations, claims or disputes pending or, to the knowledge of the Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of their Domestic

---

[5] To be removed upon completion.

Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or (b) could reasonably be expected to result in a Material Adverse Effect.

(o)    <u>Financial Condition</u>.  Since the Petition Date, other than those customarily resulting from the commencement of the Chapter 11 Cases and changes contemplated in the Borrowers' Approved Budget delivered to the Administrative Agent, there has been no material increase in the liabilities, liquidated or contingent, of the Loan Parties taken as a whole or material decrease in the assets of the Loan Parties taken as a whole.

(p)    <u>Default; Event of Default</u>.  No Default or Event of Default shall have occurred and be continuing or shall arise hereunder immediately after giving effect to this Agreement and the transactions contemplated hereby.

(q)    <u>Enforceability</u>.  Other than those resulting from the commencement of the Chapter 11 Cases, since the Petition Date there shall have been no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Loan <u>Documents</u> and the Obligations of the Loan Parties hereunder. Subject to the Orders, Administrative Agent shall be satisfied that the Interim Order and the other Collateral Documents shall be effective to create in favor of the Administrative Agent a legal, valid and enforceable first priority security interest in and Lien upon the Collateral and shall have received Lien searches and other evidence reasonably satisfactory to the Administrative Agent that such Liens are the only Liens upon the Collateral, except Liens permitted pursuant to <u>Section 8.13</u>.

(r)    <u>Approved Budget</u>.  The Administrative Agent shall have received the Approved Budget.

(s)    <u>Order</u>.  (i) The Court shall have entered the Interim Order by no later than [three (3)] Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Administrative Agent in its sole discretion, be in full force and effect, and shall not have been reversed, modified, stayed or vacated absent prior written consent of the Administrative Agent; (ii) the Administrative Agent shall have received drafts of the "first day" <u>pleadings</u> for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent, not later than a reasonable time in advance of the Petition Date for Administrative Agent's counsel to review and analyze the same; (iii) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent; and (iv) all "first day" orders shall have been approved and entered by the Court. No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and the Court shall not have entered any order granting any party, other than the Loan Parties, control over any Collateral (other than a de minimis portion of the Collateral).

(t)    <u>Plan of Reorganization</u>.  Receipt and approval by the Administrative Agent and the Lenders of a Plan of Reorganization for the Debtors and a Restructuring Support Agreement, executed by the Debtors, the lenders under the Pre-Petition Term Loan <u>Credit</u> Agreement holding at least [___]% of the obligations thereunder, the holders of the Pre-Petition Senior Notes of the Parent Borrower who beneficially own at least [___]% of the aggregate principal amount of such Pre-Petition Senior Notes, and the sponsors.

6.2    <u>Conditions to All Extensions of Credit</u> .  The agreement of each Lender to make any Extension of Credit requested to be made by it (including each Swingline Loan) is subject to the satisfaction or waiver of the following conditions precedent:

(a)    Each of the representations and warranties made by any Loan Party pursuant to this Agreement or any other Loan Document (or in any amendment, modification or supplement hereto or thereto) to which it is a party, and each of the representations and warranties contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any other Loan Document shall, except to the extent that they relate to a particular date, be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)    after giving effect to the Loans or Letters of Credit requested to be made or issued on any such date and the use of proceeds thereof, the sum of the Aggregate Lender Exposure and the aggregate amount of all Prior Revolving Credit Loans shall not exceed (x) the lesser of (A) the total Commitments as then in effect and (B) the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered) or (y) the amount projected to be outstanding on such date in the Approved Budget;

(c)    No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Extensions of Credit requested to be made on such date.

(d)    (x) except in the case of the initial Borrowing on the Closing Date and the issuance of a Letter of Credit, the Borrowers shall have, or shall project in good faith that they shall have as of the proposed Borrowing date, less than $[_____] in available cash (which, for this purpose shall include amounts in the DIP Term Loan Borrowing Account) and (y) the Borrowers shall have paid the balance of all fees and expenses then due and payable hereunder;[6]

(e)    (i) The Interim Order shall have been entered or the Final Order shall have been entered following the expiration of the Interim Order; (ii) the Interim Order or the Final Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended without the Administrative Agent's consent and shall otherwise be in full force and effect; (iii) no motion for reconsideration of the Interim Order or the Final Order, as applicable, shall have been timely filed by a Debtor or any of their Subsidiaries; and (iv) no appeal of the Interim Order or the Final Order, as applicable, shall have been timely filed.

(f)    With respect to any Borrowing, the Administrative Agent shall have received a notice of such Borrowing as required by Subsection 2.2 or 2.4, as applicable (or such notice shall have been deemed given in accordance with Subsection 2.2 or 2.4, as applicable).  With respect to the issuance of any Letter of Credit, the applicable Issuing Lender shall have received a L/C Request, completed to its satisfaction, and such other certificates, documents and other papers and information as such Issuing Lender may reasonably request.

(g)    The Borrowers shall not have any undrawn amounts or commitments under the DIP Term Loan Facility prior to such Extension of Credit.

Each request (or deemed request) for an Extension of Credit or grant of an accommodation hereunder shall constitute a representation by the Borrower Representative that the foregoing conditions are satisfied on the date of such request and on the date of such funding, issuance or grant. The conditions set forth in this Section 6.2 are for the sole benefit of the Administrative Agent, Lenders and each other Secured Party, but until the Required Lenders otherwise direct the Administrative Agent to cease making Extensions of Credit, the Lenders will fund their share of all Extensions of Credit and participate in all Swingline Loans, Letters of Credit and other Extensions of Credit whenever made or issued, which are requested by the Borrowers and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Section 6, are agreed to by the Administrative Agent in its sole discretion, provided, however, the making of any such Extension of Credit (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Administrative Agent, any Lender or other Secured Party of the provisions of this Section 6 on any future occasion or operate as a waiver of (i) the right of Administrative Agent and Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of Administrative Agent, any Lender or other Secured Party as a result of any such failure of the Loan Parties to comply.

---

[6] To be discussed.

# SECTION 7

## Affirmative Covenants

The Parent Borrower hereby agrees that, from and after the Closing Date and so long as the Commitments remain in effect or any Prior Lender Obligations remain outstanding, and thereafter until payment in full of the Loans, all Reimbursement Obligations and all other Obligations then due and owing to any Lender or any Agent hereunder and termination or expiration of all Letters of Credit (unless cash collateralized or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent), the Parent Borrower shall and shall (except in the case of delivery of financial information, reports and notices, in which case it shall or shall cause the Borrower Representative, if it is not then the Borrower Representative, to) cause each of its respective Restricted Subsidiaries to:

7.1     Financial Statements.  Furnish to the Administrative Agent for delivery to each Lender (and the Administrative Agent agrees to make and so deliver such copies):

(a)     as soon as available, but in any event not later than the fifth Business Day after the 60th day following the end of each quarter of each Fiscal Year of the Parent Borrower, the unaudited consolidated balance sheet of the Parent Borrower as at the end of such quarter and the related unaudited consolidated statements of operations and changes in equity and cash flows of the Parent Borrower for such quarter and the portion of the Fiscal Year through the end of such quarter, setting forth in comparative form, the figures for and as of the corresponding periods of the previous year, in each case certified by a Responsible Officer of the Parent Borrower as being fairly stated in all material respects (subject to normal year-end audit and other adjustments);

(b)     as soon as available, but in any event not later than the fifth Business Day after the 30th day following the end of each Fiscal Month of the Parent Borrower, an unaudited financial summary of the financial performance, sales composition (including by channel, by product category and same store sales data) , market activity, an unaudited income statement, statement of cash flows and a balance sheet of the Loan Parties for such Fiscal Month, for each including a comparison to the applicable prior year period, in the same form as the unaudited monthly financial reports previously delivered to the equity sponsor and certified by a Responsible Officer of the Parent Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Parent Borrower. For avoidance of doubt, the financial results will not include the impact of the Joint Ventures; and

(c)     all such financial statements delivered pursuant to Subsection 7.1(a) and (b) shall be certified by a Responsible Officer of the Parent Borrower to fairly present in all material respects the financial condition of the Parent Borrower and its Subsidiaries in conformity with GAAP and to be in reasonable detail and prepared in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods that began on or after the Closing Date (except as disclosed therein and the absence of certain notes); and

7.2     Certificates; Other Information.  Furnish to the Administrative Agent for delivery to each Lender (and the Administrative Agent agrees to make and so deliver such copies):

(a)     concurrently with the delivery of the financial statements and reports referred to in Subsection 7.1(a) and (b), a certificate signed by a Responsible Officer of the Borrower Representative in substantially the form of Exhibit N hereto (a "Compliance Certificate") stating that, to the best of such Responsible Officer's knowledge, each of Holdings, DB Parent, Investor and the Parent Borrower and its Restricted Subsidiaries during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement or the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default, except, in each case, as specified in such certificate (or if such event has occurred, including a description of the event and the steps to be taken with respect thereto);

(b)    within five Business Days after the same are filed, copies of all financial statements and periodic reports which the Parent Borrower may file with the SEC or any successor or analogous Governmental Authority;

(c)    within five Business Days after the same are filed, copies of all registration statements and any amendments and exhibits thereto, which the Parent Borrower may file with the SEC or any successor or analogous Governmental Authority; and

(d)    as soon as possible but no later than 5:00 p.m New York City time on Wednesday of each week (commencing on the later of (x) the Wednesday of the first full calendar week following the Petition Date and (y) November 28, 2018), a Borrowing Base Certificate substantially in the form of <u>Exhibit I</u> (a "<u>Borrowing Base Certificate</u>") setting forth the calculation of the Borrowing Base and of Excess Availability as of the last Business Day of the preceding week, duly completed and executed by a Responsible Officer of the Borrower Representative, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed.

(e)    Contemporaneously with delivery of each Borrowing Base Certificate, (or as otherwise set forth below) the Borrower Representative shall furnish to the Administrative Agent, in each case, in form and substance satisfactory to the Administrative Agent:

(i)    (i) Calculations of Inventory itemizing separately in-transit Inventory, Inventory located at Stores to be closed (if any), Inventory located at non-closing Stores, and Inventory located in warehouse locations, together with back-up information for each in-transit Inventory category and (ii) an Inventory and Accounts roll forward;

(ii)    An open accounts payable report as of the end of the most recently ended week, accompanied by such supporting detail and documentation as shall be requested by the Administrative Agent in its reasonable discretion;

(iii)    A summary of Inventory by location and type (including SKU-level detail), accompanied by such supporting documentation (including a supporting perpetual Inventory report) as shall be requested by the Administrative Agent in its reasonable discretion and with detail sufficient to permit the preparation of an updated inventory appraisal;

(iv)    Monthly, on the 15th Business Day following the end of the preceding month, an accounts payable and accrual report as of the end of the most recently ended fiscal month, in each case, accompanied by such supporting detail and documentation as shall be requested by the Administrative Agent in its sole discretion; and

(v)    Any information that the Administrative Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.

7.3    <u>Collateral Updates</u>. Upon the request of the Administrative Agent from time to time (but in each case no more frequently than twice per calendar month unless an Event of Default has occurred and is continuing), the Loan Parties shall deliver, at the Borrowers' expense, to the Agent's Advisors and their designees, in each case, in form satisfactory to the Administrative Agent:

(a)    Collateral valuation updates from the Specified Liquidation Agents, including, without limitation, the value of the ABL Priority Collateral for the purposes of a "stalking horse" bid in connection with a Store Liquidation;

(b)    Upon request from time to time (but in each case no more frequently than twice per calendar month, unless an Event of Default has occurred and is continuing), at the Borrowers' expense, an updated

collateral appraisal (i) Great American Group or any other liquidation agent approved by Administrative Agent, including reviews of inventory levels and mix, and (ii) with respect to Intellectual Property, from Hilco Streambank, it being understood that the Specified Liquidation Agent shall grant access to records, and cooperate in all respects with, the Administrative Agent and the Agent's Advisors, and shall provide all information that such parties may reasonably request in a timely manner in connection with monitoring and valuing the Collateral; and

(c)     Delivery of any information request by the Specified Liquidation Agents or any other Agent's Advisors in connection with appraisals, collateral audits, valuations of the Collateral for the purposes of a "stalking horse" bid, other Collateral reporting, or otherwise.

7.4     Approved Budget.

(a)     The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted hereunder). The initial Approved Budget (the "Initial Approved Budget") shall depict, on a weekly basis, cash revenues, receipts, expenses, professional fees and disbursements, inventory receipts and other items set forth therein (which shall include a breakdown of retail stores being closed (if any) or proposed to be closed (if any), which information with respect to such stores shall be limited to cash receipts received by the Loan Parties during the relevant period which correspond to cash receipts described in the line item contained in the Approved Budget under the heading "Receipts from Closing Stores" (if applicable), as determined in a manner consistent with the Approved Budget), for the period from the Closing Date through the Termination Date and such initial Approved Budget shall be approved by, and be in form and substance satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and satisfactory to the Administrative Agent and the Required Lenders in form and substance). The Approved Budget shall be updated, modified or supplemented by the Borrowers from time to time with the written consent of the Administrative Agent and upon the request of the Administrative Agent, but in any event the Approved Budget shall be updated by the Borrowers not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Administrative Agent in its sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that (i) in the event the Administrative Agent, on the one hand, and the Loan Parties, on the other hand, cannot agree (each acting reasonably) as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated and (ii) the approval of the Required Lenders shall be required for any modification or update to the Approved Budget which results in a decrease of ten percent (10%) or more in Total Liquidity as reflected therein as of any week ending date. Each Approved Budget delivered to the Administrative Agent and the Required Lenders shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent. Each Approved Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable.

(b)     Commencing with the third full calendar week following the Petition Date and for each calendar week thereafter, the Borrowers shall not permit (i) Actual Inventory Levels as at the end of any week to be less than 90% of the Budgeted Inventory Levels set forth in the Approved Budget as at the end of such week, (ii) the Actual Cash Receipts (without giving effect to borrowings and repayments under this Agreement and the DIP Term Loan Credit Agreement), measured on a cumulative basis, for any Cumulative Four Week Period or the Cumulative Period, in each case, to be less than 90% of the Budgeted Cash Receipts (without giving effect to borrowings and repayments under this Agreement and the DIP Term Loan Credit Agreement), measured on a cumulative basis, for any Cumulative Four Week Period or the Cumulative Period, or (iii) the Actual Disbursement Amount, measured on a cumulative basis, for any Cumulative Four Week Period or the Cumulative Period, in each case, to exceed 110% of the Budgeted Disbursement Amount, measured on a cumulative basis, for any such Cumulative Four Week Period or the Cumulative Period.

(c)     The Borrower Representative shall deliver to the Administrative Agent on or before 5:00 p.m. New York City time on Wednesday of each week (commencing on the Wednesday of the first full calendar week following the Petition Date) an Information Certificate, in the form attached hereto as Exhibit C, and such Information Certificate shall include such detail as is reasonably satisfactory to the Administrative Agent, signed

by a Responsible Officer of the Borrower Representative certifying that (i) the Loan Parties are in compliance with the covenants contained herein and (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, together with (A) a comparison for the Prior Week of the Actual Cash Receipts (and each line item thereof), the Actual Disbursement Amount (and each line item thereof) and the Actual Inventory Levels for such Prior Week to the Budgeted Cash Receipts (and each line item thereof), the Budgeted Disbursement Amount (and each line item thereof) and the Budgeted Inventory Levels for such Prior Week, (B) a cumulative comparison for the Cumulative Four Week Period of the Actual Cash Receipts (and each line item thereof) and the Actual Disbursement Amount (and each line item thereof) for such Cumulative Four Week Period to the Budgeted Cash Receipts (and each line item thereof) and the Budgeted Disbursement Amount (and each line item thereof) for such Cumulative Four Week Period, (C) a cumulative comparison for the Cumulative Period of the Actual Cash Receipts (and each line item thereof) and the Actual Disbursement Amount (and each line item thereof) for such Cumulative Period to the Budgeted Cash Receipts (and each line item thereof) and the Budgeted Disbursement Amount (and each line item thereof) for such Cumulative Period, and (D) an Approved Budget Variance Report, each of which shall be prepared by the Borrower Representative as of the last day of the Cumulative Four Week Period and the Cumulative Period, as applicable, and shall be in form and substance reasonably satisfactory to the Administrative Agent.

(d)      Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(e)      The Borrower Representative shall deliver to the Administrative Agent on or before 5:00 p.m. New York City time on Wednesday of each week (commencing on the first Wednesday following the Petition Date) supplemental thirteen (13) week projections which shall depict, on a weekly basis, cash revenues, receipts, expenses, professional fees and disbursements, net cash flows, inventory receipts and other items set forth therein (which shall include a breakdown of retail stores being closed or proposed to be closed, which information with respect to such stores shall be limited to cash receipts received by the Loan Parties during the relevant period which correspond to cash receipts described in the line item contained in the Approved Budget under the heading "Receipts from Closing Stores", as determined in a manner consistent with the Approved Budget), for the period from the Saturday immediately following delivery of such projections through the end of such thirteen (13) period. The projections delivered pursuant to this Section 7.4(e) shall not constitute the "Approved Budget" for any purpose hereunder.

7.5      Required Milestones. The Loan Parties shall comply with each of the Required Milestones.

7.6      Loan Parties' Advisors. The Loan Parties shall continue to retain (i) the Restructuring Advisor and (ii) the Financial Advisor, and shall retain such additional advisors as may be reasonably requested by the Administrative Agent and on terms and conditions satisfactory to the Administrative Agent. The Loan Parties and their representatives will fully cooperate with any such advisors and consultants (including the Restructuring Advisor, the Financial Advisor and the Specified Liquidation Agent) and grant them full and complete access to the books and records of the Loan Parties. Notwithstanding anything to the contrary in this Section 7.6, none of the Loan Parties will be required to disclose or permit access to any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (ii) that is subject to attorney client or similar privilege or constitutes attorney work product.

7.7    <u>Administrative Agent's Advisors</u>. The Administrative Agent, on behalf of itself and the Lenders, shall be entitled to retain or continue to retain (either directly or through counsel) any Agent's Advisors the Administrative Agent may deem necessary to provide advice, analysis and reporting for the benefit of the Administrative Agent and the Lenders. The Loan Parties shall pay all fees and expenses of each Agent's Advisor and all such fees and expenses shall constitute Obligations and be secured by the Collateral. The Loan Parties and their advisors, including the Restructuring Advisor, the Financial Advisor, and the Specified Liquidation Agent, shall grant access to, and cooperate in all respects with, the Administrative Agent, the Collateral Agent, the Lenders, Agent's Advisors, and any other representatives of the foregoing and provide all information that such parties may request in a timely manner.

7.8    <u>Transaction</u>. Promptly upon the Administrative Agent's request, each Loan Party shall provide the Administrative Agent with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to any Transaction and copies of any such bids and any updates, modifications or supplements to such information and materials.

7.9    <u>Debtor-In-Possession Obligations</u>. The Loan Parties shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Court.

7.10    <u>Request for Loans under DIP Term Loan Facility</u>. The Borrower Representative shall request (in accordance with terms of the DIP Term Loan Credit Agreement) all Loans (as defined in the DIP Term Loan Credit Agreement) as and when available to it under the DIP Term Loan Facility prior to making any requests for Revolving Credit Loans under this Agreement (and for the avoidance of doubt, any Agent Advances made by the Administrative Agent to the Borrower Representative shall not constitute a request by the Borrower Representative for Revolving Credit Loans under this Agreement).

7.11    <u>Payment of Taxes</u>. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings diligently conducted and reserves in conformity with GAAP with respect thereto have been provided on the books of the Parent Borrower or any of its Restricted Subsidiaries, as the case may be, or except to the extent that failure to do so, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

7.12    <u>Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law</u>. Preserve, renew and keep in full force and effect its existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole, except as otherwise permitted pursuant to <u>Subsection 8.1</u> or <u>8.4</u>, <u>provided</u> that the Parent Borrower and its Restricted Subsidiaries shall not be required to maintain any such rights, privileges or franchises and the Parent Borrower's Restricted Subsidiaries shall not be required to maintain such existence, if the failure to do so would not reasonably be expected to have a Material Adverse Effect; and comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

7.13    <u>Maintenance of Property; Insurance</u>. (<u>i</u>) Keep all property necessary in the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole, in good working order and condition, except where failure to do so would not reasonably be expected to have a Material Adverse Effect; (<u>ii</u>) use commercially reasonable efforts to maintain with financially sound and reputable insurance companies (or any Captive Insurance Subsidiary) insurance on, or self-insure, all property material to the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole, in at least such amounts and against at least such risks (but including in any event public liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business; (<u>iii</u>) furnish to the Administrative Agent, upon written request, information in reasonable detail as to the insurance carried; (<u>iv</u>) use commercially reasonable efforts to maintain property and liability policies that provide that in the event of any cancellation thereof during the term of the policy, either by the insured or by the insurance company, the insurance company shall provide to the secured party at least 30 days prior written notice thereof, or in the case of cancellation for non-payment of premium, 10 days prior

written notice thereof; (v) in the event of any material change in any of the property or liability policies referenced in the preceding clause (iv), use commercially reasonable efforts to provide the Administrative Agent with at least 30 days prior written notice thereof, and (vi) use commercially reasonable efforts to ensure that, subject to the ABL/Term Loan Intercreditor Agreement, at all times the Collateral Agent for the benefit of the Secured Parties, shall be named as an additional insured with respect to liability policies maintained by each Borrower and each Subsidiary Guarantor and the Collateral Agent for the benefit of the Secured Parties, shall be named as loss payee with respect to the property insurance maintained by each Borrower and each Subsidiary Guarantor.

     7.14    <u>Inspection of Property; Books and Records; Discussions</u>. The Administrative Agent may (x) carry out, at Borrowers' expense, and the Loan Parties shall cooperate with (i) one investigation and review of each Loan Party's property at the reasonable expense of the Loan Parties (including field audits conducted by the Administrative Agent) (each, a "<u>Field Examination</u>"), (ii) one liquidation valuation, and (iii) one Inventory appraisal, in each case, that shall be in form and detail and from third-party field examiners, appraisers or liquidators reasonably acceptable to the Administrative Agent; provided that after the occurrence and during the continuance of any Event of Default the Administrative Agent may cause such additional Field Examinations, liquidation valuations and Inventory appraisals to be taken for each of the Loan Parties as the Administrative Agent in its determines are necessary or appropriate (each, at the expense of the Loan Parties) and (y) inspect, audit and make extracts from the Parent Borrower's or other Loan Parties' books and records, and discuss with its officers, employees, agents, advisors, independent accountants, financial advisors, restructuring advisors, sales consultants, investment bankers and other consultants such Parent Borrower's or Loan Parties' business, financial condition, assets (including Inventory and Credit Card Receivables), prospects and results of operations. Notwithstanding anything to the contrary in this <u>Section 7.14</u>, none of the Borrowers or any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any binding agreement or (ii) that is subject to attorney client or similar privilege or constitutes attorney work product.

     (b)    The Borrowers shall reimburse Administrative Agent for all reasonable charges, costs and expenses of Administrative Agent in connection with visits and inspections of the properties of any Loan Party, examinations, valuations, inspections and audits of any Loan Party's books and records, Field Examinations, appraisals or valuations of Inventory and any other financial or Collateral matters as Administrative Agent deems appropriate, as frequently as required by the Administrative Agent in its discretion (which may include, not more than twice per month, updated inventory appraisals and liquidation valuations). The Loan Parties shall pay the Administrative Agent's then standard charges for each day that an employee of the Administrative Agent or its Affiliates is engaged in any examination activities, and shall pay the standard charges of the Administrative Agent's internal appraisal group, provided that such charges are competitive with the rates of third party examiners for similar work. This Section shall not be construed to limit the Administrative Agent's right to conduct examinations and/or obtain appraisals, nor to use third parties for such purposes.

     (c)    promptly, such additional financial and other information as any Agent or Lender may from time to time reasonably request; and

     (d)    promptly upon reasonable request from the Administrative Agent calculations of Fixed GAAP Terms as reasonably requested by the Administrative Agent promptly following receipt of a written notice from the Borrower Representative electing to change the Fixed GAAP Date, which calculations shall show the calculations of the respective Fixed GAAP Terms both before and after giving effect to the change in the Fixed GAAP Date and identify the material change(s) in GAAP giving rise to the change in such calculations.

Documents required to be delivered pursuant to <u>Subsection 7.1(a)</u>, <u>7.1(b)</u>, <u>7.2(b)</u>, <u>7.2(c)</u>, <u>7.2(d)</u>, or <u>7.2(e)</u> may at the Borrower Representative's option be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (<u>A</u>) in the case of any such documents other than documents required to be delivered pursuant to <u>Subsection 7.2</u>, (i) on which the Borrower Representative posts such documents, or provides a link thereto, on the Parent Borrower's (or any Parent Entity's) website on the Internet at the website address listed on <u>Schedule 7.14</u> (or such other website address as the Borrower Representative may specify by written notice to the Administrative Agent from time to time), or (ii) on which such documents are posted on the Parent Borrower's (or any Parent

Entity's) behalf on an Internet or intranet website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) and (B) in the case of any such documents required to be delivered pursuant to Subsection 7.2, on which the Borrower Representative provides a link thereto on the Parent Borrower's (or Holdings' or any Parent Entity's) website on the Internet at the website address listed on Schedule 7.14 (or such other website address as the Parent Borrower may specify by written notice to the Administrative Agent from time to time).  Following the electronic delivery of any such documents by posting such documents to a website in accordance with the preceding sentence (other than the posting by the Borrower Representative of any such documents on any website maintained for or sponsored by the Administrative Agent) the Borrower Representative shall promptly provide the Administrative Agent notice of such delivery (which notice may be by facsimile or electronic mail) and the electronic location at which such documents may be accessed; provided that, in the absence of bad faith, the failure to provide such prompt notice shall not constitute a Default hereunder.

      7.15    Notices.  Promptly give notice to the Administrative Agent and each Lender of:

      (a)    as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, the occurrence of any Default or Event of Default;

      (b)    as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, any default or event of default under any Contractual Obligation of the Parent Borrower or any of its Restricted Subsidiaries, other than as previously disclosed in writing to the Lenders, which would reasonably be expected to have a Material Adverse Effect;

      (c)    as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, the occurrence of any default or event of default under the DIP Term Loan Credit Agreement;

      (d)    as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, any litigation, investigation or proceeding affecting the Parent Borrower or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

      (e)    the following events, as soon as possible and in any event within 30 days after a Responsible Officer of the Parent Borrower or any of its Restricted Subsidiaries knows thereof:  (i) the occurrence or expected occurrence of any Reportable Event (or similar event) with respect to any Single Employer Plan (or Foreign Plan), a failure to make any required contribution to a Single Employer Plan, Multiemployer Plan or Foreign Plan, the creation of any Lien on the property of the Parent Borrower or its Restricted Subsidiaries in favor of the PBGC, a Plan or a Foreign Plan or any withdrawal from, or the full or partial termination, ERISA Reorganization or Insolvency of, any Multiemployer Plan or Foreign Plan; or (ii) the institution of proceedings or the taking of any other formal action by the PBGC or the Parent Borrower or any of its Restricted Subsidiaries or any Commonly Controlled Entity or any Multiemployer Plan which would reasonably be expected to result in the withdrawal from, or the termination, ERISA Reorganization or Insolvency of, any Single Employer Plan, Multiemployer Plan or Foreign Plan; provided, however, that no such notice will be required under clause (i) or (ii) above unless the event giving rise to such notice, when aggregated with all other such events under clause (i) or (ii) above, would be reasonably expected to result in a Material Adverse Effect;

      (f)    as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, (i) any release or discharge by the Parent Borrower or any of its Restricted Subsidiaries of any Materials of Environmental Concern required to be reported under applicable Environmental Laws to any Governmental Authority, unless the Borrower Representative reasonably determines that the total Environmental Costs arising out of such release or discharge would not reasonably be expected to have a Material Adverse Effect; (ii) any condition, circumstance, occurrence or event not previously disclosed in writing to the Administrative Agent that would reasonably be expected to result in liability or expense under applicable Environmental Laws, unless the Borrower Representative reasonably determines that the total Environmental Costs arising out of such condition, circumstance, occurrence or event would not reasonably be expected to have a Material Adverse Effect, or would not reasonably be expected to result in the imposition of any lien or other material restriction on the title, ownership or transferability of any

facilities and properties owned, leased or operated by the Parent Borrower or any of its Restricted Subsidiaries that would reasonably be expected to result in a Material Adverse Effect; and (iii) any proposed action to be taken by the Parent Borrower or any of its Restricted Subsidiaries that would reasonably be expected to subject the Parent Borrower or any of its Restricted Subsidiaries to any material additional or different requirements or liabilities under Environmental Laws, unless the Borrower Representative reasonably determines that the total Environmental Costs arising out of such proposed action would not reasonably be expected to have a Material Adverse Effect;

(g)      any loss, damage, or destruction to a significant portion of the ABL Priority Collateral, whether or not covered by insurance;

(h)      as soon as possible after a Responsible Officer of the Borrower Representative becomes aware thereof, any change in the information provided in a Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification, a written notice specifying any such change;

(i)      (i) as soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to (x) the Chapter 11 Cases (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby, the DIP Term Loan Facility and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other material notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, and (iii) each report, notice or certificate required to be delivered to any of the lenders or agents under the DIP Term Loan Credit Agreement;

(j)      promptly after a Responsible Officer of the Borrower Representative knows thereof, any default, event of default or termination under any material warehouse or Store lease of the Parent Borrower or any of its Restricted Subsidiaries, other than as previously disclosed in writing to the Lenders, which would reasonably be expected to have a Material Adverse Effect; and

(k)      No less frequently than weekly, if requested by the Administrative Agent, from and after the Petition Date (at a mutually agreeable location and time or telephonically), meetings management of Parent Borrower and their advisors open to all Lenders regarding the financing results, operations, compliance of the Loan Parties and developments in the Chapter 11 Cases.

Each notice pursuant to this Subsection 7.15 shall be accompanied by a statement of a Responsible Officer of the Borrower Representative (and, if applicable, the relevant Commonly Controlled Entity or Restricted Subsidiary) setting forth details of the occurrence referred to therein and stating what action the Borrower Representative (or, if applicable, the relevant Commonly Controlled Entity or Restricted Subsidiary) proposes to take with respect thereto.

7.16      Environmental Laws.      (a) (i) Comply substantially with, and require substantial compliance by all tenants, subtenants, contractors, and invitees with, all applicable Environmental Laws; (ii) obtain, comply substantially with and maintain any and all Environmental Permits necessary for its operations as conducted and as planned; and (iii) require that all tenants, subtenants, contractors, and invitees obtain, comply substantially with and maintain any and all Environmental Permits necessary for their operations as conducted and as planned, with respect to any property leased or subleased from, or operated by the Parent Borrower or its Restricted Subsidiaries. For purposes of this Subsection 7.16(a), noncompliance shall not constitute a breach of this covenant, provided that, upon learning of any actual or suspected noncompliance, the Parent Borrower and any such affected Restricted Subsidiary shall promptly undertake and diligently pursue reasonable efforts, if any, to achieve

compliance, and <u>provided</u>, <u>further</u>, that in any case such noncompliance would not reasonably be expected to have a Material Adverse Effect.

(b)    Promptly comply, in all material respects, with all orders and directives of all Governmental Authorities regarding Environmental Laws, other than such orders or directives (<u>i</u>) as to which the failure to comply would not reasonably be expected to result in a Material Adverse Effect or (<u>ii</u>) as to which: (<u>x</u>) appropriate reserves have been established in accordance with GAAP; (<u>y</u>) an appeal or other appropriate contest is or has been timely and properly taken and is being diligently pursued in good faith; and (<u>z</u>) if the effectiveness of such order or directive has not been stayed, the failure to comply with such order or directive during the pendency of such appeal or contest would not reasonably be expected to have a Material Adverse Effect.

7.17    <u>Subsidiaries</u>. (a) With respect to any Domestic Subsidiary that is a Wholly Owned Subsidiary (other than an Excluded Subsidiary) (<u>i</u>) created or acquired subsequent to the Closing Date by the Parent Borrower or any of its Domestic Subsidiaries that are Wholly Owned Subsidiaries (other than an Excluded Subsidiary), (<u>ii</u>) being designated as a Restricted Subsidiary, (<u>iii</u>) ceasing to be a Foreign Subsidiary Holdco or other Excluded Subsidiary as provided in the applicable definition thereof after the expiry of any applicable period referred to in such definition, or (<u>iv</u>) that becomes a Domestic Subsidiary as a result of a transaction pursuant to, and permitted by, <u>Subsection 8.2</u> or <u>8.4</u> (other than an Excluded Subsidiary), promptly notify the Administrative Agent of such occurrence and, if the Administrative Agent or the Required Lenders so request, promptly (<u>i</u>) execute and deliver to the Collateral Agent for the benefit of the Secured Parties such amendments to the Guarantee and Collateral Agreement as the Collateral Agent shall reasonably deem necessary or reasonably advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected second priority security interest (as and to the extent provided in the Guarantee and Collateral Agreement) in the Capital Stock of such new Domestic Subsidiary owned directly by the Parent Borrower or any of its Domestic Subsidiaries that are Wholly Owned Subsidiaries (other than Excluded Subsidiaries), (<u>ii</u>) deliver to the Collateral Agent the certificates (if any) representing such Capital Stock, together with undated stock powers, executed and delivered in blank by a duly authorized officer of the parent of such new Domestic Subsidiary and (<u>iii</u>) cause such new Domestic Subsidiary (<u>A</u>) to become a party to the Guarantee and Collateral Agreement and (<u>B</u>) to take all actions reasonably deemed by the Collateral Agent to be necessary or advisable to cause the Lien created by the Guarantee and Collateral Agreement in such new Domestic Subsidiary's Collateral to be duly perfected in accordance with all applicable Requirements of Law (as and to the extent provided in the Guarantee and Collateral Agreement), including the filing of financing statements in such jurisdictions as may be reasonably requested by the Collateral Agent.

(b)    With respect to any Foreign Subsidiary or Domestic Subsidiary that is a Non-Wholly Owned Subsidiary created or acquired subsequent to the Closing Date by the Parent Borrower or any of its Domestic Subsidiaries that are Wholly Owned Subsidiaries (in each case, other than any Excluded Subsidiary), the Capital Stock of which is owned directly by the Parent Borrower or a Domestic Subsidiary that is a Wholly Owned Subsidiary (other than an Excluded Subsidiary), promptly notify the Administrative Agent of such occurrence and if the Administrative Agent or the Required Lenders so request, promptly (<u>i</u>) execute and deliver to the Collateral Agent a new pledge agreement or such amendments to the Guarantee and Collateral Agreement as the Collateral Agent shall reasonably deem necessary or reasonably advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected second priority security interest (as and to the extent provided in the Guarantee and Collateral Agreement) in the Capital Stock of such new Subsidiary that is directly owned by any Borrower or any Domestic Subsidiary that is a Wholly Owned Subsidiary (other than an Excluded Subsidiary) and (<u>ii</u>) to the extent reasonably deemed advisable by the Collateral Agent, deliver to the Collateral Agent the certificates, if any, representing such Capital Stock, together with undated stock powers, executed and delivered in blank by a duly authorized officer of the relevant parent of such new Subsidiary and take such other action as may be reasonably deemed by the Collateral Agent to be necessary or desirable to perfect the Collateral Agent's security interest therein (in each case as and to the extent required by the Guarantee and Collateral Agreement); <u>provided</u> that in either case in no event shall more than 65.0% of each series of Capital Stock of any new Foreign Subsidiary be required to be so pledged.

(c)    At its own expense, execute, acknowledge and deliver, or cause the execution, acknowledgement and delivery of, and thereafter register, file or record in an appropriate governmental office, any document or instrument reasonably deemed by the Collateral Agent to be necessary or desirable for the creation,

perfection and priority and the continuation of the validity, perfection and priority of the foregoing Liens or any other Liens created pursuant to the Security Documents (to the extent the Collateral Agent determines, in its reasonable discretion, that such action is required to ensure the perfection or the enforceability as against third parties of its security interest in such Collateral) in each case in accordance with, and to the extent required by, the Guarantee and Collateral Agreement.

(d)     Notwithstanding anything to the contrary in this Agreement, (A) the foregoing requirements shall be subject to the terms of the ABL/Term Loan Intercreditor Agreement, and, in the event of any conflict with such terms, the terms of the ABL/Term Loan Intercreditor Agreement shall control, (B) no security interest or lien is or will be granted pursuant to any Loan Document or otherwise in any right, title or interest of any of Holdings, DB Parent, Investor, the Parent Borrower or any of its Subsidiaries, (C) no Loan Party or any Affiliate thereof shall be required to take any action in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction in order to create any security interests in assets located or titled outside of the U.S. or to perfect any security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction) and (D) nothing in this Subsection 7.17 shall require that any Subsidiary grant a Lien with respect to any property or assets in which such Subsidiary acquires ownership rights to the extent that the Borrower Representative and the Administrative Agent reasonably determine in writing that the costs or other consequences to Holdings, DB Parent, Investor or any of their Subsidiaries of the granting of such a Lien is excessive in view of the benefits that would be obtained by the Secured Parties.

7.18     Use of Proceeds.   Use the proceeds of the Loans only for the purposes set forth in Subsection 5.16 and request the issuance of Letters of Credit only for the purposes set forth in Subsection 3.1(b).

7.19     Accounting Changes.   The Parent Borrower will, for financial reporting purposes, cause the Parent Borrower's and each of its Subsidiaries' Fiscal Years to end on the Saturday closest to December 31st of each calendar year; provided that the Borrower Representative may, upon written notice to the Administrative Agent, change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Borrower Representative and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

7.20     KYC Information.   Promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

7.21     Anti-Corruption Laws; Sanctions   Conduct its businesses in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other applicable anti-corruption legislation in other jurisdictions and with all applicable Sanctions, and maintain policies and procedures designed to promote and achieve compliance with such laws and Sanctions.

# SECTION 8

## Negative Covenants

The Parent Borrower hereby agrees that so long as the Commitments remain in effect, and thereafter until payment in full of all Obligations and Prior Lender Obligations, and termination or expiration of all Letters of Credit (unless cash collateralized or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent), the Parent Borrower shall not and shall not permit any of its Restricted Subsidiaries to, directly or indirectly (and, in the case of Section 8.20, Holdings, DB Parent, and Investor shall not):

8.1     Limitation on Fundamental Changes.   Enter into any merger, consolidation or amalgamation or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or assets, except:

(a)    any Subsidiary of the Parent Borrower may be merged, amalgamated or consolidated with or in-to the Parent Borrower; provided that the Parent Borrower shall be the continuing or surviving Person;

(b)    any Restricted Subsidiary may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Parent Borrower; or

(c)    any Restricted Subsidiary that is not a Loan Party may liquidate or dissolve if the Parent Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Parent Borrower and is not materially disadvantageous to the Lenders and any Restricted Subsidiary that is a Loan Party may liquidate or dissolve with the prior written consent of the Administrative Agent.

8.2    Limitation on Restricted Payments.  Declare or pay any Restricted Payment, except that:

(a)    each Restricted Subsidiary may make Restricted Payments to the Parent Borrower and to another Loan Party (other than Holdings, DB Parent, and Investor);

(b)    the Borrowers may declare and make any Restricted Payment payable solely in the Capital Stock (other than Disqualified Capital Stock) of such Person; and

(c)    the Parent Borrower and its Restricted Subsidiaries may make Restricted Payments to Holdings, DB Parent, and Investor, in each case, solely to the extent such amounts are included in the Approved Budget:

(i)    the proceeds of which will be used to pay the portion of any consolidated, combined or similar income tax liability attributable to the income of the Parent Borrower or its Subsidiaries; provided that no such payments shall exceed the income tax liability that would have been imposed on the Parent Borrower and/or the applicable Subsidiaries had such entity(ies) paid such taxes on a stand-alone basis;

(ii)    the proceeds of which shall be used to pay such equity holder's operating costs and expenses incurred in the ordinary course of business, other overhead costs and expenses and fees (including administrative, legal, accounting and similar expenses provided by third parties as well as trustee, directors and general partner fees) which are reasonable and customary and incurred in the ordinary course of business and attributable to the ownership or operations of the Parent Borrower and its Subsidiaries (including any reasonable and customary indemnification claims made by directors or officers of Parent Entity attributable to the direct or indirect ownership or operations of the Parent Borrower and its Subsidiaries) and fees and expenses otherwise due and payable by the Parent Borrower or any Restricted Subsidiary and permitted to be paid by the Parent Borrower or such Restricted Subsidiary under this Agreement not to exceed $500,000, over the term of this Agreement; and

(iii)    the proceeds of which shall be used to pay franchise and excise taxes, and other fees and expenses, required to maintain its existence.

8.3    Limitations on Certain Acquisitions.  Acquire by purchase or otherwise all the business or assets of, or stock or other evidences of beneficial ownership of, any Person.

8.4    Limitation on Dispositions .  Engage in any Disposition, except:

(a)    Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Parent Borrower and its Restricted Subsidiaries;

(b)    Dispositions of inventory in the ordinary course of business;

(c)     Dispositions of property to the Parent Borrower or another Loan Party (other than Holdings, DB Parent, and Investor);

(d)     Dispositions permitted (i) under Section 8.1, (ii) as Investments under Section 8.11, (iii) as Restricted Payments under Section 8.2 and (iv) Liens permitted by Section 8.13;

(e)     Dispositions of Cash Equivalents or Temporary Cash Investments in the ordinary course of business;

(f)     leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole;

(g)     transfers of property subject to Recovery Event upon receipt of the net proceeds of such Recovery Event; or

(h)     the Parent Borrower and the Restricted Subsidiaries may sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof.

8.5     Limitation on Modifications of Indebtedness and Other Documents.    (a) Amend, supplement, waive or otherwise modify any of the provisions of any Indebtedness (A) in a manner that shortens the maturity date of the Indebtedness incurred thereunder to a date prior to the date that is 91 days after the Termination Date, (B) in a manner that provides for a shorter weighted average life to maturity with respect to such Indebtedness (provided that compliance with this restriction shall be determined ignoring the effect of any payment of customary upfront fees or any permanent prepayment of such Indebtedness, in each case based on market conditions at the time of the applicable amendment, supplement, waiver or other modification), (C)  in a manner that increases the rate or shortens the time for payment of interest or premium payable, whether at maturity, at a date fixed for prepayment or by acceleration or otherwise thereunder or (D) otherwise without the consent of the Administrative Agent.

(b)     Amend or modify all or any part of, or any provision of, its Organizational Documents, except for changes, amendments and modifications, either individually or in the aggregate, that are not materially adverse to the interests of the Administrative Agent, the Lenders and the Issuing Lenders under the Loan Documents or in the Collateral; provided that the applicable Loan Parties comply with all requirements under the Security Documents to the extent required in connection therewith.

8.6     Sanctions; Anti-Corruption Laws

(a)     Directly or indirectly, use the proceeds of any Extension of Credit, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, Arranger, Administrative Agent, Issuing Lender, Swingline Lender, or otherwise) of Sanctions.

(b)     Directly or indirectly use the proceeds of any Extension of Credit for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other anti-corruption legislation in other jurisdictions.

8.7     Limitation on Negative Pledge Clauses.  Enter into with any Person any agreement which prohibits or limits the ability of the Parent Borrower or any of its Restricted Subsidiaries that are Loan Parties to create, incur, assume or suffer to exist any Lien in favor of the Lenders in respect of obligations and liabilities under this Agreement or any other Loan Documents upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than:

(a)    restrictions and conditions imposed by (A) applicable law, rule, regulation or order, or required by any regulatory authority having jurisdiction over the Parent Borrower or any Restricted Subsidiary or any of their businesses, (B) any Loan Document or Pre-Petition Loan Document, (C) the Pre-Petition Senior Notes Debt Documents, and (D) the Pre-Petition Term Loan Credit Agreement (and the related Pre-Petition Term Loan Documents) or the DIP Term Loan Facility (and related "Loan Documents" as defined in the DIP Term Loan Credit Agreement);

(b)    customary restrictions and conditions existing on the Closing Date or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)    customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(d)    restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(e)    (i) any restriction by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of the Parent Borrower or any Restricted Subsidiary not otherwise prohibited by this Agreement, the RSA, or the Orders, (ii) customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Parent Borrower or any Restricted Subsidiary, (iii) customary provisions contained in agreements and instruments entered into in the ordinary course of business (including but not limited to leases and licenses) or in joint venture and other similar agreements entered into in the ordinary course of business, or in shareholder, partnership, limited liability company and other similar agreements in respect of non-Wholly Owned Restricted Subsidiaries, or (iv) without limiting the Orders and the RSA, the Joint Venture Agreements not otherwise prohibited by this Agreement;

(f)    restrictions or conditions in any Indebtedness permitted pursuant to Section 8.12 that is incurred or assumed by Non-Loan Parties to the extent such restrictions or conditions are no more restrictive than the restrictions and conditions in the Loan Documents or, in the case of subordinated debt, are market terms at the time of issuance or, in the case of Indebtedness of any Non-Loan Party, are imposed solely on such Non-Loan Party and its Subsidiaries;

(g)    restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions constituting Liens permitted hereunder);

(h)    restrictions set forth on Schedule 8.7 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(i)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by Section 8.11 and applicable solely to such joint venture and entered into in the ordinary course of business;

(j)    negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 8.12(f), but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness;

(k)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(l)    customary net worth provisions contained in real property leases entered into by Subsidiaries of the Parent Borrower, so long as the Parent Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Parent Borrower and its Subsidiaries to meet their ongoing obligation; and

(m)    provisions restricting the granting of a security interest in intellectual property contained in licenses or sublicenses by the Parent Borrower and its Restricted Subsidiaries of such intellectual property, which licenses and sublicenses were entered into in the ordinary course of business (in which case such restriction shall relate only to such intellectual property).

8.8    <u>Limitation on Lines of Business</u>.  Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses of the same general type as those in which the Parent Borrower and its Restricted Subsidiaries are engaged in on the Closing Date or which are reasonably related thereto and any business related thereto.

8.9    <u>Limitations on Currency, Commodity and Other Hedging Transactions</u>.  Enter into any Hedging Agreement, or purchase or otherwise acquire, or enter into agreements or arrangements relating to, any currency or commodity (each a "<u>Hedging Arrangement</u>") except, to the extent and only to the extent, that such Hedging Agreements or other agreements or arrangements are entered into with, or such currency or commodity is purchased or otherwise acquired through, reputable financial institutions or vendors other than for purposes of speculation (any such Hedging Agreement, agreement or arrangement, or purchase or acquisition permitted by this Subsection, a "<u>Permitted Hedging Arrangement</u>").

8.10    <u>Limitations on Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrowers, whether or not in the ordinary course of business, other than:

(a)    transactions between or among the Parent Borrower and any other Loan Party (other than Holdings, DB Parent, and Investor);

(b)    transactions on terms substantially as favorable to the Parent Borrower or such Restricted Subsidiary as would be obtainable by the Parent Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)    Restricted Payments permitted under <u>Section 8.2</u>;

(d)    loans and other transactions by and among the Borrowers and/or one or more Subsidiaries to the extent permitted under this Article VIII; and

(e)    the payment of (x) customary fees to directors, officers, managers, employees, consultants and other service providers of the Parent Borrower and its Restricted Subsidiaries, Holdings, DB Parent, Investor in the ordinary course of business to the extent attributable to the ownership or operation of the Parent Borrower and its Restricted Subsidiaries and (y) reasonable out of pocket costs to, and indemnities provided on behalf of, directors, officers, managers, employees, consultants, partners, members and other service providers of the Parent Borrower and its Restricted Subsidiaries or any Parent Entity in the ordinary course of business to the extent attributable to the ownership or operation of the Parent Borrower and its Restricted Subsidiaries, in each case of clauses (x) and (y), solely to the extent made in accordance with the Approved Budget.

8.11    <u>Limitations on Investments</u>.  Make or maintain, directly or indirectly, any Investment except for Permitted Investments.

8.12    <u>Limitations on Indebtedness</u>.  Directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness except for the following (collectively, "<u>Permitted Indebtedness</u>"):

(a)    Indebtedness of the Parent Borrower and any of its Subsidiaries (i) under the Loan Documents or (ii) consisting of the Prior Lender Obligations;

(b)    Indebtedness (i) under the Pre-Petition Senior Notes in an aggregate principal amount not to exceed $[_____], (ii) under the Pre-Petition Term Loan Credit Agreement in an aggregate principal amount

not to exceed $[_____], provided that the Indebtedness under the Pre-Petition Term Loan Credit Agreement is subject to the ABL/Term Loan Intercreditor Agreement and (iii) Indebtedness under the DIP Term Loan Credit Agreement in an aggregate amount not to exceed $[_____], plus the amount of any capitalized interest and fees, provided that the Indebtedness under the DIP Term Loan Credit Agreement is subject to the Orders, the ABL/Term Loan Intercreditor Agreement and the Intercreditor Acknowledgment;

(c)    Indebtedness listed on Schedule 8.12(c) (which Schedule shall include all intercompany Indebtedness outstanding on the date hereof);

(d)    Guarantee Obligations of the Parent Borrower and its Restricted Subsidiaries in respect of Indebtedness of the Parent Borrower or any Restricted Subsidiary otherwise permitted hereunder; provided that (i) such Guarantee Obligation shall be subordinated in right of payment to the Guarantee of the Obligations and (ii) no Guarantee by any Restricted Subsidiary of any Indebtedness of a Loan Party shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations;

(e)    Indebtedness of the Parent Borrower or any Restricted Subsidiary owing to the Parent Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by Section 8.11; provided that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to a subordination agreement in form and substance satisfactory to the Administrative Agent;

(f)    other Indebtedness (including Financing Leases); provided that the aggregate principal amount of such Indebtedness shall not exceed $250,000 in the aggregate;

(g)    Indebtedness in respect of Hedging Agreements incurred in the ordinary course of business and not for speculative purposes;

(h)    Indebtedness in respect of Cash Management Arrangements and netting services, ACH arrangements, overdraft protections and similar arrangements in each case in connection with deposit accounts incurred in the ordinary course;

(i)    Indebtedness consisting of (a) the financing of insurance premiums or (b) take or pay obligations entered into in the ordinary course of business;

(j)    Indebtedness incurred by the Parent Borrower or any of its Restricted Subsidiaries in respect of letters of credit, bank guarantees, banker's acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(k)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Parent Borrower or any of its Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(l)    Guarantee Obligations of the Parent Borrower or any Restricted Subsidiary in connection with the provision of credit card payment processing services;

(m)    (i) unsecured Indebtedness in respect of obligations of the Parent Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of the Parent Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(n)    Indebtedness in respect of letters of credit in an aggregate maximum face amount not to exceed $[_____]; provided that such Indebtedness is reflected in the Approved Budget;

(o)    Indebtedness arising from the honoring of a check, draft or similar instrument against insufficient funds and which is extinguished within five Business Days of its incurrence;

(p)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (o) above;

(q)    The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 8.12; and

(r)    Indebtedness in respect of any letters of credit issued in favor of any Issuing Lender or the Swingline Lender to support any Defaulting Lender's participation in Letters of Credit or Swingline Loans as provided for in Subsection 3.4, in each case to the extent not exceeding the maximum amount of such participations.

Notwithstanding any of the foregoing, and except for the [Priority Carve-Out], no Indebtedness permitted under this Section 8.12 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the superpriority administrative expense claims of (i) the Administrative Agent and the Lenders and (ii) the Prior Agent and the Prior Lenders, in each case, as set forth herein and in the applicable Order, other than, solely with respect to Collateral that is not ABL Priority Collateral, (x) Indebtedness under the Pre-Petition Term Loan Credit Agreement permitted under Section 8.12(b)(ii) and (y) Indebtedness under the DIP Term Loan Credit Agreement permitted under Section 8.12(b)(iii).

For purposes of determining compliance with this Subsection 8.12, in the event that any Indebtedness (including Guarantee Obligations) meets the criteria of more than one of the types of Indebtedness (including Guarantee Obligations) described in clauses (a) through (x) above or any related subclauses, the Borrower Representative, in its sole discretion, shall classify such item of Indebtedness and may include the amount and type of such Indebtedness in one or more of such clauses or subclauses (including in part under one such clause or subclause and in part under another such clause or subclause). Furthermore, for purposes of this definition, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness), on the date that such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount or, if issued with original issue discount, the aggregated accreted value (whichever is higher) of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing.

8.13    Limitations on Liens.  Create or suffer to exist, any Lien upon or with respect to any of their respective properties or assets, whether now owned or hereafter acquired, or assign, or permit any of their respective Restricted Subsidiaries to assign, any right to receive income, except for the following (collectively, "Permitted Liens"):

(a)    Liens granted by the Orders and created pursuant to (i) the Loan Documents to secure the Obligations;

(b)    Liens existing on the Closing Date and disclosed on Schedule 8.13(b);

(c)    Customary Permitted Liens;

(d)    Liens in favor of lessors securing operating leases permitted hereunder;

(e)    statutory or common law Liens or rights of setoff of depository banks or securities intermediaries with respect to deposit accounts, securities accounts or other funds of the Parent Borrower or any Restricted Subsidiary maintained at such banks or intermediaries, including to secure fees and charges in connection with returned items or the standard fees and charges of such banks or intermediaries in connection with the deposit accounts, securities accounts or other funds maintained by the Parent Borrower or such Restricted Subsidiary at such banks or intermediaries (excluding any Indebtedness for borrowed money owing by the Parent Borrower or such Restricted Subsidiary to such banks or intermediaries);

(f)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Parent Borrower or its Restricted Subsidiaries in the ordinary course of business;

(g)    leases, subleases, licenses or sublicenses to or from third parties;

(h)    Liens securing the Prior Lender Obligations;

(i)    Liens securing (i) Indebtedness permitted pursuant to Section 8.12(b)(ii); provided any such Liens are subject to the ABL/Term Loan Intercreditor Agreement and the Orders and (ii) Indebtedness permitted pursuant to Section 8.12(b)(iii); provided any such Liens are subject to the ABL/Term Loan Intercreditor Agreement, the Intercreditor Acknowledgement and the Orders;

(j)    Deposits to merchandise vendors in connection with the production of goods, which deposits are made in accordance with the Approved Budget;

(k)    Liens in respect of cash collateral securing letters of credit permitted under Section 8.12(n); provided that such cash collateral shall not exceed 105% of aggregate maximum face amount of the outstanding letters of credit; or

(l)    Deposits or other collateral to secure any bank products in accordance with the Orders; or

(m)    the (i) Adequate Protection Liens and (ii) Adequate Protection Superpriority Claims.

Notwithstanding the foregoing, Liens permitted under this Section 8.13 (other than the Liens securing the DIP Term Loan Facility (solely to the extent set forth in the Orders)) shall at all times be junior and subordinate to the Liens under the Loan Documents and the applicable Order securing the Obligations.  The prohibition provided for in this Section 8.13 specifically includes any effort by any Debtor, any official committee in any Chapter 11 Case or any other party in interest in the Chapter 11 Cases, as applicable, to prime or create pari passu to any claims, Liens or interests of (i) the Agents and the Lenders or (ii) for so long as the Prior Lender Obligations have not been indefeasibly paid in full in cash, the Prior Agent and the Prior Lenders, any Lien, in each case, other than as set forth in the applicable Orders and irrespective of whether such Liens or interests may be "adequately protected."

8.14    Orders. Notwithstanding anything to the contrary herein, use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of Paragraph [   ] (Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out) of the Interim Order.

8.15    Prepayments of Other Indebtedness. Other than pursuant to an order of the Court (including any Order) and in accordance with the Approved Budget, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any

Indebtedness prior to its scheduled maturity, other than (i) the Obligations and the Prior Lender Obligations or (ii) any payments in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases in accordance with the Approved Budget.

8.16    Repayment of Indebtedness. Without limiting any other provision hereof, except pursuant to the Approved Budget, without express prior written consent of the Administrative Agent and pursuant to an order of the Court (including any Order) after notice and a hearing, make any payment or transfer with respect to any Lien or Indebtedness or claim incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

8.17    Reclamation Claims. Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $500,000.

8.18    Insolvency Proceeding Claims. Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the applicable Order.

8.19    Bankruptcy Actions. Seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Order or any of the other Loan Documents.

8.20    Holdings, DB Parent, and Investor Covenants. business or operations other than (i) the ownership of the Capital Stock (other than disqualified equity interests) of the Parent Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, DB Parent, Investor and the Borrowers, (iv) the performance of its obligations under and in connection with the Loan Documents and any documents relating to other Indebtedness permitted under Section 8.12, (v) any transaction between Holdings, DB Parent, Investor and the Borrowers or any Restricted Subsidiary permitted under this Article VIII, (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying Taxes, (vii) providing customary indemnification to officers and directors and as otherwise permitted in Article VIII, (viii) the making of any loan to any officers or directors contemplated by Section 8.10, the making of any Investment in the Borrowers or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 8.11, a Restricted Subsidiary, (ix) activities required to comply with applicable laws, (x) maintenance and administration of Pre-Petition stock option and stock ownership plans and activities incidental thereto, and (xi) activities incidental to the businesses or activities described in this Section 8.20.

# SECTION 9

## Events of Default

9.1    Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code to the extent provided in the applicable Order, with respect to the Debtors and without notice, application or motion, hearing before, or order of the Court or any notice to any Loan Party, any of the following shall constitute an event of default:

(a)     Any of the Borrowers shall fail to pay any principal of any Loan or any Reimbursement Obligation when due in accordance with the terms hereof (whether at Stated Maturity, by mandatory prepayment or otherwise); or any of the Borrowers shall fail to pay any interest on any Loan, or any other amount payable hereunder, within three days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)     Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document (or in any amendment, modification or supplement hereto or thereto) or which is contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any such other Loan Document, including, without limitation, the Information Certificate, Borrowing Base Certificate or the Approved Budget Variance Report, shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)     Any Loan Party shall default in the payment, observance or performance of any term, covenant or agreement contained in (i) Subsection 4.16, (ii) Section 7 or (iii) Section 8; or

(d)     Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in clauses (a) through (c) of this Subsection 9.1), and such default shall continue unremedied for a period of 10 days after the earlier of (A) the date on which a Responsible Officer of the Borrower Representative becomes aware of such failure and (B) the date on which written notice thereof shall have been given to the Borrower Representative by the Administrative Agent or the Required Lenders; or

(e)     Except for defaults arising as a result of the entry into this Agreement and the DIP Term Loan Credit Agreement or occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, any Loan Party or any of its Restricted Subsidiaries shall (i) default in (x) any payment of principal of or interest on the DIP Term Loan Credit Agreement or any Indebtedness (excluding the Loans and the Reimbursement Obligations) in excess of $500,000 or (y) in the payment of any Guarantee Obligation in excess of $500,000, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created; (ii) default in the observance or performance of any other agreement or condition relating to any Indebtedness (excluding the Loans and the Reimbursement Obligations) or Guarantee Obligation referred to in clause (i) above or contained in any instrument or agreement evidencing, securing or relating thereto (other than a default in the observance of any financial maintenance covenant or a failure to provide notice of a default or an event of default under such instrument or agreement), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice or lapse of time if required, such Indebtedness to become due prior to its Stated Maturity or such Guarantee Obligation to become payable (an "Acceleration"; and the term "Accelerated" shall have a correlative meaning), and such time shall have lapsed and, if any notice (a "Default Notice") shall be required to commence a grace period or declare the occurrence of an event of default before notice of Acceleration may be delivered, such Default Notice shall have been given and such default shall not have been remedied or waived by or on behalf of such holder or holders; (iii) in the case of any Indebtedness or Guarantee Obligations referred to in clause (i) above containing or otherwise requiring observance or compliance with any financial maintenance covenant, such Indebtedness or Guarantee Obligation shall have been Accelerated and such Acceleration shall not have been rescinded; or (iv) any "Event of Default" (as defined in the DIP Term Loan Credit Agreement) occurs that has not been cured or waived under the DIP Term Loan Credit Agreement; or

(f)     (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of either of the Parent Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with

respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is in the reasonable opinion of the Administrative Agent likely to result in the termination of such Plan for purposes of Title IV of ERISA, (<u>iv</u>) any Single Employer Plan shall terminate for purposes of Title IV of ERISA other than a standard termination pursuant to Section 4041(b) of ERISA, (<u>v</u>) either of the Parent Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Administrative Agent is reasonably likely to, incur any liability in connection with a withdrawal from, or the Insolvency or ERISA Reorganization of, a Multiemployer Plan, (<u>vi</u>) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could be reasonably expected to result in a Material Adverse Effect, or (<u>vii</u>) the PBGC purports to assert or otherwise seeks to impose any Lien on the Collateral having a priority senior to or pari passu with the Liens, and the security interests granted under the Orders, the Loan Documents or under the Prepetition Loan Documents or the Pre-Petition Term Loan Credit Agreement; or

(g)    One or more Post-Petition judgments or decrees shall be entered against the Debtors involving in the aggregate at any time a liability (net of any insurance or indemnity payments actually received in respect thereof prior to or within 10 days from the entry thereof) of $500,000 or more or which would operate to divest the Debtors of any material assets; or

(h)    (i) Any of the Security Documents or any Pre-Petition Loan Document shall cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party which is a party to any such Security Document shall so assert in writing, or (<u>ii</u>) the Lien created by any of the Security Documents or the Orders shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any portion of the ABL Priority Collateral (other than in connection with any termination of such Lien in respect of any Collateral as permitted hereby or by any Security Document); or

(i)    A Change of Control shall have occurred; or

(j)    The provisions of the ABL/Term Loan Intercreditor Agreement shall for any reason be revoked or invalidated in any material respect, or otherwise cease to be in full force and effect, or any Loan Party, DIP Term Loan Agent, any DIP Term Loan Lender, any agent with respect to the Pre-Petition Term Loan Credit Agreement, any lender under Pre-Petition Term Loan Credit Agreement or any Affiliate of any of the foregoing shall have commenced a suit or action, including any motion or adversary proceeding in the Chapter 11 Cases, contesting in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations or Pre-Petition Obligations for any reason shall not have the priority contemplated by this Agreement, the Pre-Petition Credit Agreement, the Orders, the ABL/Term Loan Intercreditor Agreement, or such subordination provisions, as applicable; or

(k)    The DIP Term Loan Lenders fail to fund any loans or credit extensions under the DIP Term Loan Credit Agreement following a formal borrowing request therefor by the Borrowers; or

(l)    The occurrence of any of the following in any of the Chapter 11 Cases:

(i)    any material breach or failure to comply with the material terms of the Interim Order or the Final Order, as applicable; or

(ii)    (ii) any breach or failure to comply with the Required Milestones; or

(iii)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other

than Liens permitted pursuant to Section 8.13 upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties or Prior Agent and Prior Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the Collateral Agent; or (D) any other action or actions adverse to (x) the Administrative Agent and Lenders or Prior Agent and Prior Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral or (y) Prior Agent and Prior Lenders or their rights under the Pre-Petition Credit Agreement or the other Pre-Petition Loan Documents or their interest in the Collateral (as defined in the Pre-Petition Credit Agreement); or

(iv)     (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Prior Lender Obligations or by any other Person to which the Administrative Agent and the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization; or

(v)     the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that (A) is not acceptable to the Administrative Agent and the Required Lenders in their sole discretion or (B) does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement and the Prior Lender Obligations on or before the effective date of such plan or plans; or

(vi)     (x) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order, the Final Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement and/or the other Loan Documents (including any order in respect of the Required Milestones specified herein and/or in the Orders or the RSA) without the written consent of the Administrative Agent or the filing by a Loan Party of a motion for reconsideration with respect to the Interim Order or the Final Order or the Interim Order, the Final Order or the Cash Management Order shall otherwise not be in full force and effect or (y) any Loan Party or any Subsidiary shall fail to comply with either Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Credit Agreement and/or the other Loan Documents,  in any material respect; or

(vii)     the Court's (A) entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Loan Parties of a value in excess of $[500,000]; (B) entry of an order terminating exclusivity having been entered (or requested, unless actively contested by the Loan Parties); (C) failure of the Court to enter the Final Order within 35 days following the commencement of the Chapter 11 Cases (or such other date as may be agreed to by the Administrative Agent and fixed by the Court) permitting extensions of credit under the Facility not to exceed $125,000,000 in principal amount and otherwise in form and substance reasonably satisfactory to the Administrative Agent; or

(viii)     [reserved]; or

(ix)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral or against the Prior Agent, any Prior Lender or any Collateral (as defined in the Pre-Petition Credit Agreement); or

(x)     (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded

powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale without the Administrative Agent's consent of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement and all Prior Lender Obligations at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable; or

(xi)    the dismissal of any Chapter 11 Case or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise; or

(xii)    any Loan Party shall file a motion (without consent of the Administrative Agent) seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Administrative Agent with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $500,000 or more or (D) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(xiii)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Administrative Agent or any Lender or Prior Agent or any Prior Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on either the Administrative Agent or such Lender or Prior Agent or any Prior Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents or the Prior Lender Obligations or Liens of the Prior Agent or Prior Lenders under the Pre-Petition Loan Documents to any other claim, or (y) have a material adverse effect on the rights and remedies of the Administrative Agent or any Lender or Prior Agent or any Prior Lender under any Loan Document or the Prior Agent or Prior Lenders under the Pre-Petition Loan Documents or the collectability of all or any portion of the Obligations under the Loan Documents or the Prior Lender Obligations; or

(xiv)    the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Prior Lender Obligations owing under the Pre-Petition Loan Documents; or

(xv)    the failure of any Loan Party to perform any of its obligations under the Interim Order, the Final Order, the Cash Management Order, or any order of the Court approving any Transaction or to perform in any material respect its obligations under any order of the Court approving bidding procedures; or

(xvi)    the existence of any claims or charges, or the entry of any order of the Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, the DIP Term Loan Credit Agreement, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this

Agreement and the other Loan Documents, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent), whichever is in effect; or

(xvii)    the Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of Administrative Agent; or

(xviii)    an order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties, or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prior Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(xix)    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent, of (i) the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prior Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date; or

(xx)    an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

(xxi)    any order having been entered or granted (or requested, unless actively opposed by the Loan Parties) by either the Court or any other court of competent jurisdiction materially adversely impacting the rights and interests of the Administrative Agent and the Lenders, as determined by the Administrative Agent, acting reasonably, without the prior written consent of the Administrative Agent; or

(xxii)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the Prior Agent or the Prior Lenders with respect to the Pre-Petition Obligations, or without the consent of the Administrative Agent, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any Pre-Petition agent or lender that is inconsistent with the Order; or

(xxiii)    without the Administrative Agent's consent, the entry of any order by the Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents and the DIP Term Loan Credit Agreement; or

(xxiv)    [reserved];

(xxv)    [reserved]; or

(xxvi)    if, unless otherwise approved by the Administrative Agent, an order of the Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within 10 days; or

(xxvii)    without the Administrative Agent's consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Agents' or the DIP Term Loan Lenders' liens and security interests; or (b) to modify or affect any of the rights of the Administrative Agent, the Lenders or the DIP Term Loan Lenders under the Orders, the Loan Documents, or the DIP Term Loan Credit Agreement and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases; or

(xxviii)    any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 9.1(l) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(xxix)    any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur; or

(xxx)    the occurrence of any termination event under the RSA, whether or not the RSA is then in effect, or the failure to achieve or satisfy any Required Milestone in the RSA or the Orders; or

(xxxi)    the occurrence of any event set forth in clauses (f) through (i) of the definition of Termination Date; or

(xxxii)    failure of the Borrowers or any other Loan Party to use the proceeds of the Loans as set forth in and in compliance with the Approved Budget (subject to the variances permitted herein) and this Agreement; or

(xxxiii)    any material breach or failure to comply with the material terms of the Interim Order or the Final Order, as applicable; or

(xxxiv)    (xxxii) any breach or failure to comply with the Required Milestones under the Orders or the RSA.

9.2    Remedies Upon an Event of Default.    Subject to the applicable Order, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall: (i) declare the Commitment of each Lender to make Loans and any obligation of the Issuing Lender to issue L/Cs to be terminated, whereupon such commitments and obligation shall be terminated, (ii) terminate, reduce or restrict the right or ability of the Loan Parties to use any cash collateral; (iii) declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable, (iv) subject to the Remedies Notice Period, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Administrative Agent pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); (v) subject to the Remedies

Notice Period, (A) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law or (B) take any and all actions described in the Order; and (vi) declare that the application of the Carve-Out has occurred through the delivery of a Carve-Out Trigger Notice (as defined in the Order).

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents.  Except as expressly provided above in this Section 9, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

9.3     License; Access; Cooperation. The Administrative Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of Loan Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral in each case after the occurrence, and during the continuance, of an Event of Default. The Administrative Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and Store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition it being understood and agreed that the Administrative Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral. Upon the occurrence and the continuance of an Event of Default and the exercise by the Administrative Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, Borrower shall assist the Administrative Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Collateral Agent.

9.4     Lift of Stay; Stay of Proceedings. Subject to the applicable Order, the Automatic Stay shall be modified and vacated to permit the Administrative Agent and Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without further notice, motion or application to, hearing before, or order from, the Court.

# SECTION 10

## The Agents and the Other Representatives

10.1     Appointment.  (a) Each Lender and each Issuing Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender or Issuing Lender under this Agreement and the other Loan Documents, and each such Lender or Issuing Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to or required of such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Each Lender hereby authorizes the Agents to consent, on behalf of each Lender, to the Interim Order and the Final Order, each to be negotiated between the Borrowers and Guarantors, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agents and the Other Representatives shall not have any duties or responsibilities, except, in the case of the Administrative Agent, the Collateral Agent and the Issuing Lender, those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent or the Other Representatives.

(b)    Each of the Agents may perform any of their respective duties under this Agreement, the other Loan Documents and any other instruments and agreements referred to herein or therein by or through its respective officers, directors, agents, employees or affiliates, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent (it being understood and agreed, for avoidance of doubt and without limiting the generality of the foregoing, that the Administrative Agent and the Collateral Agent may perform any of their respective duties under the Security Documents by or through one or more of their respective affiliates).  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Section 10 shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(c)    Except for Subsections 10.5, 10.8(a), 10.8(b), 10.8(c), 10.8(e), 10.13 and (to the extent of the Borrowers' rights thereunder and the conditions included therein) 10.9, the provisions of this Section 10 are solely for the benefit of the Agents, the Lenders and the Issuing Lenders, and no Borrower or any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.

10.2    The Administrative Agent and Affiliates.  Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity.  Such person and its affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holdings, DB Parent, Investor, the Borrowers or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

10.3    Action by an Agent.  In performing its functions and duties under this Agreement, each Agent shall act solely as agent for the Lenders and, as applicable, the other Secured Parties, and no Agent assumes any (and shall not be deemed to have assumed any) relationship of agency or trust with or for the Parent Borrower or any of its Subsidiaries.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact (including the Collateral Agent in the case of the Administrative Agent), and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact or counsel selected by it with reasonable care.

10.4    Exculpatory Provisions.  (a) No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Requirement of Law; and

(iii)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the person serving as such Agent or any of its affiliates in any capacity;

(b)    No Agent shall be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Subsection 9.2</u> or <u>11.1</u>, as applicable) or (y) in the absence of its own bad faith, gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by a Borrower, a Lender or an Issuing Lender.

(c)    No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents or (v) the satisfaction of any condition set forth in <u>Section 6</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term as used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(d)    Each party to this Agreement acknowledges and agrees that the Administrative Agent may use an outside service provider for the tracking of all UCC financing statements required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of the Borrowers and the other Loan Parties.  No Agent shall be liable for any action taken or not taken by any such service provider.

10.5    <u>Acknowledgement and Representations by Lenders</u>.  Each Lender and each Issuing Lender expressly acknowledges that none of the Agents or the Other Representatives nor any of their officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it and that no act by any Agent or any Other Representative hereafter taken, including any review of the affairs of any Borrowers or any other Loan Party, shall be deemed to constitute any representation or warranty by such Agent or such Other Representative to any Lender.  Each Lender further represents and warrants to the Agents, the Other Representatives and each of the Loan Parties that it has had the opportunity to review each other document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender and each Issuing Lender represents to the Agents, the Other Representatives and each of the Loan Parties that, independently and without reliance upon any Agent, the Other Representatives or any other Lender, and based on such documents and information as it has deemed appropriate, it has made and will make, its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Holdings, DB Parent, Investor and the Borrowers and the other Loan Parties, it has made its own decision to make its Loans or issue Letters of Credit hereunder and enter into this Agreement and it will make its own decisions in taking or not taking any action under this Agreement and the other Loan Documents and, except as expressly provided in this Agreement, neither the Agents nor any Other Representative shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.  Each Lender and each Issuing Lender represents to each other party hereto that it is a bank, savings and loan association or other similar savings institution, insurance company, investment fund or company or other financial institution which makes or acquires commercial loans in the ordinary course of its business, that it is participating hereunder as a Lender or Issuing Lender, as applicable, for such commercial purposes, and that it has the knowledge and experience to be and is capable of evaluating the merits and risks of being a Lender hereunder.  Each Lender and each Issuing Lender acknowledges and agrees to comply with the provisions of <u>Subsection 11.6</u> applicable to the Lenders and Issuing Lenders hereunder.

10.6    <u>Indemnity; Reimbursement by Lenders</u>.  (a) To the extent that the Parent Borrower or any other Loan Party for any reason fails to indefeasibly pay any amount required under <u>Subsection 11.5</u> to be paid by it to the Administrative Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), the Issuing Lenders, the Swingline Lender or any Other Representative or any Related Party of any of the foregoing, each Lender severally agrees to pay ratably according to their respective Commitment Percentages in effect on the date on which the applicable unreimbursed expense or indemnity payment is sought under this <u>Subsection 10.6</u> (or, if the applicable unreimbursed expense or indemnity payment is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their Commitment Percentages, immediately prior to such date) such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); <u>provided</u> that (i) the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof), the Swingline Lender or the Issuing Lenders in their capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof), the Swingline Lender or Issuing Lenders in connection with such capacity and (ii) such indemnity for the Swingline Lender or the Issuing Lenders shall not include losses incurred by the Swingline Lender or the Issuing Lenders due to one or more Lenders defaulting in their obligations to purchase participations of Swingline Exposure under <u>Subsections 2.4(c)</u> and <u>2.4(d)</u> or L/C Obligations under <u>Subsection 3.4</u> (it being understood that this proviso shall not affect the Swingline Lender's or any Issuing Lender's rights against any Defaulting Lender).  The obligations of the Lenders under this <u>Subsection 10.6</u> are subject to the provisions of <u>Subsection 4.8</u>.

(b)    Any Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document (except actions expressly required to be taken by it hereunder or under the Loan Documents) unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

(c)    All amounts due under this <u>Subsection 10.6</u> shall be payable not later than 3 Business Days after demand therefor.  The agreements in this <u>Subsection 10.6</u> shall survive the payment of the Loans and all other amounts payable hereunder.

10.7    <u>Right to Request and Act on Instructions; Reliance</u>.  (a) Each Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents an Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the requesting Agent shall be absolutely entitled as between itself and the Lenders to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Lender for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of an Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), an Agent shall have no obligation to any Lender to take any action if it believes, in good faith, that such action would violate applicable law or exposes an Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of <u>Subsection 10.6</u>.

(b)    Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an Issuing Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender or such Issuing Lender unless the Administrative Agent shall have received notice to the contrary from such Lender or such Issuing Lender prior to the making of such Loan or the issuance of such Letter of Credit.  Each Agent may

consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

10.8    <u>Collateral Matters</u>.  (a) Each Lender authorizes and directs the Administrative Agent and the Collateral Agent to enter into the Security Documents and the ABL/Term Loan Intercreditor Agreement for the benefit of the Lenders and the other Secured Parties.  Each Lender hereby agrees, and each holder of any Note or participant in Letters of Credit by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Administrative Agent, Collateral Agent or the Required Lenders in accordance with the provisions of this Agreement, the Security Documents or the ABL/Term Loan Intercreditor Agreement, and the exercise by the Agents or the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any applicable Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loans unless instructed to do so by the Collateral Agent, it being understood and agreed that such rights and remedies may be exercised only by the Collateral Agent.  The Collateral Agent may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any guarantee by any Subsidiary (including extensions beyond the Closing Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Closing Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

(b)    The Lenders hereby authorize each Agent, in each case at its option and in its discretion, (<u>A</u>) to release any Lien granted to or held by such Agent upon any Collateral (<u>i</u>) upon termination of the Commitments and payment and satisfaction of all of the Obligations under the Loan Documents at any time arising under or in respect of this Agreement or the Loan Documents or the transactions contemplated hereby or thereby that are then due and unpaid, (<u>ii</u>) constituting property being sold or otherwise disposed of (to Persons other than a Loan Party) upon the sale or other disposition thereof in a transaction not prohibited by this Agreement, (<u>iii</u>) if approved, authorized or ratified in writing by the Required Lenders (or such greater amount, to the extent required by <u>Subsection 11.1</u>), (<u>iv</u>) constituting DIP Term Loan Priority Collateral (as defined in the Guarantee and Collateral Agreement) upon the "Discharge of Term Loan Collateral Obligations" (as defined in the ABL/Term Loan Intercreditor Agreement) or (<u>v</u>) as otherwise may be expressly provided in the relevant Security Documents and (<u>B</u>) at the written request of the Borrower Representative to subordinate any Lien on any as or any other property granted to or held by such Agent, as the case may be under any Loan Document, to the holder of any Lien on such property that is permitted by <u>Subsection 8.13</u>.  Upon request by any Agent, at any time, the Lenders will confirm in writing any Agent's authority to release particular types or items of Collateral pursuant to this <u>Subsection 10.8</u>.

(c)    No Agent shall have any obligation whatsoever to the Lenders to assure that the Collateral exists or is owned by Holdings, DB Parent, Investor, the Parent Borrower or any of its Restricted Subsidiaries or is cared for, protected or insured or that the Liens granted to any Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Agents in this <u>Subsection 10.8</u> or in any of the Security Documents, it being understood and agreed by the Lenders that in respect of the Collateral, or any act, omission or event related thereto, each Agent may act in any manner it may deem appropriate, in its sole discretion, given such Agent's own interest in the Collateral as a Lender and that no Agent shall have any duty or liability whatsoever to the Lenders, except for its bad faith, gross negligence or willful misconduct.

(d)    Notwithstanding any provision herein to the contrary, any Security Document may be amended (or amended and restated), restated, waived, supplemented or modified as contemplated by and in

accordance with Subsection 11.1 with the written consent of the Agent party thereto and the Loan Party party thereto.

(e)    The Collateral Agent may, and hereby does, appoint the Administrative Agent as its agent for the purposes of holding any Collateral and/or perfecting the Collateral Agent's security interest therein and for the purpose of taking such other action with respect to the collateral as such Agents may from time to time agree.

10.9    Successor Agent.  Subject to the appointment of a successor as set forth herein, (i) the Administrative Agent or the Collateral Agent may be removed by the Borrower Representative or the Required Lenders if the Administrative Agent, the Collateral Agent, or a controlling affiliate of the Administrative Agent or the Collateral Agent is a Defaulting Lender and (ii) the Administrative Agent and the Collateral Agent may resign as Administrative Agent or Collateral Agent, respectively, in each case upon 10 days' notice to the Administrative Agent, the Collateral Agent, the Lenders, the Issuing Lenders and the Borrower Representative, as applicable.  If the Administrative Agent or the Collateral Agent shall be removed by the Borrower Representative or the Required Lenders pursuant to clause (i) above or if the Administrative Agent or the Collateral Agent shall resign as Administrative Agent or Collateral Agent, as applicable, under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which such successor agent shall be subject to approval by the Borrower Representative; provided that such approval by the Borrower Representative in connection with the appointment of any successor Administrative Agent shall only be required so long as no Event of Default has occurred and is continuing; provided, further, that the Borrower Representative shall not unreasonably withhold its approval of any successor Administrative Agent if such successor is a commercial bank with a consolidated combined capital and surplus of at least $5,000,000,000.  Upon the successful appointment of a successor agent, such successor agent shall succeed to the rights, powers and duties of the Administrative Agent or the Collateral Agent, as applicable, and the term "Administrative Agent" or "Collateral Agent", as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Administrative Agent or Collateral Agent, as applicable, shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans or issuers of Letters of Credit.  After any retiring Agent's resignation or removal as Agent, the provisions of this Section 10 (including this Subsection 10.9) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.  After the resignation or removal of any Administrative Agent pursuant to the preceding provisions of this Subsection 10.9, such resigning or removed Administrative Agent (x) shall not be required to act as Issuing Lender for any Letters of Credit to be issued after the date of such resignation or removal (and all unpaid fees accrued for the account of the resigning Issuing Lender shall be paid in full upon its resignation or removal) and (y) shall not be required to act as Swingline Lender with respect to Swingline Loans to be made after the date of such resignation or removal (and all outstanding Swingline Loans of such resigning or removed Administrative Agent shall be required to be repaid in full upon its resignation or removal), although the resigning or removed Administrative Agent shall retain all rights hereunder as Issuing Lender and Swingline Lender with respect to all Letters of Credit issued by it, and all Swingline Loans made by it, prior to the effectiveness of its resignation or removal as Administrative Agent hereunder.  The fees payable by the Borrower Representative to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower Representative and such successor.

10.10    Swingline Lender.  The provisions of this Section 10 shall apply to the Swingline Lender in its capacity as such to the same extent that such provisions apply to the Administrative Agent.

10.11    Withholding Tax.  To the extent required by any applicable law, each Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax, and in no event shall such Agent be required to be responsible for or pay any additional amount with respect to any such withholding.  If the Internal Revenue Service or any other Governmental Authority asserts a claim that any Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify such Agent of a change in circumstances which rendered the exemption from or reduction of withholding tax ineffective or for any other reason, without limiting the provisions of Subsection 4.11(a) or 4.12, such Lender shall indemnify such Agent fully for all amounts paid, directly or indirectly, by such Agent as tax or otherwise, including any penalties or interest and together with any expenses incurred and shall make payable in respect thereof within 30 days after demand therefor.

A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this <u>Subsection 10.11</u>. The agreements in this <u>Subsection 10.11</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations. For purposes of this <u>Subsection 10.11</u>, the term "Lender" includes any Issuing Lender.

10.12    <u>Other Representatives</u>.    No Other Representative shall have nor be deemed to have a fiduciary relationship with any Lender. At any time that any Lender serving as an Other Representative shall have transferred to any other Person (other than any of its affiliates) all of its interests in the Loans and in the Commitments, such Lender shall be deemed to have concurrently resigned as such Other Representative.

10.13    <u>Appointment of Borrower Representatives</u>.    Each Borrower hereby designates the Parent Borrower as its Borrower Representative. The Borrower Representative will be acting as agent on each of the Borrowers behalf for the purposes of issuing notices of Borrowing and notices of conversion/continuation of any Loans pursuant to <u>Section 2</u> and <u>Section 4</u> or similar notices, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, requesting Letters of Credit, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents. The Borrower Representative hereby accepts such appointment. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

10.14    <u>Administrative Agent May File Proofs of Claim</u>.    In case of the pendency of any bankruptcy proceeding, Bail-In Action or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) is hereby authorized by the Lenders, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Sections 4.5</u> and <u>11.5</u>) allowed in such judicial proceeding;

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same and any custodian, trust, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 4.5 and 11.5.

10.15    <u>Application of Proceeds; Pre-Default Allocation of Payments</u>.    At all times when <u>Section 10.15(b)</u> does not apply and except as otherwise expressly provided herein, monies to be applied to the Obligations and the Prior Lender Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff, or otherwise, shall be allocated as follows:

(i)    *First*, to permanently reduce the fees, interest and principal in respect of the Prior Lender Obligations (if any) in accordance with Section 10.15 of the Pre-Petition Credit Agreement, until paid in full;

(ii)     *Second*, to permanently reduce the other Prior Lender Obligations (if any) in accordance with Section 10.15 of the Pre-Petition Credit Agreement other than any amounts that are required to be deposited in the Pre-Petition Indemnity Account, until paid in full;

(iii)     *Third*, to the payment of all Agent Advances funded by the Administrative Agent and fees, costs, indemnities and expenses owing to the Administrative Agent and the Collateral Agent, until paid in full;

(iv)     *Fourth*, to the payment of all interest and fees on the Obligations then due and payable owed to the Lenders, Swingline Lenders and Issuing Lender, until paid in full;

(v)     *Fifth*, to the payment of principal of the Revolving Credit Loans and Swingline Loans and the payment of matured L/C Obligations, until paid in full;

(vi)     *Sixth*, to any other Obligations then due and owing, until paid in full;

(vii)     *Seventh*, to the Pre-Petition Indemnity Account, if applicable; and

(viii)     *Eighth*, any remainder shall be for the account of and paid to the Borrowers.

Amounts shall be applied to each category of Obligations set forth above until Full Payment thereof and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category.  The application of amounts under this Section 10.15(a) to the Prior Lender Obligations shall be applicable only if and to the extent that any such Prior Lender Obligations remain outstanding after the occurrence of the full roll of the Prior Lender Obligations into the Obligation as described in Section 4.4(i).

(b)     Post-Default Allocation of Payments.  Notwithstanding anything herein to the contrary, at the election of Administrative Agent (in its discretion) or the Required Lenders, after the occurrence and during the continuation of an Event of Default, monies to be applied to the Obligations and the Prior Lender Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(i)     *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including attorneys' fees payable under Section 11.5 and Section 10.15 and amounts payable under Section 4) payable to each Agent in its capacity as such (other than in connection with Designated Cash Management Agreements or Obligations in respect of Designated Hedging Agreements);

(ii)     *Second*, to pay interest and principal due in respect of all Agent Advances until paid in full;

(iii)     *Third*, to permanently reduce the other Prior Lender Obligations (if any) in accordance with the provisions of Section 10.15 of the Pre-Petition Credit Agreement, until paid in full;

(iv)     *Fourth*, to fund the Pre-Petition Indemnity Account, if applicable;

(v)     *Fifth*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including attorneys' fees payable under Section 11.4, amounts payable under Section 4 and fees and other amounts payable under Section 2.10), ratably among them in proportion to the amounts described in this clause *Fifth* payable to them (other than in connection with Designated Cash Management Agreements or Obligations in respect of Designated Hedging Agreements), until paid in full;

(vi)     *Sixth*, to pay interest accrued in respect of all Swingline Loans until paid in full;

(vii)    *Seventh*, to pay the principal due in respect of all Swingline Loans, until paid in full;

(viii)    *Eighth*, to pay interest accrued in respect of the Revolving Credit Loans (other than Agent Advances), until paid in full;

(ix)    *Ninth*, ratably (i) to pay the principal of all Revolving Credit Loans (other than Agent Advances) until paid in full, (ii) to the Administrative Agent, to be held by the Administrative Agent, for the benefit of the Issuing Lenders, as cash collateral in an amount up to 105% of the maximum drawable amount of any outstanding Letters of Credit and (iii) to pay any Obligations under Designated Cash Management Agreements;

(x)    *Tenth*, to pay any amounts owing with respect to any Obligations in respect of Designated Hedging Agreements;

(xi)    *Eleventh*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties (other than any Defaulting Lenders) on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties (other than any Defaulting Lenders) on such date, until paid in full;

(xii)    *Twelfth*, ratably to pay any Obligations owed to Defaulting Lenders, until paid in full; and

(xiii)    *Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by law.

Amounts shall be applied to each category of Obligations set forth above until Full Payment thereof and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category. The application of amounts under this Section 10.15(b) to the Prior Lender Obligations shall be applicable only if and to the extent that any such Prior Lender Obligations remain outstanding after the occurrence of the full roll of the Prior Lender Obligations into the Obligation as described in Section 4.4(i). Amounts distributed with respect to any Designated Hedging Agreement or L/C Obligations shall be the lesser of the applicable L/C Obligations or Designated Hedging Agreement amount last reported to Administrative Agent or the actual L/C Obligations or Designated Hedging Agreement amount as calculated by the methodology reported to Administrative Agent for determining the amount due. Subject to Section 2.10, amounts used to cash collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause *Ninth* above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn, paid or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above. Administrative Agent shall have no obligation to calculate the amount to be distributed with respect to any Designated Hedging Agreement, but may rely upon written notice of the amount (setting forth a reasonably detailed calculation) from the Secured Party. In the absence of such notice, Administrative Agent may assume the amount to be distributed is the Designated Hedging Agreement amount last reported to it. The allocations set forth in this Section 10.15(b) are solely to determine the rights and priorities of Administrative Agent and Lenders as among themselves, may be changed by agreement among them without the consent of any Loan Party and are subject to Section 3.11 (regarding Defaulting Lenders). Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section 10.15(b). This Section 10.15(b) is not for the benefit of or enforceable by any Loan Party.

10.16    ERISA Representations. Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)        such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)       the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)        In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).


# SECTION 11

## Miscellaneous

11.1    <u>Amendments and Waivers</u>.  (a) Subject to Section 3.03(b), neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, supplemented, modified or waived except in accordance with the provisions of this <u>Subsection 11.1</u>.  With the acknowledgement of the Administrative Agent (which acknowledgement shall be deemed to have been received if the Administrative Agent has not responded to the Borrower Representative within two Business Days of its receipt, in accordance with <u>Subsection 11.2</u>, of a substantially final draft of the applicable amendment, supplement, modification or waiver), the Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent may, from time to time, (<u>x</u>) enter into with the respective Loan Parties hereto or thereto, as the case may be, written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to

this Agreement or to the other Loan Documents or changing, in any manner the rights or obligations of the Lenders or the Loan Parties hereunder or thereunder or (y) waive at any Loan Party's request, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that amendments pursuant to Subsection 11.1(d) may be effected without the consent of the Required Lenders to the extent provided therein; provided, further, that no such waiver and no such amendment, supplement or modification shall:

(i)    (A) reduce or forgive the amount or extend the scheduled date of maturity of any Loan or any Reimbursement Obligation or of any scheduled installment thereof (including extending the Termination Date), (B) reduce the stated rate of any interest, commission or fee payable hereunder (other than as a result of any waiver of the applicability of any post-default increase in interest rates), (C) increase the amount or extend the expiration date of any Lender's Commitment or extend the scheduled date of any payment thereof or (D) change the currency in which any Loan or Reimbursement Obligation is payable, in each case without the consent of each Lender directly and adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the aggregate Commitments of all Lenders shall not constitute an increase of the Commitment of, or an extension of the scheduled date of maturity, any scheduled installment, or the scheduled date of payment of the Loans of, any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase in the Commitment of such Lender);

(ii)    amend, modify or waive any provision of this Subsection 11.1(a) or reduce the percentage specified in the definition of "Required Lenders" or "Supermajority Lenders," or consent to the assignment or transfer by the Parent Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (other than pursuant to Subsection 8.2 or 11.6(a)) or amend or modify the defined term "Plan of Reorganization", in each case without the written consent of all the Lenders;

(iii)    release Guarantors accounting for all or substantially all of the value of the Guarantee of the Obligations pursuant to the Guarantee and Collateral Agreement, or, in the aggregate (in a single transaction or a series of related transactions), all or substantially all of the Collateral without the consent of all of the Lenders, except as expressly permitted hereby or by any Security Document (as such documents are in effect on the date hereof or, if later, the date of execution and delivery thereof in accordance with the terms hereof);

(iv)    require any Lender to make Loans having an Interest Period of longer than six months or shorter than one month without the consent of such Lender;

(v)    amend, modify or waive any provision of Section 10 without the written consent of the then Agents;

(vi)    amend, modify or waive any provision of Subsections 10.1(a), 10.5 or 10.12 without the written consent of any Other Representative directly and adversely affected thereby;

(vii)    amend, modify or waive any provision of the Swingline Note (if any) or Subsection 2.4 without the written consent of the Swingline Lender and each other Lender, if any, which holds, or is required to purchase, a participation in any Swingline Loan pursuant to Subsection 2.4(d);

(viii)    amend, modify or waive the provisions of any Letter of Credit or any L/C Obligation without the written consent of the Issuing Lender with respect thereto and each directly and adversely affected Lender;

(ix)    increase the advance rates set forth in the definition of "Borrowing Base," or make any change to the definitions of "Borrowing Base" (by adding additional categories or components thereof), "Eligible Accounts", "Eligible Credit Card Receivables", "Eligible In-Transit Inventory", "Eligible Inventory" or "Eligible Letter of Credit Inventory" or "Tradename Appraisal Amount" that would have the effect of increasing the amount of the Borrowing Base in each case without the consent of the Supermajority Lenders; provided that the Administrative Agent may increase or decrease the amount of, or otherwise modify or eliminate, any Availability Reserves that it implements in its Permitted Discretion in accordance with Subsection 2.1(b) or otherwise in accordance with the terms of this Agreement, and in any such case, such change will not be deemed to require any Supermajority Lender or other Lender consent; or

(x)    amend, modify or waive the order of application of payments set forth in the penultimate sentence of Subsection 4.4(a), or Subsection 4.4(d), 4.8(a), 4.16(d), 10.14 or 11.7 hereof or clause (c) or (d) of Section 4.1 of the ABL/Term Loan Intercreditor Agreement, in each case without the consent of each Lender directly and adversely affected thereby;

provided, further, that notwithstanding and in addition to the foregoing, and in addition to Liens the Collateral Agent is authorized to release pursuant to Subsection 10.8(b), the Collateral Agent may, in its discretion, release the Lien on Collateral valued in the aggregate not in excess of $7,500,000 in any Fiscal Year without the consent of any Lender.

(b)    Any waiver and any amendment, supplement or modification pursuant to this Subsection 11.1 shall apply to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, each of the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(c)    Notwithstanding any provision herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except to the extent the consent of such Lender would be required under clause (i) in the further proviso to the second sentence of Subsection 11.1(a).

(d)    Notwithstanding any provision herein to the contrary, this Agreement and the other Loan Documents may be amended (i) to cure any ambiguity, mistake, omission, defect or inconsistency, with the consent of the Parent Borrower and the Administrative Agent and (ii) in accordance with Subsection 7.11, to change the financial reporting convention.  Without limiting the generality of the foregoing, any provision of this Agreement and the other Loan Documents, including Subsection 4.4, 4.8, 4.16 or 10.14, may be amended as set forth in the immediately preceding sentence to provide for non-pro rata borrowings and payments of any amounts hereunder as between any tranche hereunder.  The Administrative Agent hereby agrees (if requested by the Borrower Representative) to execute any amendment referred to in this clause (d) or an acknowledgement thereof.

(e)    Notwithstanding any provision herein to the contrary, this Agreement may be amended (or deemed amended) or amended and restated with the written consent of the Required Lenders, the Administrative Agent and the Borrowers (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the existing Facilities and the accrued interest and fees in respect thereof, (y) to include, as appropriate, the Lenders holding such credit facilities in any required vote or action of the Required Lenders or of the Lenders of each Facility hereunder and (z) to provide class protection for any additional credit facilities.

(f)    If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement and/or any other Loan Document as contemplated by Subsection 11.1(a), the consent of each Lender or each affected Lender, as applicable, is required and the consent of the Required Lenders at such time is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained (each such other Lender, a "Non-Consenting Lender") then the Borrower Representative may, on notice

to the Administrative Agent and the Non-Consenting Lender, (A) replace such Non-Consenting Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Subsection 11.6 (with the assignment fee and any other costs and expenses to be paid by the Parent Borrower in such instance) all of its rights and obligations under this Agreement to one or more assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Parent Borrower to find a replacement Lender; provided, further, that the applicable assignee shall have agreed to the applicable change, waiver, discharge or termination of this Agreement and/or the other Loan Documents; and provided, further, that all obligations of the Borrowers owing to the Non-Consenting Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such Non-Consenting Lender concurrently with such Assignment and Acceptance or (B) so long as no Event of Default under then exists or will exist immediately after giving effect to the respective prepayment, prepay the Loans and, at the Borrower Representative's option, terminate the Commitments of such Non-Consenting Lender, in whole or in part, subject to Subsection 4.12, without premium or penalty.  In connection with any such replacement under this Subsection 11.1(f), if the Non-Consenting Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Acceptance and/or such other documentation and (b) the date as of which all obligations of the Borrowers owing to the Non-Consenting Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such Non-Consenting Lender, then such Non-Consenting Lender shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the applicable Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Non-Consenting Lender, and the Administrative Agent shall record such assignment in the Register.

      11.2    Notices. (a) All notices, requests, and demands to or upon the respective parties hereto to be effective shall be in writing (including telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, or, in the case of delivery by a nationally recognized overnight courier, when received, addressed as follows in the case of the Borrowers, the Administrative Agent and the Collateral Agent, and as set forth in Schedule A in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Loans:

| | |
|---|---|
| The Parent Borrower (including in its capacity as Borrower Representative) | David's Bridal, Inc.<br>[1001 Washington Street<br>Conshohocken, PA 19428<br>Attention:  Joan Hilson<br>Facsimile:      (610) _____]<br>Telephone:    (610) _____] |
| With copies (which shall not constitute notice) to: | Debevoise & Plimpton LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attention:  Scott B. Selinger, Esq.<br>Facsimile:      (212) 909-6836<br>Telephone:    (212) 909-6000 |
| The Administrative Agent/the Collateral Agent: | Bank of America, N.A.<br>100 Federal Street, 9th Floor<br>Boston, MA 02110<br>Attention:  Andrew Cerussi<br>Facsimile:      (617) 310-2686<br>Telephone:    (617) 434-9398 |
| With copies (which shall not constitute notice) to: | Morgan, Lewis & Bockius LLP<br>One Federal Street<br>Boston, MA 02110-1726<br>Attention:  Matthew F. Furlong, Esq. |

Facsimile: (617) 341-7741
Telephone: (617) 341-7740

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Subsection 3.2, 4.2, 4.4 or 4.8 shall not be effective until received.

(b)    Without in any way limiting the obligation of any Loan Party and its Subsidiaries to confirm in writing any telephonic notice permitted to be given hereunder, the Administrative Agent, the Swingline Lender (in the case of a Borrowing of Swingline Loans) or any Issuing Lender (in the case of the issuance of a Letter of Credit), as the case may be, may prior to receipt of written confirmation act without liability upon the basis of such telephonic notice, believed by the Administrative Agent, the Swingline Lender or such Issuing Lender in good faith to be from a Responsible Officer of a Loan Party.

(c)    Loan Documents may be transmitted and/or signed by facsimile or other electronic means (i.e., a "pdf" or "tiff").  The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on each Loan Party, each Agent and each Lender.  The Administrative Agent may also require that any such documents and signatures be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or other electronic document or signature.

(d)    Notices and other communications to the Lenders and any Issuing Lender hereunder may be delivered or furnished by electronic communication (including electronic mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent.  Unless the Administrative Agent otherwise prescribes (with the Borrower Representative's consent), (i) notices and other communications sent to an e-mail address shall be deemed to have been duly made or given when delivered, provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the posting thereof.

(e)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANT THE ACCURACY OR COMPLETENESS OF MATERIALS AND/OR INFORMATION PROVIDED BY OR ON BEHALF OF THE BORROWER REPRESENTATIVE HEREUNDER (THE "BORROWER MATERIALS") OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.

(f)    Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower Representative and the Administrative Agent.

(g)    All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

11.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Agent, any Lender or any Loan Party, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in the other Loan Documents (or in any amendment, modification or supplement hereto or thereto) and in any certificate delivered pursuant hereto or such other Loan Documents shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

11.5    <u>Payment of Expenses and Taxes; Indemnification</u>.  Borrowers shall, jointly and severally, reimburse Administrative Agent, the Collateral Agent, and the Lead Arranger and their respective Affiliates, for all reasonable and documented legal (including all Attorney Costs of Morgan, Lewis & Bockius LLP (and of any local or special counsel retained by any Agent or the Lead Arranger in each relevant jurisdiction)), accounting, field examination, appraisal, liquidation or valuation consultant, consulting, financial advisory and other fees, costs and expenses incurred by it in connection with (a) negotiation, preparation, due diligence, syndication, execution and delivery of any Loan Documents, the Pre-Petition Loan Documents, the Interim Order and the Final Order, including any amendment, waiver or other modification thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; (c) all reasonable and documented out-of-pocket expenses incurred by any Issuing Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit, or any demand for payment thereunder; (d) each Field Examination, inspection, audit or appraisal with respect to any Loan Party or Collateral, whether prepared by the Administrative Agent's personnel or a third party; and (e) otherwise incurred in connection with the Loan Documents, the Pre-Petition Loan Documents, the Restructuring Support Agreement, the Chapter 11 Cases or any exit financing to the Loan Parties upon their emergence from Chapter 11 Cases. Borrowers shall also reimburse the Administrative Agent, the Collateral Agent, the Lead Arranger, the Issuing Lenders and Lenders for all reasonable and documented costs and expenses incurred by them (whether during an Event of Default or otherwise) in connection with the enforcement or preservation of any rights under this Agreement or any of the other Loan Documents (including during any workout, restructuring or negotiations in respect of Loans, Letters of Credit, Loan Documents or the transactions contemplated thereby), including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. For the avoidance of doubt, the Borrowers shall reimburse Administrative Agent, the Collateral Agent, the Lead Arranger and their respective Affiliates for all reasonable and documented legal, accounting, appraisal, consulting, financial advisory and other fees, costs and expenses incurred in connection with the negotiation, preparation and administration of the Loan Documents, the Interim Order, and the Final Order or incurred in connection with:

(i)    amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the syndication and administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Administrative Agent, the Collateral Agent, any Lender, the Borrowers or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents, the Pre-Petition Loan Documents, the Restructuring Support Agreement or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against any Borrower or any other Person that may be obligated to Agent by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (b) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final non-appealable judgment of a court of competent jurisdiction);

(iii)    any attempt to enforce or prosecute any rights or remedies of Agents against any or all of the Loan Parties or any other Person that may be obligated to the Administrative Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any

DB1/ 100473273.8
1004794810v9

such remedies in the course of any work-out or restructuring of the Loans prior to or during the pendency of one or more Events of Default;

(iv)    any work-out or restructuring of the Obligations prior to or during the pendency of one or more Events of Default;

(v)    the obtaining of approval of the Loan Documents by the Court or any other court;

(vi)    the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any Successor Cases, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any Successor Cases, and general monitoring of the Chapter 11 Cases and any Successor Cases and any action, arbitration or other proceeding (whether instituted by or against any Agent, any Lender, any Loan Party, any representative of creditors of an Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of any Agent's Liens with respect to any Collateral), the Pre-Petition Loan Documents, Loan Documents or Obligations, including any lender liability or other claims;

(vii)    efforts to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Loan Parties or their respective affairs, (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral or (iv) settle or otherwise satisfy any taxes, charges or Liens with respect to any Collateral;

(viii)    any lien searches or request for information listing financing statements or liens filed or searches conducted to confirm receipt and due filing of financing statements and security interests in all or a portion of the Collateral; and

(ix)    including, as to each of clauses (i) through (viii) above, all reasonable and documented attorneys' and other professional and service providers' (including each Agent's Advisors') fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 11.5, all of which shall be payable by Borrower to the Agents.  Without limiting the generality of the foregoing, such reasonable expenses, costs, charges and fees may include: reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, any Agent's Advisor, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal, professional or other advisory services.

All amounts reimbursable by Borrowers under this Section 11.5 shall constitute Obligations secured by the Collateral. The agreements in this Section 11.5 shall survive the termination of the aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 11.5 shall be paid within ten (10) Business Days of receipt by the Borrowers of an invoice relating thereto. If the Borrowers fail to pay when due any amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of the Borrowers by the Administrative Agent in its discretion by charging any loan account(s) of the Borrowers, without notice to or consent from the Borrowers, and any amounts so paid shall constitute Loans hereunder.

THE BORROWERS SHALL INDEMNIFY AND HOLD HARMLESS EACH AGENT, EACH LEAD ARRANGER, EACH LENDER (WITHOUT DUPLICATION) AND THEIR RESPECTIVE AFFILIATES, AND THE RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ADVISORS, AND OTHER REPRESENTATIVES OF EACH OF THE FOREGOING (COLLECTIVELY, THE "INDEMNITEES") AND HOLD THEM HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES AND LIABILITIES OF ANY KIND OR NATURE AND DOCUMENTED OR INVOICED OUT-OF-POCKET FEES

AND EXPENSES (INCLUDING REASONABLE ATTORNEY COSTS OF ONE COUNSEL FOR ALL INDEMNITEES AND, IF NECESSARY, ONE FIRM OF LOCAL COUNSEL IN EACH APPROPRIATE JURISDICTION (WHICH MAY INCLUDE A SINGLE SPECIAL COUNSEL ACTING IN MULTIPLE JURISDICTIONS) FOR ALL INDEMNITEES TAKEN AS A WHOLE (AND, IN THE CASE OF AN ACTUAL OR PERCEIVED CONFLICT OF INTEREST, WHERE THE INDEMNITEE AFFECTED BY SUCH CONFLICT INFORMS THE BORROWER OF SUCH CONFLICT AND THEREAFTER RETAINS ITS OWN COUNSEL, OF SUCH OTHER FIRM OF COUNSEL FOR SUCH AFFECTED INDEMNITEE)) (COLLECTIVELY, THE "<u>LOSSES</u>") OF ANY SUCH INDEMNITEE ARISING OUT OF OR RELATING TO ANY CLAIM OR ANY LITIGATION OR OTHER PROCEEDING (INCLUDING ANY INQUIRY OR INVESTIGATION OF THE FOREGOING) (REGARDLESS OF WHETHER SUCH INDEMNITEE IS A PARTY THERETO AND WHETHER OR NOT SUCH PROCEEDINGS ARE BROUGHT BY ANY BORROWER, ITS EQUITY HOLDERS, ITS AFFILIATES, CREDITORS OR ANY OTHER THIRD PERSON) THAT RELATES TO THE TRANSACTIONS, INCLUDING THE FINANCING CONTEMPLATED HEREBY (COLLECTIVELY, THE "<u>INDEMNIFIED LIABILITIES</u>") AND ANY LOSSES THAT RELATE TO ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OR THREATENED RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY OTHER LIABILITY ARISING UNDER ENVIRONMENTAL LAW, IN EACH CASE ARISING OUT OF THE ACTIVITIES OR OPERATIONS OF THE BORROWER OR ANY SUBSIDIARY; <u>provided</u> that the Borrowers shall not have any obligation hereunder to an Indemnitee or any Related Party thereof with respect to Indemnified Liabilities arising from (i) the gross negligence, bad faith or willful misconduct of such Indemnitee or any Related Party thereof, as determined by a court of competent jurisdiction in a final and non-appealable decision or (ii) claims against such Indemnitee or any Related Party thereof brought by any other Indemnitee that do not involve claims (x) against any Lead Arranger or Agent in its capacity as such or (y) arising from any act or omission of the Borrowers or any Subsidiary. None of the Borrowers nor any Indemnitee shall be liable for any indirect, special, punitive or consequential damages hereunder; <u>provided</u> that nothing contained in this sentence shall limit the Borrowers' indemnity or reimbursement obligations under this <u>Subsection 11.5</u> to the extent such indirect, special, punitive or consequential damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder. All amounts due under this <u>Subsection 11.5</u> shall be payable not later than 10 days after written demand therefor. Statements reflecting amounts payable by the Loan Parties pursuant to this <u>Subsection 11.5</u> shall be submitted to the address of the Borrower Representative set forth in <u>Subsection 11.2</u>, or to such other Person or address as may be hereafter designated by the Borrower Representative in a notice to the Administrative Agent. Notwithstanding the foregoing, except as provided in <u>Subsections 11.5</u>(a) above, no Borrower shall have any obligation under this <u>Subsection 11.5</u> to any Indemnitee with respect to any tax, levy, impost, duty, charge, fee, deduction or withholding imposed, levied, collected, withheld or assessed by any Governmental Authority. The agreements in this <u>Subsection 11.5</u> shall survive repayment of the Loans and all other amounts payable hereunder.

      11.6   <u>Successors and Assigns; Participations and Assignments</u>. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any affiliate of the applicable Issuing Lender that issues any Letter of Credit), except that (<u>i</u>) other than in accordance with <u>Subsection 8.2</u>, none of the Loan Parties may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Loan Party without such consent shall be null and void) and (<u>ii</u>) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Subsection 11.6</u>.

      (b)   (i) Subject to the conditions set forth in <u>Subsection 11.6(b)(ii)</u> below, any Lender other than a Conduit Lender may, in the ordinary course of business and in accordance with applicable law, assign (other than to any natural person or to Holdings, DB Parent, Investor, the Parent Borrower or any of their respective Subsidiaries or Affiliates) to one or more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including its Commitments and/or Loans, pursuant to an Assignment and Acceptance) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

      (A)   the Borrower Representative, <u>provided</u> that (i) no consent of the Borrower Representative shall be required for an assignment if an Event of Default with respect to the Parent Borrower has occurred and is continuing, to any other Person and (ii) no consent of the Borrower

Representative shall be required for an assignment to any national or state banking institution or to any other Lender or an Affiliate of a Lender; and; and

(B)     the Administrative Agent and the Issuing Lender (such consent not to be unreasonably withheld).

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless the Borrower Representative and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower Representative shall be required if an Event of Default with respect to the Parent Borrower has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates, if any;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent in any given case); provided that for concurrent assignments to two or more Lenders or Affiliates of a Lender, such assignment fee shall only be required to be paid once in respect of and at the time of such assignments; and

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire.

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(iv) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and bound by any related obligations under) Subsections 4.10, 4.11, 4.12, 4.13, 4.15 and 11.5, and bound by its continuing obligations under Subsection 11.16). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Subsection 11.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Subsection 11.6.

(iv)     The Borrowers hereby collectively designate the Administrative Agent, and the Administrative Agent agrees, to serve as the Borrowers' agent, solely for purposes of this Subsection 11.6, to maintain at one of its offices in New York, New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and interest and principal amounts of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent, the Issuing Lender and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers, the Issuing Lender and, solely with respect to entries applicable to such Lender, any Lender, at any reasonable time and from time to time upon reasonable prior notice. Notwithstanding anything herein to the contrary, any assignment by a Lender to any natural person or to Holdings, DB Parent, Investor, the Parent Borrower or any of their respective Subsidiaries or Affiliates shall be deemed null and void *ab initio* and the Register

shall be modified to reflect a reversal of such assignment.  In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any prospective assignee is a natural person or to Holdings, DB Parent, Investor, the Parent Borrower or any of their respective Subsidiaries or Affiliates.

(v)        Each Lender that sells a participation shall, acting for itself and, solely for this purpose, as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary (x) to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or (y) for any Borrower to enforce its rights hereunder.  The entries in the Participant Register shall be conclusive absent manifest error, and a Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(vi)       Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Subsection 11.6(b) and any written consent to such assignment required by this Subsection 11.6(b), the Administrative Agent shall accept such Assignment and Acceptance, record the information contained therein in the Register and give prompt notice of such assignment and recordation to the Borrower Representative.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (vi).

(vii)      On or prior to the effective date of any assignment pursuant to this Subsection 11.6(b), the assigning Lender shall surrender any outstanding Notes held by it all or a portion of which are being assigned.  Any Notes surrendered by the assigning Lender shall be returned by the Administrative Agent to the Parent Borrower marked "cancelled".

Notwithstanding the foregoing provisions of this Subsection 11.6(b) or any other provision of this Agreement, if the Parent Borrower shall have consented thereto in writing in its sole discretion, the Administrative Agent shall have the right, but not the obligation, to effectuate assignments of Loans and Commitments via an electronic settlement system acceptable to Administrative Agent and the Borrower Representative as designated in writing from time to time to the Lenders by Administrative Agent (the "Settlement Service").  At any time when the Administrative Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed Assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be subject to the prior written approval of the Borrower Representative and shall be consistent with the other provisions of this Subsection 11.6(b).  Each assigning Lender and proposed Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loans and Commitments pursuant to the Settlement Service.  Assignments and assumptions of the Loans and Commitments shall be effected by the provisions otherwise set forth herein until the Administrative Agent notifies the Lenders of the Settlement Service as set forth herein.  The Borrower Representative may withdraw its consent to the use of the Settlement Service at any time upon notice to the Administrative Agent, and thereafter assignments and assumptions of the Loans and Commitments shall be effected by the provisions otherwise set forth herein.

Furthermore, no Assignee, which as of the date of any assignment to it pursuant to this Subsection 11.6(b) would be entitled to receive any greater payment under Subsection 4.10, 4.11, 4.12 or 11.5 than the assigning Lender would have been entitled to receive as of such date under such Subsections with respect to the rights assigned, shall, notwithstanding anything to the contrary in this Agreement, be entitled to receive such greater payments unless the assignment was made after an Event of Default has occurred and is continuing or the Borrower

122

Representative has expressly consented in writing to waive the benefit of this provision at the time of such assignment.

(c)    (i) Any Lender other than a Conduit Lender may, in the ordinary course of its business and in accordance with applicable law, without the consent of the Borrower Representative or the Administrative Agent, sell participations (other than to a natural person or the Parent Borrower or any of the Parent Borrower's Affiliates or its Subsidiaries) to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents and (D) the Borrower Representative, the Administrative Agent, the Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the second proviso to the second sentence of Subsection 11.1(a) and (2) directly affects such Participant.  Subject to Subsection 11.6(c)(ii), each Borrower agrees that each Participant shall be entitled to the benefits of (and shall have the related obligations under) Subsections 4.10, 4.11, 4.12, 4.13, 4.15 and 11.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Subsection 11.6(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Subsection 11.7(b) as though it were a Lender, provided that such Participant shall be subject to Subsection 11.7(a) as though it were a Lender.  Any attempted participation which does not comply with Subsection 11.6 shall be null and void.

(ii)    No Loan Party shall be obligated to make any greater payment under Subsection 4.10, 4.11, 4.12 or 11.5 than it would have been obligated to make in the absence of any participation, unless the sale of such participation is made with the prior written consent of the Borrower Representative and the Borrower Representative expressly waives the benefit of this provision at the time of such participation.  Any Participant that is not incorporated under the laws of the United States of America or a state thereof shall not be entitled to the benefits of Subsection 4.11 unless such Participant complies with Subsection 4.11(b) and provides the forms and certificates referenced therein to the Lender that granted such participation.

(d)    Any Lender, without the consent of the Borrower Representative or the Administrative Agent, may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Subsection 11.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute (by foreclosure or otherwise) any such pledgee or Assignee for such Lender as a party hereto.

(e)    No assignment or participation made or purported to be made to any Assignee or Participant shall be effective without the prior written consent of the Borrower Representative if it would require any Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction, and the Borrower Representative shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee or Participant to determine whether any such filing or qualification is required or whether any assignment or participation is otherwise in accordance with applicable law.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower Representative or the Administrative Agent and without regard to the limitations set forth in Subsection 11.6(b).  Each Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any domestic or foreign bankruptcy, reorganization,

arrangement, insolvency or Bail-In Action or liquidation proceeding under any state, federal or provincial bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.  Each such indemnifying Lender shall pay in full any claim received from the Parent Borrower pursuant to this Subsection 11.6(f) within 30 Business Days of receipt of a certificate from a Responsible Officer of the Borrower Representative specifying in reasonable detail the cause and amount of the loss, cost, damage or expense in respect of which the claim is being asserted, which certificate shall be conclusive absent manifest error.  Without limiting the indemnification obligations of any indemnifying Lender pursuant to this Subsection 11.6(f), in the event that the indemnifying Lender fails timely to compensate the Parent Borrower for such claim, any Loans held by the relevant Conduit Lender shall, if requested by the Borrower Representative, be assigned promptly to the Lender that administers the Conduit Lender and the designation of such Conduit Lender shall be void.

(g)    If the Borrower Representative wishes to replace the Loans or Commitments under any Facility with ones having different terms, it shall have the option, with the consent of the Administrative Agent and subject to at least three Business Days' advance notice to the Lenders under such Facility, instead of prepaying the Loans or reducing or terminating the Commitments to be replaced, to (i) require the Lenders under such Facility to assign such Loans or Commitments to the Administrative Agent or its designees and (ii) amend the terms thereof in accordance with Subsection 11.1.  Pursuant to any such assignment, (x) all Loans to be replaced shall be purchased at par (allocated among the Lenders under such Facility in the same manner as would be required if such Loans were being optionally prepaid), accompanied by payment of any accrued interest and fees thereon and any amounts owing pursuant to Subsection 4.12 and (y) all Commitments to be replaced shall be allocated among the Lenders under such Facility in the same manner as would be required if such Commitments were being optionally reduced or terminated by the Borrowers, accompanied by payment of any accrued fees thereon and any amounts owing pursuant to Subsection 4.12.  By receiving such purchase price (including accrued interest, fees and indemnity payments), the Lenders under such Facility shall automatically be deemed to have assigned the Loans or Commitments under such Facility pursuant to the terms of the form of the Assignment and Acceptance, the Administrative Agent shall record such assignment in the Register and accordingly no other action by such Lenders shall be required in connection therewith.  The provisions of this clause (g) are intended to facilitate the maintenance of the perfection and priority of existing security interests in the Collateral during any such replacement.

11.7    Adjustments; Set-off; Calculations; Computations.    (a) If any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of its Revolving Credit Loans or the Reimbursement Obligations owing to it, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise (except pursuant to Subsection 4.4, 4.5(b), 4.9, 4.10, 4.11, 4.12, 4.13(d), 8.6(b), 11.1(g) or 11.6)), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Revolving Credit Loans or the Reimbursement Obligations, as the case may be, owing to it, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders an interest (by participation, assignment or otherwise) in such portion of each such other Lender's Revolving Credit Loans or the Reimbursement Obligations, as the case may be, owing to it, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law and the applicable Order, each Lender shall have the right (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court), without prior notice to the Borrowers, any such notice being expressly waived by each Borrower to the extent permitted by applicable law, upon the occurrence of an Event of Default under Subsection 9.1(a) to set-off and appropriate and apply against any amount then due and payable under Subsection 9.1(a) by such Borrower any and all deposits (general or

special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of such Borrower. Each Lender agrees promptly to notify the Borrower Representative and the Administrative Agent after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

11.8    Judgment.  (a) If, for the purpose of obtaining or enforcing judgment against any Loan Party in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this Subsection 11.8 referred to as the "Judgment Currency") an amount due under any Loan Document in any currency (the "Obligation Currency") other than the Judgment Currency, the conversion shall be made at the rate of exchange prevailing on the Business Day immediately preceding the date of actual payment of the amount due, in the case of any proceeding in the courts of any other jurisdiction that will give effect to such conversion being made on such date, or the date on which the judgment is given, in the case of any proceeding in the courts of any other jurisdiction (the applicable date as of which such conversion is made pursuant to this Subsection 11.8 being hereinafter in this Subsection 11.8 referred to as the "Judgment Conversion Date").

(b)    If, in the case of any proceeding in the court of any jurisdiction referred to in Subsection 11.8(a), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual receipt for value of the amount due, the applicable Loan Party shall pay such additional amount (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount actually received in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of the Judgment Currency stipulated in the judgment or judicial order at the rate of exchange prevailing on the Judgment Conversion Date.  Any amount due from any Loan Party under this Subsection 11.8(b) shall be due as a separate debt and shall not be affected by judgment being obtained for any other amounts due under or in respect of any of the Loan Documents.

(c)    The term "rate of exchange" in this Subsection 11.8 means the rate of exchange at which the Administrative Agent, on the relevant date at or about 12:00 noon (New York City time), would be prepared to sell, in accordance with its normal course foreign currency exchange practices, the Obligation Currency against the Judgment Currency.

11.9    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy and other electronic transmission), and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be delivered to the Borrower Representative and the Administrative Agent.

11.10    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.11    Integration.  This Agreement and the other Loan Documents represent the entire agreement of each of the Loan Parties party hereto, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any of the Loan Parties party hereto, the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

11.12    Governing Law.  THIS AGREEMENT AND ANY NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

11.13    <u>Submission to Jurisdiction; Waivers</u>.    Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party to the nonexclusive jurisdiction of the Bankruptcy Court for the District of Delaware and the Courts of the State of New York for the County of New York and the United States District Court for the Southern District of New York (collectively, the "<u>Applicable Courts</u>") and appellate courts from either of them; <u>provided</u> that nothing in this Agreement shall be deemed or operate to preclude (<u>i</u>) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this <u>Subsection 11.13</u> would otherwise require to be asserted in a legal action or proceeding in an Applicable Court), or to enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent, (<u>ii</u>) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment, (<u>iii</u>) if all such Applicable Courts decline jurisdiction over any Person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction and (<u>iv</u>) in the event a legal action or proceeding is brought against any party hereto or involving any of its assets or property in another court (without any collusive assistance by such party or any of its Subsidiaries or Affiliates), such party from asserting a claim or defense (including any claim or defense that this <u>Subsection 11.13(a)</u> would otherwise require to be asserted in a legal proceeding in an Applicable Court) in any such action or proceeding.

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the applicable Borrower, the applicable Lender or the Administrative Agent, as the case may be, at the address specified in <u>Subsection 11.2</u> or at such other address of which the Administrative Agent, any such Lender and any such Borrower shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or (subject to clause (a) above) shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Subsection 11.13</u> any consequential or punitive damages.

11.14    <u>Acknowledgements</u>.  Each Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither any Agent nor any Other Representative or Lender has any fiduciary relationship with or duty to any Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and Lenders, on the one hand, and the Borrowers, on the other hand, in connection herewith or therewith is solely that of creditor and debtor;

(c)    the Agents, each Lender, and their Affiliates may have economic interests that conflict with the Borrower and its Subsidiaries; and

(d)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby and thereby among the Lenders or among any of the Borrowers and the Lenders.

11.15      Waiver of Jury Trial.    EACH OF THE BORROWERS, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY NOTES OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

11.16      Confidentiality.    (a) Each Agent and each Lender agrees to keep confidential any information (a) provided to it by or on behalf of Holdings, DB Parent, Investor or any of the Borrowers or any of their respective Subsidiaries pursuant to or in connection with the Loan Documents or (b) obtained by such Lender based on a review of the books and records of Holdings, DB Parent, Investor or any of the Borrowers or any of their respective Subsidiaries; provided that nothing herein shall prevent any Lender from disclosing any such information (i) to any Agent, any Other Representative or any other Lender, (ii) to any Transferee, or prospective Transferee or any creditor or any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations which agrees to comply with the provisions of this Subsection 11.16 pursuant to a written instrument (or electronically recorded agreement from any Person listed above in this clause (ii), in respect to any electronic information (whether posted or otherwise distributed on any Platform)) for the benefit of the Parent Borrower (it being understood that each relevant Lender shall be solely responsible for obtaining such instrument (or such electronically recorded agreement)), (iii) to its Affiliates and the employees, officers, partners, directors, agents, attorneys, accountants and other professional advisors of it and its Affiliates, provided that such Lender shall inform each such Person of the agreement under this Subsection 11.16 and take reasonable actions to cause compliance by any such Person referred to in this clause (iii) with this agreement (including, where appropriate, to cause any such Person to acknowledge its agreement to be bound by the agreement under this Subsection 11.16), (iv) upon the request or demand of any Governmental Authority having jurisdiction over such Lender or its affiliates or to the extent required in response to any order of any court or other Governmental Authority or as shall otherwise be required pursuant to any Requirement of Law, provided that, other than with respect to any disclosure to any bank regulatory authority, such Lender shall, to the extent applicable and unless prohibited by any Requirement of Law, notify the Borrower Representative of any disclosure pursuant to this clause (iv) as far in advance as is reasonably practicable under such circumstances, (v) which has been publicly disclosed other than in breach of this Agreement, (vi) in connection with the exercise of any remedy hereunder, under any Loan Document or under any Interest Rate Protection Agreement, (vii) in connection with periodic regulatory examinations and reviews conducted by the National Association of Insurance Commissioners or any Governmental Authority having jurisdiction over such Lender or its affiliates (to the extent applicable), (viii) in connection with any litigation to which such Lender (or, with respect to any Interest Rate Protection Agreement, any Affiliate of any Lender party thereto) may be a party subject to the proviso in clause (iv) above, and (ix) if, prior to such information having been so provided or obtained, such information was already in an Agent's or a Lender's possession on a non-confidential basis without a duty of confidentiality to any Borrower being violated. Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Acceptance, the provisions of this Subsection 11.16 shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

(b)      Each Lender acknowledges that any such information referred to in Subsection 11.16(a), and any information (including requests for waivers and amendments) furnished by the Borrowers or the Administrative Agent pursuant to or in connection with this Agreement and the other Loan Documents, may include material non-public information concerning the Borrowers, the other Loan Parties and their respective Affiliates or their respective securities. Each Lender represents and confirms that such Lender has developed compliance procedures regarding the use of material non-public information; that such Lender will handle such material non-public information in accordance with those procedures and applicable law, including United States federal and state securities laws; and that such Lender has identified to the Administrative Agent a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law.

11.17      Keepwell

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Guarantee and Collateral Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 11.17 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.17, or otherwise under the Guarantee and Collateral Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor intends that this Section 11.17 constitute, and this Section 11.17 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

11.18    USA PATRIOT Act Notice.  Each Lender hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") and the CDD Rule, it is required to obtain, verify, and record information that identifies each Loan Party, which information includes the name of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act and the CDD Rule, and each Borrower agrees to provide such information from time to time to any Lender.

11.19    Electronic Execution of Assignments and Certain Other Documents.    The words "execution," "signed," "signature" and words of like import in any Assignment and Acceptance or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.20    Reinstatement.  This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Loan Party for liquidation or reorganization, should any Loan Party become insolvent or make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver, receiver and manager or trustee be appointed for all or any significant part of any Loan Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the obligations of the Borrowers under the Loan Documents, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the obligations, whether as a fraudulent preference, reviewable transaction or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the obligations of the Borrowers hereunder shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.21    Joint and Several Liability; Postponement of Subrogation.  (a) The obligations of the Borrowers hereunder and under the other Loan Documents shall be joint and several and, as such, each Borrower shall be liable for all of such obligations of the other Borrowers under this Agreement and the other Loan Documents.  To the fullest extent permitted by law the liability of each Borrower for the obligations under this Agreement and the other Loan Documents of the other applicable Borrowers with whom it has joint and several liability shall be absolute, unconditional and irrevocable, without regard to (i) the validity or enforceability of this Agreement or any other Loan Document, any of the obligations hereunder or thereunder or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any applicable Secured Party, (ii) any defense, set-off or counterclaim (other than a defense of payment or performance hereunder; provided that no Borrower hereby waives any suit for breach of a contractual provision of any of the Loan Documents) which may at any time be available to or be asserted by such other applicable Borrower or any other Person against any Secured Party or (iii) any other circumstance whatsoever (with or without notice to or knowledge of such other applicable Borrower or such Borrower) which constitutes, or might be construed to constitute, an equitable or legal discharge of such other applicable Borrower for the obligations hereunder or under any other Loan Document, or of such Borrower under this Subsection 11.21, in bankruptcy, Bail-In Action or in any other instance.

DB1/ 100473273.8
1004794810v9

(b)     Each Borrower agrees that it will not exercise any rights which it may acquire by way of rights of subrogation under this Agreement, by any payments made hereunder or otherwise, until the prior payment in full in cash of all of the obligations hereunder and under any other Loan Document, the termination or expiration of all Letters of Credit and the permanent termination of all Commitments.  Any amount paid to any Borrower on account of any such subrogation rights prior to the payment in full in cash of all of the obligations hereunder and under any other Loan Document, the termination or expiration of all Letters of Credit and the permanent termination of all Commitments shall be held in trust for the benefit of the applicable Secured Parties and shall immediately be paid to the Administrative Agent for the benefit of the applicable Secured Parties and credited and applied against the obligations of the applicable Borrowers, whether matured or unmatured, in such order as the Administrative Agent shall elect.  In furtherance of the foregoing, for so long as any obligations of the Borrowers hereunder, any Letters of Credit or any Commitments remain outstanding, each Borrower shall refrain from taking any action or commencing any proceeding against any other Borrower (or any of its successors or assigns, whether in connection with a bankruptcy proceeding, Bail-In Action or otherwise) to recover any amounts in respect of payments made in respect of the obligations hereunder or under any other Loan Document of such other Borrower to any Secured Party.

11.22     Designated Cash Management Agreements and Designated Hedging Agreements.  (a) Notwithstanding any designation of a Cash Management Arrangement as a Designated Cash Management Agreement or an Interest Rate Protection Agreement, Hedging Agreement or other Permitted Hedging Arrangement as a Designated Hedging Agreement, no provider or holder of any such Designated Cash Management Agreement or Designated Hedging Agreement shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider under such agreements, nor shall their consent be required (other than in their capacities as a Lender to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of the Collateral or any Subsidiary Guarantors.

(b)     The Administrative Agent accepts no responsibility and shall have no liability for the calculation of the exposure owing by the Loan Parties under any such Designated Cash Management Agreement or Designated Hedging Agreement, and shall be entitled in all cases to rely on the applicable Cash Management Party, Hedging Party or the Parent Borrower (in the case of any Dealer Polling), as the case may be, in each case party to such agreement for the calculation thereof.

11.23     Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured (all such liabilities, the "Covered Liabilities"), may be subject to the Write-Down and Conversion Powers and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers to any Covered Liability arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such Covered Liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such Covered Liability;

(ii)     conversion of all, or a portion of, such Covered Liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such Covered Liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such Covered Liability in connection with the exercise of Write-Down and Conversion Powers.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the date first written above.

DB MIDCO, INC., as a Guarantor


By:_____
    Name:
    Title:

DB HOLDCO, INC., as a Guarantor


By:_____
    Name:
    Title:

DB INVESTORS, INC., as a Guarantor


By:_____
    Name:
    Title:


DAVID'S BRIDAL, INC., as a Parent Borrower and a Borrower


By:_____
    Name:
    Title:

AGENT AND LENDERS:

BANK OF AMERICA, N.A.,
    as Administrative Agent, Collateral Agent, Issuing
    Lender and Swingline Lender


By:_____
    Name:
    Title:

[_____],
    as Lender


By:_____
    Name:
    Title:


[By:_____
    Name:
    Title:]

DB1/ 100792378.6
1004774816v9

# **EXHIBIT C**

## **DIP Term Loan Credit Agreement**

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT
AGREEMENT

among

DAVID'S BRIDAL, INC.
as the Parent Borrower, a Debtor and a Debtor-In-Possession Under Chapter 11 of the Bankruptcy Code,

THE SUBSIDIARY BORROWERS PARTY HERETO,
As Borrowers, Debtors and Debtors-In-Possession under Chapter 11 of the Bankruptcy Code,

THE LENDERS FROM TIME TO TIME PARTY HERETO

and

CANTOR FITZGERALD SECURITIES
as Administrative Agent and Collateral Agent

dated as of November [_], 2018

# TABLE OF CONTENTS

**Page**

SECTION 1    DEFINITIONS ...................................................................................................2
1.1    Defined Terms .............................................................................................2
1.2    Other Definitional Provisions .......................................................................37
1.3    Borrower Representative .............................................................................38
1.4    Divisions ...................................................................................................38
SECTION 2    AMOUNT AND TERMS OF COMMITMENTS .......................................38
2.1    DIP Term Loan Facility ..............................................................................39
2.2    Notes ........................................................................................................39
2.3    Borrowing Procedures ................................................................................40
2.4    [Reserved] .................................................................................................41
2.5    Repayment of Loans ...................................................................................41
2.6    [Reserved] .................................................................................................41
2.7    Defaulting Lenders .....................................................................................42
2.8    Allocation of Payments ...............................................................................43
2.9    Super Priority Nature of Obligations and Collateral Agent's Liens; Payment of Obligations ...............................................................................................45
SECTION 3    [RESERVED] ..................................................................................................45
SECTION 4    GENERAL PROVISIONS APPLICABLE TO LOANS ...............................45
4.1    Interest Rates and Payment Dates ................................................................45
4.2    Conversion and Continuation Options ...........................................................45
4.3    Minimum Amounts; Maximum Sets ..............................................................46
4.4    Optional and Mandatory Prepayments ...........................................................46
4.5    Administrative Agent's Fee; Other Fees ........................................................47
4.6    Computation of Interest and Fees .................................................................47
4.7    Inability to Determine Interest Rate ..............................................................48
4.8    Pro Rata Treatment and Payments ................................................................49
4.9    Illegality ...................................................................................................50
4.10    Requirements of Law ..................................................................................50
4.11    Taxes ........................................................................................................52
4.12    Indemnity ..................................................................................................55
4.13    Certain Rules Relating to the Payment of Additional Amounts .......................56
SECTION 5    REPRESENTATIONS AND WARRANTIES ............................................57
5.1    Financial Condition .....................................................................................57
5.2    No Change .................................................................................................58

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 5.3 | Corporate Existence; Compliance with Law | 58 |
| 5.4 | Corporate Power; Authorization; Enforceable Obligations | 58 |
| 5.5 | No Legal Bar | 59 |
| 5.6 | No Material Litigation | 59 |
| 5.7 | No Default | 59 |
| 5.8 | Ownership of Property; Liens | 59 |
| 5.9 | Intellectual Property | 59 |
| 5.10 | Taxes | 59 |
| 5.11 | Federal Regulations | 60 |
| 5.12 | ERISA | 60 |
| 5.13 | Collateral | 61 |
| 5.14 | Investment Company Act; Other Regulations | 61 |
| 5.15 | Subsidiaries | 61 |
| 5.16 | Purpose of Loans | 61 |
| 5.17 | Environmental Matters | 61 |
| 5.18 | No Material Misstatements | 62 |
| 5.19 | Labor Matters | 63 |
| 5.20 | Insurance | 63 |
| 5.21 | Patriot Act | 63 |
| 5.22 | FCPA | 63 |
| 5.23 | Sanctioned Persons | 63 |
| 5.24 | Beneficial Ownership | 63 |
| 5.25 | EEA Financial Institutions | 63 |
| 5.26 | Approved Budget | 63 |
| 5.27 | Reorganization Matters | 64 |
| 5.28 | No Default | 64 |
| SECTION 6 | CONDITIONS PRECEDENT | 64 |
| 6.1 | Conditions Precedent to Effectiveness of this Agreement and to Initial Extension of Credit | 64 |
| 6.2 | Conditions Precedent to the Second Borrowing Funding | 69 |
| SECTION 7 | AFFIRMATIVE COVENANTS | 72 |
| 7.1 | Financial Statements | 72 |
| 7.2 | Certificates; Other Information | 73 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 7.3 | Payment of Taxes | 75 |
| 7.4 | Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law | 75 |
| 7.5 | Maintenance of Property; Insurance | 75 |
| 7.6 | Inspection of Property; Books and Records; Discussions | 75 |
| 7.7 | Notices, Etc. | 77 |
| 7.8 | Environmental Laws | 79 |
| 7.9 | After-Acquired Real Property and Fixtures; Subsidiaries | 79 |
| 7.10 | Use of Proceeds | 81 |
| 7.11 | Ratings | 81 |
| 7.12 | Accounting Changes | 81 |
| 7.13 | Post-Closing Security Perfection | 81 |
| 7.14 | Approved Budget | 81 |
| 7.15 | Required Milestones | 83 |
| 7.16 | Loan Parties' Advisors | 83 |
| 7.17 | Administrative Agent's Advisors/Ad Hoc Group of Prior Lender Advisors | 83 |
| 7.18 | Additional Bankruptcy Matters | 84 |
| 7.19 | Debtor-In-Possession Obligations | 84 |
| 7.20 | Sale Transaction | 84 |
| 7.21 | KYC Information | 84 |
| 7.22 | Anti-Corruption Laws; Sanctions | 84 |
| SECTION 8 | NEGATIVE COVENANTS | 84 |
| 8.1 | Limitation on Indebtedness | 84 |
| 8.2 | Limitation on Restricted Payments | 87 |
| 8.3 | Limitation on Restrictive Agreements | 87 |
| 8.4 | Limitation on Dispositions | 88 |
| 8.5 | Limitations on Transactions with Affiliates | 89 |
| 8.6 | Limitation on Liens | 89 |
| 8.7 | Limitation on Fundamental Changes | 91 |
| 8.8 | Limitations on Acquisitions | 91 |
| 8.9 | Limitations on Investments | 91 |
| 8.10 | Limitation on Amendments | 91 |
| 8.11 | Limitation on Lines of Business | 91 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 8.12 | Limitations on Currency, Commodity and Other Hedging Transactions | 92 |
| 8.13 | Sanctions; Anti-Corruption Laws | 92 |
| 8.14 | Orders | 92 |
| 8.15 | Prepayments of Other Indebtedness | 92 |
| 8.16 | Repayment of Indebtedness | 92 |
| 8.17 | Reclamation Claims | 92 |
| 8.18 | Insolvency Proceeding Claims | 93 |
| 8.19 | Bankruptcy Actions | 93 |
| 8.20 | [Reserved] | 93 |
| SECTION 9 | EVENTS OF DEFAULT | 93 |
| 9.1 | Events of Default | 93 |
| 9.2 | Remedies Upon an Event of Default | 100 |
| 9.3 | License; Access; Cooperation | 101 |
| 9.4 | Lift of Stay; Stay of Proceedings | 101 |
| SECTION 10 | THE AGENTS | 101 |
| 10.1 | Appointment | 101 |
| 10.2 | The Administrative Agent and Affiliates | 102 |
| 10.3 | Action by an Agent | 102 |
| 10.4 | Exculpatory Provisions | 102 |
| 10.5 | Acknowledgement and Representations by Lenders | 103 |
| 10.6 | Indemnity; Reimbursement by Lenders | 104 |
| 10.7 | Right to Request and Act on Instructions; Reliance | 105 |
| 10.8 | Collateral Matters | 105 |
| 10.9 | Successor Agent | 106 |
| 10.10 | [Reserved] | 107 |
| 10.11 | [Reserved] | 107 |
| 10.12 | [Reserved] | 107 |
| 10.13 | Administrative Agent May File Proofs of Claim | 107 |
| SECTION 11 | MISCELLANEOUS | 108 |
| 11.1 | Amendments and Waivers | 108 |
| 11.2 | Notices | 110 |
| 11.3 | No Waiver; Cumulative Remedies | 112 |
| 11.4 | Survival of Representations and Warranties | 112 |

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 11.5 | Payment of Expenses and Taxes; Indemnification | 113 |
| 11.6 | Successors and Assigns; Participations and Assignments | 116 |
| 11.7 | Adjustments; Set-off; Calculations; Computations | 121 |
| 11.8 | Judgment | 121 |
| 11.9 | Counterparts | 122 |
| 11.10 | Severability | 122 |
| 11.11 | Integration | 122 |
| 11.12 | Governing Law | 122 |
| 11.13 | Submission to Jurisdiction; Waivers | 122 |
| 11.14 | Acknowledgements | 123 |
| 11.15 | Waiver of Jury Trial | 123 |
| 11.16 | Treatment of Certain Information; Confidentiality | 124 |
| 11.17 | [Reserved] | 125 |
| 11.18 | Keepwell | 125 |
| 11.19 | USA PATRIOT Act Notice | 125 |
| 11.20 | Electronic Execution of Assignments and Certain Other Documents | 125 |
| 11.21 | Reinstatement | 126 |
| 11.22 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 126 |
| 11.23 | No Additional Perfection Steps Required | 126 |
| 11.24 | Orders Control | 127 |
| 11.25 | Parties including the Trustees; Court Proceedings | 127 |

SCHEDULES

| | | |
|---|---|---|
| A | -- | Commitments and Addresses |
| 1.1(c) | -- | Assumed Indebtedness |
| 1.1(d) | -- | Existing Capitalized Lease Obligations |
| 1.1(f) | -- | Existing Investments |
| 5.4 | -- | Consents Required |
| 5.6 | -- | Litigation |
| 5.8 | -- | Real Property |
| 5.9 | -- | Intellectual Property Claims |
| 5.15 | -- | Subsidiaries |
| 5.17 | -- | Environmental Matters |
| 5.20 | -- | Insurance |

| 7.2 | -- | Website Address for Electronic Financial Reporting |
| 7.13 | -- | Post-Closing Collateral Requirements |
| 8.1 | -- | Existing Indebtedness |
| 8.3 | -- | Restrictions |
| 8.6 | -- | Existing Liens |

<u>EXHIBITS</u>

| A | -- | Form of Note |
| B | -- | Form of Guarantee and Collateral Agreement |
| C | -- | Form of Information Certificate |
| D-1 | -- | Form of U.S. Tax Compliance Certificate |
| D-2 | -- | Form of U.S. Tax Compliance Certificate |
| D-3 | -- | Form of U.S. Tax Compliance Certificate |
| D-4 | -- | Form of U.S. Tax Compliance Certificate |
| E | -- | Form of Assignment and Acceptance |
| F | -- | Form of Secretary's Certificate |
| G-1 | -- | Form of Committed Loan Notice |
| G-2 | -- | Form of Conversion/Continuation Notice |
| H | -- | Form of Compliance Certificate |

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of November [__], 2018, among DAVID'S BRIDAL, INC., a Florida corporation, as a borrower, a debtor and a debtor-in-possession (the "<u>Parent Borrower</u>"), the Subsidiary Borrowers from time to time parties hereto, as a borrowers, debtors and debtors-in-possession (the "<u>Subsidiary Borrowers</u>" and  together with the Parent Borrower, collectively, the "<u>Borrowers</u>" and each individually, a "<u>Borrower</u>"), the several banks and other financial institutions from time to time party hereto (as further defined in <u>Subsection 1.1</u>, the "<u>Lenders</u>") and CANTOR FITZGERALD SECURITIES, as administrative agent (in such capacity and as further defined in <u>Subsection 1.1</u>, the "<u>Administrative Agent</u>") for the Lenders hereunder and as collateral agent (in such capacity and as further defined in <u>Subsection 1.1</u>, the "<u>Collateral Agent</u>") for the Secured Parties.

The parties hereto hereby agree as follows:

<u>RECITALS</u>

WHEREAS, on November [_], 2018 (the "<u>Petition Date</u>"), the Borrowers, Holdings, DB Parent and Investor (collectively, the "<u>Debtors</u>", and each individually, a "<u>Debtor</u>") commenced Chapter 11 Case Nos. [_____], as administratively consolidated at Chapter 11 Case No. [_____] (collectively, the "<u>Chapter 11 Cases</u>" and each individually, a "<u>Chapter 11 Case</u>") in the United States Bankruptcy Court for [_____] (the "<u>Court</u>").  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Prior Lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of October 11, 2012, among the Borrowers, the Prior Agent, the Prior Lenders and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the Petition Date, the "<u>Pre-Petition Term Loan Agreement</u>");

WHEREAS, as of the close of business on November [_], 2018, the outstanding principal balance of Loans (as defined in the Pre-Petition Term Loan Agreement) under the Pre-Petition Term Loan Agreement was approximately $481,239,196.00, plus interest, fees, costs and expenses and all other Prior Lender Obligations under the Pre-Petition Term Loan Agreement;

WHEREAS, the Prior Lender Obligations under and as defined in the Pre-Petition Term Loan Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the Guarantors as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected (except with respect to leases; provided, however, that such security interests were perfected as to proceeds of leases), and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over all other security interests;

WHEREAS, the Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a secured term loan credit facility of up to an aggregate principal amount of $60,000,000.00 (the "<u>DIP Facility</u>"), consisting of a secured term loan credit facility available in multiple draws, subject to certain conditions in each instance, pursuant to the Orders, each to fund the working capital requirements of the Borrowers during the pendency of the Chapter 11 Cases, pursuant to and in accordance with the Approved Budget;

WHEREAS, the Borrowers and the Guarantors have agreed to secure all of their Obligations under the Loan Documents by granting to the Collateral Agent, for the benefit of the

Collateral Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property;

WHEREAS, the Borrowers' and the Guarantors' business is a mutual and collective enterprise and the Borrowers and the Guarantors believe that the loans and other financial accommodations to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Borrowers and the Guarantors;

WHEREAS, the Borrowers and each Guarantor acknowledge that it will receive substantial direct and indirect benefits by reason of the making of Loans and other financial accommodations to the Borrowers as provided in this Agreement;

WHEREAS, the Administrative Agent's and the Lenders' willingness to extend financial accommodations to the Borrowers, and to administer the Borrowers' and the Guarantors' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the Guarantors and at the Borrowers' and the Guarantors' request and in furtherance of the Borrowers' and Guarantors' mutual and collective enterprise; and

WHEREAS, all capitalized terms used in this Agreement, including in these Recitals, shall have the meanings ascribed to them in Subsection 1.1, and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Subsection 1.2 shall govern. All Schedules, Exhibits, Annexes and other attachments hereto, or expressly identified in this Agreement, are incorporated by reference, and taken together with this Agreement, shall constitute a single agreement. These Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## SECTION 1

### Definitions

1.1    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>13-Week Cash Flow Forecast</u>":  as defined in <u>Subsection 7.14(e)</u>.

"<u>ABL/Term Loan Intercreditor Agreement</u>":  the Intercreditor Agreement, dated as of October 11, 2012, by and between the Prior Agent and the Prior ABL Agent and acknowledged by certain of the Loan Parties, as the same has been amended, supplemented, waived or otherwise modified from time to time.

"<u>ABR</u>":  when used in reference to any Loan or Borrowing, is used when such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"<u>ABR Loans</u>": Loans to which the rate of interest applicable is based upon the Alternate Base Rate.

"<u>Accelerated</u>": as defined in Subsection 9.1(e).

"<u>Acceleration</u>": as defined in Subsection 9.1(e).

"<u>Accounts</u>":  "<u>accounts</u>" as defined in the UCC and, with respect to any Person, all such Accounts of such Person, whether now existing or existing in the future, including (a) all accounts receivable of such Person (whether or not specifically listed on schedules furnished to the Administrative Agent), including all accounts created by or arising from all of such Person's sales of goods or rendition of services made under any of its trade names, or through any of its divisions, (b) all unpaid rights of such Person (including rescission, replevin, reclamation and stopping in transit) relating to the foregoing or arising therefrom, (c) all rights to any goods represented by any of the foregoing, including returned or repossessed goods, (d) all reserves and credit balances held by such Person with respect to any such accounts receivable of any Obligors, (e) all letters of credit, guarantees or collateral for any of the foregoing and (f) all insurance policies or rights relating to any of the foregoing.

"<u>Actual Cash Receipts</u>":  with respect to any period, as the context requires, (x) the amount of cash received during such period by the Loan Parties (excluding any borrowings under this Agreement or the DIP ABL Credit Agreement) that correspond to each line item (on a line item by line item basis) under the heading "Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Total Cash Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"<u>Actual Disbursement Amount</u>":  with respect to any period, as the context requires, (x) the amount of cash expenditures made by the Loan Parties during such period by the Loan Parties that correspond to each line item (on a line item by line item basis) under the headings "Operating Disbursements" and "Non-Operating Disbursements" in the Approved Budget and/or (y) the sum, for such period, of all such disbursements for all such line items which comprise "Total Operating Disbursements" and "Total Non-Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"<u>Actual Inventory Levels</u>": the actual aggregate consolidated inventory levels of the Loan Parties as of the relevant date of determination which correspond to the budgeted aggregate consolidated inventory levels described in the line items contained in the Approved Budget under the heading "Eligible Inventory"[1] as determined in a manner consistent with the Approved Budget.

" <u>Actual Liquidity</u>":  as of any date of determination, as the context requires, for the Loan Parties, (x) the actual amounts as of such date that correspond to each line item (on a line item by line item basis) under the heading "Liquidity" in the Approved Budget and/or (y) the sum, for such period, of all such amounts which comprise "Total Liquidity" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"<u>Adequate Protection Liens</u>":  as defined in the Interim Order (or the Final Order, when applicable).

"<u>Adequate Protection Superpriority Claims</u>":  as defined in the Interim Order (or the Final Order, when applicable).

---

[1] To confirm against final Budget.

"Ad Hoc Group Advisors":  (x) Jones Day, as legal counsel, (y) Greenhill & Co., LLC, as financial advisor, and (z) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Ad Hoc Group of Prior Lenders.

"Ad Hoc Group of Prior Lenders": those certain Prior Lenders represented by Jones Day and their financial advisor Greenhill & Co., LLC.

"Adjusted LIBOR Rate":  with respect to any Borrowing of Eurodollar Loans for any Interest Period, an interest rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1.00%) determined by the Administrative Agent to be equal to the higher of (a) (i) the LIBOR Rate for such Borrowing of Eurodollar Loans in effect for such Interest Period divided by (ii) 1 minus the Statutory Reserves (if any) for such Borrowing of Eurodollar Loans for such Interest Period and (b) 1.00%.

"Administrative Agent":  as defined in the Preamble hereto and shall include any successor to the Administrative Agent appointed pursuant to Subsection 10.9.

"Affected Loan":  as defined in Subsection 4.9.

"Affiliate":   as to any specified Person, any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent Default":  an Agent has admitted in writing that it is insolvent or such Agent becomes subject to an Agent-Related Distress Event.

"Agent Fee Letter":  the Fee Letter, dated as of the date hereof, between the Borrowers and the Administrative Agent.

"Agent-Related Distress Event": with respect to any Agent (each, a "Distressed Person"), a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; provided that an Agent-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Agent or any person that directly or indirectly controls such Agent by a Governmental Authority or an instrumentality thereof.

"Agent's Advisors":   any financial advisor, auditor, attorney (including, without limitation, Shipman & Goodwin LLP), accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Administrative Agent (it being understood that the Administrative Agent will use good faith efforts to notify the Parent Borrower of any new retentions after the Closing Date).

"Agents":  the collective reference to the Administrative Agent and the Collateral Agent and "Agent" shall mean any of them.

- 4 -

"Agreement":  this Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit Agreement, as amended, supplemented, waived or otherwise modified from time to time.

"Alternate Base Rate":  for any day, a fluctuating rate per annum equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 0.50%, and (c) the Adjusted LIBOR Rate for an Interest Period of one-month beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the Adjusted LIBOR Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) or (c) above, as the case may be, of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate, the Federal Funds Effective Rate or the Adjusted LIBOR Rate shall be effective on the effective date of such change in the Base Rate, the Federal Funds Effective Rate or the Adjusted LIBOR Rate, respectively.

"Applicable Margin": (a) with respect to Eurodollar Loans, a percentage per annum equal to 7.50% and (b) with respect to ABR Loans, a percentage per annum equal to 6.50%.

"Approved Budget":  the budget prepared by the Borrower Representative in the form of Annex A and initially furnished to the Administrative Agent and the Lenders on the Closing Date and which is approved by, and in form and substance reasonably satisfactory to, the Required Lenders and the Crossover Holder, in each case in their respective sole discretion, as the same may be updated, modified or supplemented from time to time as provided in Subsection 7.14.

"Approved Budget Variance Report": a weekly report provided by the Borrower Representative to the Administrative Agent, the Lenders, the Specified Ad Hoc Group Advisor and the Specified Crossover Holder Advisor and (i) showing, in each case, by line item, the Actual Cash Receipts, the Actual Disbursements, Actual Inventory Levels and Actual Liquidity for the last day of the Prior Week, the Cumulative Four Week Period, if applicable, and the Cumulative Period, noting therein (x) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Disbursements, the Budgeted Inventory Levels and the Budgeted Liquidity for such period set forth in the Approved Budget as in effect for such period and (y) if such Approved Budget as then in effect is not the Initial Approved Budget, all such variances, on a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Disbursements, the Budgeted Inventory Levels and the Budgeted Liquidity for such period as set forth in the Initial Approved Budget, and (ii) shall include explanations for all material variances, which report shall be certified by a Responsible Officer of the Borrower Representative and shall be in a form, and shall contain supporting information, satisfactory to the Required Lenders in their sole discretion.

"Approved Fund":  as defined in Subsection 11.6(b).

"Assignee": as defined in Subsection 11.6(b)(i).

"Assignment and Acceptance":  an Assignment and Acceptance, substantially in the form of Exhibit E hereto.

"Assumed Indebtedness":  Indebtedness for borrowed money of the Parent Borrower and its Restricted Subsidiaries outstanding on the Closing Date and disclosed on Schedule 1.1(c).

"Automatic Stay":  the automatic stay provided under Section 362 of the Bankruptcy Code.

"Backstop Lenders":  (a) those certain Prior Lenders who are members of the Ad Hoc Group of Prior Lenders and the Crossover Holder, in each case, who executed and delivered the RSA and who hold Term Loan Commitments and/or Loans hereunder and (b) any other Person to whom any Backstop Lender assigns its Term Loan Commitments and/or Loans and who becomes a party hereto pursuant to an Assignment and Assumption and to the RSA in accordance with the terms thereof.

"Bail-In Action":  the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation": with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products": as defined in the definition of "Bank Products Agreement".

"Bank Products Agreement":  any agreement pursuant to which a bank or other financial institution agrees to provide (a) treasury services, (b) credit card, merchant card, purchasing card or stored value card services (including the processing of payments and other administrative services with respect thereto), (c) cash management services (including controlled disbursements, automated clearinghouse transactions, return items, netting, overdrafts, depository, lockbox, stop payment, electronic funds transfer, information reporting, wire transfer and interstate depository network services) and (d) other banking products or services as may be requested by any Restricted Subsidiary (other than letters of credit and other than loans and advances except indebtedness arising from services described in clauses (a) through (c) of this definition) (collectively, "Bank Products"), in each case, whether any such agreements were entered into Pre-Petition or Post-Petition.

"Bank Products Obligations":  of any Person means the obligations of such Person pursuant to any Bank Products Agreement, in each case, whether incurred Pre-Petition or Post-Petition.

"Bankruptcy Code":  Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Rules": the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"Base Rate":  for any day, (a) the per annum rate of interest that is publicly quoted as from time to time by The Wall Street Journal or the applicable Markit Desktop as the "prime rate" in effect in the United States or (b) if The Wall Street Journal or the applicable Markit Desktop ceases quoting a base rate of the type described in clause (a), either (i) the per annum rate of interest quoted as the base rate on such corporate loans in a different national publication as selected by the Agent or (ii) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the Bank prime loan rate or its equivalent (but in no event for purposes of this Agreement shall such rate be less than 0%, in which case, it will equal 0%); each change in the Base Rate shall be effective on the date such change is effective.

"Beneficial Ownership Certification":  a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation":  31 C.F.R. § 1010.230, as amended, or any successor thereto.

"Benefited Lender":  as defined in Subsection 11.7(a).

"Benefit Plan:  any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board":  the Board of Governors of the Federal Reserve System.

"Board of Directors":  for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the board of directors or other governing body of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such board of directors or other governing body. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Parent Borrower.

"Borrower Materials":  as defined in Subsection 11.2(e).

"Borrower Representative":  as defined in Subsection 1.3.

"Borrowers":  as defined in the Preamble hereto.

"Borrowing":  the borrowing (or conversion or continuation) of one Type of Loan of a single Tranche from all the Lenders having Term Loan Commitments or other commitments of the respective Tranche on a given date (or resulting from a conversion or conversions on such date) having, in the case of Eurodollar Loans, the same Interest Period.

"Borrowing Date":  any Business Day specified in a notice delivered pursuant to Subsection 2.3 as a date on which the Borrower Representative requests the Lenders to make Loans hereunder.

"Budgeted Cash Receipts":  with respect to any period, as the context requires, (x) the amount that corresponds to each line item (on a line item by line item basis) under the heading "Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Total Cash Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined in a manner consistent with the Approved Budget.

"Budgeted Disbursement Amount":  with respect to any period, as the context requires, (x) the amount that corresponds to each line item (on a line item by line item basis) under the headings "Operating Disbursements" and "Non-Operating Disbursements" in the Approved Budget and/or (y) the sum, for such period, of all such disbursements for all such line items (which comprise "Total Operating Disbursements" and "Total Non-Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined in a manner consistent with the Approved Budget.

"Budgeted Inventory Levels":  the budgeted inventory levels contained in the Approved Budget under the heading "Eligible Inventory" as of the relevant date of determination.

"Budgeted Liquidity":  as of any date of determination, as the context requires, for the Loan Parties, (x) the amount that corresponds to each line item (on a line item by line item basis) under the heading "Liquidity" in the Approved Budget and/or (y) the sum, as of such date, of all such amounts for all such line items which comprise "Total Liquidity" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined in a manner consistent with the Approved Budget.

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, except that, when used in connection with a Eurodollar Loan, "Business Day" shall mean any Business Day on which dealings in Dollars between banks may be carried on in London, England and New York, New York.

"Capital Stock":  as to any Person, any and all shares of, rights to purchase, warrants or options for, or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"Capitalized Lease Obligation":  an obligation that is required to be classified and accounted for as a capitalized or financing lease (and, for the avoidance of doubt, not an operating lease) for financial reporting purposes in accordance with GAAP.  The Stated Maturity of any Capitalized Lease Obligation shall be the date of the last payment of rent or any other amount due under the related lease.

"Captive Insurance Subsidiary":  any Subsidiary of the Parent Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"Carve-Out":  as defined in the Interim Order (or Final Order, when applicable).

"Cash Equivalents":  any of the following: (a) money, (b) securities issued or fully guaranteed or insured by the United States of America or a member state of the European Union or any agency or instrumentality of any thereof, (c) time deposits, certificates of deposit or bankers' acceptances of (i) any bank or other institutional lender under this Agreement or the DIP ABL Agreement or any affiliate thereof or (ii) any commercial bank having capital and surplus in excess of $500.0 million (or the foreign currency equivalent thereof as of the date of such investment) and the commercial paper of the holding company of which is rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of another nationally recognized rating agency), (d) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (b) and (c) above entered into with any financial institution meeting the qualifications specified in clause (c) above, (e) money market instruments, commercial paper or other short-term obligations rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of another nationally recognized rating agency), (f) investments in money market funds subject to the risk limiting conditions of Rule 2a-7 or any successor rule of the SEC under the Investment Company Act of 1940, as amended, (g) investments similar to any of the foregoing denominated in foreign currencies approved by the Board of Directors, and (h) solely with respect to any Captive Insurance Subsidiary, any investment that person is permitted to make in accordance with applicable law.

"Cash Management Order":  the order of the Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent and the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Term Loan Agreement) or such other arrangements as shall be acceptable to the Administrative Agent and the Required Lenders in all material respects.

- 8 -

"CDD Rule":  the Customer Due Diligence Requirements for Financial Institutions issued by the U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN") under the Bank Secrecy Act (such rule published May 11, 2016 and effective May 11, 2018, as amended from time to time).

"CD&R":  Clayton, Dubilier & Rice, LLC and any successor in interest thereto, and any successor to its investment management business.

"CD&R Fund VIII":  Clayton, Dubilier & Rice Fund VIII, L.P., a Cayman Islands exempted limited partnership, and any successor in interest thereto.

"CD&R Investors":  collectively, (i) CD&R Fund VIII, (ii) CD&R Friends & Family Fund VIII, L.P., a Cayman Islands exempted limited partnership, and any successor in interest thereto, (iii) CD&R Advisor Fund VIII Co-Investor, L.P., a Cayman Islands exempted limited partnership, and any successor in interest thereto, and (iv) any Affiliate of any CD&R Investor identified in clauses (i) through (iii) of this definition.

"Change of Control":  (a) Continuing Directors shall cease to constitute a majority of the members of the Board of Directors of DB Parent; (b) Continuing Directors shall cease to constitute a majority of the members of the Board of Directors of Investor; (c) Continuing Directors shall cease to constitute a majority of the members of the Board of Directors of Holdings; (d) Holdings shall cease to own, directly or indirectly, 100.0% of the Capital Stock of the Parent Borrower;; or (c) a "Change of Control" as defined in the DIP ABL Credit Agreement.

"Closing Date":  the date on which all the conditions precedent set forth in Subsection 6.1 shall be satisfied or waived.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  (a) all assets of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document and (b) the "DIP Collateral" referred to in the Orders, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agent":  as defined in the Preamble hereto and shall include any successor to the Collateral Agent appointed pursuant to Subsection 10.9.

"Committed Loan Notice":  as defined in Subsection 2.3(a), but in any event, confirming at the time of the giving of such Committed Loan Notice and upon the funding thereof that (i) all representations and warranties of the Loan Parties set forth herein and in the other Loan Documents are true and correct in all material respects; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates, (ii) that no Default or Event of Default has occurred and is outstanding and (iii) all conditions precedent to such funding have been satisfied.

"Committee":  an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

"Commodities Agreement":  in respect of a Person, any commodity futures contract, forward contract, option or similar agreement or arrangement (including derivative agreements or arrangements), as to which such Person is a party or beneficiary.

"Commodity Exchange Act":  the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity":  an entity, whether or not incorporated, which is under common control with the Parent Borrower within the meaning of Section 4001 of ERISA or is part of a group which includes the Parent Borrower and which is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Sections 414(m) and (o) of the Code.

"Compliance Certificate":  as defined in Subsection 7.2(b).

"Conduit Lender":  any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument delivered to the Administrative Agent (a copy of which shall be provided by the Administrative Agent to the Borrower Representative on request); provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations under this Agreement, including its obligation to fund a Term Loan if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to any provision of this Agreement, including Subsection 4.10, 4.11, 4.12 or 11.5, than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender if such designating Lender had not designated such Conduit Lender hereunder, (b) be deemed to have any Term Loan Commitment or (c) be designated if such designation would otherwise increase the costs of the DIP Facility to any Borrower.

"Consolidation":  the consolidation of the accounts of each of the Restricted Subsidiaries with those of the Parent Borrower in accordance with GAAP; provided that "Consolidation" will not include consolidation of the accounts of any Joint Venture, but the interest of the Parent Borrower or any Restricted Subsidiary in any Joint Venture will be accounted for as an investment.  The term "Consolidated" has a correlative meaning.

"Continuing Directors":  the directors of the Parent Borrower, Holdings, DB Parent and Investor, as applicable, on the Closing Date and each other director if, in each case, such other director's nomination for election to the Board of Directors of the Parent Borrower, Holdings, DB Parent and Investor, as applicable, is recommended by at least a majority of the then Continuing Directors or the election of such other director is approved by one or more Permitted Holders.

"Contractual Obligation":  as to any Person, any provision of any material security issued by such Person or of any material agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Conversion/Continuation Notice": as defined in Section 4.2.

"Court":  as defined in the Recitals to this Agreement.

"Crossover Holder": as defined in the RSA and any Affiliates thereof holding DIP Term Loans, but only until such Person and/or its Affiliates ceases to (i) be a Lender hereunder and under the Pre-Petition Term Loan Agreement, or (ii) hold, in the aggregate, at least 33.333% of (x) the outstanding principal balance of the aggregate amount of the Term Loans under the Pre-Petition Term Loan Agreement, and (y) the aggregate principal amount of the Loans and unfunded Term Loan Commitments hereunder; provided that, immediately upon ceasing to meet either condition, such term shall no longer be of force or effect.  Each Crossover Holder covenants to provide written notice to the Administrative Agent if such Lender becomes a Crossover Holder or ceases to become a Crossover Holder, and the Agents shall be entitled to conclusively rely on a certificate or representation from any Lenders as to its status as a Crossover Holder. As of the Closing Date [____], [____] and [____] are the Crossover Holders.

"Crossover Holder Advisors": for so long as there is a Crossover Holder, (w) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, (x) Moelis & Company, as financial advisor, (y) Cozen O'Connor PC, as Delaware legal counsel and (z) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Crossover Holder.

"Cumulative Four Week Period":  the four-week period up to and through the Saturday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Cumulative Period":  the period from the commencement of the first week in which the Petition Date occurs through the most recent week ended.

"Currency Agreement":  in respect of a Person, any foreign exchange contract, currency swap agreement or other similar agreement or arrangements (including derivative agreements or arrangements), as to which such Person is a party or a beneficiary.

"Customary Permitted Liens":

(a)        Liens for taxes, assessments and similar charges that are not yet delinquent or which are being contested in good faith by appropriate proceedings and adequate reserves with respect thereto are maintained on the books of the Parent Borrower or its Restricted Subsidiaries, as the case may be, in conformity with GAAP;

(b)        Liens with respect to outstanding motor vehicle fines, liens of landlords or of mortgagees of landlords arising by statute and liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other liens imposed by law created in the ordinary course of business for amounts not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(c)        Subject to the Orders, deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security benefits or other insurance related obligations (including pledges or deposits securing liability to insurance carriers under insurance or self-insurance arrangements);

(d)        encumbrances arising by reason of zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar encumbrances on the use of real property not materially detracting from the value of such real property or

not materially interfering with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(e) encumbrances arising under leases or subleases of real property that do not, in the aggregate over all such encumbrances, materially detract from the value of such real property or interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(f) financing statements filed Pre-Petition with respect to a lessor's rights in and to personal property leased to such Person in the ordinary course of such Person's business;

(g) Liens, pledges or deposits securing the performance of (x) bids, contracts (other than for borrowed money), obligations for utilities, leases and statutory or regulatory obligations, or (y) performance, bid, surety, appeal, judgment, replevin and similar bonds, other surety arrangements, and other similar obligations, all in, or relating to liabilities or obligations incurred in, the ordinary course of business;

(h) Liens arising after the Petition Date by reason of any judgment, decree or order of any court or other Governmental Authority not constituting an Event of Default hereunder; provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; and

(j) Liens on goods in favor of customs and revenue authorities arising as a matter of law to secure customs duties in connection with the importation of such goods.

"DB Parent": DB Holdco, Inc., a Delaware corporation.

"Debtor": as defined in the Recitals to this Agreement.

"Default": any of the events specified in Subsection 9.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition specified in Subsection 9.1, has been satisfied.

"Default Rate": an interest rate equal to the interest rate otherwise applicable to such Loan (or in the case of other Obligations, the Base Rate) plus 2% per annum.

"Defaulting Lender": any Lender or Agent whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Agent Default (as though references to the "Agent" in such definition were references to the Agent or a Lender, as applicable).

"Deposit Account": any deposit account (as such term is defined in Article 9 of the UCC).

"DIP ABL Agent": as defined in the definition of DIP ABL Credit Agreement.

"DIP ABL Credit Agreement": that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of the date hereof, by and among the Borrowers, Bank of America, N.A., as administrative agent (the "DIP ABL Agent"), the financial institutions party thereto, as in effect on the Closing Date and as the same may be amended with the prior written consent of the Administrative Agent (provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous notice thereof is given to the Administrative Agent).

- 12 -

"<u>DIP ABL Facility</u>":  one or more revolving facilities pursuant to the DIP ABL Credit Agreement.

"<u>DIP ABL Lender</u>":  at any time, any "Lender" under and as defined in the DIP ABL Credit Agreement.

"<u>DIP ABL Obligations</u>":  has the meaning assigned to the term "Obligations" in the DIP ABL Credit Agreement.

"<u>DIP Borrowing Account</u>":  the segregated deposit account established by and in the name of the Borrowers at a bank reasonably acceptable to the Required Lenders (it being understood that Bank of America, N.A. is deemed to be acceptable to the Required Lenders), and within the sole dominion and control of the Administrative Agent, in which the proceeds of the Loans shall be deposited and held as provided herein.

"<u>DIP Facility</u>":  has the meaning specified in the Recitals to this Agreement.

"<u>DIP Funding Account</u>":  an account satisfactory to the Required Lenders established by and in the name of the Administrative Agent in which the proceeds of the Loans shall be deposited and held as provided herein, with all amounts held therein to be held in accordance with the terms of this Agreement and the Orders.

"<u>DIP Term Loan Indemnity Account</u>" an amount equal to $250,000 established pursuant to and in accordance with the Orders.

"<u>Disposition</u>":  the sale, assignment, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction and any sale of Capital Stock) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Disqualified Stock</u>":  with respect to any Person, any Capital Stock (other than Management Stock) that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (other than following the occurrence of a Change of Control or other similar event described under such terms as a "change of control" or an Disposition or other disposition) (i) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (ii) is convertible or exchangeable for Indebtedness or Disqualified Stock or (iii) is redeemable at the option of the holder thereof (other than following the occurrence of an Change of Control or other similar event described under such terms as a "change of control" or an Disposition or other disposition), in whole or in part, in each case on or prior to the Maturity Date of the Term Loans; <u>provided</u> that Capital Stock issued to any employee benefit plan, or by any such plan to any employees of the Parent Borrower or any Subsidiary, shall not constitute Disqualified Stock solely because it may be required to be repurchased or otherwise acquired or retired in order to satisfy applicable statutory or regulatory obligations.

"<u>Dollars</u>" and "<u>$</u>":  dollars in lawful currency of the United States of America.

"<u>Domestic Subsidiary</u>":  any Subsidiary of the Parent Borrower which is not a Foreign Subsidiary.

"<u>EEA Financial Institution</u>":  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any

- 13 -

entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country":  any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority":  any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Costs":  any and all costs or expenses (including attorney's and consultant's fees, investigation and laboratory fees, response costs, court costs and litigation expenses, fines, penalties, damages, settlement payments, judgments and awards), of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or in any way relating to, any actual or alleged violation of, noncompliance with or liability under any Environmental Laws. Environmental Costs include any and all of the foregoing, without regard to whether they arise out of or are related to any past, pending or threatened proceeding of any kind.

"Environmental Laws":  any and all U.S. or foreign, federal, state, provincial, territorial, local or municipal laws, rules, orders, enforceable guidelines and orders-in-council, regulations, statutes, ordinances, codes, decrees, and such requirements of any Governmental Authority properly promulgated and having the force and effect of law or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health (as it relates to exposure to Materials of Environmental Concern) or the environment, as have been, or now or at any relevant time hereafter are, in effect.

"Environmental Permits":  any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any Environmental Law.

"Equity Interests":  with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Adjusted LIBOR Rate.

"Event of Default":  any of the events specified in Subsection 9.1, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Exchange Act":  the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Swap Obligation":  with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes":  any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient:  (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Term Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Term Loan Commitment (other than pursuant to an assignment request by the Borrower under Subsection 4.13(d)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Subsection 4.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Subsection 4.11(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Capitalized Lease Obligations":  Capitalized Lease Obligations of the Parent Borrower and its Restricted Subsidiaries existing on the Closing Date and disclosed on Schedule 1.1(d).

"Extension of Credit":  as to any Lender, the making of any Term Loan.

"Extraordinary Receipts":  Any proceeds received by any Loan Party or any Subsidiary not in the ordinary course of business, including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) indemnity payments or funds released from escrow and (vi) any purchase price adjustment received in connection with any purchase agreement.

"FATCA":  Sections 1471 through 1474 of the Code as in effect on the Closing Date (and any amended or successor provisions that are substantially comparable), and any regulations or other administrative authority promulgated thereunder and any agreements entered into pursuant to Section 1471(b)(1) of the Code as in effect on the Closing Date (or any amended or successor provisions that are substantially comparable).

"Federal District Court":  as defined in Subsection 11.13(a).

"<u>Federal Funds Effective Rate</u>":  for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the nest succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it; provided, that in any case, if such rate is less than 0%, the Federal Funds Effective Rate shall be deemed to be 0% for purposes of this Agreement.

"<u>Final Order</u>":  collectively, the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Administrative Agent, the Required Lenders and the Crossover Holder, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent, Required Lenders and Crossover Holder waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent, the Required Lenders and Crossover Holder, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Agents' and the Lenders' claims.

"<u>Financial Advisor</u>":  a financial advisor reasonably acceptable to the Required Lenders. For the avoidance of doubt, Evercore Group L.L.C. shall be a reasonably acceptable Financial Advisor.

"<u>first priority</u>":  with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is the most senior Lien to which such Collateral is subject (subject only to Permitted Liens applicable to such Collateral which have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document). For purposes of this definition, a Lien purported to be created in any Collateral pursuant to any Security Document or Order will be construed as the "most senior Lien" to which such Collateral is subject, notwithstanding the existence of a Permitted Lien on the Collateral that is pari passu with the Lien on such Collateral, so long as such Permitted Lien is subject to the terms of the Orders and/or the ABL/Term Loan Intercreditor Agreement.

"<u>Fiscal Month</u>":  each monthly accounting period of the Parent Borrower calculated in accordance with the fiscal calendar of the Parent Borrower.

"<u>Fiscal Quarter</u>":  successive 13-week periods (each such 13 week period to begin on a Sunday and end on a Saturday) of the Parent Borrower of any Fiscal Year; provided that for any 53-week Fiscal Year, the last Fiscal Quarter of such Fiscal Year shall consist of the successive 14-week period from and including the first day after the third Fiscal Quarter of such Fiscal Year through and including the last day of such Fiscal Year.

"<u>Fiscal Year</u>":  the annual accounting Period of the Parent Borrower ending on the Saturday closest to December 31 of any calendar year calculated in accordance with the fiscal calendar of the Parent Borrower.

"<u>Fixed GAAP Date</u>":  the Closing Date, <u>provided</u> that at any time after the Closing Date, the Borrower Representative may by written notice to the Administrative Agent and the Lenders elect to

change the Fixed GAAP Date to be the date specified in such notice, and upon such notice, the Fixed GAAP Date shall be such date for all periods beginning on and after the date specified in such notice.

"Fixed GAAP Terms":  (a) the definitions of the terms "Capitalized Lease Obligation", "Consolidation", "Inventory" or "Receivable", (b) all defined terms in this Agreement used in or relating to any of the foregoing definitions, and all ratios and computations based on any of the foregoing definitions, and (c) any other term or provision of this Agreement or the Loan Documents that, at the Borrower Representative's election, may be specified by the Borrower Representative by written notice to the Administrative Agent from time to time.

"Foreign Pension Plan":  a registered pension plan which is subject to applicable pension legislation other than ERISA or the Code, which a Restricted Subsidiary sponsors or maintains, or to which it makes or is obligated to make contributions.

"Foreign Plan":  each Foreign Pension Plan, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement whether oral or written, funded or unfunded, sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the United States of America, by the Parent Borrower or any of its Restricted Subsidiaries, other than any such plan, fund, program, agreement or arrangement sponsored by a Governmental Authority.

"Foreign Subsidiary":  any Subsidiary of the Parent Borrower which is organized and existing under the laws of any jurisdiction outside of the United States of America.  Any subsidiary of the Parent Borrower which is organized and existing under the laws of Puerto Rico or any other territory of the United States of America shall be a Foreign Subsidiary.

"Full Payment":  with respect to any Obligations, the full and complete cash payment thereof, including any interest, fees and other charges accruing during the Chapter 11 Cases (whether or not allowed in the proceeding).  No Loans shall be deemed to have been paid in full until all Term Loan Commitments related to such Loans have expired or been terminated.

"GAAP":  generally accepted accounting principles in the United States of America as in effect on the Fixed GAAP Date (for purposes of the Fixed GAAP Terms) and as in effect from time to time (for all other purposes of this Agreement), including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession, and subject to the following sentence. If at any time the SEC permits or requires U.S. domiciled companies subject to the reporting requirements of the Exchange Act to use IFRS in lieu of GAAP for financial reporting purposes, the Parent Borrower may elect by written notice to the Administrative Agent and the Lenders to so use IFRS in lieu of GAAP and, upon any such notice, references herein to GAAP shall thereafter be construed to mean (a) for periods beginning on and after the date specified in such notice, IFRS as in effect on the date specified in such notice (for purposes of the Fixed GAAP Terms) and as in effect from time to time (for all other purposes of this Agreement) and (b) for prior periods, GAAP as defined in the first sentence of this definition. All ratios and computations based on GAAP contained in this Agreement shall be computed in conformity with GAAP.

"Governmental Authority":  the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing,

regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantee": any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement delivered to the Collateral Agent as of the date hereof, substantially in the form of Exhibit B hereto, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any such obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower Representative in good faith.

"Guarantors": the collective reference to Holdings, DB Parent, Investor and each Subsidiary Guarantor; individually, a "Guarantor".

"Guaranty": the guaranty of the Term Loan Facility Obligations of the Borrowers under the Loan Documents provided pursuant to the Debtor-In-Possession Term Loan Guarantee and Collateral Agreement.

"Hedging Agreements": collectively, Interest Rate Agreements, Currency Agreements and Commodities Agreements.

"Hedging Obligations": as to any Person, the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodities Agreement.

"Holdings": DB Midco, Inc., a Delaware corporation.

"IFRS": International Financial Reporting Standards and applicable accounting requirements set by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants, or any successor to either such board, or the SEC, as the case may be), as in effect from time to time.

"Incur": issue, assume, enter into any Guarantee of, incur or otherwise become liable for; and the terms "Incurs," "Incurred" and "Incurrence" shall have a correlative meaning; provided that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary. Accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness, and the payment of dividends on Capital Stock constituting Indebtedness in the form of additional shares of the same class of Capital Stock, will not be deemed to be an Incurrence of Indebtedness. Any Indebtedness issued at a discount (including Indebtedness on which interest is payable through the issuance of additional Indebtedness) shall be deemed Incurred at the time of original issuance of the Indebtedness at the initial accreted amount thereof.

"Indebtedness": with respect to any Person on any date of determination (without duplication):

(i)    the principal of indebtedness of such Person for borrowed money;

(ii)    the principal of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(iii)    all reimbursement obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit, bankers' acceptances or other instruments plus the aggregate amount of drawings thereunder that have not then been reimbursed);

(iv)    all obligations of such Person to pay the deferred and unpaid purchase price of property (except Trade Payables incurred in the ordinary course of business and payable in accordance with the Approved Budget), which purchase price is due more than one year after the date of placing such property in final service or taking final delivery and title thereto;

(v)    all Capitalized Lease Obligations of such Person;

(vi)    the redemption, repayment or other repurchase amount of such Person with respect to any Disqualified Stock of such Person or (if such Person is a Subsidiary of the Parent Borrower other than a Subsidiary Guarantor) any Preferred Stock of such Subsidiary, but excluding, in each case, any accrued dividends (the amount of such obligation to be equal at any time to the maximum fixed involuntary redemption, repayment or repurchase price for such Capital Stock, or if less (or if such Capital Stock has no such fixed price), to the involuntary redemption, repayment or repurchase price therefor calculated in accordance with the terms thereof as if then redeemed, repaid or repurchased, and if such price is based upon or measured by the fair market value of such Capital Stock, such fair market value shall be as determined in good faith by the Board of Directors of the Borrower Representative or the Board of Directors of the issuer of such Capital Stock);

(vii)    all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; provided that the amount of Indebtedness of such Person shall be the lesser of (A) the fair market value of such asset at such date of determination (as determined in good faith by the Borrower Representative) and (B) the amount of such Indebtedness of such other Persons;

(viii)    all Guarantees by such Person of Indebtedness of other Persons, to the extent so Guaranteed by such Person; and

(ix)    to the extent not otherwise included in this definition, net Hedging Obligations of such Person (the amount of any such obligation to be equal at any time to the termination value of such agreement or arrangement giving rise to such Hedging Obligation that would be payable by such Person at such time).

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venture, except to the extent such Person's liability for such Indebtedness is otherwise limited or expressly made non-recourse to such Person.

The amount of Indebtedness of any Person at any date shall be determined as set forth above or otherwise provided in this Agreement, or otherwise shall equal the amount thereof that would appear as a liability on a balance sheet of such Person (excluding any notes thereto) prepared in accordance with GAAP.

"Indemnified Liabilities": as defined in Subsection 11.5.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee": as defined in Subsection 11.5.

"Information Certificate": as defined in Subsection 7.14(c).

"Initial Approved Budget": as defined in Subsection 7.14(a).

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property": as defined in Subsection 5.9.

"Intercreditor Acknowledgment": that certain Acknowledgment and Agreement, dated as of the date hereof, by and among the Administrative Agent, and Collateral Agent, as DIP term loan agent, the Prior Agent, the DIP ABL Agent, and the Prior ABL Agent, and acknowledged by the Loan Parties.

"Interest Payment Date": (a) as to any ABR Loan, the first Business Day of each calendar month to occur while such Loan is outstanding, and the final maturity date of such Loan (or, if earlier, on the Termination Date), and (b) as to any Eurodollar Loan, the last day of such Interest Period and the final maturity of the Loan (or, if earlier, on the Termination Date).

"Interest Period":  with respect to any Eurodollar Loan:

(a)       initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two or three months thereafter, as selected by the Borrower Representative in its Committed Loan Notice or Conversion/Continuation Notice, as the case may be, given with respect thereto; and

(b)       thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two or three months thereafter, as selected by the Borrower Representative by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)       if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)      any Interest Period that would otherwise extend beyond the Maturity Date shall (for all purposes other than Subsection 4.12) end on the Maturity Date; and

(iii)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Interest Rate Agreement":  with respect to any Person, any interest rate protection agreement, future agreement, option agreement, swap agreement, cap agreement, collar agreement, hedge agreement or other similar agreement or arrangement (including derivative agreements or arrangements), as to which such Person is a party or a beneficiary.

"Interim Order":  collectively, the order of the Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and the Required Lenders and the Crossover Holder, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers and Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"Inventory":  goods held for sale, lease or use by a Person in the ordinary course of business, net of any reserve for goods that have been segregated by such Person to be returned to the applicable vendor for credit, as determined in accordance with GAAP.

"Investment":  in any Person by any other Person, any direct or indirect advance, loan or other extension of credit (other than to customers, dealers, licensees, franchisees, suppliers, consultants, directors, officers or employees of any Person in the ordinary course of business) or capital contribution (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) to, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such Person.

"Investment Company Act":  the Investment Company Act of 1940, as amended from time to time.

"Investment Grade Rating":  a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or any equivalent rating by any other Rating Agency.

"Investment Grade Securities":  (i) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents); (ii) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Parent Borrower and its Subsidiaries; (iii) investments in any fund that invests exclusively in investments of the type described in clauses (i) and (ii), which fund may also hold immaterial amounts of cash pending investment or distribution; and (iv) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"Investor":  DB Investors, Inc., a Delaware corporation, and any successor in interest thereto.

"Joint Venture Agreements":  collectively, (a) the Joint Venture and Shareholders Agreement, dated May, 2001, by and among DBI, Elemax Limited (a Hong Kong company), Soundstone Limited (a British Virgin Islands company), Wingreat Limited (a Hong Kong company) (other than Mordechai (Moty) Kafry, (b) the Joint Venture and Shareholders Agreement, dated August, 1995, by and among David's Bridal Corporation (a Pennsylvania company), Addwood Limited (a Hong Kong company), Fillberg Limited (a Hong Kong company) and Mordechai (Moty) Kafry, (c) the Joint Venture and Shareholders Agreement, dated July 1, 1998, by and among DBI, Pretty Fashions Inc. (a Taiwanese company), Elemax Limited (a Hong Kong company), Multihulls Trading Limited (a Hong Kong company) and Maxtel Limited (a Hong Kong company) and (d) the Joint Venture and Shareholders Agreement, dated January 1, 2010, by and among DBI, The Bridge Holding Limited (a Hong Kong company), Soundstone Limited (a British Virgin Island company), Executive Management Limited (a Hong Kong company) and Mordechai (Moty) Kafry, in each case as amended, supplemented, waived or otherwise modified from time to time.

"Joint Ventures":  (a) Executive Management Limited, a limited company incorporated in Hong Kong, (b) Fillberg, Ltd., a limited company incorporated in Hong Kong, (c) Wingreat Limited, a limited company incorporated in Hong Kong and (d) Maxtel Limited, a limited company incorporated in Hong Kong.

"Judgment Conversion Date":  as defined in Subsection 11.8(a).

"Judgment Currency":  as defined in Subsection 11.8(a).

"Law":  collectively, all international, foreign, federal, state, provincial and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lenders":  the several banks and other financial institutions from time to time parties to this Agreement together with, in each case, any affiliate of any such bank or financial institution through which such bank or financial institution elects, by notice to the Administrative Agent and the Borrower Representative, to make any Loans available to the Borrowers, provided that for all purposes of voting or

- 22 -

consenting with respect to (a) any amendment, supplementation or modification of any Loan Document, (b) any waiver of any of the requirements of any Loan Document or any Default or Event of Default and its consequences or (c) any other matter as to which a Lender may vote or consent pursuant to Subsection 11.1, the bank or financial institution making such election shall be deemed the "Lender" rather than such affiliate, which shall not be entitled to so vote or consent.

"LGP":  Leonard Green & Partners, L.P., a Delaware limited partnership, and any successor in interest thereto.

"LGP Investors":  collectively, (i) Green Equity Investors IV, L.P., and any successor in interest thereto and (ii) DBI Coinvest LLC, and any successor in interest thereto.

"LIBOR Rate":  with respect each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined by the Administrative Agent to be:

(a)  for any Interest Period with respect to a Eurodollar Loan, the rate per annum equal to the London Interbank Offered Rate ("LIBOR", or a comparable or successor rate which rate is approved by the Administrative Agent and the Required Lenders, as published on the applicable Markit Desktop or applicable Bloomberg or Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) (in such case, the "LIBOR Rate") as or about 11:00 a.m., London time, two (2) two London Business Days before the first day of such Interest Period; and

(b)  for any interest calculation with respect to an ABR Loan on any date, the rate per annum equal to the LIBOR Rate, at or about 11:00 a.m., London time, two (2) London Business Days prior to such date for Dollar deposits with a term of one (1) month commencing on such date;

provided that if the LIBOR Rate shall be less than 0%, it shall be deemed to be 0% for purposes of this Agreement.

"LIBOR Screen Rate":  the LIBOR quote on the applicable screen page the Administrative Agent designates to determine LIBOR (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time, which shall initially be the applicable Markit desktop).

"Lien":  any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"Loan": each Term Loan, and collectively the "Loans".

"Loan Documents":  this Agreement, any Notes, the ABL/Term Loan Intercreditor Agreement, the Intercreditor Acknowledgment, the Guarantee and Collateral Agreement, the RSA, any other Security Documents, the Agent Fee Letter, the Initial Approved Budget, and the Approved Budget, each as amended, supplemented, waived or otherwise modified from time to time.

"Loan Parties":  the Borrowers and the Guarantors; individually, a "Loan Party".

"Management Investors":  the management members, officers, directors, employees and other members of the management of any Parent Entity, the Parent Borrower or any of their respective

- 23 -

Subsidiaries, or family members or relatives of any of the foregoing (provided that, solely for purposes of the definition of "Permitted Holders," such relatives shall include only those Persons who are or become Management Investors in connection with estate planning for or inheritance from other Management Investors, as determined in good faith by the Borrower Representative, which determination shall be conclusive), or trusts, partnerships or limited liability companies for the benefit of any of the foregoing, or any of their heirs, executors, successors and legal representatives, who at any date beneficially own or have the right to acquire, directly or indirectly, Capital Stock of the Parent Borrower, any Restricted Subsidiary or any Parent Entity.

"Management Stock":  Capital Stock of the Parent Borrower, any Restricted Subsidiary or any Parent Entity (including any options, warrants or other rights in respect thereof) held by any of the Management Investors.

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) of the Borrowers and its Restricted Subsidiaries taken as a whole (excluding (i) any matters publicly disclosed in writing or disclosed to the Administrative Agent and the Lenders in writing prior to the filing of the Chapter 11 Cases, (ii) any matters disclosed in the schedules hereto, (iii) any matters disclosed in any first day pleadings or declarations and (iv) the filing of the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the Chapter 11 Orders), or (b) the validity or enforceability as to any Loan Party party thereto of this Agreement or any of the other Loan Documents or the rights or remedies of the Agents and the Lenders under the Loan Documents, in each case taken as a whole.

"Materials of Environmental Concern":  any pollutants, contaminants, hazardous or toxic substances or materials or wastes defined, listed, or regulated as such in or under, or which may give rise to liability under, any applicable Environmental Law, including gasoline, petroleum (including crude oil or any fraction thereof), petroleum products or by-products, asbestos and polychlorinated biphenyls.

"Maturity Date":  May [___], 2019.[2]

"Moody's": Moody's Investors Service, Inc.

"Mortgages":  each of the mortgages and deeds of trust, or similar security instruments executed and delivered by any Debtor to the Collateral Agent, in connection herewith.

"Multiemployer Plan":  a Plan which is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Available Cash":  from an Disposition, Recovery Event or the Extraordinary Receipts, an amount equal to the cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Disposition, Recovery Event or other Extraordinary Receipts or received in any other non-cash form) therefrom, in each case net of (i) all legal, title and recording tax expenses, commissions and other fees and expenses incurred, and all Federal, state, provincial, foreign and local taxes required to be paid or to be accrued as a liability under GAAP, in each case, as a consequence of, or in respect of, such Disposition, Recovery Event or other Extraordinary Receipts (including as a consequence of any transfer

---

[2] NTD: To be the date 180 days after the Petition Date.

of funds in connection with the application thereof in accordance with <u>Subsection 8.4)</u>, (ii) all payments made, and all installment payments required to be made, on any Indebtedness (other than Pari Passu Indebtedness) (x) that is secured by any assets subject to such Disposition or involved in such Recovery Event, in accordance with the terms of any Lien upon such assets, or (y) that must by its terms, or in order to obtain a necessary consent to such Disposition, or by applicable law, be repaid out of the proceeds from such Disposition, Recovery Event or other Extraordinary Receipts, including but not limited to any payments required to be made to increase borrowing availability under any revolving credit facility, <u>(iii)</u> all distributions and other payments required to be made to minority interest holders in Subsidiaries or joint ventures as a result of such Disposition, Recovery Event or other Extraordinary Receipts, or to any other Person (other than the Parent Borrower or a Restricted Subsidiary) owning a beneficial interest in the assets disposed of in such Disposition or subject to such Recovery Event or other Extraordinary Receipts, (iv) any liabilities or obligations associated with the assets disposed of in such Disposition or involved in such Recovery Event and retained, indemnified or insured by the Parent Borrower or any Restricted Subsidiary after such Disposition, Recovery Event or other Extraordinary Receipts, including pension and other post-employment benefit liabilities, liabilities related to environmental matters, and liabilities relating to any indemnification obligations associated with such Disposition, Recovery Event or other Extraordinary Receipts, (v) in the case of an Disposition, the amount of any purchase price or similar adjustment (x) claimed by any Person to be owed by the Parent Borrower or any Restricted Subsidiary, until such time as such claim shall have been settled or otherwise finally resolved, or (y) paid or payable by the Parent Borrower or any Restricted Subsidiary, in either case in respect of such Disposition and (vi) in the case of any Recovery Event or other Extraordinary Receipts, any amount thereof that constitutes or represents reimbursement or compensation for any amount previously paid or to be paid by the Parent Borrower or any of its Subsidiaries.

"<u>Net Cash Proceeds</u>":  with respect to any issuance or sale of any securities of the Parent Borrower or any Subsidiary by the Parent Borrower or any Subsidiary, or any capital contribution, or any Incurrence of Indebtedness (such events, other than the Incurrence of Indebtedness under and pursuant to the DIP ABL Facility in accordance with the Orders and the Approved Budget, being a "<u>Net Cash Proceeds Prepayment Event</u>"), the cash proceeds of such issuance, sale, contribution or Incurrence net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions, and brokerage, consultant and other fees actually incurred in connection with such issuance, sale, contribution or Incurrence and net of taxes paid or payable as a result, or in respect thereof.

"<u>Net Cash Proceeds Prepayment Event</u>": as defined in the definition of Net Cash Proceeds.

"<u>New York Courts</u>":  as defined in <u>Subsection 11.13(a)</u>.

"<u>New York Supreme Court</u>": as defined in <u>Subsection 11.13(a)</u>.

"<u>Non-Consenting Lender</u>":  as defined in <u>Subsection 11.1(g)</u>.

"<u>Non-Loan Party</u>": any Restricted Subsidiary of the Parent Borrower that is not a Loan Party.

"<u>Non-Wholly Owned Subsidiary</u>": each Subsidiary that is not a Wholly-Owned Subsidiary.

"<u>Note</u>":  as defined in <u>Subsection 2.2</u>.

NAI-1505414932v11

"Obligations":  with respect to any Indebtedness, any principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Parent Borrower or any Restricted Subsidiary whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, indemnities, reimbursement obligations, Guarantees of such Indebtedness (or of Obligations in respect thereof), other monetary obligations of any nature and all other amounts payable thereunder or in respect thereof; provided that Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"Obligation Currency":  as defined in Subsection 11.8(a).

"Obligor":  any purchaser of goods or services or other Person obligated to make payment to the Parent Borrower or any of its Restricted Subsidiaries (other than any Restricted Subsidiary that is not a Loan Party) in respect of a purchase of such goods or services.

"Order":  as applicable, and as the context may require, the Interim Order or the Final Order, whichever is then applicable.

"Organizational Documents":  with respect to any Person, (a) the articles of incorporation, certificate of incorporation or certificate of formation (or the equivalent organizational documents) of such Person and (b) the bylaws or operating agreement (or the equivalent governing documents) of such Person.

"Other Connection Taxes":  with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Subsection 4.13(d)).

"Outstanding Amount":  with respect to the Loans on any date, the principal amount thereof after giving effect to any borrowings and prepayments or repayments thereof occurring on such date.

"Parent Borrower":  as defined in the Preamble and the Recitals hereto.

"Parent Entity":  any of Investor, DB Parent, and any other Person that is a Subsidiary of Investor or DB Parent and of which, in each case, the Parent Borrower is a Subsidiary.

"Pari Passu Indebtedness":  Indebtedness with Liens on the Collateral ranking pari passu with the Liens securing the Term Loan Facilities Obligations.

"Participant":  as defined in Subsection 11.6(c).

"Participant Register":  as defined in Subsection 11.6(b)(v).

NAI-1505414932v11

"Patriot Act":  as defined in Subsection 11.19.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

"Permitted Holders":  any of the following: (i) any of the CD&R Investors; (ii) any of the LGP Investors, (iii) any of the Management Investors, CD&R, LGP and their respective Affiliates; (iv) any investment fund or vehicle managed, sponsored or advised by CD&R or any Affiliate thereof, and any Affiliate of or successor to any such investment fund or vehicle; or (v) any limited or general partners of, or other investors in, any CD&R Investor or any Affiliate thereof, or any such investment fund or vehicle.

"Permitted Investments":

(a)    Investments in accounts, payment intangibles and chattel paper (each as defined in the UCC), notes receivable, extensions of trade credit and similar items arising or acquired in the ordinary course of business consistent with the past practice of the Parent Borrower and its Restricted Subsidiaries;

(b)    Investments in cash, Cash Equivalents, Temporary Cash Investments and Investment Grade Securities;

(c)    Investments existing or made pursuant to legally binding written commitments in existence on the Closing Date and set forth on Schedule 1.1(f) and Investments in any Joint Venture made pursuant any Joint Venture Agreement as in effect on the Closing Date, in each case, solely to the extent reflected in the Approved Budget;

(d)    (i) Investments by any Loan Party in any other Loan Party (other than Holdings, DB Parent or Investor); provided, however, that if any such Investment is in the form of intercompany Indebtedness, such Indebtedness shall not be secured by any Lien and (ii) Investments in Holdings, DB Parent or Investor in amounts and for purposes for which dividends are permitted under Subsection 8.2;

(e)    Investments received in settlement amounts due to the Parent Borrower or any Restricted Subsidiary of the Parent Borrower effected in the ordinary course of business;

(f)    Investments by any Non-Loan Party in any other Non-Loan Party;

(g)    Solely to the extent reflected in the Approved Budget, Investments by Loan Parties in any Non-Loan Parties; provided, however, that the aggregate outstanding amount at any time of all intercompany Investments made pursuant to this clause (g) during the Chapter 11 Cases shall not exceed $50,000;

(h)    Investments by any Non-Loan Party in any Loan Party (other than Holdings, DB Parent or Investor); provided, however, that if any such Investment is in the form of intercompany Indebtedness, such Indebtedness shall not be secured by any Lien and such Investment shall be subject to a subordination agreement in form and substance satisfactory to the Required Lenders;

(i)    loans and advances (and guarantees of loans and advances by third parties) made to officers, directors or employees of any Parent Entity or Holdings, the Parent Borrower or any of its Restricted Subsidiaries, and Guarantee Obligations of the Parent Borrower or any of its Restricted Subsidiaries in respect of obligations of officers, directors or employees of any Parent Entity, Holdings,

- 27 -

the Parent Borrower or any of its Restricted Subsidiaries, in each case (i) in the ordinary course of business, (ii) existing on the Closing Date and described on <u>Schedule 1.1(f)</u>), (iii) made after the Closing Date for relocation expenses in the ordinary course of business, (iv) made for other purposes in an aggregate principal amount not to exceed $50,000 at any time or (v) relating to indemnification or reimbursement of any officers, directors or employees in respect of liabilities relating to their serving in any such capacity; provided, however, that (i) with respect to any employee of any Parent Entity, no such loans or advances shall be permitted unless the activities of such employee relate primarily to the Parent Borrower and its Restricted Subsidiaries and (ii) any such amounts permitted under this clause (i) shall be reflected in the Approved Budget;

(j)    Investments in the nature of pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "<u>Customary Permitted Liens</u>" or made in connection with Liens permitted under <u>Subsection 8.6</u>; or

(k)    Investments representing evidences of Indebtedness, securities or other property received from another Person by the Parent Borrower or any of its Restricted Subsidiaries in connection with any bankruptcy proceeding, Bail-In Action or other reorganization of such other Person or as a result of foreclosure, perfection or enforcement of any Lien or exchange for evidences of Indebtedness, securities or other property of such other Person held by the Parent Borrower or any of its Restricted Subsidiaries; provided that any such securities or other property received by the Parent Borrower or any other Loan Party is pledged to the Collateral Agent for the benefit of the Secured Parties pursuant to the Security Documents as and to the extent required thereby.

"<u>Permitted Liens</u>":  as defined in <u>Subsection 8.6</u>.

"<u>Person</u>":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"<u>Petition Date</u>":  as defined in the Recitals to this Agreement.

"<u>Plan</u>":  at a particular time, any employee benefit plan which is covered by ERISA and in respect of which the Parent Borrower or a Commonly Controlled Entity is an "employer" as defined in Section 3(5) of ERISA.

"<u>Plan of Reorganization</u>":  a plan of reorganization in form and substance satisfactory to the Administrative Agent, the Required Lenders and the Crossover Holder in all respects and consented to by the Administrative Agent, the Required Lenders and the Crossover Holder, confirmed by an order (in form and substance satisfactory to the Administrative Agent, the Required Lenders and the Crossover Holder) of the Court under the Chapter 11 Cases, containing, among other things, (i) the terms and conditions as set forth in the RSA, (ii) a release in favor of the Agents and the Lenders and their respective affiliates, and (iii) provisions with respect to the settlement or discharge of all claims and other debts and liabilities, and such Plan of Reorganization shall be in full force and effect and shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of the Administrative Agent, the Required Lenders and the Crossover Holder.

"<u>Platform</u>":  Intralinks, Debt Domain, SyndTrak Online or any other similar electronic distribution system.

"<u>Post-Petition</u>":  the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"<u>Pre-Petition</u>":  the time period ending immediately prior to the filing of the Chapter 11 Cases.

"<u>Pre-Petition ABL Credit Agreement</u>":  that certain ABL Credit Agreement, dated as of October 11, 2012, among the Borrowers, the Prior ABL Agent, the Prior ABL Lenders and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the Petition Date).

"<u>Pre-Petition ABL Loan Documents</u>":  the "Loan Documents" as defined in the Pre-Petition ABL Credit Agreement.

"<u>Pre-Petition Loan Documents</u>":  the "Loan Documents" as defined in the Pre-Petition Term Loan Agreement.

"<u>Pre-Petition Term Loan Agreement</u>":  as defined in the Recitals to this Agreement.

"<u>Preferred Stock</u>":  as applied to the Capital Stock of any corporation or company, Capital Stock of any class or classes (however designated) that by its terms is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation or company, over Capital Stock of any other class of such corporation or company.

"<u>Prepayment Date</u>":  as defined in <u>Subsection 4.4(d)</u>.

"<u>Pre-Petition Senior Notes</u>":  7.75% Senior Notes due 2020 of the Parent Borrower issued on October 11, 2012, as may be amended, supplemented, waived or otherwise modified from time to time.

"<u>Pre-Petition Senior Notes Documents</u>":  the Pre-Petition Senior Notes Indenture and all other instruments, agreements and other documents evidencing or governing the Pre-Petition Senior Notes or providing for any guarantee, obligation, security or other right in respect thereof.

"<u>Pre-Petition Senior Notes Indenture</u>":  the Indenture dated as of the date hereof, under which the Pre-Petition Senior Notes are issued, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"<u>Prior ABL Agent</u>":  Bank of America, N.A., in its capacities as administrative agent and collateral agent under the Pre-Petition ABL Credit Agreement.

"<u>Prior ABL Lenders</u>":  the lenders under the Pre-Petition ABL Credit Agreement.

"<u>Prior Agent</u>":  Bank of America, N.A., in its capacities as administrative agent and collateral agent under the Pre-Petition Term Loan Agreement.

"<u>Prior Lender Obligations</u>":  all "Obligations" as defined in the Pre-Petition Term Loan Agreement.

"Prior Lenders":  collectively, each Lender as defined in the Pre-Petition Term Loan Agreement.

"Prior Week":  as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"Qualified ECP Guarantor": in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Rating Agency":  Moody's and S&P, or if either of the foregoing are unwilling to issue a rating on the Loans any other nationally recognized statistical rating agency or agencies acceptable to the Required Lenders.

"Receivable":  a right to receive payment pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay, as determined in accordance with GAAP.

"Recipient":  any Agent or any Lender, as applicable.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Parent Borrower or any Restricted Subsidiary constituting Collateral giving rise to Net Available Cash to the Parent Borrower or such Restricted Subsidiary.

"refinance":  refinance, refund, replace, renew, repay, modify, restate, defer, substitute, supplement, reissue, resell or extend (including pursuant to any defeasance or discharge mechanism); and the terms "refinances," "refinanced" and "refinancing" as used for any purpose in this Agreement shall have a correlative meaning.

"Register":  as defined in Subsection 11.6(b)(iv).

"Regulation D":  Regulation D of the Board as in effect from time to time.

"Regulation T":  Regulation T of the Board as in effect from time to time.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Regulation X":  Regulation X of the Board as in effect from time to time.

"Related Parties":  with respect to any Person, such Person's affiliates and the partners, officers, directors, trustees, employees, employees, shareholders, members, attorneys and other advisors, agents and controlling persons of such person and of such person's affiliates and "Related Party" shall mean any of them.

"Remedies Notice Period":  as defined in the Interim Order (or Final Order, when applicable).

"<u>Reportable Event</u>":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the 30 day notice period is waived under Section 21, 22, 23, 24, 25, 27 or 28 of PBGC Regulation Section 4043 or any successor regulation thereto.

"<u>Required Lenders</u>":  Lenders, the Term Credit Percentages of which aggregate greater than 50.0%.

"<u>Required Milestones</u>":  "Milestones", or such similar term, as defined in the Interim Order (or the Final Order, when applicable) and/or the RSA.

"<u>Requirement of Law</u>":  as to any Person, the Organizational Documents of such Person, and any law, statute, ordinance, code, decree, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its material property or to which such Person or any of its material property is subject, including laws, ordinances and regulations pertaining to zoning, occupancy and subdivision of real properties; <u>provided</u> that the foregoing shall not apply to any non-binding recommendation of any Governmental Authority.

"<u>Responsible Officer</u>":  as to any Person, any of the following officers of such Person: (a) the chief executive officer or the president of such Person and, with respect to financial matters, the chief financial officer, the treasurer, the controller or the Vice President-Finance of such Person, (b) any vice president of such Person or, with respect to financial matters, any assistant treasurer or assistant controller of such Person, in each case who has been designated in writing to the Administrative Agent or the Collateral Agent as a Responsible Officer by such chief executive officer or president of such Person or, with respect to financial matters, by such chief financial officer of such Person, (c) with respect to <u>Subsection 7.7</u> and without limiting the foregoing, the general counsel of such Person and (d) with respect to ERISA matters, the senior vice president–human resources (or substantial equivalent) of such Person.

"<u>Restricted Payment</u>":  any dividend or other distribution or payment on, or purchase, repurchase, redemption, or defeasance of, (in each case, whether in cash, securities or other property) any Equity Interest of the Borrowers, Holdings, any Parent Entity or any other non-Wholly-Owned Subsidiary (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of the Borrowers, Holdings or any Parent Entity or any other non-Wholly-Owned Subsidiary.

"<u>Restricted Subsidiary</u>":  any Subsidiary of the Parent Borrower.

"<u>Restructuring Advisor</u>":  a restructuring advisor reasonably acceptable to the Required Lenders.  For the avoidance of doubt, AlixPartners LLP shall be a reasonably acceptable Restructuring Advisor.

"<u>RSA</u>": that certain Restructuring Support Agreement, dated as of November [__], 2018 by and among the Loan Parties, the Prior Lenders and the other creditor parties party thereto, to be in form and substance satisfactory to the Lenders.

"<u>RSA Event</u>": a Creditor Termination Event under and as defined in the RSA.

"<u>S&P</u>":  Standard & Poor's Ratings Group, a division of S&P Global, Inc., and its successors.

- 31 -

"Sanction(s)": any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"SEC": the United States Securities and Exchange Commission.

"Second Borrowing Availability Date": the initial date on which the conditions specified in Subsection 6.2 are satisfied or waived in accordance with Subsection 6.2.

"Second Borrowing Funding": the funding of the Term Loans pursuant to Subsection 6.2.

"Secured Parties": the "Secured Parties" as defined in the Guarantee and Collateral Agreement.

"Securities Act": the Securities Act of 1933, as amended from time to time.

"Security Documents": the collective reference to the Orders, the Guarantee and Collateral Agreement, each of the Mortgages, if any, any financing statements, and all other similar security documents hereafter delivered to the Collateral Agent granting or perfecting a Lien on any asset or assets of any Person to secure the obligations and liabilities of the Loan Parties hereunder and/or under any of the other Loan Documents or to secure any guarantee of any such obligations and liabilities, including any security documents executed and delivered or caused to be delivered to the Administrative Agent and/or the Collateral Agent pursuant to Subsection 7.9(a), 7.9(b) or 7.9(c), in each case, as amended, supplemented, waived or otherwise modified from time to time.

"Set": the collective reference to Eurodollar Loans of a single Tranche, the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Eurodollar Loans shall originally have been made on the same day).

"Settlement Service": as defined in Subsection 11.6(b).

"Single Employer Plan": any Plan which is covered by Title IV or Section 302 of ERISA or Section 412 of the Code, but which is not a Multiemployer Plan.

"Specified Ad Hoc Group Advisor": the Ad Hoc Group Advisor specified in clause (y) in the definition thereof or such other person designated as such in writing by the Ad Hoc Group of Prior Lenders to the Borrower Representative from time to time.

"Specified Crossover Holder Advisor": the Crossover Holder Advisor specified in clause (x) in the definition thereof or such other person designated as such in writing by the Crossover Holder to the Borrower Representative from time to time.

"Stated Maturity": with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"Statutory Reserves": for any day as applied to a Eurodollar Loan, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal

Reserve System in New York City with deposits exceeding one billion Dollars against "Eurocurrency liabilities" (as such term is used in Regulation D).  Eurodollar Loans shall be deemed to constitute Eurocurrency liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"Store":  any retail store operated, or to be operated, by any Loan Party.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity (a) of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned by such Person, or (b) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person and, in the case of this clause (b), which is treated as a consolidated subsidiary for accounting purposes. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Parent Borrower. The term "Subsidiary" shall not include any Joint Ventures even if such entity would be consolidated with Parent Borrower under GAAP; *provided* that, for the avoidance of doubt, nothing in this sentence shall limit or otherwise affect the treatment of Joint Ventures (including with respect to consolidation) for financial reporting purposes under and in accordance with GAAP.

"Subsidiary Borrowers":  as defined in the Preamble hereto.

"Subsidiary Guarantor":  each Domestic Subsidiary of the Parent Borrower (other than a Borrower) which executes and delivers a Guaranty pursuant to Subsection 7.9 or otherwise, in each case, unless and until such time as the respective Subsidiary Guarantor (a) ceases to constitute a Domestic Subsidiary of the Parent Borrower in accordance with the terms and provisions hereof, or (b) is released from all of its obligations under the Guaranty in accordance with terms and provisions thereof.

"Successor Case":  with respect to the Chapter 11 Cases, any subsequent proceedings under Chapter 7 of the Bankruptcy Code.

"Swap Obligation": with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Taxes":  any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Temporary Cash Investments":  any of the following:  (i) any investment in (x) direct obligations of the United States of America, a member state of the European Union or any country in whose currency funds are being held pending their application in the making of an investment or capital expenditure by the Parent Borrower or a Restricted Subsidiary in that country or with such funds, or any agency or instrumentality of any thereof, or obligations Guaranteed by the United States of America or a member state of the European Union or any country in whose currency funds are being held pending their application in the making of an investment or capital expenditure by the Parent Borrower or a Restricted Subsidiary in that country or with such funds, or any agency or instrumentality of any of the foregoing, or obligations guaranteed by any of the foregoing or (y) direct obligations of any foreign country recognized by the United States of America rated at least "A" by S&P or "A-1" by Moody's (or, in either case, the

equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (ii) overnight bank deposits, and investments in time deposit accounts, certificates of deposit, bankers' acceptances and money market deposits (or, with respect to foreign banks, similar instruments) maturing not more than one year after the date of acquisition thereof issued by (x) any bank or other institutional lender under this Agreement or the DIP ABL Agreement or any affiliate thereof or (y) a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital and surplus aggregating in excess of $250.0 million (or the foreign currency equivalent thereof) and whose long term debt is rated at least "A" by S&P or "A-1" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization) at the time such Investment is made, (iii) repurchase obligations with a term of not more than 30 days for underlying securities or instruments of the types described in clause (i) or (ii) above entered into with a bank meeting the qualifications described in clause (ii) above, (iv) Investments in commercial paper, maturing not more than 270 days after the date of acquisition, issued by a Person (other than that of the Parent Borrower or any of its Subsidiaries), with a rating at the time as of which any Investment therein is made of "P-2" (or higher) according to Moody's or "A-2" (or higher) according to S&P (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (v) Investments in securities maturing not more than one year after the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (vi) Indebtedness or Preferred Stock (other than of the Parent Borrower or any of its Subsidiaries) having a rating of "A" or higher by S&P or "A2" or higher by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (vii) investment funds investing 95.0% of their assets in securities of the type described in clauses (i) through (vi) above (which funds may also hold reasonable amounts of cash pending investment and/or distribution), (viii) any money market deposit accounts issued or offered by a domestic commercial bank or a commercial bank organized and located in a country recognized by the United States of America, in each case, having capital and surplus in excess of $250.0 million (or the foreign currency equivalent thereof), or investments in money market funds subject to the risk limiting conditions of Rule 2a-7 (or any successor rule) of the SEC under the Investment Company Act of 1940, as amended, and (ix) similar investments approved by the Board of Directors in the ordinary course of business.

"Term Credit Percentage":  as to any Lender at any time, the percentage of the aggregate outstanding Term Loans (if any) of the Lenders and aggregate unused Term Loan Commitments of the Lenders (if any) then constituted by such Lender's outstanding Term Loans (if any) and such Lender's unused Term Loan Commitments (if any).

"Termination Date":  the earliest of (a) the Maturity Date, (b) [reserved], (c) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (d) the effective date of a Plan of Reorganization for the Debtors, (e) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (f) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (g) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Administrative Agent, the Required Lenders and the Crossover Holder, (h) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Administrative

Agent, the Required Lenders and the Crossover Holder, and (i) the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect.

"Term Loan Commitments":  as to any Lender, its obligation to make Term Loans to the Borrowers pursuant to Subsection 2.1 in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in Schedule A under the heading "Term Loan Commitment"; collectively, as to all the Lenders, the "Term Loan Commitments".  As of the Closing Date, the aggregate amount of the Term Loan Commitments shall be $60,000,000.00, which Term Loan Commitments shall be comprised of (i) on or after the Closing Date but prior to the Second Borrowing Availability Date, $60,000,000.00 and  (ii) on or after the Second Borrowing Availability Date, such unfunded portion, if any, of the Term Loan Commitment as of such date.

"Term Loan Facility Obligations":  obligations of the Borrowers and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during (or would accrue but for) the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Term Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Parent Borrower and the other Loan Parties under this Agreement and the other Loan Documents.

"Term Loans": a loan made under and pursuant to the Term Loan Commitment.

"Trade Payables":  with respect to any Person, any accounts payable or any indebtedness or monetary obligation to trade creditors created, assumed or guaranteed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services.

"Tranche":  with respect to Term Loans or Term Loan Commitments, refers to whether such Term Loans or Term Loan Commitments are with the same terms and conditions made on the same day.

"Transferee":  any Participant or Assignee.

"Type":  the type of Loan determined based on the interest option applicable thereto, with there being two Types of Loans hereunder, namely ABR Loans and Eurodollar Loans.

"UCC":  the Uniform Commercial Code as in effect in the State of New York from time to time.

"United States Person":  any United States person within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate":  as defined in Subsection 4.11(g)(ii)(B)(3).

"U.S. Trustee":  the United States Trustee applicable in the Chapter 11 Cases.

NAI-1505414932v11

"Voting Stock": as to any entity, all classes of Capital Stock of such entity then outstanding and normally entitled to vote in the election of directors or all interests in such entity with the ability to control the management or actions of such entity.

"Wholly Owned Subsidiary": as to any Person, any Subsidiary of such Person of which such Person owns, directly or indirectly through one or more Wholly Owned Subsidiaries, all of the Capital Stock of such Subsidiary other than directors qualifying shares or shares held by nominees.

"Withdrawal": a disbursement of funds from the DIP Funding Account.

"Withdrawal Date": as defined in Subsection 2.3(b).

"Write-Down and Conversion Powers": with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2     Other Definitional Provisions.  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any Notes, any other Loan Document or any certificate or other document made or delivered pursuant hereto.

(a)     As used herein and in any Notes and any other Loan Document, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Parent Borrower and its Restricted Subsidiaries not defined in Subsection 1.1 and accounting terms partly defined in Subsection 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

(c)     Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (rounding-up if there is no nearest number).

(d)     Any references in this Agreement to "cash and/or Cash Equivalents", "cash, Cash Equivalents and/or Temporary Cash Investments" or any similar combination of the foregoing shall be construed as not double counting cash or any other applicable amount which would otherwise be duplicated therein.

(e)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)     All references herein to consolidated financial statements of the Parent Borrower or the Subsidiary Borrower shall, in each case, include each variable interest entity (including the Joint Ventures) that the Parent Borrower is otherwise required to consolidate in accordance with GAAP.

(g)    All references herein to the determination of any amount or ratio for the Parent Borrower and its Restricted Subsidiaries on a consolidated basis or any similar reference shall, in each case, not be deemed to include each variable interest entity (including the Joint Ventures) that the Parent Borrower is otherwise required to consolidate in accordance with GAAP.

1.3    <u>Borrower Representative</u>.  Each Borrower hereby designates the Parent Borrower as its Borrower Representative. The Borrower Representative will be acting as agent on each of the Borrowers behalf for the purposes of issuing Committed Loan Notices and Conversion/Continuation Notices of any Loans pursuant to <u>Sections 2</u> and <u>4</u> or similar notices, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents.  The Borrower Representative hereby accepts such appointment.  Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

1.4    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

# SECTION 2

## Amount and Terms of Commitments

2.1    <u>DIP Term Loan Facility</u>.

(a)    Subject to the terms and conditions set forth herein and in the Order, each Lender severally, not jointly and severally, agrees to make to the Borrowers from time to time prior to the Termination Date, on the applicable borrowing date, loans denominated in Dollars in a principal amount which, when combined with all prior Term Loan by such Lender, does not exceed such Lender's Term Loan Commitment or, in the case of the Initial Term Loans, the maximum amounts specified in accordance with the definition of "<u>Term Loan Commitments</u>" as being in effect at any such time.  The amounts borrowed under this <u>Subsection 2.1</u> and repaid or prepaid may not be reborrowed.  The Term Loans may be ABR Loans or Eurodollar Loans, as further provided herein.

(b)    Each Lender's Term Loan Commitment shall expire on the Termination Date and all Loans and all other amounts owed hereunder with respect to the Loans shall be paid in full no later than such date.  Proceeds of the Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

2.2    <u>Notes</u>.  The Borrowers agree that, upon the request to the Borrowers by any Lender made on or prior to the Closing Date or in connection with any assignment pursuant to <u>Subsection 11.6(b)</u>, in

order to evidence such Lender's Loan, the Borrowers will execute and deliver to such Lender a promissory note substantially in the form of <u>Exhibit A</u> (each, as amended, supplemented, replaced or otherwise modified from time to time, a "<u>Note</u>"), in each case with appropriate insertions therein as to payee, date and principal amount, payable to such Lender and its registered assigns and in a principal amount equal to the unpaid principal amount of the applicable Loans made (and/or acquired by assignment pursuant to <u>Subsection 11.6(b)</u>) by such Lender to the Borrower. Each Note shall be dated the Closing Date and shall be payable as provided in <u>Subsection 2.2(b)</u> and provide for the payment of interest in accordance with <u>Subsection 4.1</u>.

2.3     <u>Borrowing Procedures</u>.

        (a)     <u>Procedure for Borrowing</u>.   The Borrower Representative shall deliver to the Administrative Agent a notice in the form attached hereto as <u>Exhibit G-1</u> (a "<u>Committed Loan Notice</u>") (which notice must have been received by the Administrative Agent prior to 9:00 A.M., New York City time, and shall be irrevocable after funding) three Business Days prior to the requested date of any Borrowing (or such shorter time period as the Lenders and the Administrative Agent may agree), specifying the amount of the Loans to be borrowed and the date of such Borrowing (which must be a Business Day occurring at least three (3) days prior to the Maturity Date and at least three (3) Business Days (or such shorter time as the Lenders may agree) after the satisfaction or waiver of the conditions set forth in <u>Subsections 6.1</u> or <u>6.2</u>, as applicable). Each Committed Loan Notice shall specify (i) the proposed date of any Borrowing, (ii) the amount of such proposed Borrowing (which amounts shall be limited as set forth in the definition of "<u>Initial Term Loan Commitment</u>"), (iii) whether such Loan is requested to be a Eurodollar Loan or an ABR Loan, (iv) in the case of a Eurodollar Loan, the Interest Period for such Loan and (v) the accounts (either the DIP Funding Account or the DIP Borrowing Account) for which funds are to be disbursed, as well as the wiring instructions on account of any fees or expenses payable pursuant to this Agreement (subject to the Order), which may be set forth in a funds flow memorandum acceptable to the Administrative Agent. Notwithstanding anything to the contrary hereunder, with respect to the Term Loan Commitments, the Borrowers shall only be entitled to make one Borrowing prior to the Second Borrowing Availability Date and one additional Borrowing on or after the Second Borrowing Availability Date. Upon receipt of such Committed Loan Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its Term Credit Percentage. Each Lender shall deposit (or cause its applicable lending office to deposit) the amount of its Loan in immediately available funds in the DIP Funding Account not later than 3:00 P.M., New York City time on the requested borrowing date. The Administrative Agent shall on such date credit the account of the Borrowers on the books of the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent for the Borrower by the Lenders and in like funds as received by the Administrative Agent.

        (b)     The Borrowers may request disbursements from the DIP Funding Account by delivering to the Administrative Agent a Committed Loan Notice, which notice shall indicate the proposed date of the applicable Withdrawal (such date, the "<u>Withdrawal Date</u>"), which shall be delivered to the Administrative Agent no later than 11:00 a.m. three Business Days before the applicable Withdrawal Date.   Following receipt of such Committed Loan Notice by the Administrative Agent, the Administrative Agent shall disburse funds from the DIP Funding Account in an aggregate principal amount equal to the amount specified in such Committed Loan Notice to the DIP Borrowing Account on the Withdrawal Date. All proceeds of the Loans shall be held in the DIP Funding Account at all times until such proceeds are disbursed in accordance with this <u>Subsection 2.3</u> solely for purposes permitted under <u>Subsection 7.10</u> or to be applied in accordance with <u>Subsection 2.5</u>. Once disbursed in accordance with this Section, all proceeds of the Loans shall be held in the DIP Borrowing Account at all times until such proceeds are

disbursed solely for purposes permitted under Subsection 7.10 in accordance with the Approved Budget.

(c)    Subject to the terms and conditions set forth herein, the Administrative Agent shall honor instructions received from the Borrowers in the form of the Committed Loan Notice unless and until directed otherwise in writing by the Required Lenders upon the occurrence and continuation of a Default or Event of Default. On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders instructing the Administrative Agent that it may no longer honor instructions from the Borrowers with respect to the DIP Funding Account, the Borrowers and the other Loan Parties shall have no right to request withdrawals from the DIP Funding Account and the Administrative Agent shall not honor such requests (in each case, other than to pay the Carve-Out); provided, that the Administrative Agent shall not be liable for (A) any disbursements made pursuant to instructions from the Borrowers or (B) irrevocable electronic funds transfers or wire transfers that are subject to cut-off times, in each case, that were processed prior to receipt of such written direction from the Required Lenders.

(d)    With respect to any disbursement, withdrawal, transfer, or application of funds from the DIP Funding Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Committed Loan Notice submitted by the Borrowers and (ii) any instructions from the Required Lenders. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to fund any amount in excess of the amounts then held in the DIP Funding Account.

2.4    [Reserved].

2.5    Repayment of Loans. (a) The Borrowers hereby, jointly and severally, unconditionally promise to pay to the Administrative Agent, for the ratable account of the Lenders, on the Termination Date the aggregate principal amount of all Loans and other Term Loan Facility Obligations outstanding as of such date.  The Borrowers agree to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Subsection 4.1, for the avoidance of doubt, such Loans shall be deemed outstanding beginning with the date deposited into the DIP Funding Account.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of each of the Borrowers to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain the Register pursuant to and in accordance with Subsection 11.6(b), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder, the Type thereof, the Borrowers to which such Loan is made, each Interest Period, if any, applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from each of the Borrowers to each applicable Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from each of the Borrowers and each applicable Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Subsection 2.5(c) shall be conclusive absent manifest error of the existence and amounts of the obligations of the Borrowers therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account,

or any error therein, shall not in any manner affect the obligation of the Borrowers to repay (with applicable interest) the Loans made to the Borrowers by such Lender in accordance with the terms of this Agreement. To the extent that a Note conflicts with the Register, the terms of the Register shall control absent manifest error.

2.6     [Reserved].

2.7     <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then for so long as such Lender is a Defaulting Lender:

(1)     The Term Loan Commitments and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to <u>Subsection 11.1</u>); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Term Loan Commitments of such Defaulting Lender, shall require the consent of such Defaulting Lender.

(2)     Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section X or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Agents hereunder; *second*, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *fourth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *fifth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

2.8     <u>Allocation of Payments</u>.

(a)     <u>Pre-Default Allocation of Payments</u>. At all times when <u>Subsection 2.8(b)</u> does not apply and except as otherwise expressly provided herein or interest payable pursuant to Subsection 4.1, monies to be applied to the Term Loan Facility Obligations and the Prior Lender Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff, or otherwise, shall be allocated as follows:

(i)     *First*, to payment of that portion of the Term Loan Facility Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including attorney costs payable under <u>Subsection 11.5</u> and amounts payable under <u>Subsections 4.11</u>, <u>4.12</u>, and <u>4.13</u>) payable to each Agent in its capacity as such, until paid in full;

(ii)     *Second*, to payment of that portion of the Term Loan Facility Obligations constituting fees, indemnities and other amounts (other than principal and interest)

payable to the Lenders (including attorney costs payable under Subsection 11.5, amounts payable under Subsections 4.11, 4.12, and 4.13), ratably among them in proportion to the amounts described in this clause *Second* payable to them, until paid in full;

(iii)    *Third*, to pay interest and principal due in respect of all Loans, until paid in full;

(iv)    *Fourth*, to the payment of all other Term Loan Facility Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties (other than any Defaulting Lenders) on such date, ratably based upon the respective aggregate amounts of all such Term Loan Facility Obligations owing to the Administrative Agent and the other Secured Parties (other than any Defaulting Lenders) on such date, until paid in full;

(v)    *Fifth*, ratably to pay any Term Loan Facility Obligations that are that are due and payable to Defaulting Lenders, until paid in full;

(vi)    *Sixth*, at the written direction of the Required Lenders, in accordance with the Orders, for further payment to the DIP Term Loan Indemnity Account, if applicable; and

(vii)    *Last*, the balance, if any, to the Borrowers or as otherwise required by Law.

Amounts shall be applied to each category of Obligations set forth above until Full Payment thereof and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category.

(b)    <u>Post-Default Allocation of Payments</u>.  Notwithstanding anything herein to the contrary, at the election of the Required Lenders, after the occurrence and during the continuation of an Event of Default, monies to be applied to the Term Loan Facility Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(i)    *First*, to payment of that portion of the Term Loan Facility Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including attorney costs payable under Subsection 11.5 and amounts payable under Subsections 4.11, 4.12, and 4.13) payable to each Agent in its capacity as such, until paid in full;

(ii)    *Second*, to payment of that portion of the Term Loan Facility Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including attorney costs payable under Subsection 11.5, amounts payable under Subsections 4.11, 4.12, and 4.13), ratably among them in proportion to the amounts described in this clause *Second* payable to them, until paid in full;

(iii)    *Third*, to pay interest and principal due in respect of all Loans, until paid in full;

(iv)    *Fourth*, to the payment of all other Term Loan Facility Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties (other than any Defaulting Lenders) on such date, ratably based upon the respective aggregate amounts

of all such Obligations owing to the Administrative Agent and the other Secured Parties (other than any Defaulting Lenders) on such date, until paid in full;

(v)　　*Fifth*, ratably to pay any Term Loan Facility Obligations that are that are due and payable to Defaulting Lenders, until paid in full;

(vi)　　*Sixth*, to pay any other Term Loan Facility Obligations, until paid in full;

(vii)　　*Seventh*, at the written direction of the Required Lenders, in accordance with the Orders, for further payment to the DIP Term Loan Indemnity Account, if applicable; and

(viii)　　*Last*, the balance, if any, after all of the Term Loan Facility Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Law.

Amounts shall be applied to each category of Term Loan Facility Obligations set forth above until Full Payment thereof and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Term Loan Facility Obligations in the category.  The allocations set forth in this Subsection 2.8(b) are solely to determine the rights and priorities of the Agents and Lenders as among themselves, may be changed by agreement among the Agents and all of the Lenders without the consent of any Loan Party and are subject to Subsection 2.7 (regarding Defaulting Lenders). Appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Term Loan Facility Obligations otherwise set forth above in this Subsection 2.8(b).  This Subsection 2.8(b) is not for the benefit of or enforceable by any Loan Party.

2.9　　Super Priority Nature of Obligations and Collateral Agent's Liens; Payment of Obligations.

(1)　　The priority of the Collateral Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Interim Order and the Final Order.

(2)　　Upon the maturity (whether by acceleration or otherwise) of any of the Term Loan Facility Obligations under this Agreement or any of the other Loan Documents, Agents and Lenders shall be entitled to immediate payment of such Term Loan Facility Obligations without further application to or order of the Court.

SECTION 3

[Reserved]

SECTION 4

General Provisions Applicable to Loans

4.1　　Interest Rates and Payment Dates.  (a)  Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted LIBOR Rate determined for such day plus the Applicable Margin with respect to Eurodollar Loans.

(b)　　Each ABR Loan shall bear interest for each day that it is outstanding at a rate per annum equal to the Alternate Base Rate in effect for such day plus the Applicable Margin with respect to ABR Loans.

- 42 -

(c)     If all or a portion of (i) the principal amount of any Term Loan, (ii) any interest payable thereon, (iii) any other amount payable hereunder shall not be paid when due (whether at the Stated Maturity, by acceleration or otherwise), or (iv) any other Event of Default shall have occurred and be continuing and the Required Lenders shall have so elected, the Default Rate shall apply to all Term Loan Facility Obligations without further notice, motion application to, hearing before or order from the Court for so long as such condition shall exist.  Accrued and unpaid interest as past due amounts (including interest on past due interest) shall be due and payable on demand.

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to clause (c) of this Subsection 4.1 shall be payable from time to time on demand.

(e)     It is the intention of the parties hereto to comply strictly with applicable usury laws; accordingly, it is stipulated and agreed that the aggregate of all amounts which constitute interest under applicable usury laws, whether contracted for, charged, taken, reserved, or received, in connection with the indebtedness evidenced by this Agreement or any Notes, or any other document relating or referring hereto or thereto, now or hereafter existing, shall never exceed under any circumstance whatsoever the maximum amount of interest allowed by applicable usury laws.

4.2     Conversion and Continuation Options.  (a)   Subject to its obligations pursuant to Subsection 4.12(c), the Borrower Representative may deliver to the Administrative Agent a notice in the form of Exhibit G-2 (the "Conversion/Continuation Notice") electing from time to time to convert outstanding Loans of a given Tranche from Eurodollar Loans to ABR Loans by the Borrower Representative giving the Administrative Agent irrevocable notice of such election prior to 2:00 P.M., New York City time two Business Days prior to such election or electing from time to time to convert outstanding Term Loans of a given Tranche from ABR Loans to Eurodollar Loans, by the Borrower Representative giving the Administrative Agent irrevocable notice of such election prior to 2:00 P.M., New York City time at least three Business Days prior to such election.  Any such Conversion/Continuation Notice requesting a conversion to Eurodollar Loans shall specify the length of the initial Interest Period or Interest Periods therefor.  Upon receipt of any such Conversion/Continuation Notice the Administrative Agent shall promptly notify each affected Lender thereof.  All or any part of outstanding Eurodollar Loans or ABR Loans may be converted as provided herein, provided that (i) no Loan may be converted into a Eurodollar Loan when any Default or Event of Default has occurred and is continuing and (ii) no Term Loan may be converted into a Eurodollar Loan after the date that is one month prior to the applicable Maturity Date.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower Representative giving notice to the Administrative Agent of the length of the next Interest Period to be applicable to such Eurodollar Loan, determined in accordance with the applicable provisions of the term "Interest Period" set forth in Subsection 1.1, provided that no Eurodollar Loan may be continued as such (i) when any Default or Event of Default has occurred and is continuing and, in the case of any Default or (ii) after the date that is one month prior to the applicable Maturity Date, and provided, further, that if the Borrower Representative shall fail to give any required notice as described above in this clause (b) or if such continuation is not permitted pursuant to the preceding proviso such Eurodollar Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice of continuation pursuant to this Subsection 4.2(b), the Administrative Agent shall promptly notify each affected Lender thereof.

4.3    <u>Minimum Amounts; Maximum Sets.</u>  All borrowings, conversions and continuations of Term Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Set shall be equal to $1.0 million or a whole multiple of $250,000 in excess thereof and so that there shall not be more than five (5) Sets at any one time outstanding.

4.4    <u>Optional and Mandatory Prepayments.</u>  (a)  The Borrowers may at any time and from time to time prepay the Term Loans made to them, in whole or in part, subject to <u>Subsection 4.12</u>, without premium or penalty (except as set forth in the last paragraph of this clause (a)), upon notice by the Borrower Representative to the Administrative Agent prior to 2:00 P.M., New York City time at least three Business Days prior to the date of prepayment (in the case of Eurodollar Loans), or prior to 2:00 P.M., New York City time one Business Day prior to the date of prepayment (in the case of ABR Loans). Such notice shall specify, in the case of any prepayment of Term Loans, the applicable Tranche being repaid, and if a combination thereof, the principal amount allocable to each, the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans or a combination thereof, and, in each case if a combination thereof, the principal amount allocable to each.  Upon the receipt of any such notice the Administrative Agent shall promptly notify each affected Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (if a Eurodollar Loan is prepaid other than at the end of the Interest Period applicable thereto) any amounts payable pursuant to <u>Subsection 4.12</u>.  Partial prepayments pursuant to this <u>Subsection 4.4(a)</u> shall in the case of Eurodollar Loans be in a minimum amount of $1.0 million and multiples of $500,000 in excess thereof, and in the case of ABR Loans, in a minimum amount of $500,000 and multiples of $100,000 in excess thereof; <u>provided</u> that, notwithstanding the foregoing, any Term Loan may be prepaid in its entirety.

(b)    In accordance with the Orders, the Borrowers shall in accordance with <u>Subsections 4.4(c)</u> and <u>4.4(d)</u>, prepay the Term Loans with any and all Net Available Cash from any Disposition (other than a Disposition permitted pursuant to <u>Subsection 8.4(b)-(f)</u>), Extraordinary Receipts, Recovery Event or any Net Cash Proceeds from any Net Cash Proceeds Prepayment Event, in each case, which any Borrower or any other Loan Party receives from time to time; provided that if and to the extent that the Required Lenders consent thereto, the Borrowers may not be required to prepay Term Loans with Net Available Cash from any Recovery Event to the extent the Borrowers use such Net Available Cash to repair or purchase replacement assets damaged, lost or otherwise unavailable to the Borrowers as a result of such Recovery Event.

(c)    Subject to the last sentence of <u>Subsection 4.4(d)</u>, each prepayment of Term Loans pursuant to <u>Subsection 4.4 (a) or (b)</u> shall be allocated pro rata among the Term Loans. Each prepayment of Term Loans pursuant to <u>Subsection 4.4(a)</u> and <u>(b)</u> shall be applied within each Tranche of Term Loans to the respective installments of principal thereof in the inverse order of maturity).  Each prepayment of the Term Loans pursuant to this Section 4.4 shall be accompanied with accrued and unpaid interest on the amounts repaid.

(d)    The Borrower Representative shall give notice to the Administrative Agent of any mandatory prepayment of the Term Loans pursuant to <u>Subsection 4.4(b)</u>, promptly (and in any event within five Business Days) upon becoming obligated to make such prepayment. Such notice shall state that the Borrowers will make such mandatory prepayment within three (3) Business Days thereafter (a "<u>Prepayment Date</u>").  Once given, such notice shall be irrevocable and all amounts subject to such notice shall be due and payable on the Prepayment Date. Upon receipt by the Administrative Agent of such notice, the Administrative Agent shall immediately give notice to each Lender of the prepayment and the Prepayment Date.

(e)     Amounts prepaid on account of Term Loans pursuant to Subsection 4.4(a) or (b) may not be reborrowed.

4.5     Administrative Agent's Fee; Other Fees.  (a)  The Borrowers jointly and severally agree to pay to the Administrative Agent the fees set forth in the Agent Fee Letter.

(b)     The Borrowers jointly and severally agree to pay to the Lenders on the Closing Date a fee equal to 1.00% of the aggregate Term Loan Commitment to be allocated among the Lenders in accordance with each such Lender's Term Credit Percentage as of the Closing Date, which shall be paid by crediting the Lender in connection with the initial Borrowing.

(c)     The Borrowers jointly and severally agree to pay to the Backstop Lenders on the Closing Date a fee equal to 2.00% of the aggregate Term Loan Commitment, which shall be paid by crediting the Lender in connection with the initial Borrowing.

4.6     Computation of Interest and Fees.  (a)  Interest (other than interest based on the Base Rate) shall be calculated on the basis of a 360-day year for the actual days elapsed; and interest based on the Base Rate shall be calculated on the basis of a 365-day year (or 366-day year, as the case may be) for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower Representative and the affected Lenders of each determination of an Adjusted LIBOR Rate. Any change in the interest rate on a Term Loan resulting from a change in the Alternate Base Rate or the Statutory Reserves shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower Representative and the affected Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on each of the Borrowers and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower Representative or any Lender, deliver to the Borrower Representative or such Lender a statement showing in reasonable detail the calculations used by the Administrative Agent in determining any interest rate pursuant to Subsection 4.1, excluding any LIBOR Rate which is based upon the applicable Markit desktop and any ABR Loan which is based upon the Alternate Base Rate.

4.7     Inability to Determine Interest Rate.

(a)     If prior to the first day of any Interest Period, the Administrative Agent or the Required Lenders shall have determined (which determination shall be conclusive and binding upon each of the Borrowers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate with respect to any Eurodollar Loan for such Interest Period (the "Affected Eurodollar Rate"), the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower Representative and the Lenders as soon as practicable thereafter.  If such notice is given (a) any Eurodollar Loans the rate of interest applicable to which is based on the Affected Eurodollar Rate requested to be made on the first day of such Interest Period shall be made as ABR Loans and (b) any Loans that were to have been converted on the first day of such Interest Period to or continued as Eurodollar Loans the rate of interest applicable to which is based upon the Affected Eurodollar Rate shall be converted to or continued as ABR Loans.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans the rate of interest applicable to which is based upon the Affected Eurodollar Rate shall be made or continued as such, nor shall any of the Borrowers have the right to convert ABR Loans to Eurodollar Loans the rate of interest applicable to which is based upon the Affected Eurodollar Rate.

- 45 -

(b)    Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrowers or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower Representative) that the Borrowers or Required Lenders (as applicable) have determined, that:

(i)    adequate and reasonable means do not exist for ascertaining LIBOR for any requested Interest Period, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary;

(ii)    the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "Scheduled Unavailability Date"), or

(iii)    syndicated loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent (at the direction of the Required Lenders), the Required Lenders and the Borrowers may amend this Agreement to replace LIBOR with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "LIBOR Successor Rate"), together with any proposed LIBOR Successor Rate Conforming Changes (as defined below). Such LIBOR Successor Rate shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for the Administrative Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent (in consultation with the Required Lenders).

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower Representative and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended, (to the extent of the affected Eurodollar Loans or Interest Periods), and (y) the Adjusted LIBOR Rate component shall no longer be utilized in determining the Alternate Base Rate. Upon receipt of such notice, the Borrower Representative may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of ABR Loans (subject to the foregoing clause (y)) in the amount specified therein.

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than 1.0% for purposes of this Agreement.

For purposes hereof, "LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Alternate Base

Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the discretion of the Administrative Agent and the Required Lenders in consultation with the Borrower Representative, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent and the Required Lenders determine that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent and the Required Lenders determine is reasonably necessary in connection with the administration of this Agreement).

4.8    Pro Rata Treatment and Payments.    (a) Except as expressly otherwise provided herein, each payment (including each prepayment, but excluding payments made pursuant to Subsection 4.5, 4.9, 4.10, 4.11, 4.12, 4.13(d), 11.1(g) or 11.6) by the Borrowers on account of principal of and interest on account of any Term Loans of a given Tranche (other than payments in respect of any difference in the Applicable Margin, Adjusted LIBOR Rate or Alternate Base Rate in respect of any Tranche) shall be allocated by the Administrative Agent pro rata according to the respective outstanding principal amounts of such Term Loans of such Tranche then held by the respective Lenders.  All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim and shall be made on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 P.M., New York City time), on the due date thereof to the Administrative Agent for the account of the Lenders holding the relevant Term Loans, the Lenders or the Administrative Agent, as the case may be, at the Administrative Agent's office specified in Subsection 11.2, in Dollars in immediately available funds. Payments received by the Administrative Agent after such time shall be deemed to have been received on the next Business Day. The Administrative Agent shall distribute such payments to such Lenders if any such payment is received prior to 2:00 P.M., New York City time, on a Business Day, in like funds as received prior to the end of such Business Day and otherwise the Administrative Agent shall distribute such payment to such Lenders on the next succeeding Business Day. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day (and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension) unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.

(b)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrowers in respect of such borrowing a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Subsection 4.8(b) shall be conclusive in the absence of manifest error. If such

Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall notify the Borrower Representative of the failure of such Lender to make such amount available to the Administrative Agent and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans hereunder on demand from the Borrowers; provided that the foregoing notice and recovery provisions shall not apply to the funding of Initial Term Loans on the Closing Date.

4.9    Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof in each case occurring after the Closing Date shall make it unlawful for any Lender to make or maintain any Eurodollar Loans as contemplated by this Agreement ("Affected Loans"), (a) such Lender shall promptly give written notice of such circumstances to the Borrower Representative and the Administrative Agent (which notice shall be withdrawn whenever such circumstances no longer exist), (b) the commitment of such Lender hereunder to make Affected Loans, continue Affected Loans as such and convert an ABR Loan to an Affected Loan shall forthwith be cancelled and, until such time as it shall no longer be unlawful for such Lender to make or maintain such Affected Loans, such Lender shall then have a commitment only to make an ABR Loan when an Affected Loan is requested and (c) such Lender's Loans then outstanding as Affected Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Affected Loans or within such earlier period as required by law. If any such conversion or prepayment of an Affected Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrowers shall pay to such Lender such amounts, if any, as may be required pursuant to Subsection 4.12.

4.10    Requirements of Law.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof applicable to any Lender, or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case made subsequent to the Closing Date (or, if later, the date on which such Lender becomes a Lender):

      (i)    shall subject such Lender to any Tax of any kind whatsoever with respect to any Eurodollar Loans made or maintained by it or its obligation to make or maintain Eurodollar Loans, or change the basis of taxation of payments to such Lender in respect thereof, in each case, except for Indemnified Taxes, federal withholding Taxes imposed by FATCA and Taxes measured by or imposed upon net income, or franchise Taxes, or Taxes measured by or imposed upon overall capital or net worth, or branch Taxes (in the case of such capital, net worth or branch Taxes, imposed in lieu of such net income Tax), of such Lender or its applicable lending office, branch, or any affiliate thereof;

      (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the LIBOR Rate hereunder; or

      (iii)    shall impose on such Lender any other condition (excluding any Tax of any kind whatsoever);

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans or to reduce any amount receivable hereunder in respect thereof, then, in any such case, upon notice to the

Borrower Representative from such Lender, through the Administrative Agent in accordance herewith, the Borrowers shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable with respect to such Eurodollar Loans; provided that, in any such case, the Borrower Representative may elect to convert the Eurodollar Loans made by such Lender hereunder to ABR Loans by giving the Administrative Agent at least one Business Days' notice of such election, in which case the Borrowers shall promptly pay to such Lender, upon demand, without duplication, amounts theretofore required to be paid to such Lender pursuant to this Subsection 4.10(a) and such amounts, if any, as may be required pursuant to Subsection 4.12. If any Lender becomes entitled to claim any additional amounts pursuant to this Subsection 4.10(a), it shall provide prompt notice thereof to the Borrower Representative, through the Administrative Agent, certifying (x) that one of the events described in this clause (a) has occurred and describing in reasonable detail the nature of such event, (y) as to the increased cost or reduced amount resulting from such event and (z) as to the additional amount demanded by such Lender and a reasonably detailed explanation of the calculation thereof. Such a certificate as to any additional amounts payable pursuant to this Subsection 4.10(a) submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Subsection 4.10(a), the Borrowers shall not be required to compensate a Lender pursuant to this Subsection 4.10(a) for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower Representative of such Lender's intention to claim compensation therefor (except that, if the adoption of or change in any Requirement of Law or in the interpretation or application thereof giving rise to such increased costs or reductions is retroactive, then provided such Lender shall, within six months of such adoption, change, interpretation or application, have notified the Borrower Representative of such Lender's intention to claim compensation therefor, the six-month period first referred to in this sentence shall be extended to include the period of retroactive effect thereof). This covenant shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

(b)      If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy or liquidity (whether or not having the force of law) from any Governmental Authority, in each case, made subsequent to the Closing Date, does or shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, within ten Business Days after submission by such Lender to the Borrower Representative (through the Administrative Agent) of a written request therefor certifying (x) that one of the events described in this clause (b) has occurred and describing in reasonable detail the nature of such event, (y) as to the reduction of the rate of return on capital resulting from such event and (z) as to the additional amount or amounts demanded by such Lender or corporation and a reasonably detailed explanation of the calculation thereof, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or corporation for such reduction. Such a certificate as to any additional amounts payable pursuant to this Subsection 4.10(b) submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Subsection 4.10(b), the Borrowers shall not be required to compensate a Lender pursuant to this Subsection 4.10(b) for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower Representative of such Lender's intention to claim compensation therefor (except that, if the adoption of or change in any Requirement of Law or in the

- 49 -

interpretation or application thereof giving rise to such increased costs or reductions is retroactive, then provided such Lender shall, within six months of such adoption, change, interpretation or application, have notified the Borrower Representative of such Lender's intention to claim compensation therefor, the six-month period first referred to in this sentence shall be extended to include the period of retroactive effect thereof). This covenant shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

(c)     Notwithstanding anything herein to the contrary, the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith, and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case shall be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date for all purposes herein.

4.11    <u>Taxes</u>.

(a)     For purposes of this <u>Subsection 4.11</u>, the term "applicable Law" includes FATCA.

(b)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law.  If any applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Loan Parties shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Subsection 4.11</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     The Loan Parties shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Subsection 4.11</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower Representative by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the

extent that the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Subsection 11.6(b)(v)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>Subsection 4.11(e)</u>.

(f)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this <u>Subsection 4.11</u>, the Loan Parties shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the affected Recipient.

(g)    (i)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrower Representative or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs <u>(g)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> of this <u>Subsection 4.11</u>) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a United States Person shall deliver to the Borrower Representative and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Lender that is not a United States Person (each, a "<u>Foreign Lender</u>") shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender

becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrowers as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower Representative or the Administrative Agent to determine the withholding or deduction required to be made; and

NAI-1505414932v11

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Subsection 4.11 (including by the payment of additional amounts pursuant to this Subsection 4.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Subsection 4.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Subsection 4.11(h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Subsection 4.11(h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Subsection 4.11(h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Subsection 4.11(h) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Each party's obligations under this Subsection 4.11 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

4.12    Indemnity.  The Borrowers agree, jointly and severally, to indemnify the Administrative Agent and each Lender in respect of Extensions of Credit made, or requested to be made, to the Borrowers, and to hold each such Lender harmless from any loss or expense which such Lender may sustain or incur (other than through such Lender's bad faith, gross negligence or willful misconduct as

- 53 -

determined by a court of competent jurisdiction in a final and nonappealable decision) as a consequence of (a) default by the Borrowers in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower Representative has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrowers in making any prepayment or conversion of Eurodollar Loans after the Borrower Representative has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a payment or prepayment of Eurodollar Loans or the conversion of Eurodollar Loans on a day which is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest which would have accrued on the amount so prepaid, or converted, or not so borrowed, converted or continued, for the period from the date of such prepayment or conversion or of such failure to borrow, convert or continue to the last day of the applicable Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Eurodollar Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) <u>over</u> (ii) the amount of interest (as reasonably determined by such Lender) which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. If any Lender becomes entitled to claim any amounts under the indemnity contained in this <u>Subsection 4.12</u>, it shall provide prompt notice thereof to the Borrower Representative, through the Administrative Agent, certifying (x) that one of the events described in clause (a), (b) or (c) has occurred and describing in reasonable detail the nature of such event, (y) as to the loss or expense sustained or incurred by such Lender as a consequence thereof and (z) as to the amount for which such Lender seeks indemnification hereunder and a reasonably detailed explanation of the calculation thereof. Such a certificate as to any indemnification pursuant to this <u>Subsection 4.12</u> submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within five Business Days after receipt thereof. This covenant shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

4.13    <u>Certain Rules Relating to the Payment of Additional Amounts.</u>  (a)  Upon the request, and at the expense of the Borrower Representative, each Lender and Agent to which any Borrower is required to pay any additional amount pursuant to <u>Subsection 4.10</u> or <u>4.11</u>, and any Participant in respect of whose participation such payment is required, shall reasonably afford the Borrower Representative the opportunity to contest, and reasonably cooperate with the Borrower Representative in contesting, the imposition of any Indemnified Tax giving rise to such payment; <u>provided</u> that (i) such Lender or Agent shall not be required to afford the Borrower Representative the opportunity to so contest unless the Borrower Representative shall have confirmed in writing to such Lender or Agent the Borrowers' obligation to pay such amounts pursuant to this Agreement and (ii) the Borrowers shall reimburse such Lender or Agent for its reasonable attorneys' fees and accountants' fees and disbursements incurred in so cooperating with the Borrower Representative in contesting the imposition of such Indemnified Tax; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing no Lender or Agent shall be required to afford the Borrower Representative the opportunity to contest, or cooperate with the Borrower Representative in contesting, the imposition of any Indemnified Taxes, if such Lender or Agent in its sole discretion in good faith determines that to do so would have an adverse effect on it.

(b)    If a Lender changes its applicable lending office (other than (i) pursuant to clause (c) below or (ii) after an Event of Default under <u>Subsection 9.1(a)</u> or <u>(f)</u> has occurred and is continuing) and the effect of such change, as of the date of such change, would be to cause any of the Borrowers to become obligated to pay any additional amount under <u>Subsection 4.10</u> or <u>4.11</u>, such Borrower shall not be obligated to pay such additional amount.

NAI-1505414932v11

(c)      If a condition or an event occurs which would, or would upon the passage of time or giving of notice, result in the payment of any additional amount to any Lender or Agent by any of the Borrowers pursuant to <u>Subsection 4.10</u> or <u>4.11</u> or result in Affected Loans or commitments to make Affected Loans being automatically converted to ABR Loans or commitments to make ABR Loans, as the case may be, pursuant to <u>Subsection 4.9</u>, such Lender or Agent shall promptly notify the Borrower Representative and the Administrative Agent and shall take such steps as may reasonably be available to it to mitigate the effects of such condition or event (which shall include efforts to rebook the Term Loans held by such Lender at another lending office, or through another branch or an affiliate, of such Lender); <u>provided</u> that such Lender or Agent shall not be required to take any step that, in its reasonable judgment, would be materially disadvantageous to its business or operations or would require it to incur additional costs (unless the Borrowers agree to reimburse such Lender or Agent for the reasonable incremental out-of-pocket costs thereof).

(d)      If any of the Borrowers shall become obligated to pay additional amounts pursuant to <u>Subsection 4.10</u> or <u>4.11</u> and any affected Lender shall not have promptly taken steps necessary to avoid the need for payments under <u>Subsection 4.10</u> or <u>4.11</u> or if Affected Loans or commitments to make Affected Loans are automatically converted to ABR Loans or commitments to make ABR Loans, as the case may be, under <u>Subsection 4.9</u> and any affected Lender shall not have promptly taken steps necessary to avoid the need for such conversion under <u>Subsection 4.9</u>, the Borrower Representative shall have the right, for so long as such obligation remains, with the assistance of the Administrative Agent to seek one or more substitute Lenders (with respect to which such amounts would not be owing by the Borrowers) reasonably satisfactory to the Required Lenders and the Borrower Representative to purchase the affected Term Loan, in whole or in part, at an aggregate price no less than such Term Loan's principal amount <u>plus</u> accrued interest, and assume the affected obligations under this Agreement.  In the case of the substitution of a Lender, then, the Borrowers, the Administrative Agent, the affected Lender, and any substitute Lender shall execute and deliver an appropriately completed Assignment and Acceptance pursuant to <u>Subsection 11.6(b)</u> to effect the assignment of rights to, and the assumption of obligations by, the substitute Lender; <u>provided</u> that any fees required to be paid by <u>Subsection 11.6(b)</u> in connection with such assignment shall be paid by the Borrowers or the substitute Lender.  The Borrowers shall first pay the affected Lender any additional amounts owing under <u>Subsections 4.10</u> and <u>4.11</u> (as well as any commitment fees and other amounts then due and owing to such Lender, including any amounts under this <u>Subsection 4.13)</u> prior to such substitution.  In the case of the substitution of a Lender pursuant to this <u>Subsection 4.13(d)</u>, if the Lender being replaced does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the assignee Lender executes and delivers such Assignment and Acceptance and/or such other documentation together with the processing fee required pursuant to <u>Subsection 11.6</u> and (b) the date as of which all obligations of the Borrowers owing to such replaced Lender relating to the Term Loans and participations so assigned shall be paid in full by the assignee Lender and/or the Borrowers to such Lender being replaced, then the Lender being replaced shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the Borrowers shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Lender.

(e)      The obligations of any Agent, Lender or Participant under this <u>Subsection 4.13</u> shall survive the termination of this Agreement and the payment of the Term Loans and all amounts payable hereunder.

SECTION 5

Representations and Warranties

To induce the Administrative Agent and each Lender to make the Extensions of Credit requested to be made by it on the Closing Date and on each Borrowing Date thereafter, the Parent Borrower with respect to itself and its Restricted Subsidiaries, hereby represents and warrants, on the Closing Date and on every Borrowing Date thereafter to the Administrative Agent and each Lender that:

5.1     Financial Condition.

(a)     The annual financial statements and other unaudited financial statements, including balance sheets and related statements of income, cash flow, and shareholder's equity, that have been and are hereafter delivered to the Administrative Agent and the Lenders present fairly, in all material respects, the consolidated financial condition as at such dates, and the consolidated statements of operations and consolidated cash flows for the respective periods then ended, of the Parent Borrower and its Restricted Subsidiaries and each variable interest entity (including the Joint Ventures) that the Parent Borrower is required to consolidate in accordance with GAAP.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby (except as approved by a Responsible Officer, and disclosed in any such schedules and notes).

(b)     As of the Closing Date, except as set forth in the financial statements referred to in Subsection 5.1(a) and the Chapter 11 Cases, there are no liabilities of any Loan Party of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which would reasonably be expected to result in a Material Adverse Effect.

5.2     No Change.  Since the Closing Date, other than those customarily resulting from the commencement of the Chapter 11 Cases and changes contemplated in the Borrowers' business plan delivered to the Administrative Agent and the Lenders, there has been no development or event relating to or affecting any Loan Party which has had or would be reasonably expected to have a Material Adverse Effect

5.3     Corporate Existence; Compliance with Law.  Each of the Loan Parties (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, except (other than with respect to the Borrowers), to the extent that the failure to be in good standing would not reasonably be expected to have a Material Adverse Effect, (b) has the legal right to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, except to the extent that the failure to have such legal right would not be reasonably expected to have a Material Adverse Effect, (c) is duly qualified as a foreign corporation or limited liability company and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, other than in such jurisdictions where the failure to be so qualified and in good standing would not be reasonably expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

5.4     Corporate Power; Authorization; Enforceable Obligations.  Subject to the entry of the Interim Order or Final Order, as applicable, each Loan Party has the corporate or other organizational power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is

- 56 -

a party and, in the case of each of the Borrowers, to obtain Extensions of Credit hereunder, and each such Loan Party has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of each of the Borrowers, to authorize the Extensions of Credit to it, if any, on the terms and conditions of this Agreement and any Notes. Except for the entry of, or pursuant to the terms of the Interim Order or Final Order, as applicable, no consent or authorization of, filing with, notice to or other similar act by or in respect of, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of any Loan Party in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents to which it is a party or, in the case of each of the Borrowers, with the Extensions of Credit to it, if any, hereunder, except for (a) consents, authorizations, notices and filings described in Schedule 5.4, all of which have been obtained or made prior to the Closing Date, (b) filings to perfect the Liens created by the Security Documents, and (c) consents, authorizations, notices and filings which the failure to obtain or make would not reasonably be expected to have a Material Adverse Effect. This Agreement has been duly executed and delivered by the Parent Borrower, and each of the other Borrowers, and each other Loan Document to which any Loan Party is a party will be duly executed and delivered on behalf of such Loan Party. Upon entry by the Court of the Interim Order or Final Order, as applicable, this Agreement constitutes a legal, valid and binding obligation of each of the Borrowers and each other Loan Document to which any Loan Party is a party when executed and delivered will constitute a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, in each case except as enforceability may be limited by applicable domestic or foreign bankruptcy, insolvency, reorganization, moratorium, Bail-In Action or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law)

5.5     No Legal Bar.  Subject to the entry of the Interim Order or Final Order, as applicable, the execution, delivery and performance of the Loan Documents by any of the Loan Parties, the Extensions of Credit hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or Contractual Obligation of such Loan Party in any respect that would reasonably be expected to have a Material Adverse Effect, (b) will not result in, or require the creation or imposition of any Lien (other than Liens securing the Obligations or otherwise permitted hereby) on any of its properties or revenues pursuant to any such Requirement of Law or Contractual Obligation and (c) will not violate any provision of the Organizational Documents of such Loan Party or any of the Restricted Subsidiaries, except (other than with respect to the Borrowers) as would not reasonably be expected to have a Material Adverse Effect.

5.6     No Material Litigation.  Except for the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower Representative, threatened by or against the Parent Borrower or any of its Restricted Subsidiaries or against any of their respective properties or revenues, (a) except (i) the Chapter 11 Cases or (ii) as described on Schedule 5.6 and the Chapter 11 Cases, which is so pending or threatened at any time on or prior to the Closing Date and relates to any of the Loan Documents or any of the transactions contemplated hereby or thereby or (b) which would be reasonably expected to have a Material Adverse Effect.

5.7     No Default.  Since the Closing Date, no Default or Event of Default has occurred and is continuing.

5.8     Ownership of Property; Liens.  Each of the Parent Borrower and its Restricted Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in, all its other material property, except those for which the failure to have such good title or such leasehold interest would not be reasonably expected to have a

Material Adverse Effect, and none of such real or other property is subject to any Lien, except for Permitted Liens. <u>Schedule 5.8</u> sets forth all properties owned in fee by the Parent Borrower or any of its Restricted Subsidiaries as of the Closing Date.

5.9   <u>Intellectual Property.</u>   The Parent Borrower and each of its Restricted Subsidiaries owns, or has the legal right to use, all United States and foreign patents, patent applications, trademarks, trademark applications, trade names, copyrights, and rights in know-how and processes necessary for each of them to conduct its business as currently conducted (the "<u>Intellectual Property</u>") except for those the failure to own or have such legal right to use would not be reasonably expected to have a Material Adverse Effect. Except as provided on <u>Schedule 5.9</u>, no claim has been asserted and is pending by any Person against the Parent Borrower or any of its Restricted Subsidiaries challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower Representative know of any such claim, and, to the knowledge of the Borrower Representative, the use of such Intellectual Property by the Parent Borrower and its Restricted Subsidiaries does not infringe on the rights of any Person, except for such claims and infringements which in the aggregate, would not be reasonably expected to have a Material Adverse Effect.

5.10   <u>Taxes</u>.   To the knowledge of the Borrower Representative, (1) the Parent Borrower and each of its Restricted Subsidiaries has filed or caused to be filed all material tax returns which are required to be filed by it and has paid (a) all Taxes shown to be due and payable on such returns and (b) all Taxes shown to be due and payable on any assessments of which it has received notice made against it or any of its property and all other Taxes imposed on it or any of its property by any Governmental Authority and (2) no Tax Liens have been filed (except for Liens for Taxes not yet due and payable), and no claim is being asserted in writing, with respect to any such Taxes (in each case other than in respect of any such (i) Taxes with respect to which the failure to pay, in the aggregate, would not have a Material Adverse Effect or (ii) Taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings diligently conducted and with respect to which reserves in conformity with GAAP have been provided on the books of the Parent Borrower or its Restricted Subsidiaries, as the case may be).

5.11   <u>Federal Regulations</u>.   As of the Closing Date, none of the Collateral is comprised of any Margin Stock (within the meaning of Regulation U).  No part of the proceeds of any Extensions of Credit will be used for any purpose which violates the provisions of the Regulations of the Board, including Regulation T, Regulation U or Regulation X of the Board. If requested by any Lender or the Administrative Agent, the Borrower Representative will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, referred to in said Regulation U.  None of the Parent Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

5.12   <u>ERISA</u>.   (a)  During the five year period prior to each date as of which this representation is made, or deemed made, with respect to any Plan, none of the following events or conditions, either individually or in the aggregate, has resulted or is reasonably likely to result in a Material Adverse Effect: (i) a Reportable Event; (ii) a failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA); (iii) any noncompliance with the applicable provisions of ERISA or the Code; (iv) a termination of a Single Employer Plan (other than a standard termination pursuant to Section 4041(b) of ERISA); (v) a Lien on the property of the Parent Borrower or its Restricted Subsidiaries in favor of the PBGC or a Plan; (vi) a complete or partial withdrawal from any Multiemployer Plan by the Parent Borrower or any Commonly Controlled Entity; (vii) the ERISA Reorganization or Insolvency of any Multiemployer Plan; or (viii) any transactions that resulted or could

- 58 -

reasonably be expected to result in any liability to the Parent Borrower or any Commonly Controlled Entity under Section 4069 of ERISA or Section 4212(c) of ERISA.

(b)      With respect to any Foreign Plan, none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:  (i) substantial non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders; (ii) failure to be maintained, where required, in good standing with applicable regulatory authorities; (iii) any obligation of the Parent Borrower or its Restricted Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any Foreign Plan; (iv) any Lien on the property of the Parent Borrower or its Restricted Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding a Foreign Plan; (v) for each Foreign Plan which is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities); (vi) any facts that, to the best knowledge of the Parent Borrower or any of its Restricted Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of the Parent Borrower or any of its Restricted Subsidiaries, would reasonably be expected to result in a material liability to the Parent Borrower or any of its Restricted Subsidiaries concerning the assets of any Foreign Plan (other than individual claims for the payment of benefits); and (vii) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law.

(c)      The Parent Borrower and its Restricted Subsidiaries represent and warrant as of the Closing Date that the Borrower is not and will not be using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Plans with respect to the Borrowers entrance into, participation in, administration of and performance of the Loans, the Term Loan Commitments or this Agreement.

5.13      Collateral.  Upon execution and delivery thereof by the parties thereto and upon the entry by the Court of the Interim Order or Final Order, as applicable, the Security Documents are effective to create (to the extent described therein) in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in or liens on the Collateral described therein and the proceeds thereof, except as to enforcement, as may be limited by Bail-In Action, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing. When (a) the actions specified in Schedule 3 to the Guarantee and Collateral Agreement have been duly taken upon the entry by the Court of the Interim Order or Final Order, as applicable, (b) all applicable Instruments, Chattel Paper and Documents (each as described therein) constituting Collateral a security interest in which is perfected by possession have been delivered to, and/or are in the continued possession of, the Collateral Agent, (c) all Deposit Accounts and Pledged Stock (each as defined in the Guarantee and Collateral Agreement) a security interest in which is required to be or is perfected by "control" (as described in the Uniform Commercial Code as in effect in each applicable jurisdiction (in the case of Deposit Accounts) and the State of New York (in the case of Pledged Stock) from time to time) are under the "control" of the Collateral Agent or the Administrative Agent, as agent for the Collateral Agent and as directed by the Collateral Agent, and (d) the Interim Order or the Final Order have been entered, the security interests and liens granted pursuant thereto shall constitute a perfected security interest in (to the extent intended to be created thereby and required to be perfected under the Loan Documents) all right, title and interest of each pledgor or mortgagor (as applicable) party thereto in the Collateral described therein with respect to such pledgor or mortgagor (as applicable). Notwithstanding any other provision of this Agreement, capitalized terms that are used in this Subsection 5.13 and not defined in this Agreement are so used as defined in the applicable Security Document.

5.14    Investment Company Act; Other Regulations.    None of the Loan Parties is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act. None of the Borrowers is subject to regulation under any federal or state statute or regulation (other than Regulation X of the Board) which limits its ability to incur Indebtedness as contemplated hereby.

5.15    Subsidiaries.    Schedule 5.15 sets forth all the Subsidiaries of the Parent Borrower at the Closing Date, the jurisdiction of their organization and the direct or indirect ownership interest of the Parent Borrower therein.

5.16    Purpose of Loans.    Subject to the terms and conditions herein, the use of cash collateral and the proceeds of the Loans made hereunder shall be used by the Borrowers, solely on or after the Closing Date, in accordance with the Orders and the Approved Budget: (i) to pay related transaction costs, fees and expenses with respect to the DIP Facility, (ii) to make the adequate protection payments in accordance with the Approved Budget and the Orders, and (iii) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Court in accordance with the Approved Budget.  Loan Parties shall not be permitted to use the proceeds of the Loans or any cash collateral in contravention of the provisions of the Loan Documents, the Approved Budget, the applicable Order or the applicable insolvency laws, including any restrictions or limitations on the use of proceeds contained therein.  In addition to the foregoing, the proceeds of the Term Loans may be used to prepay outstanding obligations or liabilities under the Pre-Petition ABL Credit Agreement (other than letters of credit issued thereunder or reimbursement obligations in respect thereof).

5.17    Environmental Matters.    Other than as disclosed on Schedule 5.17 or exceptions to any of the following that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    The Parent Borrower and its Restricted Subsidiaries: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current operations or for any property owned, leased, or otherwise operated by any of them and reasonably expect to timely obtain without material expense all such Environmental Permits required for planned operations; (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits; and (iv) believe they will be able to maintain compliance with Environmental Laws and Environmental Permits, including any reasonably foreseeable future requirements thereof.

(b)    Materials of Environmental Concern have not been transported, disposed of, emitted, discharged, or otherwise released or threatened to be released, to, at or from any real property presently or formerly owned, leased or operated by the Parent Borrower or any of its Restricted Subsidiaries or at any other location, which would reasonably be expected to (i) give rise to liability or other Environmental Costs of the Parent Borrower or any of its Restricted Subsidiaries under any applicable Environmental Law, or (ii) interfere with the planned or continued operations of the Parent Borrower and its Restricted Subsidiaries, or (iii) impair the fair saleable value of any real property owned by the Parent Borrower or any of its Restricted Subsidiaries that is part of the Collateral.

(c)    There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under any Environmental Law to which the Parent Borrower or any of its Restricted Subsidiaries is, or to the knowledge of the Parent Borrower or any of its

- 60 -

Restricted Subsidiaries is reasonably likely to be, named as a party that is pending or, to the knowledge of the Parent Borrower or any of its Restricted Subsidiaries, threatened.

(d)    Neither the Parent Borrower nor any of its Restricted Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party, under the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or received any other written request for information from any Governmental Authority with respect to any Materials of Environmental Concern.

(e)    Neither the Parent Borrower nor any of its Restricted Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, nor is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum, relating to compliance with or liability under any Environmental Law.

5.18    <u>No Material Misstatements</u>.    The written information, reports, financial statements, exhibits and schedules furnished by or on behalf of the Borrower Representative or the Loan Parties to the Administrative Agent and the Lenders on or prior to the Closing Date in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, did not contain as of the Closing Date any material misstatement of fact and did not omit to state as of the Closing Date any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in their presentation of the Parent Borrower and its Restricted Subsidiaries taken as a whole. It is understood that (a) no representation or warranty is made concerning the forecasts, estimates, pro forma information, projections and statements as to anticipated future performance or conditions, and the assumptions on which they were based or concerning any information of a general economic nature or general information about Parent Borrower's and its Subsidiaries' industry, contained in any such information, reports, financial statements, exhibits or schedules, except that, in the case of such forecasts, estimates, pro forma information, projections and statements, as of the date such forecasts, estimates, pro forma information, projections and statements were generated, (i) such forecasts, estimates, pro forma information, projections and statements were based on the good faith assumptions of the management of the Borrower Representative and (ii) such assumptions were believed by such management to be reasonable and (b) such forecasts, estimates, pro forma information and statements, and the assumptions on which they were based, may or may not prove to be correct.

5.19    <u>Labor Matters</u>.    There are no strikes pending or, to the knowledge of the Borrower Representative, reasonably expected to be commenced against the Parent Borrower or any of its Restricted Subsidiaries which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. The hours worked and payments made to employees of the Parent Borrower and each of its Restricted Subsidiaries have not been in violation of any applicable laws, rules or regulations, except where such violations would not reasonably be expected to have a Material Adverse Effect.

5.20    <u>Insurance</u>.    Schedule 5.20 sets forth a complete and correct listing as of the Closing Date of all insurance that is (a) maintained by the Loan Parties and (b) material to the business and operations of the Parent Borrower and its Restricted Subsidiaries taken as a whole, with the amounts insured (and any deductibles) set forth therein.

5.21    <u>Patriot Act</u>.  (i) Neither the Borrowers nor any other Loan Party is in material violation of any material laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the USA PATRIOT Act. (ii) The use of proceeds of the Loans will not violate in any material respect the Trading with the Enemy Act, as amended or any of the foreign asset control regulations of the United States Treasury Department (31 C.F.R.  Subtitle B, Chapter V).

- 61 -

5.22    FCPA.  No part of the proceeds of the Loans will be used, directly, or, to the knowledge of the Borrowers, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

5.23    Sanctioned Persons.

(i)    None of the Borrowers or any Restricted Subsidiary is currently the target of any U.S. sanctions administered by the Office of Foreign Assets Control ("OFAC") of the U.S. Treasury Department or the U.S. Department of State.

(ii)    The Borrowers will not to their knowledge, directly or indirectly, use the proceeds of the Loans in any manner that will result in a material violation by any Lender of any U.S. sanctions administered by OFAC or the U.S. Department of State.

5.24    Beneficial Ownership.  As of the Closing Date, the information included in the Beneficial Ownership Certification delivered by the Borrowers to the Administrative Agent and the Lenders on or before the Closing Date is true and correct in all respects.

5.25    EEA Financial Institutions.  No Loan Party is an EEA Financial Institution.

5.26    Approved Budget.    The Borrower Representative has heretofore furnished to the Administrative Agent and the Lenders the Approved Budget, and such Approved Budget was prepared in good faith upon assumptions the Borrower Representative believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrower Representative, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget, other than with regards to a variance permitted under Subsection 7.4(b). The Borrowers shall thereafter deliver to the Administrative Agent and the Lenders updates to the Approved Budget in accordance with Subsection 7.14.

5.27    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (x) the motion seeking approval of the Interim Order, the Loan Documents and the Final Order and (y) the hearing for the entry of the Interim Order.  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or the Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against each Loan Party now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326,, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 346(c)(1) of the Bankruptcy Code. The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable. any other provision of the Bankruptcy Code or

- 62 -

otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Carve-Out and the priorities set forth in the Interim Order or the Final Order, as applicable.

(c)     After entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority, only to the Carve Out and Liens securing the Indebtedness permitted pursuant to Section 8.12 to the extent set forth in the Interim Order or the Final Order, as applicable.

(d)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Administrative Agent's, the Required Lenders' and the Crossover Holder's consent.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Termination Date (whether by acceleration or otherwise), the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from the Court.

## SECTION 6

### Conditions Precedent

6.1     Conditions Precedent to Effectiveness of this Agreement and to Initial Extension of Credit. This Agreement, including the agreement of each Lender to make the initial Extension of Credit requested to be made by it, shall become effective on the date on which the following conditions precedent shall have been satisfied or waived, all in form and substance reasonably satisfactory to the Administrative Agent and each of the Lenders:

(a)     Loan Documents. The Administrative Agent and the Lenders shall have received the following Loan Documents, executed and delivered as required below:

(i)     this Agreement, executed and delivered by a duly authorized officer of each of the Borrowers;

(ii)     any Notes requested by any Lender executed and delivered by a duly authorized officer of each Borrower;

(iii)     the Guarantee and Collateral Agreement and each other Security Document listed on Annex B, executed and delivered by a duly authorized officer of each Loan Party signatory thereto, together with (except as otherwise provided in such Security Documents:

(A)     certificates, if any, representing the pledged equity of Parent Borrower's Restricted Subsidiaries, together with stock powers (or similar instruments) relating thereto executed in blank; and

NAI-1505414932v11

(B)    evidence that all financing statements in favor of the Collateral Agent under the Uniform Commercial Code have been filed against the Loan Parties;

(iv)    the Intercreditor Acknowledgement, fully executed by all parties thereto;

(v)    the RSA shall have been duly executed by the parties thereto and shall be in full force and effect;

(vi)    a Florida Affidavit As To Out-Of-State Execution and Delivery executed by the Parent Borrower; and

(vii)    each other Loan Document required by the Administrative Agent and the Lenders to be delivered on or prior to the Closing Date, and each such Loan Document shall have been duly executed and delivered to Administrative Agent by each of the signatories thereto.

(b)    [reserved];

(c)    Debt Financings.  Substantially concurrently with the satisfaction of the other conditions precedent set forth in this Subsection 6.1, the Administrative Agent and the Lenders shall receive evidence, in form and substance reasonably satisfactory to the Required Lenders, that the Borrowers shall have entered into the DIP ABL Credit Agreement and the DIP ABL Credit Agreement shall be in full force and effect.

(d)    [Reserved].

(e)    [Reserved].

(f)    Lien Searches.  The Collateral Agent shall have received customary lien and judgment searches.

(g)    Fees and Expenses.

(i)    The Administrative Agent and the Lenders, respectively, shall have received all fees and expenses payable to them on the Closing Date (which may be offset against the proceeds of the DIP Facility); and

(ii)    The Backstop Lenders shall have received all fees related to the transactions hereunder payable to them to on the Closing Date.

(h)    Secretary's Certificate.  The Administrative Agent shall have received a certificate from each Loan Party, dated the Closing Date, substantially in the form of Exhibit F hereto, with appropriate insertions and attachments of resolutions or other actions, evidence of incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the Secretary or any Assistant Secretary or other authorized representative of such Loan Party.

(i)    Closing Certificate.  The Administrative Agent shall have received a certificate from a Responsible Officer of the Borrower Representative, certifying that:

(i)    after giving effect to the Loans and transactions hereunder, the representations and warranties in Article V are true and correct in all material respects (except for representations and warranties that expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date); and

(ii)    no Default or Event of Default occurred and is continuing.

(j)    <u>Patriot Act; Beneficial Ownership Regulation</u>.  The Administrative Agent and the Lenders shall have received at least five days prior to the Closing Date all documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act and the CDD Rule, to the extent such documentation or information is requested in writing by the Administrative Agent on behalf of the Lenders at least 5 days prior to the date hereof.

(k)    <u>Beneficial Ownership Certificate</u>.  At least three (3) days prior to the effectiveness of this Agreement and the making of such initial Borrowings, the Administrative Agent and the Lenders shall have received a Beneficial Ownership Certificate in relation to the Borrowers to the extent the Borrowers qualify as a "legal entity customer".

(l)    <u>Committed Loan Notice</u>.  The Administrative Agent shall have received a Committed Loan Notice of such Borrowing as required by <u>Subsection 2.3</u> (or such notice shall have been deemed given in accordance with <u>Subsection 2.3</u>).

(m)    <u>Borrowing Base Certificate</u>.  The Administrative Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on November 10, 2018, and executed by a Responsible Officer of the Borrower Representative.

(n)    <u>Approved Budget</u>.  The Administrative Agent and the Lenders shall have received the Approved Budget.

(o)    <u>[reserved]</u>;

(p)    <u>Insurance Deliverables</u>.  The Administrative Agent shall (i) be satisfied with the amount, types and terms and conditions of all insurance maintained by the Loan Parties, and (ii) shall have received certificates of insurance and endorsements thereto, naming the Collateral Agent as additional insured lender, loss payee or mortgagee, as applicable, as required by <u>Subsection 7.5</u> and in form and substance reasonably satisfactory to the Required Lenders.

(q)    <u>Appraisals; Audits</u>.  The Administrative Agent shall have received all inventory and asset appraisals, commercial finance audits, and field audits, each in form and substance reasonably satisfactory to the Administrative Agent, and such other reports, audits, and other information or certifications as the Administrative Agent or the Lenders may reasonably request.

(r)    <u>Material Adverse Effect</u>.  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effects.  No orders, injunctions or pending litigation exists which could reasonably be expected to have a Material Adverse Effect or which challenges this Agreement, the Loan Documents or the credit facility contemplated hereunder or under the DIP ABL Facility.

(s)    Litigation.    Except for actions, suits, proceedings, investigations, claims or disputes stayed by Section 362 of the Bankruptcy Code, there shall be no actions, suits, proceedings, investigations, claims or disputes pending or, to the knowledge of the Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of their Domestic Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or (b) could reasonably be expected to result in a Material Adverse Effect.

(t)    Financial Condition.    Since the Petition Date, other than those customarily resulting from the commencement of the Chapter 11 Cases and changes contemplated in the Borrowers' Approved Budget delivered to the Administrative Agent and the Lenders, there has been no material increase in the liabilities, liquidated or contingent, of the Loan Parties taken as a whole or material decrease in the assets of the Loan Parties taken as a whole.

(u)    Default or Event of Default.    No Default or Event of Default shall have occurred and be continuing or shall arise hereunder immediately after giving effect to this Agreement and the transactions contemplated hereby.

(v)    Enforceability.    Other than those resulting from the commencement of the Chapter 11 Cases, since the Petition Date there shall have been no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Loan Documents and the Obligations of the Loan Parties hereunder. Subject to the Orders, the Administrative Agent and the Required Lenders shall be satisfied that the Interim Order and the other Security Documents shall be effective to create in favor of the Agent a legal, valid and enforceable first priority security interest in and Lien upon the Collateral and shall have received Lien searches and other evidence reasonably satisfactory to the Administrative Agent that such Liens are the only Liens upon the Collateral, except Liens permitted pursuant to Subsection 8.6

(w)    Orders.    (i) The Court shall have entered the Interim Order by no later than three (3) Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders and the Crossover Holder (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders or the Crossover Holder (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent); (ii) the Administrative Agent, the Lenders and the Crossover Holder shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent, the Required Lenders and the Crossover Holder, not later than a reasonable time in advance of the Petition Date for Administrative Agent's, Lenders' and Crossover Holder's counsel to review and analyze the same; (iii) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent and the Backstop Lenders; and (iv) all "first day" orders shall have been approved and entered by the Court. No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and the Court shall not have entered any order granting any party, other than the Loan Parties, control over any Collateral (other than a de minimis portion of the Collateral).

(x)    Other Filings.    Each of the Plan of Reorganization, Disclosure Statement (as defined in the RSA) and Solicitation Motion (as defined in the RSA), in each case, in form and

substance satisfactory to the Administrative Agent, the Crossover Holder and Required Lenders shall have been filed with the Bankruptcy Court.

(y)    <u>Adequate Protection</u>.  The Prior ABL Agent and the Prior ABL Lenders shall have each consented to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

(z)    [Reserved].

(aa)    <u>Cash Flow Forecast</u>.  The Administrative Agent, the Crossover Holder and the Backstop Lenders shall have received a 13-Week Cash Flow Forecast in form and substance satisfactory to the the Crossover Holder and the Required Lenders.

(bb)    <u>Milestones</u>.  The Debtors shall have complied with all Required Milestones under the Orders and the RSA.

(cc)    <u>Communications Plan</u>.  The Debtors shall have completed a detailed internal and external communications plan relating to the Chapter 11 Cases and the restructuring contemplated thereunder, to be in form and substance satisfactory to the Required Lenders and the Crossover Holder.

The acceptance by the Borrowers of the Extensions of Credit pursuant to this <u>Subsection 6.1</u> shall conclusively be deemed to constitute a representation by the Borrowers that each of the conditions precedent set forth in this <u>Subsection 6.1</u> shall have been satisfied in accordance with its respective terms or shall have been irrevocably waived by the applicable relevant Person; provided, however, the making of any such Extension of Credit (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Administrative Agent, any Lender or other Secured Party of the provisions of this <u>Section 6</u> on any future occasion or operate as a waiver of (i) the right of Administrative Agent and Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of Administrative Agent, any Lender or other Secured Party as a result of any such failure of the Loan Parties to comply.

6.2    <u>Conditions Precedent to the Second Borrowing Funding</u>.  In addition to the conditions set forth in <u>Subsection 6.1</u> above (all of which shall be conditions hereto as well), the Obligation of the Lenders to make each Loan on or after the Second Borrowing Availability Date are subject to the satisfaction or waiver of the following additional conditions precedent:

(a)    all representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loans; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(b)    no Default or Event of Default shall exist, or would result from such proposed Loan or from the application of the proceeds therefrom and the Termination Date has not occurred;

(c)    (i) the Final Order shall be in form and substance reasonably satisfactory to the Administrative Agent, the Required Lenders and the Crossover Holder authorizing and approving, inter alia, the DIP Facility and the transactions contemplated hereby and by the DIP ABL Facility, (ii) the Final Order shall have been entered following the expiration of the Interim Order but not later than December 21, 2018 and the Administrative Agent and the Lenders shall have received a true and complete copy of such order; (iii) the Final Order shall not have been vacated, stayed, reversed, modified, or amended without the Administrative Agent's, the Required Lenders' and the Crossover Holder's consent and shall otherwise be in full force and effect; (iv) no motion for reconsideration of the Final Order shall have been timely filed by a Debtor or any of their Subsidiaries; and (v) no appeal of the Final Order shall have been timely filed;

(d)    the RSA shall be in full force and effect;

(e)    all reasonable and documented out-of-pocket fees and expenses required to be paid under the Loan Documents shall have been paid (or will be paid from the proceeds of such Loans);

(f)    the Administrative Agent shall have received a Committed Loan Notice;

(g)    the Loans shall have been made subject to and in accordance with the Approved Budget;

(h)    the Debtors shall have satisfied the Required Milestones set forth in the Final Order and the RSA;

(i)    the Administrative Agent shall have received an updated 13-Week Cash Flow Forecast in form and substance satisfactory to the the Required Lenders and the Crossover Holder; and

(j)    the initial Borrowing hereunder shall have previously been made pursuant to Subsection 6.1 above.

The acceptance by the Borrowers of the Extensions of Credit pursuant to this Subsection 6.2 shall conclusively be deemed to constitute a representation by the Borrowers that each of the conditions precedent set forth in this Subsection 6.2 shall have been satisfied in accordance with its respective terms or shall have been irrevocably waived by the applicable relevant Person; provided, however, the making of any such Extension of Credit (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Administrative Agent, any Lender or other Secured Party of the provisions of this Section 6 on any future occasion or operate as a waiver of (i) the right of Administrative Agent and Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of Administrative Agent, any Lender or other Secured Party as a result of any such failure of the Loan Parties to comply.

## SECTION 7

### Affirmative Covenants

The Parent Borrower hereby agrees that, from and after the Closing Date until payment in full of the Term Loans and all other Term Loan Facility Obligations then due and owing to any Lender or

Agent hereunder, the Parent Borrower shall and shall cause each of its respective Restricted Subsidiaries to:

7.1    <u>Financial Statements</u>.  Furnish to the Administrative Agent, the Lenders, the Specified Ad Hoc Advisor and the Specified Crossover Holder Advisor:

(a)    [reserved];

(b)    as soon as available, but in any event not later than the fifth Business Day after the 60th day following the end of each quarter of each Fiscal Year of the Parent Borrower, the unaudited consolidated balance sheet of the Parent Borrower as at the end of such quarter and the related unaudited consolidated statements of operations and changes in equity and cash flows of the Parent Borrower for such quarter and the portion of the Fiscal Year through the end of such quarter, setting forth in comparative form the figures for and as of the corresponding periods of the previous year;

(c)    as soon as available, but in any event not later than the fifth Business Day after the 30th day following the end of each Fiscal Month of the Parent Borrower, an unaudited financial summary of the financial performance, sales composition (including by channel, by product category and same store sales data) , market activity, an unaudited income statement, statement of cash flows and a balance sheet of the Loan Parties for such Fiscal Month, for each including a comparison to the applicable prior year period, in the same form as the unaudited monthly financial reports previously delivered to the equity sponsor and certified by a Responsible Officer of the Parent Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Parent Borrower. For avoidance of doubt, the financial results will not include the impact of the Joint Ventures; and

(d)    all such financial statements delivered pursuant to <u>Subsection 7.1(b)</u> or <u>(c)</u> shall be certified by a Responsible Officer of the Parent Borrower certifying that such financial statements fairly present in all material respects the financial condition of the Parent Borrower and its Subsidiaries in conformity with GAAP and to be in reasonable detail and prepared in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods that began on or after the Closing Date (except as disclosed therein and except for the absence of certain notes).

7.2    <u>Certificates; Other Information</u>.  Furnish to the Administrative Agent, the Lenders, the Specified Ad Hoc Advisor and the Specified Crossover Holder Advisor:

(a)    [Reserved].

(b)    concurrently with the delivery of the financial statements and reports referred to in <u>Subsections 7.1(b)</u> and <u>(c)</u>, a certificate signed by a Responsible Officer of the Parent Borrower in substantially the form of <u>Exhibit H</u> hereto (a "<u>Compliance Certificate</u>") (i) stating that, to the best of such Responsible Officer's knowledge, each of Holdings, DB Parent, Investor, Parent Borrower and their Restricted Subsidiaries during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement or the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default, except, in each case, as specified in such certificate (or if such event has occurred, including a description of the event and the steps to be taken with respect thereto) and (ii) if delivered with the financial

- 69 -

statements required by Subsection 7.1(b) or (c), shall include the certifications of the Responsible Officer of the Parent Borrower required to be made pursuant to <u>Subsection 7.1(d)</u>;

(c)    [reserved];

(d)    within five Business Days after the same are filed, copies of all financial statements and periodic reports which the Parent Borrower may file with the SEC or any successor or analogous Governmental Authority;

(e)    within five Business Days after the same are filed, copies of all registration statements and any amendments and exhibits thereto, which the Parent Borrower may file with the SEC or any successor or analogous Governmental Authority;

(f)    a Borrowing Base Certificate (in form and substance provided pursuant to the DIP ABL Credit Agreement) (a "<u>Borrowing Base Certificate</u>") contemporaneously with the delivery of such Borrowing Base Certificate under the DIP ABL Credit Agreement together with all other required accompanying documents;

(g)    contemporaneously with delivery of each Borrowing Base Certificate, (or as otherwise set forth below) the Parent Borrower shall furnish to the Administrative Agent and the Lenders, in each case, in form and substance satisfactory to the Required Lenders:

(i)    calculations of Inventory itemizing separately in-transit Inventory, Inventory located at Stores and Inventory located in warehouse locations, together with back-up information for each in-transit Inventory category and (ii) an Inventory and Accounts roll forward;

(ii)    an open accounts payable report as of the end of the most recently ended week, accompanied by such supporting detail and documentation as shall be requested by the Required Lenders in their reasonable discretion;

(iii)    a summary of Inventory by location and type (including SKU-level detail), accompanied by such supporting documentation (including a supporting perpetual Inventory report) as shall be requested by the Required lenders in their reasonable discretion and with detail sufficient to permit the preparation of an updated inventory appraisal;

(iv)    [reserved];

(v)    monthly, on the 15th Business Day following the end of the preceding month, an accounts payable and accrual report as of the end of the most recently ended Fiscal Month, in each case, accompanied by such supporting detail and documentation as shall be requested by the Required Lenders in their sole discretion;

(vi)    [reserved]; and

(vii)    any information that the Administrative Agent or the Required Lenders may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements,

instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.

(h)    the "Collateral Updates" as set forth in Section 7.13 of the DIP ABL Credit Agreement, contemporaneously with the delivery of such "Collateral Updates" under the DIP ABL Credit Agreement.

(i)    promptly, such additional financial and other information as any Agent or Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Subsection 7.1(a), 7.1(b), 7.1(c), 7.1(d), 7.2(b), 7.2(c), 7.2(d), 7.2(e), 7.2(f) or 7.2(g) may at the Borrower Representative's option be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower Representative posts such documents, or provides a link thereto on either Borrower's (or any Parent Entity's) website on the internet at the website address listed on Schedule 7.2 (or such other website address as the Borrower Representative may specify by written notice to the Administrative Agent from time to time); or (ii) on which such documents are posted on either Borrower's (or any Parent Entity's) behalf on an internet or intranet website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). Following the electronic delivery of any such documents by posting such documents to a website in accordance with the preceding sentence (other than the posting by the Borrower Representative of any such documents on any website maintained for or sponsored by the Administrative Agent), the Borrower Representative shall promptly provide the Administrative Agent notice of such delivery (which notice may be by facsimile or electronic mail) and the electronic location at which such documents may be accessed; provided that, in the absence of bad faith, the failure to provide such prompt notice shall not constitute a Default hereunder.

Delivery of any reports, information and documents under Subsection 7.1 and Subsection 7.2 as well as any such reports, information and documents pursuant to this Agreement, to the Administrative Agent and the Lenders is for informational purposes only and the Administrative Agent's and Lenders' receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrowers' compliance with any of its covenants hereunder (as to which the Administrative Agent and the Lenders are entitled to rely exclusively on the Compliance Certificates). The Administrative Agent and the Lenders shall have no responsibility or liability for the filing, timeliness or content of any report required under Subsection 7.1 or Subsection 7.2 or any other reports, information and documents required under this Agreement (aside from any report that is expressly the responsibility of the Lenders subject to the terms hereof).

7.3    Payment of Taxes. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings diligently conducted and reserves in conformity with GAAP with respect thereto have been provided on the books of the Parent Borrower or any of its Restricted Subsidiaries, as the case may be, or except to the extent that failure to do so, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

7.4    Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law. Preserve, renew and keep in full force and effect its existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole, except as otherwise permitted pursuant to Subsection 8.4 or 8.7, provided that the Parent Borrower and its Restricted Subsidiaries shall not be required to maintain any such rights, privileges or franchises and the

- 71 -

Parent Borrower's Restricted Subsidiaries shall not be required to maintain such existence, if the failure to do so would not reasonably be expected to have a Material Adverse Effect; and comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

7.5    <u>Maintenance of Property; Insurance</u>.  (i) Keep all property necessary in the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole, in good working order and condition except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (ii) use commercially reasonable efforts to maintain with financially sound and reputable insurance companies (or any Captive Insurance Subsidiary) insurance on, or self-insure, all property material to the business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole, in at least such amounts and against at least such risks (but including in any event public liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business; (iii) furnish to the Administrative Agent, upon written request, information in reasonable detail as to the insurance carried; (iv) use commercially reasonable efforts to maintain property and liability policies that provide that in the event of any cancellation thereof during the term of the policy, either by the insured or by the insurance company, the insurance company shall provide to the secured party at least 30 days prior written notice thereof, or in the case of cancellation for non-payment of premium, 10 days prior written notice thereof; (v) in the event of any material change in any of the property or liability policies referenced in the preceding clause (iv), use commercially reasonable efforts to provide the Administrative Agent with at least 30 days prior written notice thereof; and (vi) use commercially reasonable efforts to ensure that subject to the ABL/Term Loan Intercreditor Agreement at all times the Collateral Agent for the benefit of the Secured Parties, shall be named as an additional insured with respect to liability policies maintained by each Borrower and each Subsidiary Guarantor and the Collateral Agent for the benefit of the Secured Parties, shall be named as loss payee with respect to the property insurance maintained by each Borrower and each Subsidiary Guarantor.

7.6    <u>Inspection of Property; Books and Records; Discussions</u>.  (a) In the case of the Parent Borrower, keep proper books and records in a manner to allow financial statements to be prepared in conformity with GAAP consistently applied in respect of all material financial transactions and matters involving the material assets and business of the Parent Borrower and its Restricted Subsidiaries, taken as a whole.

(b)    Representatives of the Administrative Agent and the Lenders may (x) carry out, at Borrowers' expense, and the Loan Parties shall cooperate with (i) one investigation and review of each Loan Party's property at the reasonable expense of the Loan Parties (including field audits conducted by the Administrative Agent and the Lenders) (each, a "<u>Field Examination</u>"), (ii) one liquidation valuation, and (iii) one Inventory appraisal, in each case, that shall be in form and detail and from third-party field examiners, appraisers or liquidators reasonably acceptable to the Administrative Agent or Required Lenders, as applicable; provided that after the occurrence and during the continuance of any Event of Default the Administrative Agent or the Lenders may cause such additional Field Examinations,  liquidation valuations and Inventory appraisals to be taken for each of the Loan Parties as the Required Lenders in their discretion determines are necessary or appropriate (each, at the expense of the Loan Parties) and (y) inspect, audit and make extracts from the Parent Borrower's or other Loan Parties' books and records, and discuss with its officers, employees, agents, advisors, independent accountants, financial advisors, restructuring advisors, sales consultants, investment bankers and other consultants such Parent Borrower's or Loan Parties' business, financial condition, assets (including Inventory and credit card receivables), prospects and results of operations. Notwithstanding anything to the contrary in this <u>Subsection 7.6</u>, none of the Borrowers or any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i)

- 72 -

in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any binding agreement or (ii) that is subject to attorney client or similar privilege or constitutes attorney work product.

(c)        The Borrowers shall reimburse Administrative Agent and the Lenders for all charges, costs and expenses of Administrative Agent and the Lenders, as applicable, in connection with visits and inspections of the properties of any Loan Party, examinations, valuations, inspections and audits of any Loan Party's books and records, Field Examinations, appraisals or valuations of Inventory and any other financial or Collateral matters as Administrative Agent or the Required Lenders deem appropriate, as frequently as required by the Administrative Agent or the Required Lenders in their discretion (which may include, not more than twice per month, updated inventory appraisals and liquidation valuations). The Loan Parties shall pay the Administrative Agent's and Lender's, as applicable, then standard charges for each day that an employee of the Administrative Agent, Lender or its respective Affiliates is engaged in any examination activities, and shall pay the standard charges of the Administrative Agent's or Lender's, as applicable, internal appraisal group, provided that such charges are competitive with the rates of third party examiners for similar work. This Section shall not be construed to limit the Administrative Agent's or the Lenders' right to conduct examinations and/or obtain appraisals, nor to use third parties for such purposes.

(d)        promptly, such additional financial and other information as any Agent or Lender may from time to time reasonably request; and

(e)        promptly upon reasonable request from the Administrative Agent or Required Lenders calculations of Fixed GAAP Terms as reasonably requested by the Administrative Agent or the Required Lenders promptly following receipt of a written notice from the Parent Borrower electing to change the Fixed GAAP Date, which calculations shall show the calculations of the respective Fixed GAAP Terms both before and after giving effect to the change in the Fixed GAAP Date and identify the material change(s) in GAAP giving rise to the change in such calculations.

7.7    <u>Notices, Etc.</u>.  Promptly give notice to the Administrative Agent, each Lender, the Specified Ad Hoc Advisor and the Specified Crossover Holder Advisor of, or otherwise perform the following:

(a)        as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, the occurrence of any Default or Event of Default or any event or condition which could reasonably be expected to result in a Material Adverse Effect;

(b)        as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, any default or event of default under any Contractual Obligation of the Parent Borrower or any of its Restricted Subsidiaries, other than as previously disclosed in writing to the Lenders, which would reasonably be expected to have a Material Adverse Effect;

(c)        as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, the occurrence of any default or event of default under the DIP ABL Credit Agreement;

(d)        as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, any litigation, investigation or proceeding affecting the Parent Borrower or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

- 73 -

(e)    the following events, as soon as possible and in any event within 30 days after a Responsible Officer of the Parent Borrower or any of its Restricted Subsidiaries knows thereof: (i) the occurrence or expected occurrence of any Reportable Event (or similar event) with respect to any Single Employer Plan (or Foreign Plan), a failure to make any required contribution to a Single Employer Plan, Multiemployer Plan or Foreign Plan, the creation of any Lien on the property of the Parent Borrower or its Restricted Subsidiaries in favor of the PBGC, a Plan or a Foreign Plan or any withdrawal from, or the full or partial termination, ERISA Reorganization or Insolvency of, any Multiemployer Plan or Foreign Plan; or (ii) the institution of proceedings or the taking of any other formal action by the PBGC or the Parent Borrower or any of its Restricted Subsidiaries or any Commonly Controlled Entity or any Multiemployer Plan which would reasonably be expected to result in the withdrawal from, or the termination, ERISA Reorganization or Insolvency of, any Single Employer Plan, Multiemployer Plan or Foreign Plan; provided, however, that no such notice will be required under clause (i) or (ii) above unless the event giving rise to such notice, when aggregated with all other such events under clause (i) or (ii) above, would be reasonably expected to result in a Material Adverse Effect;

(f)    as soon as possible after a Responsible Officer of the Borrower Representative knows thereof, (i) any release or discharge by the Parent Borrower or any of its Restricted Subsidiaries of any Materials of Environmental Concern required to be reported under applicable Environmental Laws to any Governmental Authority, unless the Borrower Representative reasonably determines that the total Environmental Costs arising out of such release or discharge would not reasonably be expected to have a Material Adverse Effect; (ii) any condition, circumstance, occurrence or event not previously disclosed in writing to the Administrative Agent that would reasonably be expected to result in liability or expense under applicable Environmental Laws, unless the Borrower Representative reasonably determines that the total Environmental Costs arising out of such condition, circumstance, occurrence or event would not reasonably be expected to have a Material Adverse Effect, or would not reasonably be expected to result in the imposition of any lien or other material restriction on the title, ownership or transferability of any facilities and properties owned, leased or operated by the Parent Borrower or any of its Restricted Subsidiaries that would reasonably be expected to result in a Material Adverse Effect; and (iii) any proposed action to be taken by the Parent Borrower or any of its Restricted Subsidiaries that would reasonably be expected to subject the Parent Borrower or any of its Restricted Subsidiaries to any material additional or different requirements or liabilities under Environmental Laws, unless the Borrower Representative reasonably determines that the total Environmental Costs arising out of such proposed action would not reasonably be expected to have a Material Adverse Effect;

(g)    any loss, damage, or destruction to a significant portion of the Collateral, whether or not covered by insurance;

(h)    as soon as possible after a Responsible Officer of the Borrower Representative becomes aware thereof, any change in the information provided in a Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification, a written notice specifying any such change;

(i)    (x) as soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and all pleadings related to (1) the Chapter 11 Cases (all of which must be in form and substance reasonably satisfactory to the Required Lenders) or (2) the DIP ABL Credit Agreement and this Agreement and the credit facilities contemplated thereby, the DIP ABL Credit Facility and/or any sale contemplated in accordance

with the Required Milestones in any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders), (y) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other material notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, and (z) each report, notice or certificate required to be delivered to any of the lenders or agents under the DIP ABL Credit Agreement;

(j)     Promptly after the receipt thereof from any Rating Agency then rating the Loans, notice of any change, withdrawal, termination or "watchlisting" of any such rating;

(k)     Promptly after the receipt thereof, copies of all management letters and other material reports submitted to any of the Loan Parties or their Subsidiaries by their independent accountants in connection with any of their financial statements;

(l)     Promptly after the giving or receipt thereof, copies of all material reports, certifications, correspondence, requests or written notices, notices of default, amendments, modifications  or supplements given or received by any of the Loan Parties or their Subsidiaries under or which respect to any Material Contract;

(m)     promptly after a Responsible Officer of the Borrower Representative knows thereof, any default, event of default or termination under any material warehouse or Store lease of the Parent Borrower or any of its Restricted Subsidiaries, other than as previously disclosed in writing to the Lenders, which would reasonably be expected to have a Material Adverse Effect;

(n)     No less frequently than weekly from and after the Petition Date through the Maturity Date, hold a meeting (at a mutually agreeable location and time or telephonically) with all Lenders and management of Parent Borrower regarding the financing results, operations, compliance of the Loan Parties and developments in the Chapter 11 Cases; and

(o)     promptly upon any request of the Specified Ad Hoc Group Advisor or the Specified Crossover Holder Advisor, as applicable, hold a telephonic meeting with the Specified Ad Hoc Group Advisor or the Specified Crossover Holder Advisor, as applicable, and the Restructuring Advisor regarding the financing results, operations, other business developments and developments in the Chapter 11 Cases.

Each notice pursuant to this Subsection 7.7 shall be accompanied by a statement of a Responsible Officer of the Borrower Representative (and, if applicable, the relevant Commonly Controlled Entity or Restricted Subsidiary) setting forth details of the occurrence referred to therein and stating what action the Borrower Representative (or, if applicable, the relevant Commonly Controlled Entity or Restricted Subsidiary) proposes to take with respect thereto.

7.8     Environmental Laws.  (a)  (i) Comply substantially with, and require substantial compliance by all tenants, subtenants, contractors, and invitees with, all applicable Environmental Laws; (ii) obtain, comply substantially with and maintain any and all Environmental Permits necessary for its operations as conducted and as planned; and (iii) require that all tenants, subtenants, contractors, and invitees to obtain, comply substantially with and maintain any and all Environmental Permits necessary for their operations as conducted and as planned, with respect to any property leased or subleased from, or

- 75 -

operated by the Parent Borrower or its Restricted Subsidiaries. For purposes of this Subsection 7.8(a), noncompliance shall not constitute a breach of this covenant, provided that, upon learning of any actual or suspected noncompliance, the Parent Borrower and any such affected Restricted Subsidiary shall promptly undertake and diligently pursue reasonable efforts, if any, to achieve compliance, and provided, further, that in any case such noncompliance would not reasonably be expected to have a Material Adverse Effect.

(b)     Promptly comply, in all material respects, with all orders and directives of all Governmental Authorities regarding Environmental Laws, other than such orders or directives (i) as to which the failure to comply would not reasonably be expected to result in a Material Adverse Effect or (ii) as to which: (x) appropriate reserves have been established in accordance with GAAP; (y) an appeal or other appropriate contest is or has been timely and properly taken and is being diligently pursued in good faith; and (z) if the effectiveness of such order or directive has not been stayed, the failure to comply with such order or directive during the pendency of such appeal or contest would not reasonably be expected to have a Material Adverse Effect.

7.9    After-Acquired Real Property and Fixtures; Subsidiaries. (a)  [Reserved].

(b)     With respect to any Domestic Subsidiary that is a Wholly Owned Subsidiary created or acquired subsequent to the Closing Date by the Parent Borrower or any of its Domestic Subsidiaries, promptly notify the Administrative Agent of such occurrence and, if the Administrative Agent or the Required Lenders so request, promptly (i) execute and deliver to the Collateral Agent for the benefit of the Secured Parties such amendments to the Guarantee and Collateral Agreement as the Required Lenders shall reasonably deem necessary or reasonably advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest (as and to the extent provided in the Guarantee and Collateral Agreement) in the Capital Stock of such new Domestic Subsidiary owned directly by the Parent Borrower or any of its Domestic Subsidiaries that are Wholly Owned Subsidiaries (other than Excluded Subsidiaries), (ii) deliver to the Collateral Agent the certificates (if any) representing such Capital Stock, together with undated stock powers, executed and delivered in blank by a duly authorized officer of the parent of such new Domestic Subsidiary, and (iii) cause such new Domestic Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and (B) to take all actions reasonably deemed by the Collateral Agent to be necessary or advisable to cause the Lien created by the Guarantee and Collateral Agreement in such new Domestic Subsidiary's Collateral to be duly perfected in accordance with all applicable Requirements of Law (as and to the extent provided in the Guarantee and Collateral Agreement), including the filing of financing statements in such jurisdictions as may be reasonably requested by the Collateral Agent (at the direction of the Required Lenders) or the Required Lenders.

(c)     With respect to any Foreign Subsidiary or Domestic Subsidiary that is a Non-Wholly Owned Subsidiary created or acquired subsequent to the Closing Date by the Parent Borrower or any of its Domestic Subsidiaries that are Wholly Owned Subsidiaries, the Capital Stock of which is owned directly by the Parent Borrower or a Domestic Subsidiary that is a Wholly Owned Subsidiary, promptly notify the Administrative Agent of such occurrence and if the Administrative Agent (at the direction of the Required Lenders) or the Required Lenders so request, promptly (i) execute and deliver to the Collateral Agent a new pledge agreement or such amendments to the Guarantee and Collateral Agreement as the Required Lenders shall reasonably deem necessary or reasonably advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest (as and to the extent provided in the Guarantee and Collateral Agreement) in the Capital Stock of such new Subsidiary that is directly owned by the Parent Borrower or any Domestic Subsidiary that is a Wholly Owned Subsidiary

and (ii) to the extent reasonably deemed advisable by the Required Lenders, deliver to the Collateral Agent the certificates, if any, representing such Capital Stock, together with undated stock powers, executed and delivered in blank by a duly authorized officer of the relevant parent of such new Subsidiary and take such other action as may be reasonably deemed by the Required Lenders to be necessary or desirable to perfect the Collateral Agent's security interest therein (in each case as and to the extent required by the Guarantee and Collateral Agreement).

(d)     At its own expense, execute, acknowledge and deliver, or cause the execution, acknowledgement and delivery of, and thereafter register, file or record in an appropriate governmental office, any document or instrument reasonably necessary or deemed by the Required Lenders to be necessary or desirable for the creation, perfection and priority and the continuation of the validity, perfection and priority of the foregoing Liens or any other Liens created pursuant to the Security Documents (to the extent the Required Lenders determine, in their reasonable discretion, that such action is required to ensure the perfection or the enforceability as against third parties of its security interest in such Collateral) in each case in accordance with, and to the extent required by, the Guarantee and Collateral Agreement.

(e)     Notwithstanding anything to the contrary in this Agreement, (A) the foregoing requirements shall be subject to the terms of the ABL/Term Loan Intercreditor Agreement, and, in the event of any conflict with such terms, the terms of the ABL/Term Loan Intercreditor Agreement, shall control, (B) [reserved], (C) no Loan Party or any Affiliate thereof shall be required to take any action in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction in order to create any security interests in assets located or titled outside of the U.S. or to perfect any security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction) and (D) nothing in this Subsection 7.9 shall require that any Subsidiary grant a Lien with respect to any property or assets in which such Subsidiary acquires ownership rights to the extent that the Borrower Representative and the Required Lenders reasonably determine in writing that the costs or other consequences to Holdings or any of its Subsidiaries of the granting of such a Lien is excessive in view of the benefits that would be obtained by the Secured Parties.

7.10    Use of Proceeds.  Use the proceeds of the Term Loans only for the purposes set forth in Subsection 5.16.

7.11    Ratings.  The Borrowers shall use commercially reasonable efforts to, prior to the entry of the Final Order, obtain, and at all times thereafter, maintain, the ratings of the Initial Term Loans by at least two Rating Agencies, which shall be Moody's and S&P, or, with the consent of the Required Lenders in the event that Moody's and/or S&P are not willing to so rate the Loans, such other Rating Agency or Rating Agencies, as applicable, in their stead as are acceptable to the Required Lenders.

7.12    Accounting Changes.  The Parent Borrower will, for financial reporting purposes, cause the Parent Borrower's and each of its Subsidiaries' Fiscal Years to end on the Saturday closest to December 31st of each calendar year; provided that the Borrower Representative may, upon written notice to the Administrative Agent and the Lenders, change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Required Lenders, in which case the Borrower Representative and the Administrative Agent will, and are hereby authorized by the Lenders to make any adjustments to this Agreement that the Borrower Representative and the Required Lenders reasonably deems are necessary in order to reflect such change in financial reporting.

7.13    Post-Closing Security Perfection.  The Borrower Representative agrees to deliver or cause to be delivered such documents and instruments, and take or cause to be taken such other actions as

may be reasonably necessary to provide the perfected security interests that are not so provided on the Closing Date, and in any event to provide such perfected security interests and to satisfy such other conditions within the applicable time periods set forth on Schedule 7.13, as such time periods may be extended by the Administrative Agent (at the direction of the Required Lenders) or the Required Lenders, in their sole discretion.

7.14    Approved Budget.

(a)    The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted hereunder). The initial Approved Budget (the "Initial Approved Budget") shall depict, on a weekly basis, cash revenues, receipts, expenses, professional fees and disbursements, inventory receipts and other items set forth therein, for the period from the Closing Date through the Maturity Date and such Initial Approved Budget shall be approved by, and be in form and substance satisfactory to, the Administrative Agent, the Required Lenders and the Crossover Holder, in each case, in their sole discretion (it being acknowledged and agreed that the Initial Approved Budget attached hereto as Annex A is approved by and satisfactory to the Administrative Agent, the Required Lenders and the Crossover Holder, in form and substance). The Approved Budget shall be updated, modified or supplemented by the Borrower from time to time with the written consent of and/or at the request of the Required Lenders and the Crossover Holder, but in any event the Approved Budget shall be updated by the Borrower not less than one time in each three (3) consecutive week period, and each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Required Lenders and the Crossover Holder, in each case, in their sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event the Required Lenders and the Crossover Holder, on the one hand, and the Loan Parties, on the other hand, cannot agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the applicable three-week period covered by the prior Approved Budget has terminated. Each Approved Budget delivered to the Administrative Agent and the Lenders shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent or any Lender. Each Approved Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable.

(b)    Commencing with the third full calendar week following the Petition Date and for each calendar week thereafter, the Borrower shall not permit: (i) Actual Inventory Levels as at the end of any week to be less than 90% of the Budgeted Inventory Levels set forth in the Approved Budget as at the end of such week, (ii) the Actual Cash Receipts, measured on a cumulative basis for any Cumulative Four Week Period or Cumulative Period then ended, in each case, to be less than 90% of the Budgeted Cash Receipts, measured on a cumulative basis for any such Cumulative Four Week Period or Cumulative Period, as applicable, or (iii) the Actual Disbursement Amount, measured on a cumulative basis for any Cumulative Four Week Period or Cumulative Period then ended, in each case, to exceed 110% of the Budgeted Disbursement Amount, measured on a cumulative basis for any such Cumulative Four Week Period or Cumulative Period, as applicable.

(c)    The Borrower shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. (New York City time) on Wednesday of each week (commencing on the Wednesday of the first full calendar week following the Petition Date) an information certificate ("Information Certificate"), in the form attached hereto as Exhibit C, and such Information

Certificate shall include such detail as is reasonably satisfactory to the Required Lenders and the Crossover Holder, signed by a Responsible Officer of the Parent Borrower certifying that (i) the Loan Parties are in compliance with the covenants contained in Subsection 7.14(b) above and (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, together with (A) a comparison for the Prior Week of the Actual Cash Receipts, the Actual Disbursement Amount, the Actual Liquidity, and the Actual Inventory Levels, in each case, on a line item by line item and a cumulative basis, for such Prior Week to the Budgeted Cash Receipts, the Budgeted Disbursement Amount, the Budgeted Liquidity and the Budgeted Inventory Levels, in each case, on a line item by line item and cumulative basis, (B) a comparison for the Cumulative Four Week Period of the Actual Cash Receipts, the Actual Disbursement Amount, the Actual Liquidity, and the Actual Inventory Levels, in each case, on a line item by line item and a cumulative basis, for such Cumulative Four Week Period to the Budgeted Cash Receipts, the Budgeted Disbursement Amount, the Budgeted Liquidity, and Budgeted Inventory Levels for such Cumulative Four Week Period, in each case, on a line item by line item and a cumulative basis, (C) a comparison for the Cumulative Period of the Actual Cash Receipts, the Actual Disbursement Amount, the Actual Liquidity and the Actual Inventory Levels, in each case, on a line item by line item and a cumulative basis, for such Cumulative Period to the Budgeted Cash Receipts, the Budgeted Disbursement Amount, the Budgeted Liquidity and Budgeted Inventory Levels for such Cumulative Period, in each case on a line item by line item and a cumulative basis, and (D) an Approved Budget Variance Report, each of which shall be prepared by the Borrower as of the last day of the Cumulative Four Week Period and the Cumulative Period (as then in effect), as applicable, and shall be in form and substance reasonably satisfactory to the Required Lenders and the Crossover Holder;

(d)     The Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein.

(e)     The Parent Borrower shall deliver to the Administrative Agent and the Lenders (i) on or before 5:00 p.m. (New York City time) on Wednesday of each week (commencing on the first Wednesday following the Petition Date) supplemental thirteen (13) week projections (the "13-Week Cash Flow Forecast") which shall depict, on a weekly basis, cash revenues, receipts, expenses, professional fees and disbursements, net cash flows, inventory receipts and other items set forth therein, for the period from the Saturday immediately following delivery of such projections through the end of such thirteen (13) period, or (ii) on or before December 10, 2018, or such later date as may be agreed to by the Required Lenders, a 12-month post-emergence liquidity forecast (with the first three months being broken out weekly). The projections delivered pursuant to this Subsection 7.14(e) shall not constitute the "Approved Budget" for any purpose hereunder.

7.15    Required Milestones.  No RSA Termination Event shall have occurred, whether or not the RSA is then in effect, and the Loan Parties shall have complied with each of the Required Milestones contained in the Orders and the RSA, as applicable.

7.16    Loan Parties' Advisors.  The Loan Parties shall continue to retain (i) the Restructuring Advisor and (ii) the Financial Advisor, and shall retain such additional advisors as may be reasonably requested by the Required Lenders and on terms and conditions satisfactory to the Required Lenders.  The Loan Parties and their representatives will fully cooperate with any such advisors and consultants (including the Restructuring Advisor and the Financial Advisor) and grant them full and complete access to the books and records of the Loan Parties.  Notwithstanding anything to the contrary in this Subsection 7.16, none of the Loan Parties will be required to disclose or permit access to any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (ii) that is subject to attorney client or similar privilege or constitutes attorney work product.

7.17    Administrative Agent's Advisors/Ad Hoc Group of Prior Lender Advisors/Crossover Holder Advisors.  The Administrative Agent, on behalf of itself and the Lenders, the Ad Hoc Group of Prior Lender Advisors, on behalf of itself, the Crossover Holder and the Prior Lenders, shall each be entitled to retain or continue to retain (either directly or through counsel) any Agent's Advisors the Administrative Agent may deem necessary, any Ad Hoc Group Advisors the Ad Hoc Group of Prior Lenders may deem necessary and any Crossover Holder Advisors the Crossover Holder may deem necessary, to provide advice, analysis and reporting for the benefit of the Administrative Agent and some or all of the Lenders.  The Loan Parties shall pay all fees and expenses of each Agent's Advisor, each Ad Hoc Group Advisor and each Crossover Holder Advisor, and all such fees and expenses shall constitute Obligations and be secured by the Collateral.  The Loan Parties and their advisors, including the Restructuring Advisor and the Financial Advisor, shall grant access to, and cooperate in all respects with, the Administrative Agent, the Collateral Agent, the Crossover Holder, the Lenders, Agent's Advisors, the Ad Hoc Group Advisors, the Crossover Holder Advisors and any other representatives of the foregoing and provide all information that such parties may request in a timely manner.

7.18    Additional Bankruptcy Matters.  Promptly provide the Administrative Agent, the Lenders, the Specified Ad Hoc Committee Advisor and the Specified Crossover Holder Advisor with updates of any material developments in connection with the Loan Parties' reorganization efforts under the Chapter 11 Cases, whether in connection with the sale of all or substantially all of Parent Borrower's and the Loan Parties' assets, the marketing of the Parent Borrower's and the Loan Parties' assets, the formulation of a bidding procedure, auction plan, and documents related thereto, or otherwise. Without limiting the foregoing, promptly upon any such information becoming available to the Loan Parties, each Loan Party shall provide the Administrative Agent, the Lenders, the Specified Ad Hoc Committee Advisor and the Specified Crossover Holder Advisor with copies of any informational packages provided to potential bidders, a status report (upon request of the Administrative Agent, a Lender, the Specified Ad Hoc Committee Advisor or the Specified Crossover Holder Advisor) and updated information relating to the sale of assets, and copies of all drafts of proposed sale documentation, any such bids and any updates, modifications or supplements to such information and materials.

7.19    Debtor-In-Possession Obligations.  The Loan Parties shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Court.

7.20    Sale Transaction.  Promptly upon any Debtor's receipt thereof, each Loan Party shall provide the Administrative Agent and the Lenders with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to any sale of all or substantial all of the Debtors' assets and copies of any such bids and any updates, modifications or supplements to such information and materials.

7.21     <u>KYC Information</u>.  Promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

7.22     <u>Anti-Corruption Laws; Sanctions</u>.  Conduct its businesses in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other applicable anti-corruption legislation in other jurisdictions and with all applicable Sanctions, and maintain policies and procedures designed to promote and achieve compliance with such laws and Sanctions.

SECTION 8

<u>Negative Covenants</u>

The Parent Borrower hereby agrees that, from and after the Closing Date until payment in full of the Term Loans, all other Term Loan Facility Obligations and Prior Lender Obligations, the Parent Borrower shall not and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

8.1     <u>Limitation on Indebtedness</u>.  Directly or indirectly create, incur, assume or otherwise become directly or indirectly liable with respect to any Indebtedness except for the following (collectively, "<u>Permitted Indebtedness</u>"):

(a)     Indebtedness of the Parent Borrower and any of its Subsidiaries (i) under the Loan Documents or (ii) consisting of the Prior Lender Obligations;

(b)     Indebtedness (i) under the Pre-Petition Senior Notes in an aggregate principal amount not to exceed $270,000,000.00, (ii) under the Pre-Petition ABL Credit Agreement in an aggregate principal amount not to exceed $42,500,000.00, provided that the Indebtedness under the Pre-Petition ABL Credit Agreement is subject to the ABL/Term Loan Intercreditor Agreement and (iii) Indebtedness under the DIP ABL Credit Agreement, in the aggregate not to exceed $125,000,000.00 (inclusive of Indebtedness as described in clause (n) below) in principal at any time outstanding, plus the amount of any interest and fees, provided that the Indebtedness under the DIP ABL Credit Agreement is subject to the Orders, the ABL/Term Loan Intercreditor Agreement and the Intercreditor Acknowledgment;

(c)     Indebtedness listed on <u>Schedule 8.1</u> (which Schedule shall include all intercompany Indebtedness outstanding on the date hereof); provided that, there shall be no extensions, renewals, modifications, restatement or replacements in connection therewith that shall increase the amount of such Indebtedness;

(d)     Guarantee Obligations of the Parent Borrower and its Restricted Subsidiaries in respect of Indebtedness of the Parent Borrower or any Restricted Subsidiary otherwise permitted hereunder; provided that (i) such Guarantee Obligation shall be subordinated in right of payment to the Guarantee of the Obligations and (ii) no Guarantee by any Restricted Subsidiary of any Indebtedness of a Loan Party shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations;

(e)     Indebtedness of the Parent Borrower or any Restricted Subsidiary owing to the Parent Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by <u>Subsection 8.9</u>; provided that all such Indebtedness of any Loan Party owed to any

- 81 -

Restricted Subsidiary that is not a Loan Party shall be subject to a subordination agreement in form and substance satisfactory to the Required Lenders;

(f)    other Indebtedness (including Capitalized Leases); provided that the aggregate principal amount of such Indebtedness shall not exceed $250,000 in the aggregate;

(g)    Indebtedness in respect of Hedging Agreements incurred in the ordinary course of business and not for speculative purposes;

(h)    Indebtedness in respect of arrangements under any Bank Product Agreements or in connection with any Bank Product and netting services, ACH arrangements, overdraft protections and similar arrangements in each case in connection with deposit accounts incurred in the ordinary course;

(i)    Indebtedness consisting of (a) the financing of insurance premiums or (b) take or pay obligations entered into in the ordinary course of business;

(j)    Indebtedness Incurred by the Parent Borrower or any of its Restricted Subsidiaries in respect of letters of credit, bank guarantees, banker's acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(k)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Parent Borrower or any of its Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(l)    Guarantee Obligations of the Parent Borrower or any Restricted Subsidiary in connection with the provision of credit card payment processing services;

(m)    (i) unsecured Indebtedness in respect of obligations of the Parent Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of the Parent Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(n)    Indebtedness in respect of letters of credit in an aggregate maximum face amount not to exceed $[_____]; provided that such Indebtedness is reflected in the Approved Budget;

(o)    Indebtedness arising from the honoring of a check, draft or similar instrument against insufficient funds and which is extinguished within five Business Days of its incurrence;

(p)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (o) above; and

(q)    the accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Subsection 8.1.

Notwithstanding any of the foregoing, and except for the Carve-Out, no Indebtedness permitted under this Section 8.1 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the superpriority administrative expense claims of (i) the Agents and the Lenders and (ii) the Prior Agent and the Prior Lenders, in each case, as set forth herein and in the applicable Order, other than, solely with respect to Collateral that is not Term Loan Priority Collateral, (x) Indebtedness under the Pre-Petition ABL Credit Agreement permitted under Subsection 8.1(b)(ii)) and (y) Indebtedness under the DIP ABL Credit Agreement permitted under Section 8.1(b)(iii).

For purposes of determining compliance with this Subsection 8.1, in the event that any Indebtedness (including Guarantee Obligations) meets the criteria of more than one of the types of Indebtedness (including Guarantee Obligations) described in clauses (a) through (x) above or any related subclauses, the Borrower Representative, in its sole discretion, shall classify such item of Indebtedness and may include the amount and type of such Indebtedness in one or more of such clauses or subclauses (including in part under one such clause or subclause and in part under another such clause or subclause). Furthermore, for purposes of this definition, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness), on the date that such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount or, if issued with original issue discount, the aggregated accreted value (whichever is higher) of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing.

8.2    Limitation on Restricted Payments.  Declare or pay any Restricted Payment, except that:

(a)    each Restricted Subsidiary may make Restricted Payments to the Parent Borrower and to another Loan Party (other than Holdings, DB Parent and Investor);

(b)    the Borrowers may declare and make any Restricted Payment payable solely in the Capital Stock (other than Disqualified Stock) of such Person; and

(c)    the Parent Borrower and its Restricted Subsidiaries may make Restricted Payments to Holdings:

(i)    the proceeds of which will be used to pay the portion of any consolidated, combined or similar income tax liability attributable to the income of the Borrower or its Subsidiaries; provided that no such payments shall exceed the income tax

liability that would have been imposed on the Borrower and/or the applicable Subsidiaries had such entity(ies) paid such taxes on a stand-alone basis;

(ii)     the proceeds of which shall be used to pay such equity holder's operating costs and expenses incurred in the ordinary course of business, other overhead costs and expenses and fees (including administrative, legal, accounting and similar expenses provided by third parties as well as trustee, directors and general partner fees) which are reasonable and customary and incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries (including any reasonable and customary indemnification claims made by directors or officers of Parent Entity attributable to the direct or indirect ownership or operations of the Borrower and its Subsidiaries) and fees and expenses otherwise due and payable by the Borrower or any Restricted Subsidiary and permitted to be paid by the Borrower or such Restricted Subsidiary under this Agreement not to exceed $500,000, over the term of this Agreement and solely to the extent such amounts are included in the Approved Budget; and

(iii)     the proceeds of which shall be used to pay franchise and excise taxes, and other fees and expenses, required to maintain its existence.

8.3     <u>Limitation on Restrictive Agreements</u>.  Enter into with any Person any agreement which prohibits or limits the ability of the Parent Borrower or any of its Restricted Subsidiaries that are Loan Parties to create, incur, assume or suffer to exist any Lien in favor of the Lenders in respect of obligations and liabilities under this Agreement or any other Loan Documents upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than:

(a)     restrictions and conditions imposed by (A) applicable law, rule, regulation or order, or required by any regulatory authority having jurisdiction over the Parent Borrower or any Restricted Subsidiary or any of their businesses, (B) any Loan Document or Pre-Petition Loan Document, (C) the Pre-Petition Senior Notes Documents, and (D) the Pre-Petition ABL Credit Agreement (and the related Pre-Petition ABL Loan Documents) or the DIP ABL Credit Agreement (and related "Loan Documents" as defined in the DIP ABL Credit Agreement);

(b)     customary restrictions and conditions existing on the Closing Date or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)     customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(d)     restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(e)     (i) any restriction by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of the Parent Borrower or any Restricted Subsidiary not otherwise prohibited by this Agreement, the RSA, or the Orders, (ii) customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Parent Borrower or any Restricted Subsidiary, (iii) customary provisions contained in agreements and instruments entered into in the ordinary course of business

- 84 -

(including but not limited to leases and licenses) or in joint venture and other similar agreements entered into in the ordinary course of business, or in shareholder, partnership, limited liability company and other similar agreements in respect of non-Wholly Owned Restricted Subsidiaries, or (iv) without limiting the Orders and the RSA, the Joint Venture Agreements not otherwise prohibited by this Agreement;

(f)    restrictions or conditions in any Indebtedness permitted pursuant to Subsection 8.12 that is incurred or assumed by Non-Loan Parties to the extent such restrictions or conditions are no more restrictive than the restrictions and conditions in the Loan Documents or, in the case of Subordinated Debt, are market terms at the time of issuance or, in the case of Indebtedness of any Non-Loan Party, are imposed solely on such Non-Loan Party and its Subsidiaries;

(g)    restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions constituting Liens permitted hereunder);

(h)    restrictions set forth on Schedule 8.3 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(i)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by Subsection 8.11 and applicable solely to such joint venture and entered into in the ordinary course of business;

(j)    negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Subsection 8.12(f), but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness;

(k)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(l)    customary net worth provisions contained in real property leases entered into by Subsidiaries of the Borrowers, so long as the Borrowers have determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligation; and

(m)    provisions restricting the granting of a security interest in intellectual property contained in licenses or sublicenses by the Borrower and its Restricted Subsidiaries of such intellectual property, which licenses and sublicenses were entered into in the ordinary course of business (in which case such restriction shall relate only to such intellectual property).

8.4    Limitation on Dispositions.  Engage in any Disposition, except:

(a)    Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Parent Borrower and its Restricted Subsidiaries;

(b)    Dispositions of inventory in the ordinary course of business;

(c)    Dispositions of property to the Parent Borrower or another Loan Party (other than Holdings, DB Parent and Investor);

(d)    Dispositions permitted (i) under <u>Subsection 8.7</u>, (ii) as Investments under <u>Subsection 8.9</u>, (iii) as Restricted Payments under <u>Subsection 8.2</u> and (iv) Liens permitted by <u>Subsection 8.6</u>;

(e)    Dispositions of Cash Equivalents and Temporary Cash Investments for cash, Cash Equivalents or Temporary Cash Investments in the ordinary course of business;

(f)    leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(g)    transfers of property subject to Recovery Event upon receipt of the net proceeds of such Recovery Event;

(h)    dispositions of obsolete Equipment in the ordinary course of business; or

(i)    the Parent Borrower and the Restricted Subsidiaries may sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof.

8.5    <u>Limitations on Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of any Borrower, whether or not in the ordinary course of business, other than:

(a)    transactions between or among the Parent Borrower and any other Loan Party (other than Holdings, DB Parent and Investor);

(b)    transactions on terms substantially as favorable to the Parent Borrower or such Restricted Subsidiary as would be obtainable by the Parent Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)    Restricted Payments permitted under <u>Subsection 8.2</u>;

(d)    loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent permitted under this <u>Section 8</u>; and

(e)    the payment of (x) customary fees to directors, officers, managers, employees, consultants and other service providers of the Parent Borrower and its Restricted Subsidiaries or Holdings, DB Parent or Investor in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries and (y) reasonable out of pocket costs to, and indemnities provided on behalf of, directors, officers, managers, employees, consultants, partners, members and other service providers of the Borrower and its Restricted Subsidiaries or any Parent Entity in the ordinary course of business to the extent attributable to the ownership or operation of the Parent Borrower and its Restricted Subsidiaries, in each case of clauses (x) and (y), solely to the extent made in accordance with the Approved Budget.

8.6    <u>Limitation on Liens</u>.  Create or suffer to exist, any Lien upon or with respect to any of their respective properties or assets, whether now owned or hereafter acquired, or assign, or permit any of their respective Restricted Subsidiaries to assign, any right to receive income, except for the following (collectively, "<u>Permitted Liens</u>"):

(a)    Liens granted by the Orders and created pursuant to the Loan Documents to secure the Obligations;

(b)    Liens existing on the Closing Date and disclosed on <u>Schedule 8.6</u>;

(c)    Customary Permitted Liens;

(d)    Liens in favor of lessors securing operating leases permitted hereunder;

(e)    statutory or common law Liens or rights of setoff of depository banks or securities intermediaries with respect to deposit accounts, securities accounts or other funds of the Parent Borrower or any Restricted Subsidiary maintained at such banks or intermediaries, including to secure fees and charges in connection with returned items or the standard fees and charges of such banks or intermediaries in connection with the deposit accounts, securities accounts or other funds maintained by the Parent Borrower or such Restricted Subsidiary at such banks or intermediaries (excluding any Indebtedness for borrowed money owing by the Parent Borrower or such Restricted Subsidiary to such banks or intermediaries);

(f)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Parent Borrower or its Restricted Subsidiaries in the ordinary course of business;

(g)    leases, subleases, licenses or sublicenses to or from third parties;

(h)    Liens securing the Prior Lender Obligations;

(i)    Liens securing (i) Indebtedness permitted pursuant to <u>Subsection 8.1(b)(ii)</u>; provided any such Liens are subject to the ABL/Term Loan Intercreditor Agreement and the Orders and (ii) Indebtedness permitted pursuant to <u>Subsection 8.1(b)(iii)</u>; provided any such Liens are subject to the ABL/Term Loan Intercreditor Agreement, the Intercreditor Acknowledgement and the Orders;

(j)    Deposits to merchandise vendors in connection with the production of goods, which deposits are made in accordance with the Approved Budget;

(k)    Liens in respect of cash collateral securing letters of credit permitted under <u>Subsection 8.1(n)</u>; <u>provided</u> that such cash collateral shall not exceed 105% of aggregate maximum face amount of the outstanding letters of credit; or

(l)    Deposits or other collateral to secure any Bank Products in accordance with the Orders; or

(m)    the (i) Adequate Protection Liens and (ii) Adequate Protection Superpriority Claims.

Notwithstanding the foregoing, Liens permitted under this <u>Subsection 8.6</u> (other than the Liens securing the DIP ABL Facility (solely to the extent set forth in the Orders)) shall at all times be junior and subordinate to the Liens under the Loan Documents and the applicable Order securing the Obligations.  The prohibition provided for in this <u>Subsection 8.6</u> specifically includes any effort by any Debtor, any official committee in any Chapter 11 Case or any other party in interest in the Chapter 11

Cases, as applicable, to prime or create pari passu to any claims, Liens or interests of (i) the Agents and the Lenders or (ii) for so long as the Prior Lender Obligations have not been indefeasibly paid in full in cash, the Prior Agent and the Prior Lenders, any Lien, in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected."

8.7    <u>Limitation on Fundamental Changes</u>.    Enter into any merger, consolidation or amalgamation or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or assets, except:

      (a)    any Subsidiary of the Parent Borrower may be merged, amalgamated or consolidated with or in-to the Parent Borrower; provided that the Parent Borrower shall be the continuing or surviving Person;

      (b)    any Restricted Subsidiary may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Parent Borrower; or

      (c)    any Restricted Subsidiary that is not a Loan Party may liquidate or dissolve if the Parent Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Parent Borrower and is not materially disadvantageous to the Lenders and any Restricted Subsidiary that is a Loan Party may liquidate or dissolve with the prior written consent of the Required Lenders.

8.8    <u>Limitations on Acquisitions</u>.    Acquire by purchase or otherwise all the business or assets of, or stock or other evidences of beneficial ownership of, any Person.

8.9    <u>Limitations on Investments</u>.    Make or maintain, directly or indirectly, any Investment except for Permitted Investments.

8.10    <u>Limitation on Amendments</u>.

      (a)    amend, supplement, waive or otherwise modify any of the provisions of any (x) Pre-Petition Senior Notes Documents, (y) the Pre-Petition ABL Loan Documents or the Pre-Petition Loan Documents except as permitted by the ABL/Term Loan Intercreditor Agreement, and (z) the "Loan Documents" (as defined in the DIP ABL Credit Agreement) without the prior written consent of the Required Lenders.

      (b)    Amend or modify all or any part of, or any provision of, its Organizational Documents, except for changes, amendments and modifications, either individually or in the aggregate, that are not materially adverse to the interests of the Agents and the Lenders under the Loan Documents or in the Collateral; <u>provided</u> that the applicable Loan Parties comply with all requirements under the Security Documents to the extent required in connection therewith.

8.11    <u>Limitation on Lines of Business</u>.    Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses of the same general type as those in which the Parent Borrower and its Restricted Subsidiaries are engaged in on the Closing Date or which are reasonably related thereto and any business related thereto.

8.12    <u>Limitations on Currency, Commodity and Other Hedging Transactions</u>.    Enter into any Hedging Agreement, or purchase or otherwise acquire, or enter into agreements or arrangements relating

to, any currency or commodity, except, to the extent and only to the extent, that such Hedging Agreements or other agreements or arrangements are entered into with, or such currency or commodity is purchased or otherwise acquired through, reputable financial institutions or vendors other than for purposes of speculation.

8.13    Sanctions; Anti-Corruption Laws.

(a)    Directly or indirectly, use the proceeds of any Term Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

(b)    Directly or indirectly use the proceeds of any Term Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other anti-corruption legislation in other jurisdictions.

8.14    Orders.  Notwithstanding anything to the contrary herein, use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of Paragraph 41 (*Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out)* of the Interim Order.

8.15    Prepayments of Other Indebtedness.  Other than pursuant to an order of the Court (including any Order) and in accordance with the Approved Budget, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations, the DIP ABL Obligations, the obligations under the Pre-Petition Term Loan Agreement and the obligations under the Pre-Petition ABL Credit Agreement and (ii) any payments in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases in accordance with the Approved Budget.

8.16    Repayment of Indebtedness.

(a)    Except pursuant to the Approved Budget, without express prior written consent of the Required Lenders and the Crossover Holder and pursuant to an order of the Court (including the Orders) after notice and a hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

(b)    Use any of the Loans or the proceeds thereof to make any payment with respect to, or on account of, the obligations owing under the DIP ABL Credit Agreement or otherwise deposit any proceeds of the Loans in any deposit account subject to a sweep by the DIP ABL Agent or any DIP ABL Lender.

8.17    Reclamation Claims.  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-

Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $500,000.

8.18    <u>Insolvency Proceeding Claims</u>.  Incur, create, assume, suffer to exist or permit any other super priority administrative claim which is pari passu with or senior to the claim of the Agents or the Lenders against the Debtors, except as set forth in the applicable Order.

8.19    <u>Bankruptcy Actions</u>.  Seek, consent to, or permit to exist, without the prior written consent of the Required Lenders (which consent shall constitute authorization under this Agreement), any order granting authority to take any action that is prohibited by the terms of this Agreement, the Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Order or any of the other Loan Documents.

8.20    <u>[Reserved]</u>.

## SECTION 9

### Events of Default

9.1    <u>Events of Default.</u>  Notwithstanding the provisions of Section 362 of the Bankruptcy Code to the extent provided in the applicable Order, with respect to the Debtors and without notice, application or motion, hearing before, order of the Court or any notice to any Loan Party, any of the following shall constitute an event of default:

(a)    The Borrowers shall fail to pay any principal of any Loan when due in accordance with the terms hereof (whether at stated maturity, by mandatory prepayment or otherwise); or the Borrowers shall fail to pay any interest on any Loan, or any other amount payable hereunder, within three days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document (or in any amendment, modification or supplement hereto or thereto) or which is contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any such other Loan Document, including without limitation, the Information Certificate and the Approved Budget Variance Report, shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)    Any Loan Party shall default in the payment, observance or performance of any term, covenant or agreement contained in (i) <u>Section 7</u> or (ii) <u>Section 8;</u> or

(d)    Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in clauses (a) through (c) of this <u>Subsection 9.1</u>), and such default shall continue unremedied for a period of 10 days after the earlier of (A) the date on which a Responsible Officer of the Borrower Representative becomes aware of such failure and (B) the date on which written notice thereof shall have been given to the Borrower Representative by the Administrative Agent or the Required Lenders; or

(e)    Except for defaults arising as a result of the entry into this Agreement and the DIP ABL Credit Agreement or occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party

from complying or permits any Loan Party not to comply, any Loan Party or any of its Restricted Subsidiaries shall (i) default in (x) any payment of principal of or interest on the DIP ABL Credit Agreement or any Indebtedness (excluding the Term Loans) in excess of $500,000 or (y) in the payment of any Guarantee Obligation in excess of $500,000, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created; (ii) default in the observance or performance of any other agreement or condition relating to the DIP ABL Credit Agreement or any Indebtedness (excluding the Term Loans) or Guarantee Obligation referred to in clause (i) above or contained in any instrument or agreement evidencing, securing or relating thereto (other than a failure to provide notice of a default or an event of default under such instrument or agreement or default in the observance of or compliance with any financial maintenance covenant), or any other event or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice or lapse of time if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable (an "Acceleration"; and the term "Accelerated" shall have a correlative meaning); (iii) in the case of any Indebtedness or Guarantee Obligations referred to in clause (i) above containing or otherwise requiring observance or compliance with any financial maintenance covenant, such Indebtedness or Guarantee Obligation shall have been Accelerated and such Acceleration shall not have been rescinded, or (iv) any "Event of Default" (as defined in the ABL Credit Agreement) occurs whether or not it has been cured or waived under the DIP ABL Credit Agreement; or

(f)        [reserved];

(g)        (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of either of the Parent Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is in the reasonable opinion of the Required Lenders likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA other than a standard termination pursuant to Section 4041(b) of ERISA, (v) either of the Parent Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is reasonably likely to, incur any liability in connection with a withdrawal from, or the Insolvency or ERISA Reorganization of, a Multiemployer Plan, (vi) any other event or condition shall occur or exist with respect to a Plan; provided in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could be reasonably expected to result in a Material Adverse Effect, or (vii) the PBGC purports to assert or otherwise seeks to impose any Lien on the Collateral having a priority senior to or pari passu with the Liens and the security interests granted under the Orders, the Loan Documents, the DIP ABL Credit Agreement, the Pre-Petition Loan Documents or the Prepetition ABL Loan Documents; or

(h)        One or more Post-Petition judgments or decrees shall be entered against any Debtor involving a liability (net of any insurance or indemnity payments actually received in respect thereof prior to or within 10 days from the entry thereof,) of $500,000 or more or which would operate to divest the Debtors of any material assets; or

- 91 -

(i)        (i) Any of the Security Documents shall cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party which is a party to any such Security Document shall so assert in writing or (ii) the Lien created by the Orders or any of the Security Documents shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any material portion of the Collateral (other than in connection with any termination of such Lien in respect of any Collateral as permitted hereby or by any Security Document; or

(j)        The provisions of the ABL/Term Loan Intercreditor Agreement or the Intercreditor Acknowledgment shall for any reason be revoked or invalidated in any material respect, or otherwise cease to be in full force and effect, or any Loan Party, DIP ABL Agent, any DIP ABL Lender, any agent with respect to the Pre-Petition ABL Credit Agreement, any lender under Pre-Petition ABL Credit Agreement, any other holder of subordinated debt or any Affiliate of any of the foregoing shall have commenced a suit or action, including any motion or adversary proceeding in the Chapter 11 Cases, contesting in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations or Pre-Petition Obligations for any reason shall not have the priority contemplated by this Agreement, the Pre-Petition Term Loan Agreement, the Orders, the ABL/Term Loan Intercreditor Agreement or the Intercreditor Acknowledgment, or such subordination provisions, as applicable; or

(k)        a Change of Control shall have occurred; or

(l)        Any material provision of any Pre-Petition Loan Document shall for any reason cease to be valid and binding on or enforceable against any Loan Party; or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities under the Pre-Petition Loan Documents; or any Collateral Document (as defined in the Pre-Petition Term Loan Agreement) shall for any reason cease to create a valid security interest in any Collateral (as defined in the Pre-Petition Term Loan Agreement), in each case, purported to be covered thereby or such security interest shall for any reason cease to be a perfected Lien with the status and priority provided in the Orders; or

(m)        The DIP ABL Lenders fail to fund any loans or credit extensions under the DIP ABL Credit Agreement following a request therefor by the Borrowers; or

(n)        The occurrence of any of the following in any of the Chapter 11 Cases:

(i)        the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Subsection 8.13 upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties or Prior Lenders or Prior Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders; or (D) any other action or actions adverse to (x) the Administrative Agent and Lenders or the Prior Agent and Prior Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral or (y) the Prior Agent, the Prior Lenders or their rights under the Pre-Petition Term Loan Agreement or the other Pre-Petition Loan Documents or their interest in the Collateral (as defined in the Pre-Petition Term Loan Agreement);

- 92 -

(ii)    (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and Prior Lender Obligations, or by any other Person to which the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that (A) is not acceptable to the Required Lenders in their sole discretion or (B) does not contain a provision for termination of the Term Loan Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement and the Prior Lender Obligations on or before the effective date of such plan or plans;

(iv)    (x) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order, the Final Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement and/or the other Loan Documents (including any order in respect of the Required Milestones specified herein and/or in the Orders or the RSA) without the written consent of the Required Lenders or the filing by a Loan Party of a motion for reconsideration with respect to the Interim Order, the Final Order or the Cash Management Order shall otherwise not be in full force and effect or (y) any Loan Party or any Subsidiary shall fail to comply with either Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Credit Agreement and/or the other Loan Documents,  in any material respect;

(v)    the Court's (A) entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Loan Parties of a value in excess of $500,000; (B) entry of an order terminating exclusivity having been entered (or requested, unless actively contested by the Loan Parties); or (C) failure to enter the Final Order by December 21, 2018 (or such other date as may be agreed to by the Required Lenders and fixed by the Court) permitting extensions of credit under the DIP Facility not to exceed $125,000,000 in principal amount and otherwise in form and substance reasonably satisfactory to the Required Lenders; or

(vi)    [reserved];

(vii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agents, any Lender or any of the Collateral or against the Prior Agent, any Prior Lender or any Collateral (as defined in the Pre-Petition Term Loan Agreement);

(viii)    (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale without Required Lender consent of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement and the Prior Lender Obligations at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable;

- 93 -

(ix)    the dismissal of any Chapter 11 Case or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(x)    any Loan Party shall file a motion (without consent of the Administrative Agent and the Required Lenders) seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Administrative Agent and the Required Lenders with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $500,000 or more or (D) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(xi)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Agents or any Lender or Prior Agent or any Prior Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on either the Administrative Agent or such Lender or Prior Agent or any Prior Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Agents or any Lender under the Loan Documents or the Prior Lender Obligations or Liens of the Prior Agent or Prior Lenders under the Pre-Petition Loan Documents to any other claim, or (y) have a material adverse effect on the rights and remedies of the Agents or any Lender or Prior Agent or any Prior Lender under any Loan Document or the Prior Agent or Prior Lenders under the Pre-Petition Loan Documents or the collectability of all or any portion of the Obligations under the Loan Documents or the Prior Lender Obligations;

(xii)    the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Prior Lender Obligations owing under the Pre-Petition Loan Documents;

(xiii)    the failure of any Loan Party to perform any of its obligations under the Interim Order, the Final Order, the Cash Management Order, or any order of the Court approving any Transaction or to perform in any material respect its obligations under any order of the Court approving bidding procedures;

(xiv)    the existence of any claims or charges, or the entry of any order of the Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, the DIP ABL Credit Agreement, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of

- 94 -

Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Required Lenders), whichever is in effect;

(xv)    the Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders;

(xvi)    an order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties, or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prior Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

(xvii)    any order having been entered or granted (or requested, unless actively opposed by the Loan Parties) by either the Court or any other court of competent jurisdiction materially adversely impacting the rights and interests of the Agents and the Lenders, as determined by the Required Lenders, acting reasonably, without the prior written consent of the Administrative Agent and the Required Lenders;

(xviii)    an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties;

(xix)    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent and the Required Lenders, of (i) the right to subcharge the Collateral under Section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prior Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date;

(xx)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or to the Prior Agent or the Prior Lenders with respect to the Prior Lender Obligations, or without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any Pre-Petition agent or lender that is inconsistent with the Order;

(xxi)    without the Administrative Agent's and the Required Lenders' consent, the entry of any order by the Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents and the DIP ABL Credit Agreement;

- 95 -

(xxii)   the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Prior Lender Obligations owing under the Pre-Petition Loan Documents;

(xxiii)  if, unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within 10 days;

(xxiv)  without Required Lender consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Agents' or the DIP ABL Lenders' liens and security interests; or (b) to modify or affect any of the rights of the Agent, the Lenders, the DIP ABL Agent or the DIP ABL Lenders under the Orders, the Loan Documents, or the DIP ABL Credit Agreement and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xxv)   any Loan Party or any Subsidiary thereof or any Debtor shall take any action in support of any matter set forth in this Subsection 9.1(n) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(xxvi)  any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur;

(xxvii) the occurrence of any RSA Termination Event, whether or not the RSA is then in effect, or the failure to achieve or satisfy any Required Milestone in the RSA or the Orders;

(xxviii) The occurrence of any event set forth in clauses (f) through (i) of the definition of Termination Date;

(xxix)  Failure of the Borrowers or any other Loan Party to use the proceeds of the Loans as set forth in and in compliance with the Approved Budget (subject to the variances permitted herein) and this Agreement;

(xxxi)  any material breach or failure to comply with the material terms of the Interim Order or the Final Order, as applicable; or

(xxxii) any breach or failure to comply with the Required Milestones under the Orders or the RSA.

9.2    Remedies Upon an Event of Default.   Subject to the applicable Order, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, then, the Administrative Agent may (and upon the direction of the Required Lenders (subject to Section 10) shall) terminate the Term Loan Commitments, if any, and the Loans hereunder (with accrued interest thereon) and declare all other amounts owing under this Agreement immediately become due and payable, but without affecting the Collateral Agent's Liens or the Obligations, and the Administrative Agent may, or upon the request of the Required Lenders (subject to Section 10), the Administrative Agent shall: (i)

- 96 -

terminate, reduce or restrict the right or ability of the Loan Parties to use any cash collateral; (ii) declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable, (iii) subject to the Remedies Notice Period, (A) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law or (B) take any and all actions described in the Orders; and (iv) declare that the application of the Carve-Out has occurred through the delivery of a Carve-Out Trigger Notice (as defined in each of the Orders).

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents.  Except as expressly provided above in this <u>Section 9</u>, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

9.3    <u>License; Access; Cooperation</u>.  The Collateral Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of Loan Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral in each case after the occurrence, and during the continuance, of an Event of Default. The Collateral Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and Store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that the Collateral Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral. Upon the occurrence and the continuance of an Event of Default and the exercise by the Administrative Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, Borrower shall assist the Collateral Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Collateral Agent and Required Lenders.

9.4    <u>Lift of Stay; Stay of Proceedings</u>.  Subject to the applicable Order, the Automatic Stay shall be modified and vacated to permit the Administrative Agent and Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without further notice, motion or application to, hearing before, or order from, the Court.

## SECTION 10

### The Agents and the Other Representatives

10.1    <u>Appointment</u>.  (a)  Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to or required of such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any

provision to the contrary elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except, in the case of the Administrative Agent and the Collateral Agent, those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

(b)    Each of the Agents may perform any of their respective duties under this Agreement, the other Loan Documents and any other instruments and agreements referred to herein or therein by or through its respective officers, directors, agents, employees or affiliates, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent (it being understood and agreed, for avoidance of doubt and without limiting the generality of the foregoing, that the Administrative Agent and the Collateral Agent may perform any of their respective duties under the Security Documents by or through one or more of their respective affiliates). Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section 10 shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(c)    Except for Subsections 10.5, 10.8(a), (b), (c) and (e) and (to the extent of the Borrowers' rights thereunder and the conditions included therein) 10.9, the provisions of this Section 10 are solely for the benefit of the Agents and the Lenders, and neither the Parent Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

10.2    The Agent and Affiliates.    Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity. Such person and its affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

10.3    Action by an Agent.    In performing its functions and duties under this Agreement, each Agent shall act solely as agent for the Lenders and, as applicable, the other Secured Parties, and no Agent assumes any (and shall not be deemed to have assumed any) relationship of agency or trust with or for the Parent Borrower or any of its Subsidiaries. Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact (including the Collateral Agent in the case of the Administrative Agent), and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact or counsel selected by it with reasonable care.

10.4    Exculpatory Provisions.    (a) No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Requirement of Law and shall, in such Agent's sole discretion, be accompanied by indemnity or security satisfactory to the Agent and subject to the indemnification set forth in Subsection 10.6; and

(iii)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any of its Affiliates that is communicated to or obtained by the person serving as such Agent or any of its affiliates in any capacity.

(b)     No Agent shall be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Subsection 9.2 or Subsection 11.1, as applicable) or (y) in the absence of its own bad faith, gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by any Borrower or a Lender.  The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall reasonably deem advisable or in the best interest of the Lenders.

(c)     No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, notice (including, without limitation, any Committed Loan Notice), report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents or (v) the satisfaction of any condition set forth in Section 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term as used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(d)     Each party to this Agreement acknowledges and agrees that no Agent shall have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Agent's Lien on the Collateral, other

than, in each case, as instructed by the Required Lenders or the Backstop Lenders or any of the foregoing's counsel, together with the form of such financing statement to be filed.

10.5    <u>Acknowledgement and Representations by Lenders</u>.    (a)    Each Lender expressly acknowledges that none of the Agents nor any of their officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of the Parent Borrower or any other Loan Party, shall be deemed to constitute any representation or warranty by such Agent to any Lender. Each Lender further represents and warrants to the Agents and each of the Loan Parties that it has had the opportunity to review each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof. Each Lender represents to the Agents and each of the Loan Parties that, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, it has made and will make, its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Parent Borrower and the other Loan Parties, it has made its own decision to make its Loans hereunder and enter into this Agreement and it will make its own decisions in taking or not taking any action under this Agreement and the other Loan Documents and, except as expressly provided in this Agreement, neither the Agents shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. Each Lender represents to each other party hereto that (i) it is a bank, savings and loan association or other similar savings institution, insurance company, investment fund or company or other financial institution which makes or acquires commercial loans in the ordinary course of its business and that it is participating hereunder as a Lender for such commercial purposes and (ii) it has the knowledge and experience to be and is capable of evaluating the merits and risks of being a Lender hereunder. Each Lender acknowledges and agrees to comply with the provisions of <u>Subsection 11.6</u> applicable to the Lenders hereunder.

(b)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Term Loan Commitments.

(c)    The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Term Loan Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Term Loan Commitments for an amount less than the amount being paid for an interest in the Loans or the Term Loan Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

10.6    <u>Indemnity; Reimbursement by Lenders.</u>    (a)    Whether or not the transactions contemplated hereby are consummated, to the extent that the Parent Borrower or any other Loan Party for any reason fails to indefeasibly pay any amount required under <u>Subsection 11.5</u> to be paid by it to the Administrative Agent (or any sub-agent thereof), or the Collateral Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay ratably according to their respective Term Credit Percentages on the date on which the applicable unreimbursed expense or indemnity payment is sought under this <u>Subsection 10.6</u> such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or the Collateral Agent (or any sub-agent thereof), or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or the Collateral Agent (or any subagent thereof) in connection with such capacity, which shall include, without limitation, the initial syndication of the Term Loans and any future syndication of the Term Loans. The obligations of the Lenders under this <u>Subsection 10.6</u> are subject to the provisions of <u>Subsection 4.8.</u>

(b)    Any Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document (except actions expressly required to be taken by it hereunder or under the Loan Documents) unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

(c)    All amounts due under this <u>Subsection 10.6</u> shall be payable not later than three Business Days after demand therefor. The agreements in this <u>Subsection 10.6</u> shall survive the payment of the Loans and all other amounts payable hereunder, or the earlier resignation or removal of an Agent.

10.7    <u>Right to Request and Act on Instructions; Reliance.</u>    (a) Each Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents an Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the requesting Agent shall be absolutely entitled as between itself and the Lenders to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Lender for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of an Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement which may be delivered by electronic transmission (including e-mail) by such Lenders or Required Lenders, Crossover Lender (or its counsel, which, on the date hereof, is Paul, Weiss, Rifkind, Wharton & Garrison LLP), or Ad Hoc Group of Prior Lenders (or their counsel, which, on the date hereof, is Jones Day)) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), an Agent shall have no obligation to any Lender to take any action if it believes, in good faith, that such action would violate applicable law or exposes an Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of <u>Subsection 10.6.</u>

(b)    Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other

distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

(c)    In no event shall any Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that such Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

10.8    <u>Collateral Matters</u>.  (a)  Each Lender authorizes and directs the Administrative Agent and the Collateral Agent at the direction of the Required Lenders to enter into the Security Documents and the ABL/Term Loan Intercreditor Agreement for the benefit of the Lenders and the other Secured Parties. Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Administrative Agent, Collateral Agent or the Required Lenders in accordance with the provisions of this Agreement, the Security Documents, the ABL/Term Loan Intercreditor Agreement, any Intercreditor Acknowledgement or any agreement required in connection with the exercise by the Agents or the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any applicable Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents, though the Collateral Agent shall have no obligation to take such actions. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Term Loans unless instructed to do so by the Collateral Agent, it being understood and agreed that such rights and remedies may be exercised only by the Collateral Agent acting at the direction of the Required Lenders.  The Collateral Agent at the direction of the Required Lenders may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any guarantee by any Subsidiary (including extensions beyond the Closing Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Closing Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

(b)    The Lenders hereby authorize each Agent, (A) to release any Lien granted to or held by such Agent upon any Collateral (i) upon termination of the Term Loan Commitments and

payment and satisfaction of all of the Term Loan Facility Obligations under the Loan Documents at any time arising under or in respect of this Agreement or the Loan Documents or the transactions contemplated hereby or thereby that are then due and unpaid (as confirmed prior thereto by the Required Lenders), (ii) constituting property being sold or otherwise disposed of (to Persons other than a Loan Party) upon the sale or other disposition thereof in a transaction not prohibited by this Agreement (as confirmed prior thereto by the Required Lenders), (iii) if approved, authorized or ratified in writing by the Required Lenders (or such greater amount, to the extent required by Subsection 11.1) or (iv) as otherwise may be expressly provided in the relevant Security Documents and (B) at the written request of the Borrower Representative to subordinate any Lien on any property granted to or held by such Agent, as the case may be under any Loan Document to the holder of any Permitted Lien. Upon request by any Agent, at any time, the Lenders will confirm in writing any Agent's authority to release particular types or items of Collateral pursuant to this Subsection 10.8. The Parent Borrower shall deliver to the Agents and the Lenders a certificate of a Responsible Officer certifying that the execution and delivery of any such release documents are authorized and permitted under the Loan Documents, and the Agents may conclusively rely on such certification without further inquiry.

(c)     No Agent shall have any obligation whatsoever to the Lenders to assure that the Collateral exists or is owned by the Parent Borrower or any of its Restricted Subsidiaries or is cared for, protected or insured or that the Liens granted to any Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Agents in this Subsection 10.8 or in any of the Security Documents, it being understood and agreed by the Lenders that in respect of the Collateral, or any act, omission or event related thereto, each Agent may act in any manner it may deem appropriate, in its sole discretion, given such Agent's own interest in the Collateral as a Lender and that no Agent shall have any duty or liability whatsoever to the Lenders, except for its bad faith, gross negligence or willful misconduct (as determined by a final non-appealable judgment of a court of competent jurisdiction).

(d)     Notwithstanding any provision herein to the contrary, any Security Document may be amended (or amended and restated), restated, waived, supplemented or modified as contemplated by and in accordance with either Subsection 11.1 or 11.18, as applicable, with the written consent of the Agent party thereto, at the direction of the Required Lenders, and the Loan Party party thereto.

(e)     The Collateral Agent may, and hereby does, appoint the Administrative Agent as its agent for the purposes of holding any Collateral and/or perfecting the Collateral Agent's security interest therein and for the purpose of taking such other action with respect to the collateral as such Agents may from time to time agree.

10.9    Successor Agent. Subject to the appointment of a successor as set forth herein, (i) the Administrative Agent or the Collateral Agent may be removed by the Borrower Representative or the Required Lenders if the Administrative Agent, the Collateral Agent or a controlling affiliate of the Administrative Agent or the Collateral Agent is a Defaulting Lender and (ii) the Administrative Agent and the Collateral Agent may resign as Administrative Agent or Collateral Agent, respectively, in each case upon ten days' notice to the Administrative Agent, the Collateral Agent, the Lenders and the Borrower Representative, as applicable. If the Administrative Agent or the Collateral Agent shall be removed by the Borrower Representative or the Required Lenders pursuant to clause (i) above or if the Administrative Agent or the Collateral Agent shall resign as Administrative Agent or Collateral Agent, as

applicable, under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which such successor agent shall be subject to approval by the Borrower Representative; provided that such approval by the Borrower Representative in connection with the appointment of any successor Administrative Agent shall only be required so long as no Event of Default has occurred and is continuing; provided further, that the Borrower Representative shall not unreasonably withhold its approval of any successor Administrative Agent if such successor is a commercial bank with a consolidated combined capital and surplus of at least $5.0 billion. Upon the successful appointment of a successor agent, such successor agent shall succeed to the rights, powers and duties of the Administrative Agent or the Collateral Agent, as applicable, and the term "Administrative Agent" or "Collateral Agent", as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Administrative Agent or Collateral Agent, as applicable, shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Term Loans. After any retiring Agent's resignation or removal as Agent, the provisions of this Section 10 (including Subsection 10.9) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower Representative and such successor.

10.10    [Reserved].

10.11    [Reserved].

10.12    [Reserved].

10.13    Administrative Agent May File Proofs of Claim.    In case of the pendency of any voluntary or involuntary bankruptcy, reorganization, insolvency or liquidation proceeding or other similar proceeding, Bail-In Action or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) at the direction of the Required Lenders is hereby authorized by the Lenders, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Subsections 4.5 and 11.5) allowed in such judicial proceeding;

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Subsections 4.5 and 11.5.

- 104 -

SECTION 11

Miscellaneous

11.1    <u>Amendments and Waivers</u>. (a) Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, supplemented, modified or waived except in accordance with the provisions of this <u>Subsection 11.1</u>. With the acknowledgement of the Administrative Agent, the Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent shall (subject to Section 10), from time to time, (x) enter into with the respective Loan Parties hereto or thereto, as the case may be, written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or to the other Loan Documents or changing, in any manner the rights or obligations of the Lenders or the Loan Parties hereunder or thereunder or (y) waive at any Loan Party's request, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided, however</u>, that amendments pursuant to <u>Subsections 11.1(d)</u>, <u>(e)</u> and <u>(f)</u> may be effected without the consent of the Required Lenders to the extent provided therein; <u>provided further</u>, that no such waiver and no such amendment, supplement or modification shall:

(i)    (A) reduce or forgive the amount or extend the scheduled date of maturity of any Loan or of any scheduled installment thereof (including extending any Maturity Date), (B) reduce the stated rate of any interest, commission or fee payable hereunder (other than as a result of any waiver of the applicability of any post-default increase in interest rates), (C) extend the scheduled date of any payment of any Lenders' Loans or (D) change the currency in which any Loan is payable, in each case without the consent of each Lender directly and adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory repayment of the Loans of all Lenders shall not constitute an extension of the scheduled date of maturity, any scheduled installment, or the scheduled date of payment of the Loans of any Lender);

(ii)    amend, modify or waive any provision of this <u>Subsection 11.1(a)</u> or reduce the percentage specified in the definition of "Required Lenders," or consent to the assignment or transfer by the Parent Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (other than pursuant to <u>Subsection 8.2</u> or <u>11.6(a))</u>, in each case without the written consent of all the Lenders;

(iii)    release Guarantors accounting for all or substantially all of the value of the Guarantee of the Obligations pursuant to the Guarantee and Collateral Agreement, or, in the aggregate (in a single transaction or a series of related transactions), all or substantially all of the Collateral without the consent of all of the Lenders, except as expressly permitted hereby or by any Security Document (as such documents are in effect on the date hereof or, if later, the date of execution and delivery thereof in accordance with the terms hereof);

(iv)    require any Lender to make Loans having an Interest Period of longer than six months or shorter than one month without the consent of such Lender;

(v)    amend, modify or waive any provision of <u>Section 10</u> or <u>Subsection 11.5</u> (with respect to an Agent) without the written consent of the then Agents;

- 105 -

(vi)     amend, modify or waive any provision provided herein in a manner that materially and adversely effects the specifically enumerated rights of the Crossover Holder without the written consent of the Crossover Holder;

(vii)     [reserved];

(viii)     [reserved]; or

(ix)     amend, modify or waive the order of application of payments set forth in Subsection 4.4(c), 4.8(a), 2.8 or 11.7 or Section 4.1 of the ABL/Term Loan Intercreditor Agreement, in each case without the consent of each Lender directly and adversely affected thereby;

provided further that, notwithstanding and in addition to the foregoing, and in addition to Liens the Collateral Agent is authorized to release pursuant to Subsection 10.8(b).

(b)     Any waiver and any amendment, supplement or modification pursuant to this Subsection 11.1 shall apply to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, each of the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(c)     [Reserved].

(d)     Notwithstanding any provision herein to the contrary, this Agreement and the other Loan Documents may be amended (i) to cure any ambiguity, mistake, omission, defect, or inconsistency (in the good faith judgment of the Borrower) with the consent of the Borrowers and the Administrative Agent, or (ii) in accordance with Subsection 7.12, to change the financial reporting convention. The Administrative Agent hereby agrees (if requested by the Borrower Representative) to execute any amendment referred to in this clause (d) or an acknowledgement thereof.

(e)     Notwithstanding any provision herein to the contrary, this Agreement may be amended (or deemed amended) or amended and restated with the written consent of the Required Lenders, the Administrative Agent and the Borrowers (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the existing Facilities and the accrued interest and fees in respect thereof, (y) to include, as appropriate, the Lenders holding such credit facilities in any required vote or action of the Required Lenders and (z) to provide class protection for any additional credit facilities.

(f)     [Reserved].

(g)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement and/or any other Loan Document as contemplated by Subsection 11.1(a), the consent of each Lender or each affected Lender, as applicable, is required and the consent of the Required Lenders at such time is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained (each such other Lender,

a "<u>Non-Consenting Lender</u>") then the Borrower Representative may, on notice to the Administrative Agent and the Non-Consenting Lender, (A) replace such Non-Consenting Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to <u>Subsection 11.6</u> (with the assignment fee and any other costs and expenses to be paid by the Borrowers in such instance) all of its rights and obligations under this Agreement to one or more assignees; <u>provided</u> that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender; <u>provided</u>, <u>further</u>, that the applicable assignee shall have agreed to the applicable change, waiver, discharge or termination of this Agreement and/or the other Loan Documents; and <u>provided</u>, <u>further</u>, that all obligations of the Borrowers owing to the Non-Consenting Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such Non-Consenting Lender concurrently with such Assignment and Acceptance or (B) so long as no Event of Default under <u>Subsection 9.1(a)</u> or <u>(f)</u> then exists or will exist immediately after giving effect to the respective prepayment, prepay the Loans and, if applicable, terminate the Term Loan Commitments of such Non-Consenting Lender, in whole or in part, subject to <u>Subsection 4.12</u>, without premium or penalty. In connection with any such replacement under this <u>Subsection 11.1(g)</u>, if the Non-Consenting Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Acceptance and/or such other documentation and (b) the date as of which all obligations of the Borrowers owing to the Non-Consenting Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such Non-Consenting Lender, then such Non-Consenting Lender shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the Borrower Representative shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Non-Consenting Lender, and the Administrative Agent shall record such assignment in the Register.

11.2    <u>Notices</u>. (a) All notices, requests, and demands to or upon the respective parties hereto to be effective shall be in writing (including telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, or, in the case of delivery by a nationally recognized overnight courier, when received, addressed as follows in the case of the Borrower Representative, the Administrative Agent and the Collateral Agent, and as set forth in <u>Schedule A</u> in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Loans:

| | |
|---|---|
| The Parent Borrower (including in its capacity as Borrower Representative | David's Bridal, Inc.<br>1001 Washington Street<br>Conshohocken, PA 19428<br>Attention: Joan Hilson<br>Facsimile: (610) 943-5019<br>Telephone: (610) 943-3889 |
| With copies (which shall not constitute notice) to: | Debevoise & Plimpton LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attention: Scott B. Selinger, Esq.<br>Facsimile: (212) 909-6836<br>Telephone: (212) 909-6000 |

The Administrative Agent/the Collateral Agent:    Cantor Fitzgerald Securities
as DIP Term Loan Agent
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Telecopier: (646) 219-1180
Attention: N. Horning (David's Bridal)
E-mail: NHorning@cantor.com


and

Cantor Fitzgerald Securities
as DIP Term Loan Agent
900 West Trade Street, Suite 725
Charlotte, North Carolina 28202
Phone: (704) 374-0574
Telecopier: (646) 390-1764
Attention: B. Young (David's Bridal)
E-mail: BYoung@cantor.com


With copies (which shall not constitute notice) to:    Shipman and Goodwin LLP
One Constitution Plaza
Hartford, CT 06117
Attention: Nathan Z. Plotkin
Telephone: (860) 251-5320
E-mail: NPlotkin@goodwin.com


and

Jones Day
250 Vesey Street
New York, New York 10281
Attention: Scott J. Greenberg
Facsimile: (212) 755-7306
Telephone: (212) 326-3830

The Crossover Holder[3]:    [OCM]
[_____]
[_____]
[_____]
Attention: [_____]
Facsimile: [_____]
Telephone: [_____]

With copies (which shall not constitute notice) to:    [_____]

---

[3] NTD: Crossover Holder notice information to be provided.

- 108 -

and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Alan Kornberg
Facsimile: (212) 373-3209
Telephone: (212) 492-0209

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Subsection 4.2, 4.4 or 4.8 shall not be effective until received.

(b)      [Reserved].

(c)      Loan Documents may be transmitted and/or signed by facsimile or other electronic means (i.e., a "pdf" or "tiff"). The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on each Loan Party, each Agent and each Lender. The Administrative Agent may also require that any such documents and signatures be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or other electronic document or signature.

(d)      Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including electronic mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent. Unless the Administrative Agent otherwise prescribes (with the Borrower Representative's consent), (i) notices and other communications sent to an e-mail address shall be deemed to have been duly made or given when delivered, provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the posting thereof.

(e)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANT THE ACCURACY OR COMPLETENESS OF MATERIALS AND/OR INFORMATION PROVIDED BY OR ON BEHALF OF THE BORROWER REPRESENTATIVE HEREUNDER (THE "BORROWER MATERIALS") OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.

- 109 -

(f)    Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower Representative and the Administrative Agent.

(g)    All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

11.3    <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of any Agent, any Lender or any Loan Party, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in the other Loan Documents (or in any amendment, modification or supplement hereto or thereto) and in any certificate delivered pursuant hereto or such other Loan Documents shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

11.5    <u>Payment of Expenses and Taxes; Indemnification</u>.  Borrowers shall, jointly and severally, reimburse Administrative Agent, the Collateral Agent, the Crossover Holder, the Ad Hoc Group of Prior Lenders and the Lenders and their respective Affiliates, for all reasonable and documented legal (including all reasonable and documented fees and expenses of Jones Day, as legal counsel to the Lenders and the Ad Hoc Group of Prior Lenders and Shipman & Goodwin LLP, as legal counsel to the Agents (and of any local or special counsel retained by any Agent, the Crossover Holder (including all reasonable and documented fees and out-of-pocket expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP), and the Ad Hoc Group of Prior Lenders in each relevant jurisdiction)), accounting, field examination, appraisal, liquidation or valuation consultant, consulting, financial advisory legal (including all reasonable and documented fees and expenses of Greenhill & Co., LLC, as financial advisor to Lenders and the Ad Hoc Group of Prior Lenders, and Moelis & Company, as financial advisor to the Crossover Holder) and other fees, costs and expenses incurred by it in connection with (a) negotiation, preparation, due diligence, syndication, execution and delivery of any Loan Documents, the Pre-Petition Loan Documents, the Interim Order and the Final Order, the RSA, the Plan of Reorganization, and the Disclosure Statement, in each case, including any amendment, waiver or other modification thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; (c) each Field Examination, inspection, audit or appraisal with respect to any Loan Party or Collateral, whether prepared by the Administrative Agent's personnel, a Lender's personnel or a third party; and (d) otherwise incurred in connection with the Loan Documents, the Pre-Petition Loan Documents, the RSA, the Chapter 11 Cases, any Plan of Reorganization, any Disclosure Statement or any exit financing to the Loan Parties upon their emergence from Chapter 11 Cases.  Borrowers shall also reimburse the Administrative Agent, the Collateral Agent, the Crossover Holder, the Ad Hoc Group of Prior Lenders and the Lenders for all reasonable and documented costs and expenses incurred by them (whether during an Event of Default or otherwise) in connection with the enforcement or preservation of any rights under this Agreement or any of the other Loan Documents (including during any workout, restructuring or negotiations in respect of Loans, Letters of Credit, Loan Documents or the transactions contemplated thereby), including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans. For the

- 110 -

avoidance of doubt, the Borrowers shall reimburse Administrative Agent, the Collateral Agent, the Lenders, the Crossover Holder, the Ad Hoc Group of Prior Lenders and their respective Affiliates for all reasonable and documented legal, accounting, appraisal, consulting, financial advisory and other fees, costs and expenses incurred in connection with the negotiation, preparation and administration of the Loan Documents, the Interim Order, and the Final Order or incurred in connection with:

(i)    amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the syndication and administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Administrative Agent, the Collateral Agent, any Lender, the Borrowers or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents, the Pre-Petition Loan Documents, the RSA, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against any Borrower or any other Person that may be obligated to Agent or the Lenders by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (b) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final non-appealable judgment of a court of competent jurisdiction);

(iii)    any attempt to enforce or prosecute any rights or remedies of Agents or any Lender against any or all of the Loan Parties or any other Person that may be obligated to the Administrative Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans prior to or during the pendency of one or more Events of Default;

(iv)    any work-out or restructuring of the Term Loan Obligations prior to or during the pendency of one or more Events of Default;

(v)    the obtaining of approval of the Loan Documents by the Court or any other court;

(vi)    the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any Successor Cases, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any Successor Cases, and general monitoring of the Chapter 11 Cases and any Successor Cases and any action, arbitration or other proceeding (whether instituted by or against any Agent, any Lender, any Loan Party, any representative of creditors of an Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of any Agent's Liens with respect to any Collateral), the Pre-Petition Loan Documents, Loan Documents or Term Loan Obligations, including any lender liability or other claims;

(vii)    efforts to (i) monitor the Loans or any of the other Term Loan Obligations, (ii) evaluate, observe or assess any of the Loan Parties or their respective affairs, (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral or (iv) settle or otherwise satisfy any taxes, charges or Liens with respect to any Collateral;

(viii)    any lien searches or request for information listing financing statements or liens filed or searches conducted to confirm receipt and due filing of financing statements and security interests in all or a portion of the Collateral; and

(ix)    including, as to each of clauses (i) through (viii) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Subsection 11.5, all of which shall be payable by Borrower to the Agents.  Without limiting the generality of the foregoing, such reasonable expenses, costs, charges and fees may include: reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, any Agent's Advisor, the Crossover Holder Advisors, any Ad Hoc Group Advisor, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal, professional or other advisory services.

All amounts reimbursable by Borrowers under this Subsection 11.5 shall constitute Obligations secured by the Collateral. The agreements in this Subsection 11.5 shall survive the termination of the Term Loan Commitments and repayment of all other Term Loan Obligations. All amounts due under this Subsection 11.5 shall be paid within ten (10) Business Days of receipt by the Parent Borrower of an invoice relating thereto. If the Borrowers fail to pay when due any amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of the Borrowers by the Administrative Agent in its discretion by charging any loan account(s) of the Borrowers, without notice to or consent from the Borrowers, and any amounts so paid shall constitute Loans hereunder.

THE BORROWERS SHALL JOINTLY AND SEVERALLY INDEMNIFY AND HOLD HARMLESS EACH AGENT, EACH LENDER (WITHOUT DUPLICATION) AND THEIR RESPECTIVE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ADVISORS, AND OTHER REPRESENTATIVES (COLLECTIVELY, THE "INDEMNITEES") AND HOLD THEM HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES AND LIABILITIES OF ANY KIND OR NATURE AND DOCUMENTED OR INVOICED OUT-OF-POCKET FEES AND EXPENSES (INCLUDING REASONABLE ATTORNEY COSTS OF ONE COUNSEL FOR THE AGENTS' INDEMNITEES AND A SEPARATE COUNSEL FOR THE LENDERS' INDEMNITEES AND, IF NECESSARY, ONE FIRM OF LOCAL COUNSEL IN EACH APPROPRIATE JURISDICTION (WHICH MAY INCLUDE A SINGLE SPECIAL COUNSEL ACTING IN MULTIPLE JURISDICTIONS) FOR ALL INDEMNITEES TAKEN AS A WHOLE (AND, IN THE CASE OF AN ACTUAL OR PERCEIVED CONFLICT OF INTEREST, WHERE THE INDEMNITEE AFFECTED BY SUCH CONFLICT INFORMS THE BORROWER REPRESENTATIVE OF SUCH CONFLICT AND THEREAFTER RETAINS ITS OWN COUNSEL, OF SUCH OTHER FIRM OF COUNSEL FOR SUCH AFFECTED INDEMNITEE)) (COLLECTIVELY, THE "LOSSES") OF ANY SUCH INDEMNITEE ARISING OUT OF OR RELATING TO ANY CLAIM OR ANY LITIGATION OR OTHER PROCEEDING (INCLUDING ANY INQUIRY OR INVESTIGATION OF THE FOREGOING) (REGARDLESS OF WHETHER SUCH INDEMNITEE IS A PARTY THERETO AND WHETHER OR NOT SUCH PROCEEDINGS ARE BROUGHT BY ANY BORROWER, ITS EQUITY HOLDERS, ITS AFFILIATES, CREDITORS OR ANY OTHER THIRD PERSON) THAT RELATES TO THE TRANSACTIONS, INCLUDING THE FINANCING CONTEMPLATED HEREBY (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES") AND ANY LOSSES THAT RELATE TO ANY ACTUAL OR ALLEGED PRESENCE

- 112 -

OR RELEASE OR THREATENED RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY THE BORROWER OR ANY RESTRICTED SUBSIDIARY OR ANY OTHER LIABILITY ARISING UNDER ENVIRONMENTAL LAW, IN EACH CASE ARISING OUT OF THE ACTIVITIES OR OPERATIONS OF ANY BORROWER OR LOAN PARTY; provided that the Borrowers shall not have any obligation hereunder to any Indemnitee any Related Party with respect to Indemnified Liabilities arising from (i) the gross negligence, bad faith or willful misconduct of any such Indemnitee any Related Party thereof, as determined by a court of competent jurisdiction in a final and non-appealable decision or (ii) claims against such Indemnitee or any Related Party brought by any other Indemnitee that do not involve claims against any Agent in its capacity as such or Cantor Fitzgerald Securities, as Lender in connection with any syndication of the Term Loans.  None of the Borrowers nor any Indemnitee shall be liable for any indirect, special, punitive or consequential damages hereunder; provided that nothing contained in this sentence shall limit the Borrowers' indemnity or reimbursement obligations under this Subsection 11.5 to the extent such indirect, special, punitive or consequential damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder. All amounts due under this Subsection 11.5 shall be payable not later than 10 days after written demand therefor. Statements reflecting amounts payable by the Loan Parties pursuant to this Subsection 11.5 shall be submitted to the address of the Borrower Representative set forth in Subsection 11.2, or to such other Person or address as may be hereafter designated by the Borrower Representative in a notice to the Administrative Agent. Notwithstanding the foregoing, except as provided in Subsection 11.5(vii) above, no Borrower shall have any obligation under this Subsection 11.5 to any Indemnitee with respect to any tax, levy, impost, duty, charge, fee, deduction or withholding imposed, levied, collected, withheld or assessed by any Governmental Authority other than any Taxes that represent losses, claims, damages, liabilities or related expenses arising from any non-Tax claim. The agreements in this Subsection 11.5 shall survive repayment of the Loans and all other amounts payable hereunder or the earlier resignation or removal of any Agent.

11.6    Successors and Assigns; Participations and Assignments.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) other than in accordance with Subsection 8.7, neither Borrower shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by either Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Subsection 11.6.

(b)    (i) Subject to the conditions set forth in Subsection 11.6(b)(ii) below, any Lender other than a Conduit Lender may, in the ordinary course of business and in accordance with applicable law, assign (other than to any natural person, DB Parent, Investor, Holdings, Parent Borrower or any of their respective Subsidiaries) to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including its Term Loan Commitments and/or Loans, pursuant to an Assignment and Acceptance) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    [reserved]; and

(B)    the Administrative Agent (such consent not to be unreasonably withheld); provided that no consent of the Administrative Agent shall be required for an assignment to a Lender or an Affiliate of a Lender or an Approved Fund.

- 113 -

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Loan Commitments or Loans under the DIP Facility, the amount of the Term Loan Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an amount of an integral multiple of $1.0 million unless the Borrower Representative (other than an assignment in connection with the primary syndication of the Term Loans or as otherwise approved by the Bankruptcy Court) and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower Representative shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent in any given case); provided that for concurrent assignments to two or more Approved Funds such assignment fee shall only be required to be paid once in respect of and at the time of such assignments;

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire;

(D)    [reserved]; and

(E)    any Term Loans acquired by the Parent Borrower or any Subsidiary shall be retired and cancelled promptly upon acquisition thereof.

For the purposes of this Subsection 11.6, the term "Approved Fund" has the following meaning: "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to clause (b)(iv) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and bound by any related obligations under) Subsections 4.10, 4.11, 4.12, 4.13 and 11.5, and bound by its continuing obligations under Subsection 11.16).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Subsection 11.6 shall, to the extent it would comply with Subsection 11.6(c), be treated for purposes

of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this <u>Subsection 11.6</u> (and any attempted assignment, transfer or participation which does not comply with this <u>Subsection 11.6</u> shall be null and void).

(iv)    The Borrowers hereby designate the Administrative Agent, and the Administrative Agent agrees, to serve as the Borrowers' agent, solely for purposes of this <u>Subsection 11.6</u>, to maintain at one of its offices in the United States a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitments, and interest and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by either Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(v)    Each Lender that sells a participation shall, acting for itself and, solely for this purpose, as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary (x) to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or (y) for either Borrower to enforce its rights hereunder. The entries in the Participant Register shall be conclusive absent manifest error, and a Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(vi)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this <u>Subsection 11.6(b)</u> and any written consent to such assignment required by this <u>Subsection 11.6(b)</u>, the Administrative Agent shall accept such Assignment and Acceptance, record the information contained therein in the Register and give prompt notice of such assignment and recordation to the Borrower Representative. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (vi).

(vii)    On or prior to the effective date of any assignment pursuant to this <u>Subsection 11.6(b)</u>, the assigning Lender shall surrender any outstanding Notes held by it all or a portion of which are being assigned. Any Notes surrendered by the assigning Lender shall be returned by the Administrative Agent to the Borrower Representative marked "cancelled".

Notwithstanding the foregoing provisions of this <u>Subsection 11.6(b)</u> or any other provision of this Agreement, if the Borrower Representative shall have consented thereto in writing in its sole discretion, the Administrative Agent shall have the right, but not the obligation, to effectuate assignments of Loans and Term Loan Commitments via an electronic settlement system acceptable to Administrative Agent and the Borrower Representative as designated in writing from time to time to the Lenders by Administrative Agent (the "<u>Settlement Service</u>").  At any time when the Administrative Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed Assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be subject to the prior written approval of the Borrower Representative and shall be consistent with the other provisions of this <u>Subsection 11.6(b)</u>.  Each assigning Lender and proposed Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loans and Term Loan Commitments pursuant to the Settlement Service. Assignments and assumptions of Loans and Term Loan Commitments shall be effected by the provisions otherwise set forth herein until the Administrative Agent notifies the Lenders of the Settlement Service as set forth herein.  The Borrower Representative may withdraw its consent to the use of the Settlement Service at any time upon notice to the Administrative Agent, and thereafter assignments and assumptions of the Loans and Term Loan Commitments shall be effected by the provisions otherwise set forth herein.

Furthermore, no Assignee, which as of the date of any assignment to it pursuant to this <u>Subsection 11.6(b)</u> would be entitled to receive any greater payment under <u>Subsection 4.10</u>, <u>4.11</u>, <u>4.12</u> or <u>11.5</u> than the assigning Lender would have been entitled to receive as of such date under such Subsections with respect to the rights assigned, shall, notwithstanding anything to the contrary in this Agreement, be entitled to receive such greater payments unless the assignment was made after an Event of Default under <u>Subsection 9.1(a)</u> or <u>(f)</u> has occurred and is continuing or the Borrower Representative has expressly consented in writing to waive the benefit of this provision at the time of such assignment.

(c)    (i)  Any Lender other than a Conduit Lender may, in the ordinary course of its business and in accordance with applicable law, without the consent of the Borrower Representative or the Administrative Agent, sell participations (other than to any natural person, Holdings, DB Parent, Investor, Parent Borrower or any of their respective Subsidiaries) to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Loan Commitments and the Loans owing to it); <u>provided</u> that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents and (D) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the second proviso to the second sentence of <u>Subsection 11.1(a)</u> and (2) directly affects such Participant. Subject to <u>Subsection 11.6(c)(ii)</u>, the Borrowers agree that each Participant shall be entitled to the benefits of (and shall have the related obligations under) <u>Subsections 4.10</u>, <u>4.11</u>, <u>4.12</u>, <u>4.13</u> and <u>11.5</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Subsection 11.6(b)</u>.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Subsection 11.7(b)</u> as though it were a Lender, <u>provided</u> that such Participant shall

be subject to Subsection 11.7(a) as though it were a Lender.  Any attempted participation which does not comply with Subsection 11.6 shall be null and void.

(ii)    No Loan Party shall be obligated to make any greater payment under Subsection 4.10, 4.11, 4.12 or 11.5 than it would have been obligated to make in the absence of any participation, unless the sale of such participation is made with the prior written consent of the Borrower Representative and the Borrower Representative expressly waives the benefit of this provision at the time of such participation. Any Participant that is not incorporated under the laws of the United States of America or a state thereof shall not be entitled to the benefits of Subsection 4.11 unless such Participant complies with Subsection 4.11(b) and provides the forms and certificates referenced therein to the Lender that granted such participation.

(d)    Any Lender, without the consent of the Borrower Representative or the Administrative Agent, may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Subsection 11.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute (by foreclosure or otherwise) any such pledgee or Assignee for such Lender as a party hereto.

(e)    No assignment or participation made or purported to be made to any Assignee or Participant shall be effective without the prior written consent of the Borrower Representative if it would require either Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction, and the Borrower Representative shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee or Participant to determine whether any such filing or qualification is required or whether any assignment or participation is otherwise in accordance with applicable law.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower Representative or the Administrative Agent and without regard to the limitations set forth in Subsection 11.6(b). Each Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any domestic or foreign bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state, federal or provincial bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance. Each such indemnifying Lender shall pay in full any claim received from each such Borrower pursuant to this Subsection 11.6(f) within 30 Business Days of receipt of a certificate from a Responsible Officer of the Borrower Representative specifying in reasonable detail the cause and amount of the loss, cost, damage or expense in respect of which the claim is being asserted, which certificate shall be conclusive absent manifest error. Without limiting the indemnification obligations of any indemnifying Lender pursuant to this Subsection 11.6(f), in the event that the indemnifying Lender fails timely to compensate each such Borrower for such claim, any Loans held by the relevant Conduit

Lender shall, if requested by the Borrower Representative, be assigned promptly to the Lender that administers the Conduit Lender and the designation of such Conduit Lender shall be void.

(g)     Notwithstanding the foregoing provisions of this <u>Subsection 11.6</u>, nothing in this <u>Subsection 11.6</u> is intended to or should be construed to limit the Borrowers' right to prepay the Term Loans as provided hereunder, including under <u>Subsection 4.4</u>.

11.7     <u>Adjustments; Set-off; Calculations; Computations</u>.    (a)  If any Lender (a "<u>Benefited Lender</u>") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff or otherwise (except pursuant to <u>Subsection 4.4</u>, <u>4.5(b)</u>, <u>4.9</u>, <u>4.10</u>, <u>4.11</u>, <u>4.12</u>, <u>4.13(d)</u>, <u>11.1(g)</u> or <u>11.6</u>)), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans owing to it, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders an interest (by participation, assignment or otherwise) in such portion of each such other Lender's Loans owing to it, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application motion or notice to, hearing before, or order from, the Court), without prior notice to the Borrower Representative, any such notice being expressly waived by the Borrower Representative to the extent permitted by applicable law, upon the occurrence of an Event of Default under <u>Subsection 9.1(a)</u> to set-off and appropriate and apply against any amount then due and payable under <u>Subsection 9.1(a)</u> by the Borrowers any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrowers. Each Lender agrees promptly to notify the Borrower Representative and the Administrative Agent after any such set-off and application made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

11.8     <u>Judgment</u>.    (a)  If, for the purpose of obtaining or enforcing judgment against any Loan Party in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this <u>Subsection 11.8</u> referred to as the "<u>Judgment Currency</u>") an amount due under any Loan Document in any currency (the "<u>Obligation Currency</u>") other than the Judgment Currency, the conversion shall be made at the rate of exchange prevailing on the Business Day immediately preceding the date of actual payment of the amount due, in the case of any proceeding in the courts of any other jurisdiction that will give effect to such conversion being made on such date, or the date on which the judgment is given, in the case of any proceeding in the courts of any other jurisdiction (the applicable date as of which such conversion is made pursuant to this <u>Subsection 11.8</u> being hereinafter in this <u>Subsection 11.8</u> referred to as the "<u>Judgment Conversion Date</u>").

(b)     If, in the case of any proceeding in the court of any jurisdiction referred to in <u>Subsection 11.8(a)</u>, there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual receipt for value of the amount due, the applicable Loan Party shall pay such additional amount (if any, but in any event not a lesser amount) as may be

necessary to ensure that the amount actually received in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of the Judgment Currency stipulated in the judgment or judicial order at the rate of exchange prevailing on the Judgment Conversion Date. Any amount due from any Loan Party under this Subsection 11.8(b) shall be due as a separate debt and shall not be affected by judgment being obtained for any other amounts due under or in respect of any of the Loan Documents.

(c)    The term "rate of exchange" in this Subsection 11.8 means the rate of exchange at which the Administrative Agent, on the relevant date at or about 12:00 noon (New York City time), would be prepared to sell, in accordance with its normal course foreign currency exchange practices, the Obligation Currency against the Judgment Currency.

11.9    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy and other electronic transmission), and all of such counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be delivered to the Borrower Representative and the Administrative Agent.

11.10    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.11    Integration.   This Agreement and the other Loan Documents represent the entire agreement of each of the Loan Parties party hereto, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any of the Loan Parties party hereto, the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

11.12    Governing Law. EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND ANY NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

11.13    Submission to Jurisdiction; Waivers.   Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party to the nonexclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have, or abstains from exercising such jurisdiction, the Supreme Court of the State of New York for the County of New York (the "New York Supreme Court"), and the United States District Court for the Southern District of New York (the "Federal District Court," and together with the New York Supreme Court, the "New York Courts") and appellate courts from either of them; provided that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking

other legal action in any other jurisdiction to realize on the Collateral or any other security for the Term Loan Facility Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this Subsection 11.13 would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment, (iii) if all such New York Courts decline jurisdiction over any Person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction and (iv) in the event a legal action or proceeding is brought against any party hereto or involving any of its assets or property in another court (without any collusive assistance by such party or any of its Subsidiaries or Affiliates), such party from asserting a claim or defense (including any claim or defense that this Subsection 11.13(a) would otherwise require to be asserted in a legal proceeding in a New York Court) in any such action or proceeding.

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower Representative, the applicable Lender or the Administrative Agent, as the case may be, at the address specified in Subsection 11.2 or at such other address of which the Administrative Agent, any such Lender and the Borrower Representative shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or (subject to clause (a) above) shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Subsection 11.13 any consequential or punitive damages.

11.14    Acknowledgements.    Each Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither any Agent nor Lender has any fiduciary relationship with or duty to such Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and Lenders, on the one hand, and such Borrower, on the other hand, in connection herewith or therewith is solely that of creditor and debtor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby and thereby among the Lenders or among such Borrower and the Lenders.

NAI-1505414932v11

11.15   <u>Waiver of Jury Trial</u>.  EACH OF THE BORROWERS, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY NOTES OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

11.16   <u>Treatment of Certain Information; Confidentiality</u>.  (a)  Each Agent and each Lender agrees to keep confidential any information (a) provided to it by or on behalf of the Parent Borrower or any of their respective Subsidiaries pursuant to or in connection with the Loan Documents or (b) obtained by such Lender based on a review of the books and records of the Parent Borrower or any of their respective Subsidiaries; <u>provided</u> that nothing herein shall prevent any Lender from disclosing any such information (i) to any Agent (or actual or prospective successor Agent) or any other Lender, (ii) to any Transferee, or prospective Transferee or any creditor or any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to either Borrower and its obligations which agrees to comply with the provisions of this <u>Subsection 11.16</u> pursuant to a written instrument (or electronically recorded agreement from any Person listed above in this clause (ii), in respect to any electronic information (whether posted or otherwise distributed on any Platform)) for the benefit of the Borrowers (it being understood that each relevant Lender shall be solely responsible for obtaining such instrument (or such electronically recorded agreement)), (iii) to its Affiliates and the employees, officers, partners, directors, agents, attorneys, accountants and other professional advisors of it and its Affiliates, <u>provided</u> that such Lender shall inform each such Person of the agreement under this <u>Subsection 11.16</u> and take reasonable actions to cause compliance by any such Person referred to in this clause (iii) with this agreement (including, where appropriate, to cause any such Person to acknowledge its agreement to be bound by the agreement under this <u>Subsection 11.16</u>), (iv) upon the request or demand of any Governmental Authority having jurisdiction over such Lender or its affiliates or to the extent required in response to any order of any court or other Governmental Authority or as shall otherwise be required pursuant to any Requirement of Law, <u>provided</u> that, other than with respect to any disclosure to any bank regulatory authority, such Lender shall, to the extent practicable and unless prohibited by any Requirement of Law, notify the Borrower Representative of any disclosure pursuant to this clause (iv) as far in advance as is reasonably practicable under such circumstances, (v) which has been publicly disclosed other than in breach of this Agreement, (vi) in connection with the exercise of any remedy hereunder, under any Loan Document or under any Interest Rate Agreement, (vii) in connection with periodic regulatory examinations and reviews conducted by the National Association of Insurance Commissioners or any Governmental Authority having jurisdiction over such Lender or its affiliates (to the extent applicable), (viii) in connection with any litigation to which such Lender (or, with respect to any Interest Rate Agreement, any Affiliate of any Lender party thereto) may be a party subject to the proviso in clause (iv) above, and (ix) if, prior to such information having been so provided or obtained, such information was already in an Agent's or a Lender's possession on a non-confidential basis without a duty of confidentiality to the Borrowers being violated. Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Acceptance, the provisions of this <u>Subsection 11.16</u> shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

(b)   Each Lender acknowledges that any such information referred to in <u>Subsection 11.16(a)</u>, and any information (including requests for waivers and amendments) furnished by the Borrowers or the Administrative Agent pursuant to or in connection with this Agreement and the other Loan Documents, may include material non-public information concerning the Borrowers, the other Loan Parties and their respective Affiliates or their respective securities. Each Lender represents and confirms that such Lender has developed compliance procedures regarding the use of material non-public information; that such Lender will handle such material non-public information in accordance with those procedures and applicable law, including United States federal and state securities laws; and that such Lender has identified to

- 121 -

the Administrative Agent a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law.

For purposes of this Subsection 11.16, "Information" means all information received from the Borrower or any Subsidiary relating to the Borrowers or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrowers or any Subsidiary, provided that, in the case of information received from the Borrowers or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Subsection 11.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(c)    The Borrowers hereby acknowledge that (i) the Administrative Agent may, but shall not be obligated to, make available to the Lenders Borrower Materials by posting the Borrower Materials on the Platform and (ii) certain of the Lenders (each, a "Public Lender") may wish to receive only information that (1) is publicly available, (2) is not material with respect to the Loan Parties for the purposes of United States federal and state securities laws or (3) constitutes information of a type that would be public available if the Loan Parties were public reporting companies (as reasonably determined by the Borrowers in good faith) (such information collectively, the "Public Side Information"). Each of the Borrowers hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that is Public Side Information and that: (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as Public Side Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in clause (a) above); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

11.17    [Reserved].

11.18    Keepwell.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Guarantee and Collateral Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Subsection 11.18 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Subsection 11.18, or otherwise under the Guarantee and Collateral Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Subsection shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor intends that this Subsection 11.18 constitute, and this Subsection 11.18 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

11.19    USA PATRIOT Act Notice.    Each Lender hereby notifies the Borrowers that pursuant to the requirements under applicable "know your customer" and anti-money laundering rules and

- 122 -

regulations, including the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") and the CDD Rule, it is required to obtain, verify, and record information that identifies each Loan Party, which information includes the name of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act and the CDD Rule, and each Borrower agrees to provide such information from time to time to any Lender.

11.20    Electronic Execution of Assignments and Certain Other Documents.    The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.21    Reinstatement.    This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Loan Party for liquidation or reorganization, should any Loan Party become insolvent or make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver and manager or trustee be appointed for all or any significant part of any Loan Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the obligations of the Borrowers under the Loan Documents, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the obligations, whether as a fraudulent preference, reviewable transaction or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the obligations of the Borrowers hereunder shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.22    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured (all such liabilities, the "Covered Liabilities"), may be subject to the Write-Down and Conversion Powers and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers to any Covered Liability arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such Covered Liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such Covered Liability;

(ii)    a conversion of all, or a portion of, such Covered Liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with

- 123 -

respect to any such Covered Liability under this Agreement or any other Loan Document; or

        (iii)     the variation of the terms of such Covered Liability in connection with the exercise of the Write-Down and Conversion Powers.

       11.23  No Additional Perfection Steps Required. Upon entry of the Interim Order and pursuant to its terms, all Liens granted by Loan Parties in favor of the Administrative Agent or the Collateral Agent, for the benefit of the Secured Parties, shall be valid, binding, enforceable and perfected first priority Liens in the Collateral, senior in priority to all other Liens (subject to the terms of the Orders and the Carve-Out), and the Administrative Agent and the Collateral Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, enter into any control agreements, or to take any other action in order to validate or perfect the Liens granted by Loan Parties to the Administrative Agent and the Collateral Agent , for the benefit of the Secured Parties, pursuant to the Loan Documents or the  Orders.  Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, each Loan Party irrevocably and unconditionally authorizes the Administrative Agent and the Collateral Agent  (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming the Administrative Agent or the Collateral Agent, for the benefit of Secured Parties, as secured party and such Loan Party as debtor, as the Collateral Agent or the Administrative Agent may require, and including any other information with respect to such Loan Party or otherwise required by part 5 of Article 9 of the UCC, or otherwise, as the Administrative Agent or the Collateral Agent may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the Closing Date.  Each Loan Party hereby ratifies and approves all financing statements naming the Administrative Agent or the Collateral Agent, for the benefit of the Secured Parties, as secured party and such Loan Party as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of the Administrative Agent or the Collateral Agent prior to the Closing Date and ratifies and confirms the authorization of the Administrative Agent and the Collateral Agent to file such financing statements (and amendments, if any).  Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, each Loan Party shall take any other actions requested by Administrative Agent or the Collateral Agent from time to time to cause the attachment, perfection and priority of, and the ability of the Administrative Agent or the Collateral Agent  to enforce, any Liens of the Secured Parties in any and all of the Collateral, including the filing of a financing statement, mortgage or the taking of delivery or control (including via any account control agreements) or by appropriate filings with the United States Patent and Trademark Office or United States Copyright Office, in accordance with the laws and regulations of the United States of America and its political subdivisions, or otherwise.  The foregoing grant of authority shall not relieve the Borrowers' of the obligation to perfect and maintain the perfection of the Collateral Agent's Liens on the Collateral.

       11.24  Orders Control. In the event of any inconsistency between the provisions of the Orders and this Agreement, the provisions of the Orders shall govern.

       11.25  Parties including the Trustees; Court Proceedings.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the bankruptcy estate of each Loan Party, and any trustee, other bankruptcy estate representative or any successor-in-interest of any Loan Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  The Liens created by the Orders, this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases  or any other bankruptcy case of any Loan Party to a

case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens under applicable law.

[SIGNATURE PAGES FOLLOW]

NAI-1505414932v11

DAVID'S BRIDAL, INC., as Parent Borrower and a Borrower

By:_____
Name:
Title:

AGENT AND LENDERS:

CANTOR FITZGERALD SECURITIES, as
Administrative Agent and Collateral Agent and a Lender


By:_____
Name:
Title:


[_____], as a Lender


By:_____
Name:
Title:


[_____], as a Lender


By:_____
Name:
Title:

<u>SCHEDULES</u>

**SCHEDULE A**

Commitments and Addresses

| Lender | Commitment |
| --- | --- |
|  |  |
| [Lenders] | $[_____] |
| **Total:** | $[_____] |

# **EXHIBIT D**

**ABL Fee Letter**


[FILED UNDER SEAL]