# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-12635 (LSS)<br><br>Joint Administration Requested |

**DECLARATION OF STEPHEN GOLDSTEIN
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING
A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Stephen Goldstein, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.    I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), the proposed investment banker for the above-captioned debtors in possession in these chapter 11 cases (collectively, the "**Company**" or the "**Debtors**") and a leading independent investment banking advisory and investment management firm, which counsels multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings and other strategic transactions.

2.    Evercore was retained by the Company in April 2018 to provide strategic advice and to assist with their restructuring efforts, which are described in detail in the *Declaration of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-12635 (LSS)<br><br>Joint Administration Requested |

**DECLARATION OF STEPHEN GOLDSTEIN
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING
A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Stephen Goldstein, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.    I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), the proposed investment banker for the above-captioned debtors in possession in these chapter 11 cases (collectively, the "**Company**" or the "**Debtors**") and a leading independent investment banking advisory and investment management firm, which counsels multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings and other strategic transactions.

2.    Evercore was retained by the Company in April 2018 to provide strategic advice and to assist with their restructuring efforts, which are described in detail in the *Declaration of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

*Joan Hilson, Executive Vice President and Chief Financial and Operating Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**").[2]

3. I submit this declaration (this "**Declaration**") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**Motion**").

4. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Company, my discussions with the Debtors' senior management, other members of the Evercore team, and the Debtors' other advisors, (ii) my review of relevant documents, (iii) information provided to me by Evercore employees working under my supervision and (iv) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein on that basis.

## Background and Qualifications

5. I joined Evercore in 2012. I have approximately 20 years of investment banking and restructuring experience. Prior to joining Evercore, I was a Managing Director in the Financial Restructuring Group of Lazard Frères & Co. and, prior to Lazard, I worked in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities. I have advised corporate clients and creditor groups in a broad range of restructuring,

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

reorganization and capital raising transactions, in traditional and distressed situations, across a diverse variety of industries.  In addition, I have substantial experience marketing, structuring, and evaluating debtor in possession financings, secured debt facilities, and exit financings.

6. Evercore is a leading independent investment banking advisory and investment management firm established in 1996.  Evercore's investment banking business includes its advisory business, which provides a range of investment banking services to multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings, and other strategic transactions.  Through its investment banking business, Evercore provides capital markets advice, underwrites securities, raises funds for financial sponsors, and offers equity research and agency-only equity securities trading for institutional investors.  Evercore's investment management business includes private equity investment, institutional asset management, and wealth management. Evercore and its affiliates serve a diverse set of clients around the world from offices in New York, Boston, Chicago, Los Angeles, Washington D.C., San Francisco, Houston, Minneapolis, Palo Alto, Menlo Park, Hong Kong, Singapore, London, Aberdeen, Mexico City, Monterrey, São Paulo, and Rio de Janeiro. Since the beginning of 2000, Evercore's corporate advisory and restructuring advisory groups have advised on over $1.8 trillion of transactions.  Evercore has been involved in numerous large and complex restructuring cases in this and other districts around the United States, including *In re Tops Holding II Corp.*, Case No. 18-22279 (Bankr. S.D.N.Y. Mar. 22, 2018); *In re Fieldwood Energy* LLC, Case No. 18-30648 (Bankr. S.D. Tex. Mar. 8, 2018); *In re Pac. Drilling S.A.*, Case No. 17-131393 (Bankr. S.D.N.Y. Jan. 26, 2018); *In re Orchard Acquisition Co., LLC (J.G. Wentworth)*, Case No. 17-12914 (Bankr. D. Del. Jan. 5, 2018); *In re Castex Energy Partners, L.P.*, Case No. 17-35835 (Bankr. S.D. Tex. Dec. 4, 2017); *In re GulfMark Offshore, Inc.*, Case

No. 17-11125 (Bankr. D. Del. June 15, 2017); *In re Vanguard Nat. Res., LLC*, Case No. 17-30560 (Bankr. S.D. Tex. Mar. 20, 2017); *In re Azure Midstream Partners, LP*, Case No. 17-30461 (Bankr. S.D. Tex. Mar. 10, 2017); *In re Altegrity, Inc.*, Case No. 15-10226 (Bankr. D. Del. March 16, 2015); and *In re Energy Future Holdings Corp.*, Case No. 14-10979 (Bankr. D. Del. Sept. 16, 2014).

### Evercore's Retention

7. In connection with this engagement, Evercore was asked to advise and assist the Company in reviewing its capital structure and exploring a range of balance sheet alternatives, including as a preferred alternative the possibility for a fully consensual out-of-court refinancing or restructuring of the Company's funded debt. In this capacity, Evercore has engaged with the Company and with numerous of its creditors, creditor representatives, and potential funding sources, and has discussed a wide variety of potential capital structure alternatives.

8. I am not being compensated specifically for this testimony other than through payments received by Evercore as a professional proposed to be retained by the Debtors. All of the Debtors' financing efforts took place in the context of their existing, highly leveraged capital structure. Substantially all of the assets of the Debtors are encumbered by security interests in favor of the agents and lenders under (a) a $125.0 million senior secured asset-based revolving credit agreement, dated as of October 11, 2012 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**"), among Debtor David's Bridal, Inc. ("**David's Bridal**"), the lenders from time to time party thereto (the "**Prepetition ABL Lenders**") and Bank of America, N.A., as issuing lender, swingline lender, administrative agent and collateral agent (in such capacity, the "**Prepetition ABL Agent**") and (b) a senior secured $520.0 million term loan credit agreement, dated as of October 11, 2012 (as amended,

supplemented or otherwise modified from time to time, the "**Prepetition Term Loan Credit Agreement**"), among David's Bridal, the lenders from time to time party thereto (the "**Prepetition Term Loan Lenders**") and Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "**Prepetition Term Loan Agent**").

### Previous Financing Exploration

9. In an earlier stage of this engagement, among other things, Evercore was asked to conduct an exploratory market analysis to determine whether the Prepetition Term Loans could be refinanced in full in the context of an entirely out-of-court recapitalization involving a consensual transaction with certain holders of Unsecured Notes. After initial discussions with numerous market participants, no actionable financing proposals were brought forward.

### The Debtors' Need for DIP Financing and the Use of Cash Collateral

10. More recently, Evercore was asked to advise and assist the Company in obtaining post-petition debtor-in-possession financing when it became apparent that the Company would need to file for bankruptcy protection in order to implement a successful reorganization. The Evercore team under my supervision has worked closely with the Company's management and other professionals retained by the Company prior to commencement of these chapter 11 cases and has become well acquainted with the Debtors' capital structure, liquidity needs and business operations.

11. Prior to commencing these chapter 11 cases, Evercore conducted a detailed analysis, together with the Debtors' other advisors, of the Debtors' operations and funding needs. The Debtors generally finance their working capital needs through a combination of cash proceeds from inventory sales and borrowings under the Prepetition ABL Credit Agreement. However, the Debtors' working capital needs typically reach a high point during the fourth

quarter of each calendar year as they begin ramping up for their peak selling season immediately after the December holidays, suggesting that postpetition operations would not be sufficient to fund the Debtors' chapter 11 cases, and the Debtors would be unable to access availability under the Prepetition ABL Credit Agreement after a bankruptcy filing.  Continued access to an asset-based lending facility (and the ability to have letters of credit issued thereunder), as well as the incremental liquidity provided by the DIP Term Loan Facility, are necessary for the Debtors to continue operating their business through confirmation of the Prepackaged Plan.

### The Debtors' Efforts to Obtain Postpetition Financing

12. Evercore and the Debtors' other advisors engaged in discussions over a period of several weeks with representatives of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders about their interest in providing postpetition financing or their willingness to consent to third-party postpetition financing.  Both groups insisted that they would not consent to any priming of their security interests as part of an outside debtor-in-possession financing.  The Debtors do not have unencumbered assets of sufficient value to support enough collateralized financing to meet the Debtors' cash needs during the chapter 11 cases.  Consequently, the only practical alternative to postpetition financing provided by the Prepetition ABL Lenders and Prepetition Term Loan Lenders would have been debt that was either (a) partially unsecured or secured by liens junior to those securing the Prepetition Term Loan Credit Agreement and the Prepetition ABL Credit Agreement, or (b) secured by senior loans on a priming basis, which priming was certain to be contested.

13. I understood that the unwillingness of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders to consent to the Debtors entering into senior loans on a priming basis would require the Debtors to prove, in order to obtain approval for such priming loans, that

the interests of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders were "adequately protected" despite the priming. I understood that the Company's ability to make the required showing would be highly uncertain as a factual matter and would almost certainly involve expensive and unpredictable litigation at the early stages of the chapter 11 cases that would be materially destabilizing to the Company's business operations.

14. After discussing the situation with the Debtors and their other advisors, and based on our market experience, Evercore was reasonably confident that junior financing would not be available in the market and that market participants would be unwilling to provide loans on a contested priming basis in light of the challenge and uncertainty of such a litigated path. Nonetheless, Evercore reached out to 10 potential funding sources to confirm whether there was, in fact, any market interest in providing debtor-in-possession financing that could be obtained without the consent of the Prepetition Term Loan Lenders and Prepetition ABL Lenders on a junior secured, unsecured, or contested priming basis. Most of the parties contacted by Evercore were unwilling to either provide junior financing or to embark on a costly priming fight over the objections of such existing lienholders, while other select parties were not responsive.

15. As a result, in parallel with overall restructuring negotiations, the Debtors continued to engage with the Prepetition Term Loan Lenders and Prepetition ABL Lenders on possibly providing postpetition financing. The resulting DIP Facilities are fully consensual and are an essential aspect of the comprehensive restructuring contemplated by the Debtors' Restructuring Support Agreement that will allow a speedy exit from these chapter 11 cases while substantially deleveraging the Company's capital structure and leaving all general unsecured creditors unimpaired.

**The DIP Financing Has Been Highly Negotiated and Is the Best Financing Available**

16. The DIP Facilities being proposed for Court approval are the result of hard-fought, arms'-length negotiations. As noted above, and as further described in the First Day Declaration, leading up to the Petition Date, the Debtors and their prepetition lenders engaged in exploratory capital structure discussions for a period of months, and engaged extensive negotiations in good faith for well over two weeks regarding the specific structure and terms of post-petition financing, culminating in the terms of the proposed DIP Facilities. Through these negotiations, the Debtors were able to materially improve the terms of the proposed DIP Financing from those originally offered, particularly in ensuring that the aggregate amount of new funding would be sufficient to meet the Debtors' cash needs, including full payment of all vendor claims in the ordinary course of business during the anticipated length of the Chapter 11 Cases.

17. Evercore has conducted a review of recent comparable debtor-in-possession financing facilities in other retail chapter 11 cases. Based on this review, my experience in the current DIP financing market, the absence of alternative proposals, and the refusal of the Prepetition ABL Lenders and Prepetition Term Loan Lenders to consent to the priming of their liens, I believe that, taken as a whole, the pricing, fees, interest rates and other terms and conditions of the proposed DIP Financing, including the roll-up of the Prepetition ABL Obligations, are fair, reasonable, and generally consistent with those received by debtors in similar circumstances and that the proposed DIP Financing is the best financing available to the Debtors under the circumstances. The roll-up of the Prepetition ABL Obligations will not adversely affect any party in interest and will benefit the Debtors because, among other things, the Prepetition ABL Obligations are oversecured.

18. Based on the DIP Budget and other information made available to me, I believe the liquidity provided under the proposed DIP Financing will enable the Debtors to maximize the value of their estate for the benefit of all stakeholders, particularly by facilitating business-as-usual operations throughout these chapter 11 cases, including payment of all vendor claims in the ordinary course of business.  Furthermore, as discussed above, I believe the DIP Financing is the best and only financing currently available to the Debtors.

19. Absent approval of the DIP Facilities, the Debtors would not have sufficient liquidity to operate their business as a going concern.  I believe that it is essential that the Debtors have committed postpetition financing at the outset of these chapter 11 cases to retain the confidence of the Debtors' customers, employees and vendors as the Debtors proceed to implement the Prepackaged Plan in accordance with the RSA.  Moreover, the approval of the proposed DIP Financing is a condition of the RSA, which will facilitate a swift reorganization of the Debtors and will permit full payment of all general unsecured creditors and significant distribution of value to unsecured bondholders, all with the affirmative support of the overwhelming majorities of the Debtors' prepetition funded debt obligations.  As such, I believe that the approval of the DIP Financing is necessary and appropriate under the circumstances.

Dated: November 19, 2018
      New York, New York

*/s/ Stephen Goldstein*
Stephen Goldstein
Senior Managing Director
Evercore Group L.L.C.

01:23878536.1