# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL INC. *et al.*, | Case No. 18-12635 (LSS) |
| | Jointly Administered |
| Debtors. | |
| | Hearing Date: 12/18/18 @ 2:00 p.m. |
| | Objections Due: 12/14/18 @ 11:00 a.m. |
| | (extended by agreement) |
| | Re: D.I. 128 |

## LIMITED OBJECTION BY VARIOUS CREDITORS TO DEBTORS' APPLICATION TO RETAIN EVERCORE GROUP L.L.C. AS INVESTMENT BANKER

Oaktree Capital Management, L.P., acting solely in its capacity as investment advisor on behalf of certain funds and accounts in its Strategic Credit, High Yield and U.S. Senior Loans strategies; Courage Capital Management, LLC, acting solely in its capacity as investment manager to certain investment funds; AlbaCore Capital LLP, acting in its capacity as delegated investment manager to AlbaCore Capital Limited as AIFM to certain funds and investment entities; and Deutsche Bank AG Cayman Islands Branch (solely with respect to the Distressed Products Group) (collectively, the "Objecting Parties") hereby object on a limited basis to the application (the "Application") of the above-captioned debtors (the "Debtors") to retain Evercore Group L.L.C. ("Evercore") as investment banker, as follows:[1]

### Preliminary Statement

1. The Objecting Parties do not object to the Debtors' retention of Evercore or contest Evercore's qualifications. Instead, the Objecting Parties object to the proposed fees to be paid to Evercore as excessive and unreasonable, and certain fee terms of the Engagement Letter do not conform to market precedents.

---
[1] Capitalized terms not defined herein are ascribed the meanings given to such terms by the Application.

2. Under the Engagement Letter, as applied to this case, the Debtors propose to compensate Evercore in three ways. First, according to Evercore, it would receive a Comprehensive Restructuring Fee of 1.0% on the amount of the Debtors' entire existing debt – not just the restructured liabilities consisting of the Credit Facilities and the Unsecured Notes. Evercore calculates the Debtors' entire debt as $819 million even though the Application's summary of the Comprehensive Restructuring Fee describes it as applying only to Credit Facilities and Unsecured Notes. *See* Application at 10. Based on Evercore's view, however, Evercore would receive $8.19 million as a Comprehensive Restructuring Fee.

3. Second, Evercore would receive an ***additional*** Financing Fee of 1.0% on the amount of any DIP facility ***and*** any exit facility. The Financing Fee is problematic in multiple aspects: (a) there is no crediting of Financing Fees against the Comprehensive Restructuring Fee; (b) Evercore asserts the right to "double dip" and earn Financing Fees on ***both*** (x) the DIP facilities themselves ***and*** (y) the roll of those facilities into exit facilities; and (c) Evercore raised no outside money in this case, so is attempting to levy fees (twice) on existing investor commitments: the $125 million ABL DIP Facility from pre-petition lender Bank of America that rolls to an ABL exit facility, and the $60 million DIP Term Loan Facility provided by the existing lenders that rolls into an exit priority term loan. As the two DIP facilities in this case sum to $185 million, and then roll to exit, under the Application, Evercore demands 2 points, or $3.70 million in Financing Fees on these existing investor liabilities. And because of the lack of crediting, the $3.70 million demand levied on rollovers or new funds from existing lenders is charged ***in addition*** to the already outsized $8.19 million Comprehensive Restructuring Fee.

4. Third, Evercore would receive monthly fees of $150,000. Fifty percent of the Monthly Fees paid after the first five months may be credited towards a Transaction Fee, but

2

only if the Court approves in full any proposed Transaction Fee and Monthly Fee. Assuming that Evercore credits the Monthly Fees, Evercore would receive $1.275 million in Monthly Fees assuming a plan effective date prior to January 31, 2018.

5. If the Application were approved as filed, therefore, Evercore would stand to receive total compensation of $13.065 million.

6. The Objecting Parties, which hold over 50% of the aggregate amount of the $481.2 million in Term Loans, submit that the proposed fees to be paid to Evercore are excessive and unreasonable under the circumstances. The Debtors' disclosure statement estimates a 70.8% recovery to Class 4, which consists of holders of $481.2 million in Term Loans, and a 4.4% recovery to Class 5, which consists of holders of $270.0 million in Unsecured Notes. These creditors, who hold the vast majority of the Debtors' debt, are taking substantial haircuts to de-leverage the Debtors' balance sheet, in addition to providing essential new capital to the business. Payment of a total of $13.065 million in fees to Evercore is not justified in these circumstances or in the marketplace.

7. Moreover, Evercore's demand for $3.70 million in Financing Fees in this case is not justified by the marketplace. Given the Comprehensive Restructuring Fee, there is no justification for additional Financing Fees when the money for the DIP facilities is either rolled over or comes from existing investors to protect the Debtors' liquidity. Nor is there any justification for the proposed "double dip" by Evercore as described earlier.

8. The Objecting Parties submit that Evercore's proposed compensation should be reduced in the following ways: (a) the Comprehensive Restructuring Fee should be reduced from 1.0% to 0.7% and calculated only on the aggregate amount of the Term Loans and the Unsecured Notes; and (b) the Financing Fees should be credited fully against the Comprehensive

Restructuring Fee. Accordingly, the Objecting Parties propose that Evercore's compensation be reduced from $13.065 million to $6.534 million ($5.259 million Comprehensive Restructuring Fee plus $1.275 million in Monthly Fees), which is still sizeable for a nine-month engagement.[2]

**Background**

9. Seven and one-half months prior to the Petition Date, the Debtors engaged Evercore under the Engagement Letter dated April 3, 2018. The Engagement Letter covered a broad list of possible investment-banker services, including undertaking a Transaction, a Comprehensive Restructuring and a Financing.

10. The Engagement Letter also provided for a broad list of possible Transaction Fees in connection with possible amendment of Credit Facilities or consummation of Exchange Offers, Comprehensive Restructuring or Financing.

11. A $150,000 Monthly Fee would be credited 50% against any Transaction Fee, but only after payment of the first five months in Monthly Fees and only if the Court approves the Transaction Fees and Monthly Fees in their entirety.

12. The Engagement Letter provided for a 1.0% Comprehensive Restructuring Fee on affected debt.

13. If Evercore earned a Comprehensive Restructuring Fee, any Financing Fee would be incremental to any such Fees and regardless whether the funds came from current or new investors. Moreover, Evercore could double dip by receiving fees for a DIP facility and then for an exit facility that satisfies the DIP facility.

---

[2] The Objecting Parties do not take issue with compensation of $1.275 million in Monthly Fees to Evercore, provided that the Comprehensive Restructuring Fee is adjusted to a reasonable amount and the Financing Fees are credited fully against the Comprehensive Restructuring Fee.

14. As disclosed in the Application, prior to the Petition Date, the Debtors paid compensation to Evercore in the amount of $3.85 million, which consists of $1.35 million in Monthly Fees and $2.50 million towards a Transaction Fee.

15. Since the Petition Date, the Debtors have paid Evercore an additional $1.85 million in Financing Fees relating to the two DIP facilities, which funds were derived from existing investors. Evercore has therefore received $5.70 million in compensation already from the Debtors.

16. As set forth in the Declaration of Joan Hilson in support of the Debtors' first-day papers (the "<u>First-Day Declaration</u>"), it was the proposal of the Ad Hoc Lender Group and Oaktree in early November that promptly led to the agreement on the plan and signing of the restructuring support agreement on November 18, 2018. *See* First-Day Decl. ¶ 44.

17. The Debtors commenced these chapter 11 cases the very next day and filed their prepackaged plan. They subsequently filed the Application seeking to retain Evercore on the same terms as set forth in the Engagement Letter.

## **Limited Objection**

18. The Application should not be approved absent a significant reduction in the fees payable to Evercore, given the circumstances of this case.

19. The Court may approve the employment of a professional on terms and conditions that satisfy the reasonableness requirement. 11 U.S.C. § 328(a); *In re Federal Mogul-Global Inc.*, 348 F.3d 390, 397 (3d Cir. 2003).

20. "[A] Bankruptcy Court need not approve or reject an application as presented but may approve an application with modified terms that the Court finds necessary to render the proposed employment reasonable." *Id.* at 398; *In re Boomerang Tube, Inc.*, 548 B.R. 69, 75

(Bankr. D. Del. 2016) (explaining that the Court may deny a retention application or modify the retention agreement if the Court finds it to be impermissible).

21. The party seeking approval of a proposed retention application has the burden to demonstrate reasonableness. *In re Metricom, Inc.*, 275 B.R. 364, 371 (Bankr. N.D. Cal. 2002).

22. Judge Rendell has considered the following factors in reviewing a retention application for reasonableness: (a) whether the professional's retention is in the best interest of the estate; (b) whether the Debtors' creditors object to the retention application; (c) the significance of the proposed relief; (d) whether the parties to the engagement agreement are sophisticated business entities with equal bargaining power and engaged in an arm's length negotiation; and (e) whether such terms are viewed as normal business terms in the marketplace. *See In re United Artists Theatre Co.*, 315 F.3d 217, 238 n.4 (3d Cir. 2003) (Rendell, J., concurring); *followed by In re Insilco Techs., Inc.*, 291 B.R. 628, 634 (Bankr. D. Del. 2003).

23. With the first factor, it is true that Evercore's retention would be in the best interest of the estate; indeed, that is why the Objecting Parties have objected only on a limited basis. It should be noted, however, that most of Evercore's work in this matter has been completed at this point. The Objecting Parties submit that this factor, while supporting the Application, should be discounted to some extent.

24. The second factor supports the view that the proposed compensation is unreasonable since the Objecting Parties hold a majority of the Term Loans, which is the fulcrum security in the Debtors' capital structure. Therefore, a substantial and pivotal group of creditors opposes the proposed compensation to Evercore. This factor should be viewed as significant

given not only the significance of the creditor opposition here but also when viewed comparably to the otherwise consensual nature of these cases.[3]

25. The third factor also suggests that the proposed compensation is unreasonable because an investment-banker fee exceeding $13 million is very significant in a case with $751.3 million in restructured debt securities. In *United Artists*, Judge Rendell viewed the indemnity provision at issue as "not particularly significant" because the financial advisor performed most of its work prior to the commencement of the bankruptcy case. 315 F.2d at 238 n.4. In contrast, in this case the proposed fees are extremely significant because the Debtors would still need to pay over $8.5 million to Evercore in a case where, under the prepackaged plan, holders of Terms Loans are taking a significant haircut and holders of Unsecured Notes are receiving a distribution of pennies on the dollar.

26. The Objecting Parties do not believe that the fourth factor supports the Application because the Engagement Letter does not appear to be result of a vigorously negotiated deal. Indeed, equity is well out of the money and will receive nothing under the prepackaged plan. Rather, it is the creditors who are the stakeholders and who have an interest in keeping Evercore's fees reasonable. Indeed, in a summer 2017 engagement letter retaining Evercore where one of the Objecting Parties was a substantial investor, the engagement letter specifically states that no financing fee shall not be payable on financing from any existing stakeholder. If the Engagement Letter in this case had been negotiated vigorously by the parties with an economic interest in the business, Evercore would never have been allowed to obtain a

---

[3] The Objecting Parties expect that Evercore will reply to this Limited Objection with a list of fee comparisons. These fee comparisons are likely to have only limited utility because, in those cases, the investment banker's fees were not opposed by creditors, let alone the substantial creditors arrayed in opposition to Evercore's proposed fees in this case.

Financing Fee in addition to the Comprehensive Restructuring Fee when Evercore brought no new money to the table.[4]

27.     Finally, the fifth factor does not support Evercore's proposed compensation because it is not reasonable in the market.  With respect to the proposed $8.19 million Comprehensive Restructuring Fee, two recent non-grocery retail cases illustrate this point.

28.     In the chapter 11 case of Rue21 Inc., filed on May 15, 2017, in the Western District of Pennsylvania, the debtor retained Rothschild Inc. as its investment banker and financial advisor.  Rothschild also received a monthly fee of $150,000, and in a case with $832 million total debt, Rothschild received a transaction fee of $4.5 million, or 54 basis points.

29.     In the chapter 11 case of Payless Inc., which filed on April 4, 2017, in the United States Bankruptcy Court for the Eastern District of Missouri, the debtor retained Guggenheim Securities as its investment banker and financial advisor.  Guggenheim likewise received a monthly fee of $150,000, and in a case with $838 million total debt, Guggenheim received a transaction fee of $7.0 million, or 84 basis points.

30.     Each of those cases took longer to conclude and involved significantly more work by the investment banker because each retailer closed a substantial number of stores while in chapter 11 – Rue21 closed 420 stores, and Payless closed 637 stores.  In contrast, as set forth in First-Day Declaration, the Debtors' stores are profitable, and since no stores are proposed to be closed in this case, the case can proceed more expeditiously, with less heavy lifting by the investment banker and with less risk.

31.     Based on the comparisons in Rue21 Inc. and Payless Inc., among others, and given the lesser scope involved in a pure balance-sheet restructuring versus a more fulsome

---

[4]  The Evercore engagement letter referenced here may not be a public document, and therefore the Objecting Parties have not described it in greater detail, but it can be provided to the Court for review *in camera*.

operational restructuring achieved through a more complex chapter 11 case, the Objecting Parties believe that 70 basis points provides for a more than reasonable Comprehensive Restructuring Fee in this case ($5.259 million).

32. With respect to the Financing Fees, the Objecting Parties contend that payment of significant Financing Fees separate from the Comprehensive Restructuring Fee is not reasonable in the market for two reasons.

33. First, the funds for the DIP facilities in this case (and presumably for the exit facilities as well) were derived from existing investors, not from new investors found by Evercore, and therefore no Financing Fee separate from the Comprehensive Restructuring Fee should be payable.[5]

34. In addition to the other Evercore engagement mentioned *supra* note 2, another recent case example in the retail and consumer space in which Financing Fees were not payable when funds were derived from existing stakeholders is the chapter 11 case of Gibson Brands, filed in this District on May 1, 2018, where the debtor retained Jefferies LLC as its financial advisor.

35. Second, Evercore ***absolutely should not*** be able to "double dip" by seeking a fee both for a DIP facility as well as for the exit facilities into which the DIP facilities roll on the plan's effective date. Case examples where no double dipping was allowed include the Rue21 chapter 11 case referenced earlier as well as the Southeastern Grocers LLC chapter 11 case, which is sure to be referenced by Evercore since it was the investment banker in that case.

36. Finally, with respect to the total fees proposed to be paid to Evercore, the total $13.065 million fee represents almost 2% of the affected debt securities in this case. As

---

[5] If Evercore were to find new money for an exit facility to satisfy the ABL DIP Facility, the Objecting Parties would have no objection to compensating Evercore with a 1% Financing Fee on the amount of new money.

compared to other recent retail cases in similar industries with greater risk, the total proposed fee to Evercore is simply not normal in the marketplace.

## Motion To Adjourn Scheduled Hearing

37. This matter is presently scheduled for hearing this upcoming Tuesday, December 18, 2018. Evercore and the Objecting Parties have been negotiating for some time over Evercore's proposed fees in this case and continue to do so. If the parties do not reach a resolution, however, then the Objecting Parties request that the hearing on this matter be adjourned until the confirmation hearing, which is scheduled for January 4, 2019, to allow time for the Objecting Parties to receive and digest information from Evercore about the reasonableness of the proposed fees and to obtain discovery as necessary in advance of a contested hearing.[6]

## Conclusion

38. Based on a review of the five factors listed above, the proposed Comprehensive Restructuring Fee and Financing Fees to Evercore are excessive, duplicative and unreasonable. Accordingly, the Court should reduce the proposed Comprehensive Restructuring Fee to 70 basis points on the affected debt securities (total $5.259 million) plus $1.275 in Monthly Fees for a total fee of $6.534 million as set forth above.

---

[6] The Objecting Parties reserve their rights to file the declaration of an expert that attaches fee comparisons in advance of a hearing on the Application.

WHEREFORE, the Objecting Parties respectfully request that the Court sustain the foregoing objection in connection with any Order granting the Application.

Dated: December 14, 2018

                                             MACAULEY LLC

                                             /s/ Thomas G. Macauley
                                           Thomas G. Macauley (No. 3411)
                                           300 Delaware Avenue, Suite 1018
                                           Wilmington, DE 19801
                                           Telephone: (302) 656-0100
                                           Facsimile: (302) 654-4362

                                           Attorneys for the Objecting Parties

# **CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2018, a true and correct copy of the foregoing was sent by electronic mail to:

Robert S. Brady
Edmon L. Morton
Jaime Luton Chapman
Tara C. Pakrouh
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801


M. Natasha Labovitz
Nick S. Kaluk III
Daniel E. Stroik
Debevoise & Plimpton LLC
919 Third Avenue
New York, New York 10022


Craig A. Bruens
Debevoise & Plimpton LLC
801 Pennsylvania Ave., NW
Washington, DC  20004


                                                  /s/ Thomas G. Macauley
                                                  Thomas G. Macauley