# EXHIBIT A 1

LEASE BETWEEN

RICHARD S. JOHNSON, TRUSTEE (Landlord)

and

DAVID'S BRIDAL OF TAMPA, INC., (Tenant)

| | | | |
|---|---|---|---|
| ARTICLE I. | EXHIBITS | | 3 |
| ARTICLE II. | LEASED PREMISES, TERM AND USE | | 3 |
| 2.1. | Leased Premises | 3 | |
| 2.2. | Commencement | 3 | |
| 2.3. | Extension Options | 3 | |
| 2.4. | Lease Year Defined | 4 | |
| 2.5. | Use of Premises | 4 | |
| ARTICLE III. | LANDLORD'S AND TENANT'S WORK | | 4 |
| 3.1. | Landlord's Work | 4 | |
| 3.2. | Tenant's Work | 4 | |
| ARTICLE IV. | RENT | | 4 |
| 4.1. | Minimum Rent | 4 | |
| 4.2. | Real Estate Taxes | 5 | |
| 4.3. | Additional Rent | 5 | |
| ARTICLE V. | PARKING AND COMMON AREA USE AND FACILITIES | | 5 |
| 5.1. | Common Areas | 5 | |
| 5.2. | Use of Common Areas | 5 | |
| ARTICLE VI. | COST AND MAINTENANCE OF COMMON AREA | | 5 |
| 6.1. | Operation Costs | 6 | |
| 6.2. | Tenant to Bear Pro Rata Share of Expenses | 6 | |
| ARTICLE VII. | UTILITIES AND SERVICE | | 6 |
| 7.1. | Utilities | 6 | |
| ARTICLE VIII. | CONDUCT OF BUSINESS BY TENANT | | 6 |
| 8.1. | Conduct of Business | 6 | |
| 8.2. | Alterations | 6 | |
| ARTICLE IX. | MAINTENANCE OF PREMISES | | 6 |
| 9.1. | Maintenance by Landlord | 7 | |
| 9.2. | Maintenance by Tenant | 7 | |
| 9.3. | Surrender of Premises | 7 | |
| ARTICLE X. | SIGNS, ALTERATIONS | | 7 |
| 10.1. | Removal and Restoration by Tenant | 7 | |
| 10.2. | Tenant Shall Discharge Liens | 7 | |
| 10.3. | Signs | 7 | |

| | | | |
|---|---|---|---|
| ARTICLE XI. | INSURANCE | | 7 |
| 11.1 | By Landlord | 7 | |
| 11.2. | By Tenant | 8 | |
| 11.3. | Mutual Waiver of Subrogation Rights | 8 | |
| ARTICLE XII. | OFFSET STATEMENT ATTORNMENT, SUBORDINATION/NON-DISTURBANCE | | 8 |
| 12.1. | Offset Statement | 8 | |
| 12.2. | Attornment | 8 | |
| 12.3. | Subordination/Non-Disturbance | 8 | |
| ARTICLE XIII. | ASSIGNMENT, SUBLETTING AND CONCESSIONS | | 8 |
| 13.1. | Consent | 9 | |
| ARTICLE XIV. | DAMAGE AND DESTRUCTION | | 9 |
| 14.1. | Damage to Premises | 9 | |
| ARTICLE XV. | EMINENT DOMAIN | | 9 |
| 15.1. | Condemnation | 9 | |
| ARTICLE XVI. | DEFAULT BY TENANT | | 9 |
| 16.1. | Events of Default | 9 | |
| 16.2. | Remedies | 10 | |
| ARTICLE XVII. | TENANT'S PROPERTY | | 10 |
| 17.1. | Waiver by Landlord | 10 | |
| ARTICLE XVIII. | ACCESS BY LANDLORD | | 10 |
| 18.1. | Right of Entry | 11 | |
| ARTICLE XIX. | SUCCESSORS | | 11 |
| 19.1. | Successors | 11 | |
| ARTICLE XX. | QUIET ENJOYMENT | | 11 |
| 20.1. | Landlord's Covenant | 11 | |
| ARTICLE XXI. | TENANT IMPROVEMENT ALLOWANCE | | 11 |
| 21.1. | Payment by Landlord | 11 | |
| ARTICLE XXII. | MISCELLANEOUS | | 11 |
| 22.1. | Waiver | 11 | |
| 22.2. | No Partnership | 11 | |
| 22.3. | Notices | 11 | |
| 22.4. | Captions and Section Numbers | 12 | |
| 22.5. | Number and Gender | 12 | |
| 22.6. | Definition of Landlord | 12 | |
| 22.7. | Broker's Commission | 12 | |
| 22.8. | Early Termination | 12 | |
| 22.9. | Partial Invalidity | 13 | |
| 22.10. | Waiver of Jury Trial | 13 | |
| 22.11. | Hazardous Materials | 13 | |
| 22.12. | Satellite Dish | 13 | |
| 22.13. | Governing Law | 13 | |

## LEASE

THIS LEASE made this 3rd day of September 1998, by and between RICHARD S. JOHNSON, TRUSTEE ("Landlord") and David's Bridal of Tampa, Inc., a Florida corporation ("Tenant"):

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, the parties hereto enter into the following agreement:

### ARTICLE I.

### EXHIBITS

The exhibits listed below and attached to this Lease are incorporated herein by this reference:

EXHIBIT "A"  Legal description of real estate to be developed as a shopping center with related facilities situated on 4503, 4539 West Kennedy Boulevard, Tampa, Florida hereinafter called ("Landlord's Tract").

EXHIBIT "B"  Plot Plan of Landlord's Tract, with improvements to be constructed thereon by Landlord (Landlord's Tract with exiting and any future improvements being hereinafter called the "Center").

EXHIBIT "C"  Waiver of Landlord's Lien

### ARTICLE II.

### LEASED PREMISES, TERM AND USE

2.1.  **Leased Premises:**

Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, the space in the Center outlined in red on Exhibit "B" (herein called the "Premises"), containing approximately 11,720 square feet measured to the center line of all party or common walls and to the exterior faces of all other walls (the actual number of square feet being herein called "the Store floor area"). Tenant shall have the right to cause the Premises to be measured after construction and if such measurement shall show that the Premises are less than 11,720 square feet, the rent and other charges hereunder shall be adjusted proportionately. In addition, if the Premises contain more than 11,720 square feet of store floor area due to changes in the plans and specifications requested by Tenant, the rent and other charges hereunder shall also be adjusted proportionately.

2.2.  **Commencement of the Term:**

The term of this Lease and the obligations of the Tenant to pay rent and other charges herein shall commence and accrue on the date (the "commencement date") which is ninety (90) days after Lease execution and Landlord delivers possession of the Premises. In addition to the foregoing, if Tenant cannot obtain a certificate of occupancy or its equivalent of the operation of its business in the Premises due to Landlord's violation of any applicable laws, codes, rules and regulations pertaining to the Center, the commencement date shall be extended until Tenant receives such certificates of occupancy or its equivalent, and Tenant shall receive one (1) day free rent for each day said certificate of occupancy is delayed.

The term of this Lease (the "Lease Term") shall extend and continue for ten (10) years from the commencement date (unless terminated as herein provided), if the commencement date is the first day of the calendar month. If the commencement date is not the first day of a calendar month, the term of this Lease (the "Lease Term") shall extend and continue through the last day of the calendar month during which the Lease term commenced and for ten (10) years thereafter (unless terminated as herein provided). This Lease shall automatically cease and terminate at the end of the Lease Term without the necessity of notice from either party to the other.

2.3.  **Extension Options:**

Tenant shall have the right to extend the Lease Term for two (2) additional periods of five (5) years each. The option for the first such additional period shall be exercised by Tenant by written notice to Landlord given at least six (6) months prior to the expiration date of the original term hereof. The option for the second such additional period shall be exercised by Tenant by written notice to Landlord given at least six (6) months prior to the expiration date of the first such option period. Notwithstanding the foregoing, Tenant shall not be deemed to have waived any one or more of the options to extend this Lease for the foregoing additional periods due to a failure to give at least six (6) months prior notice of the exercise thereof, unless: (i) Landlord shall have notified Tenant between fifteen (15) and thirty (30) days prior to the date such option must be exercised of the date any such option must be exercised; or (ii) Landlord shall have notified Tenant in writing of Tenant's failure to timely give such notice and Tenant shall have failed to exercise such option within ten (10) days after receipt of such notice from Landlord.

All of the terms, covenants and conditions of this Lease pertaining to the initial term hereof shall equally pertain in all respects to the extensions of the term of this Lease.

2.4. Lease Year Defined:

"Lease Year" means a period of twelve (12) consecutive months during the Lease Term; the first Lease Year commencing on the commencement date if the commencement date is the first day of a month, or commencing on the first day of the calendar month following the calendar month in which the commencement date occurs if the commencement date is not the first day of a month, and each successive Lease Year commencing on the first day following the expiration of the prior Lease Year. "Partial Lease Year" means that portion of the Lease Term prior to the first Lease Year

2.5. Use of Premises:

(a) The Premises shall be occupied and used by Tenant for the purpose of conducting therein the business of the retail sale and/or rental of bridal wear, women's and men's formal attire, women's clothing, prom dresses, and accessories related to all of the forgoing, and/or any other goods and services related to weddings and parties.

(b) So long as Tenant is selling bridal wear in the Premises, Tenant shall have the exclusive right ("Exclusive") to sell and/or rent bridal and formalwear in the Center and any additions thereto. Should Landlord violate this Exclusive, in addition to other rights and remedies available at law or in equity, Tenant's rent shall be reduced by 50% until such time as said violation is cured.

ARTICLE III.

LANDLORD'S AND TENANT'S WORK

3.1. Landlord's Work:

Landlord shall deliver the Premises "As is".

3.2. Tenant's Work: *[handwritten: Prior to tenant's initial construction, tenant shall submit its construction plans to Landlord for its approval, said approval will not be unreasonably withheld. Should Landlord fail to approve or reject plans within two (2) business days of receipt said approval shall be deemed granted.]*

All work required by Tenant for the opening of its business in the Premises not provided herein to be done by Landlord shall be performed by Tenant and shall be deemed to be Tenant's Work.

ARTICLE IV.

RENT

4.1. Minimum Rent:

Tenant covenants and agrees to pay to Landlord without notice, demand, offset, or other deduction except as expressly provided herein, at Landlord's Notice Address (Landlord's and Tenant's Notice Address being the addressees specified in Section 22.3. hereof) (or to such other person and (or) at such other address as the Landlord may from time to time direct in writing) as rent for the Premises:

(a) During Lease Years one (1) through three (3), and the Partial Lease Year, if any:

(i) for months one (1) through thirty (30), a Monthly Rent based on a Minimum Annual Rent of Two Hundred Forty-Nine Thousand, Eight Hundred Seventy Dollars and Forty Cents ($249,870.40) per annum, payable at the rate of Twenty Thousand, Eight Hundred Twenty-Two Dollars and Fifty-Three Cents ($20,822.53) per month, in advance upon the first day of each and every month during such Lease Years, and except that such rent for the Partial Lease Year (such monthly installment being hereafter called "Minimum Monthly Rent"); and

*[handwritten: (I)(a)Tenant's Minimum Rent shall be abated for the sixth month of the First Lease Year only, however tenant shall pay $5,195.86 for the sixth month of the first year only.]*

(ii) During months thirty-one (31) through thirty-six (36), a Minimum Monthly Rent based on a Minimum Annual Rent of Two Hundred Fifty-Five Thousand, Four Hundred Ninety-Six Dollars ($255,496.00) is payable at the rate of Twenty-One Thousand, Two Hundred Ninety-One Dollars and Thirty-Three Cents ($21,291.33) per month, in advance upon the first day of each and every month during such Lease Year (such monthly installment being also hereafter called "Minimum Monthly Rent"); and

*[INITIAL stamp with handwritten initials]*

(b) During the remaining Lease Years as follows:

| | Lease Year | Annual Rent | Monthly Rent |
|---|---|---|---|
| 12/3/01 | 4 | $261,238.80 | $21,769.90 |
| 12/3/02 | 5 | $267,098.80 | $22,258.23 |
| 12/3/03 | 6 | $273,193.20 | $22,766.10 |

| | | | |
|---|---|---|---|
| 12/3/04 | 7 | $279,404.80 | $23,283.73 |
| 12/3/05 | 8 | $285,850.80 | $23,820.90 |
| 12/3/06 | 9 | $292,531.20 | $24,377.60 |
| 12/3/07 | 10 | $299,328.80 | $24,944.06 |
| 12/3/08 | 11 | $244,010.40 | $20,334.20 |
| | 12 | $251,276.80 | $20,939.73 |
| | 13 | $258,777.60 | $21,564.80 |
| | 14 | $266,512.80 | $22,209.40 |
| | 15 | $274,482.40 | $22,873.53 |
| | 16-20 | $329,332.00 | $27,444.33 |

(c)   Tenant agrees to pay Minimum Rent for the first month upon Lease execution.

(d)   Unless the context clearly provides otherwise, the term "Minimum Monthly Rent" as used in this Lease shall be deemed to mean the then current Minimum Monthly Rent as set forth above.

(e)   Payments of rent which are not paid within fifteen (15) days after the date due shall bear interest at rate of eighteen percent (18%) per annum from the date they were due until the date paid.

4.2.   Real Estate Taxes:

Landlord shall pay or cause to be paid all real estate taxes assessed or imposed upon the Center applicable to the Lease Term. Within thirty (30) days after being billed therefore (but not sooner than fifteen (15) days prior to the date the tax bill shall become delinquent), Tenant shall pay to Landlord annually for its proportionate shall of all real estate taxes upon the Center applicable to the Lease Term or actual tax bills for the Premises (such proportionate share to be prorated for periods at the beginning and end of the Lease Term which does not fall within the Lease Term), provided Landlord submits to Tenant copies of all such real estate tax bills together with request for payment thereof. Tenant's proportionate share of real estate taxes shall be that portion thereof which bears the same ratio to the total of such taxes as the Store floor area bears to all rentable floor areas in the Center during the calendar year in which such taxes are payable. Rentable floor area occupied by tenants in free-standing premises who are obligated to pay real estate taxes specifically upon specific improvements or a special parcel of land, and the real estate taxes paid by them, shall not be included in computing Tenant's obligation under this Section.

4.3.   Additional Rent:

Payments of Minimum Annual Rent represent the minimum amounts of rent due to be paid under this Lease, and all monetary obligations, including without limitation, payments due for real estate taxes, common area maintenance repayments, and other payments not specifically designated as rent, shall constitute rent hereunder, and Tenant's failure to make such payments when due shall entitle Landlord to pursue the remedies available to is pursuant to Section 16.2.

ARTICLE V.

PARKING AND COMMON AREA
USE AND FACILITIES

5.1.   Common Areas:

All parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Center, including employee parking areas, truck ways, driveways, locating docks and area, delivery areas, pedestrian sidewalks, and remap, landscaped areas, retaining walls, stairways, bus stops, lighting facilities, common utility and drainage facilities, and other areas and improvements provided by landlord for the general use in common tenants and their customers are all herein called "Common Area" or "Common Areas". Landlord shall not have their chance to give to or modify the Common Areas in any material respect, or change the entrances and exits to the Center, without obtaining Tenant's consent thereto, such consent not to be unreasonably withheld.

5.2.   Use of Common Areas:

Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or hereafter grants such rights, to use the Common Areas.

ARTICLE VI.

COST AND MAINTENANCE OF COMMON AREA

6.1. Operation Costs:

Landlord will operate, clean, maintain, repair and replace (or cause to be operated, cleaned, maintained, repaired and replaced) the Common Area, so as to maintain the Common Area in good condition at all times. "Landlord's Common Area Costs" shall mean the costs and expenses incurred by Landlord in operating, cleaning, lighting, maintaining and repairing the Common Areas, including without limitation the sorts of insurance carried by Landlord covering the Center for public liability, personal and bodily injury and property damage liability (Common Area Only), fire and extended coverage, vandalism and malicious mischief, and rent insurance, but shall specifically exclude all capital expenditures, depreciations and all overheard and management fees. In addition, Tenant's share of Common Area Costs shall not increase by more than five percent (5%) from the preceding Lease Year.

6.2. Tenant to Bear Pro Rata Share of Expenses:

(a) Tenant will reimburse Landlord, in addition to all other amounts in the Lease provided, in and for each calendar year during the term of this Lease (prorated for any partial calendar year), that portion of Landlord's Common Area Costs which bears the same ratio to the total of Landlord's Common Area Costs as the Store floor area bears to all rentable floor area in the Center.

(b) Tenant's share of Landlord's Common Area Costs shall be paid in monthly installments in amounts reasonably estimated from time to time by Landlord, one such installment being due on the first day of each month of each calendar year during the term hereof. Within sixty (60) days after the end of such calendar year the total Landlord's Common Area Coasts for such year shall be determined by Landlord and Tenant's share paid for such period shall be promptly adjusted by refund of any excess or payment of any deficiency. The computation of Tenant's proportionate share thereof shall be submitted to Tenant annually prior to the expiration of such sixty (60) day period and Tenant shall have the right to audit such charges. Back up for any items included in Landlord's Common Area Costs shall be provided to Tenant upon request. Tenant may audit said expenses at its expense after providing Landlord reasonable notice.

ARTICLE VII.

UTILITIES AND SERVICES

7.1. Utilities:

Tenant shall be responsible for and shall promptly pay all charges for use or consumption by Tenant of sewer, gas, electricity, water and all other utility services on the Premises. Landlord, at Landlord's expense, shall cause all such utilities to be separately metered to the Premises.

ARTICLE VIII.

CONDUCT OF BUSINESS BY TENANT

8.1. Conduct of Business:

Tenant's business shall be conducted under the name David's Bridal or any other name selected by Tenant from time to time. Tenant's store shall be open during Tenant's normal business hours. Tenant covenants and agrees that it will not place or maintain any merchandise or vending machines outside the Premises; will properly store garbage, trash, rubbish and other refuse; keep all interior store format surfaces clean; will not commit waste upon the Premises; and will not permit or cause odors to emanate from the Premises; merchandise or other articles on the sidewalk adjacent to the Premises or elsewhere on the exterior thereof; shall not advertise or conduct any "fire sale" or "bankruptcy sale" or similar distress sale; shall of use or permit the use of any apparatus for sound reproduction or transmission in such manner that the sounds so; and shall not park and shall require its employees to refrain from parking any vehicle except in such places as may be designated by Landlord from time to time from the use of Tenant and its employees.

8.2. Alterations:

Tenant will not make any structural or exterior alterations to the Premises without Landlord's written approval thereto, which approval shall not be unreasonably withheld. Tenant shall have the right to make interior, non-structural changes to the Premise without Landlord's consent, provided such changes comply with all applicable laws.

ARTICLE IX.

MAINTENANCE OF PREMISES

9.1. <u>Maintenance by Landlord</u>:

Landlord, at Landlord's expense, shall at all times during the term hereof keep or cause to be kept the foundations, roof (Landlord shall be responsible for roof replacement upon expiration of the initial term, and the structural portions thereof), window frames, and exterior and structural portions of the Premises clean and in good order, repair and condition (except for damage thereto due to the acts of Tenant, its employees, contractors or agents). Landlord hereby represents an warrants to Tenant that, to the best of Landlord's knowledge, the Center, including the Premises, contains no hazardous substances and if any hazardous substances shall be found to have existed on the Center and/or the Premises at the time of delivery of possession to Tenant, Landlord, at Landlord's sole cost and expense, shall promptly remove same and indemnify and hold tenant harmless from any and all loss, costs, damages and liability resulting from the existence of such hazardous substances and its removal.

9.2. <u>Maintenance by Tenant</u>:

Tenant at all times shall keep the plate glass, exterior doors and interior non-structural portions of the Premises, including the heating, ventilating, air conditioning (except for such items which are Landlord's responsibility as provided in Section 9.1. above and except for damage thereto due to the acts of Landlord, its employees, contractors or agents).

9.3. <u>Surrender of Premises</u>:

At the expiration of the tenancy hereby created, tenant shall surrender the Premises in the same condition Tenant was required to maintain them during the term hereof, reasonable wear and tear and damage by fire or other casualty excepted. If Tenant holds over beyond the end of the Lease term, Tenant will be a tenant at sufferance and shall be required to pay Minimum Monthly Rent equal to 125% of the Minimum Monthly Rent applicable prior to lease termination.

## ARTICLE X.

### SIGNS, ALTERATIONS

10.1. <u>Removal and Restoration by Tenant</u>:

All alterations, changes and additions and all improvements, including leasehold improvements, made by Tenant or made by Landlord on Tenant's behalf to the Premises, whether part of Tenant's Work or not and whether or not paid for wholly or in part by Landlord, shall remain Tenant's property for the Lease Term. Any such alterations, changes, additions and improvements shall immediately upon the termination of this Lease become Landlord's property, however Tenant shall have the right, at its option to remove any of such non-structural improvements prior to the end of the Lease Term, provided that Tenant shall repair any damage cause by such removal.

10.2. <u>Tenant Shall Discharge Liens</u>:

Tenant, with respect to any work performed by Tenant on the Premises, shall promptly pay all contractors and materialmen, and not permit or suffer any lien to attach to the Center or any part thereof in connection with such work, and if any such lien is filed, Tenant shall cause the same to be discharged or bonded against within twenty (20) days after Tenant had notice thereof.

10.3. <u>Signs</u>:

So long as Tenant complies with all applicable governmental codes and regulations in connection therewith, and have Landlord's approval of the design and location (said approval not to be unreasonably withheld or delayed), Tenant shall have the right to install and maintain during the entire term of this Lease and all extensions thereof its standard signage on the store front of the Premises, and Tenant, at its expense, shall install a pylon sign at a location mutually agreed upon by the parties. Tenant shall remove any grand opening temporary signs and/or banners erected by Tenant within three (3) weeks after grand opening.

## ARTICLE XI.

### INSURANCE

11.1. <u>By Landlord</u>:

Landlord shall carry public liability insurance on the Common Area of Landlord's Tract providing coverage in combined single limit of at least $3,000,000 for injury or death to one or more persons arising from any occurrence and in the amount of $1,000,000 with respect to property damage. landlords shall also carry insurance for fire, extended coverage, vandalism, malicious mischief and other endorsements deemed advisable by Landlord, insuring the improvements on Landlord's Tract constructed

by Landlord, including the Premises and all appurtenances thereto (excluding Tenant's lease hold improvements, merchandise, trade fixtures, furnishings, equipment and personal property) for the full insurable value thereof.

11.2.  By Tenant:

Tenant shall carry public liability insurance, insuring Landlord and Tenant, as their interest may appear, against all claims demands, or actions for injury to or death in a combined single limit of at lease $3,000,000 for injury or death to one or more person arising from any occurrence and in the amount of at least $1,000,000 for damage to property made by or on behalf of any persons, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Premises. All of said insurance shall provide that it will not be subject to cancellation, termination or change except after at least ten (10) days prior written notice to Landlord. The policies or certificates for the same shall be deposited with Landlord on or before the date of delivery of the Premises to Tenant, and upon renewals of such policies, not less than ten (10) days prior to the expiration of the term of such coverage.

11.3.  Mutual Waiver of Subrogation Rights:

Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by insurance on the Premises or in connection with property on or activities conducted on the Premises and waive on any right of subrogation which might otherwise exist in or accrue to any person on account thereof. landlord and Tenant each agree that the insurance policies obtained by them shall permit such waiver of subrogation.

ARTICLE XII.

OFFSET STATEMENT, ATTORNMENT, SUBORDINATION/NON-DISTURBANCE

12.1.  Offset Statement:

Within fifteen (15) days after Landlord's request Tenant shall deliver a declaration to any person designated by Landlord (a) stating the commencement and termination dates of this Lease; and (b) certifying (i) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated), (ii) that to the knowledge of the signer all conditions under this Lease to be performed by landlord have been satisfied (stating exceptions, if any), (iii) that to the knowledge of the signer no defenses or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed), (iv) the amount of advance rent, if any, paid by Tenant (v) the date to which rent has been paid, and (vi) the amount of security deposited with Landlord.

12.2.  Attornment:

Tenant shall, in the event of a sale or assignment of Landlord's interest in the Premises or the building in which the Premises are located, or if the Premises or such building comes into the hands of a mortgagee or any other person, whether because of a mortgage foreclosure or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder. Tenant shall execute, at Landlord's request, any attornment agreement required by any mortgagee, or other such person, to be executed, containing such provisions as such person requires.

12.3.  Subordination/Non-Disturbance:

Upon Landlord's request, Tenant will subordinate its rights hereunder to the liens of any mortgages or any lien resulting from any method of financing or refinancing (hereinafter collectively referred to as "mortgagee") now or hereafter existing against all or a part of the Center, and to all renewals, modifications, replacements, consolidations and extensions thereof, and shall execute and deliver all documents reasonably requested by a mortgage or security holder to effect such subordination, provided however, that the holder of such mortgage grants non-disturbance to Tenant so that in the event of a default under any such mortgage, Tenant's rights hereunder shall not be disturbed and the holder of such mortgage or any purchaser at a foreclosure sale or other person or entity who acquires title to the Center or nay portion thereof shall recognize and honor this Lease as a valid Lease and permit Tenant to have all its rights hereunder for the full term and all extensions hereof. In addition, within thirty (30) days of Tenant's request, Landlord shall use best efforts to obtain a non-disturbance agreement from the holders of all current mortgages on the Center to which this Lease is subordinate providing the same protection for Tenant as described in the non-disturbance provisions of the immediately preceding sentence.

ARTICLE XIII.

ASSIGNMENT, SUBLETTING AND CONCESSIONS

13.1.  Consent:

Tenant will not assign this Lease, nor sublet all or any part of the Premises, without Landlord's consent, which consent shall not be unreasonably withheld or delayed; except that Tenant may do any one or more of the following without Landlord's consent: (i) license concessions or lease departments within the Premises; (ii) assign or pledge the Lease to an institutional lender in connection with a any financing; (iii) assign or transfer this Lease or sublet the Premises to a related or affiliated entity or party; and (iv) assign this Lease to sublet the Premises in connection with a sale of Tenant's business. Not withstanding any assignment or subletting, Tenant shall remain liable for the performance of all terms, covenants and provisions of the Lease. Tenant agrees to give Landlord prompt notice following any such assignment of this Lease or subletting of the Premises. Any assignee or subtenant shall be subject to all the terms of this Lease, and any assignee shall agree to assume and perform all terms, covenants and conditions of this Lease to be kept and performed by tenant.

ARTICLE XIV.

DAMAGE AND DESTRUCTION

14.1.  Damage to Premises:

In the event the Premises or any other portion of the Center is damaged or destroyed by fire, explosion, or any other casualty, the damage shall promptly be repaired be Landlord at Landlord's expense, provided, however, that in the event any such damage or destruction to the Premises cannot reasonably be repaired or restored within nine (9) months, either party hereto shall have the right tot terminate this Lease by written notice to the other party given within sixty (60) days after such damage or destruction. If the casualty, repairing or rebuilding shall render the Premises untenable, in whole or in part in Tenant's sole judgment, an proportionate abatement of the Minimum Monthly Rent, real estate taxes, Common Area charges and all other sums payable hereunder shall be allowed from the date when the damage occurred until the thirty(30) days after date Landlord completes its work. In the event the Premises shall be rendered untenable in whole in Tenant's sole judgment, and Tenant ceases to be open for business in any part of the Premises as a result thereof, the entire amount of Minimum Monthly Rent, real estate taxes, Common Area charges, and other sums payable hereunder shall abate during the foregoing period. In the event any portion of the Common Area is damaged or destroyed by fire, explosion or any other casualty, Landlord shall, at its sole cost and expense, repair or reconstruct the same to the condition existing immediately prior to such damage within the time frame provided above for completion of repair of the Premises. In the event any other improvements within the Center are so damaged, Landlord shall have no obligation to reconstruct or repair the same; provided, however, if Landlord elects not to reconstruct or repair such improvements, Landlord shall it its sole costs and expense, cause the same to be razed and shall remove any debris resulting from such demolition from the Center.

ARTICLE XV.

EMINENT DOMAIN

15.1.  Condemnation:

If the whole of the Premises shall be taken by any public authority under the power of eminent domain, the term of this Lease shall cease as of the day possession shall be taken by such public authority, and Tenant shall pay rent up to that date with an appropriate refund by landlord of such rent as shall have been paid in advance for a period subsequent to the date of the taking. If any portion of the Premises, or fifteen (15) percent or more of the parking spaces within the Common Area shall be so taken, either party shall have the right, at their option, to terminate this Lease by notice to the other party given within thirty (30) days after the date of any such taking. If a portion of the Premises shall be so taken and this Lease shall not be terminated, the term of this Lease shall cease only as to the parts so taken as of the day possession shall betaken by such public authority, and Tenant shall pay rent up to that date with an appropriate refund by landlord of such rent as may have been paid in advance for a period subsequent to the date of taking and thereafter the Minimum Monthly Rent a and all other charges hereunder shall be equitably adjusted.

ARTICLE XVI.

DEFAULT BY TENANT

16.1.  Events of Default:

The following shall be considered to be defaults under and breaches of this Lease: (a) any failure of Tenant to pay any rent or other amount when due hereunder; (b) any failure by Tenant to perform or observe any other of the terms, provisions, conditions and covenants of this Lease; or (c) Tenant shall become bankrupt or insolvent or files a petition in bankruptcy or for reorganization or arrangements or for the appointment of a receiver or trustee of a all or a portion of Tenant's property, or Tenant makes an assignment for the benefit of creditors.

16.2.  **Remedies:**

In the event of the occurrence of any of the events of default described in Section 16.1. hereof, then, in addition to any other rights and remedies Landlord may have under this Lease, Landlord shall have the following rights; subject to the provisions of paragraph (d) below:

(a)  Landlord, or its agent, may give Tenant a written notice specifying a day not less than ten (10) days thereafter whereupon the term shall end, and on the day specified the term of this Lease shall expire as if that day were the day herein fixed for the expiration of the term, and Tenant shall then quit and surrender the Premises to Landlord and Tenant shall remain liable as hereinafter provided. Tenant shall also pay to the Landlord an amount equal to any costs and expenses including, without limitation, reasonable attorneys' fees, disbursements and court costs incurred by Landlord in recovering possession of the Premises, which amounts shall be due and payable by tenant to Landlord at such time or times as such costs and expenses shall have been incurred by Landlord.

(b)  Landlord may re-enter the Premises and remove Tenant or its legal representatives or other occupant by summary or other legal proceedings.

(c)  In case of any such re-entry, expiration and/or dispossess by summary or the legal proceedings, the rent through such date shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, together with such reasonable expenses as Landlord may incur for brokerage for preparing the Premises for re-rental. Landlord may relet the Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms which may be landlord's option be less than or exceed the period which may otherwise have constituted the balance of the term of this Lease and may garnet reasonable concessions, and Tenant shall also pay Landlord as liquidated damages for the failure of tenant to observe and perform said Tenant's covenants herein contained, any deficiency between (i) all rent and additional charges hereby reserved and/or covenanted to be paid, and (ii) the net amount, if any, of the rents collected on account of the lease of the Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease. In computing such liquidated damages, there shall be added to the said deficiency such expenses as Landlord may incur in connection with reletting, such as for brokerage, for keeping the Premises in good order, and for preparing the name for reletting. Any such liquidated damages shall be paid in monthly installments by tenant on the rent days specified in this Lease and nay suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by similar proceeding.

(d)  **Grace Period and Notice of Default.** Notwithstanding anything hereinabove, Landlord agrees that Landlord will not exercise any right of remedy provided for in this Lease or allowed by law because of any default of Tenant unless Landlord shall have first given written notice thereof to Tenant, and Tenant, within a period of ten (10) days thereafter shall have failed to pay the sum or sums due if the default consists of the failure to pay money, or if the default consists of something other than the failure to pay money, tenant shall have failed, within thirty (30) days thereafter to begin the correction of the default or thereafter fails to actively and diligently in good faith proceed with and continue the correction of the default until it shall be fully corrected, provided, however, that no such notice from landlord shall be required nor shall Landlord be required to allow any part of the said notice period if tenant shall have filed a petition in bankruptcy or for reorganization, and provided, further, that Landlord shall not be obligated to give notice for failure to pay Minimum Monthly Rent more than three (3) times in twelve (12) month period.

(e)  Landlord's rights and remedies hereunder shall be deemed cumulative.

ARTICLE XVII.

**TENANT'S PROPERTY**

17.1.  **Waiver By Landlord:**

Landlord hereby waives and relinquishes any right it might otherwise have at law or in equity or hereunder to obtain a lien on, or a security interest in, all or any portion of Tenant's inventory, fixtures, equipment or other personal property now or hereafter situate on the premises. In addition, Landlord agrees to acknowledge said waiver by executing a form substantially similar to Exhibit C.

ARTICLE XVIII.

**ACCESS BY LANDLORD**

18.1.   Right of Entry:

Landlord, its agents and employees shall have the right to enter the Premises from time to time at reasonable times during normal business hours upon reasonable notice to Tenant to examine the same, show them to prospective purchasers and other persons, and make such repairs as Landlord deems desirable; provided Landlord shall not interfere with the operation of tenant's business in connection therewith. Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation, responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise provided in this Lease.

ARTICLE XIX.

SUCCESSORS

19.1.   Successors:

All rights and liabilities herein given to or imposed upon the respective parties hereto shall bind and inure to the several respective heirs, successors, administrators, executors and assigns of the parties.

ARTICLE XX.

QUIET ENJOYMENT

20.1.   Landlord's Covenant:

If Tenant pays the rent and other amounts herein provided, and observes and performs all the other material covenants, terms and conditions of this Lease, Tenant shall peaceably and quietly hold an enjoy the Premises for the Lease Term without interruption by Landlord or any other person or persons, subject nevertheless, to the terms and conditions of this Lease.

ARTICLE XXI.

TENANT IMPROVEMENT ALLOWANCE

21.1.   Payment by Landlord:

Landlord shall pay to the Tenant the sum of $410,200 (computed on the basis of $35 per square foot of Store floor area) as an allowance used for Tenant's improvements and fit-out to the Premises (including architectural, engineering, surveying and other direct professional fees related to the construction of the Premises), which payments shall be made by wiring said allowance into an account designated by Tenant within three (3) business days after Tenant provides Landlord lien waivers. If Landlord shall fail to timely pay such sum to Tenant, in addition to Tenant's other rights and remedies for such breach, Tenant may deduct the amount due from Minimum Rent and Addition Rent due hereunder, and interest shall accrue on such late payment at the rate of eighteen percent (18%) per annum from the date due until the date paid.

ARTICLE XXII.

MISCELLANEOUS

22.1.   Waiver:

No waiver by either party to the other of any breach of any term, covenant or condition hereof shall be deemed a waiver of the same or any subsequent breach of the same or any other term, covenant or condition.

22.2.   No Partnership:

Landlord vows not, in any way or for any purpose to become a partner, employer, principal, master, agent or joint venture of or with tenant.

22.3.   Notices:

All notices from Tenant to Landlord required or permitted by any provision of this agreement shall be directed to Landlord as follows:

>   Richard S. Johnson, Trustee
>   P.O. Box 85
>   West Palm Beach, FL  33402

with a copy to:

Flagler Realty & Development, Inc.
505 South Flagler Drive
Suite 1010
West Palm Beach, FL 33402

All notices from Landlord to Tenant required or permitted hereunder shall be directed as follows namely:

c/o David's Bridal
Attn: Steven H. Erlbaum      *relocated*
44 West Lancaster Avenue
Suite 250
Ardmore, PA  19003

with a copy to:

William J. Frutkin, Esquire
44 W. Lancaster Avenue
Suite 110
Ardmore, PA  19003

All notices to be given hereunder by either party shall be written and sent by registered or certified mail, or by overnight express delivery service such as Federal Express, return receipt requested, postage prepaid, or hand delivered addressed to the party intended to be notified at the address set forth above. Either party may, at any time or from time to time, notify the other in writing of a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address. Notice given as aforesaid shall be sufficient service thereof and shall be deemed given when received.

22.4.   Captions and Section Numbers:

This Lease shall be construed without references to titles of Articles and Sections, which are inserted only can convenience of reference.

22.5.   Number and Gender:

The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

22.6.   Definition of Landlord:

The word "Landlord" is used herein to include the Landlord named above and any subsequent owner of the Premises, as well as their respective heirs, personal representatives, successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this Lease as Landlord, including the right to proceed in its own name to enter judgment by confession or otherwise, but any owner of the Premises, whether or not named herein, shall have no liability hereunder after it ceases to hold title to the Premises, except for obligations which may have theretofore accrued. There shall be no personal liability on Landlord with respect to this Lease and Tenant shall look solely to the interest of Landlord in the Center for the satisfaction of Tenant's damages in the event of a default by Landlord hereunder.

22.7.   Broker's Commission:

Landlord shall be responsible for all fees and commissions payable only to Atlantic Realty Advisors, Inc. ("Atlantic"), Florida Retail Partners ("Partners") and Flagler Realty ("Flagler"), the brokers ("Brokers"). Landlord represents that the brokerage commission due to each broker is $ 46,631.52, $11,657.88 of which amount shall be paid by Landlord upon the execution of this Lease, $11,657.88 upon the Tenant's occupancy of the Premises, and $23,315.76 due at the end of the fifth Lease Year, provided Tenant does not exercise its option of early termination of the Lease. In the event Landlord shall fail to timely pay Atlantic as aforesaid, the amount thereof shall bear interest at the rate of eighteen percent (18%) per annum from the date due until the date paid and Tenant shall have their right, at its option, to pay all or part of such amount to Atlantic directly and to deduct the amount of any such payments from the payments of rent and other charges next due hereunder.

22.8.   Early Termination:

Tenant shall have the right to terminate this Lease at the end of the fifth (5th) Lease Year provided Tenant gives Landlord six (6) months prior written notice along with payment of the unamortized portion of the Tenant Improvement Allowance, which is the remaining balance of $410,200.00 amortized over ten (10) years at nine percent (9%) per annum.

22.9. <u>Partial Invalidity</u>:

If any provision on this Lease or the application thereof to any person or circumstance shall to any extent be invalid or enforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or enforceable, shall not be affected thereby and each provision of this Lease shall be valid and enforceable by law.

22.10. <u>Waiver of Jury Trial</u>:

The parties hereto shall and they hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use and occupancy of the Premises and/or any claim of injury or damage.

22.11. <u>Hazardous Materials</u>:

Tenant shall not introduce hazardous materials (except in regulated and permitted amounts) in to the Premises, and shall indemnify and hold Landlord harmless for a breach of such covenant.

22.12. <u>Satellite Dish</u>:

Tenant may install VSAT communication equipment on the roof of the building subject to governmental approval of placement and size at Landlord's reasonable discretion. Tenant shall be responsible for any repairs to the roof resulting from the installation or removal of its satellite dish.

22.13. <u>Governing Law</u>:

This Lease shall be governed by the laws of Florida.

IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

RICHARD S. JOHNSON, TRUSTEE
BY: _____
    Richard S. Johnson
ITS: _____


DAVID'S BRIDAL OF TAMPA, INC.
BY: _____
    Steven H. Erlbaum
ITS:    PRESIDENT

EXHIBIT A

4503, 4539 W. Kennedy Blvd., Tampa, Florida

Tampania
That part of Lot 1 Blk 5 comm at SE cor of Lot 1
and run W. 82 ft for POB thence run W 60 ft N 110
ft E 60 ft and S 110 ft to beg

Tampania
S 1/2 of Lot 1 less W 80 ft less E 82 ft and less
N 40 ft and less Hwy Blk 5 less S 110 ft of E 60
ft thereof

## "CORESTATES PROVISION"

Landlord recognizes CoreStates Bank, N.A. (the "Bank") as the financial institution which has financed Tenant's, and Tenant's related entities', operation, and that the Bank has or will have a security interest in the inventory, machinery, equipment, furniture, furnishings and fixtures and other personal property (collectively the "Collateral") located at the Premises. In connection therewith:

(a) Landlord consents to the security interest of the Bank in the Collateral and waives, as against the Bank, and subordinates to the security interest of the Bank, all claims, rights of distraint or levy, liens and other rights which the Landlord now has or may hereafter acquire with respect to the Collateral under the terms of any lease, mortgage or other agreement entered or to be entered into which the Tenant or third parties or under the provisions of applicable law.

(b) As between the Landlord and the Bank, all Collateral shall be deemed to remain personal property subject to the prior security interest of the Bank, notwithstanding any physical attachment to the Premises or any provision to the contrary in any lease, mortgage or other agreement with the Tenant or third parties or under applicable statute or common law. Upon default by the Tenant under any debt instrument, the Bank may exercise any remedies available to it with respect to the Collateral, including removal from the Premises, upon reimbursement to the Landlord only of the cost of repair of physical injury, if any, to the Premises arising in the course of removal (but not reimbursement of diminution of value resulting from the absence of the Collateral removed). Bank and its agents, successors and assigns may enter the Premises at any time and as many times as it may deem necessary for such inspection or removal, and Bank may use any facilities as may then be upon the Premises, whether such facilities are owned by or in the possession of Landlord or Tenant, to assist in effectuating the removal of the Collateral from the Premises and without regard as to whether the Collateral has, in some manner, been affixed to or made part of the Premises. The Undersigned also agrees that the Bank may remove from the Premises at any time and from time to time the books, records, files, and documents (computer or otherwise), and instruments which comprise the business records of the Tenant.

1

(c) Landlord waives notice of the acceptance of this consent and waiver by Landlord and notice of the incurrence by Tenant from time to time of additional secured indebtedness and notice of default by the Tenant under any debt instrument, and agrees that the Bank may at any time or from time to time in its discretion without further notice to or consent from the Landlord or impairment of this consent and waiver by Landlord (1) extend or change the time of payment, or the manner, place or terms of payment of all or any part of the secured indebtedness; (2) exchange, release or surrender any collateral, or any part thereof, held by the Bank as security for the secured indebtedness; (3) sell, collect or otherwise dispose of any such collateral including the Collateral, at public or private transactions, in the order selected by the Bank and apply the net proceeds of any such sale or disposition to collateral in favor of the Tenant; (4) settle or compromise with any person or persons contingently liable on all or any part of the secured indebtedness; and (5) take or refrain from taking any lawful action deemed to be in its best interest with respect to the secured indebtedness, the Tenant, the Collateral or with respect to any person liable for the secured indebtedness.

(d) Landlord will give at least sixty (60) days written notice to the Bank of the termination of the Tenant's lease for any reason and will allow the Bank a reasonable time in which to remove any of the Collateral on the Premises for a period in excess of ninety (90) days after the termination date of the Tenant's lease without incurring reasonable storage costs for the same.

(e) The Landlord agrees to give written notice to the Bank of any default on any lease or mortgage where the default remains uncured for a period of sixty (60) days.

(f) Notices to Bank shall be sent in the same manner as other notices under this Lease, to the following address: 1345 Chestnut Street, Philadelphia, PA 19101, Attn: Irene Rosen Marks, or to such other address as Bank or Tenant may hereafter designate.

(g) Tenant may at any time substitute another financial institution for the Bank upon at least ten (10) days prior notice to Landlord, together with confirmation from Bank that it no longer has a security interest in the Collateral, in which event the provisions of this Section shall apply to such substitute financial institution.

2

## GUARANTY

The undersigned, intended to be legally bound hereby, hereby guarantees to Richard S. Johnson, Trustee ("Landlord") the payment of Rent and all other charges due and payable by David's Bridal of Tampa, Inc. ("Tenant"), and the compliance with all other obligations set forth in the Lease between Landlord and Tenant for Premises located at 4503, 4539 West Kennedy Boulevard, Tampa, Florida, for the first five (5) years of the Lease Term only. In addition, in the event of an uncured default by David's Bridal of Tampa, Inc. under the Lease prior to the expiration of the initial term thereof, the undersigned agrees to repay to the Landlord thereunder the amount of the then unamortized portion of the Tenant Improvement Allowance pursuant to Article XXI of the Lease (such amortization to be computed on a straight line bases over the initial ten (10) year term of the Lease at an interest rate of nine percent(9%) per annum).

This guaranty shall be legally binding upon the undersigned and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has executed, sealed and delivered this guaranty this ___ day of August, 1998.

DAVID'S BRIDAL, INC., a Florida corporation

By: _____
    Steven H. Erlbaum
Its: _____Chairman_____