# EXHIBIT A

**Reply**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, INC., *et al.*,[1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 18-12635 (LSS)<br><br>Jointly Administered<br><br>Hearing Date: December 18, 2018 at 2:00 p.m. (EST)<br>Re: Docket Nos. 128 and 181 |

## DEBTORS' REPLY TO LIMITED OBJECTION TO DEBTORS' APPLICATION TO RETAIN EVERCORE GROUP L.L.C. AS INVESTMENT BANKER

   The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") hereby reply to the limited objection [Docket No. 181] (the "**Objection**") filed by Oaktree Capital Management, L.P.; Courage Capital Management, LLC; AlbaCore Capital LLP; and Deutsche Bank AG Cayman Islands Branch (collectively the "**Objecting Parties**") with respect to the *Debtors' Application for Entry of an Order Authorizing the Debtors to Employ and Retain Evercore Group L.L.C.* ("**Evercore**") *as Investment Banker Effective* Nunc Pro Tunc *to the Petition Date* [Docket No. 128] (the "**Application**"). In support of the relief requested in the Application, the Debtors respectfully represent as follows:[2]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] In addition to the arguments set forth in this Reply, the Debtors join in the arguments in the *Reply of Evercore Group L.L.C. in Support of Debtors' Application for Entry of an Order Authorizing the Debtors to Employ and Retain Evercore Group L.L.C. as Investment Banker Effective* Nunc Pro Tunc *to the Petition Date* (the "**Evercore Reply**").

01:23971586.4

## Preliminary Statement

1. On April 3, 2018, the Debtors and Evercore executed the Engagement Letter,[3] which provides the terms and conditions for the Debtors' retention of Evercore as their restructuring investment banker. *See* Application, Ex. A-1. Those terms and conditions were the result of an arms'-length negotiation and, as set forth in the Evercore Reply, are generally consistent with market terms for similar advisory engagements.

2. Between the parties' entry into the Engagement Letter and the filing of these chapter 11 cases, Evercore worked closely with the Debtors over a period of more than seven months to explore a number of different restructuring alternatives. A team of Evercore professionals, including two Senior Managing Directors, were heavily involved in working with three distinct creditor constituencies and a wide variety of potential third-party capital providers to develop and determine whether to pursue an ever-shifting array of possible restructuring alternatives. Ultimately, Evercore played a crucial role in brokering the consensual agreement that allowed the Debtors to file these cases as a remarkably successful and fully consensual prepackaged restructuring that will pay all trade creditors in full, allow the Debtors' business operations to continue uninterrupted, and allow the Debtors' current customers to receive their approximately 80,000 outstanding orders without risk. Evercore has also, among other things, provided substantial assistance in arranging the Debtors' two debtor-in-possession financing facilities and current proposed exit financing—which, together, will provide between $40 and $60 million dollars in additional liquidity to allow the Debtors to invest in and ultimately grow their business. In fact, Evercore is still providing assistance with respect to the exit financing.

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application and the *Declaration of Joan Hilson, Executive Vice President and Chief Financial and Operating Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19] (the "**First Day Declaration**").

Finally, Evercore has prepared the going-concern valuation of the Debtors that the Debtors and the Court will ultimately rely upon in approving the Disclosure Statement and the Prepackaged Plan in connection with the combined disclosure statement and confirmation hearing in these chapter 11 cases that is scheduled on January 4, 2019.

3. The Objecting Parties do not challenge the Debtors' assertion that the services of an investment banker are necessary and appropriate in these cases, nor do they in any way challenge Evercore's expertise and experience, or the scope of services to be rendered by Evercore. In fact, the Objecting Parties freely agree that Evercore's retention "would be in the best interest of the estate." (Obj. ¶ 23.) It appears that the only thing the Objecting Parties do not like about Evercore's retention is the fee that was agreed in the Engagement Letter approximately eight months ago. Specifically, the Objecting Parties take issue with two features of Evercore's proposed compensation—the Comprehensive Restructuring Fee and the Financing Fee—claiming that the terms of those fees are unreasonable, and should be both reduced and credited against one another in a manner that would reduce Evercore's total compensation by half, even though Evercore has been working for months in the expectation of receiving the compensation it bargained for.

4. The Objection should be overruled. Evercore has worked tirelessly to perform its obligations under the Engagement Letter, and has been an integral and indispensable part of a team of professionals that has achieved a highly successful result in these chapter 11 cases. Had the Debtors not been able to reach agreement on the terms of their prepackaged restructuring, it is undisputed that tens of millions of dollars in value would have been lost, to the detriment of most constituencies in these chapter 11 cases (including the Objecting Parties). The Debtors are on the verge of being able to complete that restructuring, with only a few crucial steps left before

emerging from chapter 11. Over the next several weeks, the Debtors are relying on Evercore to continue to play its critical role as part of the professional team: specifically, the Debtors need Evercore to assist in preparing the Debtors for their confirmation hearing, providing necessary testimony in support of that hearing, and facilitating the exit financing that is a crucial step in the chapter 11 emergence process.

5. Evercore has ably performed its obligations under the Engagement Letter, and the Debtors submit that, upon their emergence from chapter 11, Evercore will have fully earned its resulting fee. The fee provisions of the Engagement Letter, as substantiated in the Evercore Reply, are generally consistent with market terms for similar advisory engagements. The Engagement letter itself is a valid contract of the Debtors, and was the product of an arms'-length transaction with negotiation over terms. The terms of Evercore's engagement were known to the Objecting Parties prior to the Application, and indeed are embedded in the DIP budget that each of the Objecting Parties has agreed to in its capacity as a DIP lender. The Debtors, therefore, have ample ability to honor the engagement terms, and it is demonstrably equitable for them to do so in light of Evercore's significant work and central role in the Debtors' positive restructuring result.

6. The appropriateness of approving Evercore's proposed engagement terms is particularly clear in these chapter 11 cases, where general unsecured claimants will be paid in full. Under the "tail" provision of the Engagement Letter, which specifies the amount of fees payable if Evercore is terminated prior to consummation of a restructuring or other transaction, Evercore's right to payment of the very fees that the Objecting Parties attack arguably vested prior to the Debtors' bankruptcy filing. If Evercore were not retained in these cases and instead the Engagement Letter was terminated or rejected, the Debtors believe they would likely have to

satisfy the contractual tail fee obligations in full as a general unsecured claim under the proposed chapter 11 plan. What the Objecting Parties are requesting, therefore, is that Evercore should continue to work for the Debtors and provide additional services (which the Objecting Parties acknowledge will benefit the Debtors), but Evercore should receive less in compensation than it likely would if its retention were not approved and their engagement was terminated. Particularly in light of the extensive work Evercore has performed and will continue to perform, and the extraordinarily positive result of the consensual reorganization that Evercore helped orchestrate, such a result would be both illogical and unfair.

7. Finally, the Objecting Parties have sought to adjourn this dispute until the confirmation hearing. But the Objecting Parties have failed to articulate a viable reason for an adjournment, and Evercore is entitled to certainty regarding its fees heading into plan confirmation. The issues raised by the Objecting Parties relate entirely to the market nature of the fees requested and, as discussed further below, they have already filed a declaration in support of such issues. Accordingly, the hearing should proceed as scheduled.

8. For these reasons, and the reasons provided below, the Debtors respectfully request that the Court overrule the Objection, and grant the employment and retention of Evercore as investment banker to the Debtors on the terms provided in the Engagement Letter.

**Relevant Procedural History**

9. On April 3, 2018, the Debtors and Evercore entered into an Engagement Letter pursuant to which the Debtors retained Evercore's investment banker services to assist the Debtors in pursuing potential refinancing efforts.

10. On November 29, 2018, the Debtors filed the Application, seeking to retain and employ Evercore as investment banker in these cases. The Application sets forth Evercore's

qualifications, the services to be provided by Evercore pursuant to the Engagement Letter, and details regarding Evercore's fee structure and its reasonableness.

11. On December 14, 2018, the Objecting Parties filed the Objection to the Application.

12. On December 15, 2018, well after their objection deadline, the Objecting Parties filed the *Declaration of Martin Lewis in Support of Limited Objection by Various Creditors to Debtors' Application to Retain Evercore Group L.L.C. as Investment Banker* [Docket No. 198] (the "**Lewis Declaration**").

## Reply to Objection

**A. Evercore's Fee Structure Is Reasonable Under Section 328(a) of the Bankruptcy Code**

13. The Objecting Parties contend that the proposed fees to be paid to Evercore are "excessive and unreasonable." (Obj. ¶ 1.) Specifically, they argue that (a) Evercore's Comprehensive Restructuring Fee of 1.0% on the amount of the Debtors' entire existing debt is unreasonable and should be reduced to 0.7% of the aggregate amount of the Term Loans and the Unsecured Notes (Obj. ¶¶ 2, 8); and that (b) Evercore's additional Financing Fee of 1.0% on the amount of any DIP facility and any exit facility is problematic because (i) there is no crediting of the Financing Fee against other fees, (ii) Evercore may earn Financing Fees on both the DIP Facilities and the "roll of those facilities into exit facilities," and (iii) the Financing Fees are based on existing investor commitments as opposed to new "outside money." (Obj. ¶ 3). Accordingly, the Objecting Parties contend that Evercore should only be entitled to one Financing Fee, which should be credited fully against the Comprehensive Restructuring Fee. (Obj. ¶ 8). This proposed line-item edit of Evercore's negotiated contract would reduce the ultimate restructuring fees in this case from $13.065 million to $6.534 million.

14. The problem with this argument is twofold: even if the Bankruptcy Code permitted the parties and the Court to accept parts of Evercore's prepetition contract while editing others, as the Objecting Parties appear to propose, it would be inequitable and inappropriate to do so in this case. Evercore has performed significant prepetition work and will continue to provide substantial support to the Debtors during these chapter 11 cases, thus fully performing its obligations under the prepetition Engagement Letter.

15. The Engagement Letter was entered into following a selection process whereby representatives of the Debtors considered and spoke at various times with multiple potential financial advisors, and selected Evercore as the best choice for the engagement based on its extensive experience and excellent reputation in providing high quality investment banking services to financially troubled companies in complex financial restructurings, both out of court and in chapter 11 cases. The negotiation of the Engagement Letter was an arms'-length process informed by recent fees for comparable engagements, and, as further substantiated in the Evercore Reply, resulted in engagement terms that are supported by and broadly consistent with market precedent. As is typical of investment banker fee structures in connection with restructurings, the terms and conditions of the Engagement Letter reflect terms that may be more or less favorable to either party depending upon the various uncertainties associated with the contemplated refinancing or restructuring of the Company's debt.

16. Evercore's proposed fee structure was known to the Objecting Parties well prior to the Application. The Objecting Parties are parties to the Debtors' Restructuring Support Agreement ("**RSA**"). The parties to the RSA knew the Debtors would require an investment banker to achieve the milestones set by the RSA, and were aware of Evercore's fees at the time of the RSA's negotiation over a very compressed time period in mid-November. Indeed, based

on a prepetition request from the Supporting Creditors under the RSA (including the Objecting Parties), Evercore voluntarily agreed during that time frame to amend its Engagement Letter to defer $2.5 million of its fees that otherwise would have been payable prepetition to instead be payable on emergence, thus providing the Debtors with additional liquidity at the beginning of these cases. In addition, the Objecting Parties are lenders under the DIP Facilities, and Evercore's fees are included in the DIP budget that was negotiated and agreed to by the DIP lenders, including the Objecting Parties.

17. Nevertheless, the Objecting Parties now argue that the Engagement Letter, and in particular the Comprehensive Restructuring Fee and the Financing Fees, permits Evercore to obtain compensation that the Objecting Parties assert excessive in light of the work done by Evercore to date. That argument ignores the tireless work by a full Evercore team over the course of many months to achieve a restructuring result that will preserve substantial value—far more than the fee at issue—for the benefit of the Debtors' creditors, including the Objecting Parties. The RSA and Prepackaged Plan are the product of months of Evercore's hard work, including negotiations on multiple fronts with the different creditor groups and third parties. The negotiations were extensive, wide-ranging, complex, time sensitive, and at times grueling. Specifically:

- Immediately upon their retention in April 2018, Evercore investigated sources of additional liquidity to support the Debtors' growth initiatives and also began discussions with certain creditor constituencies regarding a potential deleveraging refinancing of the Company's funded debt.

- In May 2018, after engaging with representatives for the creditor groups, Evercore expanded its outreach and solicited a number of potential capital sources to refinance the Term Loans. Evercore contacted approximately 39 parties, but only four indications of interest—none actionable—were received by July 2018.

- Following those efforts, Evercore reengaged with the Debtors' creditors regarding possible new-money investments and a Term Loan maturity extension and pay down to deleverage the business.

01:23971586.4

8

- In August 2018, Evercore ran a diligence process for the Company's creditors to consider more comprehensive financing and restructuring solutions. The ensuing process involved months of negotiations ultimately resulting in the RSA. Evercore's support and efforts were crucial throughout the process that led to the RSA.

- In connection with developing the Debtors' Prepackaged Plan, Evercore prepared an estimate of the going-concern value of the Reorganized Debtors, which included, among other things: (1) reviewing the Debtors' historical financial information; (2) meeting with Debtors' senior management to discuss the Company's operations and future prospects; (3) reviewing publicly available financial data and considering the market values of comparable public companies; (4) preparing discounted cash flow analyses based on the Debtors' financial projections; and (5) considering the value assigned to certain precedent change-of-control transactions for businesses similar to those of the Debtors.

- Evercore also conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans.

- Immediately prior to the filing of these chapter 11 cases, Evercore assisted the Debtors in securing the DIP Term Loan Facility and the DIP ABL Facility. In addition to negotiating with the existing lenders who ultimately provided the DIP Facilities, Evercore contacted potential third-party financing providers to solicit and gauge their interest in providing debtor-in-possession financing on better terms than the existing lenders.

- Evercore also played a crucial role in negotiating the terms of the backstop term loan exit facility, working closely with management to ensure its terms were workable for the company and that it was sized to provide necessary liquidity.

As the Court has recognized, prepetition work is relevant to the reasonableness of a professional's overall compensation, and success fees have been routinely approved where a significant portion of the advisor's work was completed prepetition.[4]

18. As all parties recognize, the Debtors require the services of their investment banker on an ongoing basis during these chapter 11 cases to provide support through

---

[4] *See*, *e.g.*, *Omnibus Order Awarding Compensation for Services Rendered and for Reimbursement of Expenses of Professionals*, *In re Remington Outdoor Co., Inc,* Case. No. 18-10684 (BLS), Docket No. 334, at 4 (Bankr. D. Del. July 16, 2018); *Order Approving Final Fee Applications of the Reorganized Debtor's Professionals*, *In re HCR Manorcare, Inc.*, Case No. 18-10467 (KG), Docket No. 335, at 3 (Bankr. D. Del. Sep. 24, 2018); *Omnibus Order Approving Final Fee Applications*, *In re U.S. Concrete, Inc.*, Case No. 10-11407 (PJW), Docket No. 447, at 3 (Bankr. D. Del. Oct. 19, 2010); *Omnibus Order Approving Final Fee Application Requests*, *In re Masonite Corp.*, Case No. 09-10844 (PJW), Docket No. 475, at 3 (Bankr. D. Del. July 29, 2009).

01:23971586.4

confirmation of the proposed plan and exit. In addition to the extensive prepetition efforts detailed above, Evercore continues to provide substantial assistance post-petition:

- Evercore will provide testimony in support of the Debtors' disclosure statement and plan, including in support of the valuation analysis and plan feasibility.

- Evercore has worked to arrange committed ABL exit financing, which is necessary to obtain for emergence, negotiating with both the existing ABL lenders and a variety of potential third-party providers.

- Evercore has assisted the Debtors in the preparation of a 12-month post-emergence liquidity forecast which, in addition to being a required deliverable under the DIP financing agreements, is critical to determining the size of the required exit facilities.

19. In sum, Evercore has performed significant work in satisfaction of its obligations under the negotiated Engagement Letter and has earned the fees provided for thereunder.

**B. Evercore's Tail Fee Likely Entitles It to Full Payment of Its Negotiated Fees in These Full-Pay Cases**

20. In addition to the reasonableness of Evercore's fees in light of the work expended, the overall circumstances of these cases and the terms of the Prepackaged Plan further support approval of Evercore's fees.

21. Section 5 of Evercore's Engagement Letter contains a "tail fee" that provides:

> Evercore's engagement hereunder may be terminated by the Company or Evercore at any time upon written notice and without liability or continuing obligation to the Company or Evercore, except that following such termination Evercore shall remain entitled to any fees accrued pursuant to Section 2 but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination or expiration, as the case may be, and Evercore shall remain entitled to full payment of all fees contemplated by Section 2 hereof in respect to any Transaction announced or occurring during the period from the date hereof until 12 months following such termination or expiration, as the case may be.

22. Such "tail" provisions are typical of investment banker retentions in restructuring engagements.[5] The tail is likely to be viewed as a fully enforceable and binding obligation against the Company, and, if Evercore had been terminated prior to the Company's chapter 11 filings, Evercore likely would have an unsecured claim for the same proposed fees sought here under the Engagement Letter.[6] Indeed, because general unsecured claims are being fully paid in these cases, Evercore likely would receive all of the proposed fees, without scrutiny for whether such fees were "reasonable."

23. Here, denial of any portion of Evercore's fees could lead to an incongruous and unusual result: Evercore likely could have received greater compensation if it were terminated prior to the bankruptcy filings and had not ever performed the post-petition work that it has completed and continues to perform. This would create perverse incentives and, indeed, would disincentivize prepetition advisors from continuing their engagements post-petition in full-pay cases—thus, preventing debtors from taking advantage of the relevant experience and expertise gained by the advisor during their prepetition engagement.

24. Accordingly, the unique circumstances of these cases—along with the substantial work performed by Evercore in fulfillment of its obligations under the Engagement Letter—warrant approval of Evercore's fee arrangement.

C. **The Objecting Parties' Request for an Adjournment Should Be Denied**

25. The Objecting Parties have requested that the hearing on the Application be adjourned until January 4, 2019, to permit additional time to prepare and conduct discovery concerning Evercore's fees. January 4 is the date set for the Court to consider confirmation of

---

[5] *See, e.g.*, *In re Borders Grp., Inc.*, No. 11-10614 (MG), 2011 WL 6026158, at *5 n.6 (Bankr. S.D.N.Y. Dec. 5, 2011).

[6] *See, e.g.*, *In re Texas Rangers Baseball Partners*, No. 10-43400-DML, 2012 WL 4464550 (Bankr. N.D. Tex. Sept. 25, 2012); *In re Nat'l Energy & Gas Transmission*, Inc., No. 03-30459 PM, 2006 WL 4595947, at *1 (Bankr. D. Md. Aug. 28, 2006).

01:23971586.4

the Prepackaged Plan.  If the Court were to grant the adjournment request, the result would be that Evercore would perform substantially all of the work contemplated for these cases without any certainty regarding its fee arrangement.  It is simply inequitable for the Court to permit such a result.

26. This is particularly true where, as here, the Objecting Parties have expressly disavowed any second-guessing as to the need for an investment banker and Evercore's qualifications to serve in such capacity, and the Objecting Parties appear to be fully capable of addressing their issues, set forth in an objection that is openly characterized as "limited," with the Court in a timely manner.  As discussed above, the Objecting Parties have been fully aware of the size of Evercore's fees for some time, and Evercore's fees were included in the DIP budget that was used as the basis for the initial lending request in these cases.  More importantly, the Objecting Parties filed the Lewis Declaration, which sets forth their view of what the Court should consider as "market" for purposes of Evercore's retention.  As a result, it would appear that the Objecting Parties have conducted the market analysis they claim is necessary, and the Court should permit Evercore to have certainty concerning its fee structure.

## **Conclusion**

27. For the reasons set forth above, the Debtors respectfully submit that the Objection should be overruled in its entirety and the Application should be approved.

Dated: December 17, 2018
       Wilmington, Delaware

*/s/ Jaime Luton Chapman*
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Jaime Luton Chapman (No. 4936)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (302) 571-1253
Email: rbrady@ycst.com
       emorton@ycst.com
       jchapman@ycst.com
       tpakrouh@ycst.com

*Proposed Counsel for the Debtors and Debtors in Possession*