**<u>Exhibit B</u>**

Reply

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
: 
: 
In re:                              :   Chapter 11
                                    : 
DAVID'S BRIDAL, INC., *et al.*,[1]  :   Case No. 18-12635 (LSS)
                                    : 
Debtors.                            :   (Jointly Administered)
                                    : 
                                    :   **Re: Docket Nos. 128, 181, 200**
------------------------------------------------------------ x

## REPLY OF EVERCORE GROUP L.L.C. IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO EMPLOY AND RETAIN EVERCORE GROUP L.L.C. AS INVESTMENT BANKER EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE

Evercore Group L.L.C. ("Evercore"), by and through its undersigned counsel, DLA Piper LLP (US), hereby submits this reply (the "Reply") in support of the *Debtors' Application for Entry of an Order Authorizing the Debtors to Employ and Retain Evercore Group L.L.C. as Investment Banker Effective nunc pro tunc to the Petition Date* [D.I. 128] (the "Application")[2] filed by David's Bridal, Inc. and its affiliated debtors (the "Debtors") and in response to the *Limited Objection by Various Creditors to Debtors' Application to Retain Evercore Group L.L.C. as Investment Banker* [D.I. 181] (the "Objection") filed by Oaktree Capital Management, L.P., acting solely in its capacity as investment advisor on behalf of certain funds and accounts in its Strategic Credit, High Yield and U.S. Senior Loans strategies; Courage Capital Management, LLC, acting solely in its capacity as investment manager to certain investment funds; AlbaCore Capital LLP, acting in its

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Application.

1

capacity as delegated investment manager to AlbaCore Capital Limited as AIFM to certain funds and investment entities; and Deutsche Bank AG Cayman Islands Branch (solely with respect to the Distressed Products Group) (collectively, the "Objecting Lenders"). In support of the Application, Evercore submits the *Supplemental Declaration of Stephen Goldstein in Support of the Debtors' Application for an Order Authorizing the Debtors to Employ and Retain Evercore Group L.L.C. as Investment Banker Effective nunc pro tunc to the Petition Date* (the "Supplemental Goldstein Declaration"), attached hereto as Exhibit A and fully incorporated herein. In further support of the Application, Evercore respectfully states as follows:

## PRELIMINARY STATEMENT

1. To put it simply, the belated objection of the Objecting Lenders is nothing but a thinly veiled attempt to extract a last minute fee concession from Evercore as the reorganization of the Debtors is coming to a highly successful, pre-packaged conclusion; this, after almost a year of effort by a number of constituencies, including Evercore as the Debtors' investment banker. Indeed, lost within the Objection are three critical facts, none of which are the subject of contention. *First,* nowhere do the Objecting Lenders question the qualifications of Evercore, their tireless commitment to this restructuring process over the past year and the considerable work that remains to be completed to confirm the Debtors' chapter 11 cases. Importantly, among other activities, the Evercore team continues to seek and negotiate the terms of exit financing facilities (the "Exit Facilities"), which, while a core component of the overall pre-packaged restructuring, remain the subject of intense negotiation.

2. *Second,* the Objecting Lenders are too quick to forget that the terms of the Evercore engagement were heavily negotiated and have, along with the engagement agreements of the investment bankers to the lenders, including the Objecting Lenders, been part of the overall

2

restructuring transaction for many weeks. In fact, all parties to the restructuring, including the Objecting Lenders, contractually agreed to support and to take all actions necessary to implement and consummate the Debtors' restructuring by the terms of the Restructuring Support Agreement dated as of November 18, 2018 (the "Restructuring Support Agreement"). As part of the negotiations leading up to the Restructuring Support Agreement, Evercore's fees were disclosed to, and heavily scrutinized by, the advisors to the Objecting Lenders; such fees were included in both the DIP Budget and the ABL Carve Out documents that are integral to the restructuring transactions. In furtherance of the Restructuring Support Agreement, at the first day hearing before this Court on November 20, 2018, the Debtors presented a consensual deal set forth in the *Proposed Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (the "Plan") that contemplates full payment in the ordinary course to unsecured creditors.

3. *Finally,* while the Objecting Lenders belatedly quibble with certain elements of Evercore's compensation, as reflected by the pre-petition agreement of the sophisticated parties to these transactions, the evidence and the applicable law, the terms and conditions of Evercore's retention in its entirety represent reasonable market terms and conditions of employment.

4. Indeed, Evercore's retention is, and continues to be, in the best interests of the Debtors, their estates and their creditors, and should be approved with the existing fee structure by this Court. And, any effort by the Objecting Lenders to now seek to adjourn this matter to another day should be viewed for exactly what it is: an additional opportunity to try and extract additional concessions from Evercore during the most critical days of these cases. For these reasons, the Objection should be overruled and the Application approved.

3

EAST\163220309.12

# ARGUMENT

5. The Application seeks approval of reasonable fees for work performed and therefore should be approved. Section 328(a) of the Bankruptcy Code, pursuant to which the Debtors seek approval of Evercore's fees and compensation structure, provides that with court approval a debtor may approve the retention of a professional "on ***any reasonable terms and conditions of employment***, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a) (emphasis added). Bankruptcy courts have applied the following non-exhaustive factors in determining whether the terms and conditions of employment are reasonable under section 328:

> a) whether terms of an engagement agreement reflect normal business terms in the marketplace;
>
> b) the relationship between the debtor and the professionals, i.e., whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation;
>
> c) whether the retention, as proposed, is in the best interests of the estate;
>
> d) whether there is creditor opposition to the retention and retainer provisions; and
>
> e) whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization," especially in light of the existence of any other "risk-minimizing" devices, such as an administrative order and/or a carve-out.

*See In re Energy Partners, Ltd.*, 409 B.R. 211, 225 (Bankr. S.D. Tex. 2009) (quoting *In re Insilco Tech., Inc.*, 291 B.R. 628, 633 (Bankr. D. Del. 2003)).

### A. The Engagement Agreement Reflects Market Business Terms

6. For obvious reasons, the Objecting Lenders claim – without support – that market terms and conditions of employment are not a critical factor in the retention of an investment banker, such as Evercore. *See* Objection, at p. 7 FN. 3. While bankruptcy courts may differ on approach, they uniformly agree that ordinary market terms are significant in determining whether the business terms of a professional engagement are reasonable. *See United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 229 (3d Cir. 2003) (noting that views on reasonable professional retentions should be "market-driven"); *In re Residential Capital, LLC*, 504 B.R. 358, 368 (Bankr. S.D.N.Y. 2014) (noting that courts in the Second Circuit have adopted a "'market-driven' approach," where comparing the cost of services is a "significant" reasonableness factor).

7. To this end, bankruptcy courts have found that compensation structures similar to that agreed to by the Debtors with Evercore, which indicate that the sought rates are prevailing in the market for professionals of comparable caliber and capacity for similar services, are reasonable. *See e.g., In re Relativity Fashion, LLC*, 565 B.R. 50, 71 (Bankr. S.D.N.Y. 2017) (citing cases where the bankruptcy court approved rates charged by other firms comparable to those sought by the professional applying for retention under section 328 of the Bankruptcy Code); *In re UDC Homes, Inc.*, 203 B.R. 218, 222 (Bankr. D. Del. 1996) (approving restructuring fee of $3.75 million in light of evidence that such fees were consistent with those charged in other cases and that advisors commonly charged such fees in a case of that size); *see also In re Busy Beaver Bldg. Ctrs, Inc.*, 19 F.3d 833, 853 (3d Cir. 1994) (in assessing the reasonableness of professional fees noting that: ". . . the bankruptcy court should compare the costs of "equivalent" practitioners

5

of the art (including their billing structures)[.]"). To that end, fee comparisons are useful for providing directional, but not definitive guidance, as to the standard of reasonableness.

        8.        Under the Engagement Agreement,[3] Evercore is entitled to the following fees:

        a.        A monthly fee in the amount of $150,000 per month until the consummation of any Transaction or the termination of Evercore's engagement (the "Monthly Fees").[4]

        b.        One of a number of transaction fees, which in this case would be the "Comprehensive Restructuring Fee" equal to 1% of the aggregate principal amount outstanding (including letters of credit) of the Credit Facilities and the aggregate principal amount of the Senior Notes (the "Transaction Fee").

        c.        A "Financing Fee" equal to 1% of all amounts committed, whether or not drawn (the "Financing Fees")[5] on both the post-petition financing facility required to fund the Debtors' bankruptcy cases and operations (the "DIP Facility"), and the exit facility necessary for consummation of the Debtors' plan of reorganization (the "Exit Facility").

*See* Application, at ¶16.

---

[3]     Capitalized terms used but not defined in this paragraph 6 shall have the meanings ascribed to them in the Engagement Agreement.

[4]     Pursuant to the Engagement Agreement, 50% of the Monthly Fees paid shall be credited (without duplication) against any Transaction Fee that becomes payable under the Engagement Agreement, provided that, in the event of a bankruptcy filing, any such credit of Monthly Fees shall only apply to the extent that all such Monthly Fees and Transaction Fee are approved in their entirety by the Bankruptcy Court…*See* Engagement Agreement, at p. 4 2(a).

[5]     Pursuant to the Engagement Agreement, 1% of all committed amounts of the financing gross proceeds is owed because it is indebtedness secured by a first lien. A greater percentage would be owed if the indebtedness was secured by a junior lien, unsecured and/or subordinated lien (2.5%) or equity or equity-linked securities or obligations (4.0%).

9. As the compensation structure is ordinary, customary and market-driven, it should be approved in its entirety. This Court has previously approved similar fee structures for investment bankers under section 328(a). *See, e.g.*, *One Aviation Corp.,* No. 18-12309 (CSS) (Bankr. D. Del. Nov. 20, 2018) [D.I.188] (approving retention of an investment banker and all compensation pursuant to section 328(a) of the Bankruptcy Code in a chapter 11 case with a prepackaged plan); *Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018) [D.I. 771] (same); *Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) [D.I. 345] (same). As set forth in detail in the Supplemental Goldstein Declaration, Evercore's compensation structure is squarely within the range of rates approved in chapter 11 cases of similar size and complexity. *See* Supplemental Goldstein Declaration, at ¶ 5. Specifically, and as addressed more fully in the Supplemental Goldstein Objection:

  a. Transaction fees, ranging from 0.84%-1.35% of the aggregate principal amount of debt outstanding, paid to debtors' advisors in cases of similar size and complexity are market terms. *Id.* at ¶ 7. Interestingly, though advisors to creditors ordinarily charge fees in percentage amounts less than debtors' advisors, the Objecting Lenders' advisors seek compensation of approximately the same quantum of Evercore's Transaction Fee in connection with these chapter 11 cases – 1% of funded debt. *Id.* at ¶ 14.

  b. The Financing Fees also reflect normal business terms. Specifically, a percentage fee based upon both the debtor-in-possession financing and the exit financing are standard market terms and conditions of employment for investment bankers such as Evercore in complex restructurings such as this. *Id.* at ¶ 8.

7

10.     The terms and conditions of Evercore's engagement were not only heavily negotiated, but provided to all stakeholder constituencies well in advance of the filing of these cases. In fact, Evercore's Engagement Agreement was specifically provided to the advisors to the Objecting Lenders on November 10, 2018, and all of the professional fees related to the restructuring (including Evercore's) were heavily scrutinized as part of the negotiations related to the DIP Budget and the ABL Carve-Out in connection with the execution of the Restructuring Support Agreement. *Id.* at ¶ 23. Now, on the eve of the Court's consideration of the Debtors' request for approval of the Application and confirmation of the Plan, the Objecting Lenders have launched a broad attack on Evercore's fees. As to the Monthly Fees, the Objecting Lenders do not raise any issues, s*ee* Objection, at p. 4 FN 2, nor could they, as the monthly fee set forth in the Engagement Agreement is in keeping with market business terms.

11.     The Lenders do object to the Financing Fees on the DIP Facility and the Exit Facility. *See* Objection at ¶¶ 32-36. As support for this objection, the Objecting Lenders summarily rely upon the last-minute *Declaration of Martin Lewis in Support of Limited Objection by Various Creditors to Debtors' Application to Retain Evercore Group L.L.C. as Investment Banker* [D.I. 198] (the "Lewis Declaration"). Specifically, Mr. Lewis concludes, without a shred of support, that "it is generally accepted practice" to credit some or all of the financing fee against a success fee when the DIP or exit facility is provided by an existing lender. *Id.* at ¶ 12. He further postures that it would not be generally accepted practice to charge a Financing Fee on an exit financing that is merely a "rolled" DIP financing. *Id.*

12.     Putting aside for the moment that the concept of "generally accepted practice" is nowhere recognized by the courts in this Circuit, what is clear is that the Financing Fee negotiated by Evercore is a market term and condition of employment. The vast majority of DIP financing

8

in recent restructurings of similar size and complexity have been provided by existing investors, and in almost all of these engagements, investment bankers in have been entitled to, and collected a financing fee in connection with the DIP facility. *See, e.g. In re MACH Gen*, Case No. 18-11369 (MFW) (Bankr. D. Del. Nov. 30, 2018) [D.I. 28]; *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Nov. 14, 2018) [D.I. 579] (approving a financing fee of $750,000 to investment banker for successful DIP financing); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (Bankr. D. Del. Apr. 12, 2018) (MFW) [D.I. 579] (authorizing investment banker's $2 million capital raising fee for closing DIP facility); *In re Remington Outdoor Co., Inc.*, Case No. 18-10684 (BLS) (Bankr. D. Del. Jul. 16, 2018) [D.I. 334] (approving investment banker's $3.5 million financing fee for DIP financing)*; In re Tops Holding II Corp.,* Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Oct. 2, 2018) [D.I. 671] (approving investment banker's $2.65 million financing fee for DIP financing); *In re Appvion, Inc.,* Case No. 17-12082 (KJC) (Bankr. D. Del. Dec. 14, 2017) [D.I. 324] (certificate of no objection regarding and notice of no order required to approve investment banker's $850,000 financing fee for DIP financing).[6] This reflects the reality that, in virtually all recent bankruptcy cases, existing secured lenders are in the best positon to provide additional capital relative to the most likely alternative: priming litigation at the outset of the case.

13. As to what appears to be the crux of the Objecting Lenders' argument – that Evercore should not receive its agreed upon Financing Fee for the Exit Facility as well as the DIP Facility -- as a threshold matter, this element of Evercore's compensation is similarly a market term and condition of employment. *See, e.g. In re Tops Holding II Corp.*, No. 18-22279 (Bankr.

---

[6] The referenced orders are voluminous in nature, and therefore, are not attached to this Reply. However, in accordance with Local Rule 7007-2, as made applicable to main cases by the Court's General Chambers Procedures, the Debtors' proposed counsel has copies of each order and will make them available to the Court and to any party that requests them. Additionally, the referenced orders are available on the Court's CM/ECF PACER site at the cited docket index numbers and on the dates specified above.

S.D.N.Y. Nov. 30, 2018) [D.I. 786] (investment banker receiving Financing Fee in connection with exit financing); *In re Payless*, Case No. 17-42267 (Bankr. E.D. Mo. Nov. 8, 2017) [D.I. 2006] (same). More critically, the Objecting Lenders completely ignore the facts of the current situation when they characterize Evercore's Financing Fees as a "double dip" on a DIP Facility that "roll[s]…into the exit facilities." *See* Objection, at ¶ 3. In fact, as of the date hereof, the Debtors do not have a committed Exit ABL Facility for the DIP ABL Facility to "roll" into. Evercore continues to work intensively with the Debtors to procure both a committed Exit ABL Facility and negotiate several open material terms of the Exit Term Loan in advance of the hearing to confirm the Plan in early January.[7] Specific work steams that Evercore has pursued in connection with the Exit Facility include: (i) signing up several potential third party lenders to the Exit ABL Facility to confidentiality agreements with the Debtors, providing such parties due diligence materials in a data room and receiving term sheets from such third parties to replace DIP lenders that do not want to participate in the Exit ABL Facility;[8] (ii) negotiating the material open terms of both Exit Facilities, which include the exit term loan facility size, borrowing base collateral calculations, and reporting requirements, financial covenants, mechanics of the excess cash flow sweeps and various intercreditor issues;[9] and (iii) preparing the Debtors to obtain a rating for the new Exit Term Loan Facility (although the DIP Term Loan has been rated by S&P and Moody's, as the Exit Term Loan Facility is a materially different financing, a new rating is required). *See* Supplemental Goldstein Declaration, at ¶¶ 25-27.

---

[7] While Evercore continues to negotiate the terms of the Exit Facility, at present only one lender has decided to participate in the Exit ABL Facility.

[8] All of the term sheets have been shared and discussed with the advisors to the Objecting Lenders.

[9] Evercore has also received inbound inquiries related to the Exit Term Loan Facility, including receipt of a third party term sheet that has been shared with the advisors to the Objecting Lenders.

14. As to the practice of crediting a portion or all of financing fees against a success fee, the Objecting Lenders' inference to the contrary, there are no market terms and conditions on crediting. Each engagement by an investment banker is unique, and the compensation structure is negotiated in totality, recognizing the facts and circumstances of the engagement. While in some engagements, a crediting mechanism may be used as part of the total compensation, in other engagements, they are not. *See*, *e.g. In re ATD Corp.,* Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 15, 2018) [D.I. 160] (providing for no credits among investment banker's event-based fees); *In re MACH Gen GP, LLC*, Case No. 18-11369 (MFW) (Bankr. D. Del. Oct. 19, 2018) [D.I. 17] (same); *In re EV Energy Partners, LP;* Case No. 18-10814 (CSS) (Bankr. D. Del. Apr. 16, 2018) [D.I. 102] (same); *In re HCR Manorcare; Inc.,* Case No. 18-10467 (KG) (Bankr D. Del. Mar. 16, 2018) [D.I. 65] (same); *In re Appvion, Inc.,* Case No. 17-12082 (KJC) (Bankr. D. Del. Oct. 6, 2017) [D.I. 83] (same); *In re Payless Holdings LLC*, No. 17-42267 (Bankr. E.D. Mo. Nov. 8, 2017) [D.I. 279] (same); *see also In re Gastar Exploration Inc.;* Case No. 18-36057 (Bankr. S.D. Tx. Nov. 27, 2018) [D.I. 204] (providing for credit of financing fee against restructuring fee only if the former exceeded $10 million).

15. With the Financing Fee having been addressed, the Objecting Lenders next object to the Transaction Fee, which they now suddenly claim to be too high. *See* Objection at ¶¶ 27-31. In fact, Mr. Lewis claims that a market fee for a Transaction Fee is between .65 and .70% on the amount of restructured debt. Lewis Declaration at ¶ 11. While cross-examination will reveal the basis, or lack thereof of his last-minute analysis, even his review reveals numerous restructuring matters with a transaction fee comparable to that agreed to with Evercore.[10] *Id.* at Schedule 1.

---

[10] While not stated by Mr. Lewis, he appears to conclude, without any support, that the "median" and the "average" demonstrate a market rate. He is incorrect. As set forth herein, fee comparisons provide direction with respect to meeting the reasonableness standard, as the market provides a range of acceptable fees rather than a single, definitive fee based upon the average of past fees.

More critically, as demonstrated in the Supplemental Goldstein Objection, the Transaction Fee is clearly within the range of market transaction fees in comparable restructuring engagements. *See* Supplemental Goldstein Declaration, Exhibit 1. What is also seemingly forgotten by Mr. Lewis is that the two sets of investment bankers to the lenders – including the investment banker to the Objecting Lenders – are being paid approximately **1% of the outstanding debt within their respective issuance.** *Id.* at ¶ 14. It would be more than ironic if Evercore, who even by the Objecting Lenders' begrudging admission were critical to this success of this restructuring, were to have a fee structure that is **30% less than the Objecting Lenders' advisors, Greenhill or Moelis for the debt restructuring.**

> **B.  Evercore's Fees Were Agreed Upon By Sophisticated Parties During Arms-Length Negotiations**

16. Having established that the Evercore's engagement affords market terms and conditions of employment, it is important to next turn to the relationship between the Debtors and Evercore, which tips in favor of approval of the Application. Evercore's fees, as set forth in the Engagement Agreement, are reasonable because they were negotiated by sophisticated parties with equal bargaining power. Prior to the Petition Date, the Debtors and Evercore engaged in arms-length negotiations over Evercore's retention, which negotiations resulted in the Engagement Agreement. *Id.* at ¶ 4. The arms-length negotiations over Evercore's fees were fulsome and in good faith. *Id.* Therefore, this Court should defer to the Debtors' business judgment and approve Evercore's reasonable fees.

17. At each and every turn, Evercore dedicated all available resources necessary to successfully reorganize the Debtors' businesses, including when Evercore voluntarily agreed during that time frame to amend its Engagement Agreement to defer approximately $2.5 million of its fees that otherwise would have been payable prepetition to instead be payable on emergence.

18. Thereafter, in November 2018 and in connection with the global resolution culminating in the Restructuring Support Agreement, Evercore provided extensive due diligence to certain of the Objecting Lenders' advisors, including information regarding Evercore's retention and compensation. *See id. at* ¶ 21. The Objecting Lenders were made fully aware of the full amount of fees payable to Evercore in the event of a restructuring in connection with negotiations related to the DIP Facility budget, the ABL carve-out and the professional fee escrow contained in the Plan. *Id*.

19. Indeed, Evercore's fees were fully disclosed to, and repeatedly discussed with, the Objecting Lenders' advisors, including over the period of a full week during which the Objecting Lenders' advisors analyzed and extensively scrutinized Evercore's fees. *Id*. After such deep analysis of Evercore's fees, the Objecting Lenders executed the Restructuring Support Agreement, essentially agreeing to Evercore's fees as set forth in various documents submitted to this Court on the Petition Date in connection with the commencement of these bankruptcy cases and submission of the Plan. The Objecting Lenders signed the Restructuring Support Agreement on November 18, 2018, approved the DIP budget by November 19, 2018 and agreed to the ABL Carve Out by November 19, 2018, all of which set forth Evercore's fees. *Id.* at ¶ 24.

20. By its terms, the Restructuring Support Agreement requires the Objecting Lenders, as parties thereto, to "support and to take all reasonable actions necessary to implement and consummate the Restructuring in a timely manner as contemplated by this Agreement[.]" *See* Restructuring Support Agreement*,* section 3(a)(i). At a minimum, the Objection violates the spirit of the Restructuring Support Agreement because consummation of the restructuring still requires the benefit of a significant amount of work by Evercore, including evidentiary support required

13

for approval the Plan and disclosure statement and raising and consummating the Exit Facility as described above.

### C. Evercore's Retention Is In The Best Interests Of The Debtors' Estates

21. The Objecting Lenders concede that Evercore's retention is indeed in the best interests of the Debtors, their estates and their creditors and yet direct the Court to discount this factor because "most of Evercore's work in this matter has been completed at this point." *See* Objection, at ¶ 23. This is misguided and unsupported. This Court routinely approves retention applications, and similar fee structures, for investment bankers where much of the work was done prepetition and a pre-packaged plan of reorganization was submitted on the petition date. *See, e.g.*, *One Aviation Corp.,* No. 18-12309 (CSS) (Bankr. D. Del. Nov. 20, 2018) [D.I.188]; *Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018) [D.I. 771]; *Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) [D.I. 345]. To hold otherwise would dissuade parties from working towards consensual restructurings and the preparation of pre-packaged plans of reorganizations, to the detriment of all stakeholders.

22. The presentation of a consensual deal on the Petition Date required considerable work on behalf of the Debtors, their creditors and their advisors, all of whom worked tirelessly to manage an extraordinarily complex and highly-contested restructuring involving three creditor groups, which required execution under the considerable time pressure created by the first quarter selling season of the bridal market. Nevertheless, confirmation of the Debtors' Plan, which is scheduled to be considered by this Court in less than three weeks, requires significant continued work from many of these parties, including Evercore. In the three weeks between now and the hearing on confirmation of the Plan, Evercore will need to prepare and submit evidentiary support to support the going-concern valuation that is included in the disclosure statement (which must be

14

approved at the combined hearing scheduled for January 4, 2019), which will in term be a necessary fact that the Debtors and this Court must rely on to establish the feasibility of the Plan at the combined hearing. *See* Supplemental Goldstein Declaration, at ¶ 28. Perhaps most importantly, Evercore continues to work to raise capital for the Exit Facility necessary for consummation of the Plan – including obtaining new ratings for the Exit Term Loan Facility, finding replacement parties as necessary to replace the DIP ABL lenders who have declined to commit to the Exit ABL Facility, communicating with prospective investors, establishing and maintaining a data room for prospective investors to conduct due diligence, and conducting management meetings. *Id*. at ¶ 27. Evercore also continues to host calls to discuss the Exit Facility budget. *Id*. Much of this is work that Evercore has yet to do that is necessary for consummation of the Plan and, therefore, the successful reorganization of the Debtors' business.[11] Therefore, the Objection should also be overruled because Evercore's retention is in the best interests of the Debtors, their estates and their creditors.

### D. Creditor Opposition Should Not Receive the Most Weight

23. By the Objection, the Objecting Lenders submit that their opposition should be given the most weight in the analysis of whether Evercore's fees are reasonable. *See* Objection at ¶ 24. This statement is self-serving and unsupported by case law and should be rejected. *See United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d at 229 (reasonableness of professional retentions should be "market-driven"); *In re Residential Capital, LLC,* 504 B.R. at 368 (market terms are significant when determining reasonableness of

---

[11] Further, by the terms of the Engagement Agreement, if the Engagement Agreement is terminated prior to consummation of the Plan, Evercore is entitled to full payment of all fees contemplated by the Engagement Agreement with respect to any transaction announced or occurring for the period during April 3, 2018 to twelve (12) months following the termination, less the crediting of the Monthly Fees. *See*, Engagement Agreement § 5. Evercore would also be entitled to seek these amounts by filing an unsecured claim in these chapter 11 cases. Under the Plan as drafted and agreed upon, general unsecured creditors will be paid in full in the ordinary course of business. *See* Plan, at § 4.6(b)

professional retentions). The Objecting Lenders, as "the fulcrum security in the Debtors' capital structure," were parties to pre-petition negotiations and discussions. The Objecting Lenders knew of Evercore's compensation structure and their advisors reviewed and analyzed Evercore's fees. They then committed to the Restructuring Support Agreement, the Plan and the DIP Facility, all of which incorporate the payments to Evercore as set forth in the Engagement Agreement. The scope of Evercore's work entitles it to the fees originally contemplated and agreed upon.

### E. Motion to Adjourn Should Be Denied

24. By the Objection, the Objecting Lenders also request that the hearing on this matter be adjourned until the confirmation hearing. Evercore respectfully requests that the Court deny this request because of the extreme prejudice to Evercore. In fact, the Objecting Lenders have already suggested that Evercore does not need to be paid in full for work completed. *See* Objection at ¶ 23 ("It should be noted, however, that most of Evercore's work in this matter has been completed at this point. The Objecting Parties submit that this factor, while supporting the Application, should be discounted to some extent."). Now, the Objecting Lenders want Evercore to complete all of the work necessary to confirm the Plan, and then come back for a determination of their compensation when they would simply double down on this same worn argument.

25. Moreover, there is simply no basis for an adjournment, other than to create additional pressure on Evercore through uncertainty about Evercore's retention and payment during the weeks leading up to confirmation of the Plan, which are some of the most important weeks of Evercore's engagement. To the extent the Objecting Lenders complain about their lack of time to prepare for this hearing, this is a problem of their own creation. As noted above, the Objecting Lenders and their advisors have been aware of the terms of Evercore's engagement for weeks. *See* Supplemental Goldstein Declaration, at ¶ 23. The Application, containing the

16

Engagement Agreement, the compensation structure and all fees, was filed publicly with this Court on November 29, 2018. A full week later, on December 6, 2018, one of the Objecting Lenders contacted Evercore with concerns about Evercore's engagement. Evercore, subject to Federal Rule of Evidence 408, has been cooperative – voluntarily extending the Objecting Lenders' objection deadline and readily providing all requested and helpful information to the Objecting Lenders regarding its fees in a good faith attempt to address the Objecting Lenders' concerns. The Objecting Lenders' have not provided a single meritorious or practical reason why the Application should be adjourned; nor have they addressed the prejudice that Evercore would suffer as the result of an adjournment. To attempt to use an adjournment as a cudgel to extract economic concessions at this late date is simply inequitable and unwarranted.

[*Remainder of Page Intentionally Left Blank*]

# CONCLUSION

For the reasons set forth herein, the Objection should be overruled and the Application, together with the compensation structure and fee amounts contained in the Engagement Agreement, should be approved.

Dated: December 17, 2018
       Wilmington, Delaware

**DLA PIPER LLP (US)**

*/s/ Maris J. Kandestin*
Maris J. Kandestin (DE Bar No. 5294)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: maris.kandestin@dlapiper.com

Richard A. Chesley (*pro hac vice* admission pending)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: richard.chesley@dlapiper.com

Jamila Justine Willis(*pro hac vice* admission pending)
1251 Avenue of the Americas, 27th Floor
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: jamila.willis@dlapiper.com

*Counsel to Evercore Group L.L.C.*