| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DAVID'S BRIDAL, INC., *et al.*,[1] | : | Case No. 18-12635 (LSS) |
| Debtors. | : | (Jointly Administered) |

## SUPPLEMENTAL DECLARATION OF STEPHEN GOLDSTEIN IN SUPPORT OF THE DEBTORS' APPLICATION FOR AN ORDER AUTHORIZING THE DEBTORS TO EMPLOY AND RETAIN EVERCORE GROUP L.L.C. AS INVESTMENT BANKER EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Stephen Goldstein declares as follows:

1. I am a Senior Managing Director of the investment banking firm Evercore Group L.L.C. ("Evercore"). I am authorized to execute this supplemental declaration on behalf of Evercore. Unless otherwise stated in this supplemental declaration, I have personal knowledge of the facts set forth herein.[2]

2. This supplemental declaration (the "Supplemental Declaration") is being submitted in connection with, and in support of, the proposed employment and retention of Evercore as investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") to perform services as set forth in the *Application of Debtors to Employ and Retain Evercore Group L.L.C. as Investment Banker Nunc Pro Tunc to the Petition*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at Evercore and are based on information provided by them.

1

*Date* (the "Application") and in response[3] to the *Limited Objection by Various Creditors to Debtors' Application to Retain Evercore Group L.L.C. as Investment Banker* [D.I. 181] (the "Objection") filed by Oaktree Capital Management, L.P., acting solely in its capacity as investment advisor on behalf of certain funds and accounts in its Strategic Credit, High Yield and U.S. Senior Loans strategies; Courage Capital Management, LLC, acting solely in its capacity as investment manager to certain investment funds; AlbaCore Capital LLP, acting in its capacity as delegated investment manager to AlbaCore Capital Limited as AIFM to certain funds and investment entities; and Deutsche Bank AG Cayman Islands Branch (solely with respect to the Distressed Products Group) (collectively, the "Lenders"). I submit this Supplemental Declaration in compliance with sections 105, 327, 328 and 1107(a) of the Bankruptcy Code and to provide the disclosures required under Rule 2014(a), 2016 and 5002 of the Bankruptcy Rules and Local Rule 2014-1.

**Engagement of Evercore**

3. Evercore first began speaking with the Debtors and the Debtors' principal equity holders in July 2017. Months later, in October 2017, Evercore began doing preliminary work for the Debtors to obtain more detailed background information on the Debtors' business and financial situation. At that time, Evercore was not yet formally engaged by the Debtors.

4. Evercore began working in earnest with the Debtors in late February 2018 to, among other things, assess the feasibility of a variety of potential transactions, including a comprehensive debt refinancing, a liability management transaction, or a potential deleveraging of the Debtors' funded debt, either in- or out-of-court. During this time, the Debtors and Evercore began negotiations to enter into the Engagement Agreement. The Debtors and Evercore engaged in more than a month of good faith, arms'-length negotiations, which resulted in the execution of Engagement Agreement on April 3, 2018.

---

[3] Contemporaneously herewith, Evercore is filing its *Reply of Evercore Group L.L.C. in Support of Debtors' Application for Entry of an Order Authorizing the Debtors' to Employ and Retain Evercore Group L.L.C. as Investment Banker Effective nunc pro tunc to the Petition Date* (the "Reply"). Capitalized terms set forth herein that are not otherwise defined shall have the meanings ascribed to such terms in the Reply.

5. While every debtor engagement is highly situation-specific, the compensation structure contained in the Engagement Agreement is standard and the fees are reasonable and consistent with market rates seen in many other engagements. Investment bankers engaged to represent debtors in connection with chapter 11 restructurings typically earn monthly fees for the duration of the engagement, a transaction fee or "success fee" that is usually a percentage of the aggregate principal amount of debt outstanding, and a financing fee that is usually a percentage of the amounts committed in any financing raised during the engagement, including post-petition DIP financing, as well as exit financing. Evercore's compensation structure in the Engagement Agreement reflects this typical market framework, and the rates charged for each of these services is squarely within the range of rates approved in chapter 11 cases of similar size and complexity.

6. Attached hereto as <u>Exhibit 1</u> is a representative list of fees paid to debtors' investment banking advisors in restructurings during the past two years that had comparable levels of debt. This exhibit was prepared by Evercore professionals based upon information compiled by Evercore professionals.[4]

7. As described in <u>Exhibit 1</u>, transaction fees ranging from 0.84%-1.35% of the aggregate principal amount of debt outstanding have been paid to debtors' advisors in recent chapter 11 cases of similar size and complexity. Accordingly, such fees are market rates and have routinely been approved by bankruptcy courts in a variety of jurisdictions, including the District of Delaware. Again, Evercore's transaction fee of 1.00% of outstanding debt is squarely within this reasonable range.

8. Attached hereto as <u>Exhibit 2</u> is a representative list of financing fees negotiated and paid in recent chapter 11 cases, which shows whether existing creditors provided the DIP funds, the total amount committed, and the fees paid to debtors' advisors in connection with the DIP financing. As described, market compensation for DIP financing ranges from 1.00%-

---

[4] The back-up and supporting materials used to compile <u>Exhibit 1</u> are available for the Court or any party in interest to review.

1.75%. As shown on Exhibit 1, financing fees for exit financing ranges from 1.00%-3.00% of the amounts committed in any financing raised during the exit financing. Such fees are market rates that have routinely been approved in bankruptcy courts in a variety of jurisdictions, including the District of Delaware. Further, the vast majority of DIP financing in recent restructurings of similar size and complexity have been provided by existing investors, and in almost all of these engagements, investment bankers have earned and collected a financing fee in connection with the DIP facility

9. As set forth above, every debtor engagement is situation-specific. The compensation structure for investment bankers in each engagement is unique and negotiated in totality, recognizing the facts and circumstances of the engagement. The nature of these agreements recognizes the risks posed to the investment banker based upon the restructuring environment, and it rewards the investment banker (and the debtor) for a successful outcome. For those reasons, each element of compensation is fully integrated to avoid the situation now sought by the Objecting Lenders to "cherry pick" those provisions that, in hindsight, they unilaterally determine to be "too rich."

10. An example of a situation specific difference in engagements is Evercore's engagement in Southeastern Grocers ("SEG"), which the Objecting Lenders point out as an example where Evercore did not get to "double dip" with a financing fee. *See* Objection, at ¶ 35. What the Objecting Lenders fail to note to the Court is that, at the time of Evercore's engagement on SEG, SEG had already hired Deutsche Bank (its historical banker and lead ABL lender) to provide certain financing and liability management services. Evercore worked with SEG to tailor its engagement structure to work seamlessly with Deutsche Bank who led the exit financing efforts (another noteworthy distinction is that there was no DIP financing in SEG). SEG ultimately paid Deutsche Bank approximately $20 million in connection with SEG's exit financing; over 60% of such ABL and secured bond exit facility was provided by the existing secured lenders to SEG. In this case, although Evercore is providing all of the services to the

4

Debtor that Deutsche Bank provided to SEG, the Objecting Lenders somehow believe that this is a "double dip" and that Evercore should provide such services for free, without reasonable market compensation.

11. As also noted by the Objecting Lenders, in certain engagements, the parties will negotiate a mechanism whereby a portion or all of financing fees is credited against a success fee as part of the total compensation. In other engagements, there is no crediting. There is no market standard for crediting; rather, the crediting mechanism is employed on a case by case basis. By way of example, in the Engagement Agreement, the Debtors and Evercore negotiated a mechanism whereby after the payment of the first five (5) monthly fees, 50% of the monthly fees actually paid will be credited (without duplication) against transaction fees that become payable under the Engagement Agreement. As is common, this was negotiated in these cases to address the duration of the restructuring process and to incentivize the financial advisor to help achieve a fast, consensual resolution.

12. Upon its engagement Evercore ran multiple analyses and created numerous presentations analyzing the Company's projected financial performance and debt capacity across a variety of financing alternatives and transaction scenarios. Evercore subsequently worked closely with the Debtors' management team to analyze the Debtors' business performance and devise a recommended strategy, which was initially presented to the Debtors' board of directors (the "Board of Directors") in April 2018 with periodic updates thereafter.

13. Evercore began discussions with Oaktree, the Debtors' largest creditor, and their advisors in mid-April 2018 to discuss capital structure alternatives. At the time, Oaktree owned approximately half of the Debtors' $270.0 million in aggregate principal amount of 7.75% senior notes due 2020 (the "Unsecured Notes"), and held a minority position in the Debtors' term loans (the "Term Loans") then outstanding under that certain senior secured $520.0 million term loan credit agreement, dated as of October 11, 2012, among David's Bridal, the lenders from time to time party thereto and Bank of America, N.A., as administrative agent and collateral agent (the

5

"Prepetition Term Loan Agreement"). Oaktree kept engagement to a minimal level because they wanted to stay unrestricted in order to continue to purchase the Debtors' secured debt in the open market, and eventually Oaktree acquired a "blocking position" of more than a third of the Debtors' Term Loans. In May 2018, Evercore and the Debtors began preliminary conversations with Solace Capital Partners ("Solace"), the Debtors' second largest senior noteholder, who owned more than one-third of the senior notes.

14. Oaktree engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel and Moelis & Company, LLC ("Moelis"), as financial advisors. Additionally, a group of Term Loan Lenders (defined below) hired Jones Day as counsel and Greenhill & Co. LLC ("Greenhill") as financial advisors. While advisors to creditors are generally compensated based upon a percentage of the aggregate principal amount of debt of the class that they represent, within the restructuring market, the amount paid to creditor advisors is lower than the percentage charged by advisors to debtors. In these cases, however, and as set forth on Exhibit 3, the advisors to both creditor groups, including those engaged by the Objecting Lenders, have charged rates that are nearly identical to those charged by Evercore.[5] The fees of both Moelis and Greenhill are included in the DIP Budget, along with all of the other professional fees in these cases. Upon information and belief, the Objecting Lenders have not asked Moelis or Greenhill to reduce their fees.

15. Based on the feedback received from Oaktree and Solace and a thorough analysis of the Debtors' financial situation, Evercore launched a financing process to recapitalize the Debtors' business in May 2018. Simultaneously, the Debtors, by and through Evercore, provided Oaktree's legal and financial advisors with extensive due diligence. In connection with the recapitalization process, Evercore constructed lender presentations, contacted approximately forty potential investors to provide additional financing for the Debtors (the "Potential Financing Parties"), created and hosted a robust data room with due diligence materials for the Potential

---

[5] The Greenhill and Moelis fees are 1.09% and 0.94% of outstanding debt, respectively, versus Evercore's fee of 1.00%.

Financing Parties, executed fifteen (15) non-disclosure agreements, created private-side lender materials, and hosted management calls with key parties to further due diligence. As a result of this, the Debtors received four (4) term sheets for offers to provide financing to refinance the Debtors' $480 million Term Loans.

16. By the time the Debtors received the term sheets to provide financing in July 2018, Oaktree had completed purchasing debt in the open market and was ready to engage with the Debtors and Evercore. Evercore shared the terms of the financing term sheets that Evercore had obtained with Oaktree and its advisors. At that time, Evercore was told that Oaktree would not accept the terms of the financing process. Solace was more receptive to pursuing a refinancing, but Oaktree's blocking position in both tranches of the Debtors' debt required their consent to pursue a successful refinancing transaction, thus ending the refinancing process that Evercore had been working on for approximately two months.

17. As a result of Oaktree refusing to accept terms of the refinancing process, the Debtors and Evercore pivoted to talks with the secured lenders (the "Term Loan Lenders") party to Prepetition Term Loan Agreement. The original framework of discussions with the Term Loan Lenders was that Oaktree and Solace would invest new capital and equitize their Unsecured Notes while the Term Loan Lenders would roll into take back debt on terms similar to what Evercore had obtained in the marketed financing process.

18. By August 2018, the Debtors had not received proposals acceptable to their creditor constituencies and the Debtors began to provide diligence to all of its creditors to consider a more comprehensive financing and restructuring solution. The Debtors' business performance was also continuing to deteriorate due to various factors, including ongoing industry headwinds and the increasingly public nature of the restructuring negotiations with the creditor groups, who were nowhere near consensus on a path forward.

19. On behalf of the Debtors, in August 2018, Evercore began discussions with the Debtors' first lien lenders' advisors and helped them to conduct extensive diligence on the

Debtors, including scheduling and hosting meetings with the Debtors' management and providing hundreds of documents and related financial analyses.

20. Simultaneously during this process, Evercore reached out to Bank of America, N.A. ("BAML"), as issuing lender, swingline lender, administrative agent and collateral agent of that certain credit agreement dated as of October 11, 2012 (as amended, supplemented or otherwise modified from time to time, the "Prepetition ABL Agreement") to request an amendment (the "ABL Amendment") to the springing maturity of the Prepetition ABL Agreement.[6] Evercore negotiated with BAML and the lenders party to the Prepetition ABL Agreement to provide the ABL Amendment, which was executed in August 2018. This critical ABL Amendment provided the Debtors with the ability to continue negotiating with its creditors into the fourth quarter of 2018. Without the ABL Amendment, the Debtors would have had an earlier default and would have been required to disclose that the Prepetition ABL would have been current and maturing within twelve (12) months. Given the Company's fragile business, critical vendors and highly particular customer base of bridal consumers, this disclosure would have likely resulted in concern around liquidity, potentially destroying considerable value for the Debtors and stakeholders. While under some other engagement arrangements Evercore might have been entitled to a fee for such an amendment, the specific terms that Evercore had agreed to in its negotiations with the Debtors did not provide for any fee because no revolver balance was outstanding at the time of the amendment.

21. From August 2018 to November 2018, Evercore and the other advisors to the Debtors worked tirelessly to reach an agreement between the Debtors and its creditor constituents. Evercore assisted the Debtors by facilitating due diligence, providing documents and management access to creditors, leading numerous negotiation sessions and devising multiple transaction alternatives, remaining actively at the center of complex, inter-creditor discussions. In fact, during this time, Evercore worked on a variety of alternative transaction

---

[6] The Prepetition ABL Agreement had a springing maturity to 91 days prior to the Term Loan maturity of October 2019 if greater than $25 million Term Loan principal remained outstanding.

paths, while continuing to drive toward the fully optimal, consensual deal that was eventually reached.

22. In conjunction with the fully consensual, pre-packaged restructuring deal reached with the Debtors' three creditor constituencies, Evercore also assisted the Debtors in negotiating the post-petition financing facilities (the "DIP Term Loan," the "DIP ABL," and collectively, the "DIP Facilities"). In these cases, the funds provided in connection with the DIP Facilities were derived from existing investors. As required by the Bankruptcy Code, Evercore sought alternative DIP financing and I served as the Debtors' declarant for interim approval of the DIP Facility (and also for the final approval sought at the hearing scheduled for December 18, 2018).

23. Upon information and belief, the Engagement Agreement was provided to the Objecting Lenders' advisors pre-petition on November 10, 2018. For a period of at least a week prior to the commencement of these bankruptcy cases, the terms of Evercore's engagement were heavily scrutinized. Following this intense period of negotiations, Evercore's fees were included in the DIP budgets provided in connection with the Debtors' post-petition DIP financing facility and the DIP ABL carve-outs, both of which were highly analyzed and negotiated by all creditor constituencies (including the Objecting Lenders) in connection with the Debtors' consensual plan of reorganization.[7]

24. On November 18, 2018, all parties executed the Restructuring Support Agreement that set forth the framework for a consensual deal set forth in the *Proposed Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (the "Plan"), which contemplates full payment in the ordinary course to unsecured creditors. The parties to the Restructuring Support Agreement were aware of Evercore's fees prior to executing the agreement. The Debtors' creditor constituencies, including the Objecting Lenders, approved the budgets provided in connection with the Debtors' post-petition financing facility by November

---

[7] In contrast to this treatment of Evercore's fees, the Supporting Creditors during the same 10-day time period requested that the Supporting Sponsors under the Restructuring Support Agreement agree explicitly to waive their otherwise-valid prepetition claims for management fees and similar obligations, and the Supporting Sponsors' agreement to do so became an express term of the Restructuring Support Agreement and the prepackaged Plan.

19, 2018 and the carve-outs contained in the ABL by November 19, 2018. Based on a prepetition request from the Supporting Creditors under the Restructuring Support Agreement (including the Objecting Lenders), Evercore voluntarily agreed during that time frame to amend its Engagement Agreement to defer approximately $2.5 million of its fees that otherwise would have been payable prepetition to instead be payable on emergence. This deferral was reflected in the DIP budget as well.

25. Since the commencement of the Debtors' bankruptcy cases on November 19, 2018, Evercore has worked with the Debtors' creditor constituencies and multiple third parties to obtain the exit financing contemplated by the Debtors' plan of reorganization. The specifics of the Exit Facilities are still being negotiated at this time. In connection with the exit financing, Evercore has created a data room for all interested third parties and executed non-disclosure agreements with four (4) potential interested investors. As of the filing of this Supplemental Declaration, Evercore has received term sheets from two (2) interested parties and indications of interest from all four (4) parties indicating that they are willing and prepared to commit to a portion of the exit financing facility as needed. As of today, BAML is the only existing DIP lender who has elected to participate in the exit financing facility. Evercore is working diligently to negotiate the terms of the exit financing facility that will allow the Debtors to successfully emerge from chapter 11. All other DIP lenders, each of which is a lender in the Prepetition ABL Agreement, have declined at this time to participate and the remaining commitments must be filled by the other lenders with whom Evercore is in discussions. While there is every expectation that these commitments will be filled, Evercore must commit its full efforts during the next three weeks to bring these discussions to fruition.

26. In connection with developing the Plan, Evercore prepared an estimate of the going-concern value of the Reorganized Debtors, which included, among other things, (1) reviewing the Debtors' historical financial information; (2) meeting with Debtors' senior management to discuss the Company's operations and future prospects; (3) reviewing publicly

10

EAST\163305078.5

available financial data and considering the market values of comparable public companies; (4) preparing discounted cash flow analyses based on the Debtors' financial projections; and (5) considering the value assigned to certain precedent change-of-control transactions for businesses similar to those of the Debtors.

27. Evercore also continues to assist the Debtors in negotiating the material open terms of the exit facility and work with advisors to the Debtors' creditors to finalize the exit budget, thus determining the size of the exit financing facility, the borrowing base collateral calculations, reporting requirements, financial covenants, mechanics of the excess cash flow sweeps and various intercreditor issues. After helping the Debtors obtain a rating of the DIP facility from S&P and Moody's, Evercore is also preparing the Debtors to obtain a rating for the new Exit Term Loan Facility (though the DIP Facility is rated, since the Exit Term Loan Facility is a materially different and new financing, the Debtors' (with Evercore's assistance) are required to obtain an additional rating). Evercore also continues to conduct due diligence with creditors and their advisors in conjunction with members of the Debtors' management team and is continuing to facilitate management meetings between advisors to the creditor constituencies and the Debtors' principals and management.

28. In addition to all of the critical work detailed above regarding the Exit Facility, prior to the hearing scheduled on confirmation of the Debtors' Plan, Evercore will need to prepare and submit evidentiary support to support the going-concern valuation that is included in the disclosure statement (which must be approved at the combined hearing scheduled for January 4, 2019), which will in term be a necessary fact that the Debtors and this Court must rely on to establish the feasibility of the Plan at the combined hearing. With confirmation less than three weeks away, Evercore continues to work diligently on behalf of the Debtors to consummate the Debtors' fully consensual, pre-packaged Plan.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 17, 2018  
       New York, New York

By: _____  
Stephen Goldstein  
Senior Managing Director  
Evercore Group, L.L.C.

EAST\163305078.3