## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 18-12635 (LSS)<br><br>(Jointly Administered)<br><br>Re: D.I. 11, 12 & 13<br>Obj. Deadline: December 21, 2018 @ 5:00 p.m.<br>Hearing Date: January 4, 2019 @ 1:30 p.m. |

**OBJECTIONS AND RESERVATION OF RIGHTS OF JENNY YOO COLLECTION, INC. TO THE DEBTORS SOUGHT AFTER COMBINED (1) DETERMINATION OF THE ADEQUACY OF THEIR DISCLOSURE STATEMENT AND (2) CONFIRMATION OF THEIR PROPOSED JOINT PREPACKAGED PLAN OF REORGANIZATION INCLUDING BUT NOT LIMITED TO THE RELEASES CONTAINED IN THE PLAN**

## INTRODUCTION

Jenny Yoo Collection, Inc. ("Jenny Yoo"), by and through their counsel Morris James and Barton LLP, hereby files the following objections and reservation of rights (the "Objection") to the sought after combined determination as to the adequacy of the above-captioned Debtors' (the "Debtors") Disclosure Statement and confirmation of their Proposed Joint Prepackaged Plan of Reorganization ("Plan") [Doc. Nos. 12, 13 and 167][1]. Jenny Yoo objects to the Plan to the extent that it prohibits Jenny Yoo from continuing to pursue its complaint against Debtor as hereinafter described and Jenny Yoo objects to the releases contained in the Plan. In support thereof, Jenny Yoo respectfully states as follows:

---

[1] On December 11, 2018, the Debtors filed a Plan Supplement to their Plan ("Plan Supplement") [Doc. No. 167]. Even though the Debtors are fast tracking these cases towards a combined determination as to the adequacy of their Disclosure Statement and confirmation of their Plan within just 6 weeks of the commencement of these cases, they inexplicably failed to serve a copy of the Plan Supplement on Jenny Yoo, a creditor undeniably impacted by various material terms of the Plan, as supplemented. Oddly, while the Supplement expressly references Jenny Yoo's pending litigation and makes other revisions to the Plan applicable to Jenny Yoo, the Debtors Affidavit of Service [Doc. No. 169] confirms that Jenny Yoo was not served a copy of the Plan Supplement which it only became aware of this week by its own review of the Court's docket while otherwise being compelled to file and serve its Objection thereto this week.

## PERTINENT FACTS

1.  Annexed hereto as Exhibit 1 is a full and complete copy of the previously filed and served 83-page Complaint of Jenny Yoo against defendants David's Bridal, Inc. ("David's Bridal" or, similarly, a "Debtor") and Clayton, Dubilier & Rice, LLC ("CDR") (collectively, with David's Bridal, the "Defendants") for, *inter alia*, (1) patent infringement, (2) federal false designation of origin and unfair competition, (3) federal trade/dress infringement, (4) state unfair competition common law trade dress infringement, (5) unfair business practices, (6) breach of contract, (7) fraudulent inducement, and (8) unjust enrichment (hereinafter, the "CM"). Jenny Yoo, by its action against both Defendants, is seeking the entry of a judgment, *inter alia*, awarding damages (including treble damages) and permanently enjoining the Defendants, and all acting in privity or in concert with them, from any further acts of infringement of Jenny Yoo's design patents, Trade Dress rights and trademarks. Jenny Yoo hereby incorporates herein the annexed Complaint and each of its statements and assertions as if set forth in full and respectfully refers the Court thereto for a full recitation of the facts.

2.  Jenny Yoo is a well-known and successful designer and industry expert of bridal and bridesmaids dresses and gowns with its principal place of business at 132 West 36th Street, New York, New York 10018. It launched its first collection of bridesmaids dresses nearly two decades ago in 2002. CM at 1, ¶ l. Jenny Yoo has expanded dramatically since its inception, including revolutionizing aspects of the bridal gown industry with its 2012 introduction of what became the well-received and widely popular four-panel, convertible bridesmaids dresses ("the Convertible Dresses"). CM at 1, ¶¶ 1-2. Jenny Yoo's Convertible Dresses were recognized by reviewers, analysts and consumers as being "game changers" with radically different designs from what was previously available in the bridal market and they found almost immediate success and acclaim in the market. CM at 1-2, ¶ 2.

3.      Jenny Yoo's achievements have resulted in intellectual property protection for its innovations, including issued design patents, pending utility patent applications, trademarks, and trade dress protection.   Nevertheless, Jenny Yoo's innovations have been the subject of widespread emulation by its competitors, who have attempted to capitalize on Jenny Yoo's success by imitating its innovative and distinctive product designs.   In an attempt to stop repeated attempts to plagiarize Jenny Yoo's protected design and trade dress, it has had to pursue costly and time-consuming legal action against numerous competitors, including, but not limited to, David's Bridal, Watters Designs, Inc. d/b/a Watters & Watters and Woo Partners, L.P. ("Watters"), Faviana International, Inc. ("Faviana"), and Essense of Australia ("Essense").   CM at 3, ¶ 5.

4.      David's Bridal and CDR have been one of the principal imitators and infringers of Jenny Yoo. CM at 3, ¶ 6. They repeatedly introduced and sold lines of David's Bridal bridesmaids dresses which copied and unfairly competed directly with Jenny Yoo's patented Convertible Dresses.   Instead of pursuing independent product development or licensing products from third parties, David's Bridal, in conjunction with and on behalf of itself and CDR, chose to slavishly copy Jenny Yoo's innovative and distinctive designs as its own. *Id*.   David's Bridal attempts to pass off Jenny Yoo's famous convertible dress designs as its own. *Id.* David's Bridal has even misappropriated and copied Jenny Yoo's distinctive approach to marketing, using models wearing its "knock-off" dresses in poses and presentations that are substantially identical to the poses and presentations of Jenny Yoo's famous dress on its website (including a step by step "How-To-Style" guide)  and in its advertising and promotional materials. CM at 4 ¶ 6. The Defendants undertook these actions to purposely try to confuse consumers into thinking David's Bridal dresses are Jenny Yoo's Convertible Dresses. *Id*. Indeed, consumer comments

about David's Bridal dresses on various websites established consumer confusion between David's Bridal copycat dresses and Jenny Yoo's original dresses *Id*.

5.     David's Bridal previously sold lines of bridesmaids dresses called "Versa" (the "Versa Dresses") which imitated Jenny Yoo's famous Convertible Dresses.  As a result, Jenny Yoo commenced an action in 2016 in the District Court for the Southern District of New York (the "New York District Court") against both Defendants to stop David's Bridal from continuing its infringements and its selling of knock-offs of Jenny Yoo's dresses (the "2016 Infringement Action").  CM at 4, ¶ 8.

6.     The 2016 Infringement Action was settled in March 2018 and David's Bridal agreed to pay Jenny Yoo a material sum and to discontinue the Versa Dresses and take them off the market entirely by the end of 2018.  However, just months after settlement, in mid-2018, David's Bridal introduced a new infringing line of "Style-Your-Way" dresses.  It was quickly clear to Jenny Yoo that the Defendants designed, manufactured, and introduced these new dresses into the United States market to replace the Versa Dresses that were the subject of the 2016 Infringement Action.  Indeed, consumer comments online to the new infringing Style-Your-Way dresses showed that consumers immediately confused them with the old Versa Dresses that David's Bridal agreed to take off the market.  CM at 5, ¶ 9.  The new infringing Style-Your-Way dresses, once again, copy Jenny Yoo's patented designs and infringe upon its protected intellectual property rights. CM at 5, ¶ 10.

7.     Since David's Bridal began selling the new infringing Style-Your-Way Dresses in mid-2018 just a few months after it settled the 2016 Infringement Action in March 2018, it appears that David's Bridal negotiated and entered into the settlement with Jenny Yoo in purposeful bad faith.  Upon information and belief, while David's Bridal was making material representations and omissions to Jenny Yoo during the mediation that led to the settlement that it

intended to discontinue the sale of "knock off" dresses that imitate Jenny Yoo's Convertible Dresses, Defendants were already in the process of developing new "knock-off" dresses. CM at 5-6, ¶ 11. By doing so, the Defendants were able to fraudulently induce Jenny Yoo to settle the 2016 Infringement Action because they had led it to believe that they would be taking the knock-off dresses off the market and no longer imitating Jenny Yoo's dress designs or infringing its patents and Trade Dress rights and trademarks. CM at 6, ¶ 11.

8.     Also, by introducing the new infringing Style-Your-Way Dresses, the Defendants breached the terms of the parties' settlement. As a result of David's Bridal's and CDR's actions, Jenny Yoo was again forced to seek relief from the New York District Court to put an end to their illegal conduct, protect Jenny Yoo's valuable intellectual property rights, and obtain compensation for the Defendants' past and ongoing violations and breach of contract. CM at 6, ¶ 12.

9.     Jenny Yoo was caused to file its present Complaint on October 26, 2018. CM, Exhibit 1. By all appearances, however, until further adjudication and/or resolution of this current action the Defendants are continuing to manufacture knock-offs of Jenny Yoo's well known designs and infringe on Jenny Yoo's design patents, Trade Dress rights and trademarks.

**PROCEDURAL POSTURE AND BANKRUPTCY CASE BACKGROUND**

10.     Approximately a month ago, on November 19, 2018, David's Bridal, together with its affiliates DB Investors, Inc, DB Holdco, Inc., and DB Midco, Inc. (collectively, the "Debtors") filed for bankruptcy with this Court. At the time of their filing, the Debtors professed that "[n]otwithstanding [the Debtors'] core operating strengths, the Debtors [were] burdened by a substantial amount of borrowed-money debt." *Declaration of Joan Hilson, Executive Vice President and Chief Financial and Operating Officer of the Debtors, in support of Chapter 11 Petitions and First Day Pleadings, dated December 19, 2018* at ¶ 3 [Doc. No. 19] (hereinafter,

"Hilson Decl."). The Debtors continued by stating that although they reportedly generate "sufficient liquidity to service their debt obligations in the ordinary course, maturities in the second half of 2019 - and the potential negative media attention associated with such looming obligations - compelled the Debtors to proactively address their overleveraged capital structure." Hilson Decl. at 3, ¶ 7. Those statements left unanswered just how the Debtors found themselves in such a significant overleveraged state. Some business commentators, however, have not hesitated to point to CDR's private equity leveraged buyout of the Debtors just six years ago in 2012 as saddling the Debtors with this unsupportable debt in the first place.

11.     On that same day, the Debtors filed their proposed Plan [Doc. No. 12] and Disclosure Statement [Doc. No. 13].

12.     Additionally, on November 19, the Debtors filed their *Motion for Entry of an Order (A) Scheduling Combined Hearing to Consider (I) Approval of Disclosure Statement, (II) Approval of Solicitation Procedures and Forms of Ballots, and (III) Confirmation of Prepackaged Plan; (B) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (C) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (D) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (E) Extending Time, and Upon Plan Confirmation, Waiving of Requirements to (I) Convene Section 341 Meeting, and (II) File Statements of Financial Affairs and Schedules of Assets and Liabilities; and (F) Granting Related Relief* [Doc. No. 11]; and on November 20, 2018 the Court entered an Order captioned as *(A) Scheduling Combined Hearing to Consider (I) Approval of Disclosure Statement, (II) Approval of Solicitation Procedures and Forms of Ballots, and (III) Confirmation of Prepackaged Plan; (B) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (C) Approving the Form and Manner of Notice of Combined Hearing, Objection*

*Deadline, and Notice of Commencement; (D) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (E) Extending Time, and Upon Plan Confirmation, Waiving of Requirements to (I) Convene Section 341 Meeting, and (II) File Statements of Financial Affairs and Schedules of Assets and Liabilities; and (F) Granting Related Relief* [Doc. No. 95].

13.     A little over a week ago, the Debtors then filed their initial Plan Supplement [Doc. No. 161], though did not serve a copy of the same on Jenny Yoo.

14.     As pertains to Jenny Yoo and its pending action against both the Debtor, David's Bridal, Inc., and the non-debtor, CDR, the Debtors' Plan, as supplemented, contains a number of terms which potentially impact Jenny Yoo's claims, interests and the ongoing adjudication of its pending lawsuit against both of these Defendants whose actions continue to infringe on Jenny Yoo's business and designs.

15.     In the first instance, Jenny Yoo as a result of its claims in the lawsuit, is a creditor of the Debtors.  By all indications, Jenny Yoo's claims are classified within, and treatable pursuant to, the General Unsecured Claims sought to be contained within Class 6 of the Plan. Were such Plan to be confirmed, then, once Jenny Yoo's claims were adjudicated or otherwise resolved, any monetary amounts owed to Jenny Yoo would, under Class 6, have to be paid in full. However, other terms of the Plan dramatically, and Jenny Yoo submits, improperly impacts the timely adjudication and/or resolution of its claims not only against the Debtor, David's Bridal, but also the non-debtor Defendant, CDR.

16.     For example, section 10.3 of the proposed Plan sets forth a broad-based claims discharge provision as follows:

> Upon the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or

> agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

Plan at 43, § 10.3. This provision is promptly followed by another suggesting that the automatic stay will remain in force up until at least, if not later, the Plan's Effective Date. Plan at 43, § 10.4.

17.     To further make sure no interested party otherwise misses the Debtors obvious attempt to block their legitimate modes of continuing to pursue their existing rights and the proper resolution of their claims, the Debtors tack on their even broader "Injunction" provision.

18.     Section 10.5 of the Plan encapsulates this Injunction, in part, as:

> **(a) Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Interest extinguished, discharged or released pursuant to the Plan.**

> **(b) Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in any or all of the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and**

**affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of or in connection with or with respect to any such Claims or Interests or against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

Plan at 44, § 10.5

19.    Somewhat counterintuitively, though, the Plan, as proposed, provides that in light

of the 100% payout treatment to holders of General Unsecured Claims under the Plan, the

holders of the Claims  "do not need to file proofs of Claim with the Bankruptcy Court, and the

Debtors … or the Reorganized Debtors, as applicable, and the holders of Claims shall determine,

adjudicate and resolve any disputes over the validity and amounts of such Claims in the ordinary

course of business …" Plan at 35, §7.1. Indeed, the Plan makes clear that only a holder of a

Claim who elects to "file a proof of Claim would be treated to have consented to this Court's

jurisdiction for all purposes with respect to such Claim." *Id.* As such, there appears to be an

inherent ambiguity between this section of the Plan and sections 10.3 and 10.5 highlighted

above.

20.     Unsatisfied though to stop at the wide breadth of their proposed Discharge and Injunction provisions, even with their seeming ambiguity with other Plan terms (*e.g.*, section 7.1), the Debtors also seek to include extremely broad Release provisions, including improper and unjustified, at least as to CDR, third-party, non-debtor releases.  Section 10.6(b) of the proposed Plan provides that:

> **Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, effective as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is confirmed by this Plan, the Releasing Parties are deemed to have fully, conclusively, absolutely and irrevocably released and discharged the Released Parties from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, asserted or unasserted, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that any such Releasing Party would have been legally entitled to assert (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Prepetition ABL Documents, the Prepetition Term Loan Documents, DIP ABL Facility Documents, the DIP Term Loan Documents, the DIP Orders, the Disclosure Statement, the Restructuring Support Agreement, any Restructuring Transactions and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation,**

**formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, without limitation, all Avoidance Actions** *provided that* **nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released thereby; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released pursuant to such release.**

Plan at 45-46, § 10.6.

21. The Release provision is laced with a multitude of defined terms requiring the reader to have to explore and parse through other provisions of the proposed Plan to determine not only who the Debtors are seeking to compel to provide the Releases (*i.e.*, who are the Releasing Parties) but also who the Debtors are seeking to quash the Releasing Parties claims against, as in, the full breadth of who could reap the benefits of the proposed Releases by seeking to brush off otherwise justified Claims (*i.e.*, the Released Parties). A review of lengthy Article I of the proposed Plan shows that Jenny Yoo, by the Debtor's definition, would be a Releasing Party. Plan at § 1.110. CDR, in turn, as an alleged "Supporting Sponsor" (a definition not in the Plan *per se* but instead set forth within a separate "Restructuring Support Agreement"), would be a Released Party. Plan at 11, §§ 1.109 and 1.127. This is the same CDR that commentators have

suggested loaded up the Debtors, as a result of its 2012 leveraged buyout, with the debt that merely six years later has them undertaking an extremely costly restructuring and under whose tutelage David's Bridal has repeatedly unlawfully infringed on the designs, patents, Trade Dress rights, and trademarks of Jenny Yoo negatively impacting its business and causing confusion in the market. Yet, in a review of more than 200 pages of the Plan, Disclosure Statement and restructuring documents, there is virtually zero evidence of what, if any, "substantial contributions" CDR is making pursuant to the Plan to warrant such an unjustified sweetheart deal.

## **RESERVATION OF RIGHTS**

22.     As constituted, the claims of Jenny Yoo against the Debtor David's Bridal, Inc. ("DBI")  fall within the General Unsecured Claims of Class 6 under the Plan, as proposed.  Plan at 21 § 4.6.  The Plan is explicit in confirming that

> "in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, holders of Claims [in Class 6] do **not** need to file proofs of Claim with the Bankruptcy Court, and the Debtors…or the Reorganized Debtors, as applicable, and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims **in the ordinary course of business**."

Plan, at 35, § 7.1 (emphasis added).

23.     Were the Plan terms to end there with respect to Jenny Yoo's claims, there would likely be little need for Jenny Yoo to make any appearance in this case and thereby allow another party in these  cases to argue that Jenny Yoo submitted itself to the jurisdiction of this Court.

24.     However, the Debtors' Plan, as discussed above, contains extremely broad Injunction and Release provisions (including, proposed non-debtor, third party releases) that undeniably seek to impact the adjudication and resolution of Jenny Yoo's claims not only against

the Debtor DBI but also the non-debtor, equity holder CDR. Simultaneously, the Debtors own Notice of commencement of these cases and summary of the Plan [Doc. No. 105], states that the holders of unimpaired Claims who do not timely object to the Plan's release provision(s) will be deemed to consent to them. In short, the Debtors' Plan, in and of itself, compels Jenny Yoo's current singular appearance.

25.     Therefore, in being compelled to file this Objection to the Disclosure Statement and Plan, nothing contained herein is intended or shall be construed to constitute: (i) a waiver or release of the rights of Jenny Yoo to have any final order entered by, or other exercise of the judicial power of the United States performed by, an Article III court; (ii) a waiver or release of the rights of Jenny Yoo to have any and all final orders in any and all non-core matters entered only after *de novo* review by a United States District Judge; (iii) Jenny Yoo's consent to the jurisdiction of the Court over any matter; (iv) an election of remedy; (v) a waiver or release of any rights Jenny Yoo may have to a jury trial; (vi) a waiver or release of the right to move to withdraw the reference with respect to any matter or proceeding that may be commenced in these chapter 11 cases against or otherwise involving Jenny Yoo; or (vii) a waiver or release of any other rights, claims, actions, defenses, setoffs or recoupments to which Jenny Yoo is or may be entitled, in law or in equity, under any agreement or otherwise, with all such rights, claims, actions, defenses, setoffs or recoupments being hereby expressly reserved.

26.     Additionally, Jenny Yoo through its undersigned counsel, reserves the right to amend or supplement this Objection in accordance with the requirements of Bankruptcy Rule 2019 at any time in the future, especially since neither the Debtors nor any other party has yet filed a brief or briefs in support of either the allowance of the Disclosure Statement or confirmation of the Plan. Finally, Jenny Yoo further reserves its right to file and pursue to

resolution, as needed, motions for relief from the automatic stay with respect to its claims as well as its action against David's Bridal and CDR.

<u>OBJECTIONS</u>

**I.    THE PROPOSED PLAN'S INJUNCTION, AND RELATED PROVISIONS, ARE AT BEST INCONCLUSIVELY AMBIGUOUS**

27.    As previously noted herein, Section 7.1 of the Plan provides that given the proposed distributions to be ultimately made to holders of Class 6 General Unsecured Claims in full for their allowed Claims, such Creditors (including Jenny Yoo) do not have to file proofs of Claim with this Court and the parties will otherwise be free to determine, adjudicate and resolve any disputes over the validity and amount of such Claims in the ordinary course of business. Plan at 35, § 7.1. In the case of Jenny Yoo and its Claims, that "ordinary course" would be the continued adjudication of its pending action before the New York District Court. Indeed, given the proposed payout to the holders of General Unsecured Claims, relief from the automatic stay seems, at best, superfluous for purposes of resolving Claims such as those of Jenny Yoo. This is especially true where, in this instance, David's Bridal currently hides behind the stay while continuing to unlawfully infringe upon Jenny Yoo's design patents and related intellectual property rights while producing its knock-off dresses, all the while making a mockery of the settlement they led the New York District Court previously to believe would resolve the earlier 2016 Infringement Action before it.

28.    As clear a section 7.1 of the proposed Plan appears to be, the separate Discharge and Injunction provisions of sections 10.3 and 10.5 of the Plan appear diametrically contrary, making the terms of the three sections ambiguous, at best. Indeed, if the point of the Plan is to, in part, satisfy, in full, the monetary Claims of the General Unsecured Creditors, it should be irrelevant how their Claims are resolved other than "in the ordinary course of business" as

though these bankruptcy cases had never been commenced. Yet, section 10.5 of the Plan, in particular, through an exercise of overly excessive legal verbiage, seeks to enjoin Creditors such as Jenny Yoo from continuing to adjudicate their Claims in a fashion seemingly contemplated by section 7.1 of the Plan. In fact, given the proposed treatment of Class 6 Creditors under the submitted Plan, it is clear that the only fair, judicious and least costly manner to resolve those Creditor Claims for timely distribution purposes is to continue, unenjoined, the same ordinary course processes that existed merely a month ago before the Debtors chose to put themselves into bankruptcy, at least upon the entry of any Order allowing the Debtors present Disclosure Statement and confirming their Plan.

29. Barring such a common sense and practical modification of the terms of Sections 10.3 and 10.5 of the proposed Plan, Jenny Yoo reserves, contemplates and objects to the Plan unless the entry of any Confirmation Order is without prejudice to its rights to obtain relief from the stay (and corresponding Injunction) to continue, to resolution, its pending action before the New York District Court.

## II. JENNY YOO OBJECTS TO THE RELEASES, THE PLAN SHOULD NOT BE CONFIRMED AS THERE IS AN INSUFFICIENT BASIS FOR ALLOWING THE THIRD-PARTY RELEASE, AND CORRESPONDING INJUNCTION TERMS, AT LEAST AS THEY PERTAIN TO CDR WHOSE DEBT-HEAVY LBO BY ALL APPEARANCES SET IN MOTION THE CIRCUMSTANCES COMPELLING THE DEBTORS INTO THIS COSTLY RESTRUCTURING IN THE FIRST PLACE

30. Jenny Yoo objects to the releases in the Plan. It has been long settled that since a discharge and injunction are extreme remedies, effectively stripping away a creditor's rights against its will, its entitlements are generally reserved for those who actually file a bankruptcy petition with all of its attendant obligations and responsibilities including abiding by the rules of the bankruptcy process. "Simply put, the enjoyment of the benefits afforded by the [Bankruptcy Code] is contingent on the acceptance of its burdens." *In re Arrowmill Dev. Corp.*, 211 B.R. 497,

503 (Bankr. D.N.J. 1997). More specifically, "persons and entities who have not subjected themselves and all their assets to the bankruptcy process have not earned the protection of the bankruptcy court's power to terminate claims by permanent injunction." *In re Digital Impact, Inc.*, 223 B.R. 1, 13 (Bankr. N.D. Okla. 1998). Of course, CDR is neither a debtor before this court nor has it subjected itself to the elaborate processes of bankruptcy. However, as previously noted, CDR's actions in loading these Debtors with unmanageable levels of debt beginning merely six years ago probably precipitated in subjecting David's Bridal and its affiliates, and their assets, to the bankruptcy process.

31.    At the same time, while this and other courts below the Third Circuit Court of Appeals have determined that nonconsensual third-party releases are not *per se* impermissible, they have done so only so long as the parties before them satisfy the "hallmarks" necessary for potentially permissible releases; as to "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) ("*Continental II*"). *See also Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584-85 (D. Del. 2018); *Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017). While not a prerequisite to such a determination, but recognizing the generalities of the *Continental II* "standards," this Court, among others, has relied on a further evaluation of the more specific five (5) factors initially set forth in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W. D. Mo. 1994).

32.    In order to seek to ascertain whether a particular proposed release is arguably necessary and fair, the *Master Mortgage* case evaluated the same by inquiring whether:

> (1) There is an identity of interest between the debtor and the third party … such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate[;]

(2) The non-debtor has contributed substantial assets to the reorganization[;]

(3) The [release or] injunction is essential to reorganization. Without ... it, there is little likelihood of success[;]

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment[;] and

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the [release or] injunction.

*Master Mortgage*, 168 B.R. at 935; *Millennium*, 591 B.R. at 584; *Millennium* 575 B.R. at 272.

33.     Here, several of those factors are lacking insofar as the third-party, non-debtor release pertains to the claims of Jenny Yoo as against CDR. First, the only "identity of interest" between CDR and the Debtors appears to be the fact that with respect to Jenny Yoo they conspired repeatedly to infringe upon the intellectual property rights and patented designs of Jenny Yoo and authorize David's Bridal to manufacture obvious knock-offs of Jenny Yoo's well-known and respected original dresses. At the same time, since the Debtors have indicated they maintain core operating strengths and corresponding operational revenue, and merely filed these cases to restructure their overleveraged debt, there appears to be no basis to suggest that causing CDR to defend against the multiple claims in Jenny Yoo's pending New York District Court action would somehow "deplete assets of the [Debtor's bankruptcy] estate."

34.     Even more significantly, CDR, as equity holders of the Debtors, is not providing any contributions much less a "substantial contribution" of assets to the Debtors' reorganization. This is hardly a case such as *Millennium* where the non-debtor released party contributed some $325 million. In fact, in reviewing more than 200 pages of the restructuring-related documents in this case (including the Plan and Disclosure Statement), Jenny Yoo can find no indication that CDR is contributing any funds or assets to support the Plan. Indeed, the documents are largely

silent with respect to CDR and the Disclosure Statement "discloses" only the barest of information concerning CDR.

35.    Since the Disclosure Statement and Plan disclose virtually nothing about CDR, much less about any material contribution under the Plan to warrant a wholesale release of claims against this non-debtor, and the Debtors and CDR have yet to file any briefs in support of confirmation of the proposed Plan, it is at best conjecture as to what they might claim amounts to any substantial contribution by CDR. To the extent they would argue that CDR's "agreement" to forego their equity stake in the Debtors to lenders to the Debtors somehow constitutes a "substantial contribution" to the Debtors' reorganization, reality and the law are directly to the contrary. Since the lenders and creditors of greater priority to CDR's equity interests have agreed to compromise the value of their claims and will receive less than the full value of those claims, CDR is effectively entitled to nothing. In short, CDR has no choice but to forfeit its existing equity holdings pursuant to the absolute priority rule; meaning, CDR is "contributing" nothing that the bankruptcy laws do not already require them to give up.

36.    Additionally, there is nothing disclosed in the Plan or Disclosure Statement that remotely evidences that the third-party release and related injunction are essential to the Debtors' reorganization. Instead, the inclusion of CDR within the terms of the Release and Injunction (as a Released Party) appears to be, more likely, CDR's attempt to extort a completely unjustifiable benefit for itself simply to help orchestrate and cooperate in the restructuring process. This is only made more ironic by the fact that by all appearances the debt it loaded the Debtors up with during the CDR's 2012 leveraged buyout simply precipitated these bankruptcies.

37.    "Fairness"? To whom? Since when does contributing virtually nothing while setting the wheels in motion to trigger an almost predictable financial demise due to obvious overleveraging of debt amount to fair circumstances warranting the quashing of other parties'

rights, interests and claims. The answer is simple, they do not and the non-debtor releases, and corresponding injunction, set forth in the Debtors' proposed Plan as they apply to CDR, are unjustified and improper warranting the denial of confirmation of the Plan. By their own admission, after 'months of negotiations" the Debtors were ultimately left with the current restructuring set forth in the proposed Plan. Hilson Decl. at 4, ¶ 8. A restructuring that virtually guaranteed CDR's forfeiture of its lowest priority equity interests. Under the circumstances, bestowing third-party releases and a related injunction upon CDR is simply unwarranted.

38.     Any confirmation order entered in this case must make clear that Jenny Yoo is not subject to the releases in the Plan.

## III.     IT REMAINS UNDECIDED IN THE THIRD CIRCUIT AS TO WHETHER THE BANKRUPTCY COURT HAS THE CONSTITUTIONAL AUTHORITY TO AUTHORIZE NON-CONSENSUAL THIRD-PARTY RELEASES

39.     Jenny Yoo is well aware of the recent decisions of the Delaware district Court, as well as this Court determining that the Bankruptcy Court has the constitutional authority to, among other things, find that nonconsensual third-party releases incorporated in a proposed Chapter 11 Plan may be legally permissible. *Millennium* 591 B.R. at 574; *Millennium* 575 B.R. at 271-72. However, the Third Circuit Court of Appeals has yet to make a similar determination and when previously requested to do so in the *Millennium* case by special certification from this Court, it denied such request. Yet, as a result of the Delaware District Court's recent ruling, the matter of this Court's constitutional authority to authorize nonconsensual third-party releases pursuant to a Plan, thereby effectively causing creditors to forfeit what may otherwise be legitimate claims against non-debtors, remains undecided by the Third Circuit. The Third Circuit, to date, simply has yet to rule whether releases of non-debtor claims against other non-debtors are permissible at all outside the realm of a mass tort case, much less have established a definitive legal standard for determining any such permissibility. Now, however, the *Millennium*

matter is on appeal to the Third Circuit which will now finally address the Bankruptcy Court's constitutional authority, if any, and potentially establish a binding standard for determining the permissibility of third-party releases in a Plan.

40.     Until the Third Circuit rules, however, the issue of whether a bankruptcy court may approve a nonconsensual third-party release as part of a reorganization plan, particularly when the released claims or action involve non-debtor, third-party direct causes of action neither arising under or in, nor in any way related to the bankruptcy, still remains a matter of some continuing controversy.  This controversy, in its most recent articulation, arises from the United States Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011) and its progeny.

41.     By requesting this Court to approve the nonconsensual Releases as part of the current Debtors' Plan confirmation, the Debtors are seeking to have the Bankruptcy Court arguably exceed the limits that Article III of the Constitution imposes on its power as an Article I tribunal to enter judgment disposing of claims that are based on non-bankruptcy substantive law and not made against the debtor itself. *See Stern*, 564 US at 503 (holding that the "Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim"); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) ("[R]ecently in *Stern*, this Court held that Congress violated Article III by authorizing bankruptcy judges to decide certain claims for which litigants are constitutionally entitled to an Article III adjudication."); *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172 (2014) (same). The holder of a Stern claim is entitled to an adjudication of that claim by an Article III court, unless it consents to a final disposition of the claim by the Bankruptcy Court. *Wellness*, 135 S. Ct. at 1939.

42.     There is really no dispute that Jenny Yoo's claims against the Defendants are *Stern* claims. Those claims are for, *inter alia*, patent and trademark infringement, breach of

contract and fraud. As alleged in the Complaint, CDR is as much liable for these claims as David's Bridal is. CDR was the corporate parent of David's Bridal, played a material role in David's Bridal's business strategies and operations, made sure it was directly involved in the settlement of the 2016 Infringement Action that Jenny Yoo was fraudulently induced into executing and CDR continued its management role within David's Bridal past the settlement. CM at 7, ¶¶ 17-19.

43. Therefore, by requesting this Court to enter a final order that may conclusively dispose of Jenny Yoo's claims against CDR (by arguably extinguishing those claims by means of the release and injunction without the consent, or ability of an opt-out by Jenny Yoo), the Debtors seek to have this Bankruptcy Court improperly exercise the "judicial power of the United States" in violation of Article III of the Constitution. The effect of such a final order would hardly be "incidental" with respect to the action pending before the New York District Court. *Millennium,* 591 B.R. at 575-76

44. In fact, by all appearances, the parties here involved in crafting the Restructuring Support Agreement as then incorporated into the proposed Plan appear, by agreeing to include CDR in the overly broad releases and injunction, to be seeking to cause this Court to expand the "limits" of nonconsensual, third-party releases to the point of virtually no limits. The creditors disputing such releases and injunction in the *Millennium* case opined that in that case the release at issue was "the most expansive non-debtor release ever approved in this District." *Millennium*, 242 F.Supp. 3d at 334. Yet, even there, the proposed non-debtor Released Parties contributed material funds of $325 million to the reorganization. Here, CDR, by all appearances, is not even bothering to donate a dime under the Plan to justify the proposed across-the-board release of any and all claims against it while at the same time compelling the Debtors it had management

control over during the restructuring process to force the same on their creditors on a nonconsensual, non-opt-out basis.

45.     In short, the Debtors proposed Plan improperly requests this court to exceed its constitutional jurisdiction to approve a Plan incorporating boundless third-party releases. This Court should not accept that invitation.

## IV.    THE DEBTORS' DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DESCRIBES AN UNCONFIRMABLE PLAN

46.     Courts generally will not approve a disclosure statement describing a plan that cannot be confirmed, regardless of the extent of disclosure. See *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 157 (3d Cir. 1993); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Market Square Inn, Inc.*, 163 B.R. 64 (Bankr. W.D. Pa. 1994) (concluding that where a plan was unconfirmable, it is "appropriate to refuse approval of the disclosure statement").

47.     This "rule" is arguably based upon the common sense conclusion that courts simply should not permit a bankruptcy estate to incur the costs of proceeding with a plan that, even if unanimously accepted by creditors, should never be confirmed. *See, e.g., In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht*, 57 B.R. 137, 139 (Bankr.E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

48.     As discussed above, the plan is unconfirmable if it provides no opportunity for creditors to opt out of the third-party Release.  Such Release (as well as the related Injunction as broadly drafted) is improper under the circumstances of the cases.  *See* ¶¶ 27-43 above.

Accordingly, the Court should not approve the Disclosure Statement unless Jenny Yoo is not subject to the release.

## CONCLUSION

49.     WHEREFORE, for all of the foregoing reasons, creditor/claimant Jenny Yoo respectfully requests that the Court (i) decline to approve the Disclosure Statement and (ii) decline to confirm the Plan unless, at a minimum, the Debtors amend the Plan to either (a) strike CDR from the definition of the Released Parties or (b) allow Jenny Yoo to opt-out of the third-party Release, and provide such further and additional relief as the Court deems appropriate.

Dated: December 21, 2018                    Respectfully submitted,

                                            */s/ Brett D. Fallon*
                                            Brett D. Fallon (DE Bar No. 2480)
                                            MORRIS JAMES LLP
                                            500 Delaware Avenue, Suite 1500
                                            P.O. Box 2306
                                            Wilmington, DE 19801-1494
                                            Telephone: (302) 888-6800
                                            Facsimile: (302) 571-1750
                                            E-mail: bfallon@morrisjames.com

                                                    and

                                            **BARTON LLP**
                                            Eric W. Sleeper, Esq.
                                            Maurice N. Ross, Esq.
                                            420 Lexington Avenue
                                            18th Floor
                                            New York, NY 10170
                                            (212) 687-6262 (main)
                                            (212) 687-3667 (facsimile)