# **EXHIBIT 1**

## **Plan Changed Pages**

**IMPORTANT: THIS PLAN OF REORGANIZATION IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THE SOLICITATION MATERIALS ACCOMPANYING THIS PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). THE DEBTORS WILL FILE THIS PLAN WITH THE BANKRUPTCY COURT FOLLOWING SOLICITATION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES AND WILL SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, INC., *et al.*,[1] | Case No. 18-~~_____~~ 12635 (~~____~~ LSS) |
| Debtors. | ~~Joint Administration Requested~~ Jointly Administered |

---

## PROPOSED JOINT PREPACKAGED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Jaime Luton Chapman (No. 4936)
Tara Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice* ~~pending~~)
Nick S. Kaluk III (admitted *pro hac vice* ~~pending~~)
Daniel E. Stroik (admitted *pro hac vice* ~~pending~~)
919 Third Avenue
New York, New York 10022
Tel:     (212) 909-6000
Fax:     (212) 909-6836

-and-

Craig A. Bruens (*pro hac vice* pending)
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel:     (202) 383-8000
Fax:     (208) 383-8118

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

*Proposed Attorneys for Debtors and Debtors in Possession*

*Proposed Attorneys for Debtors and Debtors in Possession*

Dated: ~~November 18~~December 28, 2018
Wilmington, Delaware

# TABLE OF CONTENTS

**ARTICLE I       DEFINITIONS, INTERPRETATION AND CONSENTS.**                                  **1**

**ARTICLE II      ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS.**               **15**

2.1      Administrative Expense Claims.                                                                          15

2.2      Professional Fee Claims.                                                                                   15

2.3      Fees and Expenses of Unsecured Notes Indenture Trustee.                                  16

2.4      Priority Tax Claims.                                                                                            16

2.5      DIP ABL Facility Claims.                                                                                   16

2.6      DIP Term Loan Facility Claims.                                                                       ~~16~~17

**ARTICLE III     CLASSIFICATION OF CLAIMS AND INTERESTS.**                              **17**

3.1      Classification in General.                                                                                   17

3.2      Consolidation of Debtor Class Descriptions for Convenience Only.                     17

3.3      Summary of Classification.                                                                                 17

3.4      Special Provision Governing Unimpaired Claims.                                               18

3.5      Elimination of Vacant Classes.                                                                           18

3.6      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.
         18

3.7      Voting Classes; Presumed Acceptance by Non-Voting Classes.                           18

**ARTICLE IV      TREATMENT OF CLAIMS AND INTERESTS.**                                  **18**

4.1      Priority Non-Tax Claims (Class 1).                                                                    18

4.2      Other Secured Claims (Class 2).                                                                        19

4.3      Prepetition ABL Claims (Class 3).                                                                     19

4.4      Prepetition Term Loan Claims (Class 4).                                                           20

4.5      Unsecured Notes Claims (Class 5).                                                                    20

4.6      General Unsecured Claims (Class 6).                                                                 21

4.7      Intercompany Claims (Class 7).                                                                         21

4.8      Intercompany Interests (Class 8).                                                                    ~~21~~22

4.9      Parent Interests (Class 9).                                                                                22

**ARTICLE V       MEANS FOR IMPLEMENTATION.**                                                **22**

5.1      Compromise of Controversies.                                                                          22

5.2      Sources of Cash for Plan Distribution.                                                           ~~22~~23

5.3      Restructuring Expenses.                                                                                     23

5.4      Continued Corporate Existence; Corporate Action.                                            23

| | | |
|---|---|---|
| 5.5 | Exit Facilities. | 24 |
| 5.6 | Authorization and Issuance of New Common Stock and the Warrants. | ~~24~~25 |
| 5.7 | Exemption from Registration. | 25 |
| 5.8 | Cancellation of Existing Securities and Agreements. | 26 |
| 5.9 | Officers and Boards of Directors. | ~~26~~27 |
| 5.10 | Restructuring Transactions. | 27 |
| 5.11 | Cancellation of Liens. | 28 |
| 5.12 | Employee Matters. | ~~28~~29 |
| 5.13 | Release of Avoidance Actions. | 29 |
| 5.14 | Closing of Chapter 11 Cases. | 29 |
| 5.15 | Notice of Effective Date. | ~~29~~30 |
| **ARTICLE VI** | **DISTRIBUTIONS.** | ~~29~~**30** |
| 6.1 | Distributions Generally. | ~~29~~30 |
| 6.2 | Distribution Record Date. | ~~29~~30 |
| 6.3 | Date of Distributions. | 30 |
| 6.4 | Disbursing Agent. | 30 |
| 6.5 | Rights and Powers of Disbursing Agent. | ~~30~~31 |
| 6.6 | Expenses of Disbursing Agent. | 31 |
| 6.7 | Delivery of Distributions to Unsecured Notes Indenture Trustee. | 31 |
| ~~6.7~~6.8 | Postpetition Interest. | ~~31~~32 |
| ~~6.8~~6.9 | Delivery of Distributions. | ~~31~~32 |
| ~~6.9~~6.10 | Distributions after Effective Date. | ~~31~~32 |
| ~~6.10~~6.11 | Unclaimed Property. | ~~31~~32 |
| ~~6.11~~6.12 | Time Bar to Cash Payments. | 32 |
| ~~6.12~~6.13 | Manner of Payment ~~under~~Under the Plan. | ~~32~~33 |
| ~~6.13~~6.14 | Satisfaction of Claims. | ~~32~~33 |
| ~~6.14~~6.15 | Fractional Stock and Warrant. | ~~32~~33 |
| ~~6.15~~6.16 | Minimum Cash Distributions. | ~~32~~33 |
| ~~6.16~~6.17 | Maximum Distributions and Rights of Reimbursement. | ~~32~~33 |
| ~~6.17~~6.18 | Setoffs. | ~~33~~34 |
| ~~6.18~~6.19 | No Distribution in Excess of Amount of Allowed Claim. | ~~33~~34 |
| ~~6.19~~6.20 | Withholding and Reporting Requirements. | ~~33~~34 |
| ~~6.20~~6.21 | Hart-Scott-Rodino Antitrust Improvements Act. | ~~34~~35 |
| ~~6.21~~6.22 | Claims Paid or Payable by Third Parties. | ~~34~~35 |

6.22 6.23 Allocation Between Principal and Accrued Interest. ................................... 35 36

**ARTICLE VII   PROCEDURES FOR DISPUTED CLAIMS.** ........................... 35 36

7.1     Disputed Claims Process. ......................................................................... 35 36

7.2     Objections to Claims. ............................................................................... 35 36

7.3     Estimation of Claims. ............................................................................... 36 37

7.4     No Distributions Pending Allowance. ....................................................... 36 37

7.5     Distributions after After Allowance. ......................................................... 36 37

7.6     Claim Resolution Procedures Cumulative. ................................................ 36 37

7.7     Disallowance of Claims. ........................................................................... 36 37

**ARTICLE VIII  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.** .... 37 38

8.1     General Treatment. .................................................................................... 37 38

8.2     Determination of Assumption Disputes and Deemed Consent. ................. 37 38

8.3     Payment of Cure Amounts. ....................................................................... 38 39

8.4     Survival of the Debtors' Indemnification Obligations and Guarantees. ...... 39 40

8.5     Insurance Policies. .................................................................................... 39 40

8.6     Intellectual Property Licenses and Agreements. ....................................... 39 40

8.7     Modifications, Amendments, Supplements, Restatements, or Other Agreements. ... 40 41

8.8     Reservation of Rights. ............................................................................... 40 41

**ARTICLE IX     CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
            EFFECTIVE DATE** ......................................................................... 40 41

9.1     Conditions Precedent to Confirmation of Plan. ........................................ 40 41

9.2     Conditions Precedent to Effective Date. ................................................... 41 42

9.3     Waiver of Conditions Precedent. .............................................................. 42 43

9.4     Effect of Failure of a Condition. ............................................................... 42 43

**ARTICLE X      EFFECT OF CONFIRMATION OF PLAN.** ............................. 43 44

10.1    Vesting of Assets. ..................................................................................... 43 44

10.2    Binding Effect. ......................................................................................... 43 44

10.3    Discharge of Claims and Termination of Interests. ................................... 43 44

10.4    Term of Injunctions or Stays. ................................................................... 43 44

10.5    Injunction. ................................................................................................ 44 45

10.6    Releases. ................................................................................................... 44 45

10.7    Exculpation. .............................................................................................. 46 47

10.8    Retention of Causes of Action/Reservation of Rights. .............................. 47 48

10.9    Solicitation of Plan. .................................................................................. 47 48

iii

| 10.10 | Reimbursement or Contribution. | ~~48~~49 |
|-------|-------------------------------|----------|
| 10.11 | Recoupment. | ~~48~~49 |
| 10.12 | Subordination Rights. | ~~48~~49 |

**ARTICLE XI    RETENTION OF JURISDICTION.** ~~48~~**49**

| 11.1 | Retention of Jurisdiction. | ~~48~~49 |
|------|---------------------------|----------|
| 11.2 | Courts of Competent Jurisdiction. | ~~50~~51 |

**ARTICLE XII   MISCELLANEOUS PROVISIONS.** ~~50~~**51**

| 12.1 | Payment of Statutory Fees. | ~~50~~51 |
|------|----------------------------|----------|
| 12.2 | Substantial Consummation of the Plan. | ~~50~~51 |
| 12.3 | Expedited Determination of Taxes. | ~~51~~52 |
| 12.4 | Exemption from Certain Transfer Taxes. | ~~51~~52 |
| 12.5 | Amendments. | ~~51~~52 |
| 12.6 | Effectuating Documents and Further Transactions. | ~~52~~53 |
| 12.7 | Revocation or Withdrawal of Plan. | ~~52~~53 |
| 12.8 | Severability of Plan Provisions. | ~~52~~53 |
| 12.9 | Governing Law. | ~~53~~54 |
| 12.10 | Time. | ~~53~~54 |
| 12.11 | Dates of Actions to Implement the Plan. | ~~53~~54 |
| 12.12 | Immediate Binding Effect. | ~~53~~54 |
| 12.13 | Deemed Acts. | ~~53~~54 |
| 12.14 | Successors and Assigns. | ~~53~~54 |
| 12.15 | Entire Agreement. | ~~53~~54 |
| 12.16 | Exhibits to Plan. | ~~54~~55 |
| 12.17 | Reservation of Rights. | ~~54~~55 |
| 12.18 | Plan Supplement. | ~~54~~55 |
| 12.19 | Waiver or Estoppel. | ~~54~~55 |
| 12.20 | Notices. | ~~54~~55 |

Exhibit A    Restructuring Support Agreement

David's Bridal, Inc., DB Investors, Inc., DB Holdco, Inc., and DB Midco, Inc. (each, a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint chapter 11 prepackaged plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code.

## ARTICLE I    DEFINITIONS, INTERPRETATION AND CONSENTS.

**A.    Definitions.** The following terms shall have the respective meanings specified below:

1.1    **Administrative Expense Claim** means any Claim for costs or expenses of administration of any of the Chapter 11 Cases incurred after the Petition Date and through the Effective Date under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code that have not already been paid by the Debtors, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including for the acquisition or lease of property or an interest in property or the performance of services, (d) the DIP ABL Facility Claims and the DIP Term Loan Facility Claims, (e) any compensation and reimbursement of expenses to the extent allowed under sections 330 or 503 of the Bankruptcy Code, and (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

1.2    **Affiliates** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3    **Allowed** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection or dispute has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or the Reorganized Debtors, (c) as to which the liability of the Debtors or the Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; *provided*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.4    **Amended Organizational Documents** means the forms of certificates of incorporation, certificates of formation, limited liability company agreements, or other forms of organizational documents and bylaws for the Reorganized Debtors, subject to the RSA Definitive Document Requirements.  To the extent the Amended Organizational Documents of Reorganized DB Parent reflect material changes to the existing forms of organizational documents and bylaws for DB Parent, draft forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.5    **Assumption Dispute** means an objection or dispute relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including to any Cure Amount or adequate assurance of future performance under an executory contract or unexpired lease to be assumed, which objection or dispute has been timely filed or interposed in accordance with the Plan and applicable law and has not been withdrawn or determined by a Final Order.

1.6    **Avoidance Action** means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547, 553, and 724(a) of the

Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.7     **Backstop Parties** means the parties providing the Priority Exit Facility Backstop Commitment.

1.8     **Backstop Payment** means a Cash payment equal to 3.00% of the amount of the Priority Exit Facility Loans payable to the Backstop Parties as consideration for providing the Priority Exit Facility Backstop Commitment.

1.9     **Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. § 101, et seq., as now in effect or hereafter amended from time to time, as applicable to the Chapter 11 Cases.

1.10    **Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court having subject matter jurisdiction over the Chapter 11 Cases under section 157 of title 28 of the United States Code.

1.11    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.12    **Benefit Plans** means (a) each "employee benefit plan," as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and (b) any other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of ~~its~~their current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests, or consideration based on the value of Interests, in the Debtors, which shall be assumed by the Debtors on the Effective Date.

1.13    **Business Day** means any day other than a Saturday, a Sunday, "legal holiday" as such term is defined in Bankruptcy Rule 9006(a), or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14    **Cash** means legal tender of the United States of America.

1.15    **Causes of Action** means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, claims, Avoidance Actions, counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, or assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date. Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtors or their Estates, Causes of Action shall include (a) all rights of setoff, counterclaim, or recoupment and

2

claims on contracts or for breaches of duties imposed by law or equity, (b) claims (including Avoidance Actions) pursuant to section 362, and chapter 5 of the Bankruptcy Code including sections 510, 542, 543, 544 through 550, or 553, and (c) claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

1.16    **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and styled *In re David's Bridal, Inc., et al.*, Ch. 11 Case No. [18-12635 (LSS)] (Jointly Administered).

1.17    **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.18    **Class** means any group of Claims or Interests classified herein pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.19    **Collateral** means any asset of the Estates that is subject to a Lien securing the payment or performance of a Claim, which Lien is valid, perfected, and enforceable, and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

1.20    **Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order within the meaning of the Bankruptcy Rules 5003 and 9021.

1.21    **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court to consider approval of the Disclosure Statement and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.22    **Confirmation Order** means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be subject to the RSA Definitive Document Requirements.

1.23    **Creditor** has the meaning set forth in section 101(10) of the Bankruptcy Code.

1.24    **Crossover Holder** has the meaning ascribed to it in the Restructuring Support Agreement.

1.25    **Cure Amount** means the amount of Cash or other property the Debtors must distribute (as the parties may agree or the Bankruptcy Court may order), as necessary, to (a) cure a monetary default as required by section 365(b)(1) of the Bankruptcy Code by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (b) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.26    **DB Parent** means DB Investors, Inc.

1.27    **Debtor or Debtors** has the meaning set forth in the introductory paragraph of the Plan.

1.28    **Debtors in Possession** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.29    **Definitive Documents** means the documents (including any related orders, pleadings, agreements, supplements, instruments, schedules, or exhibits) that are described in or contemplated by

the Restructuring Support Agreement or the Plan and that are otherwise reasonably necessary or advisable to implement the Restructuring and the Plan, including, but not limited to: (i) the Plan; (ii) the Plan Supplement; (iii) the Disclosure Statement; (iv) any motion seeking the approval of the adequacy of the Disclosure Statement, the solicitation of the Plan, and/or confirming the Plan; (v) the Confirmation Order; (vi) the materials related to the solicitation of the Plan; (vii) the DIP Motion; (viii) the DIP Orders; (ix) the Exit Facility Documents; (x) Amended Organizational Documents; (~~xii~~xi) the New Stockholders' Agreement; and (~~xiii~~xii) the Warrant Agreement; *provided* that all Definitive Documents (including any amendment or modification thereof) shall be subject to the RSA Definitive Document Requirements.

1.30 **DIP ABL Agreement** means that certain Senior Secured, Super Priority Debtor-in-Possession Credit Agreement, dated as of November [~~20~~]21, 2018, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the DIP ABL Facility Lenders, and the DIP ABL Facility Agent, and all exhibits, amendments, and supplements thereto, which shall be subject to the RSA Definitive Document Requirements.

1.31 **DIP ABL Facility Agent** means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the DIP ABL Agreement, and its successors and permitted assigns.

1.32 **DIP ABL Facility Claims** means all Claims arising under or related to the DIP ABL Facility Documents.

1.33 **DIP ABL Facility Documents** means the DIP ABL Agreement and all other Loan Documents (as defined in the DIP ABL Agreement), in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date and subject to the RSA Definitive Document Requirements.

1.34 **DIP ABL Facility Lenders** means the lenders party to the DIP ABL Agreement, including any Swingline Lender and any Issuing Lender (each as defined in the DIP ABL Agreement).

1.35 **DIP ABL Secured Parties** means the DIP ABL Facility Agent, the DIP ABL Facility Lenders, and any other party to whom Obligations (as defined in the DIP ABL Agreement) may be owed.

1.36 **DIP Motion** means the motion by the Debtors seeking authority to enter into the DIP ABL Agreement and the DIP Term Loan Agreement and to use "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code.

1.37 **DIP Orders** means orders of the Bankruptcy Court authorizing the Debtors to enter into the DIP ABL Agreement and the DIP Term Loan Agreement and to continue to access cash collateral on an interim basis or final basis (as applicable), each of which shall be in form and substance acceptable to the DIP ABL Facility Agent, the DIP Term Loan Facility Agent, the Prepetition ABL Agent, and the Prepetition Term Loan Agent and otherwise subject to the RSA Definitive Document Requirements.

1.38 **DIP Term Loan Agreement** means that certain Senior Secured Super Priority Term Loan Debtor-in-Possession Credit Agreement, dated as of November [~~20~~]21, 2018, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the DIP Term Loan Facility Lenders, and the DIP Term Loan Facility Agent, and all exhibits, amendments, and supplements thereto, each of which shall be subject to the RSA Definitive Document Requirements.

1.39    **DIP Term Loan Facility Agent** means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the DIP Term Loan Agreement, and its successors and permitted assigns.

1.40    **DIP Term Loan Facility Claims** means all Claims arising under or related to the DIP Term Loan Facility Documents.

1.41    **DIP Term Loan Facility Documents** means the DIP Term Loan Agreement and all other Loan Documents (as defined in the DIP Term Loan Agreement), in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date and subject to the RSA Definitive Document Requirements.

1.42    **DIP Term Loan Facility Lenders** means the lenders party to the DIP Term Loan Agreement.

1.43    **DIP Term Loan Secured Parties** means the DIP Term Loan Facility Agent, the DIP Term Loan Facility Lenders, and any other party to whom Obligations (as defined in the DIP Term Loan Agreement) may be owed.

1.44    **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest (a) has been determined by a Final Order or specified in a provision of the Plan not to be Allowed, or (b) has been agreed to by the holder of such Claim or Interest and the applicable Debtor to be equal to $0 or to be expunged.

1.45    **Disbursing Agent** means any Entity (including the Debtor or Reorganized Debtor, as applicable, that acts in such a capacity) in its capacity as a disbursing agent under Article VI of the Plan.

1.46    **Disclosure Statement** means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, including all exhibits and schedules thereto filed by the Debtors with the Bankruptcy Court, as thereafter amended, supplemented, or modified in accordance with applicable law, which shall be subject to the RSA Definitive Document Requirements.

1.47    **Disputed** means, with respect to a Claim or Interest, that (a) such Claim or Interest is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) the Debtors or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order. If the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors do not dispute, and Disputed as to the balance of such Claim.

1.48    **Distribution** means any initial or subsequent payment or transfer under the Plan.

1.49    **Distribution Record Date** means, except as otherwise provided in the Plan or designated by the Bankruptcy Court, the Effective Date.

1.50    **DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

1.51     **Effective Date** means the date following entry of the Confirmation Order on which all conditions to the effectiveness of the Plan set forth in Article IX of the Plan have been satisfied or waived in accordance with the terms of the Plan and the Plan becomes effective.

1.52     **Employee Arrangements** has the meaning set forth in ~~section~~Section 5.12(a) of the Plan.

1.53     **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.54     **Estates** means the estates of the Debtors created under section 541 of the Bankruptcy Code.

1.55     **Exchange Act** means the Securities Exchange Act of 1934, as amended.

1.56     **Exculpated Parties** means ~~each of the following solely in their capacities as such:  (a)~~ the Debtors~~; (b)~~, the Reorganized Debtors~~; (c) each of the Restructuring Support Parties; and (d) with respect to each of (a) and (b)~~ and, to the extent employed in such capacities on or after the Petition Date, ~~each of their respective~~the Debtors' and the Reorganized Debtors' directors, officers, ~~partners, managers, trustees, assigns, employees, agents, advisory board members, attorneys, financial advisors, investment bankers, accountants, consultants and other~~and professionals ~~or representatives~~.

1.57     **Exit ABL Facility** means that certain senior secured asset-based revolving credit facility to be provided to the Reorganized Debtors on the Effective Date on the terms and conditions set forth in the Exit ABL Facility Credit Agreement with commitments in the original principal amount of one hundred and twenty five million  dollars ($125 million).

1.58     **Exit ABL Facility Agent** means Bank of America, N.A. or such other agent as is chosen by the lender parties to the Exit ABL Facility Credit Agreement, as the administrative and collateral agent under the Exit ABL Facility Credit Agreement, solely in its capacity as such.

1.59     **Exit ABL Facility Credit Agreement** means that certain senior secured revolving credit agreement, dated as of the Effective Date (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), and containing terms substantially consistent with the Restructuring Term Sheet, which shall be subject to the RSA Definitive Document Requirements.

1.60     **Exit Facility** means, collectively, the Exit ABL Facility, the Priority Exit Facility, and the Takeback Term Loan.

1.61     **Exit Facility Documents** means, collectively, the Priority Exit Facility Credit Agreement, the Exit ABL Facility Credit Agreement, and the Takeback Term Loan Credit Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, notice, mortgage, control agreement, guarantee, certificate, document, or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, amended and restated, supplemented, or replaced from time to time and which shall be in form and substance substantially consistent with the Restructuring Term Sheet and subject to the RSA Definitive Document Requirements.

1.62     **Exit Facility Lenders** means each lender party to the Priority Exit Facility Credit Agreement or the Exit ABL Facility Credit Agreement and any other Person that shall become a lender

6

under the Exit Facility from time to time in accordance with the Priority Exit Facility Credit Agreement and the Exit ABL Facility Credit Agreement, as applicable.

1.63 **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.64 **Fully Diluted Shares** means a number of shares of New Common Stock equal to (a) the aggregate number of shares of New Common Stock that shall be outstanding as of the Effective Date, plus (b) the aggregate number of shares of New Common Stock or other instruments authorized for issuance under the Management Incentive Plan as of the Effective Date, plus (c) the aggregate number of shares of New Common Stock issuable upon exercise of the Warrants.

1.65 **General Unsecured Claim** means any Claim against the Debtors as of the Petition Date that is neither secured by a Lien on Collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court (other than an Unsecured Notes Claim or an Intercompany Claim).

1.66 **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.67 **Guarantee Claim** means a Claim on account of a guarantee, promise, pledge, indemnity, or similar agreement to satisfy or that relates to a Primary Claim or liability of another Debtor.

1.68 **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.69 **Intercompany Claim** means any Claim against a Debtor held by another Debtor.

1.70 **Intercompany Interest** means an Interest in a Debtor held by another Debtor.

1.71 **Interest** means any equity interest in a Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares of stock, preferred stock, membership interests, other instruments evidencing an ownership interest, or equity security in any of the Debtors, whether or not transferable, and any option, warrant, right to purchase or acquire any such interests at any time, or any other interest that is exercisable, convertible, or exchangeable into equity of a Debtor, contractual or otherwise, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted, or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.72     **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.73     **Management Incentive Plan** means the management incentive plan that will provide for stock-based compensation awards, on terms to be determined by the board of directors of the Reorganized Debtors, of up to 10.0% of the Fully Diluted Shares.

1.74     **MIP Equity** means the Fully Diluted Shares that may be issued pursuant to the Management Incentive Plan, to the extent provided for thereunder.

1.75     **New Board** means the initial board of directors of Reorganized DB Parent to be selected in accordance with Section 5.9 of the Plan.

1.76     **New Common Stock** means the shares of common stock, par value $.001 per share, of Reorganized DB Parent authorized pursuant to its certificate of incorporation, as included in the Plan Supplement.

1.77     **New Stockholders' Agreement** means that certain shareholders' agreement, in substantially the form to be filed as part of the Plan Supplement, effective as of the Effective Date, to which all parties receiving New Common Stock (and all persons to whom such parties may sell or transfer their New Common Stock in the future and all persons who purchase or acquire the New Common Stock in future transactions) shall be required to become or shall be deemed parties, which shall be subject to the RSA Definitive Document Requirements.

1.78     **Other Secured Claim** means a Claim, other than an ABL Facility Claim or Prepetition Term Loan Claim, that is (a) secured by a Lien on Collateral, which lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, to the extent of the value of such Collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors (with the consent of the DIP ABL Facility Agent, the Required DIP Term Lenders, and the Crossover Holder) or the Reorganized Debtors, as applicable, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.79     **Parent Interests** means any Interest in DB Parent.

1.80     **Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

1.81     **Petition Date** means, with respect to each Debtor, the date on which such Debtor commenced its Chapter 11 Case.

1.82     **Plan** means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

1.83     **Plan Supplement** means the forms of certain documents, schedules, and exhibits effectuating the transactions contemplated in the Plan, which are to be filed with the Clerk of the Bankruptcy Court not later than ten (10) calendar days prior to the deadline to object to the Plan, including, but not limited to, (a) the Exit ABL Facility Credit Agreement, (b) the Priority Exit Facility Credit Agreement, (c) the Takeback Term Loan Credit Agreement, (d) the Amended Organizational

Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), (e) the New Stockholders' Agreement, (f) ~~a term sheet containing the key terms of the Management Incentive Plan, (g)~~ the Warrant Agreement, (~~h~~g) a list of retained Causes of Action, and (~~i~~h)  to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, which, in each case, shall be subject to the RSA Definitive Document Requirements; *provided* that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement.

1.84     **Prepetition ABL Agent** means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the Prepetition ABL Agreement, and its successors and permitted assigns.

1.85     **Prepetition ABL Agreement** means that certain Credit Agreement, dated as of October 11, 2012, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the Prepetition ABL Lenders, and the Prepetition ABL Agent, and all exhibits, amendments, and supplements thereto.

1.86     **Prepetition ABL Claims** means all Claims arising under or related to the Prepetition ABL Documents.

1.87     **Prepetition ABL Documents** means the Prepetition ABL Agreement and all other Loan Documents (as defined in the Prepetition ABL Agreement), in each case as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date.

1.88     **Prepetition ABL Lenders** means the lenders party to the Prepetition ABL Agreement, including any Swingline Lender and any Issuing Lender (each as defined in the Prepetition ABL Agreement).

1.89     **Prepetition ABL Secured Parties** means the Prepetition ABL Agent, the Prepetition ABL Lenders, and any other party to whom Obligations (as defined in the Prepetition ABL Agreement) may be owed.

1.90     **Prepetition Term Lenders** means the lenders party to the Prepetition Term Loan Agreement from time to time.

1.91     **Prepetition Term Loan Agent** means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Agreement, and its successors and permitted assigns.

1.92     **Prepetition Term Loan Agreement** means that certain Credit Agreement, dated as of October 11, 2012, by and among David's Bridal, Inc., the Subsidiary Borrowers (as defined therein) from time to time party thereto, the Prepetition Term Lenders, and the Prepetition Term Loan Agent, and all exhibits, amendments, and supplements thereto.

1.93     **Prepetition Term Loan Claims** means all Claims arising under or related to the Prepetition Term Loan Documents.

1.94     **Prepetition Term Loan Documents** means the Prepetition Term Loan Agreement and all other Loan Documents (as defined in the Prepetition Term Loan Agreement), in each case as

amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date.

1.95 **Prepetition Term Loan Secured Parties** means the Prepetition Term Loan Agent, the Prepetition Term Lenders, and any other party to whom Obligations (as defined in the Prepetition Term Loan Agreement) may be owed.

1.96 **Primary Claim** means a Claim against a Debtor with respect to which a Guarantee Claim has been asserted against that or another Debtor.

1.97 **Priority Exit Facility** means that certain senior secured term loan facility to be provided to the Reorganized Debtors on the Effective Date on the terms and conditions set forth in the Priority Exit Facility Credit Agreement.

1.98 **Priority Exit Facility Agent** means the Person selected by the Required Supporting Term Lenders in consultation with the Crossover Holder to serve as administrative and collateral agent under the Priority Exit Facility Credit Agreement, solely in its capacity as such.

1.99 **Priority Exit Facility Backstop Commitment** means the Backstop Parties' commitment to backstop the syndication of the Priority Exit Facility in accordance with the Restructuring Term Sheet.

1.100 **Priority Exit Facility Credit Agreement** means that certain senior secured credit agreement, dated as of the Effective Date (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), and containing terms substantially consistent with the Restructuring Term Sheet and otherwise subject to the RSA Definitive Document Requirements.

1.101 **Priority Exit Facility Documents** means the Priority Exit Facility Credit Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, notice, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, amended and restated, supplemented, or replaced from time to time and which shall be in form and substance substantially consistent with the Restructuring Term Sheet and subject to the RSA Definitive Document Requirements.

1.102 **Priority Exit Facility Loans** means the loans made by the lenders under the Priority Exit Facility Credit Agreement and in accordance with the terms thereof.

1.103 **Priority Non-Tax Claim** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.104 **Priority Tax Claim** means any secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.105 **Professional Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained under sections 327, 328, 330 or 1103 of the Bankruptcy Code in these Chapter 11 Cases by an order of the

Bankruptcy Court, in each case to the extent such fees and expenses have not been paid or are not disallowed pursuant to an order of the Bankruptcy Court.

1.106 **Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.107 **Reinstate, Reinstated, or Reinstatement** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest in accordance with section 1124 of the Bankruptcy Code, or (b) if applicable under section 1124 of the Bankruptcy Code: (i) curing all prepetition and postpetition defaults, other than defaults relating to the insolvency or financial condition of the applicable Debtor or its status as a debtor under the Bankruptcy Code; (ii) reinstating the maturity date of the Claim; (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a contractual provision or such applicable law allowing the Claim's acceleration; and (iv) not otherwise altering the legal, equitable, or contractual rights to which the Claim entitles the holder thereof.

1.108 **Related Parties** means with respect to any Released Party, such entities' predecessors, successors, and assigns (whether by operation of law or otherwise), subsidiaries, current and former affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders (and any fund managers, fiduciaries, or other agents of shareholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees; *provided* that any Person or Entity who has asserted or subsequently asserts a Claim against a Released Party shall not be a Related Party with respect to any release provided by such Released Party hereunder.

1.109 **Released Parties** means each of, and solely in its capacity as such, (a) the Debtors or the Reorganized Debtors, (b) the DIP ABL Facility Agent, (c) the DIP ABL Secured Parties, (d) the DIP Term Loan Facility Agent, (e) the DIP Term Loan Secured Parties, (f) the Supporting Term Lenders, (g) the Crossover Holder, (h) the Supporting Noteholders, (i) the Supporting Sponsors, (j) the Unsecured Notes Indenture Trustee, (k) the Exit ABL Facility Agent, (l) the Priority Exit Facility Agent, (m) the Exit Facility Lenders, (n) the Takeback Term Loan Agent, (o) the Prepetition ABL Secured Parties, (p) the Prepetition Term Loan Secured Parties, and (q) the Related Parties for each of the foregoing; *provided that*, Released Parties shall exclude any of the foregoing parties that do not (or are not deemed to) provide the releases under the Plan.

1.110 **Releasing Parties** means each of, and solely in its capacity as such, (a) the Debtors or the Reorganized Debtors, (b) the DIP ABL Facility Agent, (c) the DIP ABL Secured Parties, (d) the DIP Term Loan Facility Agent, (e) the DIP Term Loan Secured Parties, (f) the Supporting Term Lenders, (g) the Crossover Holder, (h) the Supporting Noteholders, (i) the Supporting Sponsors, (j) the Unsecured Notes Indenture Trustee, (k) the Exit ABL Facility Agent, (l) the Priority Exit Facility Agent, (m) the Exit Facility Lenders, (n) the Takeback Term Loan Agent, (o) the Prepetition ABL Secured Parties, (p) the Prepetition Term Loan Secured Parties, and (q) all Holders of Claims or Interests (i) who vote to accept the Plan, (ii) who are Unimpaired under the Plan and do not timely object to the releases provided herein, (iii) whose vote to accept or reject the Plan is solicited but do not vote either to accept or to reject the Plan and do not opt out of granting the releases herein, or (iv) who vote to reject the Plan but do not opt out of granting the releases herein.

1.111 **Reorganized Debtors** means each of the Debtors, as reorganized on the Effective Date in accordance with the Plan, including any newly formed Entity that is a transferee or successor thereto by merger, consolidation, transfer or otherwise pursuant to the Restructuring Transactions.

1.111 1.112 **Reorganized DB Parent** means the Entity that will be, as of the Effective Date, the ultimate parent company of the other Reorganized Debtors and that, in accordance with the Plan (including the Restructuring Transactions), will be the issuer of the New Common Stock and the Warrants.

1.112 **Reorganized Debtors** means each of the Debtors, as reorganized on the Effective Date in accordance with the Plan, including any newly formed Entity that is a transferee or successor thereto by merger, consolidation, transfer, or otherwise pursuant to the Restructuring Transactions.

1.113 **Required DIP Term Lenders** has the meaning ascribed to "Required Lenders" under the DIP Term Loan Agreement.

1.114 **Required Supporting Term Lenders** has the meaning ascribed to it in the Restructuring Support Agreement.

1.115 **Restructuring** has the meaning ascribed to it in the Restructuring Support Agreement.

1.116 **Restructuring Expenses** means all reasonable and documented fees and expenses of the Supporting Party Professionals incurred in their respective representation of the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders, or the Supporting Sponsors, as applicable, relating to the Restructuring.

1.117 **Restructuring Support Agreement** means that certain Restructuring Support Agreement, dated as of November 18, 2018, by and among the Debtors and the parties thereto, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, a copy of which, without individual holdings shown on the signature pages, is attached to the Plan as Exhibit A.

1.118 **Restructuring Support Parties** means, collectively, the Supporting Term Lenders, the Supporting Noteholders, the Crossover Holder, and the Supporting Sponsors, in each case, that are or from time to time become parties to the Restructuring Support Agreement.

1.119 **Restructuring Term Sheet** means that certain term sheet attached to the Restructuring Support Agreement as Exhibit A.

1.120 **Restructuring Transactions** has the meaning set forth in Article V Section 5.10(a) of the Plan.

1.121 **RSA Definitive Document Requirements** means that the Definitive Documents shall be subject to the respective consent rights of the Debtors and the applicable Restructuring Support Parties as set forth in the Restructuring Support Agreement.

1.122 **Security** has the meaning set forth in in section 101(49) of the Bankruptcy Code.

1.123 **Solicitation Parties** means each of the following in its capacity as a solicitation agent: (a) the Debtors; (b) the Unsecured Notes Indenture Trustee; and (c) the professionals of each of the foregoing.

1.124 **Supplemental Securities** means 15.0% of the New Common Stock to be issued and distributed on the Effective Date to the initial lenders under the Priority Exit Facility.

1.125 **Supporting Noteholder** has the meaning ascribed to it in the Restructuring Support Agreement.

1.126 **Supporting Party Professionals** means (i) Jones Day as counsel to the Supporting Term Lenders; (ii) Pachulski Stang Ziehl & Jones as co-counsel to the Supporting Term Lenders; (iii) Greenhill & Co., LLC as financial advisor and investment banker to the Supporting Term Lenders; (iv) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Crossover Holder; (v) Cozen O'Connor P.C. as co-counsel to the Crossover Holder; (vi) Moelis & Company LLC as financial advisor and investment banker to the Crossover Holder; (vii) Fried, Frank, Harris, Shriver & Jacobson LLP as counsel to a Supporting Noteholder; (viii) Morris Nichols Arsht & Tunnell LLP as Delaware counsel to a Supporting Noteholder; (ix) FTI Consulting as counsel to a Supporting Noteholder; and (x) Cole Schotz P.C. as counsel to a Supporting Sponsor.

1.127 **Supporting Sponsor** has the meaning ascribed to it in the Restructuring Support Agreement.

1.128 **Supporting Term Lender** has the meaning ascribed to it in the Restructuring Support Agreement.

1.129 **Takeback Term Loan** means the debt to be issued by the Reorganized Debtors under the Plan to the Prepetition Term Lenders on the terms and conditions set forth in the Takeback Term Loan Credit Agreement, in the original principal amount equal to three hundred million Dollars ($300,000,000), less the commitment amount of the Priority Exit Facility.

1.130 **Takeback Term Loan Agent** means the Person selected by the Required Supporting Term Lenders in consultation with the Crossover Holder to serve as the administrative and collateral agent under the Takeback Term Loan Credit Agreement, solely in its capacity as such.

1.131 **Takeback Term Loan Credit Agreement** means that certain second-priority secured credit agreement, dated as of the Effective Date (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), and containing terms substantially consistent with the Restructuring Term Sheet and otherwise subject to the RSA Definitive Document Requirements.

1.132 **Term Loan Stock Allocation** means 76.25% of the New Common Stock (subject to dilution by the MIP Equity and any Warrant Equity).

1.133 **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.134 **Unsecured Noteholder** means a holder of Unsecured Notes and its successors and permitted assigns.

1.135 **Unsecured Notes** means the outstanding 7.75% notes due 2020, issued pursuant to the Unsecured Notes Indenture in the aggregate principal amount of $270,000,000 Dollars.

1.136    **Unsecured Notes Claim** means, collectively, all Claims arising under the Unsecured Notes and the Unsecured Notes Indenture, including any Guarantee Claims arising on account of the Unsecured Notes and the Unsecured Notes Indenture, other than Restructuring Expenses.

1.137    **Unsecured Notes Indenture** means that certain Indenture, dated as of October 11, 2012, by and among David's Bridal, Inc., as issuer, the guarantors named therein, and the Unsecured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

1.138    **Unsecured Notes Indenture Trustee** means Wilmington Trust, National Association, in its capacity as trustee under the Unsecured Notes Indenture and its successors and assigns.

1.139    **Unsecured Notes Indenture Trustee Charging Lien** means any Lien or other priority in payment to which the Unsecured Notes Indenture Trustee is entitled, pursuant to the Unsecured Notes Indenture, against distributions to be made to the Unsecured Noteholders under this Plan or otherwise, for payment of any Unsecured Notes Indenture Trustee Fees.

1.140    **Unsecured Notes Indenture Trustee Fees** means the reasonable and documented fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, annual fees, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Unsecured Notes Indenture Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Unsecured Notes Indenture.

1.141    ~~1.139~~ **Unsecured Notes Stock Allocation** means 8.75% of the New Common Stock (subject to dilution by the MIP Equity and any Warrant Equity).

1.142    ~~1.140~~ **U.S. Trustee** means the United States Trustee for the District of Delaware.

1.143    ~~1.141~~ **Voting Agent** means Donlin, Recano & Company, Inc., the Debtors' voting agent.

~~1.142    **Voting Deadline** means the date by which all Persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.~~

1.144    **Warrant Agreement** means the Definitive Document governing the Warrants, which shall be subject to the RSA Definitive Document Requirements and filed as part of the Plan Supplement (as further amended, modified, or supplemented in accordance with its terms).

1.145    **Warrant Equity** means the New Common Stock issued upon the exercise of the Warrants.

1.146    ~~1.143~~ **Warrants** means the five (5) year warrants issued in accordance with the Plan, entitling holders thereof, upon exercise thereof, to receive 20% of the New Common Stock, subject to dilution by the MIP Equity and subject to the terms of the Amended Organizational Documents and the New Stockholders' Agreement, on terms and conditions otherwise consistent with the Restructuring Term Sheet and subject to the RSA Definitive Document Requirements.

14

1.144 **Warrant Agreement** means the Definitive Document governing the Warrants, which shall be subject to the RSA Definitive Document Requirements and filed as part of the Plan Supplement (as further amended, modified or supplemented in accordance with its terms).

1.145 **Warrant Equity** means the New Common Stock issued upon the exercise of the Warrants.

B.     **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.     **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to Cash, unless otherwise expressly provided.

D.     **Controlling Document.**

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and any Definitive Documents or other documents, schedules, or exhibits contained in the Plan Supplement, subject to the RSA Definitive Document Requirements, such Definitive Document or other document, schedule, or exhibit shall control.  In the event of an inconsistency between the Plan or any Definitive Documents or other documents, schedules, or exhibits contained in the Plan Supplement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control.

## ARTICLE II   ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS.

2.1     **Administrative Expense Claims.**

Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably

15

practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided* that any Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions; *provided further*, that the Debtors or Reorganized Debtors, as applicable, shall obtain the consent of the Priority Exit Facility Agent (as directed by the requisite lenders under the applicable underlying documentation), which consent shall not be unreasonably withheld, before resolving, settling, or otherwise agreeing to the payment of any Administrative Expense Claim representing liabilities incurred outside of the ordinary course of business before such Claim becomes an Allowed Administrative Expense Claim.

2.2  **Professional Fee Claims.**

All Entities seeking an award by the Bankruptcy Court of Professional Fee Claims shall file and serve on counsel for the Reorganized Debtors, the U.S. Trustee, counsel for the Supporting Term Lenders, counsel for the Crossover Holder, counsel for the Supporting Noteholders, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to any Professional Fee Claims must be filed and served on counsel for the Reorganized Debtors, counsel for the Supporting Term Lenders, counsel for the Crossover Holder, counsel for the Supporting Noteholders, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (a) upon the later of (i) the Effective Date, and (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, in each case, as soon as reasonably practicable, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors or the Reorganized Debtors, as applicable. On or about the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtors or their Estates as of the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of ~~the Professional's~~ such holders' request for payment of Professional Fee Claims. The Debtors or the Reorganized Debtors shall either escrow or separately reserve for and segregate such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by order of the Bankruptcy Court or agreement of the parties.

The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3  **Fees and Expenses of Unsecured Notes Indenture Trustee.**

On the Effective Date ~~, the Reorganized~~ (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan), the Debtors shall pay in Cash all unpaid reasonable and documented Unsecured Notes Indenture Trustee Fees (without duplication ~~of~~to the

16

amounts to be paid, if any, pursuant to Section 4.5 of the Plan) ~~in full in Cash all reasonable and documented prepetition and postpetition fees, expenses, and reimbursements of the~~<ins>without application or approval of the Bankruptcy Court and without a reduction to recoveries of the Holders of the Unsecured Notes. For the avoidance of doubt, nothing herein affects each Unsecured Notes Indenture Trustee's right to exercise its</ins> Unsecured Notes Indenture Trustee ~~(including the~~<ins>Charging Lien against distributions to the Holders of the Unsecured Notes. Any such</ins> reasonable and documented ~~fees and expenses of one counsel) to the extent provided for under the~~Unsecured Notes Indenture. ~~Any such fees, expenses, or reimbursements~~<ins>Trustee Fees</ins> invoiced after the Effective Date shall be paid promptly, but no later than ten (10) Business Days after the Reorganized Debtors receive an invoice. ~~The Unsecured Notes Indenture Trustee shall provide the Debtors, the Supporting Term Lenders, the Crossover Holder and the Supporting Noteholders with an estimate of the Unsecured Notes Indenture Trustee fees and expenses no later than five (5) Business Days prior to the Effective Date.~~

<ins>No later than five (5) Business Days prior to the Effective Date, the Unsecured Notes Indenture Trustee shall provide the Debtors with the amount of all accrued fees and expenses as of such date and an estimate of the future Unsecured Notes Indenture Trustee Fees expected to be incurred by the Unsecured Notes Indenture Trustee. If the Debtors or Reorganized Debtors dispute any requested Unsecured Notes Indenture Trustee Fees, the Debtors or Reorganized Debtors shall (i) pay the undisputed portion of Unsecured Notes Indenture Trustee Fees, and (ii) notify the Unsecured Notes Indenture Trustee of such dispute before the Effective Date or, if such Unsecured Notes Indenture Trustee Fees were incurred for post-Effective Date Service, within ten (10) days after presentment of the invoices by the Unsecured Notes Indenture Trustee. Any disputes concerning the amount of the Unsecured Notes Indenture Trustee Fees may be submitted to the Bankruptcy Court for resolution. Nothing herein shall be deemed to impair, waive, discharge or negatively impact any Unsecured Notes Indenture Trustee Charging Lien.</ins>

2.4     **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

2.5     **DIP ABL Facility Claims.**

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to a less favorable treatment of such Claim or has been indefeasibly paid in full in Cash at the default rate before the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL Facility Claim, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall (i) receive Cash in the full amount of its Allowed DIP ABL Facility Claim, and (ii) all issued and undrawn Letters of Credit (as defined in the DIP ABL Agreement) shall be replaced or cash collateralized in the amounts specified under the DIP ABL Agreement, from the proceeds of the Exit ABL Facility and the existing commitments under the DIP ABL Agreement shall be terminated, provided that, at the option of such holder, to the extent such holder has issued commitments

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Prepetition ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Prepetition Term Loan Claims | Impaired | Yes |
| 5 | Unsecured Notes Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Interests | Impaired | No (Deemed to reject) |

3.4    **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5    **Elimination of Vacant Classes.**

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one (1) holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan (subject to the Restructuring Support Agreement and, for the avoidance of doubt, the RSA Definitive Document Requirements) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules, and (b) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.

3.7    **Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

### ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS.

4.1    **Priority Non-Tax Claims (Class 1).**

(a)    <u>Classification</u>:  Class 1 consists of Priority Non-Tax Claims.

Agreement on such unreimbursed amounts through the Effective Date, plus any fees, charges, expenses, reimbursement obligations, indemnification obligations, Unpaid Drawings (as defined in the Prepetition ABL Agreement), increased costs, and other amounts due but unpaid under the Prepetition ABL Agreement. Neither the holders of the Prepetition ABL Claims nor the Prepetition ABL Agent shall be required to file proofs of Claim on account of any Prepetition ABL Claim.

(c)     Treatment:  Except to the extent that a holder of an Allowed Prepetition ABL Claim agrees to a less favorable treatment of such Claim or has been indefeasibly paid in full in Cash at the default rate or "rolled up" or converted into DIP ABL Claims pursuant to the applicable DIP Order before the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition ABL Claim, on the Effective Date, each holder of an Allowed Prepetition ABL Claim shall (i) receive Cash in the full amount of its Allowed Prepetition ABL Claim and (ii) all issued and undrawn Letters of Credit (as defined in the Prepetition ABL Agreement) shall be replaced or cash collateralized in the amounts specified under the Prepetition ABL Agreement, from the proceeds of the Exit ABL Facility and the existing commitments under the Prepetition ABL Agreement shall be terminated.

(d)     Voting:  Class 3 is Unimpaired, and the holders of Prepetition ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Prepetition ABL Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 4.4    Prepetition Term Loan Claims (Class 4).

(a)     Classification:  Class 4 consists of Prepetition Term Loan Claims.

(b)     Allowance:  The Prepetition Term ~~Loans~~Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against David's Bridal, Inc. and DB Midco, Inc. in the aggregate principal amount of $481,239,196.00, plus (i) accrued but unpaid interest owed as of the Petition Date and any fees, charges, and other amounts due but unpaid under the Prepetition Term Loan Credit Agreement or any related documents as of the Petition Date and (ii) any other Prepetition Term Loan Claims accrued under any order of the Bankruptcy Court but unpaid as of the Effective Date. Neither the holders of the Prepetition Term Loan Claims nor the Prepetition Term Loan Agent shall be required to file proofs of Claim on account of any Prepetition Term Loan Claim.

(c)     Treatment:  Except to the extent that a holder of an Allowed Prepetition Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Term Loan Claim, on the Effective Date, each holder of an Allowed Prepetition Term Loan Claim shall receive its Pro Rata Share of (i) the Takeback Term Loan, (ii) the Term Loan Stock Allocation and (iii) the right to participate in the Priority Exit Facility (and receive the Supplemental Securities in accordance therewith). The holders of Allowed Prepetition Term Loan Claims shall be deemed to have waived, and shall not receive any recovery on account of, any deficiency claim.

(d)     Voting:  Class 4 is Impaired, and the holders of Secured Notes Claims are entitled to vote to accept or reject the Plan.

### 4.5    Unsecured Notes Claims (Class 5).

(a)     Classification:  Class 5 consists of Unsecured Notes Claims.

(b)     Allowance:  The Unsecured Notes Claims are Allowed against David's Bridal, Inc. in the aggregate principal amount of $270,000,000 plus accrued but unpaid interest owed as of the Petition Date and any fees, charges, and other amounts due but unpaid under the Unsecured Notes, the Unsecured Notes Indenture, or any related documents as of the Petition Date.  Neither the holders of the Unsecured Notes Claims nor the Unsecured Notes Indenture Trustee shall be required to file proofs of Claim on account of any Unsecured Notes Claim.

(c)     Treatment:  Except to the extent that a holder of an Allowed Unsecured Notes Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Unsecured Notes Claim, on the Effective Date, each holder of an Allowed Unsecured Notes Claim shall receive its Pro Rata share of (i) the Unsecured Notes Stock Allocation and (ii) the Warrants.  Distribution to each Holder of an Allowed Unsecured Notes Claim shall be subject to, and in accordance with, the rights and the terms of the Unsecured Notes Indenture.

(d)     Voting:  Class 5 is Impaired, and the holders of Unsecured Notes Claims in Class 5 are entitled to vote to accept or reject the Plan.

### 4.6     General Unsecured Claims (Class 6).

(a)     Classification:  Class 6 consists of General Unsecured Claims.

(b)     Treatment:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim or has been paid before the Effective Date, on and after the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, (i) the Reorganized Debtors shall continue to pay or treat each Allowed General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced, or (ii) such holder will receive such other treatment so as to render such holder's Allowed General Unsecured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, in each case subject to all defenses or disputes the Debtors and the Reorganized Debtors may have with respect to such Claims, including as provided in Section 6.17 of the Plan; *provided* that, notwithstanding the foregoing, the Allowed amount of General Unsecured Claims shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable; *provided*, *further*, that the Supporting Sponsors holding General Unsecured Claims shall be deemed to have waived such Claims and shall not receive any distributions on account of such Claims.

(c)     Voting:  Class 6 is Unimpaired, and the holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 4.7     Intercompany Claims (Class 7).

(a)     Classification:  Class 7 consists of Intercompany Claims.

(b)     Treatment:  On the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be paid, adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Debtors (with the

consent of the Required Supporting Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, subject to the Restructuring Transactions.

(c)      Voting:  Class 7 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 4.8    **Intercompany Interests (Class 8).**

(a)      Classification:  Class 8 consists of Intercompany Interests.

(b)      Treatment:  On the Effective Date, or as soon as practicable thereafter, all Intercompany Interests shall be Reinstated, (i) subject to the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder and (ii) the Restructuring Transactions.

(c)      Voting:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

(d)      To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the holders of the New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

### 4.9    **Parent Interests (Class 9).**

(a)      Classification:  Class 9 consists of Parent Interests.

(b)      Treatment:  Holders of Parent Interests shall not receive or retain any property under the Plan on account of such Parent Interests.  On the Effective Date, or as soon as practicable thereafter, all Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)      Voting:  Class 9 is Impaired, and the holders of Parent Interests are conclusively deemed to have rejected the Plan.  Therefore, holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders of Parent Interests will not be solicited.

## ARTICLE V   MEANS FOR IMPLEMENTATION.

### 5.1    **Compromise of Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and controversies resolved under the Plan, as to the Debtors, the Reorganized Debtors and the Restructuring Support Parties, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, and the Bankruptcy Court's findings shall constitute its

determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest, and fair and equitable. Each provision of the Plan constitutes a part of this settlement that is non-severable from the remaining terms of the Plan.

5.2     **Sources of Cash for Plan Distribution.**

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and Cash balances, the Priority Exit Facility Loans and the Exit ABL Facility.

5.3     **Restructuring Expenses.**

To the extent not otherwise paid and notwithstanding any contrary limitations or conditions to such payment in an order of the Bankruptcy Court other than the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay outstanding and invoiced Restructuring Expenses as follows:  (Aa) on the Effective Date, Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least two (2) Business Days in advance of the Effective Date and (Bb) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided that* such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.

5.4     **Continued Corporate Existence; Corporate Action.**

(a)     Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and will be effective without any further action or approval (other than any requisite filings required under applicable state or federal law).

(b)     On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (i) the adoption and/or filing of the Amended Organizational Documents and the New Stockholders' Agreement; (ii) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (iii) the authorization, issuance, and distribution of New Common Stock (including the Supplemental Securities) and Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; (iv) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (v) the entry into the Exit Facilities and the execution, delivery, and filing of the Exit Facility Documents, as applicable; (vi) implementation of the Restructuring Transactions; (vii) payment of the Backstop Payment; and (viii) all other actions contemplated by the Plan (whether to occur before,

on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtors, and any corporate action required by the Debtors or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, Reorganized DB Parent, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of Reorganized DB Parent and the other Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Section 5.4(b) shall be effective notwithstanding any requirements under non-bankruptcy law.

5.5  **Exit Facilities.**

(a)  On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit Facility Documents, the Reorganized Debtors will enter into the Exit Facilities without the need for any further corporate action and without further action by the holders of Claims or Interests.  The proceeds of the Exit Facilities shall be used to (i) refinance the Prepetition ABL Agreement (to the extent outstanding), DIP ABL ~~Facility~~Agreement and DIP Term Loan ~~Facility~~Agreement in full in accordance with ~~3.7~~Sections 2.5, 2.6 and 4.3 of the Plan, (ii) fund other Distributions, costs, and expenses contemplated by the Plan, (iii) pay the Backstop Payment and (iv) fund general working capital and for general corporate purposes of the Reorganized Debtors, in each case subject to the terms of the Exit Facility Documents.

(b)  To the extent that holders of Prepetition Term Loan Claims do not fully fund the Priority Exit Facility in accordance with Section 4.4 hereof, the Backstop Parties have agreed to backstop the Priority Exit Facility to the extent of the Priority Exit Facility Backstop Commitment, consistent with the Restructuring Term Sheet and subject to the terms thereof, to ensure that the entire Priority Exit Facility is funded.  In consideration of the Priority Exit Facility Backstop Commitment, on the Effective Date, each Backstop Party shall receive its applicable allocation of the Backstop Payment.

(c)  The Confirmation Order shall constitute approval of the Exit Facilities (including the transactions contemplated thereby and all payments contemplated thereunder (including the Backstop Payment), and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents and make such payment and any other payment in connection therewith as may be required or appropriate.

(d)  On the Effective Date, the Exit Facility Documents shall be executed and delivered substantially on the terms and conditions set forth in the Restructuring Term Sheet.  All Liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law, (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer, and (iii) not otherwise subject to avoidance, recharacterization, or subordination under any applicable law.  Each of the Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security

section 1145(a) of the Bankruptcy Code and, if applicable, shall be freely tradable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) any applicable regulatory approval.

(c)     Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock and/or the Warrants through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock and Warrants under applicable securities laws.

(d)     Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock and Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock and/or Warrants and/or shares of New Common Stock (including any other securities issuable upon exercise of Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

5.8     **Cancellation of Existing Securities and Agreements.**

(a)     Except for the purpose of evidencing a right to a Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any Prepetition ABL Claims, Prepetition Term Loan Claims, Unsecured Notes Claims, or any Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     Notwithstanding such cancellation and discharge, the Prepetition ABL Agreement, the Prepetition Term Loan Agreement, and the Unsecured Notes Indenture shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Prepetition ABL Claims, Allowed Prepetition Term Loan Claims, and Allowed Unsecured Notes Claims to receive Distributions under the Plan, (ii) allow the Debtors, the Reorganized Debtors, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Unsecured Notes Indenture Trustee, and the Disbursing Agent to make post-Effective Date Distributions or take such other action pursuant to the Plan on account of the Allowed Prepetition ABL Claims, Allowed Prepetition Term Loan Claims, and Allowed Unsecured Notes Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (iii) permit the Prepetition ABL Agent, the Prepetition Term Loan Agent, and the Unsecured Notes Indenture Trustee to appear in the Chapter 11 Cases, *provided* that nothing in this Section 5.8 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(c)     In addition to the foregoing, the Unsecured Notes Indenture shall continue in effect to the extent necessary to (i) permit the Unsecured Notes Indenture Trustee to assert its Unsecured

Notes Indenture Trustee Charging Lien; (ii) allow the Unsecured Notes Indenture Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Unsecured Notes Indenture; (iii) exercise its rights and obligations relating to the interests of its holders under the Unsecured Notes Indenture; and (iv) permit the Unsecured Notes Indenture Trustee to perform any functions that are necessary to effectuate the powers outlined in this Section 5.8. Except for the foregoing, the Unsecured Notes Indenture Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the Unsecured Notes Indenture and related documents and the Plan, except with respect to such other rights of the Unsecured Notes Indenture Trustee that, pursuant to the Unsecured Notes Indenture, survive the termination of the Unsecured Notes Indenture. Subsequent to the performance by the Unsecured Notes Indenture Trustee of its obligations pursuant to the Plan, the Unsecured Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Unsecured Notes Indenture and shall be discharged.

(d) (c) Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.8 shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.9     **Officers and Boards of Directors.**

(a)     On the Effective Date, the New Board shall consist of seven (7) directors in total to be designated by the Supporting Term Lenders and the Crossover Holder in a manner to be determined consistent with the Restructuring Term Sheet. To the extent then known and determined, the identities of the members of each board of directors or managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such Amended Organizational Documents.

5.10    **Restructuring Transactions.**

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors shall, subject to the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder, take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (collectively, the "**Restructuring Transactions**"), including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution, the Amended Organizational Documents, (iv) the issuance of Securities (including the New

Common Stock, Warrants and Supplemental Securities), all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (v) all other actions that the applicable Entities determine to be necessary or appropriate, including (A) making filings or recordings that may be required by applicable law, subject, in each case, to the Amended Organizational Documents, and (B) such other transactions that may be required or necessary to effectuate any of the Restructuring Transactions in the most tax-efficient manner, including mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations:, (vi) the execution, delivery, and filing, if applicable, of the Exit Facility Documents, the Amended Organizational Documents, the New Stockholders' Agreement and the Warrant Agreement:, and (vii) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, *provided*, that any of the foregoing actions and documents shall, in each case, be subject to the RSA Definitive Document Requirements (as applicable). The Restructuring Transactions may include a taxable transfer of all or a portion of the Debtors' assets or Entities to one or more ~~newly formed~~newly formed Entities (or an affiliate or subsidiary of such Entity or Entities) formed and controlled by certain holders of Claims against the Debtors and, in such case, the New Common Stock (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of such Entity or Entities.

(b)      Each officer, member of the board, or manager of the Debtors is (and each officer, member of the board, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Securities issued pursuant to the Plan and any Restructuring Transaction (including the New Common Stock, Warrants and Supplemental Securities) in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the shareholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)      On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the New Stockholders' Agreement, the Warrant Agreement, and the Exit Facility Documents, as applicable, and the Bankruptcy Code. The Amended Organizational Documents shall, among other things: (i) authorize the issuance of the New Common Stock (including the Supplemental Securities) and the Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; and (ii) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the Amended Organizational Documents, the New Stockholders Agreement and the Warrant Agreement.

(d)      All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, to the extent applicable, or any corporate, limited liability company, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, members, or directors or managers of the Debtors or the Reorganized Debtors, and with

like effect as though such action had been taken unanimously by the shareholders, members, directors, managers, or officers, as applicable, of the Debtors or the Reorganized Debtors.

5.11    **Cancellation of Liens.**

Except as otherwise specifically provided herein, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge or other security interest under the Exit Facility Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including pursuant to Section 5.8(b) hereof, upon the indefeasible payment in full in Cash of an Other Secured Claim or ABL Facility Claim, any Lien securing an Other Secured Claim or ABL Facility Claim that is indefeasibly paid in full, in Cash, shall be deemed released and discharged, and the holder of such Other Secured Claim or ABL Facility Claim shall be authorized and directed to release any Collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release or discharge of such Lien, including the execution, delivery and filing or recording of such releases or discharges as may be requested by the Reorganized Debtors, and the Reorganized Debtors and their designees shall be authorized to file UCC-3 termination statements and other release or discharge documentation (to the extent applicable) with respect thereto.

5.12    **Employee Matters.**

(a)    Subject to Section 5.12(c) of ~~this~~the Plan, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which any Debtor is a party (collectively, the "**Employee Arrangements**"); *provided that* notwithstanding anything contrary in the Employee Arrangements, the consummation of the Plan shall not be treated as a change in control or change of control or other similar transaction under the Employee Arrangements.

(b)    Within sixty (60) days following the Effective Date, the New Board shall establish the Management Incentive Plan for members of the Reorganized Debtors' management. The participants and the amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board.

(c)    Any Parent Interests granted prior to the Effective Date to a current or former employee, officer, director or contractor under an Employee Arrangement or otherwise shall be deemed cancelled on the Effective Date. For the avoidance of doubt, if a Benefit Plan or an Employee Arrangement is assumed and the Benefit Plan or Employment Arrangement provides in part for an award or potential award of Interests in the Debtors, such Benefit Plan or Employment Arrangement shall be assumed in all respects other than the provisions of such agreement relating to Interest awards.

5.13    **Release of Avoidance Actions.**

On the Effective Date, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors.

5.14    **Closing of Chapter 11 Cases.**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases, *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.  Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

5.15    **Notice of Effective Date.**

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE VI  DISTRIBUTIONS.

6.1    **Distributions Generally.**

One or more Disbursing Agents shall make all Distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2    **Distribution Record Date.**

As of the close of business on the Effective Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Effective Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease (or such non-Debtor party's counsel and/or managing agent) as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.  For the avoidance of doubt, the Distribution Record Date shall not apply to the Unsecured Notes, the holders of which shall receive a Distribution in accordance with 3.7Section 4.5 of the Plan and, as applicable, the customary procedures of DTC on or as soon as practicable after the Effective Date.

6.3    **Date of Distributions.**

Except as otherwise provided in the Plan, any Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of 3.7Article IV of the Plan, or as soon as

practicable thereafter; *provided* that the Reorganized Debtors may implement periodic Distribution dates to the extent they determine them to be appropriate.

6.4 **Disbursing Agent.**

All Distributions under the Plan shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided herein), on or after the Effective Date or as otherwise provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and expenses incurred by such Disbursing Agent directly related to Distributions hereunder shall be reimbursed by the Reorganized Debtors. The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or the Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.196.20 of the Plan.

6.5 **Rights and Powers of Disbursing Agent.**

(a) From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b) The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6 **Expenses of Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.7 **Delivery of Distributions to Unsecured Notes Indenture Trustee.**

(a) All distributions to Holders of Unsecured Notes Claims shall be made in accordance with the terms of the Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims.

As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders.

(b)     If the Unsecured Notes Indenture Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with such Unsecured Notes Indenture Trustee's cooperation, shall make such distributions to the extent reasonably practicable to do so (provided that until such distributions are made, the Unsecured Notes Indenture Trustee Charging Lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Unsecured Notes Indenture Trustee).  As to any Holder of an Allowed Unsecured Notes Claim that is held in the name of, or by a nominee of DTC, the Reorganized Debtors, shall seek the cooperation of DTC, or other transfer agent, so that such distribution shall be made through the facilities of DTC, or other transfer agent, on or as soon as practicable on or after the Effective Date.

6.8     6.7 **Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court (including the DIP Orders) or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Petition Date; *provided* that, if interest is payable pursuant to this Section 6.7 6.8, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.  Notwithstanding the foregoing, postpetition interest on Prepetition ABL Claims and Prepetition Term Loan Claims shall accrue and be paid in accordance with the terms set forth in the agreements governing such Claims, including, without limitation, the DIP Orders, the Prepetition ABL Documents and the Prepetition Term Loan Documents (as applicable).

6.9     6.8 **Delivery of Distributions.**

All Distributions to any holder of an Allowed Claim as and when required by the Plan shall be made by the Disbursing Agent.  In the event that any Distribution to any holder is returned as undeliverable, no further Distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently due, missed Distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable Distributions and, if located, assist such holders in complying with Section 6.19 6.20 of the Plan.

6.10    6.9 **Distributions after Effective Date.**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.11    6.10 **Unclaimed Property.**

Undeliverable Distributions or unclaimed Distributions shall remain in the possession of the Reorganized Debtors until such time as a Distribution becomes deliverable or the holder accepts Distribution, or such Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of the attempted Distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any

33

other holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by (i) reviewing the Debtors' books and records and filings with the Bankruptcy Court and (ii) posting a list of undeliverable Distributions on the Voting Agent's website.

6.12    6.11 **Time Bar to Cash Payments.**

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.13    6.12 **Manner of Payment under Under the Plan.**

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.14    6.13 **Satisfaction of Claims.**

Except as otherwise specifically provided in the Plan, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.15    6.14 **Fractional Stock and Warrant.**

If any Distributions of New Common Stock or the Warrant pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or the Warrant, then the number of shares of New Common Stock or the Warrant to be issued in respect of such Distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down). The total number of shares of New Common Stock or the Warrant to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14 6.15. No consideration shall be provided in lieu of fractional shares that are rounded down. To the extent applicable, DTC is considered a single holder for rounding and distribution purposes. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a Distribution that is less than one (1) share of New Common Stock.

6.16    6.15 **Minimum Cash Distributions.**

The Disbursing Agent shall not be required to make any Distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided* that if any Distribution is not made pursuant to this Section 6.15 6.16, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

**6.17** ~~6.16~~ **Maximum Distributions and Rights of Reimbursement**.

(a)     An (i) Allowed Primary Claim that receives Distributions in the Allowed amount of such Claim or (ii) Allowed Guarantee Claim that receives any payment or transfer that, when combined with Distributions provided on account of the corresponding Primary Claim equals the Allowed amount of the Primary Claim, shall, in each case, be deemed to have had such Allowed Primary Claim or Allowed Guarantee Claim, as applicable, satisfied in full as against the applicable Debtor.

(b)     In no event shall (i) an Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim, or (ii) an Allowed Guarantee Claim receive Distributions under the Plan that, when combined with Distributions or other consideration provided on the corresponding Primary Claim are in excess of the Allowed amount of the Primary Claim (or such amount as may be agreed to by the Debtors and the holder of the Allowed Guarantee Claim, with the consent of the Required Supporting Term Lenders and the Crossover Holder).

(c)     Nothing contained herein shall in any way affect, impair or modify the rights of a holder of a Primary Claim or a Guarantee Claim against an Entity that is not a Debtor.

**6.18** ~~6.17~~ **Setoffs**.

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**6.19** ~~6.18~~ **No Distribution in Excess of Amount of Allowed Claim**.

No holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim, except to the extent postpetition interest is permitted by Section ~~6.7~~6.8 of the Plan.

**6.20** ~~6.19~~ **Withholding and Reporting Requirements**.

(a)     Withholding Rights.  In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting

requirements.  In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations. Any party issuing any instrument or making any Distribution pursuant to the Plan, shall, to the extent reasonably practicable, notify any recipient of a Distribution pursuant to the Plan and all related agreements if it is going to withhold taxes pursuant to this Section 6.196.20 and reasonably cooperate with the recipient to minimize or avoid such withholding.

(b)  Forms.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.

### 6.21   6.20  Hart-Scott-Rodino Antitrust Improvements Act.

Any New Common Stock or the Warrant to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

### 6.22   6.21  Claims Paid or Payable by Third Parties.

(a)  **Claims Paid by Third Parties**

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen days of receipt thereof, repay or return the Distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.  The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Reorganized Debtors annualized interest at the federal judgment rate on such amount

owed for each Business Day after the fourteen day grace period specified above until the amount is repaid.

(b) **Claims Payable by Insurance Carriers**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(c) **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein, nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.23 ~~6.22~~ **Allocation Between Principal and Accrued Interest.**

The aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued but unpaid through the Effective Date.

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1 **Disputed Claims Process.**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, holders of Claims do not need to file proofs of Claim with the Bankruptcy Court, and the Debtors (with the reasonable consent of the Required Supporting Term Lenders and the Crossover Holder) or the Reorganized Debtors, as applicable, and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business; *provided*, that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. If a holder of a Claim elects to file a proof of Claim with the Bankruptcy Court, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Claims, which shall be resolved on a case-by-case basis through settlements, Claim objections (or, if necessary, through adversary proceedings), adjudication in a forum other than the Bankruptcy Court, or by withdrawal of the Claims by the holders of such Claims. From

and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

7.2 **Objections to Claims.**

Except insofar as a Claim is Allowed under the Plan, only the Reorganized Debtors shall be entitled to object to Claims after the Effective Date. Any objections to proofs of Claim shall be served and filed (a) on or before one-hundred and eighty (180) days following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors. The expiration of such period shall not limit or affect the Reorganized Debtors' rights to dispute Claims asserted other than through a proof of Claim.

7.3 **Estimation of Claims.**

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

7.4 **No Distributions Pending Allowance.**

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.5 **Distributions ~~after~~After Allowance.**

To the extent that a Disputed Claim ultimately becomes, in whole or in part, an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in ~~3.7~~Article IV of the Plan. Such Distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.6 **Claim Resolution Procedures Cumulative.**

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE

9.1     **Conditions Precedent to Confirmation of Plan.**

The following are conditions precedent to confirmation of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order;

(b)     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and shall have satisfied the RSA Definitive Document Requirements; and

(c)     the Restructuring Support Agreement shall not have been terminated and no termination notice shall have been given that with the passage of time would cause or permit a termination of the Restructuring Support Agreement.

9.2     **Conditions Precedent to Effective Date.**

The following are conditions precedent to the Effective Date of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order and no stay thereof shall be in effect;

(b)     the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect and no termination notice shall have been given that with the passage of time would cause or permit a termination of the Restructuring Support Agreement;

(c)     the Debtors shall not be in default under the DIP ABL ~~Facility~~Agreement, the DIP Term Loan ~~Facility~~Agreement or any of the DIP Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the applicable parties to the DIP ABL ~~Facility Parties or~~Agreement or parties to the DIP Term Loan ~~Facility Parties~~Agreement or cured by the Debtors in a manner consistent with the DIP ABL ~~Facility~~Agreement, the DIP Term Loan ~~Facility~~Agreement or the applicable DIP Orders);

(d)     (i) the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility Documents shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility Documents shall be deemed to occur concurrently with the occurrence of the Effective Date; and (ii) the Debtors shall have paid the Backstop Payment in full in Cash to the appropriate Backstop Parties;

(e)     (i) the Definitive Documents shall (x) have satisfied the RSA Definitive Document Requirements, (y) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith (other than any conditions precedent related to the occurrence of the Effective Date), and (z) be in full force and effect and binding upon the relevant parties; (ii) in addition to the RSA Definitive Document Requirements applicable to the Exit Facility Documents, (x) the Exit Facility Documents governing the Exit ABL Facility also shall be in form and substance reasonably satisfactory to the Exit ABL Facility Agent, (y) the Exit Facility Documents governing the Priority Exit Facility shall be in form and substance reasonably satisfactory to

43

(d)     The injunctions in this Section 10.5 shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

10.6    **Releases.**

(a)     Releases by Debtors.

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, effective as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is confirmed by this Plan,  the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, asserted or unasserted, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the DIP ABL Facility Documents, the DIP Term Loan Facility Documents, the DIP Orders, the Disclosure Statement, the Restructuring Support Agreement, any Restructuring Transactions and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, without limitation, all Avoidance Actions; *provided that* nothing in this Section 10.6(a) shall be construed to release the Released Parties from gross negligence, willful misconduct or intentional fraud as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released thereby; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released pursuant to such release.**

12.13 **Deemed Acts.**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.14 **Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.15 **Entire Agreement.**

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.16 **Exhibits to Plan.**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.17 **Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

12.18 **Plan Supplement.**

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Voting Agent's website at www.donlinrecano.com/davidsbridal- or the Bankruptcy Court's website at https://www.pacer.gov/.

12.19 **Waiver or Estoppel.**

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

IN WITNESS WHEREOF, each Debtor has executed this Plan this _____ day of ~~November~~December, 2018.

Respectfully submitted,

**DAVID'S BRIDAL, INC.**
**DB INVESTORS, INC.**
**DB HOLDCO, INC.**
**DB MIDCO, INC.**


By: _____
Name:   Joan Hilson
Title:   Executive Vice President and
          Chief Financial and Operating Officer