# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, INC., *et al.*,[1] | Case No. 18-12635 (LSS) |
| Debtors. | Jointly Administered |

## DEBTORS' (1) MEMORANDUM OF LAW IN SUPPORT OF (I) APPROVAL OF (A) DISCLOSURE STATEMENT, (B) SOLICITATION OF VOTES AND VOTING PROCEDURES, AND (C) FORM OF BALLOTS, AND (II) CONFIRMATION OF JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF DAVID'S BRIDAL, INC. AND ITS AFFILIATED DEBTORS AND (2) OMNIBUS REPLY TO OBJECTIONS THERETO

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Jaime Luton Chapman (No. 4936)
Tara Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253

*Attorneys for Debtors and Debtors in Possession*

Dated: December 28, 2018
         Wilmington, Delaware

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Nick S. Kaluk III (admitted *pro hac vice*)
Daniel E. Stroik (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Tel:     (212) 909-6000
Fax:     (212) 909-6836

-and-

Craig A. Bruens (admitted *pro hac vice*)
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel:     (202) 383-8000
Fax:     (202) 383-8118

*Attorneys for Debtors and Debtors in Possession*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holding, Inc. (4567); and DB Midco, Inc. (3096).  The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................... 1

FACTS ...................................................................................... 4

General Background of Chapter 11 Cases and Development of Prepackaged Plan ........... 4

Prepackaged Plan Solicitation ................................................................. 5

ARGUMENT .................................................................................. 7

I.    THE DEBTORS' SOLICITATION AND VOTING PROCEDURES
      SHOULD BE APPROVED. ................................................................. 8

      A.    The Debtors' Prepetition Solicitation Complied with the
            Requirements of Sections 1125(g) and 1126(b) of the Bankruptcy
            Code. ........................................................................ 8

            1.    Solicitation Was Exempt from Federal and State Securities
                  Registration Requirements and Proxy Rules. ......................... 8

            2.    The Disclosure Statement Contains Adequate Information
                  Within the Meaning of Section 1125(a)(1) of the
                  Bankruptcy Code. .................................................... 10

      B.    Solicitation of Classes Presumed to Accept the Plan and Classes
            Deemed to Reject the Plan Is Not Required. ............................... 12

      C.    The Debtors' Solicitation Package, Ballots, and Solicitation
            Procedures Complied with the Requirements of Bankruptcy Rules
            3017(d) and 3018(c). ...................................................... 14

            1.    Solicitation Packages. .............................................. 16

            2.    Combined Notice and Publication Notice. ............................. 17

            3.    Ballots. ........................................................... 17

      D.    The Solicitation Period Was Reasonable Under Bankruptcy Rule
            3018(b). ................................................................... 18

      E.    The Debtors' Solicitation Procedures Should Be Approved Under
            Bankruptcy Rule 3017(e). ................................................. 20

II.   THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY
      CODE AND SHOULD BE APPROVED. ..................................................... 20

      A.    The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code. ........... 21

      B.    Classification of Claims and Interests Complies with Section 1122
            of the Bankruptcy Code. .................................................. 21

      C.    The Plan Complies with Section 1123(a) of the Bankruptcy Code. ......... 24

      D.    The Plan Complies with Section 1123(b) of the Bankruptcy Code. ......... 25

|   |   | 1. | Plan Permissive Provisions. ....................................................... 25 |
|   |   | 2. | The Settlement Encompassed within the Restructuring Support Agreement Is an Integral Component of the Plan and Should be Approved..................................... 26 |
|   |   | 3. | The Plan Releases Should Be Approved. ...................................... 30 |
|   |   | 4. | The Plan Exculpation Provision Should Be Approved................. 46 |
|   | E. | The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code. ............. 47 |
|   | F. | The Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code. .............................................. 48 |
|   | G. | The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. .............................................................................................. 50 |
|   | H. | The Debtors Complied with Section 1129(a)(5) of the Bankruptcy Code. .............................................................................................. 51 |
|   | I. | The Plan Does Not Contain Any Rate Changes. ..................................... 51 |
|   | J. | The Plan Is in Best Interests of All Creditors Of, and Equity Interest Holders In, Each Debtor. ............................................................. 51 |
|   | K. | The Plan Has Been Accepted by or Is Deemed to Have Been Accepted by Impaired Classes Entitled to Vote on the Plan, and as to Such Classes, Requirements of Section 1129(a)(8) of the Bankruptcy Code Have Been Satisfied.................................................... 54 |
|   | L. | The Plan Provides for Payment in Full of All Allowed Priority Claims. ....................................................................................................... 54 |
|   | M. | The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code. ........... 56 |
|   | N. | The Plan Is Feasible. ............................................................................... 56 |
|   | O. | The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code. .............................................................................................. 58 |
|   | P. | The Plan Satisfies Section 1129(a)(13) of the Bankruptcy Code. ........... 59 |
|   | Q. | The Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes. ................. 59 |
|   |   | 1. | The Plan Does Not Discriminate Unfairly.................................... 60 |
|   |   | 2. | The Plan Is Fair and Equitable..................................................... 61 |
| III. | THE OBJECTIONS SHOULD BE OVERRULED OR RECOGNIZED AS MOOT, AND THE PLAN SHOULD BE CONFIRMED. ............................. 61 |
|   | A. | The Plan Provisions Reserving the Debtors' Right to Assume or Reject Executory Contracts and Unexpired Leases After Resolution of an Assumption Dispute Are Appropriate. .......................... 61 |

1004841629v8

B.  Objections of Jenny Yoo and Cumberland to the Non-Debtor Releases, and the Opt-Out Election by the Holder of an Unsecured Notes Claim ............................................................................ 63

C.  Objections Resolved Through Additional Language in the Proposed Confirmation Order. ................................................... 65

D.  Additional Objections Listed on the Objection Summary Chart Should Be Overruled to the Extent They Are Not Consensually Resolved Before the Confirmation Hearing. ............................................ 67

IV.  CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER. ............................................................................................... 67

CONCLUSION ............................................................................................................... 68

1004841629v8

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434 (1999)..................................................................................... 59

*Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),*
  767 F.2d 417 (8th Cir. 1985) ........................................................................ 66

*DJS Props., L.P. v. Simplot,*
  397 B.R. 493 (D. Idaho 2008) ....................................................................... 71

*Gunter Hotel Assocs.,*
  96 B.R. 696 (Bankr. W.D. Tex. 1988).......................................................... 71

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II),*
  994 F.2d 1160 (5th Cir. 1993) ...................................................................... 23

*In re 710 Long Ridge Rd. Operating Co., II, LLC,*
  Case No. 13-13653, 2014 WL 886433, (Bankr. D.N.J. Mar. 5, 2014)......... 41, 44, 45

*In re Adelphia Commc'ns Corp.,*
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd,* 544 F.3d 420 (2d Cir. 2008) ............... 32, 42, 60

*In re Affiliated Foods, Inc.,*
  249 B.R. 770 (Bankr. W.D. Mo. 2000) ......................................................... 60

*In re Aleris Int'l, Inc.,*
  Case No. 09-10478, 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...... 37

*In re Am. Capital Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012) .......................................................................... 65

*In re Am. Gilsonite Co.,*
  Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174] ................. passim

*In re AOV Indus., Inc.,*
  792 F.2d 1140 (D.C. Cir. 1986) .................................................................... 26

*In re Armstrong World Indus., Inc.,*
  348 B.R. 111 (D. Del. 2006).......................................................................... 69

*In re Basic Energy Servs. Inc.,*
  Case No. 16-12320 (KJC) (Bankr. D. Del. Dec. 9, 2016) [Docket No. 257] .............. 10, 51, 54

*In re Capmark Fin. Grp. Inc.,*
  438 B.R. 471 (Bankr. D. Del. 2010) .............................................................. 31, 32, 33

*In re Caribbean Petroleum Corp.,*
  512 B.R. 774 (Bankr. D. Del. 2014) .............................................................. 39

*In re Chemtura Corp.,*
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................... 56, 57

iv

*In re Coram Healthcare Corp.*,
 315 B.R. 321  (Bankr. D. Del. 2004) ........................................................................... 31, 33, 48

*In re DBSD N. Am., Inc.*,
 419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 90–3061 (REG), 2010 WL 1223109
 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. DISH Network Corp. v. DBSD
 N. Am. Inc.* (*In re DBSD N. Am.*), 634 F.3d 79 (2d Cir. 2011) ................................................. 38

*In re Dex Media, Inc.*,
 Case No. 16-11200 (KG) (Bankr. D. Del. July 15, 2016) [Docket No. 320] ........................... 10

*In re Drexel Burnham Lambert Grp., Inc.*,
 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................................. 61, 65

*In re Energy Future Holdings Corp.*,
 Case No. 14-10979 (CSS) (Bankr. D. Del. Aug. 29, 2016) [Docket No. 9421]...................... 47

*In re Enron Corp.*,
 Case No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) .................. 27

*In re Exide Techs.*,
 303 B.R. 48 (Bankr. D. Del. 2003) ................................................................................. 23, 52

*In re Finlay Enters. Inc.*,
 No. 09-14873, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) ..................................... 70

*In re Genco Shipping & Trading Ltd.*,
 513 B.R. 233 (Bankr. S.D.N.Y. 2014) ............................................................................. 43, 44

*In re Genesis Health Ventures, Inc.*,
 266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................................... 24

*In re Greater Se. Cmty. Hosp. Corp. I*,
 327 B.R. 26 (Bankr. D.D.C. 2005) .................................................................................. 71, 72

*In re Halcón Res. Corp.*,
 Case No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016) [Docket No. 200] ................... 11, 47

*In re HCR ManorCare, Inc.*,
 Case No. 18-10467 (KG) (Bankr. D. Del. Apr. 13, 2018) [Docket No. 127].......................... 21

*In re Hibbard Brown & Co.*,
 217 B.R. 41 (Bankr. S.D.N.Y. 1998) ..................................................................................... 33

*In re Homer City Generation, L.P.*,
 Case No. 17-10086 (MFW) (Bankr. D. Del. Feb. 15, 2017) [Docket No. 157] ..... 21, 46, 50, 54

*In re Indianapolis Downs, LLC*,
 486 B.R. 286 (Bankr. D. Del. 2013) ............................................................................... passim

*In re Key Energy Servs., Inc.*,
 Case No. 16-12306 (BLS) (Bankr. D. Del. Dec. 6, 2016) [Docket No. 245]........................... 47

*In re Keystone Tube Co., LLC*,
 Case No. 17-11330 (LSS) (Bankr. D. Del. Aug. 2, 2017) [Docket No. 244]........................... 21

v

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd sub nom. Stonington Partners, Inc. v. Official
    Comm. of Unsecured Creditors* (*In re Lernout & Hauspie Speech Prods., N.V.*), 308 B.R. 672
    (D. Del. 2004) .............................................................................................................. 69

*In re Louise's, Inc.*,
    211 B.R. 798 (D. Del. 1997) ........................................................................................ 31

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ....................................................................................... 56

*In re Marvel Entm't Grp., Inc.*,
    222 B.R. 243 (D. Del. 1998) ........................................................................................ 31

*In re Marvel Entm't Grp., Inc.*,
    273 B.R. 58 (D. Del. 2002) .......................................................................................... 38

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) .................................................................. 36, 41

*In re MolyCorp, Inc.*,
    Case No. 15-11357 (CSS) (Bankr. D. Del. Apr. 8, 2016) [Docket No. 1580] ......... 51

*In re Motors Liquidation Co.*,
    447 B.R. 198 (Bankr. S.D.N.Y. 2011) ......................................................................... 37

*In re Offshore Grp. Inv. Ltd.*,
    Case No. 15-12422 (BLS) (Bankr. D. Del. Jan. 15, 2016) [Docket No. 188] ...... 10, 51

*In re Orchard Acquisition Co., LLC*,
    Case No. 17-12914 (KG) (Bankr. D. Del. Jan. 17, 2018) [Docket No. 152] ........... 21

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1127 (3d Cir. 1979) ...................................................................................... 32

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998), *aff'd sub nom. Solow v. PPI Enters. (U.S.), Inc.* (*In re
    PPI Enters. (U.S.), Inc.*), 324 F.3d 197 (3d Cir. 2003) ............................................. 55

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) ........................................................................... 66

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) .......................................................................... 53, 55, 56

*In re Rand Logistics, Inc.*,
    Case No. 18-10175 (BLS) (Bankr. D. Del. Feb. 28, 2018) [Docket No. 156] ......... 21

*In re Seventy Seven Fin. Inc.*,
    Case No. 16-11409 (LSS) (Bankr. D. Del. July 14, 2016) [D ................................... 21

*In re Sound Radio, Inc.*,
    93 B.R. 849 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R. 521 (D.N.J.
    1989), aff'd, 908 F.2d 964 (3d Cir. 1990) (unpublished table decision), and *aff'd sub nom.
    Appeal of Robinson*, 908 F.2d 964 (3d Cir. 1990) (unpublished table decision) ..................... 66

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ...................................................................... 57

*In re Tidewater Inc.*,
    Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378].................. passim

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ....................................................................... 55

*In re Triad Guaranty Inc.*,
    Case No. 13-11452 (MFW) (Bankr. D. Del. Jan. 9, 2018) [Docket No. 588] ......................... 54

*In re Triangle USA Petroleum Corp.*,
    Case No. 16-11566 (MFW) (Bankr. D. Del. Mar. 10, 2017) [Docket No. 825] ..................... 54

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011),
    *conditionally granting stay*, 477 B.R. 465 (Bankr. D. Del. 2012) ........................................... 41

*In re Tribune Co.*,
    476 B.R. 843 (Bankr. D. Del. 2012), *aff'd as modified,* No. 12-CV-1072 GMS, 2014 WL
    2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part sub nom. In re Tribune Media
    Co.*, 799 F.3d 272 (3d Cir. 2015) ................................................................................ 26

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013) ................................................................... 26, 60, 65

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ............................................................... 33, 39

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ........................................................ 39, 41, 43, 44

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ...................................................................................... 26

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*),
    419 B.R. 221 (Bankr. S.D.N.Y. 2009), *appeal dismissed sub nom. R2 Invs., LDC v. Charter
    Commc'ns, Inc.* (*In re Charter Commc'ns, Inc.*), 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d
    476 (2d Cir. 2012) ....................................................................................................... 33

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
    843 F.2d 636 (2d Cir. 1988) ................................................................................. 64, 69

*Krystal-Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) ...................................................................................... 11

*Lisanti v. Lubektin* (*In re Lisanti Foods, Inc.*),
    329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ......................................... 58

*Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*),
    880 F.2d 694 (4th Cir. 1989) ...................................................................................... 12

*Momentum Mfg. Corp. v. Emp. Creditors Comm.* (*In re Momentum Mfg. Corp.*),
    25 F.3d 1132 (2d Cir. 1994) ...................................................................................... 12

1004841629v8

*Myers v. Martin* (*In re Martin*),
    91 F.3d 389 (3d Cir. 1996) ............................................................................... 32

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988) ....................................................................... 11, 12

*Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*),
    761 F.2d 1374 (9th Cir. 1985) .......................................................................... 65

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ......................................................................................... 31

*Remington Outdoor Co.*,
    Case No. 18-10684 (BLS) (Bankr. D. Del. May 4, 2018) [Docket No. 248] ............ 9

*SE Property Holdings, LLC v. Seaside Engineering & Surveying, Inc.* (*In re Seaside Eng'g & Surveying, Inc.*),
    780 F.3d 1070 (2015) ....................................................................................... 44

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co.* (*In re Spansion, Inc.*),
    426 B.R. 114 (Bankr. D. Del. 2010) .................................................. 37, 38, 40, 52

*U.S. v. Energy Res. Co.*,
    495 U.S. 545 (1990) ......................................................................................... 64

*Will v. Nw. Univ.* (*In re Nutraquest, Inc.*),
    434 F.3d 639 (3d Cir. 2006) ............................................................................. 33

**Statutes**

11 U.S.C. § 1122 ............................................................................................... 24

11 U.S.C. § 1122(a) ........................................................................................... 25

11 U.S.C. § 1123 ......................................................................................... 24, 71

11 U.S.C. § 1123(a) ........................................................................................... 27

11 U.S.C. § 1123(a)(2) ....................................................................................... 27

11 U.S.C. § 1123(a)(3) ....................................................................................... 27

11 U.S.C. § 1123(a)(4) ....................................................................................... 28

11 U.S.C. § 1123(a)(5) ....................................................................................... 28

11 U.S.C. § 1123(a)(6) ....................................................................................... 28

11 U.S.C. § 1123(a)(7) ....................................................................................... 28

11 U.S.C. § 1123(a)(8) ....................................................................................... 27

11 U.S.C. § 1123(b) ........................................................................................... 29

11 U.S.C. § 1123(b)(1) ....................................................................................... 29

11 U.S.C. § 1123(b)(3)(A)-(B) ........................................................... 29, 31, 36, 37

11 U.S.C. § 1123(b)(5) ....................................................................................... 29

11 U.S.C. § 1123(b)(6) ....................................................................................... 29

11 U.S.C. § 1123(d) ......................................................................................... 30

11 U.S.C. § 1125 ............................................................................... 3, 22, 55, 78

11 U.S.C. § 1125(a)(1) ..................................................................................... 11

11 U.S.C. § 1125(g) ............................................................................. 8, 9, 11, 22

11 U.S.C. § 1126(b) ................................................................................... passim

11 U.S.C. § 1126(f) ........................................................................................... 62

11 U.S.C. § 1126(g) ................................................................................... 14, 62

11 U.S.C. § 1129 ....................................................................................... passim

11 U.S.C. § 1129(a)(1) ............................................................................... 24, 71

11 U.S.C. § 1129(a)(10) ................................................................................... 64

11 U.S.C. § 1129(a)(11) ............................................................................. 64, 67

11 U.S.C. § 1129(a)(12) ................................................................................... 67

11 U.S.C. § 1129(a)(13) ............................................................................. 67, 68

11 U.S.C. § 1129(a)(2) ............................................................................... 54, 55

11 U.S.C. § 1129(a)(3) ..................................................................................... 55

11 U.S.C. § 1129(a)(4) ..................................................................................... 58

11 U.S.C. § 1129(a)(5) ..................................................................................... 58

11 U.S.C. § 1129(a)(6) ..................................................................................... 59

11 U.S.C. § 1129(a)(8) ..................................................................................... 62

11 U.S.C. § 1129(a)(9) ..................................................................................... 62

11 U.S.C. § 1129(a)(9)(C) ............................................................................... 63

11 U.S.C. § 1129(b) ......................................................................................... 68

11 U.S.C. § 1129(b)(1) ..................................................................................... 69

11 U.S.C. § 1129(b)(2)(B)(ii) ........................................................................... 70

11 U.S.C. § 1129(b)(2)(C)(ii) ........................................................................... 70

11 U.S.C. § 365(b)(1)(a) ................................................................................... 75

11 U.S.C. § 365(d)(4)(A) ................................................................................. 72

11 U.S.C. § 365(d)(4)(A)(ii) ............................................................................ 71

11 U.S.C. § 365(d)(4)(B) ................................................................................. 71

11 U.S.C. § 365(d)(4)(B)(i) ................................................................... 3, 72, 73

11 U.S.C. § 507(a) ........................................................................................... 63

11 U.S.C. § 507(a)(8) ....................................................................................... 63

11 U.S.C. §§ 1129(a)(14)-1129(a)(16) ........................................................... 23

11 U.S.C. §§ 1129(a)(9)(A)-(B) ........................................................................... 63

1126 ........................................................................................................................ 55

15 U.S.C. § 77d(a)(2) ........................................................................................... 10

15 U.S.C. §§ 77a–77aa .......................................................................................... 10

**Rules**

Fed. R. Bankr. P.  3017(e) ................................................................................. 8, 22

Fed. R. Bankr. P.  3018(c) ................................................................................. 8, 22

Fed. R. Bankr. P. 2002(l) ....................................................................................... 17

Fed. R. Bankr. P. 3017 ............................................................................................. 3

Fed. R. Bankr. P. 3017(d) ................................................................................ passim

Fed. R. Bankr. P. 3017(e) ....................................................................................... 22

Fed. R. Bankr. P. 3018 ......................................................................................... 3, 22

Fed. R. Bankr. P. 3018(b) ............................................................................. 8, 20, 22

Fed. R. Bankr. P. 3018(c) ................................................................................. 17, 19

Fed. R. Bankr. P. 3020(e) ....................................................................................... 77

Fed. R. Bankr. P. 9019(a) ....................................................................................... 31

Rule 3017-1 of the Local Rules of Bankruptcy Practice and Procedure for the U.S. Bankruptcy
    Court for the District of Delaware ................................................................... 3

David's Bridal, Inc. ("**David's Bridal**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] submit this memorandum of law (the "**Memorandum**") and omnibus reply to the Confirmation Objections,[3] in support of the Debtors' request for:

- approval of the (i) *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of David's Bridal, Inc. and its Affiliated Debtors*, dated November 18, 2018 [Docket No. 13] (the "**Disclosure Statement**"), pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "**Bankruptcy Code**"); (ii) solicitation of votes on the Plan (as defined herein) and the voting procedures used in connection therewith (the "**Solicitation**"); and (iii) Solicitation Package (as defined herein), including forms of ballots (collectively, the "**Solicitation Procedures**"); and

- confirmation of the Debtors' *Proposed Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated November 18, 2018 [Docket No. 12] (as the same has been or may be amended, modified, supplemented or restated, the "**Plan**"), including the Plan Supplement, dated December 11, 2018 [Docket No. 167], as supplemented on December 28, 2018 by a supplement filed substantially contemporaneously with this Memorandum, pursuant to section 1129 of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1.     The Plan has been unanimously accepted by 100% of the voting holders of Prepetition Term Loan Claims and more than 99% by amount and 96.7% by number of the voting holders of Unsecured Notes Claims—the only two classes of voting creditors. Collectively, the creditors who voted on the Plan hold more than $463.4 million (or approximately 96%) of the approximately $481.2 million in outstanding principal amount of Prepetition Term Loan Claims and more than $236 million (or approximately 87%) of the approximately $270 million in outstanding principal amount of Unsecured Notes as of the

---

[2]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Disclosure Statement or the Scheduling Motion (each as defined herein).

[3]     Objections to confirmation of the Plan (the "**Confirmation Objections**") are listed on the chart attached hereto as **Exhibit A** (the "**Objection Summary Chart**").

Voting Record Date. The remarkable support for the reorganization contemplated by the Plan by the overwhelming majority of voting creditors speaks volumes as to the Plan's fairness, the good-faith efforts that culminated in its filing and its compliance with the Bankruptcy Code. As demonstrated in this brief and in the Supporting Declarations (as defined herein), and as will be established at the Confirmation Hearing, the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code and achieves the objectives of chapter 11. In addition, all of the Confirmation Objections should be overruled to the extent that they have not already been resolved consensually. Accordingly, the Plan should be confirmed.[4]

2. The Debtors received 12 Confirmation Objections (including joinders filed by parties). Generally, the Confirmation Objections can be summarized as follows:

- Various landlords filed Confirmation Objections (i) seeking confirmation that (A) their rights under the Debtors' assumed unexpired leases are unimpaired (which they are) and (B) they would receive notice of any assignment of their leases and an opportunity to object (which they will), (ii) asserting cure disputes, which do not need to be resolved to confirm the Plan, and (iii) objecting to the Plan's provisions allowing the Debtors to reject an unexpired lease or contract post-confirmation after the resolution or determination of an Assumption Dispute; and

- Jenny Yoo Collections, Inc. ("**Jenny Yoo**") objected to clarify that the Plan will not prevent Jenny Yoo from continuing its ongoing intellectual property-related litigation against the Debtors.[5]

3. Additionally, some landlords raised specific objections to certain provisions of the Plan, which are reflected on the Objection Summary Chart attached hereto as **Exhibit A**. The Debtors believe that most of the Confirmation Objections have been resolved, or will be resolved

---

[4] Objections to the Debtors' assumption of unexpired leases and executory contracts are also listed in the Objection Summary Chart (the "**Lease/Contract Objections**"). To the extent not otherwise resolved before the Confirmation Hearing, the Debtors believe that such Lease/Contract Objections should be adjourned and set for a further hearing in accordance with Section 8.2 of the Plan.

[5] Jenny Yoo and Cumberland Avenue, Plaza, L.L.C., as Unimpaired Creditors, also properly utilized the procedures outlined in the Court-approved notice of the Combined Hearing (as defined herein) to opt out of the Plan's proposed third-party releases.

by the time of the Combined Hearing, through language that the Debtors have added to the proposed order confirming the Plan (the "**Proposed Confirmation Order**"), which is being filed substantially contemporaneously with this Memorandum, as more fully discussed in Part III of this Memorandum and the Objection Summary Chart. As a result, the Debtors believe that only one primary issue remains contested with respect to the Plan, namely the propriety of the Plan provisions providing the Debtors with the ability to reject unexpired leases and executory contracts after the resolution or determination of an Assumption Dispute. As described further in Part III below:

- Section 8.1(a) of the Plan, which contemplates the post-confirmation rejection of unexpired leases for nonresidential real property, is fully compliant with section 365(d)(4)(B)(i) of the Bankruptcy Code. Section 365(d)(4)(B)(i) authorizes bankruptcy courts to extend the deadline for the assumption or rejection of unexpired nonresidential leases of real property, provided that the Debtors demonstrate cause. The extension is warranted in connection with confirmation of the Plan because the Plan was developed on an accelerated timeline before the Petition Date and the Restructuring Support Parties may need additional time to assess the merits of assuming any contract or lease for which there exists an Assumption Dispute. Courts in this district have confirmed chapter 11 plans in other chapter 11 cases that include language that is identical or has the same practical effect as the language contained in the Plan.

4.     For the reasons set forth herein and in the Supporting Declarations (as defined herein), the Disclosure Statement and the Solicitation Procedures satisfy the requirements of sections 1125 and 1126(b) of the Bankruptcy Code, Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3017-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). Furthermore, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. Accordingly, the Disclosure Statement and the Solicitation Procedures should be approved and the Plan should be confirmed.

1004841629v8

**FACTS**

**General Background of Chapter 11 Cases and Development of Prepackaged Plan**

5.       The Debtors respectfully refer the Court to the Disclosure Statement, the Scheduling Motion (as defined herein), the Plan, the First Day Declaration,[6] the *Declaration of Stephen Goldstein in Support of Confirmation of the Prepackaged Plan* (the "**Goldstein Confirmation Declaration**") filed substantially contemporaneously herewith and the *Declaration of Carrianne J.M. Basler in Support of Confirmation of the Prepackaged Plan* (the "**Basler Confirmation Declaration**" and together with the First Day Declaration and the Goldstein Declaration, the "**Supporting Declarations**") filed substantially contemporaneously herewith, the *Affidavit of Service* of Jung W. Song, filed on December 11, 2018 [Docket No. 165] (the "**Solicitation Affidavit of Service**"), the *Affidavit of Service* of Jennifer S. Goode regarding service of the Combined Notice [Docket No. 153], the *Notice of Service Regarding Customer Notice* [Docket No. 151], the *Affidavit of Publication of Notice of Commencement of Cases Under Chapter 11 of the Bankruptcy Code -and- Summary of Joint Prepackaged Chapter 11 Plan and Notice of Hearing to Consider (a) Adequacy of Disclosure Statement and Solicitation Procedures (b) Confirmation of Plan of Reorganization and (c) Related Materials* [Docket No. 222], the *Affidavit of Service* of Edward A. Calderon regarding service of the notice of the Plan Supplement [Docket No. 169], the *Declaration of Jung W. Song on Behalf of Donlin, Recano & Company, Inc. Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting Proposed Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Voting Certification**") filed substantially contemporaneously with this Memorandum, and the record of the Chapter 11 Cases for facts that support approval of the

---

[6]       The "**First Day Declaration**" means the *Declaration of Joan Hilson in Support of the Debtors' Chapter 11 Petitions and First-Day Relief* [Docket No. 19], filed on November 19, 2018.

Disclosure Statement and the Solicitation Procedures and confirmation of the Plan. The Supporting Declarations and any testimony and other declarations that may be adduced or submitted at or in connection with the Combined Hearing (as defined herein) are incorporated herein as if fully set forth.

### Prepackaged Plan Solicitation

6. Prior to the filing of these cases on November 19, 2018 (the "**Petition Date**"), on November 18, 2018, the Debtors commenced the solicitation of votes to accept or reject the Plan. Specifically, the Debtors caused Donlin, Recano & Company, Inc. (the "**Voting Agent**") to distribute copies of the Disclosure Statement, the Plan and a form of ballot with voting instructions (the "**Ballot**" and, collectively, the "**Solicitation Package**") to each holder of a Claim in Class 4 (Prepetition Term Loan Claims) and Class 5 (Unsecured Notes Claims). *See* Solicitation Affidavit of Service. The Debtors established November 15, 2018 as the record date (the "**Voting Record Date**") for determining which holders of Prepetition Term Loan Claims and Unsecured Notes Claims were entitled to vote on the Plan. The voting period ended at 5:00 p.m. Eastern Standard Time on December 18, 2018 (the "**Voting Deadline**"). As reflected in the Voting Certification, Class 4 (Prepetition Term Loan Claims) and Class 5 (Unsecured Notes Claims)—the only voting classes under the Plan—each voted to accept the Plan in accordance with the requirements of section 1126 of the Bankruptcy Code. *See* Voting Certification, Ex. A.

7. The holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (Prepetition ABL Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims), and Class 8 (Intercompany Interests) (collectively, the "**Unimpaired Classes**") are unimpaired by the Plan and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. Accordingly, the holders of Claims or Interests in each of such Unimpaired Classes are not entitled to vote to accept or reject the Plan,

and the Debtors did not cause the Voting Agent to serve the Solicitation Package on such holders. Moreover, the holders of Interests in Class 9 (Parent Interests) are not entitled to any distribution or to retain any property pursuant to the Plan and, thus, such holders are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code (although the vast majority of such holders are party to the Restructuring Support Agreement). Accordingly, the Debtors did not cause the Voting Agent to serve the Solicitation Package on such holders.

8.      On the Petition Date, the Debtors filed a motion [Docket No. 11] (the "**Scheduling Motion**") seeking an order scheduling a combined hearing on the adequacy of the Disclosure Statement and the Solicitation Procedures and confirmation of the Plan (the "**Combined Hearing**"). On November 20, 2018, the Court entered an order [Docket No. 95] (the "**Scheduling Order**") granting the relief requested therein.

9.      On or before November 21, 2018, as required by the Scheduling Order, the Debtors served a notice [Docket No. 105] (the "**Combined Notice**") of, among other things: (i) the commencement of the Chapter 11 Cases, (ii) the date, time, and place of the Combined Hearing, (iii) instructions for obtaining copies of the Disclosure Statement and the Plan, (iv) a summary of the Plan, including a chart summarizing distributions under the Plan and the treatment of Claims and Interests, (v) the Plan Releases (as defined herein) and instructions for opting out of or objecting to the Plan Releases, and (vi) the deadline and procedures for objecting to the Disclosure Statement, the Solicitation Procedures, and confirmation of the Plan. The Combined Notice was served upon (a) the SEC, (b) the Internal Revenue Service, (c) the United States Trustee's Office for the District of Delaware, and (d) all other entities required to be served under Bankruptcy Rules 2002 and 3017 or otherwise in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules (the "**Master Service List**"). The Combined

Notice was also served on all known holders of Claims against and Interests in the Debtors in compliance with the Scheduling Order. *See* Docket No. 153. In addition, in accordance with the Scheduling Order, the Debtors caused a notice substantially similar to the Combined Notice (the "**Publication Notice**") to be published in *USA Today* on December 13, 2018, 22 days before the Combined Hearing. *See* Docket No. 222.

10. On December 11, 2018, the Debtors filed the initial version of the Plan Supplement, consisting of the following: (i) a term sheet for the Priority Exit Facility Credit Agreement, (ii) a term sheet for the Takeback Term Loan Credit Agreement, and (iii) the list of Retained Causes of Action. *See* Docket No. 167.

11. Substantially contemporaneously with this Memorandum, the Debtors are filing a *Notice of Filing of Supplements to Plan Supplement in Connection with the Proposed Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, which contains documents supplementing the previously filed Plan Supplement. The Debtors anticipate further supplementing the Plan Supplement prior to the Combined Hearing.

12. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.

13. Substantially contemporaneously with this Memorandum, the Debtors are filing a *Notice of Filing of Blackline for Revised Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, which contains technical modifications to the Plan (the "**Plan Modifications**").

## ARGUMENT

14. This Memorandum is divided into four parts. Part I addresses the Disclosure Statement and the Solicitation Procedures and their satisfaction of the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules. Part II addresses the

applicable requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each requirement. Part III addresses the Debtors' responses to certain of the Confirmation Objections, demonstrating why they should be overruled or are otherwise moot. Part IV requests a waiver of any stay of the Proposed Confirmation Order.

## I. THE DEBTORS' SOLICITATION AND VOTING PROCEDURES SHOULD BE APPROVED.

15. To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d) and (e) and 3018(b) and (c).

### A. The Debtors' Prepetition Solicitation Complied with the Requirements of Sections 1125(g) and 1126(b) of the Bankruptcy Code.

#### 1. Solicitation Was Exempt from Federal and State Securities Registration Requirements and Proxy Rules.

16. Sections 1125(g) and 1126(b) of the Bankruptcy Code govern the acceptance of a plan of reorganization by a holder of a claim or interest prior to the commencement of a chapter 11 case. Section 1125(g) provides:

> Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.

11 U.S.C. § 1125(g).

17. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that was solicited before the commencement of the chapter 11 case and has voted on the plan is deemed to have accepted or rejected such plan if:

i.   the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or

ii.  if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b). The Debtors have complied with these requirements.

18.     The Debtors commenced Solicitation before the commencement of the Chapter 11 Cases.[7] To the extent that the Solicitation was deemed to constitute an offer of new securities, such Solicitation is exempt from registration pursuant to section 4(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (as amended from time to time, the "**Securities Act**"). Specifically, section 4(a)(2) of the Securities Act provides an exemption from the registration requirements under the Securities Act for transactions not involving a "public offering." 15 U.S.C. § 77d(a)(2). The Debtors have complied with the requirements of section 4(a)(2) of the Securities Act, and the prepetition solicitation of acceptances would constitute a private offer of securities. The solicitation to creditors before the Petition Date was made only to those holders of Claims in Class 4 (Prepetition Term Loan Claims) and Class 5 (Unsecured Notes Claims) that are "Accredited Investors" (within the meaning of rule 501(a) of Regulation D of the Securities Act), as such creditors were required to certify on their Ballots that they were "Accredited Investors." Prepetition solicitations relying on the exemption in section 4(a)(2) of the Securities Act have been approved in other prepackaged chapter 11 cases. *See, e.g.*, *In re Tidewater Inc.*,

---

[7]   Here, the solicitation period did not end until after the Petition Date. However, courts in this district have recognized that debtors may "straddle" solicitation by commencing solicitation prior to the petition date and concluding postpetition. *See, e.g.*, *Remington Outdoor Co.*, Case No. 18-10684 (BLS) (Bankr. D. Del. May 4, 2018) [Docket No. 248] (approving continued postpetition solicitation commenced prior to petition date); *In re Tidewater Inc.*, Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378] (same); *In re Am. Gilsonite Co.*, Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174] (same); *In re Basic Energy Servs.*, Inc., Case No. 16-12320 (KJC) (Bankr. D. Del. Dec. 9, 2016) [Docket No. 257] (same); *In re Dex Media, Inc.*, Case No. 16-11200 (KG) (Bankr. D. Del. July 15, 2016) [Docket No. 320] (same); *In re Offshore Grp. Inv. Ltd.*, Case No. 15-12422 (BLS) (Bankr. D. Del. Jan. 15, 2016) [Docket No. 188] (same).

1004841629v8

Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378]; *In re Am. Gilsonite Co.*, Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174]; *In re Basic Energy Servs. Inc.,* Case No. 16-12320 (KJC) (Bankr. D. Del. Dec. 9, 2016) [Docket No. 257]; *In re Halcón Res. Corp.*, Case No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016) [Docket No. 200].

19.     Accordingly, the Debtors have satisfied sections 1125(g) and 1126(b) of the Bankruptcy Code.

> **2.     The Disclosure Statement Contains Adequate Information Within the Meaning of Section 1125(a)(1) of the Bankruptcy Code.**

20.     Under section 1125(b) of the Bankruptcy Code, the Disclosure Statement and the Solicitation must disclose "adequate information."  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as follows:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .11 U.S.C. § 1125(a)(1).

21.     A disclosure statement must, as a whole, provide information that is reasonably practicable to permit an informed judgment by impaired creditors or equity interest holders entitled to vote on a plan of reorganization.  *See*, *e.g., Krystal-Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003) (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.

Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.").

22.     The Court has broad discretion in examining the adequacy of the information contained in a disclosure statement. *See Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 696 (4th Cir. 1989) (noting that determination of adequacy of information is made on a "case by case basis"); *see also Momentum Mfg. Corp. v. Emp. Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994) (affirming bankruptcy court's use of equitable powers when debtors failed to engage in "full and fair" disclosure).

23.     This grant of discretion was intended to facilitate the effective reorganization of a debtor in the broad range of businesses in which chapter 11 debtors engage and the broad range of circumstances that accompany chapter 11 cases. *See* H.R. Rep. No. 95-595, at 409 (1977)*, reprinted in* 1978 U.S.C.C.A.N. 5963, 6365. "In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest." *Id.* Accordingly, the determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case. *See Oneida Motor Freight, Inc.*, 848 F.2d at 417 ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.") (citation omitted).

24.     The Disclosure Statement contains adequate information necessary to enable all parties in interest to make an informed judgment with respect to the Plan as required by section 1125 of the Bankruptcy Code, including a discussion of:

  i.      an overview of the Debtors' operations (Disclosure Statement, Art. II);

  ii.     key events leading to the commencement of the Chapter 11 Cases (Disclosure Statement, Art. III);

  iii.    anticipated events during the Chapter 11 Cases, including first-day motions (Disclosure Statement, Art. IV);

iv.     information regarding pending litigation (Disclosure Statement, Art. V);

v.      a summary of the Plan (Disclosure Statement, Art. VI);

vi.     financial information and projections of the business (Disclosure Statement, Art. VII);

vii.    a valuation analysis of the Debtors (Disclosure Statement, Art. VIII);

viii.   transfer restrictions and consequences under federal securities laws (Disclosure Statement, Art. IX);

ix.     tax consequences of the Plan (Disclosure Statement, Art. X);

x.      certain risk factors to be considered in evaluating the Plan (Disclosure Statement, Art. XI);

xi.     voting procedures and requirements related to the Plan (Disclosure Statement, Art. XII);

xii.    requirements for confirmation of the Plan (Disclosure Statement, Art. XIII); and

xiii.   alternatives to confirmation and consummation of the Plan (Disclosure Statement, Art. XIV).

25.     The Disclosure Statement also contains:

i.      a copy of the Plan (Disclosure Statement, Ex. A);

ii.     a copy of the Restructuring Support Agreement (Disclosure Statement, Ex. B); and

iii.    a copy of the Liquidation Analysis (Disclosure Statement, Ex. C).

26.     Accordingly, the Disclosure Statement satisfies the requirements of section 1125 of the Bankruptcy Code and should be approved.

**B.      Solicitation of Classes Presumed to Accept the Plan and Classes Deemed to Reject the Plan Is Not Required.**

27.     The holders of Claims or Interests in each of the Unimpaired Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject

the Plan. The Bankruptcy Code does not require the solicitation of votes from such holders. Specifically, section 1126(f) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

11 U.S.C. § 1126(f). Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims or Interests in each of the Unimpaired Classes are conclusively presumed to accept the Plan and have not been solicited.

28. The holders of Interests in Class 9 (Parent Interests) are not entitled to any distribution or to retain any property pursuant to the Plan and, as such, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. The Bankruptcy Code does not require the solicitation of votes from such holders. Specifically, section 1126(g) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(g).

29. Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, the holders of Interests in Class 9 (Parent Interests) are conclusively deemed to reject the Plan and have not been solicited.

30. The Solicitation Procedures undertaken by the Debtors with respect to the classes of Claims against and Interests in the Debtors that were presumed to accept or deemed to reject the Plan comply with the Bankruptcy Code and should be approved. The Debtors are not required to mail copies of the Plan and the Disclosure Statement to holders of claims and equity

interests presumed to accept or deemed to reject the Plan under Bankruptcy Rule 3017(d). *See* Fed. R. Bankr. P. 3017(d) (requiring transmission of court-approved disclosure statement to, *inter alia*, classes of unimpaired creditors and equity security holders except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders). Because the Debtors solicited acceptances and rejections of the Plan on a prepetition basis, no disclosure statement was "approved" under Bankruptcy Rule 3017(d), and therefore Bankruptcy Rule 3017 is not applicable here. However, as set forth above, in accordance with the Scheduling Order, the Debtors provided a summary of the Plan and other relevant information in the Combined Notice to holders of Claims and Interests in the Unimpaired Classes and to holders of Interests deemed to reject the Plan. The Debtors also made the Disclosure Statement and the Plan available to all Classes at no cost on the Voting Agent's website (http://www.donlinrecano.com/davidsbridal). Moreover, it would be a significant and unnecessary administrative burden on the Debtors to transmit the Disclosure Statement and the Plan to holders of Claims and Interests that have been presumed to accept or deemed to reject the Plan. Accordingly, the Debtors should not be required to transmit copies of the Solicitation Package to the holders of Claims or Interests not entitled to vote to accept or reject the Plan.

  **C. The Debtors' Solicitation Package, Ballots, and Solicitation Procedures Complied with the Requirements of Bankruptcy Rules 3017(d) and 3018(c).**

  31. Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan of reorganization:

> Upon approval of a disclosure statement,—except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders—the debtor in possession, trustee, proponent of the plan, or clerk as the court

orders shall mail to all creditors and equity security holders, and in a chapter 11 reorganization case shall transmit to the United States trustee,

(1)     the plan or a court-approved summary of the plan;

(2)     the disclosure statement approved by the court;

(3)     notice of the time within which acceptances and rejections of the plan may be filed; and

(4)     any other information as the court may direct, including any court opinion approving the disclosure statement or a court-approved summary of the opinion.

In addition, notice of the time fixed for filing objections and the hearing on confirmation shall be mailed to all creditors and equity security holders in accordance with Rule 2002(b), and a form of ballot conforming to the appropriate Official Form shall be mailed to creditors and equity security holders entitled to vote on the plan.

Fed. R. Bankr. P. 3017(d).

Bankruptcy Rule 3017(d) also provides, in relevant part, as follows:

If the court orders that the disclosure statement and the plan or a summary of the plan shall not be mailed to any unimpaired class, notice that the class is designated in the plan as unimpaired and notice of the name and address of the person from whom the plan or summary of the plan and disclosure statement may be obtained upon request and at the plan proponent's expense, shall be mailed to members of the unimpaired class together with the notice of the time fixed for filing objections to and the hearing on confirmation.

*Id.*

32.     Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."  Fed. R. Bankr. P. 3018(c).  In addition, Bankruptcy Rule 2002(l) permits a court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice."  Fed. R. Bankr. P. 2002(l).

**1.  Solicitation Packages.**

33.  As required by Bankruptcy Rule 3017(d), the Solicitation Package included the Disclosure Statement (which included as exhibits thereto, the Plan, the Restructuring Support Agreement and the Liquidation Analysis), as well as notice of the deadline to submit the Ballots to accept or reject the Plan.  On November 18, the Solicitation Package was transmitted to the Voting Agent who, in turn, transmitted the Solicitation Package on November 18 and November 19 before the commencement of the Chapter 11 Cases to (i) the holders of Claims in Class 4 (Prepetition Term Loan Claims) by electronic mail and U.S. first class mail, and (ii) Broadridge Financial Solutions, Inc. by hand delivery for distribution to the banks, brokers, dealers, agents, or other nominees or their agents through which the beneficial owners of the holders of Claims in Class 5 (Unsecured Notes Claims) hold the various securities (collectively, the "**Nominees**")  with instructions to distribute the Solicitation Package to the beneficial owners of the Unsecured Notes by electronic mail.  *See* Solicitation Affidavit.  As mentioned above, holders of Claims or Interests in the remaining Classes were not provided with a Solicitation Package.

34.  On December 11, 2018, the Debtors filed the Plan Supplement and caused the Voting Agent to serve notice of the Plan Supplement on the Master Service List by first class and electronic mail.  *See* Docket Nos. 167, 169.  Pursuant to Section 1.83 of the Plan and the Plan Supplement, the Debtors expressly reserved their right to amend and supplement the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement through the Effective Date.  Substantially contemporaneously with this Memorandum, the Debtors are filing supplements to the Plan Supplement and will cause notice of the Supplements to the Plan Supplement to be served on the Master Service List.

35. Accordingly, the Solicitation Package and the Plan Supplement (as supplemented) satisfy Bankruptcy Rule 3017(d).

### 2. Combined Notice and Publication Notice.

36. The Debtors distributed the Combined Notice to, among others, all of the Debtors' known creditors and equity interest holders in compliance with the Scheduling Order, *see* Docket No. 153, and published the Publication Notice in *USA Today*, as required by the Scheduling Order. *See* Docket No. 222. The Debtors also provided notice to customers in compliance with the Scheduling Order. *See* Docket No. 151. The Combined Notice provided that copies of the Plan and the Disclosure Statement could be obtained by written or phone request to the Voting Agent, or by accessing the case website free of charge at http://www.donlinrecano.com/davidsbridal. The Combined Notice also set forth the date, time, and place of the Combined Hearing, summarized the Plan, including the distributions thereunder, and described the procedures and deadline for submitting an objection to approval of the Disclosure Statement, the Solicitation Procedures, or confirmation of the Plan. The Combined Notice also identified the proposed releases under the Plan and set forth the procedures for opting out of or objecting to such releases.

37. The Solicitation Procedures, including service of the Combined Notice and publication of the Publication Notice, afforded parties in interest ample notice of these proceedings and should be approved.

### 3. Ballots.

38. Bankruptcy Rules 3017(d) and 3018(c) require the Debtors to solicit votes on a plan of reorganization using a form of ballot substantially conforming to Official Form No. 14. The forms of Ballots, which were annexed as Exhibits B-1 to B-3 to the Scheduling Motion and approved by the Scheduling Order, were based on Official Form No. 14, but were modified to

address the particular circumstances of the Chapter 11 Cases and to include certain additional information that is relevant and appropriate for creditors entitled to vote to accept or reject the Plan. The Ballots included, for example, a mechanism to allow holders of Claims in the classes entitled to vote—Class 4 (Prepetition Term Loan Claims) and Class 5 (Unsecured Notes Claims)—to elect to opt out of consenting to certain releases provided under the Plan. The Ballots clearly stated that, to be counted as votes to accept or reject the Plan, all Ballots had to be properly executed, completed, and delivered to the Voting Agent so that they would be received by no later than the Voting Deadline. The Ballots conform substantially to Official Form No. 14 and, therefore, satisfy Bankruptcy Rules 3017(d) and 3018(c) and should be approved.

**D.    The Solicitation Period Was Reasonable Under Bankruptcy Rule 3018(b).**

39.    Bankruptcy Rule 3018(b) provides, in relevant part, that (i) the plan must have been transmitted to substantially all creditors and equity security holders in a voting class, (ii) the period of time prescribed for such creditors and equity security holders to accept or reject the plan must not have been unreasonably short, and (iii) the solicitation must have been in compliance with section 1126(b) of the Bankruptcy Code. Fed. R. Bankr. P. 3018(b). The Debtors' solicitation satisfied the standards set forth in Bankruptcy Rule 3018(b) and section 1126(b) of the Bankruptcy Code.

40.    As noted above, on November 18 and before the commencement of the Chapter 11 Cases on November 19, the Debtors caused the Voting Agent to distribute the Solicitation Package to holders of Claims in Class 4 (Prepetition Term Loan Claims) and Class 5 (Unsecured Notes Claims). The Voting Deadline was December 18, 2018, giving the holders of Claims in Class 4 and Class 5 at least 30 days (and 20 business days) to submit a completed Ballot to the Voting Agent—more than sufficient time to review the Disclosure Statement and the Plan. The

Ballots stated in clear and conspicuous language that all Ballots must be properly executed, completed, and delivered and/or transmitted to the Voting Agent by the Voting Deadline.

41. The solicitation period was not "unreasonably short." The holders of Claims in Class 4 and Class 5 are sophisticated institutional creditors, many with substantial knowledge of the Debtors' businesses and operations. Indeed, before the commencement of the solicitation process, the Debtors entered into the Restructuring Support Agreement with holders of approximately 85% of the Prepetition Term Loan Claims and 97% of the Unsecured Notes Claims. Thus, before the solicitation process began, the majority of the holders of Claims in Class 4 and Class 5 were already intimately familiar with the terms of the Plan and the Disclosure Statement. The high rate of return of the Ballots—approximately 96% in amount of all Claims in Class 4 and approximately 87% in amount of all Claims in Class 5—is further evidence that the solicitation period was not unreasonably short.

42. Courts in this district have previously approved prepackaged solicitation procedures with a similar voting period, if not shorter, in analogous circumstances. *See, e.g.*, *In re HCR ManorCare, Inc.*, Case No. 18-10467 (KG) (Bankr. D. Del. Apr. 13, 2018) [Docket No. 127] (3 days); *In re Rand Logistics, Inc.*, Case No. 18-10175 (BLS) (Bankr. D. Del. Feb. 28, 2018) [Docket No. 156] (8 days); *In re Orchard Acquisition Co., LLC*, Case No. 17-12914 (KG) (Bankr. D. Del. Jan. 17, 2018) [Docket No. 152] (28 days); *In re Keystone Tube Co., LLC*, Case No. 17-11330 (LSS) (Bankr. D. Del. Aug. 2, 2017) [Docket No. 244] (18 days); *In re Homer City Generation, L.P.*, Case No. 17-10086 (MFW) (Bankr. D. Del. Feb. 15, 2017) [Docket No. 157] (28 days); *In re Am. Gilsonite Co.*, Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174] (27 days); *In re Seventy Seven Fin. Inc.*, Case No. 16-11409 (LSS) (Bankr. D. Del. July 14, 2016) [Docket No. 192] (25 days).

43.     In light of the foregoing, the solicitation period in these cases complied with applicable nonbankruptcy law and was not unreasonably short, thereby complying with section 1125(g) of the Bankruptcy Code and Bankruptcy Rule 3018.

**E.     The Debtors' Solicitation Procedures Should Be Approved Under Bankruptcy Rule 3017(e).**

44.     Bankruptcy Rule 3017(e) requires that the Court "consider the procedures for transmitting the documents and information required by subdivision (d) of this rule to the beneficial holders of stock, bonds, debentures, notes, and other securities, determine the adequacy of [such] procedures, and enter any orders the court deems appropriate." Fed. R. Bankr. P. 3017(e). The Debtors caused the Solicitation Package, including the Disclosure Statement, to be distributed to the holders of Claims in Class 4 and Class 5 to solicit votes to accept or reject the Plan as described in the Solicitation Affidavit. For the reasons set forth above *supra* Part I.A-D, the Solicitation Procedures were appropriate and should be approved.

45.     Accordingly, based on the facts contained in Part I of this Memorandum, the Scheduling Motion, and the Supporting Declarations, the Solicitation Package and the Solicitation Procedures should be approved by the Court as they satisfy the requirements of sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d) and (e) and 3018(b) and (c).

**II.     THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED.**

46.     To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence. As the United States Court of Appeals for the Fifth Circuit stated in *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II* (*In re Briscoe Enters., Ltd., II*): "The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to

conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown." 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003) ("The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a) . . . ."). The Debtors will demonstrate, by a preponderance of the evidence, that all of the applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.[8]

### A. The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.

47. Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001) ("The phrase 'applicable provisions' is not defined. The legislative history reflects that 'the applicable provisions' of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks and alterations omitted) (citations omitted)). The Plan fully complies with these requirements.

### B. Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code.

48. Section 1122(a) of the Bankruptcy Code provides as follows:

---

[8] Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtors. Section 1129(a)(14) relates to the payment of domestic support obligations. *See* 11 U.S.C. § 1129(a)(14). The Debtors are not subject to any domestic support obligations. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). *See* 11 U.S.C. § 1129(a)(15). None of the Debtors is an "individual." Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law. *See* 11 U.S.C. § 1129(a)(16). Each Debtor is a moneyed, business, or commercial corporation.

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a). In total, there are nine Classes of Claims against and Interests in the Debtors as follows:[9]

- Class 1 includes Priority Non-Tax Claims, which are Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

- Class 2 includes Other Secured Claims, which are Claims, other than Prepetition ABL Claims or Prepetition Term Loan Claims, that are (i) secured by a Lien on Collateral, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, to the extent of the value of such Collateral, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

- Class 3 includes Prepetition ABL Claims, which are Claims arising under or related to the Prepetition ABL Agreement and all other Loan Documents (as defined in the Prepetition ABL Agreement).

- Class 4 includes Prepetition Term Loan Claims, which are Claims arising under or related to the Prepetition Term Loan Agreement and all other Loan Documents (as defined in the Prepetition Term Loan Agreement).

- Class 5 includes Unsecured Notes Claims, which are Claims arising under the Unsecured Notes and the Unsecured Notes Indenture, including any Guarantee Claims arising on account of the Unsecured Notes and the Unsecured Notes Indenture, other than Restructuring Expenses.

- Class 6 includes General Unsecured Claims, which are any Claims against the Debtors as of the Petition Date that are neither secured by a Lien on Collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court (other than an Unsecured Notes Claim or an Intercompany Claim).

- Class 7 includes Intercompany Claims, which are Claims against a Debtor held by another Debtor.

- Class 8 includes Intercompany Interests, which are Interests in a Debtor held by another Debtor.

---

[9]    Administrative Expense Claims, Professional Fee Claims, the fees and expenses of the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee, and Priority Tax Claims are not classified and are separately treated.

- Class 9 includes Parent Interests, which are Interests in DB Parent.

49.     To determine whether claims are "substantially similar," courts have held that the proper focus is on "the legal character of the claim as it relates to the assets of the debtor." *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986); *see also In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (concluding that phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them" (internal quotation marks omitted)), *aff'd as modified,* No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part sub nom. In re Tribune Media Co.*, 799 F.3d 272 (3d Cir. 2015).   Courts interpreting section 1122(a) of the Bankruptcy Code generally uphold separate classification of claims if a reasonable basis exists for the classification and all claims within a particular class are substantially similar.   *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (interpreting section 1122(a) to bar debtor from arbitrarily designating classes or doing so in a manner that "would not serve any legitimate purpose"); *see also In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (same).   Section 1122 of the Bankruptcy Code "only prohibits the identical classification of dissimilar claims and does not require the same classification for claims sharing some attributes."   *In re Enron Corp.*, Case No. 01-16034, 2004 Bankr. LEXIS 2549, at *203 (Bankr. S.D.N.Y. July 15, 2004) (citations omitted).

50.     The classification scheme of the Plan is rational and complies with the Bankruptcy Code.   Generally, the Plan incorporates a "waterfall" classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code.   All Claims and Interests within a Class have the same or similar rights against the Debtors.   The Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.   Accordingly, the

classification scheme of the Plan complies with section 1122 of the Bankruptcy Code and should be approved.

### C. The Plan Complies with Section 1123(a) of the Bankruptcy Code.

51. Section 1123(a) of the Bankruptcy Code sets forth seven applicable requirements which the proponent of a chapter 11 plan must satisfy.[10]  *See* 11 U.S.C. § 1123(a).  The Plan fully complies with each such requirement:

- The Plan designates Classes of Claims and Classes of Interests as required by section 1123(a)(1).  *See* Plan, Art. III.

- The Plan specifies whether each Class of Claims and Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.  *See* Plan, Arts. III and IV.

- Except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4).  *See* Plan, Art. IV.

- The Plan provides adequate means for implementation as required by section 1123(a)(5) through, among other things: (i) the compromise of controversies, *see* Plan, § 5.1; (ii) all corporate action set forth in Article V of the Plan, including the adoption and filing of the Amended Organizational Documents pursuant to applicable law and the New Stockholders' Agreement, *see* Plan §§ 5.4, 5.8; (iii) the provisions governing the issuance of the New Common Stock and the Warrants under the Plan, *see* Plan, § 5.6; (iv) the Exit Facilities and the funds that will be available to the Reorganized Debtors thereunder, *see* Plan, § 5.5; (v) the provisions governing distributions under the Plan, *see* Plan, Art. VI; and (vi) the cancellation of agreements and documents evidencing any Prepetition ABL Claims, Prepetition Term Loan Claims, Unsecured Notes Claims, or any Interest (other than Intercompany Interests that are not modified by the Plan), subject to certain limited exceptions provided in the Plan. *See* Plan, § 5.8.

- In accordance with section 1123(a)(6) of the Bankruptcy Code, the organizational documents of each Debtor have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities and set

---

[10]  An eighth requirement, set forth in 11 U.S.C. § 1123(a)(8), only applies in a case in which the debtor is an individual and, thus, is inapplicable to the Chapter 11 Cases.

1004841629v8

forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

- Section 5.9 of the Plan provides that the composition of each board of directors or managers, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, will be disclosed at or prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code. On or before the Confirmation Hearing, the Debtors will file with the Court amendments to the Plan Supplement, which will include a list of the currently known initial directors of the Debtors.

- The Plan provisions governing the manner of selection of any officer, director, or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

**D.      The Plan Complies with Section 1123(b) of the Bankruptcy Code.**

**1.      Plan Permissive Provisions.**

52.      Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b):[11]

- As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, Article IV of the Plan describes the treatment of Unimpaired Classes.

- Article VIII of the Plan provides for the procedures governing the assumption of executory contracts and unexpired leases to which the Debtors are parties.

- As permitted by section 1123(b)(3)(A) of the Bankruptcy Code and explained in greater detail below, (i) the compromise of controversies embodied in Section 5.1 of the Plan represents a compromise and settlement of claims among the Debtors and the Restructuring Support Parties and (ii) Section 10.6(a) of the Plan provides for a release of Claims and Causes of Action owned by the Debtors, the Reorganized Debtors, and the Estates. Moreover, as permitted by section 1123(b)(3)(B) of the Bankruptcy Code, Section 10.8 of the Plan preserves for the Reorganized Debtors any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date, except as otherwise provided in the Plan.

---

[11]      The Plan does not provide for the sale, transfer, or assignment of all or substantially all of the Debtors' property and, therefore, section 1123(b)(4) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.

- As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of holders of Claims and Interests in Class 4 (Prepetition Term Loan Claims), Class 5 (Unsecured Note Claims), and Class 9 (Parent Interests) and leaves unimpaired the rights of holders of Claims and Interests in the remaining classes.

- As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan "may include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan (i) contains certain release and exculpation provisions consistent with the applicable provisions of the Bankruptcy Code and case law in the Third Circuit, which are discussed *infra*, and (ii) provides that the offer, issuance, and distribution of the New Common Stock and the Warrant thereunder shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (a) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and (b) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

- As contemplated by section 1123(d) of the Bankruptcy Code, on November 30, 2018, the Debtors filed and served the *Notice of Assumption of Executory Contracts and Unexpired Leases of Debtors and Related Procedures* [Docket No. 138], which states the Debtors' intent to assume all executory contracts and unexpired leases unless such contracts or leases (i) were previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court, (ii) are subject to a separate motion or notice filed before the Confirmation Date seeking to assume, assume and assign or reject, or (iii) are the subject of a pending Assumption Dispute.

    2.    **The Settlement Encompassed within the Restructuring Support Agreement Is an Integral Component of the Plan and Should be Approved.**

53.    The Plan incorporates a settlement among the Restructuring Support Parties, which forms the basis of the Plan and has maximized value for the Debtors and the Estates. The settlement entails a compromise and settlement of, among other things, the valuation of the Debtors' enterprise for distributions to creditors under the Plan and the treatment of various classes of claims under the Plan.

54.    The settlement underpinning the Plan represents the best path forward for the Debtors and the Estates as it has paved the way for the Plan's unimpairment of General

Unsecured Claims and the Plan's consensual division of value among Prepetition Term Loan Claims and Unsecured Notes Claims, thereby avoiding what could certainly have been lengthy and protracted litigation concerning valuation. Accordingly, for the reasons set forth below, the Debtors respectfully submit that the Court should approve the settlement contained within the Plan.

55. Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). As part of the restructuring process, the Court "may approve a compromise or settlement" under Bankruptcy Rule 9019(a), and "the standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019[.]" *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).

56. To be approved, a settlement need only be "fair and equitable." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

57. In making this determination, it is not necessary for a court to conduct a "mini-trial" of the facts or the merits of the underlying disputes to be settled or "decide the numerous questions of law or fact raised by litigation." *Capmark*, 438 B.R. at 515 ("[T]he Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise."); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979) (explaining that a court need only consider those facts which are necessary to enable it to evaluate the settlement and to

make an informed and independent judgment about the settlement). Instead, the court "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *Capmark*, 438 B.R. at 515; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242 (Bankr. S.D.N.Y. 2007) ("[A] bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement or assess the minutia of each and every claim; rather, the court need only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.") (internal quotation marks omitted), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

58. In the Third Circuit, in evaluating whether the settlement is above the lowest point in the range of reasonableness, courts consider the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Capmark*, 438 B.R. at 515 (quoting *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996)). In addition, a court should defer to the debtor's business judgment "so long as there is a legitimate business justification for [its] action." *Coram Healthcare*, 315 B.R. at 330 (citing *Martin*, 91 F.3d at 395); *see also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (explaining that while the "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored") (citation omitted), *appeal dismissed sub nom. R2 Invs., LDC v. Charter Commc'ns, Inc.* (*In re Charter Commc'ns, Inc.*), 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012).

59. In considering whether to approve a settlement, courts should exercise their discretion "in light of the general public policy favoring settlements." *Capmark*, 438 B.R. at 515

(quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.") (citations omitted).

60.     Finally, when evaluating the settlement, courts look to "whether the settlement as a whole is reasonable."  *In re Wash. Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable.  This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole.  Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately.").

61.     The Court should approve the settlement contained within the Plan as a valid exercise of the Debtors' business judgment.  The Plan settlement allows for (i) a comprehensive resolution of all of the issues among the Debtors and the Restructuring Support Parties, including any valuation dispute, (ii) General Unsecured Claims to be paid in full, (iii) certain releases of Restructuring Support Parties and other released parties and (iv) the Debtors' timely and expeditious exit from chapter 11.  Absent the settlement within the Plan, the Debtors would likely incur significant expense and delay confirming a chapter 11 plan and exiting the Chapter 11 Cases, which could jeopardize the Debtors' financing under the Exit Facility and the treatment of all creditors under the Plan (including the unimpaired treatment of all general unsecured creditors).  Accordingly, it is in the best interests of the Debtors and their stakeholders to settle such claims pursuant to the Plan and emerge quickly from chapter 11 with a reconstituted balance sheet that will position them to thrive.

### 3.     The Plan Releases Should Be Approved.

62.     The Plan provides for (i) releases of claims held by the Debtors and the Estates (the "**Debtors' Release**"), *see* Plan, § 10.6(a), and (ii) consensual[12] releases of claims held by certain creditors and interest holders of the Debtors (the "**Non-Debtor Releases**" and, together with the Debtors' Release, the "**Plan Releases**"), *see* Plan, § 10.6(b), in each case, against the Debtors, the Reorganized Debtors and certain non-debtor third parties (collectively, the "**Released Parties**").[13]   The Plan Releases are integral components of the Restructuring Support Agreement and the Plan and the transactions embodied therein, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law.  Accordingly, the Plan Releases should be approved.

63.     The near unanimous support for the Plan by voting holders of Claims in Class 4 (representing 96% in amount of all Claims in Class 4) and voting holders of Claims in Class 5 (representing 87% in amount of all Claims in Class 5) is compelling evidence that the Plan Releases should be approved.  All potentially affected creditors, including landlords, contract counterparties, trade vendors, and employees, received notice of the Plan Releases and their right to object to such releases.  Only two creditors in the General Unsecured Claims class (Jenny Yoo and Cumberland) filed the requisite objection to opt out of the Non-Debtor Releases, and only

---

[12]   The Debtors had reserved the right to seek approval of non-consensual Non-Debtor Releases for the three parties who took action to opt out of the releases.  Under these circumstances, however, the Debtors have determined in consultation with the Restructuring Support Parties to carve these opt-out parties out of the Non-Debtor Releases, and to seek approval of the Non-Debtor Releases on a consensual basis as described below.

[13]   As defined in Section 1.109 of the Plan, "**Released Parties**" means "each of, and solely in its capacity as such, (a) the Debtors or the Reorganized Debtors, (b) the DIP ABL Facility Agent, (c) the DIP ABL Secured Parties, (d) the DIP Term Loan Facility Agent, (e) the DIP Term Loan Secured Parties, (f) the Supporting Term Lenders, (g) the Crossover Holder, (h) the Supporting Noteholders, (i) the Supporting Sponsors, (j) the Unsecured Notes Indenture Trustee, (k) the Exit ABL Facility Agent, (l) the Priority Exit Facility Agent, (m) the Exit Facility Lenders, (n) the Takeback Term Loan Agent, (o) the Prepetition ABL Secured Parties, (p) the Prepetition Term Loan Secured Parties and (q) the Related Parties for each of the foregoing; provided that, Released Parties shall exclude any of the foregoing parties that do not (or are not deemed to) provide the releases under the Plan."

one holder of Unsecured Notes made the ballot election to opt out. Consistent with the procedures approved by this Court, these creditors who took the necessary steps to opt out of the releases will be deemed not to have given the Non-Debtor Releases.

64. The fact that only three parties took steps to opt out of the Plan Releases is a significant endorsement, both of the Plan overall and of the Plan Releases, that the Court should not overlook. In particular, it reinforces and affirms the Debtors' determination that the Debtors' Release is in the best interests of the Estates. Indeed, there could be no better evidence as to the reasonableness and fairness of the Debtors' Release than the support of those creditors and interest holders who would be most affected by a release of estate claims or causes of action. *See In re Master Mortg. Inv. Fund, Inc*., 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994) (stating that creditor approval of a release is "the single most important factor" to determine whether a release is appropriate); *see also In re Key3Media Grp., Inc.,* 336 B.R. 87, 97-98 (Bankr. D. Del. 2005) (granting a settlement of estate causes of action over creditor's objection because, among other things, a majority of creditors approved of the settlement), *aff'd sub nom. Key3Media Grp., Inc. v. Pulver.com, Inc.*, No. 03-10323, 2006 WL 2842462 (D. Del. Oct. 2, 2006). Accordingly, for these reasons and for the reasons set forth below, the Plan Releases should be approved.

### a. The Debtors' Release Is Appropriate and Should Be Approved.

65. In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, Section 10.6(a) of the Plan contains a release of certain claims or Causes of Action of the Debtors, the Reorganized Debtors, and the Estates against the Released Parties. The Debtors' Release does not (a) release (i) any claims or Causes of Action arising after the Effective Date against any party, (ii) any claims against a party that does not (or is not deemed to) provide a reciprocal release to the Released Parties, or (iii) any claims or Causes of Action for gross negligence, willful misconduct or intentional fraud as determined by a Final Order, and (b) affect the rights

31

of the Debtors or the Reorganized Debtors to enforce the terms of the Plan or any Definitive Documents. As demonstrated below, the Debtors' Release should be approved as it represents an appropriate exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates. No party in interest has raised any objection to the Debtors' Release.

66. When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A), the appropriate standard is whether the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate. *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.") (citation omitted); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan"); *In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Releases by estates involve a give-up of potential rights that are owned by the estate, and are perfectly permissible in a plan, either as parts of plan settlements or otherwise, though the court must satisfy itself (at least if anyone raises the issue) that the give-up is an appropriate exercise of business judgment, and, possibly, in the best interests of the estate."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving plan provision that released and discharged claims and causes of action by debtors on the basis that such releases and discharges "represent a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate"), *aff'd*, No. 90–3061 (REG), 2010 WL

1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. DISH Network Corp. v. DBSD N. Am. Inc.* (*In re DBSD N. Am.*), 634 F.3d 79 (2d Cir. 2011).

67.     As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference.  *See, e.g.*, *In re Spansion*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors . . . ."); *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment." (internal quotation marks and citations omitted)).

68.     In considering whether a debtor's release of claims is appropriate, some courts in this district have also applied the following list of non-exclusive and disjunctive factors (the "**Zenith Factors**"):

> i.    an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> ii.   substantial contribution by the non-debtor of assets to the reorganization;
>
> iii.  the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;
>
> iv.   an agreement by a substantial majority of creditors to support the injunction, specifically if the impaired class or classes "overwhelmingly" votes to accept the plan; and
>
> v.    a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 303–04 (Bankr. D. Del. 2013)  ("These factors are neither exclusive

nor are they a list of conjunctive requirements."); *In re Wash. Mut., Inc.*, 442 B.R. at 346 (stating that the factors "simply provide guidance in the [c]ourt's determination of fairness"). These disjunctive factors provide a way of "weighing the equities of the particular case after a fact-specific review." *In re Indianapolis Downs*, 486 B.R. at 303. Notably, courts have approved releases where only one or two factors are present. *See*, *e.g.*, *In re Caribbean Petroleum Corp.*, 512 B.R. 774, 777-78 (Bankr. D. Del. 2014) (finding "no question" that release of debtors' claims was proper because non-debtor "provided Debtors with substantial consideration in exchange for the releases, providing the justification for the Court approving the releases."); *In re Spansion*, 426 B.R. at 143 (approving release where releasees were actively involved in negotiating the plan and four of five creditor classes voted overwhelmingly in favor).

69.     Here, the Debtors' Release is an essential component of the Plan and constitutes a sound exercise of the Debtors' business judgment. During the negotiations regarding the Plan, it was clear that the Debtors' Release and the Non-Debtor Release would be necessary conditions to entry into and consummation of the restructuring transaction embodied in the Plan. *See* Goldstein Confirmation Declaration, ¶¶ 13–15. Without the Plan Releases, the Debtors would not have been able to secure the substantial benefits provided by the Plan, as contemplated under the Restructuring Support Agreement, including the reduction of total debt by more than $450 million and the payment in full of Claims in the Unimpaired Classes (including General Unsecured Claims). Had the Plan Releases not been provided, the Debtors' chances of securing all of the valuable consideration provided by the Plan would have been significantly diminished (and potentially eliminated). *See* Goldstein Confirmation Declaration, ¶ 15. As additional consideration for the Debtors' Release, the Debtors and their Estates will receive reciprocal releases from potential Claims and Causes of Action of the Released Parties and the Supporting

Sponsors have agreed to waive their valid General Unsecured Claims, which would have been entitled to full payment under the Plan. As demonstrated below, the Debtors' Release is a valid exercise of the Debtors' business judgment and satisfies the Zenith Factors with respect to the Released Parties.

70. First, an identity of interest exists between the Debtors and each of the Released Parties. An identity of interest is established where a debtor and a released party share a common goal of confirming a plan and implementing a restructuring. *See, e.g., In re Zenith*, 241 B.R. at 110 (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared an identity of interest with debtor "in seeing that the Plan succeed and the company reorganize"); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, Case No. 13-13653, 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (approving non-consensual third-party release and finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder"); *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (noting an identity of interest between debtors and settling parties where such parties "share[d] the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement"), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011), *conditionally granting stay*, 477 B.R. 465 (Bankr. D. Del. 2012). Here, the Released Parties were instrumental in negotiating, formulating and/or implementing the Plan, and share the common goal of the Debtors' successful reorganization.

71. Moreover, an identity of interest may be established where the non-debtor is entitled to indemnification from the debtor. *See In re Master Mortg.*, 168 B.R. at 937 (noting that an indemnity relationship may satisfy the identity of interest factor); *Adelphia Commc'ns*,

368 B.R. at 268 (considering the "identity of interest" factor in the context of a third-party release and stating that "[t]o the extent that the third party releases are congruent with the indemnification obligations, and the [d]ebtor[] would be liable for any liability imposed on such person[]" an identity of interest is established), *appeal dismissed sub. nom. Official Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.*), 371 B.R. 660 (S.D.N.Y. May 17, 2007), *aff'd sub nom. Official Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp. v. Official Comm. of Unsecured Creditors of Adelphia Commc'ns Corp (In re Adelphia Commc'ns Corp.*), 544 F.3d 420 (2d Cir. 2008). Certain of the Released Parties, such as the Prepetition ABL Secured Parties and Agent, the Prepetition Term Loan Secured Parties and Agent and the Supporting Sponsors, have a right to indemnification from the Debtors arising from various corporate governance documents, debt documents and contractual agreements. In light of the unimpaired treatment of General Unsecured Claims under the Plan, a claim against any party the Debtors have an obligation to indemnify might as well be a claim against the Debtors, as the Debtors would be required to pay 100% of such party's fees, expenses and related costs.

72. Second, the Released Parties have made substantial contributions to the Chapter 11 Cases in exchange for both the Debtors' Release and the Non-Debtor Releases, as set forth more fully below.

### Creditor Released Parties

- The Supporting Term Lenders, the Crossover Holder and the Supporting Noteholders agreed to compromise their Claims, and the Supporting Term Lenders consented to distributions to the holders of Unsecured Notes Claims and General Unsecured Claims, both of which are junior to the Prepetition Term Loan Claims. Courts have held that agreeing to waive or compromise claims against the estate constitutes substantial contribution. *See, e.g., In re Zenith*, 241 B.R. at 111 (finding substantial contribution by creditor who funded plan and agreed to compromise claims against estates and by bondholder committee who was

instrumental in negotiating the plan and assisting in the solicitation of bondholders who voted overwhelmingly in favor of the plan).

- The DIP ABL Facility Agent, the DIP ABL Secured Parties, the DIP Term Loan Facility Agent, the DIP Term Loan Secured Parties, the Supporting Term Lenders, the Crossover Holder, and the Prepetition ABL Secured Parties engaged in good-faith negotiations to facilitate the implementation and execution of a consensual and expeditious reorganization of the Debtors. In addition, the Debtors, the DIP ABL Secured Parties and the DIP Term Loan Secured Parties entered into the DIP ABL Agreement and the DIP Term Loan Agreement, providing for the roll-up of all Prepetition ABL Obligations and $60 million in incremental liquidity under the DIP Term Loan Facility, allowing the Debtors access to sufficient liquidity to operate their business during these chapter 11 cases. As part of entering into the DIP ABL Agreement, the Prepetition ABL Secured Parties also consented to the Debtors' use of cash collateral throughout the Chapter 11 Cases.

- The Exit ABL Facility Agent, the Priority Exit Facility Agent, the Exit Facility Lenders and the Takeback Term Loan Agent collectively are working together to provide the Reorganized Debtors with substantial and necessary liquidity for the Exit ABL Facility. The exit financing is necessary to ensure the Plan's feasibility as such financing will allow for the Plan's treatment of Class 4 Prepetition Term Loan Claims and the payment of General Unsecured Claims under the Plan, and to provide liquidity for post-emergence operations. *See* Goldstein Confirmation Declaration, ¶ 19. Postpetition financing to a debtor may constitute "substantial contribution" for purposes of approving a release of claims. *See, e.g.*, *In re Zenith*, 241 B.R. at 111 (finding substantial contribution by creditor who funded the plan and agreed to compromise claims against estates); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 272 (Bankr. S.D.N.Y. 2014) (finding that certain creditors made a substantial contribution where, among other things, they provided new value to debtors in form of an agreement to backstop a rights offering).

### The Supporting Sponsors

- The Supporting Sponsors have agreed to compromise their Parent Interests in the Debtors and to forego the pursuit of litigation with respect to valuation of the Debtors. Moreover, the Supporting Sponsors have agreed to waive their General Unsecured Claims worth approximately $1 million in cash value as part of the negotiations that permitted the Plan to provide for the Unimpaired treatment of all General Unsecured Claims. In addition, the Supporting Sponsors agreed to a covenant in the Restructuring Support Agreement restricting their ability (without a court order) to transfer their Parent Interests or take a worthless stock deduction in 2018 in respect of their Parent Interests if doing so would impair any of the Debtors' tax attributes. The Supporting Sponsors also have cooperated and continue to cooperate with the Debtors and the other Restructuring Support Parties in connection with the consummation of the Plan and to facilitate an

expeditious restructuring of the Debtors. The actions of the Supporting Sponsors constitute "substantial contribution" for purposes of approving a release of claims. *See, e.g.*, *710 Long Ridge Rd.*, 2014 WL 886433, at *16 (finding that a waiver of claims held by certain non-debtor affiliates, among other things, constituted a substantial contribution because such waiver allowed for "enhanced distribution to general unsecured creditors"); *In re Genco Shipping*, 513 B.R. at 272 (finding that certain creditors made a substantial contribution where, among other things, they forewent consideration "to which they would otherwise be entitled" and provided "a distribution of warrants to existing equity holders" and agreed to "receive equity in exchange for debt").

### The Debtors' Related Parties

- The Debtors' Related Parties have (i) expended substantial time and effort in connection with restructuring matters, in addition to their normal duties, (ii) engaged in negotiations and open dialogue with the Debtors' key stakeholders to facilitate a consensual restructuring, and (iii) assisted with any and all endeavors necessary to navigate the Debtors through the Chapter 11 Cases. Moreover, the Debtors' directors have continued to provide valuable services to the Debtors throughout the Chapter 11 Cases. *See* Goldstein Confirmation Declaration, ¶ 24.

- The participation by the Debtors' Related Parties in the negotiation, structuring, and implementation of a reorganization constitutes a substantial contribution. *See, e.g.*, *In re Zenith*, 241 B.R. at 111 (finding substantial contribution by officers and directors who, among other things, negotiated the financial restructuring); *In re Energy Future Holdings Corp.*, Case No. 14-10979, Hr'g Tr. at 68 (Bankr. D. Del. Dec. 3, 2015) (CSS) [Docket No. 7255] (finding that debtors' directors and officers made critical contribution to plan based on extensive participation in board and committee meetings); *SE Property Holdings, LLC v. Seaside Engineering & Surveying, Inc.* (*In re Seaside Eng'g & Surveying, Inc.*), 780 F.3d 1070, 1079–80 (2015) (finding that the debtors' professionals provided substantial contribution in the form of skilled labor and services); *Mercedes Homes*, 431 B.R. at 881 (finding substantial contribution in the form of debtors' directors' and officers' expertise and knowledge).

### The Restructuring Support Parties

- As noted above, the Supporting Term Lenders, the Crossover Holders, the Supporting Noteholders and the Supporting Sponsors and their Related Parties have made substantial contributions to the Chapter 11 Cases through (i) agreeing to compromise their Claims or Interests in the Debtors pursuant to the terms of the Restructuring Support Agreement and to forego the pursuit of litigation with respect to a valuation dispute, thus avoiding significant delay, expense, and uncertainty related to protracted litigation and maximizing value for the Estates and minimizing the disruption to the Debtors' operations, (ii) cooperating with the Debtors in connection with the consummation of the Plan

and facilitating an expeditious restructuring of the Debtors, (iii) committing to support the Plan (including by agreeing to vote their impaired Claims in favor of the Plan) and not taking any action to jeopardize the reorganization, and (iv) participating in the negotiations that led to securing binding commitments to fund exit financing.

73. Third, the Debtors' Release is essential to the reorganization. In applying this Zenith Factor, courts look to the circumstances of the bankruptcy case, inquiring whether the releases were a necessary component to building consensus on the plan. *See, e.g.*, *710 Long Ridge*, 2014 WL 886433, at *16 ("Simply put, without the releases, there is no chance of reorganization or recovery for any creditor."); *see also In re PNG Ventures, Inc.*, No. 09-13162, Hr'g Tr. at 75 (Bankr. D. Del. Mar. 5, 2010) (CSS) [Docket No. 368] (approving third-party release where "plan would not happen" in the absence of such releases). During the course of negotiations with the Released Parties, it was clear that the substantial contributions described above were conditioned on the inclusion of the Debtors' Release in the Plan. Simply put, without providing such releases, the Debtors would not have been able to provide unimpaired treatment to all general unsecured creditors. *See* Goldstein Confirmation Declaration, ¶¶ 13–15.

74. Fourth, a substantial majority of creditors support the Debtors' Release. As set forth in the Voting Certification, the Plan has been unanimously accepted by 100% of the voting holders of Prepetition Term Loan Claims and accepted by 99% percent by amount and 96.7% by number of the voting holders of Unsecured Notes Claims. The overwhelming acceptance of the Plan by voting creditors demonstrates that the Debtors' Release has been resoundingly approved by such creditors. In addition, all potentially affected creditors received notice of the Debtors' Release through the Combined Notice and the Publication Notice and not a single party has objected to the Debtors' Release.

75. Fifth, the Plan provides for meaningful recoveries for all classes affected by the Debtors' Release. All Claims are being paid in full under the Plan with the exception of the

Prepetition Term Loan Claims and the Unsecured Notes Claims, the holders of which have overwhelmingly voted to approve the Plan and the releases provided for therein.

76.     In sum, for the reasons set forth above, and because the successful restructuring that is before the Court would not have been possible without the Debtors' release of claims and Causes of Action against the Released Parties, the Debtors' Release is a reasonable exercise of the Debtors' business judgment, fair, and in the best interests of the Estates.

77.     Similar releases have been approved in this district in comparable circumstances. *See In re Tidewater Inc.*, Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378]; *In re Homer City Generation, L.P.*, Case No. 17-10086 (Bankr. D. Del. Feb. 15, 2017) (MFW) [Docket No. 157]; *In re Am. Gilsonite Co.,* Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174]; *In re Basic Energy Servs., Inc.,* Case No. 16-12320 (KJC) (Bankr. D. Del. Dec. 9, 2016) [Docket No. 257]; *In re Key Energy Servs., Inc.*, Case No. 16-12306 (BLS) (Bankr. D. Del. Dec. 6, 2016) [Docket No. 245]; *In re Halcón Res. Corp.,* Case No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016) [Docket No. 200]; *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Aug. 29, 2016) [Docket No. 9421].

> b.     **The Non-Debtor Releases Are Appropriate and Should Be Approved.**

78.     Section 10.6(b) of the Plan contains releases by certain non-debtor holders of claims and interests (collectively, the "**Releasing Parties**") against the Released Parties for liability relating to the Debtors, their affiliates, or the Chapter 11 Cases (collectively, the "**Non-Debtor Releases**").  The Non-Debtor Releases were necessary to secure the Plan and the significant benefits embodied therein for the Debtors and their stakeholders.

1004841629v8

79. The Debtors seek approval of the Non-Debtor Releases on a consensual basis with respect to the Releasing Parties, which include the following creditors or interest holders and their Related Parties:

> i. holders of Claims or Interests who were entitled to vote on the Plan and voted to accept the Plan;
>
> ii. holders of Claims or Interests who were entitled to vote on the Plan and (a) rejected or abstained from voting on the Plan <u>and</u> (b) did not indicate on their Ballot an intent to opt out of granting the releases provided in the Plan; and
>
> iii. holders of Unimpaired Claims or Interests, presumed to accept the Plan, who did not timely object to the Plan.

80. As discussed below, the Non-Debtor Releases satisfy the standard for approval of third-party releases on a consensual basis established by courts in this Circuit and, accordingly, should be approved.

81. In the Third Circuit, where releasing parties have consented to a provision in a plan of reorganization that releases claims against non-debtors, such releases will be approved on the basis of general principles of contract law. *See*, *e.g.*, *Indianapolis Downs*, 486 B.R. at 305 ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.") (citation omitted).

82. Here, the Releasing Parties have consented to the Non-Debtor Releases. Pursuant to the Plan, the two parties who filed an objection indicating their lack of consent to the Non-Debtor Releases (Jenny Yoo, Cumberland Avenue Plaza, L.L.C.) and the one holder of Unsecured Notes that made a ballot election to opt out of the Non-Debtor Releases will not be bound by the Non-Debtor Releases. As set forth above, and in the Supporting Declarations, the Plan has been unanimously accepted by 100% of the voting holders of Class 4 (Prepetition Term Loan Claims) and approximately 99% percent by amount and 96.7% by number of the voting

holders of Class 5 (Unsecured Notes Claims), indicating their express consent to the Non-Debtor

Releases. *See* Voting Certification, Ex. A; *Coram Healthcare*, 315 B.R. at 336 (finding that

voting in favor of a plan of reorganization that provides for a third-party release indicates

consent to the release, even without an explicit election to accept the third-party release

provision).

83.     The Ballots provided clear notice of the release, exculpation and injunction

provisions of the Plan and indicated that the solicited holders would be deemed to have

consented to the releases contained in Section 10.6(b) of the Plan if they vote to reject the Plan or

abstain from voting on the Plan and do not opt-out of granting the Non-Debtor Releases:

> **PLEASE BE ADVISED THAT THE PLAN CONTAINS
> CERTAIN RELEASE, EXCULPATION AND INJUNCTION
> PROVISIONS.    THESE PROVISIONS ARE FOUND IN
> ARTICLE X OF THE PLAN.    YOU ARE ADVISED AND
> ENCOURAGED    TO    CAREFULLY    REVIEW    AND
> CONSIDER THE PLAN, INCLUDING THE RELEASE,
> EXCULPATION AND INJUNCTION PROVISIONS, AS
> YOUR RIGHTS MIGHT BE AFFECTED.**

*See* Scheduling Order, Ex. B-1 (Form of Ballot for Prepetition Term Loan Claims) and Ex. B-3

(Form of Beneficial Holder Ballot for Unsecured Notes Claims).    Moreover, the Non-Debtor

Releases and the opt-out option, including the mechanism for General Unsecured Creditors and

other holders of Unimpaired Claims to opt out by objecting to the Plan, was conspicuously noted

in the Combined Notice and the Disclosure Statement:

> **Releases.  Please be advised that under the Prepackaged Plan,
> the following holders are deemed to have granted the releases
> contained in Section 10.6 of the Prepackaged Plan (as reflected
> on Annex A):**
>
> **(a) holders of Impaired Claims or Interests <u>except</u> those
> (I) deemed to reject the Prepackaged Plan or who voted to
> reject or abstained from voting on the Prepackaged Plan <u>and</u>
> (II) who have indicated on their ballot that they have opted out
> of granting the releases provided in the Prepackaged Plan; and**

> **(b) holders of Unimpaired Claims or Interests who do not timely object to the releases provided in the Prepackaged Plan by filing an objection with the Bankruptcy Court before the Plan/Disclosure Statement Objection Deadline. IF YOU DO NOT OBJECT TO THE RELEASES CONTAINED IN THE PREPACKAGED PLAN BY THE PLAN/DISCLOSURE STATEMENT OBJECTION DEADLINE, YOU WILL BE DEEMED TO HAVE CONSENTED TO SUCH RELEASES.**

Combined Notice, at 5.

> THE PLAN PROVIDES THAT THE FOLLOWING HOLDERS ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN: (I) THE HOLDERS OF IMPAIRED CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN OR VOTE TO REJECT THE PLAN BUT DO NOT OPT OUT OF THESE RELEASES ON THE BALLOTS; (II) THE HOLDERS OF UNIMPAIRED CLAIMS OR INTERESTS WHO DO NOT OBJECT TO THE RELEASES BY FILING AN OBJECTION TO THE PLAN; (III) THE HOLDERS OF IMPAIRED CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (IV) THE SUPPORTING NOTEHOLDERS; (V) THE SUPPORTING TERM LENDERS; (VI) THE CROSSOVER HOLDER; (VII) THE SUPPORTING SPONSORS; AND (VIII) THE OTHER RELEASING PARTIES.

Disclosure Statement, at 100–01.

84.     With respect to those Releasing Parties that abstained from voting on the Plan (approximately 4% of the holders of Class 4 (Prepetition Term Loan Claims) and approximately 13% of the holders of Class 5 (Unsecured Notes Claims)), the Non-Debtor Releases are nonetheless consensual under applicable law because such parties had an opportunity to affirmatively opt out of the releases.  Courts in this district have approved third-party releases as consensual where holders of claims or interests did not opt out of the releases, either by abstaining from voting or by voting against the plan but not otherwise opting out of the releases, when such creditors were provided detailed instructions on how to opt out.  *See Indianapolis Downs,* 486 B.R. at 303–06 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record

reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *see also In re Homer City Generation, L.P.*, Case No. 17-10086 (MFW) (Bankr. D. Del. Feb. 15, 2017) [Docket No. 157] (confirming plan and approving third party releases by creditors who had consented by not opting out of the release, either by abstaining from voting or by voting against the plan without affirmatively electing to opt out); *In re Tidewater Inc.*, Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378] (same); *In re Am. Gilsonite Co.*, Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174] (same); *In re Basic Energy Servs.*, *Inc.*, Case No. 16-12320 (KJC) (Bankr. D. Del. Dec. 9, 2016) [Docket No. 257] (same); *In re MolyCorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Apr. 8, 2016) [Docket No. 1580]; *In re Offshore Grp. Inv. Ltd*, Case No. 15-12422 (BLS) (Bankr. D. Del. Jan. 15, 2016) [Docket No. 188].[14]

85. Finally, the procedures established in the Scheduling Order allowed all holders of Unimpaired Claims an opportunity to object to the Non-Debtor Releases by December 21, 2018 at 4:00 p.m. Prevailing Eastern Time (the "**Plan Objection Deadline**"). The Combined Notice, which was served on all of the Debtors' known creditors and equity interest holders, and the Publication Notice each provided that holders of Unimpaired Claims or Interests who did not timely object to the releases provided in Section 10.6(b) of the Plan (which provision was annexed to the Combined Notice) by the Plan Objection Deadline would be deemed to have granted the Non-Debtor Releases. Courts in this district have upheld the deemed consent of

---

[14] *But see In re Wash. Mut. Inc.*, 442 B.R. at 355 ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release."); *In re Zenith*, 241 B.R. at 111 (finding that a release provision had to be modified to permit third parties' release of non-debtors only by those creditors who voted in favor of the plan).

unimpaired creditors who are presumed to accept the plan because such creditors are being paid in full and have received consideration for the releases. *See Indianapolis Downs*, 486 B.R. at 306 ("[T]he third party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases . . . . Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *In re Spansion*, 426 B.R. at 144 ("[T]he silence of the unimpaired classes on this issue is persuasive. This aspect of the Third Party Release is not over-reaching. The unimpaired classes are being paid in full and have received adequate consideration for the release. I will overrule the objection to the extent that the UST opposes applying the Third Party Release to those parties who are 'deemed' to have accepted the Plan.").

86. Based on the foregoing, the Debtors have established that the Non-Debtor Releases are consensual with respect to all non-objecting creditors and creditors who did not validly opt out of the Non-Debtor Releases. Therefore, the Debtors do not need to satisfy the factors governing non-consensual releases for such creditors. *See In re Exide Techs.*, 303 B.R. at 74 (holding that because third-party release was consensual, "there [was] no need to consider" whether factors governing non-consensual releases were satisfied). Nonetheless, the Debtors also note that, for the reasons set forth above, the Non-Debtor Releases are also appropriate pursuant to *Continental* and could be approved even under the higher standard that would be applicable for non-consensual releases, for the all of reasons discussed herein. The significance attached to the Non-Debtor Releases by the Released Parties, whose support is indispensable to the Debtors' restructuring, the financial contributions provided by the Released Parties, and the distributions available to creditors and interest holders as a result of the support of the Released

Parties and their financial contributions all demonstrate that the Non-Debtor Releases are fair and necessary to the Debtors' reorganization.

### 4. The Plan Exculpation Provision Should Be Approved.

87. In addition to the releases discussed above, Section 10.7 of the Plan contains a release and exculpation for certain Exculpated Parties for claims arising out of or relating to the Debtors' restructuring, the Chapter 11 Cases, and the negotiations and agreements made in connection therewith (the "**Exculpation Provision**"). The Exculpation Provision carves out acts or omissions that are determined by a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud. In response to comments from the United States Trustee, as reflected in the Plan Modifications, the Debtors and the Restructuring Support Parties have agreed to revise the Plan so that the definition of Exculpated Parties is limited to the Debtors, the Reorganized Debtors and, to the extent employed in such capacities on or after the Petition Date, the Debtors' and the Reorganized Debtors' directors, officers and professionals. Plan § 1.56.

88. Exculpation provisions similar to the Exculpation Provision are appropriate where the exculpated parties have acted in good faith in negotiating and working toward the implementation of a chapter 11 plan. *See*, *e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (observing that the debtors and certain other parties, such as the unsecured creditors' committee members and the professionals retained by such committee, who provided services to assist in the reorganization, are entitled to a "limited grant of immunity . . . for actions within the scope of their duties"). The Exculpated Parties, as modified, have participated in the Debtors' restructuring in good faith and the Exculpation Provision is necessary to protect those parties who have contributed to the Debtors' reorganization from collateral attacks related to any good-faith acts or omissions related to the Debtors' restructuring. Further, the scope of the

Exculpation Provision is appropriately tailored and will not affect any liability that arises from gross negligence, willful misconduct, or intentional fraud as determined by final order.

89.     Courts in this district have approved similar exculpations in chapter 11 plans of similarly-situated debtors.     *See, e.g.*, *In re Triad Guaranty Inc.*, Case No. 13-11452 (MFW) (Bankr. D. Del. Jan. 9, 2018) [Docket No. 588]; *In re Tidewater Inc.*, Case No. 17-11132 (BLS) (Bankr. D. Del. July 7, 2017) [Docket No. 378]; *In re Triangle USA Petroleum Corp.*, Case No. 16-11566 (MFW) (Bankr. D. Del. Mar. 10, 2017) [Docket No. 825]; *In re Homer City Generation, L.P.*, Case No. 17-10086 (MFW) (Bankr. D. Del. Feb. 15, 2017) [Docket No. 157]; *In re Am. Gilsonite Co.,* Case No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174]; *In re Basic Energy Servs., Inc.,* Case No. 16-12320 (KJC) (Bankr. D. Del. Dec. 9, 2016) [Docket No. 257].

90.     The Exculpation Provision is consistent with the Bankruptcy Code and complies with applicable case law.  As such, the Exculpation Provision should be approved.

91.     Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Plan satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

**E.     The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.**

92.     Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent comply with the applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also PWS Holding Corp.*, 228 F.3d at 248 ("[Section] 1129(a)(2) requires that the plan proponent comply

with the adequate disclosure requirements of § 1125.").  The Debtors' compliance with sections 1125 and 1126 of the Bankruptcy Code is discussed above and, for the reasons stated, the Debtors have satisfied the requirement of section 1129(a)(2) of the Bankruptcy Code.

>    **F.      The Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code.**

93.      Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Third Circuit has defined the good faith standard as requiring a showing that "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)), *aff'd sub nom. Solow v. PPI Enters. (U.S.), Inc.* (*In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197 (3d Cir. 2003); *see also PWS Holding Corp.*, 228 F.3d at 242 ("For purposes of determining good faith under section 1129(a)(3) … the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (citation omitted).  "Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).  "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan."  *Id.* (internal quotation marks and citations omitted).

94.      In satisfaction of their fiduciary duties, the Debtors developed the Plan in close consultation with their primary stakeholders following months of diligence and negotiation.

More specifically, the Debtors conducted exhaustive analyses of issues related to the Plan and the Debtors' business to provide for the Debtors' ongoing viability upon emergence—which is in the best interests of all stakeholders. The Plan (including all documents necessary to effectuate the Plan) is the ultimate result of months of discussions and negotiations among the Debtors, the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors, which culminated in the execution of the Restructuring Support Agreement, pursuant to which all of such parties agreed to support confirmation of the Plan. *See* First Day Declaration, ¶ ¶ 7–8. The Debtors determined, and the Supporting Term Lenders, the Crossover Holder, the Supporting Noteholders and the Supporting Sponsors agreed, that it was in the interests of all stakeholders to pursue a balance sheet restructuring that impairs only the holders of Prepetition Term Loan Claims and the holders of Unsecured Notes Claims, while leaving all of the Debtors' other creditors, such as landlords, trade vendors, and employees, unimpaired under the Plan.

95.    The near unanimous acceptance of the Plan by the holders of Claims in Class 4 (Prepetition Term Loan Claims) and Class 5 (Unsecured Notes Claims) that voted on the Plan reflects the Plan's fairness and the good-faith efforts of the parties to achieve the objectives of chapter 11. Accordingly, the Debtors have acted with the best intentions of creditors in proposing the Plan and the good faith requirement of section 1129(a)(3) is satisfied. *See In re Chemtura Corp.*, 439 B.R. at 608–09 (finding good faith requirement met because, among other things, debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan which "in the aggregate demonstrate a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case").

### G. The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.

96.     Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *Lisanti v. Lubektin* (*In re Lisanti Foods, Inc.*), 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007).

97.     All payments for services provided to the Debtors during the Chapter 11 Cases must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code. Specifically, Section 2.2 of the Plan provides that all professional fees for estate professionals must be approved by the Court as reasonable pursuant to final fee applications. Further, the Plan provides that the Court shall retain jurisdiction to "hear and determine all Professional Fee Claims and any disputes related to Restructuring Expenses." Plan, § 11.1(h). Lastly, Section 2.3 of the Plan provides that payment of any dispute concerning the Indenture's Trustee's fees and expenses would be decided by the Court. Therefore, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**H.      The Debtors Complied with Section 1129(a)(5) of the Bankruptcy Code.**

98.      Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent there are any insiders that will be retained or employed by the reorganized debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5).

99.      The Debtors have satisfied the foregoing requirements.  In accordance with the provisions of the Plan, from and after the Effective Date, the board of directors or managers and officers, as applicable, of the Reorganized Debtors shall consist of those individuals listed in the Plan Supplement, which includes information about director and officer affiliations.  The Plan, therefore, complies with section 1129(a)(5) of the Bankruptcy Code.

**I.      The Plan Does Not Contain Any Rate Changes.**

100.      Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6).  The Plan does not provide for any rate changes by the Debtors, and, therefore, section 1129(a)(6) is inapplicable.

**J.      The Plan Is in Best Interests of All Creditors Of, and Equity Interest Holders In, Each Debtor.**

101.      Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and stockholders in each Debtor—commonly referred to as the "best interests" test.  The best interests test focuses on potential individual dissenting creditors rather

than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 441 n.13 (1999). It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

102. Under the best interests test,

> the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7. In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation.

*Adelphia Commc'ns*, 368 B.R. at 252; *see also In re W.R. Grace & Co.*, 475 B.R. at 141 ("Under the test, every creditor to a Chapter 11 reorganization plan must receive at least the liquidation value of its claim under the plan as it would in a Chapter 7 proceeding against the debtor in order for the court to find the plan is in the creditors' best interest."), *aff'd*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013). The Court must evaluate the liquidation analysis cognizant of the fact that "the hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000); *In re W.R. Grace & Co.*, 475 B.R. at 142 ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record. It is not necessary to itemize or specifically determine precise values during this estimation procedure. Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation."). As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of

impaired claims or equity interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

103.     The best interests test does not apply to the holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (Prepetition ABL Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims), and Class 8 (Intercompany Interests) because each such holder is Unimpaired, presumed to accept the Plan, and will either receive payment in full, in Cash, be reinstated and paid in the ordinary course, or otherwise its legal, equitable, or contractual rights will not be altered.  Accordingly, the holders of such Claims or Interests are receiving or retaining under the Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

104.     As set forth in the Liquidation Analysis, the best interests test is satisfied as to every holder of a Claim in Class 4 and Class 5 and holders of Parent Interests in Class 9. Holders of (i) Claims in Class 4 (Prepetition Term Loan Claims) are expected to receive a recovery of approximately 70.8% under the Plan, as opposed to a midpoint of 4.3% in a hypothetical chapter 7 liquidation, (ii) Claims in Class 5 (Unsecured Notes Claims) are expected to receive a recovery of approximately 4.4% under the Plan, as opposed to 0% in a hypothetical chapter 7 liquidation, and (iii) Interests in Class 9 (Parent Interests) would not receive recoveries in a hypothetical chapter 7 liquidation.  Disclosure Statement, Ex. C (Liquidation Analysis); Basler Confirmation Declaration at ¶ 9.

**K.** **The Plan Has Been Accepted by or Is Deemed to Have Been Accepted by Impaired Classes Entitled to Vote on the Plan, and as to Such Classes, Requirements of Section 1129(a)(8) of the Bankruptcy Code Have Been Satisfied.**

105. Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan. *See* 11 U.S.C. § 1129(a)(8). As set forth above, holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (Prepetition ABL Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) are not impaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, as evidenced by the Voting Certification, the Plan has been accepted by well in excess of two-thirds in amount and one-half in number of voting holders of Claims in Class 4 (Prepetition Term Loan Claims) and Class 5 (General Unsecured Claims). Thus, as to such Classes, the requirements of section 1129(a)(8) have been satisfied.

106. Holders of Interests in Class 9 (Parent Interests) are not receiving or retaining any property on account of their Interests and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. As discussed more fully below, the Plan may be confirmed notwithstanding the deemed rejection by Class 9 under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**L.** **The Plan Provides for Payment in Full of All Allowed Priority Claims.**

107. Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan. Unless the holder of a priority claim agrees to a different treatment, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide.

108.    The Plan complies with section 1129(a)(9) of the Bankruptcy Code.  The Plan provides that holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in Cash, unless such holder agrees to less favorable treatment; to the extent any Allowed Administrative Expense Claims represent liabilities incurred in the ordinary course of business by the Debtors, such Claims will be paid in the ordinary course, consistent with past practice and the terms and conditions of any course of dealing or agreements governing or relating to such transactions.  *See* Plan, § 2.1.

109.    Moreover, the Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8), as described below) will (i) be paid in full, in Cash, on the later of the Effective Date and the date that is 10 Business Days after the date on which such Claim becomes Allowed, or as soon thereafter as is reasonably practicable, (ii) be Reinstated or (iii) receive such other treatment so as to render such holder's Claim Unimpaired.  *See* Plan, § 4.1(b).  The Plan, therefore, satisfies the requirements of section 1129(a)(9)(A) and (B).

110.    The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code in respect of the treatment of Priority Tax Claims under section 507(a)(8). Pursuant to Section 2.4 of the Plan, unless a holder agrees to less favorable treatment, holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C). *See* Plan, § 2.4.

111.    Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

## M. The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.

112. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth in the Voting Certification, Class 4 (Prepetition Term Loan Claims) is impaired and has voted to accept the Plan unanimously. The Debtors are unaware of any insiders who hold Prepetition Term Loan Claims. Thus, the Plan has been accepted by Class 4 without respect to acceptances by any insiders. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

## N. The Plan Is Feasible.

113. Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as a condition precedent to confirmation. Specifically, it requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan. The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court to determine whether the Plan may be implemented and has a reasonable likelihood of success. *See U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*)*,* 843 F.2d 636, 649 (2d Cir. 1988). Section 1129(a)(11) does not, however, require a guarantee of a plan's success; rather, the appropriate inquiry is whether a plan offers a reasonable assurance of success. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012); *In re Drexel Burnham*, 138 B.R. at 762 ("It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success. . . . The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." (internal quotation marks and citations omitted)).

114.     The Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.  The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed.  As noted by the United States Court of Appeals for the Ninth Circuit: "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  *Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985); *see also In re W.R. Grace & Co.*, 475 B.R. at 114 ("The purpose of the feasibility requirement is to prevent court confirmation of 'visionary schemes.'").  Clearly, the Plan does not contain any visionary scheme but is a rational plan for the continued viability of the Debtors' business.

115.     In assessing feasibility, courts have identified, among others, the following probative factors:

     i.     the prospective earnings or earning power of the debtor's business;

     ii.     the soundness and adequacy of the capital structure and working capital for the debtor's post-confirmation business;

     iii.     the debtor's ability to meet its capital expenditure requirements;

     iv.     economic conditions;

     v.     the ability of management and the likelihood that current management will continue; and

     vi.     any other material factors that would affect the successful implementation of the plan.

*See Indianapolis Downs*, 486 B.R. at 298; *see also In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *Clarkson v. Cooke Sales & Serv. Co.* (*In re Clarkson*), 767 F.2d 417, 420 (8th Cir. 1985); *In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir.

1990) (unpublished table decision), and *aff'd sub nom. Appeal of Robinson*, 908 F.2d 964 (3d Cir. 1990) (unpublished table decision).

116.     The Debtors have analyzed their ability to fulfill their obligations under the Plan and have taken into consideration their estimated costs of administration.  The Debtors, with aid from their advisors, prepared financial projections (the "**Projections**") for fiscal years 2019 through 2021, as set forth in Section VII of the Disclosure Statement.  The Projections take into account that the Plan provides for the reduction of total debt of the Debtors by more than $450 million.  *See* Goldstein Confirmation Declaration, ¶ 15.  This material reduction will further reinforce the Reorganized Debtors' ability to perform their obligations under the Plan and reorganized capital structure.  Moreover, the Debtors are expected to have approximately $14 million in liquidity, including $10 million of balance sheet cash, upon emergence and access to the Exit Facilities.  Based upon the Projections and prior course of conduct, the Debtors will be able to continue to make all payments and distributions as contemplated by the Plan.

117.     The Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

## O.     The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.

118.     Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan"  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Plan provides that on the Effective Date, and thereafter as may be required, such fees, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, shall be paid by the Reorganized Debtors.

**P.** **The Plan Satisfies Section 1129(a)(13) of the Bankruptcy Code.**

119.    Section 1129(a)(13) requires that:

> The plan provides for the continuation after its effective date of payment of all retiree benefits . . . at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).    Pursuant to Section 5.12 of the Plan, all of the Employee Arrangements (including Benefit Plans) (other than those tied to prepetition equity) shall be deemed to be, and will be treated as if they were, executory contracts to be assumed under the Plan.    Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

**Q.** **The Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes.**

120.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.    Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

121.    By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors or interest holders that rejects a plan.    *See* 11 U.S.C. § 1129(b) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan.") (emphasis added).    As each of the Classes entitled to vote on the Plan (Class 4 (Prepetition Term Loan Claims) and Class 5

(Unsecured Notes Claims)) voted to accept the Plan, cramdown is only relevant to Class 9 (Parent Interests), which is deemed to reject the Plan.

122.    As discussed below, the Plan may be confirmed as to Class 9 pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

### 1.    The Plan Does Not Discriminate Unfairly.

123.    Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair. Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination") (quoting *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd sub nom. Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors* (*In re Lernout & Hauspie Speech Prods., N.V.*), 308 B.R. 672 (D. Del. 2004)); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988)). As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment. *See*, *e.g.*, *In re Johns-Manville Corp.*, 843 F.2d at 636.

124.    In the perspective of the foregoing standards, the Plan does not "discriminate unfairly" with respect to Class 9 (Parent Interests). The holders of Interests in Class 9 are distinct from the holders of Interests in Class 8. All Intercompany Interests in Class 8 consist of

Interests in a Debtor held by another Debtor. The holders of Interests in Class 9, which are being cancelled pursuant to the Plan, are distinct in nature from Class 8 because Class 9 consists of holders of equity interests that are not held by another Debtor.

### 2. The Plan Is Fair and Equitable.

125. Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest. *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii), (C)(ii).

126. Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the rule of absolute priority. Pursuant to the Plan, holders of Interests in Class 9 (Parent Interests) are deemed to have rejected the Plan and, therefore, the absolute priority rule must be satisfied as to such class. The absolute priority rule is not violated as to the holders of Interests in Class 9 (Parent Interests) because no interests junior to such class will receive or retain any property under the Plan on account of such junior interests. *See In re Finlay Enters. Inc.*, No. 09-14873, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (holding that fair and equitable test was satisfied where no interest junior to interests of rejecting class received any property under plan). The Plan is, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

### III. THE OBJECTIONS SHOULD BE OVERRULED OR RECOGNIZED AS MOOT, AND THE PLAN SHOULD BE CONFIRMED.

### A. The Plan Provisions Reserving the Debtors' Right to Assume or Reject Executory Contracts and Unexpired Leases After Resolution of an Assumption Dispute Are Appropriate.

127. Several landlords (collectively the "**Objecting Landlords**") have objected to certain provisions in the Plan that they believe empower the Debtors to "change their minds"

1004841629v8

about the assumption of an unexpired lease after the Confirmation Date. In particular, the Objecting Landlords argue that certain plan provisions are contrary to the Debtors' obligations under sections 1129(a)(1), 1123 and 365(d)(4)(A)(ii) of the Bankruptcy Code.[15] However, the Objecting Landlords improperly view plan confirmation as an inflexible barrier beyond which the Debtors may no longer assume unexpired leases of nonresidential real property. This interpretation is inconsistent with case law addressing a similar provision in section 365(d)(2) of the Bankruptcy Code[16] and disregards section 365(d)(4)(B), which permits the Court to extend the deadline under section 365(d)(4)(A) for cause. *See* 11 U.S.C. § 365(d)(4)(B).

128. The Debtors believe that the Plan adheres to the initial statutory deadline to assume or reject executory contracts and unexpired leases by the entry of an order confirming a plan, and that section 8.1(a)(iii) of the Plan serves to create a permitted extension of that deadline in limited circumstances where the Debtors would easily be able to demonstrate cause for the extension.[17]

---

[15] The Objecting Landlords have primarily cited to Sections 8.1(a) and 8.8(d) of the Plan in relation to this objection.

[16] Courts have confirmed plans of reorganization that permit debtors to determine whether to assume or reject executory contracts or unexpired leases post-confirmation despite language in section 365(d)(2) that permits the debtor to assume or reject contracts and unexpired leases "at any time before confirmation of the plan." *See, e.g., In re Greater Se. Cmty. Hosp. Corp. I*, 327 B.R. 26 (Bankr. D.D.C. 2005) (holding that "[t]he Bankruptcy Code permits questions of assumption or rejection under a plan to be determined after confirmation of a plan calling for such post-confirmation determination"); *see, e.g., DJS Props., L.P. v. Simplot*, 397 B.R. 493, 498 (D. Idaho 2008) (interpreting sections 365(d)(2) and 1123(b)(2) of the Bankruptcy Code to permit a debtor to determine whether to assume or reject a particular contract post-confirmation); *Gunter Hotel Assocs.*, 96 B.R. 696 (Bankr. W.D. Tex. 1988) (permitting debtor to make decision regarding assumption or rejection of executory contract up to 60 days following the effective date of its plan).

[17] Section 365(d)(4)(B)(i) provides, specifically, that the "court may extend the period determined under subparagraph (A)...for 90 days on the motion of the trustee or lessor for cause." By not limiting the reference to "the period determined under subparagraph (A)" to subparagraph (A)(i), the Debtors understand this provision to allow for extensions of the deadline past the date of entry of the confirmation order. *See* 3 Collier on Bankruptcy ¶ 365.05[b] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("By referring to subparagraph (A), rather than to "the 120 day period," as the statute does later in the same clause, a court might conclude that either deadline in subparagraph (A) – 120 days after the order for relief or the entry of the confirmation order – may be extended. Such a reaching would permit the court to extend the deadline for 90 days after the entry of the confirmation order.").

129.    Section 8.1(a)(iii) of the Plan creates flexibility where the Debtors would be required to assume an unexpired lease and pay unexpected Cure Amounts that could potentially exceed the benefit of assuming an unexpired lease, notwithstanding the treatment of General Unsecured Claims in these chapter 11 cases.[18]

130.    The Debtors believe that, given the development of the Plan on an accelerated timeline and the desire for the prompt emergence from chapter 11, it is appropriate to provide flexibility regarding assumption of an unexpired lease as appropriate if there is a dispute as to the Cure Amount.  While the Debtors and the parties to the Restructuring Support Agreement intend for the Debtors to assume all unexpired leases of non-residential property, they also seek to protect themselves against the possibility that the ultimate Cure Amounts associated with individual unexpired leases might prove to be unreasonable.  For this reason, the Debtors seek to extend the time period during which they may assume or reject unexpired leases under the Plan, in accordance with the provisions of the Plan and the Proposed Confirmation Order.  As stated above, this request is well within the bounds of the Court's authority as defined under section 365(d)(4)(B)(i) of the Bankruptcy Code, and in the best interest of the Debtors, the Estates and their Creditors.

### B.    Objections of Jenny Yoo and Cumberland to the Non-Debtor Releases, and the Opt-Out Election by the Holder of an Unsecured Notes Claim

131.    As noted previously in this Memorandum, the Debtors received two objections (Jenny Yoo and Cumberland) to the Plan with respect to the Non-Debtor Releases and one holder of an Unsecured Notes Claim elected to opt out of the Non-Debtor Releases.[19]   The

---

[18]    *See In re Greater Se. Cmty. Hosp. Corp. I,* 327 B.R. at 30 (finding that a debtor could reject executory contracts post-confirmation when cure amounts are unreasonable).

[19]    As discussed on the Objection Summary Chart, Jenny Yoo also objected to the injunction provisions in sections 10.3 and 10.5 of the Plan to the extent that they prevent Jenny Yoo from continuing its patent infringement litigation against the Debtors.  There never has been an intent to preclude litigation with respect

objections and the opt-out election are being honored under the Plan and, therefore, the Debtors do not believe there is any live controversy with respect to these objections or the opt-out election.

132.     More specifically, as discussed earlier in this Memorandum, the Court-approved Ballots for impaired creditors, such as holders of Unsecured Notes Claims, contained an optional election for the holder to opt out of the proposed Non-Debtor Release.  As reflected in the Voting Certification, one of the holders of Unsecured Notes Claims exercised this optional election with respect to its $1 million Unsecured Notes Claim.  *See* Voting Certification at Ex. B.

133.     With respect to holders of Unimpaired Claims who did not receive ballots, the Debtors provided clear notice of an alternate mechanism for expressing an intent to opt out of the proposed Non-Debtor Releases, as described fully in paragraph 83, above.  Specifically, holders of General Unsecured Claims and other Unimpaired Claims could opt out of the Non-Debtor releases by filing an objection to the Plan.  Only Jenny Yoo and Cumberland timely filed objections to the Non-Debtor Releases.

134.     As contemplated by the Plan and the prior Court-approved Ballots and the Combined Notice, Jenny Yoo and Cumberland have properly utilized the Non-Debtor Release opt-out mechanisms and will not be bound by the Non-Debtor Releases.  Therefore, as the Debtors are not asking the Court to approve the Non-Debtor Releases with respect to these creditors, the Debtors believe that the objections and the election opt-out do not pose any live controversy and that any objection that had been made is moot by the treatment described herein.

---

to contested Unimpaired Claims, and the Proposed Confirmation Order makes this clear with respect to all creditors and reiterates that point with particularity with respect to Jenny Yoo.

C.    **Objections Resolved Through Additional Language in the Proposed Confirmation Order.**

135.    As indicated on the Objection Summary Chart, the following objections were raised, often by more than one party.   The Debtors believe that such objections are fully addressed by incorporating the language below into the Proposed Confirmation Order and as such, the following objections should be overruled to the extent not consensually resolved.

- Several parties objected to the Plan asserting that the Plan improperly seeks to deprive creditors of their existing setoff, recoupment and subrogation rights.  The Debtors have included the following clarifying language in the Proposed Confirmation Order to resolve such objections:

    "Nothing in this Order or in the Plan shall in any way limit, reduce or otherwise bar, except to the extent limited by the Bankruptcy Code, including section 502(b)(6), an otherwise valid and enforceable right of setoff, subrogation or recoupment against the Debtors."

- Several parties requested language in the Proposed Confirmation Order clarifying that the Reorganized Debtors will bear both the benefits and the burdens of any unexpired leases of non-residential real property that are assumed.  The Debtors have included the following language in the Proposed Confirmation Order to resolve such objections:

    "Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or this Order shall affect the respective obligations of the Reorganized Debtors and the applicable counterparty to any executory contract or unexpired lease assumed pursuant to the Plan, this Order or another order of the Bankruptcy Court following such assumption to comply with the terms of such assumed executory contract or unexpired lease (as applicable), except as modified by Section 8.2(c) of the Plan, and be liable (when and if applicable) for all obligations arising under such executory contracts or unexpired leases that are not otherwise due and owing as of the Effective Date and thus not required to be asserted as a Cure Amount, including (A) amounts owed or accruing under such leases that are unbilled or not yet due as of the Effective Date, regardless of when such amounts or obligations accrued, on account of common area maintenance, insurance, taxes, utilities and similar charges, (B) any regular or periodic adjustment or reconciliation of charges under such unexpired leases that are not due or have not been determined as of the Effective Date, (C) any percentage rent that comes due under such unexpired leases, (D) post-assumption obligations under such unexpired leases, (E) any obligations to indemnify the non-Debtor counterparty under such unexpired leases for any claims of third parties pursuant to the

terms of such unexpired leases, which are not known or liquidated by the time of the Confirmation Hearing (and therefore not yet payable as a cure cost pursuant to section 365(b)(1)(a) of the Bankruptcy Code), (F) any applicable obligations relating to the maintenance, replacement, and/or repair of the subject premises, including those related to environmental conditions, the roof, the parking lot and the heating, ventilation and air conditioning systems of the subject premises, and such deferred maintenance, replacement and repair obligations that may have arisen or accrued or continued to accrue over a period of time, both before and after the assumption of any such unexpired lease, and (G) any obligations arising under such unexpired leases as they come due, including between the Confirmation Date and the Effective Date. Other than with respect to Cure Amounts fixed in the ordinary course prior to the Effective Date or specifically in connection with the Plan, all rights of the Debtors or Reorganized Debtors and the other counterparties to any assumed unexpired lease to dispute amounts due thereunder are preserved. For the avoidance of doubt, Cure Amounts are only required to be asserted in the ordinary course of business. In addition, for the further avoidance of doubt, the rights of non-Debtor parties under assumed unexpired leases shall not be improved by this Order or the Plan relative to such rights as they existed before the Petition Date."

- Several parties objected to the Plan asserting that unexpired leases cannot be assigned under the Plan without notice to the applicable landlords. The Debtors have included the following language in the Proposed Confirmation Order to resolve such objections:

    "Notwithstanding anything to the contrary in the Plan, in the event the Debtors seek to assign certain executory contracts or unexpired leases to Affiliates, the Debtors must provide at least 14 days' notice to the non-Debtor contract counterparty to such executory contract or unexpired lease and opportunity to object to such assignment, which notice and opportunity to object must include adequate assurance information for the specific proposed assignee entity that evidences the assignee's ability to perform under the contract or lease designated for assignment."

- Jenny Yoo objected to the injunction provisions in the Plan to the extent that they prevent Jenny Yoo from continuing its pending litigation against the Debtors. The Debtors believe that this concern is unfounded given that the Proposed Confirmation Order clearly provides that the plan injunction does not prevent holders of Unimpaired Claims from efforts to pursue and collect upon such claims, but nevertheless the Debtors have included the following additional language in the Proposed Confirmation Order to resolve the Jenny Yoo objection:

    "For the avoidance of doubt, notwithstanding any other provision in this Order or the Plan, on or after the Effective Date, the injunction in Section 10.5 of the Plan shall not apply to the action entitled Jenny Yoo

Collection, Inc. v. David's Bridal, Inc. and Clayton, Dubilier & Rice, LLC, U.S. District Court for the Southern District of New York, Case No. 18-09926. Further, nothing in the Plan, nor the entry of this Order, shall prejudice any rights of Jenny Yoo Collection, Inc. to file and pursue a motion to lift the stay with respect to its claims and the aforementioned lawsuit."

**D. Additional Objections Listed on the Objection Summary Chart Should Be Overruled to the Extent They Are Not Consensually Resolved Before the Confirmation Hearing.**

136.   In addition to the above-discussed objections, there are certain additional objections that remained unresolved and are listed as "Disputed" as set forth in more detail on the Objection Summary Chart. The Debtors do not believe these objections raise significant issues and will continue to work with the objecting parties to resolve these objections. The Debtors believe these objections may potentially be resolved by incorporating agreed-upon language in the Proposed Confirmation Order. To the extent that such a resolution cannot be reached, the Debtors request that such objections be overruled for the reasons set forth on the Objection Summary Chart.

## IV.   CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER.

137.   The Debtors respectfully request that the Bankruptcy Court direct that the Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e). Bankruptcy Rule 3020(e) provides that: "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). As such, and as the Advisory Committee notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately." Fed. R. Bankr. P. 3020(e) advisory committee's note to 1999 amendment.

1004841629v8

138.    Under the circumstances, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order.  The Debtors' prompt emergence from chapter 11 will assuage the concerns of customers, vendors and valuable employees regarding the viability of the Debtors at the crucial beginning of the Debtors' peak selling season.  Furthermore, each day that the Debtors remain in chapter 11 they incur additional administrative and professional costs.  For these reasons, the Debtors, their advisors and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions necessary to effectuate the Plan so that the Effective Date may occur as soon as possible after the entry of the Confirmation Order.  Based on the foregoing, the requested waiver of the 14-day stay is in the best interests of the Estates and creditors and will not prejudice any parties in interest.

## CONCLUSION

A.    The Disclosure Statement and the Solicitation Procedures satisfy the requirements of sections 1125 and 1126(b) of the Bankruptcy Code, and Bankruptcy Rules 3017 and 3018, and should be approved.

B.    The Plan complies with all of the requirements of section 1129 of the Bankruptcy Code and should be confirmed.

1004841629v8

Dated: December 28, 2018      */s/ Jaime Luton Chapman*
Wilmington, Delaware      **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Jaime Luton Chapman (No. 4936)
Tara Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: rbrady@ ycst.com
        emorton@ycst.com
        jchapman@ycst.com
        tpakrouh@ycst.com

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Nick S. Kaluk, III (admitted *pro hac vice*)
Daniel E. Stroik (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Tel:    (212) 909-6000
Fax:    (212) 909-6836
Email: nlabovitz@debevoise.com
        nskaluk@debevoise.com
        destroik@debevoise.com

-and-

**DEBEVOISE & PLIMPTON LLP**
Craig A. Bruens (admitted *pro hac vice*)
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel:    (202) 383-8000
Fax:    (202) 383-8118
Email: cabruens@debevoise.com

*Co-Counsel for the Debtors and Debtors in Possession*