# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 1812635 (LSS)<br><br>Jointly Administered<br><br>**RE: Docket Nos. 12, 13, & 248** |

## DECLARATION OF STEPHEN GOLDSTEIN
## IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PREPACKAGED
## PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

I, Stephen Goldstein, hereby declare (this "**Declaration**")[2] under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), the proposed investment banker for the above-captioned debtors in possession in these chapter 11 cases (collectively, the "**Company**" or the "**Debtors**") and a leading independent investment banking advisory and investment management firm, which counsels multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings and other strategic transactions.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] Capitalized terms used by not defined herein have the meanings ascribed to them in the *Proposed Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, filed November 18, 2018 [Docket No. 12] (the "**Plan**") or the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of David's Bridal, Inc. and Its Affiliated Debtors*, dated November 18, 2018 [Docket No. 13] (the "**Disclosure Statement**"), as applicable.

2. Evercore was retained by the Company in April 2018 to provide strategic advice and to assist with its restructuring efforts, which are described in detail in the *Declaration of Joan Hilson, Executive Vice President and Chief Financial and Operating Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19] (the "**First Day Declaration**").

3. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances gleaned during the course of Evercore's engagement by the Company, my discussions with the Debtors' senior management, other members of the Evercore team, and the Debtors' other advisors, (ii) my review of relevant documents, (iii) information provided to me by Evercore employees working under my supervision and (iv) my opinion based upon my experience as a restructuring professional. I submit this Declaration in support of the *Debtors' (1) Memorandum of Law in Support of (I) Approval of (A) Disclosure Statement, (B) Solicitation of Votes and Voting Procedures, and (C) Form of Ballots, and (II) Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of David's Bridal, Inc. and Its Affiliated Debtors and (2) Omnibus Reply to Objections Thereto* (the "**Memorandum**"). If called to testify, I could and would testify to each of the facts set forth herein on that basis.

## Background and Qualifications

4. I joined Evercore in 2012. I have approximately 20 years of investment banking and restructuring experience. Prior to joining Evercore, I was a Managing Director in the Financial Restructuring Group of Lazard Frères & Co. and, prior to Lazard, I worked in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities. I have advised corporate clients and creditor groups in a broad range of restructuring,

reorganization and capital raising transactions, in traditional and distressed situations, across a diverse variety of industries. In addition, I have substantial experience marketing, structuring, and evaluating debtor in possession financings, secured debt facilities, and exit financings.

5. Evercore is a leading independent investment banking advisory and investment management firm established in 1996. Evercore's investment banking business includes its advisory business, which provides a range of investment banking services to multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings, and other strategic transactions. Through its investment banking business, Evercore provides capital markets advice, underwrites securities, raises funds for financial sponsors, and offers equity research and agency-only equity securities trading for institutional investors. Evercore's investment management business includes private equity investment, institutional asset management, and wealth management. Evercore and its affiliates serve a diverse set of clients around the world from offices in New York, Boston, Chicago, Los Angeles, Washington D.C., San Francisco, Houston, Minneapolis, Palo Alto, Menlo Park, Hong Kong, Singapore, London, Aberdeen, Mexico City, Monterrey, São Paulo, and Rio de Janeiro. Since the beginning of 2000, Evercore's corporate advisory and restructuring advisory groups have advised on over $1.8 trillion of transactions. Evercore has been involved in numerous large and complex restructuring cases in this and other districts around the United States, including *In re Tops Holding II Corp.*, Case No. 18-22279 (Bankr. S.D.N.Y. Mar. 22, 2018); *In re Fieldwood Energy* LLC, Case No. 18-30648 (Bankr. S.D. Tex. Mar. 8, 2018); *In re Pac. Drilling S.A.*, Case No. 17-131393 (Bankr. S.D.N.Y. Jan. 26, 2018); *In re Orchard Acquisition Co., LLC (J.G. Wentworth)*, Case No. 17-12914 (Bankr. D. Del. Jan. 5, 2018); *In re Castex Energy Partners, L.P.*, Case No. 17-35835 (Bankr. S.D. Tex. Dec. 4, 2017); *In re GulfMark Offshore, Inc.*, Case

No. 17-11125 (Bankr. D. Del. June 15, 2017); *In re Vanguard Nat. Res., LLC*, Case No. 17-30560 (Bankr. S.D. Tex. Mar. 20, 2017); *In re Azure Midstream Partners, LP*, Case No. 17-30461 (Bankr. S.D. Tex. Mar. 10, 2017); *In re Altegrity, Inc.*, Case No. 15-10226 (Bankr. D. Del. March 16, 2015); and *In re Energy Future Holdings Corp.*, Case No. 14-10979 (Bankr. D. Del. Sept. 16, 2014).

## Valuation Analysis

6. As described in the Disclosure Statement, in connection with developing the Plan, the Debtors directed Evercore to estimate the going-concern value of the Reorganized Debtors. Evercore performed an analysis underlying the estimated recoveries under the Plan, utilizing certain assumptions set forth in Article VIII of the Disclosure Statement (the "**Valuation Analysis**"). The Financial Projections provided by the Debtors for use by Evercore in preparing the Valuation Analysis were for fiscal years 2018–2021 and take into account the reduction of total debt of the Debtors by an amount in excess of $450 million.

7. As further described in the Disclosure Statement, in preparing the estimated total enterprise value range for the Reorganized Debtors, Evercore: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (4) considered certain economic and industry information relevant to the Debtors' operating business; (5) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; (6) considered the

value assigned to certain precedent change-of-control transactions for businesses similar to those of the Debtors; and (7) conducted such other analyses as Evercore deemed appropriate.

8. Although Evercore conducted a review and analysis of the Debtors' business, operating assets and liabilities, and business plans, Evercore relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and on certain publicly available information as to which Evercore does not have independent knowledge.

9. Evercore relied on the Debtors' representation and warranty that financial projections provided by the Debtors to Evercore (1) were prepared in good faith, (2) were based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflected the Debtors' best currently available estimates and (4) reflected the good faith judgments of the Debtors. No independent evaluations or appraisals of the Company's assets were sought or were obtained in connection with Evercore's valuation. Evercore did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Company, and therefore made no representations as to their impact on the Company's financial statements.

10. As further described in the Disclosure Statement, Evercore performed certain financial analyses to arrive at a range of estimated total enterprise values for the Reorganized Debtors, including applying the following valuation methodologies as applicable to the operations of the Company: (1) the discounted cash flow methodology; (2) the peer group company trading multiples methodology and (3) the precedent transactions methodology. In arriving at its valuation estimate, Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors.

11. The valuation was based upon information available to, and analyses undertaken by, Evercore as of November 18, 2018, and reflected, among other factors discussed in the Disclosure Statement, the financial market conditions and the inherent uncertainty as of the date of the Disclosure Statement as to the achievement of the Financial Projections. For purposes of the valuation, Evercore assumed that no material changes that would affect value would occur between the date of the Disclosure Statement and the assumed Effective Date.

12. Based on the financial projections set forth in the Disclosure Statement and subject to the disclaimers and the descriptions of Evercore's methodology set forth therein, and solely for purposes of the Plan, Evercore estimated the total enterprise value of the Reorganized Debtors to be between approximately $400 million and $472 million as of an assumed Effective Date of December 31, 2018. The range of total equity value, which took into account the total enterprise value less the estimated net debt outstanding as of an assumed Effective Date of December 31, 2018, was estimated by Evercore to be between approximately $67 million and $139 million.

### Plan Releases

13. The Plan provides for (i) releases of claims held by the Debtors and the Estates (the "**Debtors' Release**"), and (ii) consensual releases of claims held by certain creditors and interest holders of the Debtors (the "**Non-Debtor Releases**" and, together with the Debtors' Release, the "**Plan Releases**"), in each case, against the Debtors, the Reorganized Debtors and certain non-debtor third parties (collectively, the "**Released Parties**"). As described below, I believe the Plan Releases are integral components of the Restructuring Support Agreement and the Plan and the transactions embodied therein, and are appropriate and necessary under the circumstances.

14. Inclusion of the Debtor and Non-Debtor Releases in the Plan was a key term in the negotiation of the Restructuring Support Agreement and the Plan. In my experience, when negotiating a support agreement for a prepackaged bankruptcy, it is customary for supporting creditors and interest holders to insist that the plan include protective releases. It is also customary for the current and former officers, directors, managers, employees, advisors, and other related parties of the debtors to benefit from those releases. This restructuring was no different.

15. During negotiations, it became apparent that none of the Supporting Noteholders, the Supporting Term Lenders, the Crossover Holder, or the Supporting Sponsors would be willing to make the substantial concessions embodied in the Restructuring Support Agreement without the protection of the Plan Releases for themselves or certain other entities, such as the Unsecured Notes Indenture Trustee and the providers of the Exit Facilities contemplated by the Plan. It was also apparent that the lenders who would provide the debtor-in-possession financing facilities embodied in the DIP Term Loan Agreement and the DIP ABL Agreement (together, the "**DIP Agreements**") would not do so unless the DIP ABL Facility Agent, the DIP ABL Secured Parties, the DIP Term Loan Facility Agent, the DIP Term Loan Secured Parties, the Exit ABL Facility Agent, the Priority Exit Facility Agent, the Exit Facility Lenders, the Takeback Term Loan Agent, the Prepetition ABL Secured Parties, and the Prepetition Term Loan Secured Parties were covered by the Plan Releases.. Based on the foregoing, it is my opinion that, absent the Plan Releases, the Debtors would not have been able to muster the necessary support to finance (both through the DIP facilities as well as the Exit Facilities) the Chapter 11 Cases and confirm the Plan on a prepackaged basis. Accordingly, had the Plan Releases not been provided, I believe it would have significantly diminished (and potentially eliminated) the Debtors'

chances of securing all of the valuable benefits provided by the Plan, including the reduction of total debt by more than $450 million and the payment in full of Claims in the Unimpaired Classes (including General Unsecured Claims).

**Substantial Contributions of the Released Parties**

16. I understand that in evaluating whether a debtor's or non-debtor party's release of a non-debtor party is permissible under the Bankruptcy Code, courts consider several factors, including whether the non-debtor party made substantial contributions to the Debtors' reorganization. As described in more detail below, I believe that the Released Parties have made substantial contributions to the Debtors and their Estates.

Creditor Released Parties

17. I believe the Creditor Released Parties (as defined in the Memorandum) have made substantial contributions to the Debtors' reorganization. Each Creditor Released Party engaged in good faith negotiations in order to facilitate the implementation and execution of a consensual and expeditious reorganization of the Debtors. Crucially, during negotiations, the Supporting Term Lenders, the Crossover Holder and the Supporting Noteholders agreed to compromise their Claims, and, with respect to the Supporting Term Lenders, consented to distributions to the holders of Unsecured Notes Claims and General Unsecured Claims, which are junior to the Prepetition Term Loan Claims.

18. In addition, the Debtors, the DIP ABL Secured Parties and the DIP Term Loan Facility Secured Parties entered into the DIP ABL Agreement and the DIP Term Loan Agreement, providing for the roll-up of all Prepetition ABL Obligations and $60 million in incremental liquidity under the DIP Term Loan Facility, allowing the Debtors access to sufficient liquidity to operate their business during the Chapter 11 Cases. As part of entering into the DIP

Agreements, the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties also consented to the Debtors' use of cash collateral throughout the Chapter 11 Cases.

19. The Exit ABL Facility Agent, the Priority Exit Facility Agent, the Exit Facility Lenders and the Takeback Term Loan Agent are collectively working together and with the Debtors to provide the Reorganized Debtors with necessary liquidity in the form of the Priority Exit Facility and the Exit ABL Facility. I believe this exit financing is necessary to ensure the Plan's feasibility as such financing will allow for the Plan's treatment of Prepetition Term Loan Claims and the payment of General Unsecured Claims under the Plan, and provide liquidity for post-emergence operations.

The Supporting Sponsors

20. I believe the Supporting Sponsors have made substantial contributions to the Debtors' reorganization. Like the Creditor Released Parties, the Supporting Sponsors have engaged in good faith negotiations in order to facilitate the implementation and execution of a consensual and expeditious reorganization of the Debtors. In addition, in signing the Restructuring Support Agreement, the Supporting Sponsors agreed to forego the pursuit of litigation with respect to valuation of the Debtors and to make several tangible commitments to help ensure successful negotiation and implementation of the Plan.

21. The Supporting Sponsors, who to my knowledge have never taken a cash dividend or similar distribution in respect of their Interests in the Debtors, have agreed to waive their General Unsecured Claims worth approximately $1 million in cash as part of the negotiations that permitted the Plan to provide for the Unimpaired treatment of all General Unsecured Claims. The waived Claims are largely comprised of management fees owed to the Supporting Sponsors (who agreed to forego receipt of management fees during the negotiation of

the restructuring). Because a prepackaged plan typically requires that General Unsecured Claims be paid in full, and several Consenting Creditors were unwilling to endorse a prepackaged plan if it meant that the Supporting Sponsors would receive a recovery on account of their General Unsecured Claims, the waiver of Claims by the Supporting Sponsors represented a significant, monetary contribution to achieve a prepackaged plan and bridge the divide between the different creditor constituencies in the days leading up to the execution of the Restructuring Support Agreement.

22. Another example of the Supporting Sponsors providing real, tangible value to the Debtors' restructuring relates to tax. During the Restructuring Support Agreement negotiations, certain of the Supporting Creditors (as defined in the Restructuring Support Agreement) expressed concern that the Supporting Sponsors could take actions which could impair the tax attributes the Reorganized Debtors would retain after the Effective Date. In particular, these Supporting Creditors informed the Supporting Sponsors that they did not want the Supporting Sponsors to take a worthless stock deduction in respect of their equity interests in the Debtors in 2018. While retaining the ability to take the deduction in 2018 (and to otherwise dispose of their Interests in the Debtors without further restrictions) was valuable to the Supporting Sponsors, in order to help achieve the global settlement embodied in the Restructuring Support Agreement, the Supporting Sponsors agreed to a covenant in the Restructuring Support Agreement restricting their ability (without a court order) to transfer their Interests in the Debtors or take a worthless stock deduction in respect of such Interests in 2018 if doing so would impair any of the Debtors' tax attributes.

23. Finally, the Supporting Sponsors have cooperated and continue to cooperate with the Debtors and the other Restructuring Support Parties in connection with the consummation of

01:24005477.1

10

the Plan and to facilitate an expeditious restructuring of the Debtors and, to my knowledge no party to the Restructuring Support Agreement has raised the possibility of any claims existing against the Supporting Sponsors.

The Debtors' Related Parties

24. I believe the Debtors' current and former officers, directors, managers, employees, advisors, and other related parties (the "**Debtors' Related Parties**") have made a substantial contribution to the Chapter 11 Cases through (i) expending substantial time and effort in connection with restructuring matters, in addition to their normal duties (including compliance with the substantial reporting and budgetary obligations imposed under the DIP Agreements), (ii) engaging in negotiations and open dialogue with the Debtors' key stakeholders to facilitate a consensual restructuring, and (iii) assisting with any and all endeavors necessary to navigate the Debtors through the Chapter 11 Cases. Moreover, the Debtors' directors have continued to provide valuable services and oversight to the Debtors throughout these Chapter 11 Cases to facilitate the Debtors smooth transition to new ownership.

**The Plan is Feasible**

25. In negotiating the Plan, Evercore assisted the Debtors in analyzing whether there was a reasonable probability that the Plan can be implemented and has a reasonable likelihood of success. This analysis included consideration of the Debtors' ability to fulfill their obligations under the Plan and the estimated costs of administration. The Debtors, with aid from Evercore and their other advisors, prepared financial projections for fiscal years 2019 through 2021, as set forth in Section VII of the Disclosure Statement (the "**Projections**"). Additionally, as discussed above, the Plan provides for a material reduction in the Debtors' total debt, which will further enhance the Reorganized Debtors' ability to perform their obligations under the Plan. Since the

filing of the Plan and Disclosure Statement, Evercore has worked to update the liquidity forecast in light of the most current information available to the Debtors. On December 11, 2018, the Evercore and the Debtors delivered an updated liquidity analysis to the Supporting Creditors (as required by the DIP Agreements) (the "**Updated Liquidity Projections**"). Those Updated Liquidity Projections show, after taking into account the Exit Facilities, the Debtors having approximately $28 million (depending on the size of the Priority Exit Facility) in liquidity. In my opinion, based upon the Projections and the Updated Liquidity Projections, as well as Debtors' operating history, there is a reasonable probability that the Debtors will be able to make all payments and distributions as contemplated by the Plan, and the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

[*Remainder of Page Intentionally Left Blank*]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief

Dated: December 28, 2018
      New York, New York

                                */s/ Stephen Goldstein*
                                Stephen Goldstein
                                Senior Managing Director
                                Evercore Group L.L.C.