## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, INC., *et al.*,[1] | Case No. 18- 12635 (LSS) |
| Debtors. | Jointly Administered |
| | **RE: Docket Nos. 12 and 167** |

## SUPPLEMENTS TO PLAN SUPPLEMENT TO PROPOSED
## JOINT PREPACKAGED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

## TABLE OF CONTENTS

| Exhibit | Description | Supplement |
|---|---|---|
| **1** | Form of the Exit ABL Facility Credit Agreement | Supplemented with **Exhibit 1** attached hereto |
| **4** | Form of the Amended Organizational Documents | Supplemented with **Exhibit 4** attached hereto |
| **5** | Form of the New Stockholders' Agreement | Supplemented with **Exhibit 5** attached hereto |
| **6** | Form of the Warrant Agreement | Supplemented **Exhibit 6** attached hereto |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: David's Bridal, Inc. (4563); DB Investors, Inc. (8503); DB Holdco, Inc. (4567); and DB Midco, Inc. (3096). The location of the Debtors' corporate headquarters is 1001 Washington Street, Conshohocken, Pennsylvania 19428. Capitalized terms used but not defined herein have the meanings ascribed to them in the *Proposed Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 12] (as amended, supplemented, or otherwise modified, the "Plan").

## Exhibit 1

### Form of the Exit ABL Facility Credit Agreement

Certain documents, or portions thereof, contained in this <u>Exhibit 1</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

CONFIDENTIAL

## SUMMARY OF INDICATIVE TERMS AND CONDITIONS ("**TERM SHEET**")
### $125,000,000 SENIOR ABL CREDIT FACILITY (EXIT)

THIS TERM SHEET REPRESENTS AN OUTLINE OF THE BASIS ON WHICH BANK OF AMERICA, N.A. AND THE LENDERS REFERRED TO BELOW WOULD CONSIDER PROVIDING FINANCING TO DAVID'S BRIDAL INC. AND CERTAIN OF ITS DOMESTIC SUBSIDIARIES AND AFFILIATES. IT IS FOR DISCUSSION PURPOSES ONLY, AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO LEND OR TO NEGOTIATE ANY SUCH COMMITMENT. ANY COMMITMENT TO DO SO WOULD BE EVIDENCED BY AN EXECUTED COMMITMENT LETTER OR DEFINITIVE DOCUMENTATION. THIS TERM SHEET IS NOT EXHAUSTIVE AS TO ALL TERMS AND CONDITIONS WHICH WOULD GOVERN ANY PROPOSED FINANCING. THE ACTUAL TERMS AND CONDITIONS UPON WHICH BANK OF AMERICA, N.A. AND THE LENDERS MIGHT AGREE TO EXTEND CREDIT TO DAVID'S BRIDAL INC. AND CERTAIN OF ITS DOMESTIC SUBSIDIARIES AND AFFILIATES ARE SUBJECT TO INTERNAL CREDIT APPROVALS, SATISFACTORY REVIEW OF DOCUMENTATION AND SUCH OTHER TERMS AND CONDITIONS AS ARE DETERMINED BY BANK OF AMERICA, N.A. AND THE LENDERS. THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS, AND IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF FEDERAL RULE OF EVIDENCE 408 AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.

*Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this Exhibit A is attached.*

| | |
|---|---|
| **BORROWER:** | David's Bridal Inc., a Florida corporation (the "***Company***") and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred from the Company upon its emergence from bankruptcy (the "***Borrower***"). |
| **GUARANTORS:** | The obligations of the Borrower and its subsidiaries and affiliates under the Senior ABL Credit Facility and under any treasury management, bank products, cash management services, interest protection or other hedging arrangements (other than any obligation of any Guarantor to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act (a "Swap"), if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, |

regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof)) entered into with a Lender (or any affiliate thereof) will be guaranteed by DB Midco, Inc., a Delaware corporation ("**Midco**") that is the direct parent of the Borrower and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred from Midco upon its emergence from bankruptcy ("**Holdings**"), each other obligor, if any, under any of the Exit Term Loan Facilities, and each existing and future direct and indirect domestic subsidiary of the Borrower or Holdings (the "**Subsidiary Guarantors**" and together with Holdings, collectively, the "**Guarantors**", and together with the Borrower, the "**Loan Parties**")).  All guarantees will be guarantees of payment and not of collection.

**ADMINISTRATIVE AGENT:**

Bank of America, N.A. ("**Bank of America**") will act as sole administrative agent (in such capacity, the "**Administrative Agent**").

**LENDERS:**

Bank of America, N.A., and such other financial institutions as may become parties to the Credit Agreement (collectively, the "**Lenders**").

**SENIOR ABL CREDIT FACILITY:**

Subject to the terms under the heading "Borrowing Base," a $125 million revolving credit facility (the "**Senior ABL Credit Facility**" ; the loans thereunder, the "**ABL Loans**"; the commitments thereunder, the "**ABL Commitments**") available from time to time until the fourth anniversary of the Closing Date, which will include a $80 million sublimit for the issuance of letters of credit (the "**Letters of Credit**") and a $20 million sublimit for swingline loans (each a "**Swingline Loan**"). Letters of Credit will be issued by Bank of America (in such capacity, the "**L/C Issuer**"). Swingline Loans will be made available by Bank of America, and each of the Lenders under the Senior ABL Credit Facility will purchase an irrevocable and unconditional participation in each Letter of Credit and each Swingline Loan.

**DIP ABL CREDIT AGREEMENT:**

The Senior Secured, Super Priority, Debtor-In-Possession ABL Credit Agreement, dated as of November 21, 2018 (as amended, restated, supplemented and otherwise modified from time to time, the "**DIP ABL Credit Agreement**"), among the Borrower, the other borrowers party thereto (if any), the lenders party thereto from time to time, and the Administrative Agent.  Effective as of the Closing Date, there will be no additional loans or other extensions of credit to the Borrower under the DIP ABL Credit Agreement.  The loans and all other obligations under or described in the DIP ABL Credit Agreement (collectively, the "**DIP Obligations**") will be repaid in full by the proceeds of the Senior ABL Credit Facility on the Closing Date.

**PREPETITION CREDIT AGREEMENT:**

The Credit Agreement, dated as of October 11, 2012 (as amended by that certain Amendment No. 1, dated July 26, 2016, as further amended by that certain Amendment No. 2, dated August 9, 2018 and as may be further amended, restated, supplemented and otherwise modified from

time to time, the "***Prepetition Credit Agreement***"), among the Borrower, Holdings, the other borrowers or guarantors party thereto, the lenders party thereto from time to time, and the Administrative Agent. The loans and all other obligations under or described in the Prepetition Credit Agreement (collectively, the "***Prepetition Obligations***") were repaid in full as provided for in, or otherwise rolled into, the DIP Credit Agreement.

**INCREMENTAL FACILITY:** The Senior ABL Credit Facility will include a provision permitting the Borrower from time to time after the Closing Date to increase the aggregate amount of the Senior ABL Credit Facility through a usual and customary "accordion" by up to an aggregate of $75,000,000 (or such other amount as may be mutually agreed) with additional commitments from Lenders or new commitments from financial institutions acceptable to the Administrative Agent in its reasonable discretion, without the approval of Required Lenders.

**USE OF PROCEEDS:** The proceeds of the Senior ABL Credit Facility shall be used solely for, in each case in a manner consistent with the terms and conditions herein, (a) repayment of the DIP ABL Obligations, (b) payments described in the approved plan of reorganization (to be in form and substance reasonably satisfactory to Bank of America and approved by the Court (the "***Approved Plan***")), (c) payment of fees, costs and expenses incurred in connection with consummation of the Approved Plan, and (d) for working capital and other general corporate purposes of the Loan Parties and their respective subsidiaries.

**BORROWING BASE:** Advances under the Senior ABL Credit Facility may be made to the Borrower on a revolving basis up to the full amount of the Senior ABL Credit Facility and Letters of Credit may be issued up to the sublimit for Letters of Credit, in each case, so long as the outstanding obligations would not exceed a borrowing base (the "***Borrowing Base***") equal to the result of: (i) 90% of eligible credit card receivables of the Borrower and the Subsidiary Guarantors, plus (ii) 90% of eligible accounts of the Borrower and the Subsidiary Guarantors, plus (iii) 90% (or, during the months from December through April, 92.5%) of the appraised net orderly liquidation value of eligible inventory of the Borrower and the Subsidiary Guarantors, plus (iv) 90% of the appraised net orderly liquidation value of eligible inventory of the Borrower and the Subsidiary Guarantors supported by an eligible letter of credit, plus (v) 90% of the appraised net orderly liquidation value of eligible in-transit inventory of the Borrower and the Subsidiary Guarantors, minus (vi) subject to the "Reserve" section below, any applicable reserves to be determined by the Administrative Agent in its Permitted Discretion (to be defined as a good faith determination made by the Administrative Agent's exercise of reasonable (from the perspective of a secured asset-based lender) business judgment).

Eligible credit card receivables, eligible accounts, eligible inventory, net orderly liquidation value of eligible inventory, net orderly liquidation value of eligible letter of credit inventory, and net orderly liquidation

value of eligible in-transit inventory shall be defined consistent with the Pre-Petition Credit Agreement (provided that the exclusion of receivables or inventory based on the Permitted Discretion afforded to the Administrative Agent shall, subject to the "Reserve" section below, become immediately effective upon notice to the Borrower) with such changes as may be required by the Administrative Agent in its Permitted Discretion.

The Borrowing Base will be computed by the Borrower monthly, and a certificate (the "***Borrowing Base Certificate***") presenting the Borrower's computation of the Borrowing Base will be delivered to the Administrative Agent promptly, but in no event later than the fifteenth day following the end of each calendar month; provided, however, that (a) during the continuance of an Event of Default (as defined below) or (b) if Excess Availability (as defined below) is less than the greater of (x) 15% of the lesser of (A) the aggregate commitments under the Senior ABL Credit Facility at such time and (B) the Borrowing Base (such lesser amount, the "***Maximum Borrowing Amount***") and (y) $15,000,000 for three (3) consecutive business days, the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate on a weekly basis until the date on which, as applicable, in the case of clause (a), such Event of Default is cured or waived, or in the case of clause (b), Excess Availability has been greater than the greater of (x) 15.0% of the Maximum Borrowing Amount and (y) $15,000,000, in each case, for at least thirty consecutive days.

"***Excess Availability***" shall mean, at any time, (a) the Maximum Borrowing Amount, *minus* (b) the aggregate outstanding amount of all loans and Letter of Credit obligations at such time under the Senior ABL Credit Facility.

**RESERVES**: The Administrative Agent shall have the right to establish, modify or eliminate Reserves or to establish or adjust any eligibility criteria in Permitted Discretion; provided, that such Reserves shall not be established or eligibility criteria changed except upon prior written notice to the Borrower (it being agreed that the Administrative Agent shall use commercially reasonable efforts to give the Borrower at least two (2) Business Days' prior written notice of any increase or imposition of any Reserve or modification of eligibility criteria); provided further that no such prior notice shall be required for changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserves in accordance with the methodology of calculation previously utilized (such as, but not limited to, rent and Customer Credit Liabilities).

**CLOSING DATE**: The "***Closing Date***" shall occur as promptly as is practical after the entry of an order of the Court confirming the Approved Plan, but no later than January [__], 2019.

**MATURITY**: The Senior ABL Credit Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full on the earlier of (i) four (4) years after the Closing Date and (ii) 91 days prior to the

maturity of any of the Exit Term Loan Facilities (or any indebtedness which refinances, in whole or in part, any of the Exit Term Loan Facilities) or any other indebtedness for borrowed money of more than $25,000,000.

**MANDATORY PREPAYMENTS:** In the event that the aggregate outstanding amount of loans and Letter of Credit obligations at such time under the Senior ABL Credit Facility exceeds the then Maximum Borrowing Amount, the Borrower will immediately prepay an amount sufficient to result in Excess Availability being equal to or greater than $0.

**OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:**

The Senior ABL Credit Facility may be prepaid in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR borrowings. The unutilized portion of the commitments under the Senior ABL Credit Facility may be irrevocably reduced or terminated by the Borrower at any time without penalty, <u>provided</u> that that any notice of reduction or termination delivered by the Borrower may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**SECURITY:** The Loan Parties shall grant the Administrative Agent and the Lenders valid and perfected first priority (subject to the Intercreditor Agreement, and subject to certain exceptions to be set forth in the loan documentation) liens and security interests in all property and assets of the Loan Parties (collectively, the "***Collateral***"), including, without limitation:

(a) All present and future shares of capital stock of (or other ownership or profit interests in) each of its present and future subsidiaries, including, without limitation, all of the equity interests in the Borrower owned or otherwise held by the Loan Parties.

(b) All present and future intercompany debt of the Loan Parties.

(c) All of the present and future property and assets of the Loan Parties, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, credit card receivables, fixtures, bank accounts, general intangibles, payment intangibles, financial assets, investment property, license rights, patents, trademarks, tradenames, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash.

(d)    All proceeds and products of the property and assets described in clauses (a), (b) and (c) above.

Notwithstanding the foregoing, it is anticipated that the Administrative Agent shall have a *first* priority lien on all "ABL Priority Collateral" (as defined in the Intercreditor Agreement referred to below) and a *third* priority lien on all "Term Loan Priority Collateral" as defined in the Intercreditor Agreement (subject only to the liens in favor of (i) the holders of the Priority Exit Facility (as defined in the Approved Plan) and (ii) the holders of the Takeback Term Loan (as defined in the Approved Plan)).  It is anticipated that (a) the "Intercreditor Agreement" will take the form of an intercreditor agreement to be agreed between the Administrative Agent and the holders of the Priority Exit Facility and the Takeback Term Loan and (b) the intellectual property of the Loan Parties will constitute "Term Loan Priority Collateral".

The Intercreditor Agreement will provide, among other things, that the Administrative Agent and its agents shall have an irrevocable license and right to access and use, on a rent free, royalty free basis and for a period of time reasonably acceptable to the Administrative Agent, all Term Loan Priority Collateral in connection with the exercise of remedies with respect to, or the sale or other disposition of, the ABL Priority Collateral.

The Collateral shall secure the relevant party's obligations in respect of the Senior ABL Credit Facility and any treasury management, cash management services, bank products, interest protection or other hedging arrangements (other than any obligation of any Guarantor to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof)) entered into with a Lender (or an affiliate thereof).

**CASH MANAGEMENT:**        The Loan Parties and their subsidiaries shall establish cash management procedures reasonably acceptable to the Administrative Agent.  Subject to exceptions to be mutually agreed, all deposit accounts and securities accounts of the Loan Parties shall be subject to control agreements in favor of the applicable Administrative Agent (such accounts subject to the control of such Administrative Agent, collectively, the "***Blocked Accounts***"), which control agreements may take the form of four party control agreements (to include the depositary bank and the agents under each of the exit credit facilities).  Upon the occurrence and during the continuation of a Cash Dominion Period (as defined below), the Administrative Agent may cause all amounts maintained in deposit accounts (that are Blocked Accounts) to be swept, on a daily basis, to a collection account of the Administrative Agent, to be applied to the outstanding obligations under the Senior ABL Credit Facility, it being understood that a Cash Dominion Period shall commence on the Closing

Date.  The Borrower, the Guarantors and their subsidiaries will maintain their primary controlled disbursement and ACH relationship with Administrative Agent and its affiliates.

"*Cash Dominion Period*" shall mean (a) the period beginning on the Closing Date and ending on the date Excess Availability shall have been at least 30% of the Maximum Borrowing Amount for thirty (30) consecutive calendar days, (b) thereafter, each period beginning on the date that Excess Availability shall have been less than the greater of (x) $12,500,000, and (y) 12.5% of the Maximum Borrowing Amount and ending on the date Excess Availability shall have been at least the greater of (x) $12,500,000 and (y) 12.5% of the Maximum Borrowing Amount, in each case, for thirty (30) consecutive calendar days or (c) the period during which an Event of Default has occurred and is continuing.

**DOCUMENTATION:**

The credit agreement ("*Credit Agreement*") and the other loan documentation will contain customary representations and warranties, funding and yield protection provisions, conditions precedent, affirmative, negative and financial reporting covenants, indemnities, events of default and remedies and other provisions appropriate for transactions agented by the Administrative Agent of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent, the Lenders and their counsel.  It is anticipated that the documentation will be based upon an agreed precedent document, with such changes as may be reasonably required by the Administrative Agent and the Lenders, including, without limitation, those changes necessary (i) that reflect the consummation of the transactions contemplated by the Approved Plan and the Loan Parties' emergence from bankruptcy, (ii) that reflect the terms of this Exhibit A and the Fee Letters, (iii) to reflect changes in law or accounting or regulatory standards and requirements of local law or to cure mistakes or defects, and (iv) as are reasonably necessary to take into account the current size, credit profile, geographical locations, operations and financial reporting of the Loan Parties.

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the Senior ABL Credit Facility will be subject to satisfaction of customary closing conditions for transactions of this type, including, without limitation, the following conditions precedent:

(i)      The negotiation, execution and delivery of a credit agreement, perfection certificates, collateral documents and other documents to be executed or delivered in connection therewith (collectively, with the Credit Agreement, the "*Senior ABL Credit Facility Documentation*") reasonably satisfactory to the Administrative Agent and the Lenders.

(ii)     The Administrative Agent shall have received evidence of the perfection and priority of liens and security interests referred to above under the section entitled "*Security*" (including all filings, recordations and searches necessary or desirable in connection with (such liens and

security interests)). The Administrative Agent shall be satisfied that the Borrower maintains adequate insurance with respect to the Collateral, and the Lenders shall have received endorsements naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lender loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Borrower and its subsidiaries forming part of the Lenders' collateral described under the section entitled "*Security*" set forth above.

(iii)     The Administrative Agent shall have received reasonably satisfactory legal opinions (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the Senior ABL Credit Facility Documentation), corporate certificates and other usual and customary closing documentation for transactions of this type.

(iv)     The Administrative Agent shall have received customary evidence of organizational authority to enter into the Credit Agreement and the other Senior ABL Credit Facility Documentation and documents related to the Priority Exit Facility and the Takeback Term Loan and the other exit transactions contemplated by the Approved Plan (collectively the "*Exit Transactions*") and governing documents, in each case, reasonably acceptable to the Administrative Agent.

(v)     The Administrative Agent shall have received good standing certificates, or the equivalent, in the respective jurisdictions of organization of the Loan Parties.

(vi)     (a) There shall have been since the date the Debtors filed a case (the "*Case*") for bankruptcy protection (such date, the "*Petition Date*") no Material Adverse Effect and (b) no litigation shall exist which could reasonably be expected to have a Material Adverse Effect. "*Material Adverse Effect*" means a circumstance or condition that would materially and adversely affect (A) the business or financial condition of the Borrower, the Guarantors and their subsidiaries, taken as a whole, (B) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Senior ABL Credit Facility Documentation to which such Loan Party is a party or (C) the rights and remedies of the Administrative Agent and the Lenders under the Senior ABL Credit Facility Documentation, excluding, in each case, the effect of filing the Case, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Senior ABL Credit Facility Documentation.

(vii)     An order of the Court in form and substance reasonably satisfactory to the Administrative Agent and the Lenders confirming the Approved Plan which shall not (i) have been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders or (ii) be the subject of an appeal (the "*Confirmation Order*") and authorizing Borrower, the Guarantors and their subsidiaries

to execute, deliver and perform under all documents contemplated hereunder and thereunder (including the payment of all fees with respect thereto) shall have been entered and shall be in full force and effect. The Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan shall have been (or concurrently with the occurrence of the Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with applicable law, Court and regulatory approvals. The respective indebtedness or obligations of the Borrower and the Guarantors and any liens securing same that are outstanding immediately after the consummation of the Approved Plan shall not exceed the amount contemplated by the Approved Plan as of the effective date thereof.

(viii)     Receipt by the Administrative Agent and the Lenders (A) at least three (3) business days prior to the date of the initial Borrowing all documentation and other information about the Borrower and the Guarantors as has been reasonably requested at least five (5) business days prior to the date of the initial Borrowing that they reasonably determine is required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and (B) at least five (5) days prior to the Closing Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulations (31 C.F.R. § 1010.230) shall deliver a Beneficial Ownership Certification in relation to such Loan Party.

(ix) The Administrative Agent and the Lenders shall be reasonably satisfied that the amount of committed financing available to the Borrower and its subsidiaries shall be sufficient to meet the ongoing financial needs of the Borrower and its subsidiaries after giving effect to the Exit Transactions and there shall be no less than $[_____] of Excess Availability under the Senior ABL Credit Facility as of the Closing Date, after giving effect to the Exit Transactions and all extensions of credit under the Senior ABL Credit Facility, the Priority Exit Facility and the Takeback Term Loan on such date.

(x)     Receipt of all governmental, shareholder and third party consents and approvals necessary in connection with the Senior ABL Credit Facility, the Exit Transactions and the related financings and other transactions contemplated hereby and by the Approved Plan.

(xi)     Each of the Exit Transactions shall have been consummated on terms consistent with those outlined in the Approved Plan and otherwise on terms and conditions, and pursuant to documentation in form and substance, reasonably satisfactory to the Administrative Agent. The Administrative Agent shall have received copies of each of the material documents (reasonably satisfactory thereto) executed and or delivered in connection with the Exit Transactions, each of which shall be certified by a responsible officer of the Borrower as being true, complete, correct and in full force and effect.

(xii)   The Administrative Agent shall have received a fully executed and effective Intercreditor Agreement with the holders of the Exit Term Loan Facilities (or an agent for such holders), in form, substance, and on terms, reasonably acceptable to the Administrative Agent.

(xiii)   The Administrative Agent and the Lenders shall have received pro forma consolidated financial statements as to the Company and its subsidiaries giving effect to all elements of the Exit Transactions, and forecasts prepared by management of the Company, each in form and substance reasonably satisfactory to the Administrative Agent, of balance sheets, income statements and cash flow statements on a monthly basis for the first year following the Closing Date and on an annual basis for each year thereafter during the term of the Senior ABL Credit Facility. The Administrative Agent and the Lenders shall have received and be satisfied with a monthly availability forecast for the Borrower and the Guarantors for the first year following the Closing Date.  The Administrative Agent and the Lenders shall have received and be reasonably satisfied with the business plan and shall be reasonably satisfied with the capital structure of the Borrower and the Guarantors.

(xiv)   The Administrative Agent and the Lenders shall have received certification as to the financial condition and solvency of the Borrower and the Guarantors, on a consolidated basis (after giving effect to the Exit Transactions and the incurrence of indebtedness related thereto) from the chief financial officer of the Borrower.

(xv)   Receipt by the Administrative Agent, for the benefit of the Lenders and the Administrative Agent, of all reasonable and documented out-of-pocket fees and expenses (including the reasonable and documented fees and expenses of counsel (including any local counsel) for the Administrative Agent) due and payable in accordance with the Commitment Letter and the Fee Letter.

(xvi)   All outstanding obligations under, or described in, the DIP Credit Agreement shall have been repaid or refinanced in full in cash, after giving effect to, and from the proceeds of, the Senior ABL Credit Facility.

(xvii)   On the Closing Date, the Borrower shall have received proceeds of not less than $[___],000,000 representing the term loans under the Priority Exit Facility.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:**

Each extension of credit (excluding the continuation or conversion of any borrowing) under the Senior ABL Credit Facility will be subject to satisfaction or waiver of the following conditions precedent:  (i) all of the representations and warranties in the Senior ABL Credit Facility Documentation shall be true and correct in all material respects as of the date of such extension of credit (except for representations and warranties that expressly relate to an earlier date); (ii) no Event of

Default under the Senior ABL Credit Facility or incipient default shall have occurred and be continuing or would result from such extension of credit; (iii) the Administrative Agent shall have received a notice of borrowing from the Borrower not later than 2:00 p.m. on such date; and (iv) the aggregate principal amount of all loans outstanding and, if applicable, Letters of Credit outstanding on such date, after giving effect to the applicable borrowing or issuance or renewal of a Letter of Credit, as the case may be, shall not exceed the Maximum Borrowing Amount on such date. The request by the Borrower of, and the acceptance by the Borrower of, each extension of credit shall be deemed to be a representation and warranty by the Borrower that the foregoing conditions have been satisfied.

**REPRESENTATIONS AND WARRANTIES:**

Including, without limitation, the following: (i) legal existence; qualification and power; (ii) due authorization and no contravention of law, material contracts or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect; (vi) no material litigation; (vii) no default; (viii) ownership of property and liens; including disclosure of liens, properties, leases and investments; (ix) insurance matters; (x) environmental matters; (xi) tax matters; (xii) ERISA compliance; (xiii) identification of subsidiaries, equity interests and loan parties; (xiv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xv) status under Investment Company Act; (xvi) accuracy of disclosure; (xvii) compliance with laws; (xviii) intellectual property; (xix) solvency; (xx) no casualty; (xxi) labor matters; (xxii) collateral documents; (xxiii) none of the Loan Parties is an EEA Financial Institution and (xxiv) representations relating to the PATRIOT Act, anti-money laundering laws and sanctions and Beneficial Ownership Certifications.

**AFFIRMATIVE AND NEGATIVE COVENANTS:**

Including, without limitation, the following:

(a) <u>Affirmative Covenants</u> - (i) delivery of financial statements, budgets and forecasts; (ii) delivery of certificates (including Borrowing Base Certificates) and other information; (iii) delivery of notices (of any default, material adverse condition, ERISA event, material change in accounting or financial reporting practices, disposition of property, sale of equity, incurrence of debt); (iv) payment of obligations; (v) preservation of existence; (vi) maintenance of properties; (vii) maintenance of insurance; (viii) compliance with laws; (ix) maintenance of books and records; (x) inspection rights; (xi) use of proceeds; (xii) covenant to guarantee obligations, give security; (xiii) compliance with environmental laws; (xiv) further assurances; (xv) compliance with Confirmation Order and Approved Plan; (xvi) designation as senior debt and (xvii) information and documentation requested for purposes of

compliance with applicable "know your customer" requirements under the PATRIOT Act, the Beneficial Ownership Regulation or other anti-money laundering laws.

(b) <u>Negative Covenants</u> - Restrictions on (i) liens; (ii) indebtedness, (including guarantees and other contingent obligations); (iii) investments (including loans and advances); (iv) mergers and other fundamental changes; (v) sales and other dispositions of property or assets; (vi) payments of dividends and other distributions; (vii) changes in the nature of business; (viii) transactions with affiliates; (ix) burdensome agreements; (x) use of proceeds; (xi) amendments of organizational documents; (xii) changes in accounting policies or reporting practices; (xiii) voluntary prepayments and voluntarily redemption of other indebtedness; (xiv) modification or termination of the Confirmation Order or the Approved Plan in any manner that could reasonably be expected to adversely affect the interest of the Administrative Agent or the Lenders or modification of any of the Exit Term Loan Facilities or certain indebtedness, with exceptions to be agreed; (xv) changes in activities of Holdings; and (xvi) designation of other senior debt, in each case, with such exceptions as may be agreed and are reasonably acceptable to the Administrative Agent. In addition to the foregoing, after the delivery of the audited financial statements for the Fiscal Year 2019, the Borrower shall be permitted to (w) voluntarily prepay and voluntarily redeem other indebtedness, (x) make dividends, restricted payments and other distributions, (y) make investments and (z) incur unsecured or subordinated debt, subject to the satisfaction of the Payment Conditions.

"*Payment Conditions*" shall mean, with respect to any applicable transaction, event, prepayment, payment, dividend, redemption, repurchase, or other restricted payment (each, a "*Specified Payment*") , (a) no Event of Default shall exist before or immediately after giving effect to such Specified Payment, and (b) the Borrower shall have demonstrated to the reasonable satisfaction of the Administrative Agent (i) both (x) Excess Availability (on a pro forma basis after giving effect to such Specified Payment) will be greater than the greater of (I) 15% of the Maximum Borrowing Amount or (II) $15,000,000, immediately following such Specified Payment and as projected on a pro-forma basis as of the end of each fiscal month for each of the six (6) fiscal months following such Specified Payment, and (y) the Fixed Charge Coverage Ratio for the trailing twelve month period most recently ended shall be greater than 1.00 to 1.00 (calculated both before giving effect to such Specified Payment and on a pro forma basis after giving effect to such Specified Payment) or (ii) Excess Availability (on a pro forma basis after giving effect to such Specified Payment) will be greater than the greater of (I) 20% of the Maximum Borrowing Amount or (II) $20,000,000 (or, in the case of (x) prepay and voluntarily redeem other indebtedness or (y) any dividend, redemption, repurchase, restricted payment or other distribution, (I) 25% of the Maximum Borrowing Amount or (II) $25,000,000), immediately following such Specified Payment and as

projected on a pro-forma basis as of the end of each fiscal month for each of the six (6) fiscal months following such Specified Payment. The Borrower shall certify in a certificate addressed to the Administrative Agent that the Payment Conditions are satisfied.

The Senior ABL Credit Facility will permit mandatory prepayments of the Exit Term Loan Facilities as provided therein (i) from the proceeds of permitted dispositions or casualty events of Term Priority Collateral, (ii) with the proceeds of refinancings thereof, (iii) with the proceeds of certain debt and equity issuances, (iv) in accordance with stated amortization of not more than 5% per annum plus accrued and unpaid interest, payable on a quarterly basis, commencing on the last day of the first full fiscal quarter after the Closing Date, and (v) (x) in an amount up to 50% of excess cash flow for each fiscal year (commencing with the Fiscal Year 2019 (calculated on a stub basis from the first day of the first month following the Closing Date through the end of the fiscal year)), in each case, payable annually upon delivery of the annual audit for the applicable fiscal year, so long as (I) no Event of Default shall exist before or immediately after giving effect to such payment, and (II) in the case of Fiscal Year 2019, pro forma Excess Availability at the time of such payment and projected for each of the six (6) fiscal months following such payment shall not, at any time, be less than the greater of (A) 20% of the Maximum Borrowing Amount or (B) $20,000,000, or (y) in an amount up to 85% of excess cash flow for each fiscal year (commencing with the Fiscal Year 2019 (calculated on a stub basis from the first day of the first month following the Closing Date through the end of the fiscal year)), in each case, payable annually upon delivery of the annual audit for the applicable fiscal year, so long as (I) no Event of Default shall exist before or immediately after giving effect to such payment, (II) pro forma Excess Availability at the time of such payment and projected for each of the six (6) fiscal months following such payment shall not, at any time, be less than the greater of (A) 20% of the Maximum Borrowing Amount or (B) $20,000,000, and (III) the consolidated total leverage ratio as of the last day of the immediately preceding fiscal year was greater than 3.50:1.00; and *provided, however,* that the ability to make payments under clauses (iii) through (v) above is without prejudice to the Administrative Agent's right to sweep cash during a Cash Dominion Period as set forth under the Cash Management section above..

**FINANCIAL COVENANT:**     At all times on or prior to the date that the Borrower delivers the audited financial statements for its Fiscal Year 2019 and certifies that no Default or Event of Default then exists, the Loan Parties shall maintain, at all times, Excess Availability in an amount not less than the greater of (a) $10.0 million and (b) ten percent (10%) of the Maximum Borrowing Amount. After the date that the Borrower delivers the audited financial statements for its Fiscal Year 2019 and certifies that no Default or Event of Default then exists, if Excess Availability is less than the greater of (a) $10.0 million and (b) ten percent (10%) of the Maximum Borrowing Amount, then the Consolidated Fixed Charge Coverage Ratio as of the last day of the immediately preceding fiscal month shall be greater than or

equal to 1.00:1.00, with such Financial Covenant to be tested as of the last day of each fiscal month thereafter until such time as Excess Availability is equal to or greater than the greater of (a) $10.0 million and (b) ten percent (10%) of the Maximum Borrowing Amount for thirty (30) consecutive days.

**FIELD EXAMS AND APPRAISALS:**

The Administrative Agent may conduct (a) one (1) field examination and one (1) inventory appraisal (each at the expense of the Borrower) during any twelve (12) consecutive month period; <u>provided</u> that (i) at any time after the date on which Excess Availability is less than the greater of (x) 20% of the Maximum Borrowing Amount and (y) $20,000,000 for five (5) consecutive business days, field examinations and inventory appraisals may each be conducted (at the expense of the Borrower) two (2) times during the next twelve months, and (ii) at any time during the continuation of an Event of Default, field examinations and inventory appraisals may be conducted (at the expense of the Borrower) as frequently as determined by the Administrative Agent in its reasonable discretion and (b) one (1) additional field examination and one (1) additional inventory appraisal during any twelve (12) consecutive month period at the expense of the Lenders.

**EVENTS OF DEFAULT:**

Including, without limitation, the following (each, an "***Event of Default***"): (i) nonpayment of principal, interest, fees or other amounts (with grace periods for non-principal payments); (ii) failure to perform or observe covenants set forth in the loan documentation within a specified period of time, where customary and appropriate, after notice of such failure; (iii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in an amount to be agreed; (viii) customary ERISA defaults; (ix) actual or asserted invalidity or impairment of any loan documentation; (x) change of control; and (xi) actual or asserted invalidity or impairment of any subordination provisions, in the case of each of the foregoing defaults subject to threshold, notice and grace period provisions to be agreed.

**ASSIGNMENTS AND PARTICIPATIONS:**

Assignments and participations appropriate for transactions agented by the Administrative Agent of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders, provided that the Loan Parties will not be permitted to list disqualified lenders.

<u>Consents</u>:  The consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) will be required unless (i) an Event of Default has occurred and is continuing or (ii) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the Senior ABL Credit Facility),

provided that, to the extent the consent of the Borrower is required, the Borrower shall be deemed to have consented to such assignment if the Lead Borrower has been given five (5) business days' prior notice of such assignment and has not objected to such assignment within such period. The consent of the Administrative Agent will be required for any assignment in respect of the Senior ABL Credit Facility, to an entity that is not a Lender, an affiliate of such Lender or an Approved Fund in respect of such Lender. The consent of the fronting bank and the lender of any Swingline Loan will be required for any assignment under the Senior ABL Credit Facility.

_Assignments Generally_: An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion.

_Participations_: Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the Senior ABL Credit Facility or all or substantially all of the value of the guaranty of the Borrower's obligations made by the Guarantors.

**WAIVERS AND AMENDMENTS:**

Waiver and amendments provisions appropriate for transactions agented by the Administrative Agent of this size, type and purpose and shall be reasonably acceptable to the Administrative Agent and the Lenders.

**INDEMNIFICATION:**

The Borrower will indemnify and hold harmless the Administrative Agent, the Lenders and their respective affiliates and their partners, directors, officers, employees, agents and advisors from and against all losses, claims, damages, liabilities and reasonable and documented out-of-pocket expenses arising out of or relating to the Senior ABL Credit Facility, any other aspect of the Exit Transactions, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable and documented out-of-pocket attorneys' fees and settlement costs (it being agreed that in connection with the negotiation, preparation and execution of the Senior ABL Credit Facility Documentation, the Borrower shall only be liable for the reasonable and documented out-of-pocket fees and expenses of a single law firm, as counsel to the Administrative Agent, and a single local counsel in each relevant jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed); _provided_ that no party shall be indemnified for any loss or related expense to the extent it has resulted from (a) the gross negligence, bad faith or willful misconduct of such party or any of its affiliates or any of the officers, directors, employees, advisors, agents or other representatives of any of the foregoing (collectively, the "**_Indemnified Persons_**") (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (b) any claim, litigation, investigation or other proceeding (other than a claim, litigation, investigation or other proceeding against the Administrative Agent or any person acting in a

similar capacity, in each case, acting pursuant to the Senior ABL Credit Facility Documentation or in its capacity as such or of any of its affiliates or its or their respective officers, directors, employees, agents, advisors and other representatives and the successors of each of the foregoing) solely between or among Indemnified Persons that does not involve any act or omission by the Borrower or any of its affiliates. This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**    State of New York.

**PRICING/FEES/EXPENSES:**    As set forth in <u>Addendum I</u>.

**COUNSEL TO THE ADMINISTRATIVE AGENT:**    Morgan, Lewis & Bockius LLP.

**OTHER:**    Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. Each of the parties shall agree not to bring any suit or action in respect of or related to the Senior ABL Credit Facility or any Senior ABL Credit Facility Documentation therefor in any forum, other than in courts of the state of New York sitting in New York county and of the United States District Court of the Southern District of New York. The Senior ABL Credit Facility Documentation will contain customary increased cost, withholding tax, capital adequacy and yield protection provisions and EU bail-in and defaulting lender language.

| | |
|---|---|
| **INTEREST RATES:** | The interest rates per annum applicable to the Senior ABL Credit Facility (other than in respect of Swingline Loans) will be LIBOR *plus* the Applicable Rate (as hereinafter defined) or, at the option of the Borrower, the Base Rate (to be defined as the highest of (a) the Federal Funds Rate plus ½ of 1%, (b) the Bank of America prime rate and (c) LIBOR *plus* 1.00%) *plus* the Applicable Rate. "***Applicable Rate***" means a percentage per annum to be determined in accordance with the pricing grid set forth below. |

Each Swingline Loan shall bear interest at the Base Rate plus the Applicable Rate for Base Rate loans under the Senior ABL Credit Facility. Notwithstanding anything to the contrary contained herein, to the extent that, at any time, LIBOR shall be less than zero, LIBOR shall be deemed to be zero for purposes of the Senior ABL Credit Facility. The Applicable Rate for the period from the Closing Date through the second full fiscal quarter of the Borrower after the Closing Date shall be as set forth in Level III below.

The Borrower may select interest periods of one, two, three or six months for LIBOR loans, subject to availability. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

During the continuance of any Event of Default under the Senior ABL Credit Facility Documentation (as hereinafter defined), at the option of the requisite Lenders, the Applicable Rate on obligations owing under the Senior ABL Credit Facility Documentation shall increase by 2% per annum.

| | |
|---|---|
| **COMMITMENT FEE:** | Commencing on the Closing Date, a commitment fee of a percentage per annum determined in accordance with the pricing grid set forth below shall be payable on the actual daily unused portions of the Senior ABL Credit Facility. Such fee shall be payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Closing Date. Swingline Loans will not be considered utilization of the Senior ABL Credit Facility for purposes of this calculation. |

| Pricing Level | Average Daily Used Percentage | Commitment Fee Rate |
|---|---|---|
| I | **Greater than 50%** | 0.250% |
| II | **Less than or equal to 50%** | 0.375% |

| | |
|---|---|
| **LETTER OF CREDIT FEES:** | Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum equal to the Applicable Rate from time to time applicable to Revolving Credit LIBOR loans. Such fees will be (a) payable quarterly in arrears, commencing on the first quarterly payment date to occur after the |

Closing Date, and (b) shared proportionately by the Lenders under the Senior ABL Credit Facility.  In addition, a fronting fee shall be payable to the fronting bank for its own account, in an amount to be mutually agreed.

| Level | Quarterly Average Excess Availability | Applicable Rate for LIBOR Loans / Letter of Credit Fees | Applicable Rate for Base Rate Loans |
|-------|----------------------------------------|----------------------------------------------------------|--------------------------------------|
| I | Greater than 66% | 1.75% | 0.75% |
| II | Less than or equal to 66%, but greater than 33% | 2.00% | 1.00% |
| III | Less than or equal to 33% | 2.25% | 1.25% |

**CALCULATION OF INTEREST AND FEES:** Other than calculations in respect of interest at the Bank of America prime rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**COST AND YIELD PROTECTION:** Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**EXPENSES:** The Borrower will pay all reasonable and documented out-of-pocket costs and expenses associated with the preparation, due diligence, administration, and closing of all Senior ABL Credit Facility Documentation, including, without limitation, the legal fees of counsel to the Administrative Agent, regardless of whether or not the Senior ABL Credit Facility is closed.  The Borrower will also pay the reasonable and documented out-of-pocket expenses of the Administrative Agent and each Lender in connection with the work-out or enforcement of any of the Senior ABL Credit Facility Documentation.

**OTHER FEES:** [Confidential]

# Exhibit 4

## Form of the Amended Organizational Documents

Certain documents, or portions thereof, contained in this <u>Exhibit 4</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**SECOND AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION**

**(Amended and Restated as of January [__], 2019 (the "<u>Emergence Date</u>"))**

DB Investors, Inc., a corporation organized and existing under the laws of the State of Delaware (the "<u>Corporation</u>"), does hereby certify as follows:

1.  The present name of the Corporation is DB Investors, Inc. The Corporation filed a Certificate of Incorporation with the Secretary of State of the State of Delaware on August 24, 2012 under the name, "CDR DB Investors, Inc.". Thereafter, the Corporation filed an Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware on October 5, 2012 (the "<u>Amended and Restated Certificate</u>"). Thereafter, the Corporation filed a Certificate of Amendment to its Amended and Restated Certificate with the Secretary of State of the State of Delaware on November 7, 2018, changing its name to "DB Investors, Inc.".

2.  The Corporation desires to amend and restate in its entirety the Amended and Restated Certificate pursuant to this Second Amended and Restated Certificate of Incorporation (this "<u>Certificate</u>"), which was duly adopted on the Emergence Date in accordance with the provisions of Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware.

3.  The terms of this Certificate are as follows:

ARTICLE 1

Section 1.01.  *Name*.  The name of the Corporation is **[DB Investors, Inc.]**

ARTICLE 2

Section 2.01.  *Registered Office*.  The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, County of New Castle.  The name of its registered agent at such address is Corporation Service Company.

ARTICLE 3

Section 3.01.  *Purpose*.  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended (the "<u>DGCL</u>").

ARTICLE 4

Section 4.01.  *Capitalization*.  The total number of shares of stock that the Corporation shall have authority to issue is 101,000,000 shares, consisting of solely:

(a)  100,000,000 shares of a single class of common stock, par value $0.01 per share (the "<u>Common Stock</u>"); and

(b)  1,000,000 shares of preferred stock, par value $0.01 per share (the "<u>Preferred Stock</u>").

Section 4.02.  *Common Stock*.

(a)  <u>Voting Rights</u>.  Each share of Common Stock shall be entitled to one vote per share on all matters on which stockholders generally are entitled to vote in person or by proxy.  Any share of

Common Stock held by the Corporation shall have no voting rights. Except as otherwise required by applicable law, the holders of Common Stock shall vote together as a single class on all matters submitted to a vote of stockholders of the Corporation generally. The holders of Common Stock shall not have cumulative voting rights.

(b) <u>Dividends and Distributions</u>. Subject to applicable law and to the preferences applicable to any Preferred Stock outstanding at any time, if any, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Corporation's Board of Directors (the "<u>Board</u>") from time to time out of assets or funds of the Corporation legally available therefor.

(c) <u>Liquidation</u>. If the Corporation shall be liquidated, dissolved or wound up, whether voluntarily or involuntarily, the holders of the Common Stock shall be entitled to share ratably in the net assets of the Corporation remaining after payment of all liquidation preferences, if any, applicable to any outstanding Preferred Stock.

Section 4.03. *Preferred Stock*. The Board is authorized, subject to limitations prescribed by applicable law and the provisions of <u>Section 4.01</u> and <u>Section 4.03</u>, to provide for the issuance of the Preferred Stock in series, and by filing a certificate pursuant to the DGCL, to establish the number of shares to be included in each such series, and to fix the designation, relative rights, preferences and limitations of the shares of each such series. Subject to the foregoing, the authority of the Board with respect to each series shall include, but not be limited to, determination of the following:

(a) <u>Number</u>. The number of shares constituting that series and the distinctive designation of that series;

(b) <u>Dividends</u>. The dividend rate on the shares of that series;

(c) <u>Voting Rights</u>. Voting rights relative to that series; provided that, to the maximum extent permitted by the DGCL, to the extent such series has voting rights, such series will vote together with the Common Stock as a class on all matters to be voted on by the holders of the Common Stock; and provided, further, that the holders of Preferred Stock shall not have cumulative voting rights;

(d) <u>Redemption</u>. Whether or not the shares of that series shall be redeemable, and, if so, the terms and conditions of such redemption, including the date or dates upon or after which they shall be redeemable, and the amount per share payable in case of redemption, which amount may vary under different conditions and at different redemption dates;

(e) <u>Rights on Winding Up</u>. The rights of the shares of that series in the event of voluntary or involuntary liquidation, dissolution or winding up of the Corporation; and

(f) <u>Other Rights</u>. Any other relative rights, preferences and limitations of that series.

Section 4.04. *Non-Voting Securities.* The Corporation shall not issue non-voting equity securities; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

The prohibition on the issuance of non-voting equity securities is included in this Certificate in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. §1123(a)(6)).

ARTICLE 5

Section 5.01. *Board of Directors.* The business and affairs of the Corporation shall be managed by or under the direction of the Board. The number of directors of the Corporation shall be determined from time to time in accordance with the By-Laws of the Corporation (the "By-Laws"). Each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal (in accordance with the By-Laws).

ARTICLE 6

Section 6.01. *Limited Liability of Directors.* To the fullest extent permitted by the DGCL, no director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of any fiduciary or other duty as a director, provided that this provision shall not eliminate or limit the liability of a director (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (3) under Section 174 of the DGCL, or (4) for any transaction from which the director derived an improper personal benefit (unless and to the extent the DGCL eliminates this requirement). Neither the amendment nor the repeal of this <u>ARTICLE 6</u> shall eliminate or reduce the effect thereof in respect of any matter occurring, or any cause of action, suit or claim that, but for this <u>ARTICLE 6</u>, would accrue or arise, prior to such amendment or repeal.

Section 6.02. *Indemnification.*

(a) Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (collectively, a "proceeding"), by reason of the fact that he or she is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties or amounts paid in settlement) incurred or suffered by such indemnitee in connection therewith; provided, however, that with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board.

(b) In addition to the right to indemnification conferred in <u>Section 6.02(a)</u>, an indemnitee shall also have the right to be advanced by the Corporation the expenses (including attorneys' fees) incurred in defending any such proceeding in advance of its final disposition (an "advancement of expenses"); provided, however, that, if the DGCL requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation,

service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (an "<u>undertaking</u>") by such indemnitee to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "<u>final adjudication</u>") that such indemnitee is not entitled to be indemnified for such expenses under this <u>Section 6.02(b)</u> or otherwise.

(c)   If a claim under <u>Section 6.02(a)</u> or <u>Section 6.02(b)</u> is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by the DGCL, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In any suit (i) brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses), it shall be a defense that the indemnitee has not met any applicable standard for indemnification set forth under the DGCL, and (ii) brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication with respect to such standard for indemnification.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth under the DGCL, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the indemnitee has not met such applicable standard of conduct shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this <u>ARTICLE 6</u> or otherwise shall be on the Corporation.

(d)   The rights to indemnification and to the advancement of expenses conferred in this <u>ARTICLE 6</u> shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, this Certificate, the By-Laws, agreement or otherwise.

(e)   The Corporation shall maintain customary insurance at its expense to protect any director or officer of the Corporation or another corporation, partnership, joint venture, trust or other enterprise to the maximum extent of the coverage available for any such director or officer under such policy or policies against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

(f)   The Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this <u>ARTICLE 6</u> with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

(g)   The rights conferred upon indemnitees in this <u>ARTICLE 6</u> shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any

amendment, alteration or repeal of this <u>ARTICLE 6</u> that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.  Each non-executive indemnitee shall be entitled to the same indemnification rights (including entering into a director indemnification agreement to the extent any other director of the Corporation is or at any time hereafter becomes a party to such an agreement) and coverage under the Corporation's directors' and officers' insurance policies, as other non-executive indemnitees.  The Corporation acknowledges that certain non-executive indemnitees may have certain rights to indemnification, advancement of expenses and/or insurance provided by the investment funds and accounts to which such indemnitee provides advisory services (collectively, the "<u>Other Indemnitors</u>").  The Corporation hereby agrees (i) that the Corporation is the indemnitor of first resort (i.e., the Corporation's obligations to such indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such indemnitee are secondary), (ii) that the Corporation shall be required to advance the full amount of expenses incurred by such indemnitee and shall be liable for the full amount of all expenses and losses to the extent legally permitted and as required by the terms of this Certificate and/or the By-Laws, without regard to any rights such indemnitee may have against the Other Indemnitors, and (iii) that the Corporation irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Corporation further agrees that no advancement or payment by the Other Indemnitors on behalf of such indemnitee with respect to any claim for which such indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such indemnitee against the Corporation.  The Corporation and such indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this section.

ARTICLE 7

Section 7.01.  *Amendment.*  The Corporation reserves the right to amend this Certificate in any manner permitted by the DGCL and all rights and powers conferred upon stockholders, directors and officers herein are granted subject to this reservation.

Section 7.02.  *Amendment to By-Laws.*  The Board is expressly authorized to make, amend, alter, change, add to or repeal the By-Laws without the assent or vote of the stockholders in any manner not inconsistent with the DGCL or this Certificate.

ARTICLE 8

Section 8.01.  *Forum Selection.*  The Court of Chancery of the State of Delaware (the "<u>Court of Chancery</u>") shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or employee of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the DGCL, this Certificate or the By-Laws of the Corporation, or (d) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (a) through (d) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which

is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction.

Section 8.02. *Severability.*  If any provision or provisions of this Certificate shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Certificate (including, without limitation, each portion of any sentence of this <u>ARTICLE 8</u> containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

ARTICLE 9[1]

Section 9.01.  *Corporate Opportunities.*

(a)  Subject to and following the approval by a majority of the Corporation's directors who are not interested in such Excluded Opportunity, the Corporation shall renounce, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, such Excluded Opportunity.  An "<u>Excluded Opportunity</u>" is any matter, transaction or interest that is presented to, acquired, created or developed by, or which otherwise comes into the possession of (i) any director or officer of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any stockholder or any partner, member, director, stockholder, employee or agent of any such stockholder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, "<u>Covered Persons</u>"), unless such matter, transaction or interest is presented to, acquired, created or developed by, or otherwise comes into the possession of a Covered Person expressly and solely in connection with a Covered Person's capacity as a director, officer or stockholder of the Corporation.

(b)  The foregoing notwithstanding, in recognition and anticipation that (1) certain directors, principals, officers, employees and/or other representatives of Oaktree Capital Management, L.P. ("<u>Oaktree</u>") and its Affiliates (as defined below) may serve as directors, officers or agents of the Corporation and (2) Oaktree and its Affiliates may now engage and continue to engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, the provisions of this <u>ARTICLE 9</u> are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve Oaktree or its  Affiliates and the powers, rights, duties and liabilities of the Corporation and its directors, officers and stockholders in connection therewith.

(c)  None of Oaktree or its Affiliates shall, to the fullest extent permitted by law, have any duty to refrain from directly or indirectly (1) engaging in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages or proposes to engage or (2) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by law, none of Oaktree or its Affiliates shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary or other duty by reason of the fact that Oaktree or its Affiliates engages in any such activities, provided that Oaktree or such Affiliate does not use the Corporation's confidential information or otherwise breach its duty of loyalty in connection with such activities.  To the fullest extent permitted by law and subject to

---

[1] <u>NTD</u>: Subject to further discussion.

and following the approval by a majority of the Corporation's directors who are not interested in such corporate opportunity, the Corporation hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for Oaktree or any of its Affiliates and the Corporation or any of its Affiliates, except as provided in clause (d) of this Section 9.01.

(d) The Corporation does not renounce its interest in any corporate opportunity offered to any director or officer of the Corporation if such opportunity is offered to such person solely in his or her capacity as a director or officer of the Corporation, and the provisions of clause (c) of this Section 9.01 shall not apply to any such corporate opportunity.

(e) The following terms shall have the meanings ascribed to them in this clause: (1) "Affiliate" shall mean (i) with respect to Oaktree, any Person (other than the Corporation and its Affiliates) that, directly or indirectly, controls, is controlled by or is under common control with Oaktree, as applicable, and shall include any principal, member, director, partner, stockholder, officer, employee or other representative of such Person, and (ii) with respect to the Corporation, any Person that, directly or indirectly, is controlled by the Corporation; and (2) "Person" shall mean any individual, corporation, partnership, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any other entity.

(f) Notwithstanding any other provision of this Certificate, and in addition to any vote of the Board required by this Certificate and/or the DGCL, until the last to occur of (i) each of Oaktree and its Affiliates cease to beneficially own (as shall be determined in accordance with Rules 13d-3 and 13d-5 promulgated under the Securities Exchange Act of 1934, as amended) shares of Common Stock representing at least ten percent (10%) of the votes entitled to be cast by the then-outstanding shares of all classes and series of capital stock of the Corporation entitled generally to vote on the election of the directors of the Corporation (or any class thereof) at any annual or special meeting of stockholders, and (ii) no director is serving on the Board pursuant to the right of Oaktree to nominate such director for election to the Board in accordance with the Corporation's Bylaws and pursuant to the Stockholders Agreement of the Corporation, dated as of the Emergence Date (as may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "Stockholders Agreement"), the affirmative vote of the holders of at least eighty percent (80%) of the voting power of the stock outstanding and entitled to vote thereon, voting together as a single class, shall be required to amend, alter, change or repeal, or to adopt any provision as part of this Certificate inconsistent with, any provision of this ARTICLE 9.

(g) None of the amendment, alteration, change or repeal of this ARTICLE 9, nor the adoption of any provision of this Certificate or the Stockholders Agreement inconsistent with this ARTICLE 9 shall eliminate or reduce the effect of this ARTICLE 9 in respect of any matter occurring, or any cause of action, suit or claim that, but for this ARTICLE 9, would accrue or arise, prior to such amendment, alteration, change, repeal or adoption.

(h) To the fullest extent permitted by law, any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this ARTICLE 9.

IN WITNESS WHEREOF, the undersigned has executed this Second Amended and Restated Certificate of Incorporation as of the Emergence Date.

[DB INVESTORS, INC.]

By: _____

Name: _____

Title: _____

**Exhibit 5**

**Form of the New Stockholders' Agreement**

Certain documents, or portions thereof, contained in this <u>Exhibit 5</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

<span style="background-color: yellow">**[DB INVESTORS, INC.]**</span>[1]
**STOCKHOLDERS AGREEMENT**

This Stockholders Agreement (this "Agreement") is made and entered into as of January <span style="background-color: yellow">**[___]**</span>, 2019, by and among <span style="background-color: yellow">**[DB Investors, Inc.]**</span>, a Delaware corporation (the "Company"), and all of the stockholders of the Company who were issued shares of Company Common Stock in the Plan (each such party as identified on Schedule I hereto, together with any Person (as defined below) who hereafter becomes a party to this Agreement, a "Holder" and, collectively, the "Holders"). The Company and the Holders are referred to collectively herein as the "Parties."

In consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties agree as follows:

**1.     Definitions.**  As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Additional Minimum Threshold" means 20% of the outstanding Company Common Stock.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); provided that for purposes of this Agreement, no Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means the sale of Registrable Securities constituting less than 1% of Company Common Stock then outstanding to one or more purchasers in a registered transaction without a prior marketing process by means of (a) a bought deal, (b) a block trade, or (c) a direct sale.

"Approved Transferee" has the meaning set forth in Section 4(a).

"Board" means the board of directors of the Company.

["Business" means the wedding (including bridal) retail, formal wear retail and/or gift registry businesses.][2]

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

---

[1] NTD: Discuss name change from current DB Investors, Inc.

[2] NTD: Subject to further discussion.

"By-Laws" means the Second Amended and Restated By-Laws of the Company as amended from time to time.

"Certificate of Incorporation" means the Second Amended and Restated Certificate of Incorporation of the Company as amended from time to time.

"Chosen Courts" has the meaning set forth in Section 9(e).

"Close of Business" means 5:00 p.m. Eastern Time.

"Commission" means the Securities and Exchange Commission or any other federal agency then administering the Securities Act or Exchange Act.

"Company" has the meaning set forth in the preamble.

"Company Common Stock" means the shares of common stock, par value $0.01 per share, of the Company.

"Company Common Stock Equivalent" has the meaning set forth in Section 8(a).

"Confidential Information" has the meaning set forth in Section 3(b)(i).

"Demand Eligible Holder" has the meaning set forth in Section 7(a)(i).

"Demand Eligible Holder Request" has the meaning set forth in Section 7(a)(i).

"Demand Notice" has the meaning set forth in Section 7(a)(i).

"Demand Registration" has the meaning set forth in Section 7(a)(i).

"Drag-along Notice" has the meaning set forth in Section 6(a)(ii).

"Drag-along Sale" has the meaning set forth in Section 6(a)(i).

"Drag-along Stockholder" has the meaning set forth in Section 6(a)(i).

"Dragging Stockholder" has the meaning set forth in Section 6(a)(i).

"Effectiveness Period" has the meaning set forth in Section 7(a)(iii).

"EV Holder" means Eaton Vance Management and its Affiliates that are Holders.

"Excess New Securities" has the meaning set forth in Section 8(b)(i).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Family Member" means, with respect to any natural Person, such Person's parents, spouse (but not including a former spouse or a spouse from whom such Person is legally separated) and descendants (whether or not adopted) and any trust, family limited partnership or limited liability company that is and remains solely for the benefit of such Person and such Person's spouse (but not including a former spouse or a spouse from whom such Person is legally separated) and/or descendants.

"FINRA" means the Financial Industry Regulatory Authority.

NAI-1505727171v9

"General Directors" means a Person nominated for election as a director by the General Stockholders.

"General Stockholders" means (a) during the Initial Term, the Supporting Term Lenders (other than the EV Holder or its Major Transferee) and (b) following the Initial Term, the Holders of the Company Common Stock.

"Holder" has the meaning set forth in the preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"Holders of a Majority of Included Registrable Securities" means Holders of a majority of the Registrable Securities included in the Registration Statement.

"Indemnified Person" has the meaning set forth in Section 7(k)(i).

"Initial Term" has the meaning set forth in Section 2(a)(iii).

"Issuer Free Writing Prospectus" means an issuer free writing prospectus, as defined in Rule 433, relating to an offer of the Registrable Securities.

"Joinder" has the meaning set forth in Section 4(a).

"Losses" has the meaning set forth in Section 7(k)(i).

"Major Transferee" means an Approved Transferee to which a Nominating Stockholder transfers at least the Minimum Threshold (or in the case of the Oaktree Holder, the Additional Minimum Threshold), in each case so long as such transferee continues to hold at least the Minimum Threshold or the Additional Minimum Threshold, as applicable; *provided*, *however*, that a Major Transferee's rights as a Nominating Stockholder under Section 2 shall be subject to the terms and conditions of Section 2(d). For the avoidance of doubt, if a Major Transferee transfers the Minimum Threshold (or in the case of a Major Transferee that is a transferee of the Oaktree Holder, the Additional Minimum Threshold) to another Approved Transferee, such Approved Transferee shall be deemed a "Major Transferee" so long as such transferee continues to hold at least the Minimum Threshold or the Additional Minimum Threshold, as applicable.

"Management Incentive Plan" means _____.[3]

"Maximum Offering Size" has the meaning set forth in Section 7(a)(iv).

"Minimum Threshold" means 10% of the outstanding Company Common Stock.

"Necessary Approval" has the meaning set forth in Section 5.

"New Issuance Notice" has the meaning set forth in Section 8(a).

"New Securities" has the meaning set forth in Section 8(a).

"Nominating Stockholder" means each of the Oaktree Holder, the EV Holder or a Major Transferee of the Oaktree Holder or the EV Holder, in each case so long as such Person holds at least the Minimum Threshold.

---

[3] NTD: Name to be inserted.

"Non-Recourse Party" has the meaning set forth in Section 9(m).

"Oaktree Holder" means Oaktree Capital Management and its Affiliates that are Holders.

"Other Registrable Securities" means (a) Company Common Stock, (b) any securities issued or issuable with respect to, on account of or in exchange for Company Common Stock, whether by stock split, stock dividend, recapitalization, merger, consolidation or other reorganization, charter amendment or otherwise and (c) any options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in clauses (a) and (b) above, in each case held by any other Person who has rights to participate in any offering of securities by the Company pursuant to a registration rights agreement or other similar arrangement with the Company or any direct or indirect parent of the Company relating to the Company Common Stock (which shall not include this Agreement).

"Parties" has the meaning set forth in the preamble.

"Person" means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Piggyback Eligible Holders" has the meaning set forth in Section 7(b)(i).

"Piggyback Notice" has the meaning set forth in Section 7(b)(i).

"Piggyback Registration" has the meaning set forth in Section 7(b)(i).

"Piggyback Registration Statement" has the meaning set forth in Section 7(b)(i).

"Plan" means the Joint Prepackaged Chapter 11 Plan of Reorganization of David's Bridal, Inc. and certain of its debtor affiliates under chapter 11 of Title 11 of the United States Code.

"Preemptive Rightholder" has the meaning set forth in Section 8(a).

"Preferred Stock" has the meaning set forth in the Certificate of Incorporation.

"Proportionate Percentage" has the meaning set forth in Section 8(b)(i).

"Proposed Price" has the meaning set forth in Section 8(a).

"Proposed Transferee" has the meaning set forth in Section 6(b)(i).

"Prospectus" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A promulgated under the Securities Act), all amendments and supplements to the Prospectus, including post-effective amendments, all material incorporated by reference or deemed to be incorporated by reference in such Prospectus and any Issuer Free Writing Prospectus.

"Public Offering" means any sale to the public pursuant to a public offering registered (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 is applicable) under the Securities Act.

NAI-1505727171v9

"<u>QIPO</u>" means an initial public offering pursuant to which the Company Common Stock is admitted for trading on the New York Stock Exchange, The NASDAQ Stock Market or the London Stock Exchange's Main Market with an aggregate offering value (net of underwriters' discounts and selling commissions) of at least $**[50,000,000]**[4].

"<u>Qualified Holder</u>" means one or more Holders who beneficially own in the aggregate 25% or more of the outstanding shares of Company Common Stock as of the date of determination.

"<u>Registrable Securities</u>" means (a) any Company Common Stock, (b) any securities issued or issuable with respect to, on account of or in exchange for Company Common Stock, whether by stock split, stock dividend, recapitalization, merger, consolidation or other reorganization, charter amendment or otherwise and (c) any options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in clauses (a) and (b) above, in each case that are held by the Holders and their respective Affiliates or any transferee or assignee of any Holder or its Affiliates after giving effect to a transfer made in compliance with <u>Section 4(a)</u>, in each case, whether now held or hereafter acquired, all of which securities are subject to the rights provided herein until such rights terminate pursuant to the provisions of this Agreement.  As to any particular Registrable Securities, such securities shall not be Registrable Securities when (i) a Registration Statement registering such Registrable Securities under the Securities Act has been declared effective and such Registrable Securities have been sold, transferred or otherwise disposed of by the Holder thereof pursuant to such effective Registration Statement, (ii) such Registrable Securities are sold, transferred or otherwise disposed of pursuant to Rule 144, (iii) such securities cease to be outstanding, or (iv) such securities are held by a Holder who, together with its Affiliates, holds less than 1% of the outstanding shares of Company Common Stock and in the hands of such Holder, all such securities may be sold pursuant to Rule 144 without limitations.

"<u>Registration Expenses</u>" means (a) all registration, qualification and filing fees and expenses (including fees and expenses (i) of the Commission or FINRA, (ii) incurred in connection with the listing of the Registrable Securities on the Trading Market, and (iii) in compliance with applicable state securities or "Blue Sky" laws (including reasonable fees and disbursements of counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities)); (b) printing expenses (including expenses of printing certificates for the Company's shares and of printing prospectuses); (c) analyst or investor presentation or road show expenses of the Company and the underwriters, if any; (d) messenger, telephone and delivery expenses; (e) fees and disbursements of counsel (including any local counsel), auditors and accountants for the Company (including the expenses incurred in connection with "comfort letters" required by or incident to such performance and compliance); (f) the reasonable fees and disbursements of underwriters to the extent customarily paid by issuers or sellers of securities (including, if applicable, the fees and expenses of any "qualified independent underwriter" and its counsel) that are required to be retained in accordance with the rules and regulations of FINRA and the other reasonable fees and disbursements of underwriters (including reasonable fees and disbursements of counsel for the underwriters) in connection with any FINRA qualification; (g) fees and expenses of any special experts retained by the Company; (h) Securities Act liability insurance, if the Company so desires such insurance; (i) reasonable fees and disbursements of one counsel (along with any reasonably necessary local counsel) representing all Holders participating in such registration mutually agreed by Holders of a Majority of Included Registrable Securities participating in such registration; and (j) fees and expenses payable in connection with any ratings of the Registrable Securities, including expenses relating to any presentations to rating agencies.

---

[4] NTD: Subject to further discussion.

NAI-1505727171v9

"Registration Statement" means a registration statement of the Company filed with or to be filed with the Commission under the Securities Act and other applicable law, including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Related Party" has the meaning set forth in Section 2(j).

"Related Party Transaction" has the meaning set forth in Section 2(j).

"Representative Director" means a Person nominated for election as a director by a Nominating Stockholder.

"Representatives" of a Holder means its partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 145" means Rule 145 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 158" means Rule 158 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 405" means Rule 405 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 433" means Rule 433 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Sale Notice" has the meaning set forth in Section 6(b)(ii).

"Seasoned Issuer" means an issuer eligible to use Form S-3 under the Securities Act and who is not an "ineligible issuer" as defined in Rule 405.

"Securities Act" means the Securities Act of 1933, as amended.

"Selling Expenses" means all underwriting fees, discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and related legal and other fees of a Holder not included within the definition of Registration Expenses.

"Selling Stockholder" has the meaning set forth in Section 6(b)(i).

"Specified Issuance" has the meaning set forth in Section 8(c).

"Subject Purchaser" has the meaning set forth in Section 8(a).

"Subsidiary" means, when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Supporting Term Lender" has the meaning set forth in that certain Restructuring Support Agreement, dated as of November 18, 2018, by and among the Company, DB Holdco, Inc., DB Midco, Inc. and the other parties thereto.

"Suspension Period" has the meaning set forth in Section 7(d).

"Tag-along Notice" has the meaning set forth in Section 6(b)(iii).

"Tag-along Period" has the meaning set forth in Section 6(b)(iii).

"Tag-along Sale" has the meaning set forth in Section 6(b)(i).

"Tag-along Seller" has the meaning set forth in Section 6(b)(iii).

"Tag-along Stockholder" has the meaning set forth in Section 6(b)(i).

"Trading Market" means the principal national securities exchange in the United States on which Registrable Securities are (or are to be) listed.

"Warrants" means the warrants representing the right to acquire _____[5] shares of Company Common Stock issued pursuant to the Plan.

"Warrant Agreement" means the Warrant Agreement, dated the date hereof, by and between the Company and **[TBD]**, pursuant to which the Warrants were issued.

"WKSI" means a "well known seasoned issuer" as defined under Rule 405 and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also a Seasoned Issuer.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections, paragraphs and clauses refer to Sections, paragraphs and clauses of this Agreement; (c) the terms "include," "includes," "including" or words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) unless the context otherwise requires, the term "or" is not exclusive and shall have the inclusive meaning of

---

[5] NTD: Figure to be inserted.

"and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall be deemed to refer to such law or statute as amended or supplemented from time to time and shall include all rules and regulations and forms promulgated thereunder, and references to any law, rule, form or statute shall be construed as including any legal and statutory provisions, rules or forms consolidating, amending, succeeding or replacing the applicable law, rule, form or statute; (h) references to any Person include such Person and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated. Each of the Parties hereto acknowledges that each Party was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against any Party hereto because one is deemed to be the author thereof.

2. **Board of Directors.**

(a) <u>Composition and Size</u>. From and after the date hereof, each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary or desirable actions within its control (including calling special board and stockholder meetings), so that:

(i) the number of directors constituting the Board is seven directors;

(ii) the following individuals are elected and continue to serve as directors of the Board:

(A) two individuals designated by the Oaktree Holder or its Major Transferee, as applicable, so long as the Oaktree Holder or its Major Transferee, as applicable, holds the Additional Minimum Threshold; *provided*, *however*, if the Oaktree Holder or its Major Transferee, as applicable ceases to hold the Additional Threshold but continues to hold the Minimum Threshold, the number of individuals the Oaktree Holder or its Major Transferee, as applicable, shall have the right to designate shall be reduced to one;

(B) one individual designated by the EV Holder or its Major Transferee, as applicable, so long as the EV Holder or its Major Transferee, as applicable, holds the Minimum Threshold;

(C) [four individuals collectively designated (and, after the Initial Term, collectively elected) by the General Stockholders;][6]

(iii) the individuals nominated as directors as of the date hereof shall, subject to each such individual's resignation or removal by the applicable Nominating Stockholder (in the case of a Representative Director) or by the General Stockholders (in the case of the General Directors), serve as directors on the Board until the annual meeting of the stockholders of the Company in 2020 (such term, the "<u>Initial Term</u>");

---

[6] NTD: Subject to further discussion.

(iv)    at each annual meeting of the stockholders of the Company (or in connection with any written consent in lieu of an annual meeting) at which a Nominating Stockholder and/or the General Stockholders are entitled to nominate a Representative Director and/or a General Director, as applicable, the Person(s) so nominated shall be elected or reelected, as applicable, at such annual meeting (or in such written consent, if applicable); and

(v)    at the election of the Oaktree Holder or its Major Transferee, and for so long as the Oaktree Holder or its Major Transferee holds the Additional Minimum Threshold, one director nominated by the Oaktree Holder or its Major Transferee shall also serve as a director of the Company's Subsidiaries and participate [in the committees established by the boards of directors of the Company's Subsidiaries][7].

(b)    <u>Company Action</u>.  The Company shall take all actions necessary to cause the nomination of the persons contemplated by <u>Section 2(a)</u>, including causing such Persons to be included in the slate of nominees recommended by the Board to the Holders for election as directors.

(c)    <u>Minimum Threshold</u>.  If a Nominating Stockholder ceases to hold at least its Minimum Threshold or Additional Minimum Threshold, as applicable, at any time following the date hereof (including following such Holder's transfer of its Minimum Threshold or Additional Minimum Threshold, as applicable, to a Major Transferee), (i) such Holder's designee (or in the case of the Oaktree Holder or its Major Transferee that ceases to hold the Additional Minimum Threshold but continues to hold the Minimum Threshold, the designee of its choosing) shall be removed immediately from the Board without further action by the Board and the resulting vacancy shall be filled in accordance with the By-Laws and this Agreement and (ii) thereafter such Nominating Stockholder (or such Major Transferee) shall no longer have the right to nominate a director (or in the case of the Oaktree Holder or its Major Transferee that ceases to hold the Additional Minimum Threshold but continues to hold the Minimum Threshold, such Holder shall no longer have the right to nominate two directors) and the number of directors who shall be nominated in accordance with <u>Section 2(a)(ii)(C)</u> shall be increased by one. Furthermore, if the Oaktree Holder or its Major Transferee ceases to hold the Additional Minimum Threshold, the director serving as a director of the Company's Subsidiaries and on their respective committees shall be removed immediately from such positions without further action by the governing bodies of such Subsidiaries and the resulting vacancy shall be filled in accordance with the organizational documents of such Subsidiaries.

(d)    <u>Assignment of Nominating Stockholder Rights</u>.  A Nominating Stockholder, in such Nominating Stockholder's sole discretion, shall have the right to assign all (but not less than all) of its rights under this <u>Section 2</u> to one (but not more than one) Major Transferee.  If a Nominating Stockholder shall exercise such right, the Nominating Stockholder must deliver written notice thereof to the Company, and the Company shall within three Business Days thereafter deliver written notice thereof to all of the other Holders.  For the avoidance of doubt, (i) any Holder that assigns its rights under this <u>Section 2</u> as a Nominating Stockholder shall no longer be a Nominating Stockholder or have any rights as a Nominating Stockholder hereunder and (ii) the right of the Oaktree Holder or its Major Transferee to designate two individuals so long as it holds the Additional Minimum Threshold shall not be assigned to more than one Major Transferee.

(e)    <u>Nomination of Directors</u>.  Notwithstanding anything to the contrary in the By-Laws, unless a Nominating Stockholder provides written notice to the Company and its Representative Director, as applicable, no later than 60 days prior to an annual meeting of the

---

[7] NTD: Subject to further discussion.

stockholders of the Company (or at any time prior to a solicitation by written consent in lieu of such annual meeting) that the then-current Representative Director will not be nominated for reelection to the Board at such annual meeting of the stockholders of the Company (or through such written consent in lieu of such annual meeting), such then-current Representative Director shall be automatically nominated for reelection to the Board at such annual meeting (or through such written consent in lieu of such annual meeting) unless at the time of such meeting (or such written consent) such Nominating Stockholder no longer has the right to nominate a Representative Director.

(f)     _Increase in Board Size_.  Any increase in the number of directors on the Board shall require the prior written consent of each Nominating Stockholder.

(g)     _Removal of Directors_.  Notwithstanding anything to the contrary in the By-Laws, (i) a Representative Director may be removed with or without cause at any time by his or her Nominating Stockholder and (ii) a General Director may be removed with or without cause at any time by the General Stockholders, in each case by the relevant Nominating Stockholder or the General Stockholders, as applicable, providing written notice to the Board at least one Business Day prior to the effectiveness of such removal.

(h)     _Vacancies on the Board_.  Notwithstanding anything to the contrary in the By-Laws, any vacancy on the Board resulting from the death, designation, removal or otherwise of a Representative Director or a General Director shall be filled by the relevant Nominating Stockholder or the General Stockholders, as applicable; _provided_, _however_, a majority of the remaining members of the Board may fill any vacancy not filled by the relevant Nominating Stockholder or the General Stockholders, as applicable, within 90 days after such vacancy.  In recognition of Article 9 of the Company's Second Amended and Restated Certificate of Incorporation, the Oaktree Holder agrees that at any time its Representative Director(s) engage in the Business (including by serving as a director, officer, manager or employee of any Person), the Oaktree Holder shall promptly remove such Representative Director(s) and shall designate a replacement Representative Director that is not engaged in the Business; _provided that_ for purposes of this Section 2(h), "engage" or "engaged" shall mean that the revenues derived from the Business constitute [50%][8] or more of the total revenues of the applicable Person during the last full fiscal year for which consolidated financial statements of such Person are available.

(i)     _Quorum_.  The presence of the Representative Directors shall be required for a quorum for the transaction of business of the Board.

(j)     _Related Party Transactions_.  The Board shall take reasonable steps to cause the Company to enact controls so that the Company does not, and does not permit any of its Subsidiaries to, enter into any agreement or transaction (or amendment or modification thereto) with any Holder owning more than 5% of the Company Common Stock, any director or officer of the Company or any of its Subsidiaries or any "affiliate", "associate" or member of the "immediate family" (as such terms are respectively defined in Rule 12b-2 and 16a-1 of the Exchange Act) of any such Holder, director or officer (collectively, a "Related Party"), except in connection with a Holder's (other than a director or officer's) employment with the Company or such Subsidiary in the ordinary course of business, without the affirmative vote of a majority of the members of the Board (excluding any director who is, or is a Related Party of, the Person with whom the Company or any of its Subsidiaries is proposing to enter into the relevant agreement or transaction (or amendment or modification thereto)) (a "Related Party Transaction"), subject to all other requirements in this Agreement, the Certificate of

---

[8] NTD: Subject to further discussion.

Incorporation and the By-Laws necessary to effectuate an act of the Board. In any case, all Related Party Transactions must be on arm's-length terms; *provided*, *however*, that any issuance of equity securities pursuant to the pre-emptive rights described in Section 8 below shall not be deemed a Related Party Transaction; *provided further*, that approval by the Board of a Related Party Transaction in accordance with the terms of this <u>Section 2(j)</u> shall be deemed to be conclusive evidence that the Related Party Transactions is on arm's length terms.

(k)     <u>Governing Documents</u>.  In the event of any conflict between the terms and provisions of this Agreement and those contained in the Certificate of Incorporation, By-Laws and other similar governing documents of the Company, the terms and provisions of this Agreement shall govern and control to the maximum extent permitted by the DGCL.

## 3.     <u>Information Rights.</u>

(a)     <u>Financial Statements; Earnings Calls</u>.[9]  The Company will furnish to each Holder the following: (i) within 45 days following the conclusion of each of the Company's fiscal quarters ending after the date hereof, quarterly unaudited consolidated financial statements of the Company and its Subsidiaries; and (ii) within 90 days after the end of each fiscal year, annual audited consolidated financial statements of the Company and its Subsidiaries. Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Company will provide a telephonic presentation to the Representatives of Holders to discuss the Company's financial condition and results of operations, following which presentation the Company will allow Representatives of the Holders to ask reasonable questions. Any recipient of financial statements and any participant in quarterly calls (including bona fide potential transferees described in the last sentence of this <u>Section 3(a)</u>) (x) shall not be engaged in (whether as a director, advisor, Affiliate, employee or representative), and shall not own **[20]**% or more of, any Person that is actively engaged in, the Business, and such recipient must certify to the same and (y) shall be subject to <u>Section 3(b)</u>; *provided that* for purposes of this <u>Section 3(a)</u>, "engaged" shall mean that the revenues derived from the Business constitute **[50%]**[10] or more of the total revenues of the applicable Person during the last fiscal year for which consolidated financial statements of such Person are available; *provided further that* the Supporting Term Lenders and the Oaktree Holder shall not be subject to the certification requirement in the foregoing clause (x).  Each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of <u>Section 3(b)</u> if such Representative or recipient were party to this Agreement.  With respect to any recipient who is a bona fide potential transferee of Company Common Stock, the applicable Holder must obtain from such recipient prior to sharing any such information a confidentiality agreement that (1) contains provisions no less restrictive than those set forth in <u>Section 3(b)</u> and (2) expressly names the Company as a third-party beneficiary of such confidentiality agreement.

(b)     <u>Confidentiality</u>.

(i)     Each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement (the "<u>Confidential Information</u>") is confidential and competitively sensitive.  Each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed pursuant to clause (A) below to use, the Confidential Information only in connection with its investment in the shares of Company Common Stock and not for any other purpose (including to disadvantage competitively the Company or any other

---

[9] NTD: Timing to be synced with credit facility requirements.

[10] NTD: Subject to further discussion.

Holder). Each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(A) to the Holder's Representatives in the normal course of the performance of their duties for such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 3(b));

(B) to the extent requested or required by applicable law, rule or regulation; *provided* that the Holder shall give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Holder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(C) to any Person to whom the Holder is contemplating a transfer of its shares of Company Common Stock permitted in accordance with the terms hereof; *provided* that such Person is not prohibited from receiving such information pursuant to this Section 3 and, prior to such disclosure, such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a form approved by the Board and which agreement is independently enforceable by the Company;

(D) to any regulatory authority or rating agency to which the Holder or any of its Affiliates is subject or with which it has regular dealings, as long as such authority or agency is advised of the confidential nature of such information;

(E) in connection with the Holder's or the Holder's Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Holder or the Holder's Affiliates, or prospective merger partner of the Holder or the Holder's Affiliates; *provided* that prior to such disclosure the Persons to whom such information is disclosed are advised of the confidential nature of such information and executes a non-disclosure agreement in a form approved by the Board; or

(F) if the prior written consent of the Company shall have been obtained.

(ii) Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or the Holder. The restrictions contained in this Section 3(b) shall terminate 18 months following the date on which the Holder ceases to own any shares of Company Common Stock.

(iii) Confidential Information does not include information that: (A) is or becomes generally available to the public (including as a result of any information filed or submitted by the Company with the Commission) other than as a result of a disclosure by the Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) is or was available to the Holder or its Representatives on a non-confidential basis prior to its disclosure to the Holder or its Representatives by the

-12-

Company, or (C) was or becomes available to the Holder or its Representatives on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of the Holder's or its Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person.

## 4. Transfer Restrictions.

(a) <u>Requirements for Transfer</u>. Each Holder agrees that it shall not transfer any of its Company Common Stock except (i) in compliance with the Securities Act, any other applicable securities or "blue sky" laws, (ii) in accordance with the terms and conditions of the By-Laws, the Certificate of Incorporation and this Agreement, (iii) unless otherwise approved by the Board, to a transferee that is not engaged in (whether as a director, advisor, Affiliate, employee or representative), and does not own **[20]**% or more of, any Person that is actively engaged in, the Business, and such transferee must provide a certification to same, and (iv) with a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u> (a "<u>Joinder</u>") executed and delivered by the transferee (the transferee of any such transfer being an "<u>Approved Transferee</u>"); *provided that* transfers (x) pursuant to a Drag-along Sale in accordance with <u>Section 6</u> hereof shall not be subject to the restrictions in the foregoing clause (iii) or (y) to Affiliates of the Supporting Term Lenders and the Oaktree Holder shall not be subject to the certification requirement in the foregoing clause (iii); *provided further* that for purposes of this <u>Section 4(a)</u>, "engaged" shall mean that the revenues derived from the Business constitute **[50%]**[11] or more of the total revenues of the applicable transferee or Person during the last full fiscal year for which consolidated financial statements of such transferee or Person are available. The Company shall update <u>Schedule I</u> from time to time to reflect (A) any additional Holders that are Approved Transferees or new Holders that become party hereto in accordance with this Agreement's terms, (B) the removal of any Persons who are no longer Holders and (C) any changes in any Holder's address. In no event may any transfer of Company Common Stock or Preferred Stock by any Holder be made if such transfer would result in the Company having more than 475 (or such higher number established by the Board from time to time) holders of record of capital stock of the Company. In addition, the Holders agree that the Board may prohibit a transfer of Company Common Stock or Preferred Stock by one Holder to 20 or more new Holders, *provided* that the Board may not prohibit such transfer if (a) the transferor is an investment fund, and (b) the transfer results from the wind-down of such investment fund. Any attempt to transfer any shares of Company Common Stock not in compliance with this Agreement, the By-Laws and the Certificate of Incorporation shall be null and void *ab initio*, and the Company shall not give any effect in the Company's stock records to such attempted transfer. Nothing in this <u>Section 4</u> shall affect any restrictions on transfer contained in any other contract by and among the Company and any of the Holders, or by and among any of the Holders.

(b) <u>New Issuances</u>. No shares of capital stock (including any shares of Company Common Stock or Preferred Stock) shall be issued to any Person who is not a party to this Agreement (including upon the exercise of any options or other shares of capital stock issued to any director, officer or employee of the Company under any employee benefit plan) unless and until such Person shall have executed and delivered to the Company a Joinder. For the avoidance of doubt, any holder of Company Common Stock issued upon the exercise of the Warrants shall automatically be deemed to be a party to this Agreement without further action or signature, including any requirement to execute and deliver a Joinder, in accordance with terms of the Warrant Agreement governing the Warrants.

---

[11] NTD: Subject to further discussion.

**5.** **[Major Decisions**. The Company shall not, and shall not permit any of its Subsidiaries to, take any of the following actions without the prior written approval of Holders owning in the aggregate not less than 60% of the voting power of the Company's capital stock (the "Necessary Approval"):

(a) sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of related transactions) assets or stock of another Person held by the Company or any of its Subsidiaries with a value greater than $50,000,000;

(b) incur after the date hereof any debt for borrowed money (whether in one transaction or in a series of related transactions) in excess of $50,000,000, excluding intercompany debt between or among the Company and any of its wholly owned Subsidiaries;

(c) other than (i) issuances to the Company or any of its Subsidiaries, (ii) issuances upon exercise of any Warrants or under the Management Incentive Plan or (iii) issuances that are subject to the process set forth in Section 8, issue or authorize for issuance (A) any Preferred Stock or (B) any other stock (including Common Stock) or equity instrument of the Company or any of its Subsidiaries, except in the case of clause (B) in a transaction or a series of related transactions that will result in aggregate proceeds of less than $50,000,000; or

(d) merge or consolidate with any other Person (other than the Company or a wholly owned Subsidiary) or sell, transfer, exclusively license, lease or otherwise dispose of (whether in one transaction or in a series of related transactions) all or substantially all of the assets of the Company or any of its Subsidiaries.][12]

**6.** **Tag-along and Drag-along Rights.**

(a) Drag-along Rights.

(i) If at any time a Holder or group of Holders who hold 50% or more of the outstanding voting power of the Company's capital stock (a "Dragging Stockholder"), receives a bona fide offer from a third party purchaser to consummate, in one transaction, or a series of related transactions, the sale of the Company (a "Drag-along Sale"), the Dragging Stockholder shall have the right to require that each other Holder (each, a "Drag-along Stockholder") participate in such transfer in the manner set forth in this Section 6(a), *provided*, *however*, to the extent the drag-along right is sought to be exercised in connection with a transfer by a Holder to an Affiliate of such Holder, the drag-along shall not be effective unless and until approved by a majority of the disinterested directors on the Board acting in accordance with their fiduciary duties. Notwithstanding anything to the contrary in this Agreement, each Drag-along Stockholder shall vote in favor of the transaction and take all actions to waive any dissenters, appraisal or other similar rights.

(ii) The Dragging Stockholder shall exercise its rights pursuant to this Section 6(a) by delivering a written notice (the "Drag-along Notice") to the Company no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy of the Drag-along Notice to each Drag-along Stockholder. The Drag-along Notice shall make reference to the Dragging Stockholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of shares of Company Common Stock to be sold by the Dragging Stockholder, if the Drag-along Sale is structured as a transfer of Company Common Stock; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other

---

[12] NTD: Subject to further discussion.

NAI-1505727171v9

material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith to the extent available.

(iii)    The consideration to be received by a Drag-along Stockholder shall be the same form and amount of consideration per share of Common Stock to be received by the Dragging Stockholder (or, if the Dragging Stockholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Stockholder transfers its Common Stock. Any (A) representations and warranties to be made or provided by a Drag-along Stockholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such Drag-along Stockholder's authority, ownership and the ability to convey title to its Common Stock, and with respect thereto, shall be the same representations and warranties that the Dragging Stockholder make or provide with respect to their Common Stock, (B) Drag-along Stockholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Stockholders shall be the same covenants, indemnities and agreements as the Dragging Stockholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Stockholder, the Drag-along Stockholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; *provided that* any indemnification obligation relating to the Company shall be pro rata based on the consideration received by the Dragging Stockholder and each Drag-along Stockholder, in each case in an amount not to exceed the aggregate proceeds received by the Dragging Stockholder and each such Drag-along Stockholder in connection with the Drag-along Sale.

(iv)    The fees and expenses of the Dragging Stockholder incurred in connection with a Drag-along Sale and for the benefit of all Stockholders as determined in good faith by the Board, excluding any director appointed or nominated by any Dragging Stockholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Stockholder for its sole benefit will not be considered to be for the benefit of all Stockholders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Stockholders on a pro rata basis, based on the aggregate consideration received by each Stockholder; *provided that* no Stockholder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

(v)    Each Stockholder shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Stockholder.

(vi)    The Dragging Stockholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Stockholder has not completed the Drag-along Sale, the Dragging Stockholder may not then effect a transaction subject to this Section 6(a) without again fully complying with the provisions of this Section 6(a).

(b)    Tag-along Rights.

(i)     If at any time a Holder or group of Holders who holds 50% or more of the outstanding voting power of the Company's capital stock (the "Selling Stockholder") proposes to transfer any of its or their shares of Company Common Stock to a third party purchaser (the "Proposed Transferee") and the Selling Stockholder cannot or has not elected to exercise its drag-along rights set forth in Section 6(a), each other Holder (each, a "Tag-along Stockholder") shall be permitted to participate in such transfer (a "Tag-along Sale") on the terms and conditions set forth in this Section 6(b).

(ii)     Prior to the consummation of any such transfer of Company Common Stock described in Section 6(b)(i), the Selling Stockholder shall deliver to the Company and each other Holder a written notice (a "Sale Notice") of the proposed Tag-along Sale subject to this Section 6(b) no later than 10 days prior to the closing date of the Tag-along Sale. The Sale Notice shall make reference to the Tag-along Stockholders' rights hereunder and shall describe in reasonable detail: (A)  the aggregate number of shares of Company Common Stock the Proposed Transferee has offered to purchase; (B) the identity of the Proposed Transferee; (C) the proposed date, time and location of the closing of the Tag-along Sale; (D) the per share purchase price and the other material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)     Each Tag-along Stockholder may exercise its right to participate in a transfer of Company Common Stock by the Selling Stockholder subject to this Section 6(b) by delivering to the Selling Stockholder a written notice (a "Tag-along Notice") stating its election to do so and specifying the number of shares of Company Common Stock to be transferred by it no later than five days after receipt of the Sale Notice (the "Tag-along Period"). The offer of each Tag-along Stockholder set forth in a Tag-along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-along Stockholder shall be bound and obligated to transfer in the proposed transfer on the terms and conditions set forth in this Section 6(b). Each Tag-along Stockholder that timely delivers a Tag-along Notice (a "Tag-along Seller") shall have the right to transfer in a transfer subject to this Section 6(b) up to the number of shares of Company Common Stock equal to the product of (x) the aggregate number of shares of Company Common Stock owned by the Tag-along Seller and (y) a fraction (A) the numerator of which is equal to the number of shares of Company Common Stock proposed to be sold by the Selling Stockholder in the Tag-along Sale, and (B) the denominator of which is equal to the number of shares of Company Common Stock owned by the Selling Stockholder.

(iv)     Each Tag-along Stockholder who does not deliver a Tag-along Notice in compliance with Section 6(b)(iii) above shall be deemed to have waived all of such Tag-along Stockholder's rights to participate in such transfer, and the Selling Stockholder shall (subject to the rights of any Tag-along Seller) thereafter be free to transfer to the Proposed Transferee its shares of Company Common Stock at a per share price that is no greater than the per share price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Stockholder than those set forth in the Sale Notice without any further obligation to the non-accepting Tag-along Stockholders.

(v)     Each Tag-along Seller shall receive the same consideration per share as the Selling Stockholder after deduction of such Tag-along Seller's proportionate share of the related expenses in accordance with Section 6(b)(vii) below.

(vi)     Each Tag-along Seller shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Stockholder makes or provides in connection with the Tag-along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Selling

Stockholder, the Tag-along Seller shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); *provided that* all representations, warranties, covenants and indemnities shall be made by the Selling Stockholder and each Tag-along Seller severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties shall be pro rata based on the consideration received by the Selling Stockholder and each Tag-along Seller, in each case in an amount not to exceed the aggregate proceeds received by the Selling Stockholder and each such Tag-along Seller in connection with any Tag-along Sale.

(vii)     The fees and expenses of the Selling Stockholder incurred in connection with a Tag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any director appointed or nominated by any Dragging Stockholder or its Affiliates (it being understood that costs incurred by or on behalf of the Selling Stockholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by all the Holders participating in the Tag-along Sale on a pro rata basis, based on the aggregate consideration received by each such Holder; *provided, that* no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Tag-along Sale.

(viii)     Each Tag-along Seller shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Selling Stockholder.

(ix)     The Selling Stockholder shall have 120 days following the expiration of the Tag-along Period in which to transfer the shares of Common Stock described in the Sale Notice and the shares to be sold by the Tag-along Sellers, on the terms set forth in the Sale Notice (which such 120 day period may be extended for a reasonable time not to exceed 150 days to the extent reasonably necessary to obtain any government approvals). If at the end of such 120 day period, the Selling Stockholder has not completed such transfer, the Selling Stockholder may not then effect a transfer of Common Stock subject to this <u>Section 6(b)</u> without again fully complying with the provisions of this <u>Section 6(b)</u>.

(x)     If the Selling Stockholder transfers to the Proposed Transferee any of its shares of Company Common Stock in breach of this <u>Section 6(b)</u>, then each Tag-along Stockholder shall have the right to transfer to the Selling Stockholder, and the Selling Stockholder undertakes to purchase from each Tag-along Stockholder, the number of shares of Company Common Stock that such Tag-along Stockholder would have had the right to transfer to the Proposed Transferee pursuant to this <u>Section 6(b)</u>, for a per share amount and form of consideration and upon the terms and conditions on which the Proposed Transferee bought such Company Common Stock from the Selling Stockholder, but without indemnity being granted by any Tag-along Stockholder to the Selling Stockholder; *provided, that*, nothing contained in this <u>Section 6(b)</u> shall preclude any Stockholder from seeking alternative remedies against such Selling Stockholder as a result of its breach of this <u>Section 6(b)</u>. The Selling Stockholder shall also reimburse each Tag-along Stockholder for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Tag-along Stockholder's rights.

7.     <u>Registration Rights.</u>

(a)     <u>Demand Registration</u>.

NAI-1505727171v9

(i)        At any time and from time to time commencing **[180]** days after the consummation of an initial Public Offering upon written notice to the Company (a "Demand Notice") delivered by a Qualified Holder(s) requesting that the Company effect the registration (a "Demand Registration") under the Securities Act (other than pursuant to a registration statement on Form S-4 or Form S-8 or any similar or successor form under the Securities Act) of any or all of the Registrable Securities held by such Qualified Holder(s) (which offering is expected to yield aggregate gross proceeds of at least $**[50,000,000 – 75,000,000]**), the Company shall promptly (but in any event, not later than five  Business Days following the Company's receipt of such Demand Notice) give written notice of the receipt of such Demand Notice to all other Holders that, to its knowledge, hold Registrable Securities (each, a "Demand Eligible Holder"). The Company shall promptly file the appropriate Registration Statement (the "Demand Registration Statement") subject to Section 7(a)(ii) and use its commercially reasonable efforts to effect, at the earliest practicable date, the registration under the Securities Act and under the applicable state securities laws of (A) the Registrable Securities which the Company has been so requested to register by the Qualified Holder(s) in the Demand Notice, (B) all other Registrable Securities of the same class or series as those requested to be registered by the Qualified Holder(s) that the Company has been requested to register by the Demand Eligible Holders by written request (the "Demand Eligible Holder Request") given to the Company within ten Business Days after the giving of such written notice by the Company, and (C) any Registrable Securities to be offered and sold by the Company, in each case subject to Section 7(a)(ii), all to the extent required to permit the disposition (in accordance with the intended methods of disposition) of the Registrable Securities to be so registered.

(ii)        Demand Registration Using Form S-3.  The Company shall effect any requested Demand Registration using Form S-3 whenever the Company is a Seasoned Issuer or a WKSI and is eligible to use such form under applicable rules.  Subject to the terms and conditions of this Agreement, for so long as the Company remains a Seasoned Issuer or a WKSI, the Qualified Holder(s) shall have the right to make an unlimited number of requests for Demand Registration on Form S-3; provided that the Company shall not be obligated to effect (x) more than two Demand Registrations in any six-month period and (y) a registration pursuant to Section 7(a) unless the Registrable Securities requested to be registered by Qualified Holder(s), together with the Registrable Securities requested to be registered by the Demand Eligible Holders and Other Registrable Securities requested to be included, in such registration are  expected to yield aggregate gross proceeds of at least $**[50,000,000 – 75,000,000]**.

(iii)        Effectiveness of Demand Registration Statement. The Company shall use its commercially reasonable efforts to have the Demand Registration Statement declared effective by the Commission and keep the Demand Registration Statement continuously effective under the Securities Act for the period of time necessary for the underwriters or Holders to sell all the Registrable Securities covered by such Demand Registration Statement or such shorter period which will terminate when all Registrable Securities covered by such Demand Registration Statement have been sold pursuant thereto (including by filing with the Commission a post-effective amendment or a supplement to the Demand Registration Statement or the related Prospectus or any document incorporated therein by reference or by filing any other required document or otherwise supplementing or amending the Demand Registration Statement, in each case, if required by the rules, regulations or instructions applicable to the registration form used by the Company for such Demand Registration Statement or by the Securities Act, any state securities or "blue sky" laws, or any other rules and regulations thereunder or if otherwise necessary) (the "Effectiveness Period").  A Demand Registration requested pursuant to this Section 7(a) shall not be deemed to have been effected (A) if the Demand Registration Statement is withdrawn without becoming effective, (B) if the Demand Registration Statement has not been declared effective or does not remain effective in compliance with the provisions of the Securities Act and the laws of any state or other

jurisdiction applicable to the disposition of the Registrable Securities covered by such Registration Statement for the Effectiveness Period, (C) if, after it has become effective, such Registration Statement is subject to any stop order, injunction or other order or requirement of the Commission or other governmental or regulatory agency or court for any reason other than a violation of applicable law solely by any selling Holder and has not thereafter become effective, (D) in the event of an underwritten offering, if the conditions to closing specified in the underwriting agreement entered into in connection with such registration are not satisfied or waived other than by reason of some wrongful act or omission by a Qualified Holder, or (E) if the Company does not include in the applicable Registration Statement any Registrable Securities held by a Holder that are required by the terms hereof to be included in such Registration Statement.

(iv)     Priority of Registration.  Notwithstanding any other provision of this Section 7(a), if (A) the Qualified Holder(s) intend to distribute the Registrable Securities covered by a Demand Registration by means of an underwritten offering and (B) the managing underwriters advise the Company that in their reasonable view, the number of Registrable Securities proposed to be included in such offering (including Registrable Securities requested by Holders to be included in such offering and any securities that the Company or any other Person proposes to be included that are not Registrable Securities) exceeds the number of shares of Company Common Stock that can be sold in such underwritten offering and/or the number of shares of Company Common Stock proposed to be included in such Demand Registration would adversely affect the price per share of the Company Common Stock proposed to be sold in such underwritten offering (in either situation, the "Maximum Offering Size"), then the Company shall so advise the Qualified Holder(s) and the Demand Eligible Holders with Registrable Securities requested to be included in such underwritten offering, and shall include in such offering the number of Registrable Securities which can be so sold in the following order of priority, up to the Maximum Offering Size:  (1) first, the Registrable Securities requested to be included in such underwritten offering by the Qualified Holders and the Demand Eligible Holders, allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among the Qualified Holders and Demand Eligible Holders on the basis of the number of Registrable Securities requested to be included therein by each such Holder, up to the Maximum Offering Size, (2) second, any securities proposed to be registered by the Company, and (3) third, Other Registrable Securities requested to be included in such underwritten offering to the extent permitted hereunder, allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among the respective holders of such Other Registrable Securities on the basis of the number of securities requested to be included therein by each such holder.  For any Holder of Other Registrable Securities that is a partnership, limited liability company, corporation or other entity, the partners, members, stockholders, Subsidiaries, parents and Affiliates of such Holder, or the estates and Family Members of any such partners/members and retired partners/members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "Holder," and any pro rata reduction with respect to such Other Registrable Securities shall be based upon the aggregate amount of securities requested to be included in such registration by all entities and individuals included in such Other Registrable Securities.

(v)     Underwritten Demand Registration.  The determination of whether any offering of Registrable Securities pursuant to a Demand Registration will be an underwritten offering shall be made in the sole discretion of the Holders of a Majority of Included Registrable Securities included in such underwritten offering, and such Holders of a Majority of Included Registrable Securities shall have the right to (A) determine the plan of distribution, including the price at which the Registrable Securities are to be sold and the underwriting commissions, discounts and fees, and (B) select the investment banker(s) and manager(s) to administer the offering (which shall consist of one or more reputable nationally recognized investment banks

reasonably satisfactory to the Company) and one firm of counsel to represent all of the Holders (along with any reasonably necessary local counsel), in connection with such Demand Registration; *provided*, that the Company shall select such investment banker(s) and manager(s) if the Holders of such Majority of Included Registrable Securities cannot so agree on the same within a reasonable time period.

(vi)     Withdrawal of Registrable Securities.  Any Holder whose Registrable Securities were to be included in any such registration pursuant to this Section 7(a) may elect to withdraw any or all of its Registrable Securities therefrom, without liability to any of the other Holders and without prejudice to the rights of any such Holder to include Registrable Securities in any future registration (or registrations), by written notice to the Company delivered on or prior to the effective date of the relevant Demand Registration Statement.

(b)     Piggyback Registration.

(i)     Registration Statement on behalf of the Company.  If at any time the Company proposes to file a Registration Statement for an offering of Registrable Securities (for purposes of this section, irrespective of the holders thereof) for cash (excluding a Public Offering, an offering relating solely to an employee benefit plan, an offering relating to a transaction on Form S-4, a rights offering or an offering on any form of Registration Statement that does not permit secondary sales) (a "Piggyback Registration Statement"), the Company shall give prompt written notice (the "Piggyback Notice") to all Holders that, to its knowledge, hold Registrable Securities (collectively, the "Piggyback Eligible Holders") of the Company's intention to file a Piggyback Registration Statement reasonably in advance of (and in any event at least ten Business Days before) the anticipated filing date of such Piggyback Registration Statement. The Piggyback Notice shall offer the Piggyback Eligible Holders the opportunity to include for registration in such Piggyback Registration Statement the number of Registrable Securities of the same class and series as those proposed to be registered as they may request, subject to Section 7(b)(ii) (a "Piggyback Registration").  Subject to Section 7(b)(ii), the Company shall use its commercially reasonable efforts to include in each such Piggyback Registration such Registrable Securities for which the Company has received written requests (each, a "Piggyback Request") from Piggyback Eligible Holders within five Business Days after giving the Piggyback Notice.  If a Piggyback Eligible Holder decides not to include all of its Registrable Securities in any Piggyback Registration Statement thereafter filed by the Company, such Piggyback Eligible Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent Piggyback Registration Statements or other Registration Statements as may be filed by the Company with respect to offerings of Registrable Securities, all upon the terms and conditions set forth herein.  The Company shall use its commercially reasonable efforts to effect the registration under the Securities Act of all Registrable Securities which the Company has been so requested to register pursuant to the Piggyback Requests, to the extent required to permit the disposition of the Registrable Securities so requested to be registered.

(ii)     Priority of Registration.  If the Piggyback Registration under which the Company gives notice pursuant to Section 7(b)(i) is an underwritten offering, and the managing underwriter or managing underwriters of such offering advise the Company and the Piggyback Eligible Holders that, in their reasonable view the amount of securities requested to be included in such registration (including Registrable Securities requested by the Piggyback Eligible Holders to be included in such offering and any securities that the Company or any other Person proposes to be included that are not Registrable Securities) exceeds the Maximum Offering Size (which, for the purposes of a Piggyback Registration shall be within a price range acceptable to the Company), then the Company shall so advise all Piggyback Eligible Holders with Registrable Securities requested to be included in such Piggyback Registration, and shall

NAI-1505727171v9

include in such offering the number which can be so sold in the following order of priority, up to the Maximum Offering Size: (A) first, the securities that the Company proposes to sell up to the Maximum Offering Size, (B) second, the Registrable Securities requested to be included in such Piggyback Registration, allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among the Piggyback Eligible Holders on the basis of the number of Registrable Securities requested to be included therein by each such Piggyback Eligible Holder, up to the Maximum Offering Size, and (C) third, Other Registrable Securities requested to be included in such Piggyback Registration, allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among the holders thereof on the basis of the number of securities requested to be included therein by each such holder. All Piggyback Eligible Holders requesting to be included in the Piggyback Registration must sell their Registrable Securities to the underwriters selected as provided in Section 7(b)(iv) on the same terms and conditions as apply to the Company if such underwritten offering is consummated, subject to such Holders' right to withdraw described in the immediately succeeding sentences. Promptly (and in any event on the same day the Company receives notice) following receipt of notification by the Company from the managing underwriter of a range of prices at which such Registrable Securities are likely to be sold, the Company shall so advise each Piggyback Eligible Holder requesting registration in such offering of such price. If any Piggyback Eligible Holder disapproves of the terms of any such underwriting (including the price offered by the underwriter(s) in such offering), such Piggyback Eligible Holder may elect to withdraw any or all of its Registrable Securities therefrom, without liability to any of the other Holders and without prejudice to the rights of any such Holder to include Registrable Securities in any future Piggyback Registration or other Registration Statement, by written notice to the Company and the managing underwriter(s) delivered on or prior to the effective date of such Piggyback Registration Statement. Any Registrable Securities withdrawn from such underwritten offering shall be excluded and withdrawn from the registration. For any Piggyback Eligible Holder that is a partnership, limited liability company, corporation or other entity, the partners, members, stockholders, Subsidiaries, parents and Affiliates of such Piggyback Eligible Holder, or the estates and Family Members of any such partners/members and retired partners/members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "Piggyback Eligible Holder," and any pro rata reduction with respect to such "Piggyback Eligible Holder" shall be based upon the aggregate amount of securities requested to be included in such registration by all entities and individuals included in such "Piggyback Eligible Holder," as defined in this sentence.

(iii)     Withdrawal from Registration.   The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 7(b) prior to the effective date of such Registration Statement, whether or not any Piggyback Eligible Holder has elected to include Registrable Securities in such Registration Statement, without prejudice, however, to the right of the Holders immediately to request that such registration be effected as a registration under Section 7(a) to the extent permitted thereunder and subject to the terms set forth therein. The Company shall promptly give notice of the withdrawal or termination of any registration to each Piggyback Eligible Holder who has elected to participate in such registration. The Registration Expenses of such withdrawn  or terminated registration shall be borne by the Company in accordance with Section 7(j) hereof.

(iv)     Selection of Bankers and Counsel.  If a Piggyback Registration pursuant to this Section 7(b) involves an underwritten offering, the Company shall have the right, in consultation with the Holders of a Majority of Included Registrable Securities included in such underwritten offering, to (A) determine the plan of distribution, including the price at which the Registrable Securities are to be sold and the underwriting commissions, discounts and fees and (B) select the investment banker or bankers and managers to administer the offering, including the lead managing underwriter or underwriters.

NAI-1505727171v9

(v)     Effect of Piggyback Registration.   No registration effected under this Section 7(b) shall relieve the Company of its obligations to effect any registration of the offer and sale of Registrable Securities upon request under Section 7(a), and no registration effected pursuant to this Section 7(b) shall be deemed to have been effected pursuant to Section 7(a).

(c)     Notice Requirements.   Any Demand Notice, Demand Eligible Holder Request or Piggyback Request shall (i) specify the maximum number and class or series of Registrable Securities intended to be offered and sold by the Holder making the request, (ii) express such Holder's bona fide intent to offer up to such maximum number of Registrable Securities for distribution, (iii) describe the nature or method of the proposed offer and sale of Registrable Securities (to the extent applicable), and (iv) contain the undertaking of such Holder to provide all such information and materials and take all action, in each case, as may reasonably be required in order to permit the Company to comply with all applicable requirements in connection with the registration of such Registrable Securities.

(d)     Suspension Period.   Notwithstanding any other provision of this Section 7, the Company shall have the right, but not the obligation, to defer the filing of (but not the preparation of), or suspend the use by the Holders of, any Registration Statement for a period of up to 45 days (unless a longer period is consented to by Holders of a Majority of Included Registrable Securities) (i) upon issuance by the Commission of a stop order suspending the effectiveness of such Registration Statement with respect to Registrable Securities or the initiation of proceedings with respect to such Registration Statement under Section 9(d) or 8(e) of the Securities Act; or (ii) (x) if the Company's board of directors determines, in its good faith judgment, that any such registration or offering should not be undertaken because it would reasonably be expected to materially interfere with any material corporate development or plan of the Company or (y) if the Company believes in good faith that it would require the Company (after consultation with external legal counsel), under applicable securities laws and other laws, to make disclosure of material nonpublic information that would not otherwise be required to be disclosed at that time and the Company believes in good faith that such disclosures at that time would not be in the Company's best interests; *provided* that this exception (y) shall continue to apply only during the time that such material nonpublic information has not been disclosed and remains material; *provided* that the Holders shall have Piggyback Registration rights with respect to such primary underwritten offering in accordance with and subject to the restrictions set forth in Section 7(b) (any such period, a "Suspension Period"); *provided*, *however*, that in such event, the Qualified Holders will be entitled to withdraw any request for a Demand Registration and, if such request is withdrawn, such Demand Registration will not count as a Demand Registration under Section 7(a) and the Company will pay all Registration Expenses in connection with such registration; and *provided*, *further*, that in no event shall the Company declare a Suspension Period more than once in any 12-month period. The Company shall (i) give prompt written notice to the Holders of its declaration of a Suspension Period and of the expiration or termination of the relevant Suspension Period and (ii) promptly resume the process of filing or requesting for effectiveness, or update the suspended Registration Statement, as the case may be, as may be necessary to permit the Holders to offer and sell their respective Registrable Securities in accordance with applicable law.   If the filing of any Demand Registration is suspended pursuant to this Section 7(d), once the Suspension Period ends, the Qualified Holders may request a new Demand Registration.

(e)     Required Information.   The Company may require each Holder of Registrable Securities as to which any Registration Statement is being filed or sale is being effected to furnish to the Company such information regarding the intended method of distribution of such securities and such other information relating to such Holder and its ownership of Registrable Securities as the Company may from time to time reasonably request in writing (provided that such information shall be used only in connection with such registration) and the Company may

NAI-1505727171v9

exclude from such registration or sale the Registrable Securities of any such Holder who fails to furnish such information within a reasonable time after receiving such request. Each Holder agrees to furnish such information to the Company and to cooperate with the Company as reasonably necessary to enable the Company to comply with the provisions of this Agreement.

(f)     Other Registration Rights Agreements.  The Company has not entered into and, unless agreed in writing by each Holder on or after the date of this Agreement, will not enter into, any agreement or arrangement that (i) is inconsistent with the rights granted to the Holders with respect to Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof in any material respect or (ii) other than as set forth in this Agreement, would allow any holder of Company Common Stock or other securities of the Company to include such securities in any Registration Statement filed by the Company on a basis that is more favorable in any material respect to the rights granted to the Holders hereunder. For the avoidance of doubt, granting a Person registration rights that would have priority over the Registrable Securities with respect to the inclusion of such securities in any registration would constitute granting registration rights to such Person on a basis that is more favorable in a material respect with respect to the rights granted to the Holders and would require the prior written consent of each Holder under this Agreement.

(g)     Cessation of Registration Rights.  All registration rights granted under this Section 7 shall continue to be applicable with respect to any Holder until such Holder no longer holds any Registrable Securities.  In the event the Company engages in a merger or consolidation in which the Registrable Securities of the Company are converted into securities of another Person, the Company will use its commercially reasonable efforts to make appropriate arrangements so that the registration rights provided under this Agreement continues to be provided by the issuer of such securities. To the extent such new issuer, or any other Person acquired by the Company in a merger or consolidation, was bound by registration rights that would conflict with the provisions of this Agreement, the Company will use its commercially reasonable efforts to modify any such "inherited" registration rights so as not to interfere in any material respect with the rights provided under this Agreement.

(h)     Lock-Up Agreement.  Each Holder of Registrable Securities agrees that in connection with any registered offering of the Company Common Stock in connection with this Section 7, and upon the request of the managing underwriter in such offering, such holder shall not, without the prior written consent of such managing underwriter, during the period commencing on the effective date of such registration and ending on the date specified by such managing underwriter (such period not to exceed 90 days), (i) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any shares of Company Common Stock or any securities convertible into, exercisable for or exchangeable for shares of Company Common Stock held immediately before the effectiveness of the Registration Statement for such offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Company Common Stock or such other securities, in cash or otherwise. The foregoing provisions of this Section 7(h) shall not apply to holders of Registrable Securities that own less than 5% of outstanding Company Common Stock. Each holder of Registrable Securities agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter that are consistent with the foregoing or that are necessary to give further effect thereto.

(i)     Registration Procedures.  The procedures to be followed by the Company and each participating Holder to register the sale of Registrable Securities pursuant to a Registration

Statement in accordance with this Agreement, and the respective rights and obligations of the Company and such Holders with respect to the preparation, filing and effectiveness of such Registration Statement, are as follows:

(i)     The Company will (A) prepare and file a Registration Statement or a Prospectus, as applicable, with the Commission (within the time period specified in <u>Section 7(a)</u>) which Registration Statement (1) shall be on a form required by this Agreement (or if not so required, selected by the Company) for which the Company qualifies, (2) shall be available for the sale of the Registrable Securities in accordance with the intended method or methods of distribution, and (3) shall comply as to form in all material respects with the requirements of the applicable form and include and/or incorporate by reference all financial statements required by the Commission to be filed therewith, (B) use its commercially reasonable efforts to cause such Registration Statement to become effective and remain effective for the periods provided under <u>Section 7(a)</u>, (C) use its commercially reasonable efforts to prevent the occurrence of any event that would cause a Registration Statement to contain a material misstatement or omission or to be not effective and usable for resale of the Registrable Securities registered pursuant thereto (during the period that such Registration Statement is required to be effective as provided under <u>Section 7(a)</u>), and (D) cause each Registration Statement and the related Prospectus and any amendment or supplement thereto, as of the effective date of such Registration Statement, amendment or supplement, (x) to comply in all material respects with any requirements of the Securities Act and the rules and regulations of the Commission and (y) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. The Company will, (1) at least five Business Days prior to the anticipated filing of a Registration Statement or any related Prospectus or any amendment or supplement thereto (including any documents incorporated by reference therein) or before using any Issuer Free Writing Prospectus, furnish to such Holders, the Holders' counsel and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, copies of all such documents proposed to be filed and make such of the representatives of the Company as shall be reasonably requested by the Holders available for discussion of such documents, (2) use its commercially reasonable efforts to address in each such document prior to being so filed with the Commission such comments as each such Holder, its counsel or underwriter reasonably shall propose and (3) not file any Registration Statement or any related Prospectus or any amendment or supplement thereto containing information regarding a participating Holder to which such participating Holder objects.

(ii)     The Company will as promptly as reasonably practicable (A) prepare and file with the Commission such amendments, including post-effective amendments, and supplements to each Registration Statement and the Prospectus used in connection therewith as (1) may be reasonably requested by any Holder of Registrable Securities covered by such Registration Statement necessary to permit such Holder to sell in accordance with its intended method of distribution or (2) may be necessary under applicable law to keep such Registration Statement continuously effective with respect to the disposition of all Registrable Securities covered thereby for the periods provided under <u>Section 7(a)</u> in accordance with the intended method of distribution and, subject to the limitations contained in this Agreement, prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the Holders, (B) cause the related Prospectus to be amended or supplemented by any required prospectus supplement, and as so supplemented or amended, to be filed pursuant to Rule 424, (C) respond to any comments received from the Commission with respect to each Registration Statement or Prospectus or any amendment thereto, and (D) as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the Commission relating to such Registration Statement or Prospectus other than any comments that the

Company determines in good faith would result in the disclosure to such Holders of material non-public information concerning the Company that is not already in the possession of such Holder.

(iii)    The Company will comply in all material respects with the provisions of the Securities Act and the Exchange Act (including Regulation M under the Exchange Act) with respect to each Registration Statement and the disposition of all Registrable Securities covered by each Registration Statement.

(iv)    The Company will notify such Holders that hold Registrable Securities and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, as promptly as reasonably practicable: (A)(1) when a Registration Statement, any pre-effective amendment, any Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement or any free writing prospectus is proposed to be filed; (2) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments on such Registration Statement (in which case the Company shall provide true and complete copies thereof and all written responses thereto to each Holder, its counsel and each underwriter, if applicable, other than information which the Company determines in good faith would constitute material non-public information that is not already in the possession of such Holder); and (3) with respect to each Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (B) of any request by the Commission or any other federal or state governmental or regulatory authority for amendments or supplements to a Registration Statement or Prospectus or for additional information (whether before or after the effective date of the Registration Statement) or any other correspondence with the Commission or any such authority relating to, or which may affect, the Registration Statement; (C) of the issuance by the Commission or any other governmental or regulatory authority of any stop order, injunction or other order or requirement suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or preventing or suspending the use of any Prospectus or the initiation or threatening of any Proceedings for such purpose; (D) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; (E) if, at any time, the representations and warranties of the Company in any applicable underwriting agreement or similar agreement cease to be true and correct in all material respects; or (F) of the occurrence of any event that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or if, as a result of such event or the passage of time, such Registration Statement, Prospectus or other documents requires revisions so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, or when any Issuer Free Writing Prospectus includes information that may conflict with the information contained in the Registration Statement or Prospectus, or if, for any other reason, it shall be necessary during such time period to amend or supplement such Registration Statement or Prospectus in order to comply with the Securities Act, which shall correct such misstatement or omission or effect such compliance.

(v)    The Company will use its commercially reasonable efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (A) any stop order or other order suspending the effectiveness of a Registration Statement or preventing or suspending the use of any Prospectus, or (B) any suspension of the qualification (or exemption from qualification) of any of

NAI-1505727171v9

the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment, or if any such order or suspension is made effective during any Suspension Period, at the earliest practicable moment after the Suspension Period is over.

(vi)     During the Effectiveness Period, the Company will furnish to each selling Holder, its counsel and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, upon their request, without charge, at least one conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such selling Holder, counsel or underwriter (including those incorporated by reference) promptly after the filing of such documents with the Commission.

(vii)     The Company will promptly deliver to each selling Holder, its counsel and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, without charge, as many copies of each Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such selling Holder, counsel or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities by such selling Holder or underwriter.  The Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders and any applicable underwriter in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(viii)     The Company will use its commercially reasonable efforts to (A) register and qualify, or cooperate with the selling Holders, their counsel, the underwriters, if any, and counsel for the underwriters in connection with the registration or qualification (or exemption from such registration or qualification) of, the Registrable Securities covered by a Registration Statement, no later than the time such Registration Statement is declared effective by the Commission, under all applicable securities laws (including the "blue sky" laws) of such jurisdictions each underwriter, if any, or any selling Holder shall reasonably request; (B) keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective under the terms of this Agreement and (C) do any and all other acts and things which may be reasonably necessary or advisable to enable such underwriter, if any, and each selling Holder to consummate the disposition of the Registrable Securities covered by such Registration Statement in each such jurisdiction; *provided, however,* that the Company will not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process (other than service of process in connection with such registration or qualification or any sale of Registrable Securities in connection therewith) in any such jurisdiction.

(ix)     To the extent that the Company has certificated shares of Company Common Stock, the Company will cooperate with each selling Holder and the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if applicable, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as each selling Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, may request in writing.  In connection therewith, if required by the Company's transfer agent, the Company will promptly, after the effective date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to and maintained with such transfer agent, together with any other authorizations, certificates and directions required by the transfer agent which

authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, of such Registrable Securities pursuant to the Registration Statement.

(x)     Upon the occurrence of any event contemplated by Section 7(i)(iv)(F), as promptly as reasonably practicable, the Company will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference or to the applicable Issuer Free Writing Prospectus, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, in light of the circumstances under which they were made) not misleading and no Issuer Free Writing Prospectus will include information that conflicts with information contained in the Registration Statement or Prospectus, such that each selling Holder can resume disposition of such Registrable Securities covered by such Registration Statement or Prospectus.

(xi)     Selling Holders may distribute the Registrable Securities by means of an underwritten offering; *provided* that (A) such Holders provide to the Company a Demand Notice of their intention to distribute Registrable Securities by means of an underwritten offering, (B) the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwritten offering and the inclusion of such Holder's Registrable Securities in the underwritten offering to the extent provided herein, (C) each Holder participating in such underwritten offering agrees to enter into customary agreements, including an underwriting agreement in customary form, and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Holders entitled to select the managing underwriter or managing underwriters hereunder (*provided* that any such Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties, agreements and indemnities regarding such Holder, such Holder's title to the Registrable Securities, such Holder's intended method of distribution, and the accuracy of information contained in the applicable Registration Statement or the related Prospectus concerning such Holder as provided by or on behalf of such Holder and the aggregate amount of the liability of such Holder in connection with such offering shall not exceed such Holder's net proceeds from the disposition of such Holder's Registrable Securities in such offering) and (D) each Holder participating in such underwritten offering completes and executes all questionnaires, powers of attorney, custody agreements and other documents reasonably required under the terms of such underwriting arrangements. The Company hereby agrees with each Holder that, in connection with any underwritten offering in accordance with the terms hereof, it will negotiate in good faith, execute and perform its obligations under all indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements, and will procure auditor "comfort" letters addressed to the underwriters in the offering from the Company's independent certified public accountants or independent auditors (and, if necessary, any other independent certified public accountants or independent auditors of any Subsidiary of the Company or any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement) in customary form and covering such matters of the type customarily covered by comfort letters for an underwritten public offering as the underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement.

NAI-1505727171v9

(xii)     The Company will obtain for delivery to the underwriter or underwriters of an underwritten offering of Registrable Securities an opinion or opinions and a negative assurance letter from counsel for the Company (including any local counsel reasonably requested by the underwriters) dated the most recent effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, covering the matters customarily covered in opinions and negative assurance letters requested in sales of securities or public underwritten offerings, which opinions shall be reasonably satisfactory to such underwriters and their counsel.

(xiii)     For a reasonable period prior to the filing of any Registration Statement and throughout the Effectiveness Period, and in respect of any offering of Registrable Securities, the Company will make available upon reasonable notice at the Company's principal place of business or such other reasonable place for inspection by any selling Holder of Registrable Securities covered by the applicable Registration Statement, by any managing underwriter or managing underwriters selected in accordance with this Agreement and by any attorney, accountant or other agent retained by such Holders or underwriter, such financial and other information and books and records of the Company, and cause the officers, employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably requested by such Holders, underwriters, attorneys, accountants or agents (and in the case of counsel, not violate an attorney-client privilege in such counsel's reasonable belief) to conduct a reasonable investigation within the meaning of the Securities Act.

(xiv)     The Company will (A) provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement and provide and enter into any customary agreements with a custodian for the Registrable Securities and (B) not later than the effective date of the applicable Registration Statement, provide a CUSIP number for all Registrable Securities included in such Registration Statement.

(xv)     The Company will cooperate with each Holder of Registrable Securities and each underwriter or agent participating in the disposition of Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA and in performance of any due diligence investigations by any underwriter.

(xvi)     The Company will use its commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, the Trading Market, FINRA and any state securities authority, and make available to each Holder, as soon as reasonably practicable after the effective date of the Registration Statement, an earnings statement covering at least 12 months, which shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158.

(xvii)     The Company will use its commercially reasonable efforts to ensure that any Issuer Free Writing Prospectus utilized in connection with any Prospectus complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related Prospectus, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(xviii)     In connection with any registration of Registrable Securities pursuant to this Agreement, the Company will take all commercially reasonable actions as are necessary or advisable in order to expedite or facilitate the disposition of Registrable Securities by such

Holders, including furnishing to the selling Holders and/or any underwriters such further customary certificates, opinions and documents as they may reasonably request using commercially reasonable efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable advance notice, to meet with prospective investors in presentations, meetings and road shows.

(xix)   The Company shall use its commercially reasonable efforts to list the Company Common Stock and any other Registrable Securities of any class or series covered by a Registration Statement on the New York Stock Exchange or The Nasdaq Global Market or any successor national securities exchange.  Following the listing of the Company Common Stock and any other Registrable Securities on the New York Stock Exchange or The Nasdaq Global Market or any successor national securities exchange, the Company will use its commercially reasonable efforts to maintain such listing.

(xx)   The Company shall, if for an underwritten offering is pursuant to a Registration Statement on Form S-3 or any similar short-form registration, include in such Registration Statement such additional information for marketing purposes as the managing underwriter(s) reasonably request(s).

(xxi)   The Company shall use its commercially reasonable efforts to cooperate in a timely manner with any reasonable and customary request of the Holders in respect of any Alternative Transaction, including entering into customary agreements with respect to such Alternative Transactions (and providing customary representations, warranties, covenants and indemnities in such agreements) as well as providing other reasonable assistance in respect of such Alternative Transactions of the type applicable to a Public Offering subject to this Section 7, to the extent customary for such transactions.

(xxii)   Each Holder agrees by its acquisition of Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in clauses (B) through (D) and (F) of Section 7(i)(iv) or the occurrence of a Suspension Period, such Holder will forthwith discontinue disposition of such Registrable Securities under the applicable Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus or amended Registration Statement or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement.  In the event the Company shall give any such notice, the period during which the applicable Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented Prospectus or amended Registration Statement or is advised in writing by the Company that the use of the Prospectus may be resumed.

(j)   Registration Expenses.  The Company shall bear all reasonable Registration Expenses incident to the Parties' performance of or compliance with their respective obligations under this Agreement or otherwise in connection with any Demand Registration or Piggyback Registration (excluding any Selling Expenses), whether or not any Registrable Securities are sold pursuant to a Registration Statement.  In addition, the Company shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including expenses payable to third parties and including all salaries and expenses of the Company's officers and employees performing legal or accounting duties), the expense of any annual audit and any underwriting fees, discounts, selling commissions and stock transfer taxes and related legal and other fees applicable to securities sold by the

NAI-1505727171v9

Company and in respect of which proceeds are received by the Company. Each Holder shall pay any Selling Expenses applicable to the sale or disposition of such Holder's Registrable Securities pursuant to any Demand Registration Statement or Piggyback Registration Statement, in proportion to the amount of such selling Holder's shares of Registrable Securities sold in any offering under such Demand Registration Statement or Piggyback Registration Statement.

(k)     Indemnification.

(i)     The Company shall indemnify and hold harmless each underwriter, if any, engaged in connection with any registration referred to in Section 7 and provide representations, covenants, opinions and other assurances to such underwriter in form and substance reasonably satisfactory to such underwriter and the Company. Further, the Company shall indemnify and hold harmless each Holder, its partners, stockholders, equityholders, general partners, managers, members, and Affiliates and each of their respective officers and directors and any Person who controls any such Holder (within the meaning of the Securities Act or the Exchange Act) and any employee or Representative thereof (each, an "Indemnified Person" and collectively, "Indemnified Persons"), to the fullest extent permitted by law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys', accountants' and experts' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act, the Exchange Act or otherwise (collectively, "Losses"), as incurred, arising out of, based upon, resulting from or relating to (A) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, Prospectus (including in any preliminary prospectus (if used prior to the effective date of such Registration Statement)), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto or in any documents incorporated or deemed incorporated by reference in any of the foregoing, (B) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements made therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, or (C) any violation or alleged violation by the Company or any of its Subsidiaries of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any federal, state, foreign or common law rule or regulation in connection with such Registration Statement, disclosure document or related document or report or any offering covered by such Registration Statement, and the Company shall reimburse such Indemnified Person for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability, demand, action, suit or proceeding; provided, however, that the Company shall not be liable to any Indemnified Person to the extent that any such Losses arise out of, are based upon or results from an untrue or alleged untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Indemnified Person specifically for use therein.

(ii)     In connection with any Registration Statement filed by the Company pursuant to Section 7 hereof in which a Holder has registered for sale its Registrable Securities, each such selling Holder agrees (severally and not jointly) to indemnify and hold harmless, to the fullest extent permitted by law, the Company, its directors and officers, employees, agents and each Person who controls the Company (within the meaning of the Securities Act or the

NAI-1505727171v9

Exchange Act) and any other Holder selling securities under such Registration Statement, its partners, stockholders, equityholders, general partners, managers, members, and Affiliates and each of their respective officers and directors and any Person who controls such other Holder (within the meaning of the Securities Act or the Exchange Act) and any employee or Representative thereof from and against any Losses resulting from (A) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which such Registrable Securities were registered or sold under the Securities Act, Prospectus (including in any preliminary prospectus (if used prior to the effective date of such Registration Statement)), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto or in any documents incorporated by reference in any of the foregoing, (B) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, or (C) any violation or alleged violation by such Holder of any federal, state or common law rule or regulation relating to action or inaction in connection with any information provided by such Holder in such registration, disclosure document or related document or report in the case of clauses (A) and (B) to the extent, but only to the extent, that such untrue statement or omission occurs in reliance upon and in conformity with any information furnished in writing by or on behalf of such selling Holder to the Company specifically for inclusion in such registration, disclosure document or related document or report and has not been corrected in a subsequent writing prior to the sale of the Registrable Securities thereunder, and the Holder will reimburse the Company for any legal or other expenses reasonably incurred by it in connection with investigating or defending such Losses. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder under the sale of Registrable Securities giving rise to such indemnification obligation less any amounts paid by such Holder in connection with such sale.

(iii)     Any Indemnified Person under paragraph (i) or (ii) of this <u>Section 7(k)</u> shall (A) give prompt written notice to the indemnifying person under paragraph (i) or (ii) of this <u>Section 7(k)</u> of any claim with respect to which it seeks indemnification (*provided* that any delay or failure to so notify the indemnifying person shall not relieve the indemnifying party of its obligations hereunder except to the extent, if at all, that the indemnifying person's ability to defend such claim (through the forfeiture of substantive rights or defenses) is actually and materially prejudiced by reason of such delay or failure) and (B) permit such indemnifying person to assume the defense of such claim with counsel reasonably satisfactory to the Indemnified Person; *provided*, *however*, that any Indemnified Person shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (1) the indemnifying person has agreed in writing to pay such fees or expenses, (2) the indemnifying person shall have failed to assume the defense of such claim and employ counsel reasonably satisfactory to such Indemnified Person within a reasonable time after receipt of notice of such claim from the Indemnified Person, (3) the Indemnified Person has reasonably concluded (based upon advice of its counsel) that there may be legal defenses available to it or other Indemnified Persons that are different from or in addition to those available to the indemnifying person, or (4) in the reasonable judgment of any such Indemnified Person (based upon advice of its counsel) a conflict of interest may exist between such Indemnified Person and the indemnifying person with respect to such claims (in which case, if the Indemnified Person notifies the indemnifying person in writing that such Indemnified Person elects to employ separate counsel at the expense of the indemnifying person, the indemnifying person shall not have the right to assume the defense of such claim on behalf of such Indemnified Person).  If any action is settled or if there be a final judgment for the plaintiff, the indemnifying person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment.  No action may be settled without the prior written consent of the

Indemnified Person (which consent shall not be unreasonably withheld, delayed or conditioned), *provided* that the prior written consent of the Indemnified Person shall not be required if (x) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such settlement; (y) such settlement provides for the payment by the indemnifying person of money as the sole relief for such action and (z) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person. It is understood that the indemnifying person or persons shall not, except as specifically set forth in this <u>Section 7(k)(iii)</u>, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements or other charges of more than one separate firm (in addition to any local counsel that is required to effectively defend against any such proceeding) for all Indemnified Persons and that all such fees and expenses shall be paid or reimbursed promptly.

(iv) If the indemnification provided for in this <u>Section 7(k)</u> is held by a court of a competent jurisdiction to be unavailable to an Indemnified Person with respect to any loss, damage, claim or liability, the indemnifying party, in lieu of indemnifying such Indemnified Person thereunder, shall to the extent permitted by law, contribute to the amount paid or payable by such Indemnified Person as a result of such loss, damage, claim or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the Indemnified Person on the other in connection with the actions that resulted in such loss, claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying person and of the Indemnified Person shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying person or Indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Parties agree that it would not be just and equitable if contribution pursuant to this <u>Section 7(k)(iv)</u> were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding sentences. Notwithstanding the provisions of this <u>Section 7(k)(iv)</u>, no selling Holder shall be required to contribute any amount in excess of the net proceeds (after deducting the underwriters' discounts and commissions) received by such selling Holder in the offering. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. Each selling Holder's obligation to contribute pursuant to this <u>Section 7(k)(iv)</u> is several in the proportion that the net proceeds of the offering received by such selling Holder bears to the total net proceeds of the offering received by all such selling Holders and not joint.

(v) The remedies provided for in this <u>Section 7(k)</u> are not exclusive and shall not limit any rights or remedies which may otherwise be available to any Indemnified Person at law or in equity. The obligations of the Company and Holders under this <u>Section 7(k)</u> shall survive completion of any offering of Registrable Securities pursuant to a Registration Statement and the termination of this Agreement.

(l) <u>Facilitation of Sales Pursuant to Rule 144</u>. The Company shall use its commercially reasonable efforts to timely file the reports required to be filed by it under the Exchange Act or the Securities Act and the rules adopted by the Commission thereunder (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144 under the Securities Act), and shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act within the

limitations of the exemption provided by Rule 144 under the Securities Act. Upon the written request of any Holder in connection with that Holder's sale pursuant to Rule 144 under the Securities Act, the Company shall deliver to such Holder a written statement as to whether it has complied with such requirements. This <u>Section 7(l)</u> shall apply only after a Public Offering.

## 8. <u>Future Issuance of Shares; Preemptive Rights.</u>

(a) <u>Offering Notice</u>. Except for (a) options to purchase Company Common Stock or restricted stock which may be issued pursuant to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company, (b) a stock split, stock dividend, reorganization or recapitalization applicable to all shares of Company Common Stock, (c) equity securities of the Company issued upon exercise, conversion or exchange of any security or obligation, including the Warrants, which is by its terms convertible into or exchangeable or exercisable for shares of Company Common Stock (such security or obligation, a "<u>Company Common Stock Equivalent</u>"), either (x) previously issued or (y) issued in accordance with the terms of this Agreement, (d) equity securities of the Company issued in consideration of an acquisition, business combination or debt financing (whether pursuant to a stock purchase, asset purchase, merger or otherwise), approved by the Board, and, if applicable, the Holders, in accordance with the terms of this Agreement, by the Company of another Person, (e) issuances to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board, (f) issuances as consideration approved by the Board payable to a third party that is not an Affiliate of the Company for any other business relationship the primary purpose of which is not to raise capital, including for the acquisition or license of technology by the Company or its Subsidiaries, joint venture or development activities or the distribution, supply or manufacture of the Company's or its Subsidiaries' products and services, (g) issuances to the public pursuant to an effective Registration Statement and (h) issuances in connection with any dividend or distribution on shares of Preferred Stock of the Company, if any, if the Company or any of its Subsidiaries wishes to issue any equity securities or debt securities of the Company or such Subsidiary (collectively, "<u>New Securities</u>") to any Person (the "<u>Subject Purchaser</u>"), then the Company shall (or shall cause its applicable Subsidiary to) offer such New Securities to each of the Holders (other than Holders who receive Company Common Stock or Company Common Stock Equivalents under the Warrants, Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company) (each, a "<u>Preemptive Rightholder</u>", and collectively, the "<u>Preemptive Rightholders</u>") by sending written notice (the "<u>New Issuance Notice</u>") to the Preemptive Rightholders at least 15 Business Days prior to such issuance of New Securities, which New Issuance Notice shall state, in reasonable detail, the material terms and conditions of such issuance, including (x) the number of New Securities proposed to be issued and (y) the proposed purchase price per security of the New Securities (the "<u>Proposed Price</u>"). Upon delivery of the New Issuance Notice, such offer shall be irrevocable unless and until the rights provided for in <u>Section 8(b)</u> shall have been waived or shall have expired.

(b) <u>Exercise</u>.

(i) For a period of ten Business Days after the giving of the New Issuance Notice pursuant to <u>Section 8(a)</u>, each of the Preemptive Rightholders shall have the right, but not the obligation, to purchase its Proportionate Percentage (as hereinafter defined) of the New Securities, at a purchase price equal to the Proposed Price and upon the same terms and conditions set forth in the New Issuance Notice. Each such Preemptive Rightholder shall have the right to purchase that percentage of the New Securities determined by dividing (x) the total number of shares of Company Common Stock then owned by such Preemptive Rightholder exercising its rights under this <u>Section 8(b)</u> by (y) the total number of shares of Company

Common Stock owned by all of the Preemptive Rightholders exercising their rights under this Section 8(b) (the "Proportionate Percentage"). If any Preemptive Rightholder does not fully subscribe for the number or amount of New Securities that it or he is entitled to purchase pursuant to the preceding sentence, then each Preemptive Rightholder which elected to purchase New Securities shall have the right to purchase that percentage of the remaining New Securities not so subscribed for (for the purposes of this Section 8(b)(i), the "Excess New Securities") determined by dividing (x) the total number of shares of Company Common Stock then owned by such fully participating Preemptive Rightholder by (y) the total number of shares of Company Common Stock then owned by all fully participating Preemptive Rightholders who elected to purchase Excess New Securities.

(ii) The right of each Preemptive Rightholder to purchase the New Securities under subsection (a) above shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the ten Business Day period referred to in Section 8(b)(i) to the Company or its applicable Subsidiary, which notice shall state the amount of New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 8(b)(i). The failure of a Preemptive Rightholder to respond within such ten Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights under Section 8(b)(i), provided that each Preemptive Rightholder may waive its rights under Section 8(b)(i) prior to the expiration of such ten Business Day period by giving written notice to the Company or the applicable Subsidiary.

(c) Specified Issuance. Notwithstanding the requirements of Section 8(a), the Company or its applicable Subsidiary may proceed with an issuance of New Securities that would otherwise be subject to Section 8(a) prior to having complied with the provisions of Section 8(a) (such issuance, a "Specified Issuance") (but subject to the applicable approvals of the Board and the Holders in accordance with this Agreement); provided, that the Company shall (or shall cause its applicable Subsidiary to):

(i) provide to each Preemptive Rightholder as of the date of the Specified Issuance prompt written notice of such Specified Issuance;

(ii) within a reasonable period of time (but in any event not more than 15 Business Days following such Specified Issuance, offer, in writing, to issue to each Preemptive Rightholder its Proportionate Percentage of the New Securities, at the same price and on the same terms and conditions with respect to such New Securities as the proposed transferees received in such Specified Issuance; and

(iii) keep such offer open for a period of no less than ten Business Days, during which period, each Preemptive Rightholder may accept such offer by sending a written notice of exercise to the Company or its applicable Subsidiary committing to purchase in accordance with the procedures set forth in Section 8(b), an amount of such New Securities (not to exceed the amount specified in the offer made pursuant to Section 8(c)(ii);

provided, further, that (A) for all purposes under this Agreement, any issuance of New Securities to a Preemptive Rightholder pursuant to this Section 8(c) shall be deemed to have occurred on the date of the consummation of such Specified Issuance and (B) during the period commencing on the consummation of such Specified Issuance and ending on the earlier of (x) the consummation of the issuance of New Securities to a Preemptive Rightholder pursuant to this Section 8(c) and (y) the expiration of the ten Business Day period specified in clause (iii) above, the New Securities issued pursuant to this Section 8(c) shall not be taken into account in calculating the Proportionate Percentage of any Holder for any purposes under this Agreement

(d)    Closing.  The closing of the purchase of New Securities subscribed for by the Preemptive Rightholders under (i) Section 8(b) shall be held at the executive office of the Company at 11:00 a.m., local time, on (a) the 15th Business Day after the giving of the New Issuance Notice pursuant to Section 8(a), if the Preemptive Rightholders elect to purchase all of the New Securities under Section 8(b), or (b) the date of the closing of the sale to the Subject Purchaser made pursuant to Section 8(a) if the Preemptive Rightholders elect to purchase some, but not all, of the New Securities under Section 8(b), (ii) Section 8(c) shall be held at the executive office of the Company at 11:00 a.m., local time, on the 15th Business Day after the date of the offer specified under Section 8(c)(ii), or (iii) in relation to both (i) and (ii), at such other time and place as the parties to the transaction may reasonably agree.  At such closing, the Company shall (or shall cause its applicable Subsidiary to) deliver certificates (to the extent that the Company or its applicable Subsidiary has certificated shares) representing the New Securities to the participating Preemptive Rightholders, and such New Securities shall be issued free and clear of all liens (other than those arising hereunder or pursuant to applicable law and those attributable to actions by the purchasers thereof) and the Company shall (or shall cause its applicable Subsidiary to) so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Preemptive Rightholders and after payment therefor, duly authorized, validly issued, fully paid and non-assessable.  Each Preemptive Rightholder purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by him, her or it.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary to effectuate the closing.  Notwithstanding the foregoing, if the closing of a sale or issuance of New Securities is not consummated within a six-month period (plus such number of additional days (if any) necessary to allow the expiration or termination of all waiting periods under antitrust laws applicable to such sale) after the date upon which the New Issuance Notice is delivered or if the principal terms of such sale change such that the terms are, in the aggregate, less favorable in any material respect to the Preemptive Rightholders than those in the New Issuance Notice, then the restrictions provided for herein shall again become effective, and no issuance or sale of New Securities may be made thereafter by the Company or its applicable Subsidiary without again offering the same to the Preemptive Rightholders in accordance with this Section 8.  Notwithstanding any other provision of this Section 8, there shall be no liability on the part of the Company, any of its Subsidiaries or any Holder to any Preemptive Rightholder arising from the failure of the Company or its applicable Subsidiary to consummate the sale of New Securities for any reason.

9.    **Miscellaneous.**

(a)    Termination.  This Agreement (other than Sections 3(b) and 7 and their respective defined terms) shall terminate automatically upon the effectiveness of a QIPO.

(b)    Remedies.  In the event of a breach by the Company or a Holder of any of its obligations under this Agreement, the Company or the Holder, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Parties agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate and shall waive any requirement for the posting of a bond.  No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

NAI-1505727171v9

(c)     <u>Amendment; Modification; Waivers</u>.  This Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by the Company and Holders of a majority of the outstanding shares of the voting power of the Company's capital stock, provided that no amendment may adversely affect a Holder relative to other Holders without such Holder's consent.   Notwithstanding the foregoing, any amendment to or waiver of (i) <u>Section 5</u> shall require Necessary Approval, (ii) <u>Section 7</u> shall require the prior written consent of Holders of a majority of Registrable Securities and (iii) any provision of this Agreement applicable to a Nominating Stockholder shall require the prior written consent of such Nominating Stockholder.  Any amendment or waiver must specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s).

(d)     <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (i) upon delivery, if served by personal delivery upon the Person for whom it is intended, (ii) on the third Business Day after the date mailed if delivered by registered or certified mail, return receipt requested, postage prepaid, (iii) on the following Business Day if delivered by a nationally-recognized, overnight, air courier or (iv) when delivered or, if sent after the Close of Business, on the following Business Day if sent by facsimile transmission or email with electronic confirmation, in each case, to the address set forth on <u>Schedule I</u> (or if to the Company, to the address set forth on the Company's signature page hereto) or to such other address as may be designated in writing, in the same manner, by such Person.

(e)     <u>Governing Law; Forum</u>.  This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws.  Each of the Company and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "<u>Chosen Courts</u>").  In connection with any claim arising out of or related to this Agreement, each of the Company and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Company or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with <u>Section 9(d)</u>, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient.  Notwithstanding anything herein to the contrary, (i) nothing in this <u>Section 9(e)</u> shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and (ii) each of the Company and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

(f)     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors, legal representatives, permitted assigns and Approved Transferees.  The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the obligations of the Company under this Agreement or enter into a new agreement with the Holders on terms substantially the same as this Agreement as a condition of any such transaction.

NAI-1505727171v9

(g)     Waiver of Trial by Jury.  EACH OF THE COMPANY AND EACH HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT.   EACH OF THE COMPANY AND EACH HOLDER CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(h)     Severability.  The provisions of this Agreement shall be deemed severable.  The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; *provided*, *however*, that if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

(i)     Business Days.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

(j)     Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and supersedes any and all prior or contemporaneous discussions, agreements and understandings, whether oral or written, that may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

(k)     Execution of Agreement; Counterparts.  This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(l)     Determination of Ownership.  In determining ownership of Company Common Stock hereunder for any purpose, the Company may rely solely on the records of the transfer agent for the Company Common Stock from time to time, or, if no such transfer agent exists, the Company's stock ledger.

(m)     No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each Holder covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Company's or any Holder's former, current or future direct or indirect equity holders, controlling Persons, stockholders, directors, officers, employees, agents, Affiliates, members, financing sources, managers, general or limited partners or assignees (each, a "Non-Recourse Party" and collectively, the "Non-Recourse Parties"), in each case other than the Company, the Holders or any of their permitted assigns under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Non-Recourse Parties, as such, for any obligation or liability of the Company or the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 9(m) shall relieve or otherwise limit the liability of the Company or any Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(n)     Third-Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company and the Holders and their respective successors and permitted assigns any rights, benefits or remedies of any nature whatsoever.

(o)     Recapitalizations, Exchanges, etc.  The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the Company Common Stock, (ii) any and all securities into which shares of Company Common Stock are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Company and (iii) any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the Company Common Stock and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof.

(p)     Headings; Section References.     All heading references contained in this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,
SIGNATURE PAGES OF HOLDERS TO FOLLOW]*

NAI-1505727171v9

IN WITNESS WHEREOF, the Parties have executed this Stockholders Agreement as of the date first written above.

**[DB INVESTORS, INC.]**

By: _____

Name: _____

Title: _____

Address:

with a copy (which shall not constitute notice)
to: _____
_____
_____
_____
_____

# SCHEDULE I

# EXHIBIT A

## *Form of Joinder Agreement*

The undersigned hereby agrees, effective as of the date set forth below, to become a party to that certain Stockholders Agreement (as amended, restated and modified from time to time, the "Agreement"), dated as of **[_____ ___]**, 2019, by and among **[DB Investors, Inc.]**, a Delaware corporation (the "Company"), and the stockholders of the Company. The undersigned hereby agrees to be bound by all of the terms of the Agreement and shall hereafter be deemed to be, for all purposes of the Agreement, a party to the Agreement and a "Holder" (as defined in the Agreement). This Joinder Agreement and all disputes or controversies arising out of or relating to this Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. The address, facsimile number and email address to which notices may be sent to the undersigned are as follows:

Address:   _____
       _____
       _____
Facsimile No.: _____
Email:
Date:    _____

**[**If entity**]**

**[**ENTITY NAME**]**

By:_____
   Name:
   Title:

**[**If individual**]**

_____
Individual Name:

## Exhibit 6

### Form of the Warrant Agreement

Certain documents, or portions thereof, contained in this Exhibit 6 and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**WARRANT AGREEMENT**


**BETWEEN**


**DB INVESTORS, INC.**


**AND**


**[WARRANT AGENT]**


**DATED [●], 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................................. 1
    Section 1.1    Definition of Terms.................................................................... 1
    Section 1.2    Accounting Terms and Determinations ..................................... 5
    Section 1.3    Rules of Construction ............................................................... 5
    Section 1.4    Stockholders Agreement ........................................................... 6

ARTICLE II APPOINTMENT OF WARRANT AGENT ............................................... 6
    Section 2.1    Appointment .............................................................................. 6
    Section 2.2    Resignation or Removal of Warrant Agent ............................... 6

ARTICLE III WARRANTS ........................................................................................... 7
    Section 3.1    Issuance of Warrants................................................................. 7
    Section 3.2    Form of Warrant ....................................................................... 7
    Section 3.3    Execution of Warrant Certificates ............................................ 8
    Section 3.4    Registration and Countersignature........................................... 8
    Section 3.5    Withholding and Reporting Requirements ................................ 9

ARTICLE IV EXERCISE OF WARRANT ................................................................... 9
    Section 4.1    Term of Warrant; Method of Exercise....................................... 9
    Section 4.2    Fractional Shares..................................................................... 13
    Section 4.3    Expenses ................................................................................. 13
    Section 4.4    Reservation of Warrant Shares ...................... **Error! Bookmark not defined.**
    Section 4.5    Valid Issuance ........................................................................ 13

ARTICLE V ADJUSTMENT......................................................................................... 14
    Section 5.1    Adjustments Generally............................................................ 14
    Section 5.2    Stock Dividends, Splits and Combinations.............................. 14
    Section 5.3    Adjustment to the Number of Warrant Shares.......................... 16
    Section 5.4    Reorganization, Reclassifications or Recapitalization of the Company ......... 16
    Section 5.5    Liquidity Event ...................................................................... 17
    Section 5.6    Independent Financial Expert ................................................. 17
    Section 5.7    Notice to the Registered Holders ............................................ 19

ARTICLE VI TRANSFERS........................................................................................... 19
    Section 6.1    Ownership of Warrant............................................................. 19
    Section 6.2    Transfers ................................................................................. 19
    Section 6.3    Restrictions on Transfer.......................................................... 20
    Section 6.4    Obligations with Respect to Transfers and Exchanges of Warrants.............. 20

ARTICLE VII MISCELLANEOUS................................................................................ 21
    Section 7.1    Loss, Theft, Destruction or Mutilation of a Warrant Certificate .................. 21
    Section 7.2    Business Days ......................................................................... 21
    Section 7.3    Amendment; Modification; Waivers ....................................... 21
    Section 7.4    Notices ................................................................................... 21

i

Section 7.5    Third-Party Beneficiaries ................................................................................ 22
Section 7.6    Governing Law; Submission to Jurisdiction .................................................. 22
Section 7.7    Waiver of Trial by Jury ................................................................................. 22
Section 7.8    Assignment; Successors ................................................................................ 23
Section 7.9    Headings ........................................................................................................ 23
Section 7.10   Severability ................................................................................................... 23
Section 7.11   Specific Performance .................................................................................... 23
Section 7.12   Counterparts .................................................................................................. 23
Section 7.13   No Rights as Registered Holder .................................................................... 24
Section 7.14   Confidentiality .............................................................................................. 24

Exhibit A      Form of Warrant Certificate
Exhibit B      Form of Notice of Exercise (Direct Registration Warrants)
Exhibit C      Form of Assignment (Direct Registration Warrants)

NAI-1505848304v3

# WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this "<u>Agreement</u>"), dated as of [●], is by and among DB Investors, Inc., a Delaware corporation (the "<u>Company</u>") and [NAME OF WARRANT AGENT] (the "<u>Warrant Agent</u>").

**WHEREAS**, on [●], the Company and its affiliated debtors and debtors in possession filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the for the District of Delaware (the "<u>Bankruptcy Court</u>"), case number [●];

**WHEREAS**, on [●], the Company and its affiliated debtors and debtors in possession filed their Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as amended or supplemented from time to time, the "<u>Plan of Reorganization</u>");

**WHEREAS**, on [●], the Bankruptcy Court entered an order confirming the Plan of Reorganization, and the Company and its affiliated debtors and debtors in possession emerged from their chapter 11 cases on the date first written above (the "<u>Effective Date</u>");

**WHEREAS**, pursuant to the Plan of Reorganization, on or as soon as practicable after the Effective Date, the Company will issue or cause to be issued, warrants (the "<u>Warrants</u>") to acquire [●] shares of the common stock of the Company, par value $[●] per share ("<u>Common Stock</u>"), with each such Warrant being exercisable at the Warrant Exercise Price (as defined below);

**WHEREAS**, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants;

**WHEREAS**, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, call, exercise and cancellation of the Warrants; and

**WHEREAS**, all acts and things have been done and performed which are necessary to make the Warrants, when issued, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Definition of Terms</u>.  As used in this Agreement, the following capitalized terms shall have the following respective meanings:

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such specified Person.

"Board of Directors" means the Board of Directors of the Company.

"Business Day" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of Delaware are authorized or required by law or other governmental action to close.

"Close of Business" means 5:00 p.m. Eastern Time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and the policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Fair Market Value" means, as of the date of determination:

(a)     with respect to any security listed or admitted to trading on any Trading Market in which the average daily weighted trading volume for such security over the prior 30 consecutive Trading Days from the date of determination is at least US$1,000,000, an amount equal to its five-day volume weighted average as of such date;

(b)     with respect to any evidences of indebtedness or assumptions of liabilities or indebtedness other than as set forth in (a) above, an amount equal to the face value (plus accrued interest, whether paid or unpaid, if applicable) of any such evidences of indebtedness or assumptions of liabilities or indebtedness;

(c)     with respect to deposits and short-term money market instruments, an amount equal to its value at cost (together with accrued and unpaid interest) or market, depending on the type of investment; and

(d)     with respect to all other determinations, including pursuant to Section 4.1(b)(iii) and Section 5.2(b), an amount determined in accordance with Sections 5.6(b) and (d).

"GAAP" means the United States generally accepted accounting principles as in effect from time to time.

"Governmental Authority" means any federal, state or local governmental authority or agency or any instrumentality thereof.

"Independent Financial Expert" means an independent, nationally recognized investment banking, accounting or valuation firm appointed in accordance with Section 5.6(a).

"Liquidity Event" means:

(a)     a merger, consolidation, amalgamation or other similar transaction or series of related transactions to which the Company is a party and pursuant to which the holders of shares of Common Stock immediately prior to such transaction hold less than 50% of the shares of common stock of the surviving entity immediately following such transaction; or

(b)     any sale, transfer or other disposition in a single transaction or series of related transactions of all or substantially all of the Company's and its subsidiaries' assets in one transaction or a series of related transactions.

"Liquidity Event Proceeds" means that portion of the aggregate consideration (including all cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or assumptions of liabilities or indebtedness or other property) paid or payable to the Company and any holders of shares of Common Stock or other equity securities of the Company or their respective Affiliates, in connection with the Liquidity Event (after deducting expenses paid or payable by the Company in consummating such Liquidity Event). For purposes of the foregoing, the consideration paid or payable in the Liquidity Event shall include the cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or other property paid or payable to any holders of shares of Common Stock or other equity securities of the Company, or their respective Affiliates, as well as the amount of all indebtedness and other liabilities assumed by the purchasers or their Affiliates, in each case, in connection with the Liquidity Event, regardless of how such consideration is characterized in the definitive documents relating to such Liquidity Event (which consideration might include non-competition, consulting or other similar payments), but excluding any consideration received for employees' wages or for other bona fide services on no less favorable terms to the contracting third party than arm's length terms.

"Open of Business" means 9:00 a.m. Eastern Time.

"Person" means an individual, a trust, a corporation, a partnership, an association, a joint venture, a limited liability company, a joint stock company, an unincorporated organization and a Government Authority.

"Pro Rata Warrant Value" means an amount, expressed in U.S. dollars (rounded up to two decimal places), equal to (a) the Warrant Value of such Warrant multiplied by (b) the quotient of (x) the aggregate number of Warrant Shares issuable upon exercise of such Warrant and (y) the aggregate number of Warrant Shares issuable upon exercise of all Warrants issued and outstanding on such date.

"Registered Holder" means each Person in whose name Warrants are registered on the Warrant Register, including its successors and assigns.

"Representatives" of a Registered Holder means its partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its affiliates or wholly owned subsidiaries.

"Required Holders" means at any time Registered Holders of Warrants exercisable for a [majority][1] of the Warrant Shares issuable upon exercise of all Warrants then outstanding; provided that, for the avoidance of doubt, a Registered Holder may vote part of its holdings in favor of the matter presented for it, and part of its holdings against such matter, and such split voting shall be taken into account when determining whether the required majority threshold has been satisfied. For the avoidance of doubt, the "Required Holders" shall not include the Company or any of its controlled Affiliates.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated from time to time thereunder.

"Stockholders Agreement" means that certain Stockholders Agreement, dated as of the Effective Date, by and among the Company and the holders of shares of Common Stock party thereto.

"Termination Date" means the Close of Business on the fifth (5th) anniversary of the Effective Date.

"Total Warrant Shares" means, as of the Effective Date, [●] shares of Common Stock, subject to adjustment pursuant to Section 5.2(a) and (b).

"Trading Day" means a day on which the applicable security is traded on a Trading Market.

"Trading Market" means the following markets or exchanges on which the applicable security is listed or quoted for trading on the date in question: OTC Bulletin Board, OTCQX Market, The NYSE MKT, The NASDAQ Capital Market, The NASDAQ Global Market, The NASDAQ Global Select Market, the New York Stock Exchange, the Toronto Stock Exchange and the London Stock Exchange.

"Transfer" means any sale, assignment or other disposition of ownership interests in a Warrant. The terms "Transferred" and "Transferrable" shall have correlative meanings.

"Warrant Certificate" means individually, and "Warrant Certificates" means collectively, any warrant certificate issued in connection with the Warrants in the form attached as Exhibit A hereto, and all modifications, amendments, supplements, and replacements thereof.

"Warrant Exercise Price" [means an amount, in cash, equal to the quotient of the amount of $[_____] divided by a number equal to the Total Warrant Shares, rounded up to two decimal places.][2]

"Warrant Shares" means the shares of Common Stock issued upon the exercise of a Warrant.

---

[1]   Note to Draft: Subject to further discussion.

[2]   Note to Draft: Calculation subject to confirmation pending finalization of Priority Exit size.

NAI-1505848304v3

"<u>Warrant Value</u>" means, as of any date of determination, an amount, expressed in U.S. dollars (rounded up to two decimal places), equal to the fair market value of all of the Warrants outstanding as of such date, as determined in accordance with <u>Sections 5.6(c)</u> and <u>(d)</u>.

In addition, the following terms are defined in the Sections indicated:

| **Term** | **Section** |
| --- | --- |
| Agreement | Preamble |
| Appropriate Officer | 3.2 |
| Bankruptcy Court | Recitals |
| Cashless Notice Date | 4.1(b)(iii) |
| Certificated Warrant | 3.1 |
| Chosen Courts | 7.6 |
| Common Stock | Recitals |
| Company | Preamble |
| Confidential Information | 7.14(a) |
| Direct Registration Warrants | 3.1 |
| DTC | 4.1(c) |
| Effective Date | Recitals |
| Exercise Date | 4.1(c) |
| Holders Independent Financial Advisor | 5.6(b) |
| Notice Date | 5.6(a) |
| Notice of Exercise | 4.1(b)(i) |
| Plan of Reorganization | Recitals |
| Warrant Agent | Preamble |
| Warrant Exercise Documentation | 4.1(b)(ii) |
| Warrant Register | 3.4(c) |
| Warrant Share Delivery Date | 4.1(c) |
| Warrant Statements | 3.1 |
| Warrants | Recitals |

Section 1.2    <u>Accounting Terms and Determinations</u>.  Except as otherwise may be expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to any Registered Holder hereunder shall be prepared, in accordance with GAAP.  All calculations made for the purposes of determining compliance with the terms of this Agreement shall (except as otherwise may be expressly provided herein) be made by application of GAAP.

Section 1.3    <u>Rules of Construction</u>.  The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement.  The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  In the case of this Agreement, (a) the meanings

of defined terms are equally applicable to the singular and plural forms of the defined terms; (b) Annex, Exhibit, Schedule and Section references are to this Agreement unless otherwise specified; (c) the term "including" is not limiting and means "including but not limited to"; (d) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including"; (e) unless otherwise expressly provided in this Agreement, (i) references to agreements and other contractual instruments (or to specific provisions therein) shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of the Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation; (f) this Agreement may use several different limitations, tests or measurements to regulate the same or similar matters, all of which are cumulative and each shall be performed in accordance with its terms; and (g) this Agreement is the result of negotiations among and has been reviewed by counsel to the Company and the other parties hereto and is the product of all parties; accordingly, it shall not be construed against a Registered Holder merely because of such Registered Holder's involvement in its preparation.

Section 1.4    Stockholders Agreement.  Upon exercise of any Warrant or any issuance of Warrant Shares, the Registered Holder thereof will automatically be deemed to be a party to, and bound by the terms and provisions of, the Stockholders Agreement without further action or signature.

## ARTICLE II
## APPOINTMENT OF WARRANT AGENT

Section 2.1    Appointment.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.  The Company and the Warrant Agent have entered into a separate fee agreement and all of the costs and expenses of the Warrant Agent shall be paid by the Company.

Section 2.2    Resignation or Removal of Warrant Agent.

(a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company and the Registered Holders, which resignation shall only be effective upon the appointment of a successor Warrant Agent.  In the event of any such resignation of the Warrant Agent or successor thereto, the Company shall promptly give notice of such resignation to Registered Holders in accordance with Section 7.4.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by a Registered Holder, then the Required Holders may appoint a successor Warrant Agent.  The Company may,

NAI-1505848304v3

at any time and for any reason at no cost to the Registered Holders, remove the Warrant Agent and appoint a successor Warrant Agent by written instrument signed by the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.  Any successor Warrant Agent, whether appointed by the Company or the Required Holders, shall be a Person organized and existing under the laws of the United States of America, or any state thereunder, in good standing.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed.  In the event it becomes necessary or appropriate for any reason, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder, and, upon the request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing necessary to fully vest in and confirm to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b)     In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such Registered Holder's address appearing on the Warrant Register in accordance with Section 7.4.  Failure to give any notice provided for in this Section 2.2(b) or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

### ARTICLE III
### WARRANTS

Section 3.1     Issuance of Warrants.  The Warrants shall either be (x) represented by Warrant Certificates ("Certificated Warrant") or (y) issued by electronic entry registration on the books of the Warrant Agent ("Direct Registration Warrants") and shall be reflected on statements issued by the Warrant Agent from time to time to the holders thereof (the "Warrant Statements").

Section 3.2     Form of Warrant.  The Certificated Warrants, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A attached hereto.  The Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement or applicable law, and may have such letters, numbers or other marks of identification or designation and such legends, summaries, or endorsements placed thereon as may be required by the Warrant Agent or to comply with any law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange, or as may, consistently herewith, be determined by such officers as may be authorized and designated from time to time by the Company (each, an "Appropriate Officer") executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates, provided any such insertions, omissions, substitutions or variations shall be reasonably acceptable to the Warrant Agent; and

provided further, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent or the Registered Holders.

Section 3.3    Execution of Warrant Certificates.

(a)    The Warrant Certificates shall be signed on behalf of the Company by an Appropriate Officer.  Each such signature upon the Warrant Certificates may be in the form of an electronic signature of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the electronic signature of any Appropriate Officer.

(b)    If any Appropriate Officer who shall have signed any of the Warrant Certificates shall cease to be such Appropriate Officer before the Warrant Certificates so signed shall have been countersigned, either by manual or electronic signature, by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by any person who, on the date of the execution of such Warrant Certificate, is an Appropriate Officer.

(c)    A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

Section 3.4    Registration and Countersignature.

(a)    Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent (i) shall upon receipt of Warrant Certificates, duly executed on behalf of the Company, countersign, either by manual or electronic signature, such Warrant Certificates evidencing Warrants, and record such Warrant Certificates, including the Registered Holders thereof, in the Warrant Register, and (ii) shall register in the Warrant Register any Direct Registration Warrants in the names of the initial Registered Holders thereof.  Such written order of the Company shall specifically state the number of Warrants that are to be issued as Certificated Warrants or Direct Registration Warrants and the name of the Registered Holders thereof and the Warrant Agent may rely conclusively on such written order.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, the Company shall not instruct the Warrant Agent to register any Direct Registration Warrants unless and until the Warrant Agent shall notify the Company in writing that it has the capabilities to accommodate Direct Registration Warrants.

(b)    No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the manual or electronic signature of the Warrant Agent.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder.

(c)    The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable

regulations as it may prescribe, it shall register the Certificated Warrants or Direct Registration Warrants, and exchanges, cancellations and Transfers of outstanding Warrants in accordance with the procedures set forth in <u>Article VI</u> of this Agreement, all in a form satisfactory to the Company and the Warrant Agent. No service charge shall be made for any exchange or registration of Transfer of the Warrants but the Warrant Agent on behalf of the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

(d) Prior to due presentment for registration of Transfer or exchange of any Warrants in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the person in whose name such Warrants are registered upon the Warrant Register as the absolute owner of such Warrants, for all purposes, including for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or Transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

Section 3.5   <u>Withholding and Reporting Requirements</u>.  The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision to the contrary, the Company will be authorized to (i) take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) as a condition of receiving the benefit of any adjustment provided pursuant to <u>Article V</u>.

**ARTICLE IV**
**EXERCISE OF WARRANT**

Section 4.1   <u>Term of Warrant; Method of Exercise</u>.

(a) A Warrant may be exercised, in whole or in part, by the Registered Holder thereof at any time, and from time to time, during the period commencing on and after the date hereof and prior to the Close of Business on the Termination Date.

(b) Subject to the terms and conditions of the Warrants and this Agreement, the Registered Holder of any Warrants may exercise, in whole or in part, such Holder's right to acquire the Warrant Shares issuable upon exercise of such Warrants by:

NAI-1505848304v3

(i)  (A) in the case of Certificated Warrants, properly completing and duly executing the exercise form for the election to exercise such Warrants (including the exercise forms referred to in clause (B) below, a "Notice of Exercise") appearing on the reverse side of the Warrant Certificates and providing such Notice of Exercise to the Warrant Agent or (B) in the case of Direct Registration Warrants, providing a Notice of Exercise substantially in the form of Exhibit B hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent;

(ii)  paying the Warrant Exercise Price to the Company for the portion of such Warrant exercised in cash or by certified check or wire transfer for all Warrant Shares purchased pursuant to the such Notice of Exercise (such payment, together with the Warrant Certificate and such Notice of Exercise, the "Warrant Exercise Documentation"); and

(iii)  in the case of exercising on a "cashless basis", notifying the Company in accordance with Section 7.4 of such Registered Holder's intent to exercise on a "cashless basis" (the date on which such notice is delivered, the "Cashless Notice Date") and surrendering the Warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the excess of the Fair Market Value of the Common Stock over the Warrant Exercise Price by (y) the Fair Market Value of the Common Stock.

(A)  In the case of exercising on a "cashless basis" pursuant to Section 4.1(b)(iii) on the Termination Date or within 20 Business Days thereof, "Fair Market Value of the Common Stock" shall be determined (1) first, in the manner set forth in subsection (a) of the definition of Fair Market Value as set forth in Section 1.1 if the conditions to such subsection (a) are satisfied, and (2) if the conditions to subsection (a) of the definition of Fair Market Value as set forth in Section 1.1 are not satisfied, by mutual agreement of the Company and the Required Holders and (3) in the event the Company and the Required Holders are unable to agree upon such value within 10 Business Days following the Cashless Notice Date, by an Independent Financial Expert, selected in accordance with  Section 5.6(a), in accordance with Sections 5.6(b) and (d); provided that the Company shall notify the exercising Registered Holders of the selection of the Independent Financial Expert in accordance with Section 5.6(a) within 15 Business Days following the Cashless Notice Date; provided further that if the Fair Market Value of the Common Stock has been previously determined by an Independent Financial Expert pursuant to Sections 5.6(b) and (d) within a period beginning 18 months prior to the Cashless Notice Date and ending on the Cashless Notice Date, "Fair Market Value of the Common Stock" shall, in lieu of a new determination by an Independent Financial Expert pursuant to Sections 5.6(b) and (d) as provided herein, continue to mean such previously determined value unless and until the Board of Directors shall have determined in good faith that such value does not reasonably reflect the then-current value of the Common Stock; provided further that the Board of Directors shall periodically review the value of the Common Stock.

10

(B)     In the case of exercising on a "cashless basis" pursuant to Section 4.1(b)(iii) prior to the date that is 20 Business Days prior to the Termination Date, "Fair Market Value of the Common Stock" shall be determined (1) first, in the manner set forth in subsection (a) of the definition of Fair Market Value as set forth in Section 1.1 if the conditions to such subsection (a) are satisfied, and (2) if the conditions to subsection (a) of the definition of Fair Market Value as set forth in Section 1.1 are not satisfied, by mutual agreement of the Company and the exercising Registered Holder or (3) in the event the Company and the exercising Registered Holder are unable to agree upon such value within 10 Business Days following the Cashless Notice Date, by an Independent Financial Expert, selected in accordance with Section 5.6(a), in accordance with Sections 5.6(b) and (d); provided that, for purposes of this sub-clause (3), when applying Section 5.6(a), the Registered Holder exercising on a "cashless basis" shall be substituted for "the Registered Holders"; provided further that the Company shall notify the exercising Registered Holder of the selection of the Independent Financial Expert in accordance with Section 5.6(a) within 15 Business Days following the Cashless Notice Date; provided further that if the Fair Market Value of the Common Stock has been previously determined by an Independent Financial Expert pursuant to Sections 5.6(b) and (d) within a period beginning 18 months prior to the Cashless Notice Date and ending on the Cashless Notice Date, "Fair Market Value of the Common Stock" shall, in lieu of a new determination by an Independent Financial Expert pursuant to Sections 5.6(b) and (d), continue to mean such previously determined value unless and until the Board of Directors shall have determined in good faith that such value does not reasonably reflect the then-current value of the Common Stock; provided further that the Board of Directors shall periodically review the value of the Common Stock.  In connection with a determination of the "Fair Value of the Common Stock" by an Independent Financial Expert pursuant to sub-clause (3) above, the Company and the exercising Registered Holder shall each provide to the other an estimated fair market value of the Common Stock (the difference between the two estimates, the "Disputed Value") no later than the 11th Business Day following the Cashless Notice Date.  The fees, costs and expenses of the Independent Financial Expert selected pursuant to sub-clause (3) shall be allocated between the Company, on the one hand, and the exercising Registered Holder, on the other hand, based upon the percentage which the portion of the Disputed Value not awarded to each party bears to the amount actually contested by such party (and in the event Fair Market Value of the Common Stock is determined by the Independent Financial Expert to be (i) less than the Company's estimated fair market value or (ii) greater than the exercising Registered Holder's estimated fair market value, such fees costs and expenses shall be solely borne by the exercising Registered Holder or the Company, respectively).  For example, if the exercising Registered Holder estimates the fair market value of the Common Stock to be $1,000 greater than the estimate of the Company and if the Independent Financial Expert ultimately determines the Fair Market Value of the Common Stock to be $300 greater than the estimate of the Company, then the fees, costs and expenses of the Independent Financial Expert will be allocated 30% (i.e., 300 ÷ 1,000) to the Company and 70% (i.e., 700 ÷ 1,000) to the exercising Registered Holder.

11

For purposes of clarification, the Registered Holders are not required to exercise the Warrants to be entitled to the Pro Rata Warrant Value of the Warrants in connection with a Liquidity Event as provided for in Section 5.5(a).

(c)     As promptly as practicable, and in any event within five Business Days after receipt of all Warrant Exercise Documentation (the "Warrant Share Delivery Date"), the Company shall: (i) to the extent that the Warrant Agent is participating in The Depository Trust Company ("DTC") Fast Automated Securities Transfer Program (or any successor program) and the Warrants and Common Stock have been made eligible for DTC settlement, upon the request of the applicable Registered Holder, credit such aggregate number of Warrant Shares to which the applicable Registered Holder is entitled pursuant to such exercise to the Registered Holder's or its designee's balance account with DTC through its Deposit Withdrawal Agent Commission System (or any successor system), or (ii) if the Warrant Agent is not participating in the DTC Fast Automated Securities Transfer Program (or any successor program) or either the Warrants or Common Stock have not been made eligible for DTC settlement, deliver, or cause to be delivered, certificates representing the Warrant Shares (whether through its transfer agent or otherwise) to the applicable Registered Holder or its designee(s) at the address(es) specified by the applicable Registered Holder in the Notice of Exercise.  The Warrant Shares shall be issued free of all legends, unless, in the reasonable opinion of the Company the securities laws require a legend(s) to be affixed to the certificate(s) representing the Warrants Shares.  The Warrant Certificate shall be deemed to have been exercised, and the Warrant Shares shall be deemed to have been issued, and the applicable Registered Holder or its designee(s) shall be deemed to have become a holder of record of such Warrant Shares, on the first date on which all Warrant Exercise Documentation has been delivered to the Company, which date is referred to herein as, the "Exercise Date".

(d)     If a Warrant shall have been exercised in part, the Company shall, at the time of delivery of Warrant Shares (if the Warrant Agent is not participating the DTC Fast Automated Securities Transfer Program (or any successor program) or either the Warrants or Common Stock have not been made eligible for DTC settlement) or by the Warrant Share Delivery Date (if the Warrant Agent is participating the DTC Fast Automated Securities Transfer Program and the Warrants and Common Stock have been made eligible for DTC settlement), deliver to the Registered Holder a new Warrant Certificate (if such partially exercised Warrant was evidenced by a Warrant Certificate) evidencing the rights of the Registered Holder to purchase the unpurchased Warrant Shares underlying such Warrant, which new Warrant Certificate shall be dated as of the Effective Date and, in all other respects, be identical with the original Warrant Certificate.

(e)     Any exercise of a Warrant may be conditioned by the Registered Holder on any event or the consummation of any transaction, including any Liquidity Event. Any exercise so conditioned shall not be deemed to have occurred except concurrently with the consummation of such event or transaction, except that, for purposes of determining whether such exercise is timely, it shall be deemed to have occurred as of the date all Warrant Exercise Documentation was delivered to the Company.  The Registered Holder may rescind the exercise of this Warrant at any time prior to the consummation of such event or transaction by providing notice of such rescission to the Company at least three Business Days prior to such consummation.

NAI-1505848304v3

(f)     The Company will not close its shareholder books or records in any manner that prevents the timely exercise of a Warrant, pursuant to, and in accordance with, the terms of this Agreement except as required by law or regulation.

Section 4.2     Fractional Shares.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of any Warrants, and in any case where a Registered Holder would, except for the provisions of this Section 4.2, be entitled under the terms thereof to receive a fraction of a share upon the exercise of such Warrants, the Company shall, upon the exercise of such Warrants, issue or cause to be issued only the largest whole number of Warrant Shares issuable upon such exercise after a rounding of such fraction to the nearest share (up or down), with half shares or less being rounded down (and such fraction of a share will be disregarded, and the Registered Holder shall not have any rights or be entitled to any payment with respect to such fraction of a share); provided that the number of whole Warrant Shares which shall be issuable upon the contemporaneous exercise of any Warrants shall be computed on the basis of the aggregate number of Warrant Shares issuable upon exercise of all such Warrants.

Section 4.3     Expenses.  Except as set forth in Section 3.4(c) and Section 6.4(a), the Company shall pay all reasonable expenses and taxes (including all documentary, stamp, transfer, and other transactional taxes) other than income taxes, attributable to the preparation, issuance, transfer or delivery of this Agreement, the Warrants, and the Warrant Shares.

Section 4.4     Reservation of Warrant Shares.

(a)     The Company agrees that it shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance of Warrant Shares upon the exercise of the Warrants, a number of shares of Common Stock equal to the aggregate Warrant Shares issuable upon the exercise of all outstanding Warrants.  The Company shall take all such actions as may be reasonably necessary to assure that the issuance of all such shares of Common Stock will be duly authorized and that all such shares of Common Stock may be so issued without violating the Company's governing documents, any agreements to which the Company is a party, any requirements of any national securities exchange upon which shares of Common Stock may be listed or any applicable laws. The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of Warrant Shares required to be reserved hereunder for issuance upon exercise of the Warrants.

(b)     [The Company covenants that it will take such actions as may be reasonably necessary or appropriate in order that all Warrant Shares issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and non-assessable and free from any and all (i) security interests created by or imposed upon the Company and (ii) taxes, liens and charges with respect to the issuance thereof.  If at any time prior to the Termination Date the number and kind of authorized but unissued shares of the Company's capital stock shall not be sufficient to permit exercise in full of the Warrants, the Company will promptly take such corporate action as may, in the opinion of its counsel, be reasonably necessary (including seeking stockholder approval, if required, by convening a

special meeting of stockholders or obtaining written consent of stockholders) to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes. The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Shares to issue Warrant Shares upon the exercise of Warrants.][3]

Section 4.5 <u>Valid Issuance</u>. All Warrant Shares issued upon exercise of a Warrant will, upon payment of the Warrant Exercise Price and issuance by the Company, be duly authorized, validly and legally issued, fully paid, and nonassessable and free and clear of all taxes, liens, security interests, charges, and other encumbrances or restrictions with respect to the issuance thereof, other than those existing under applicable securities laws, and shall not take any action that could cause a contrary result.

# ARTICLE V
# ADJUSTMENT

Section 5.1 <u>Adjustments Generally</u>. In order to prevent dilution of the acquisition rights granted under the Warrants, the Total Warrant Shares (and as a result the number of Warrant Shares issuable upon exercise of a Warrant) shall be subject to adjustment from time to time solely as provided in this <u>Article V</u> (in each case, after taking into consideration any prior adjustments pursuant to this <u>Article V</u>).

Section 5.2 <u>Stock Dividends, Splits and Combinations</u>.

(a) If the Company at any time distributes shares of its Common Stock to holders of Common Stock in the form of a stock dividend, subdivides its outstanding shares of Common Stock into a greater number of shares of Common Stock or if the outstanding shares of Common Stock are combined into a smaller number of shares of Common Stock, the Total Warrant Shares shall be adjusted pursuant to the following formula:

$$W = W_0 \ x \ \frac{N_1}{N_0}$$

where:

$W$ = the as-adjusted number of Total Warrant Shares, rounded up to the nearest whole share, immediately following the Open of Business on the effective date for such distribution, subdivision or combination, as the case may be;

---

[3] <u>Note to Draft</u>: Subject to further discussion.

$W_0$ = the number of Total Warrant Shares as of the time immediately prior to the Open of Business on the effective date for such distribution, subdivision or combination, as the case may be;

$N_0$ = the number of shares of Common Stock outstanding immediately prior to the Open of Business on the effective date for such distribution, subdivision or combination, as the case may be (excluding, for the avoidance of doubt, any treasury shares and any shares of Common Stock underlying any other securities of the Company (including the Warrants) convertible into, or exchangeable or exercisable for, shares of Common Stock); and

$N_1$ = the number of shares of Common Stock outstanding immediately after the effectiveness of such distribution, subdivision or combination excluding, for the avoidance of doubt, any treasury shares and any shares of Common Stock underlying any other securities of the Company convertible into, or exchangeable or exercisable for, shares of Common Stock).

Such adjustment shall become effective immediately after the Open of Business on the effective date for such subdivision or combination. If any distribution, subdivision or combination of the type described in this Section 5.2(a) is declared or announced but not made, the number of Total Warrant Shares shall again be adjusted to the number of Total Warrant Shares that then would be in effect if such distribution, subdivision or combination had not been declared or announced, as the case may be.

(b)     A rights offering to holders of the Common Stock or other equity securities of the Company entitling such holders to purchase shares of Common Stock or other equity securities of the Company at a price less than the "Fair Market Value" shall be deemed a stock dividend of a number of shares of Common Stock or such other equity security offered equal to the product of (i) the number of shares of Common Stock or such other equity security actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for the Common Stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Common Stock or such other equity security paid in such rights offering divided by (y) the "Fair Market Value". For purposes of this Section 5.2(b), if the rights offering is for securities convertible into or exercisable for Common Stock or other equity securities of the Company, in determining the price payable, there shall be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion. For purposes of this Section 5.2(b), "Fair Market Value" shall be determined (1) first, in the manner set forth in subsection (a) of the definition of Fair Market Value as set forth in Section 1.1 if the conditions to such subsection (a) are satisfied, and (2) if the conditions to section (a) of the definition of Fair Market Value as set forth in Section 1.1 are not satisfied, by mutual agreement of the Company and the Required Holders and (3) in the event the Company and the Required Holders are unable to agree upon such value within 10 Business Days following notice to Registered Holders of such rights offering in accordance with Section 7.4, by an Independent Financial Expert, selected in accordance with Section 5.6(a), in accordance with Sections 5.6(b) and (d); provided that the Company shall

notify the Registered Holders of the selection of the Independent Financial Expert in accordance with Section 5.6(a) within 15 Business Days following the delivery of notice to Registered Holders of the applicable rights offering.

Section 5.3   Adjustment to the Number of Warrant Shares.  Concurrently with any adjustment to the number of Total Warrant Shares under Section 5.2(a) and (b), the number of Warrant Shares issuable upon the exercise of any Warrant also will be adjusted such that the number of Warrant Shares issuable upon the exercise of any Warrant immediately following the effectiveness of such adjustment, rounded to the nearest whole Warrant Share, will be equal to the number of Warrant Shares issuable upon the exercise of any Warrant immediately prior to such adjustment multiplied by a fraction, (a) the numerator of which is the Total Warrant Shares in effect immediately following such adjustment and (b) the denominator of which is the Total Warrant Shares in effect immediately prior to such adjustment. If the number of Warrant Shares are adjusted pursuant to this Section 5.3, the Company, within 5 Business Days of a Registered Holder surrendering a Warrant Certificate to the Company at its registered office, shall provide such Registered Holder with a new Warrant Certificate evidencing the rights of the Registered Holder to purchase the Warrant Shares then-underlying the Warrants represented by such Warrant Certificate (as adjusted in accordance with this Section 5.3), which new Warrant Certificate shall be dated as of the Effective Date and, in all other respects, be identical with the Warrant Certificate so surrendered.  Irrespective of any adjustments in accordance with this Section 5.3, Warrants theretofore or thereafter issued may continue to express the same number of Warrant Shares as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the number of Warrant Shares issuable upon exercise specified thereon shall be deemed to have been so adjusted.

Section 5.4   Reorganization, Reclassifications or Recapitalization of the Company.  Subject to Section 5.5, in the event of any (a) capital reorganization of the Company, (b) reclassification of the Common Stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or distribution or a subdivision, split-up or combination of shares), (c) consolidation or merger of the Company with or into another Person, or (d) other similar transaction, in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or other property, as of the date of determination with respect to or in exchange for Common Stock but is not a Liquidity Event, the Warrants shall, immediately after such reorganization, reclassification, consolidation, merger, sale or similar transaction, subject to Section 5.5, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then exercisable under the Warrants, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Registered Holders would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or similar transaction if the Registered Holders had exercised the Warrants in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or similar transaction and acquired the applicable number of Warrant Shares then issuable upon exercise of the Warrants as a result of such exercise (without taking into account any limitations or restrictions on the exercisability of the Warrants), and, in such case, appropriate adjustment (in form and substance satisfactory to the Required Holders) shall be made with respect to the Registered Holders' rights under the

16

Warrants to insure that the provisions of this Article V shall thereafter be applicable, as nearly as possible, to the Warrants in relation to any cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or other property thereafter acquirable upon exercise of the Warrants. The provisions of this Section 5.4 shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or similar transactions.

Section 5.5    Liquidity Event.

(a)    If, at any time after the Effective Date a Liquidity Event occurs, each Warrant outstanding immediately prior to the effectiveness of such Liquidity Event shall be terminated and cancelled and converted into the right to receive the Pro Rata Warrant Value for the Warrant Shares issuable upon exercise of such Warrant in full as of the effectiveness of such Liquidity Event.  Promptly following the effectiveness of such Liquidity Event, but in any event prior to or concurrently with any distribution to the holders of the Common Stock, the Company shall pay (or cause, or arrange for, the acquirer or surviving Person in such Liquidity Event or the holders of the Common Stock, to pay) to each Registered Holder of outstanding Warrants the Pro Rata Warrant Value of the Warrants held by such Registered Holder.

(b)    At least [10] Business Days prior to the effectiveness of a Liquidity Event, the Company shall notify each Registered Holder of such Liquidity Event, which notice shall include (i) a summary of the expected terms of such Liquidity Event and (ii) the Warrant Value and the Pro Rata Warrant Value of the Warrants held by such Registered Holder, as determined in accordance with Sections 5.6(c) and (d) after giving effect to the expected terms of such Liquidity Event.

(c)    The Company shall include provisions in the definitive documents entered into by the Company with respect to a Liquidity Event, which provide for (i) the conversion of the Warrants into the right to receive the Pro Rata Warrant Value as provided for in Section 5.5(a) and (ii) the allocation and payment of the Pro Rata Warrant Value to each of the Registered Holders based on the determination of the Warrant Value and the Fair Market Value of any assets or liabilities (other than evidences of indebtedness or assumptions of liabilities or indebtedness, securities listed or admitted to trading or deposits and short-term money market instruments) included as part of the Liquidity Event Proceeds in accordance with Section 5.6. The Company shall not distribute or permit any portion of the Liquidity Event Proceeds to be distributed to the holders of equity securities of the Company (including the Registered Holders) until the Liquidity Event Proceeds or Warrant Value (as applicable) resulting from such Liquidity Event are finally determined as provided for herein.  If the Liquidity Event Proceeds consist of items of consideration other than cash (or cash in part and other securities or other assets in part), the proportions of the Pro Rata Warrant Value that is payable to the Registered Holders in cash, other securities and other assets will be the same proportions as the Liquidity Event Proceeds that is payable to holders of Common Stock.

Section 5.6    Independent Financial Expert.

(a)    The Company shall select the Independent Financial Expert by delivering, or causing to be delivered, in accordance with Section 7.4 to each Registered Holder at its address as it shall appear upon the Warrant Register of the Company (the date on which

such notice is delivered, the "Notice Date"), a notice of such selected Independent Financial Expert.  If the Required Holders object to the selected Independent Financial Expert and deliver written notice of such objection to the Company in accordance with Section 7.4 within seven calendar days following the Notice Date, the Company and the Required Holders will jointly select the Independent Financial Expert within 10 calendar days following the Notice Date (it being acknowledged and agreed that the Company, on the one hand, and the Required Holders, on the other hand, shall use their respective reasonable efforts to negotiate in good faith to select an Independent Financial Expert during such period). If the Company and the Required Holders are unable to agree upon the selection of an Independent Financial Expert within such 10-day period, the Required Holders shall select promptly, but no later than 14 calendar days following the Notice Date, a separate Independent Financial Expert (the "Holders Independent Financial Advisor"), and such Independent Financial Expert and the Independent Financial Expert selected by the Company shall select promptly, but no later than 21 calendar days following the Notice Date, a third Independent Financial Expert, which will be the Independent Financial Expert for purposes of this Agreement. The fees, costs, expenses and disbursements of the Independent Financial Expert shall be paid by the Company; provided, that the Company shall be under no obligation to pay the fees, costs, expenses and disbursements of the Holders Independent Financial Advisor.

(b)       The Independent Financial Expert shall determine the Fair Market Value of (i) all assets or liabilities (other than evidences of indebtedness or assumptions of liabilities or indebtedness, securities listed or admitted to trading or deposits and short-term money market instruments), (ii) the Common Stock, in accordance with Section 4.1(b)(iii) and (iii) the equity securities of the Company in accordance with Section 5.2(b).  The Company will provide such information regarding the items to be valued as is reasonably requested by the Independent Financial Expert. The Registered Holders shall have 10 Business Days following appointment or selection, as the case may be, of the Independent Financial Advisor to provide to the Independent Financial Expert, with copy to the Company, such information regarding the items to be valued that such Registered Holders may possess.  The foregoing notwithstanding, the Company and the Required Holders may at any time agree upon the Fair Market Value of any item enumerated in clauses (i)-(iii) above, and such agreement shall, absent manifest error, be final and binding.

(c)       The Independent Financial Expert shall determine the Warrant Value using the Black-Scholes method for valuing options, subject to the following assumptions: [(i) the value of a share of Common Stock used in applying the model shall be determined by reference to the per share value of the consideration distributed or paid in or with respect to the Liquidity Event (assuming that all contingent consideration and the present value of all payments to be made over time are paid at the consummation of the Liquidity Event) plus, in the case of a Liquidity Event that does not include substantially all of the businesses and assets of the Company on the date of determination, the Fair Market Value of any businesses retained by the Company following the Liquidity Event][4], (ii) the maturity date used in applying the model, will be the Termination Date, (iii) the strike price used in applying the model will be the Warrant Exercise Price on the date of determination (after giving effect to any adjustments resulting from

---

[4] Note to Draft: Subject to further discussion.

such Liquidity Event) and (iv) [the assumed volatility used in applying the model shall be [•]].[5] The foregoing notwithstanding, the Company and the Required Holders may at any time agree upon the Warrant Value, and such agreement shall, absent manifest error, be final and binding.

(d)     The Independent Financial Expert shall be acting solely as a valuation professional, and not as an arbitrator. The determination of the Independent Financial Expert shall, absent manifest error, be final and binding with respect to the calculation of Fair Market Value and Warrant Value, and the fees and expenses of the Independent Financial Expert shall be borne solely by the Company.

Section 5.7     <u>Notice to the Registered Holders</u>.

(a)     In addition to any notice required by <u>Section 5.5(b)</u>, the Company shall give prompt written notice to Registered Holders and the Warrant Agent, if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(i)     the occurrence of any event that would result in any adjustment to the Total Warrant Shares, Warrant Shares or Warrant Exercise Price under <u>Article V</u>, setting forth in reasonable detail the method of calculation of each such amount; and

(ii)     the occurrence of an event that requires the Independent Financial Expert to determine the Fair Market Value of any assets or liabilities in accordance with <u>Section 5.5(b)</u>;

(b)     The Company shall, upon the written request of a Registered Holder furnish or cause to be furnished to such Registered Holder a certificate setting forth (i) the number of Total Warrant Shares at the time in effect (as Total Warrant Shares may have been adjusted from time to time), (ii) the Warrant Exercise Price at the time in effect and (iii) the number of Warrant Shares or other property that at the time would be received upon exercise of a Warrant.

**ARTICLE VI**
**TRANSFERS**

Section 6.1     <u>Ownership of Warrant</u>. The Company may deem and treat the Person in whose name a Warrant is registered as the Registered Holder and owner thereof until provided with notice by such Person to the contrary.

Section 6.2     <u>Transfers</u>. When Certificated Warrants or Direct Registration Warrants are presented to the Warrant Agent with a written request:

(a)     to register the Transfer of such Certificated Warrants or Direct Registration Warrants; or

---

[5] <u>Note to Draft</u>: Subject to further discussion.

(b)　　　to exchange such Certificated Warrants or Direct Registration Warrants for an equal number of Certificated Warrants or Direct Registration Warrants, respectively, of other authorized denominations,

the Warrant Agent shall register the Transfer or make the exchange, and in the case of Certificated Warrants shall issue such new Warrant Certificates, as requested if its customary requirements for such transactions are met, provided, that the Warrant Agent shall have received (i) a written instruction of Transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing, (ii) a written certification by the Transferee that it (A) is not directly engaged in any business that is competitive with the Company or (B) if it owns (directly or through Affiliates) more than 10% of any business that is competitive with the Company, it has implemented internal controls to prevent the sharing of the confidential information within the organization, (iii) a written order of the Company signed by an Appropriate Officer authorizing such exchange and (iv) in the case of Certificated Warrants, surrender of the Warrant Certificate or Warrant Certificates representing same duly endorsed for Transfer or exchange, and the Warrant Agent on behalf of the Company shall have received any amount owing pursuant to Section 3.4(c) or Section 6.4(a).

Section 6.3　　　Restrictions on Transfer.  The Warrants shall be freely transferable; provided, however, no Warrants or Warrant Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws and no Warrant may be transferred to any Person that the Board of Directors determines is a competitor of the Company.

Section 6.4　　　Obligations with Respect to Transfers and Exchanges of Warrants.

(a)　　　All Certificated Warrants or Direct Registration Warrants issued upon any registration of Transfer or exchange of Certificated Warrants or Direct Registration Warrants, respectively, shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Certificated Warrants or Direct Registration Warrants surrendered upon such registration of Transfer or exchange.  No service charge shall be made to a Registered Holder for any registration, Transfer or exchange of any Certificated Warrants or Direct Registration Warrants, but the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Registered Holder in connection with any such exchange or registration of Transfer.  The Warrant Agent shall forward any such sum collected by it to the Company or to such persons as the Company shall specify by written notice.  The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

(b)　　　Subject to Section 6.3 and this Section 6.4, the Warrant Agent shall,

(i)　　　in the case of Certificated Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Certificated Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of the Warrant Certificate representing such Certificated Warrants, properly completed and

20

duly endorsed for Transfer, by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, and upon any such registration of Transfer, a new Warrant Certificate shall be issued to the transferee; and

(ii)     in the case of Direct Registration Warrants, upon receipt of all information required to be delivered hereunder register the Transfer of any outstanding Direct Registration Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of a form of assignment substantially in the form of Exhibit C hereto, properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, and upon any such registration of Transfer, new Direct Registration Warrants shall be issued to the transferee.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1     Loss, Theft, Destruction or Mutilation of a Warrant Certificate. The Company covenants that upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of a Warrant Certificate, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which shall not include the posting of any bond), and upon surrender and cancellation of such Warrant Certificate, if mutilated, the Company will make and deliver a new Warrant Certificate of like tenor and dated as of such cancellation, in lieu of such Warrant Certificate.

Section 7.2     Business Days. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

Section 7.3     Amendment; Modification; Waivers. [A provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by the Company and the Required Holders, which writing shall specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s). No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.] [6]

Section 7.4     Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) if served by personal delivery upon the Person for whom it is intended, (b) if delivered by registered or certified mail, return receipt requested, postage prepaid, (c) if delivered by a nationally-recognized, overnight, air courier or (d) if sent by facsimile transmission or email with electronic confirmation, in each case, to the address set forth on the signature pages hereto opposite the signature block of the Person to receive such

---

[6] Note to Draft: Subject to further discussion.

NAI-1505848304v3

notice (which, in the Registered Holder's case, shall be the address for the Registered Holder included in the Warrant Register) or to such other address as may be designated in writing, in the same manner, by such Person (provided that the Company shall update the Warrant Register to reflect any change in the Registered Holder's contact information made pursuant to this Section 7.4).

Section 7.5    Third-Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company and the Registered Holders and their respective successors and permitted assigns any rights, benefits or remedies of any nature whatsoever.

Section 7.6    Governing Law; Submission to Jurisdiction.  This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principals of conflicts of laws of any jurisdiction that would cause application of the laws of a jurisdiction other than Delaware.  Each of the Company and each Registered Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts"), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Company or the Registered Holder, (d) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 7.4 of this Agreement, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (e) agrees not to seek a transfer of venue on the basis that another forum is more convenient. Notwithstanding anything herein to the contrary, (i) nothing in this Section 7.6 shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and (ii) each of the Company and each Registered Holder agrees that the Company or any Registered Holder may seek to record, register or enforce any judgment issued by a Chosen Court in any jurisdiction in the world and before or with any court, tribunal or other government or judicial body  and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction or body.

Section 7.7    Waiver of Trial by Jury.  EACH OF THE COMPANY AND EACH REGISTERED HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS WARRANT OR IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH OF THE COMPANY AND EACH REGISTERED HOLDER CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF

LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (d) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND EACH ANCILLARY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.8    Assignment; Successors.  Subject to applicable securities laws, this Agreement and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors of the Company and the successors of each Registered Holder.  The provisions of this Agreement are intended to be for the benefit of all Registered Holders of the Warrants from time to time and shall be enforceable by any such Registered Holder or holder of Warrant Shares.

Section 7.9    Headings.  All heading references contained in this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

Section 7.10    Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; provided, that, if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

Section 7.11    Specific Performance.  Each of the Company and the Registered Holders hereby acknowledges and agrees that its respective failure to perform its agreements and covenants hereunder will cause irreparable injury to the other party or parties hereto for which damages, even if available, will not be an adequate remedy.  Accordingly, each of the Company and the Registered Holders hereby consents to the issuance of injunctive relief by the Chosen Courts to compel performance of their respective obligations and to the granting by the Chosen Courts of the remedy of specific performance of their respective obligations hereunder and waives the necessity of posting of a bond as a condition to the granting of specific performance.

Section 7.12    Counterparts.  This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement

by telecopy or by electronic delivery in Adobe Portable Document Format will be effective as delivery of a manually executed counterpart of this Agreement.

Section 7.13    No Rights as Registered Holder.  The Warrants do not entitle the Registered Holders to any voting rights or other rights as holder of Common Stock of the Company prior to the date of exercise hereof.

Section 7.14    Confidentiality.

(a)    Each Registered Holder acknowledges that any notices or information furnished pursuant to this Agreement (the "Confidential Information") is confidential and competitively sensitive.  Each Registered Holder shall use, and shall cause any Person to whom Confidential Information is disclosed pursuant to clause (i) below to use, the Confidential Information only in connection with its investment in the Warrants or Warrant Shares and not for any other purpose (including to disadvantage competitively the Company or any other Registered Holder).  Each Registered Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(i)    to the Registered Holder's Representatives in the normal course of the performance of their duties for such Registered Holder (it being understood that such Representatives shall be informed by the Registered Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 7.14);

(ii)    to the extent requested or required by applicable law, rule or regulation; provided, that the Registered Holder shall give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Registered Holder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall seek, at the expense of the Company, an order or other reliable assurance that confidential treatment will be accorded to such information);

(iii)    to any Person to whom the Registered Holder is contemplating a transfer of its Warrants permitted in accordance with the terms hereof; provided, that such Person is not prohibited from receiving such information pursuant to Article VI and, prior to such disclosure, such potential transferee is advised of the confidential nature of such information and agrees in a writing to be bound by the confidentiality and use provisions hereof (which shall be deemed to permit, in the case of a potential transferee, to evaluate its potential investment in the Warrants);

(iv)    to any regulatory authority or rating agency to which the Registered Holder or any of its affiliates is subject or with which it has regular dealings, as long as such authority or agency is advised of the confidential nature of such information;

(v)    in connection with the Registered Holder's or the Registered Holder's affiliates' normal fund raising, marketing, informational or reporting

activities or to any bona fide prospective purchaser of the equity or assets of the Registered Holder or the Registered Holder's affiliates, or prospective merger partner of the Registered Holder or the Registered Holder's affiliates; <u>provided,</u> that prior to such disclosure the Persons to whom such information is disclosed are advised of the confidential nature of such information and agree in a writing to be bound by the confidentiality and use provisions hereof; or

(vi)    if the prior written consent of the Company shall have been obtained.

(b)    Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or the Registered Holder.  The restrictions contained in this <u>Section 7.14</u> shall terminate one (1) year following the date on which the Registered Holder ceases to own any Warrants.

(c)    Confidential Information does not include information that: (i) is or becomes generally available to the public (including as a result of any information filed or submitted by the Company with the Securities and Exchange Commission) other than as a result of a disclosure by the Registered Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (ii) is or was available to the Registered Holder or its Representatives on a non-confidential basis prior to its disclosure to the Registered Holder or its Representatives by the Company, or (iii) was or becomes available to the Registered Holder or its Representatives on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of the Registered Holder's or its Representative's knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person.

*[Signature Page Follows]*

NAI-1505848304v3

IN WITNESS WHEREOF, the Company has caused this Warrant Agreement to be executed by its officer thereunto duly authorized.

DB INVESTORS, INC.                          Address for Notices:


By: _____
    Name:
    Title:


[WARRANT AGENT]                          Address for Notices:


By: _____
    Name:
    Title:

FACE OF WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., EASTERN TIME, ON [   ], 2024

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [   ], 2019, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

Certificate Number _____     Warrants _____

CUSIP   [ ]

This certifies that

is the holder of

WARRANTS TO ACQUIRE COMMON STOCK OF

DB INVESTORS, INC.

transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed. Each Warrant entitles the holder and its registered assigns (collectively, the "Registered Holder") to acquire from DB Investors, Inc., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., Eastern Time, on [   ], 2024, for each Warrant the number of fully paid and non-assessable share of Common Stock of the Company set forth above at the per share Warrant Exercise Price (as defined in the Warrant Agreement) as of the applicable Exercise Date (each as defined in the Warrant Agreement). The number and kind of shares purchasable hereunder and the Warrant Exercise Price are subject to adjustment from time to time as provided in the Warrant Agreement.

This certificate is not valid unless countersigned and registered by the Warrant Agent.

**WITNESS** the seal of the Corporation and the signatures of its duly authorized officers.

DATED

_____

Authorized Officer

Attest:                                    [Corporate seal]     COUNTERSIGNED AND REGISTERED
                                                                [●],
                                                                WARRANT AGENT.
_____

_____                                     By _____

Secretary                                                          AUTHORIZED SIGNATURE

REVERSE OF WARRANT CERTIFICATE

**EXHIBIT C**

**DB INVESTORS, INC.**

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of [●] Warrants, with each such Warrant exercisable for the number of shares of Common Stock of the Company as provided for in the Warrant Agreement), issued pursuant to the Warrant Agreement, as dated [    ], 2019 (the "Warrant Agreement"), by and among DB Investors, Inc. (the "Company"), and [●] (the "Warrant Agent"). A copy of the Warrant Agreement may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used in this Warrant Certificate that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock. No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws. The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

---

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations.

| | |
|---|---|
| Ten COM – as tenants in common | UNIF GIFT MIN ACT - _____ Custodian _____ |
| | (Cust)                    (Minor) |
| TEN ENT – as tenants by the entireties | under Uniform Gifts to Minor Act _____ (State) |
| JT TEN – as joint tenants with right of survivorship and not as tenants in common | UNIF GIFT MIN ACT - _____ Custodian (until age) _____ (Cust) |
| | _____ under Uniform Transfers to Minors Act |
| | (Minor)                 (State) |

---

## FORM OF ASSIGNMENT

For value received, _____ hereby sells, assigns and transfers the Warrants to acquire shares of DB Investors, Inc. <span style="font-size:smaller">Social Security or Other Taxpayer Identification Number</span> represented by this Warrant Certificate to:

_____
Print name and address

and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrants on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

Dated: _____ , 20__       Signature: _____

                                          Name: _____

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

## EXERCISE FORM

The undersigned Registered Holder of this Warrant Certificate hereby irrevocably elects to exercise the number of Warrants indicated below:

Number of Warrants: _____

Number of Warrants Exercised _____

(Total number of Warrants being exercised – may be expressed as a percentage)

The undersigned requests that the Warrant Shares be issued in the name of the undersigned Registered Holder or as otherwise indicated below:

Name _____

Social Security or Other Taxpayer Identification Number

Address _____

_____

If such Warrants shall not constitute all of the Warrants represented hereby, the undersigned requests that a new Warrant Certificate of like tenor and date for the balance of the Warrants represented hereby be issued and delivered in the name of the undersigned Holder or as otherwise indicated as follows:

Name _____

Social Security or Other Taxpayer Identification Number

Address _____

_____

Dated: _____ , 20__

Signature: _____

Name: _____

In addition, this form is accompanied by the transferee certification required by Section 6.2.

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

**EXERCISE FORM FOR REGISTERED HOLDERS
OF DIRECT REGISTRATION WARRANTS**
(To be executed upon exercise of Warrants)

NOTE: THIS NOTICE OF EXERCISE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON [   ], 2024.

The undersigned Registered Holder, being the holder of Direct Registration Warrants of DB Investors, Inc., issued pursuant to that certain Warrant Agreement, as dated [●], 2019 (the "Warrant Agreement"), by and among DB Investors, Inc. (the "Company"), and [●] (the "Warrant Agent"), hereby irrevocably elects to exercise the number of Direct Registration Warrants indicated below, to acquire the number of shares of Common Stock indicated below. All capitalized terms used in this Exercise Form that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

Number of Warrants:  _____

Number of Warrants Exercised  _____

(Total number of Warrants being exercised – may be expressed as a percentage)

The undersigned requests that the Warrant Shares be issued in the name of the undersigned Registered Holder or as otherwise indicated below:

Name  _____

Address  _____

_____

Social Security or Other Taxpayer Identification Number

_____

If said number of Warrant Shares shall not be all the Warrant Shares issuable upon exercise of the Warrant, the undersigned requests that a new Warrant representing the balance of such Warrant shall be issued in the name of the undersigned Registered Holder or as otherwise indicated below and that a Warrant Statement reflecting such balance be delivered to the address indicated below:

Name  _____

Address  _____

_____

Social Security or Other Taxpayer Identification Number

_____

Dated: _____ , 20__

Signature:  _____

Name:  _____

In addition, this form is accompanied by the transferee certification required by Section 6.2 of the Warrant Agreement.

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

EXHIBIT C

FORM OF ASSIGNMENT

FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed only upon assignment of Warrants)

For value received, the undersigned Registered Holder of Direct Registration Warrants issued pursuant to that certain Warrant Agreement, as dated [  ], 2019, by and among DB Investors, Inc. (the "Company"), and [●] (the "Warrant Agent"), hereby sells, assigns and transfers unto the Assignee(s) named below the number of Direct Registration Warrants listed opposite the respective name(s) of the Assignee(s) named below, and all other rights of the Registered Holder under said Direct Registration Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Direct Registration Warrants, as and to the extent set forth below, on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

| **Name(s) of Assignee(s)** | **Address of Assignee(s)** | **Number of Warrants** |
|---|---|---|
| | | |

Dated: _____ , 20__         Signature: _____

                                        Name: _____

Note: The above signature and name should correspond exactly with the name of the Registered Holder of the Direct Registration Warrants as it appears on the Warrant Register.